# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

GORDON J. COBURN and
STEVEN SCHWARTZ,

Defendants.

Crim. No. 19-120 (KM)

Hon. Kevin McNulty

**Confidential – Submitted Under Seal**

## BRIEF IN SUPPORT OF DEFENDANTS' JOINT MOTION TO COMPEL COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION'S COMPLIANCE WITH RULE 17(C) SUBPOENAS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iv

PRELIMINARY STATEMENT ................................................................................... 1

RELEVANT BACKGROUND AND PROCEDURAL HISTORY .............................. 3

    I.      FACTUAL BACKGROUND ................................................................. 3

        A.    Cognizant Initiates Its Investigation. .........................................4

        B.    Schwartz and Coburn Interviews, Under Threat of Termination. ...............5

        C.    Cognizant Self-Discloses to the Government, Coordinating Its Investigation with the Government. ...............................................6

        D.    While Coordinating with the Government, Cognizant Interviews Schwartz Again and Plans To Interview Coburn Again. ............................8

        E.    Cognizant's Continued Coordination with the Government. ...................10

        F.    Cognizant Provides the Government with a Roadmap for Its Investigation. ...............................................................12

        G.    Cognizant's Cooperation with the Government Through Declination and Defendants' Indictment, and Beyond. ...........................13

    II.     PROCEDURAL HISTORY .................................................................. 14

        A.    The Government Refuses to Produce Records of Its Coordination with Cognizant and Invites Defendants to Seek Records Through Rule 17 Subpoenas to Cognizant. ...............................................14

        B.    The Government Intervenes in an Attempt to Prevent the Issuance of the Subpoenas to Cognizant. ................................................15

        C.    The Court Amends and Issues Rule 17 Subpoenas to Cognizant, Then Rejects the Government's Attempt to Narrow the Subpoenas. ........16

        D.    Cognizant Narrows the Scope of the Subpoenas, Withholds Responsive Non-Privileged Documents, and Produces a Deficient Privilege Log. ...................................................................18

            1.    Specific Categories of Records in Dispute ................................... 19

            2.    Cognizant's Deficient Privilege Log ............................................ 20

LEGAL ARGUMENT ............................................................................................ 21

I.      COGNIZANT SHOULD BE COMPELLED TO PRODUCE
DOCUMENTS RESPONSIVE TO THE PLAIN LANGUAGE OF THE
SUBPOENAS AND THE COURT'S SEPTEMBER 14 AND
SEPTEMBER 29 ORDERS ................................................................... 23

      A.     Cognizant Improperly Narrowed the Court-Authorized Subpoenas
and Orders. ............................................................................... 23

      B.     Cognizant's Full Compliance with the Subpoenas Is Critical for the
Forthcoming Motion Practice Concerning Outsourcing. .......................... 25

      C.     The Narrow Date Range Used By Cognizant Is Inconsistent with
the Terms of the Subpoenas and the Orders of the Court. ........................ 37

            1.     The Court-Approved Subpoena Requests on Their Face
Extend Beyond Cognizant's Narrow Date Range. ...................... 37

            2.     Cognizant's Search Should Extend Back to April 2016,
When the Investigation Commenced. ............................................ 38

            3.     Cognizant's Search Should Extend Beyond October 24,
2016, Through At Least February 14, 2019, the Date of the
Indictment. ................................................................................. 41

      D.     Cognizant Should Be Compelled to Search the Files of Additional
Custodians. ............................................................................... 46

            1.     The Defendants. ............................................................. 46

            2.     Additional Cognizant Custodians: Robert Molina, Henry
Shiembob, and Maureen Breakiron-Evans. .................................. 47

            3.     Cognizant's Accounting Firms. ................................................... 49

      E.     Cognizant Should Be Compelled to Expand Its Search to Include
Essential Search Terms Omitted from Those Cognizant Self-
Selected. ................................................................................... 51

      F.     Cognizant Should Be Compelled to Search for and Produce
Communications as Defined in the Subpoena, and Thus Not Limit
Its Search to Only Email Communications. ............................................ 52

II.     COGNIZANT SHOULD BE COMPELLED TO PRODUCE THE
RESPONSIVE DOCUMENTS IT WITHHELD OR REDACTED ON
THE BASIS OF ERRONEOUS PRIVILEGE AND WORK PRODUCT
ASSERTIONS. ...................................................................................... 54

A. Cognizant Has Thwarted Defendants' Ability to Fairly Evaluate its Privilege and Work Product Assertions. ................................................... 59

B. Cognizant Has Improperly Asserted Privilege or Work Product Protection Over Vast Categories of Responsive Documents. .................... 61

    1. Cognizant Has Improperly Withheld or Redacted Documents Containing Facts and Material Unrelated to the Provision of Legal Advice. ........................................................... 63

    2. Cognizant Has Effected a Broad Subject Matter Waiver Through Extensive and Deliberate Prior Disclosures to the Government. ................................................................................... 64

        a. Cognizant Effected Subject Matter Waiver Over Any Privilege Asserted With Regard to the Conduct Alleged in the Indictment by Sharing With the Government Facts Relating to Precisely That Conduct. ........................................................................... 66

        b. Cognizant Effected Subject Matter Waiver over Its Internal Investigation by Providing Detailed Oral Downloads to the Government. ........................................ 68

        c. ████████████████████████████. ............................ 72

    3. Cognizant's Privilege and Work Product Assertions over Communications with Third-Party Accounting and Public Relations Firms Should Be Rejected. ........................................... 76

C. Defendants' Constitutional Right to the Responsive Materials Outweighs Cognizant's Privilege and Work Product Claims. ................... 78

    1. Defendants' Sixth Amendment Right to Present a Complete Defense Trumps Cognizant's Attorney-Client Privilege Assertions. ................................................................................... 80

    2. Defendants' Substantial Need for These Materials Overcomes Any Work Product Protection. .................................. 81

CONCLUSION ...................................................................................................... 82

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*,
  No. 07-md-01871, 2009 WL 4641707 (E.D. Pa. Dec. 7, 2009) ............................................63

*Bailey Indus., Inc. v. CLJP, Inc.*,
  270 F.R.D. 662 (N.D. Fla. 2010) ...........................................................................................52

*In re Banc of Ca. Sec. Litig.*,
  No. SA CV 17-00118-AG, 2018 WL 2373860 (C.D. Cal. May 23, 2018) ............................69

*Berger v. United States*,
  295 U.S. 78 (1935) ................................................................................................................36

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ..............................................................................................................26

*Bowman Dairy Co. v. United States*,
  341 U.S. 214 (1951) ..............................................................................................................21

*Boyington v. Percheron Field Servs., LLC*,
  No. 3:14-CV-90, 2016 WL 6068813 (W.D. Pa. Oct. 14, 2016) ...........................................64

*Brady v. Maryland*,
  373 U.S. 83 (1963) ....................................................................................................... *passim*

*California v. Trombetta*,
  467 U.S. 479 (1984) ..............................................................................................................32

*Chabot v. Walgreens Boots All., Inc.*,
  No. 1:18-CV-2118, 2020 WL 3410638 (M.D. Pa. June 11, 2020) ...................................63, 64

*Cooper v. U.S. Postal Serv.*,
  577 F.3d 479 (2d Cir. 2009) ..................................................................................................26

*Cottillion v. United Ref. Co.*,
  279 F.R.D. 290 (W.D. Pa. 2011) ...........................................................................................77

*Crane v. Kentucky*,
  476 U.S. 683 (1986) ..........................................................................................................12, 78

*In re eBay Seller Antitrust Litig.*,
  No. C 07-01882 JF (RS), 2007 WL 2852364 (N.D. Cal. Oct. 2, 2007) ................................64

*Fabrikant v. French*,
    691 F.3d 193 (2d Cir. 2012)................................................................................26

*Favors v. Cuomo*,
    285 F.R.D. 187 (E.D.N.Y. 2012) .......................................................................60

*Flatow v. The Islamic Republic of Iran*,
    196 F.R.D. 203 (D.D.C. 2000), *aff'd*, 305 F.3d 1249 (D.C. Cir. 2002)................................23

*Garrity v. New Jersey*,
    385 U.S. 493 (1967)..........................................................................27, 31, 36

*Glennon v. Wing Enterprises, Inc.*,
    No. 10-0324 (JAP), 2010 WL 4782773 (D.N.J. Nov. 17, 2010)............................................61

*In re Grand Jury Investigation*,
    599 F.2d 1224 (3d Cir. 1979)...........................................................................61

*Gruss v. Zwirn*,
    No. 09 Civ. 6441-(PGG)(MHD), 2013 WL 3481350 (S.D.N.Y. July 10, 2013) ...................65

*Herbert v. Lando*,
    441 U.S. 153 (1979)....................................................................................78

*Hickman v. Taylor*,
    329 U.S. 495 (1947)....................................................................................62

*Holloway v. Wells Fargo Bank, N.A.*,
    No. 12-cv-2184, 2013 WL 6912690 (N.D. Tex. Dec. 30, 2013) ...........................................73

*Hologram USA, Inc. v. Pulse Evolution Corp.*,
    No. 14-cv-772, 2016 WL 3654285 (D. Nev. July 5, 2016) ...............................................73

*Horvath v. Westport Library Ass'n*,
    362 F.3d 147 (2d Cir. 2004)............................................................................26

*Hostetler v. Dillard*,
    No. 3:13-CV-351-DCB-MTP, 2014 WL 6871262 (S.D. Miss. Dec. 3, 2014) .......................73

*In re Hum. Tissue Prods. Liab. Litig.*,
    255 F.R.D. 151 (D.N.J. 2008), *aff'd*, No. CIV. 06-135, 2009 WL 1097671
    (D.N.J. Apr. 23, 2009) ...........................................................................60, 67

*Impounded*, 277 F.3d 407 (3d Cir. 2002)................................................................22, 45

*Ingersoll-Rand Co. v. Barnett*,
    No. 05-1636 (DRD), 2007 WL 203944 (D.N.J. Jan. 24, 2017).............................................61

*Irth Sols., LLC v. Windstream Commc'ns LLC*,
  No. 2:16-CV-219, 2017 WL 3276021 (S.D. Ohio Aug. 2, 2017) ..........................................73

*Jackson v. Metropolitan Edison Co.*,
  419 U.S. 345 (1974)........................................................................................................26

*Koch Materials Co. v. Shore Slurry Seal, Inc.*,
  208 F.R.D. 109 (D.N.J. 2002)....................................................................................66, 67

*La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*,
  253 F.R.D. 300 (D.N.J. 2008)............................................................................62, 77, 78

*In re Leslie Fay Cos. Sec. Litig.*,
  161 F.R.D. 274 (S.D.N.Y. 1995) .................................................................................67

*Lisle v. McDaniel*,
  No. 203-cv-1005-JCM-LRL, 2006 WL 3253488 (D. Nev. Nov. 8, 2006)...........................80

*Major Tours, Inc. v. Colorel*,
  No. 05-3091 (JBS/JS), 2009 WL 2413631 (D.N.J. Aug. 4, 2009) ..........................................64

*In re Martin Marietta Corp.*,
  856 F.2d 619 (4th Cir. 1988) .................................................................................22, 65

*Medinol, Ltd. v. Boston Scientific Corp.*,
  214 F.R.D. 113 (S.D.N.Y. 2002) ...............................................................................50

*Millennium Labs., Inc. v. Am. Clinical Sols., LLC*,
  No. 11-cv-1299, 2012 WL 13103115 (M.D. Fla. Feb. 21, 2012).......................................73

*Morales v. Portuondo*,
  154 F. Supp. 2d 706 (S.D.N.Y. 2001)...........................................................................80

*Nugent v. Scott Fetzer Co.*,
  No. 19-14759, 2020 WL 1322268 (E.D. La. March 20, 2020) ...............................................53

*Pennsylvania v. Ritchie*,
  480 U.S. 39 (1987)......................................................................................................78

*In re Pfizer Inc. Securities Litigation*,
  No. 90 Civ. 1260 (SS), 1993 WL 561125 (S.D.N.Y. Dec. 23, 1993) ....................................50

*Potomac Elec. Power Co. & Subsidiaries v. United States*,
  107 Fed. Cl. 725 (2012) ..............................................................................................73

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*,
  32 F.3d 851 (3d Cir. 1994)..........................................................................................62

*In re Riddell Concussion Reduction Litig.*,
  No. 13-7585 (JBS/JS), 2016 WL 7108455 (D.N.J. Dec. 5, 2016)..........................................63

*Rowe v. E.I. duPont de Nemours & Co.*,
  No. CIV.06-1810-RMD-AMD, 2008 WL 4514092 (D.N.J. Sept. 30, 2008) ........................77

*S.E.C. v. Vitesse Semiconductor Corp.*,
  No. 10 CV 9239 (JSR), 2011 WL 2899082 (S.D.N.Y. July 14, 2011)....................................70

*Saleh v. Titan Corp.*,
  580 F.3d 1 (D.C. Cir. 2009) ....................................................................................................26

*Schaeffer v. Tracey*,
  No. 15-CV-08836-MCA-SCM, 2017 WL 465913 (D.N.J. Feb. 2, 2017) ..............................60

*In re Sealed Case*,
  676 F.2d 793 (D.C. Cir. 1982) ................................................................................................65

*Shire LLC v. Amneal Pharms., LLC*,
  No. 2:11-cv-03781 (SRC)(CLW), 2014 WL 1509238 (D.N.J. Jan. 10, 2014).................66, 67

*Skinner v. Railway Labor Executives' Ass'n*,
  489 U.S. 602 (1989).................................................................................................................31

*Smith v. Best Buy Stores, L.P.*,
  No. 16-cv-296, 2017 WL 3484158 (D. Idaho Aug. 14, 2017) ................................................73

*Strand v. USANA Health Sci., Inc.*,
  No. 2:17-cv-00925-HCN-PMW, 2019 WL 6324629 (D. Utah Nov. 26, 2019) .....................53

*In re Teleglobe Commc'ns Corp.*,
  493 F.3d 345 (3d Cir. 2007).............................................................................................62, 67

*Torres v. Kuzniasz*,
  936 F. Supp. 1201 (D.N.J. 1996) ............................................................................................60

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*,
  No. 07-1299 (SRO)(MAS), 2012 WL 1585335 (D.N.J. May 4, 2012) ..................................60

*U.S. Bank. Nat. Ass'n v. PHL Variable Ins. Co.*,
  No. 12-cv-6811(CM)(JCF), 2013 WL 1728998 (S.D.N.Y. Apr. 22, 2013) ...........................23

*United States Sec. & Exch. Comm'n v. Herrera*,
  324 F.R.D. 258 (S.D. Fla. 2017)..............................................................................................70

*United States v. Anderson*,
  No. CR02-0423C, 2004 WL 7339793 (W.D. Wash. July 23, 2004).......................................80

*United States v. Beckford*,
  964 F. Supp. 1010 (E.D. Va. 1997) ....................................................................22

*United States v. Blumberg*,
  No. 14-CR-458, ECF No. 248 (D.N.J. Mar. 13, 2018)................................27, 31, 59

*United States v. Caruso*,
  948 F. Supp. 382 (D.N.J. 1996) ................................................................21, 45

*United States v. Connolly*,
  No. 16 CR. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019) ........................... *passim*

*United States v. Criden*,
  633 F.2d 346 (3d Cir. 1980).....................................................................78, 79

*United States v. Cruz-Jiminez*,
  977 F.2d 95 (3d Cir. 1992).........................................................................22

*United States v. DiTomasso*,
  932 F.3d 58 (2d Cir. 2019)..........................................................................26

*United States v. Duronio*,
  No. CRIM.A.02-933 (JAG), 2006 WL 1457936 (D.N.J. May 23, 2006)..............................26

*United States v. Folad*,
  877 F.3d 250 (6th Cir. 2017) ........................................................................32

*United States v. Gupta*,
  848 F. Supp. 2d 491 (S.D.N.Y. 2012).................................................................79

*United States v. Howard*,
  No. 12-1, 2014 WL 1249512 (E.D. La. Mar. 26, 2014) ..............................................22

*United States v. Kastigar*,
  406 U.S. 441 (1972)..................................................................................27

*United States v. Kovel*,
  296 F.2d 918 (2d Cir. 1961)..........................................................................77

*United States v. Llanez-Garcia*,
  735 F.3d 483 (6th Cir. 2013) ........................................................................22

*United States v. Marcus Schloss & Co.*,
  No. 88 CR. 796 (CSH), 1989 WL 62729 (S.D.N.Y. June 5, 1989)........................................82

*United States v. McClure*,
  No. 10–028, 2010 WL 3523030 (E.D. La. Sept. 1, 2010) ..............................................45

*United States v. Messercola*,
    701 F. Supp. 482 (D.N.J. 1988) ................................................................21

*United States v. Nixon*,
    418 U.S. 683 (1974) ................................................................ *passim*

*United States v. O'Neill*,
    619 F.2d 222 (3d Cir. 1980) ................................................................60

*United States v. Peitz*,
    No. 01-CR 852, 2002 WL 31101681 (N.D. Ill. Sept. 20, 2002) ............................80

*United States v. Rainone*,
    32 F.3d 1203 (7th Cir. 1994) ................................................................80

*United States v. Risha*,
    445 F.3d 298 (3d Cir. 2006) ................................................................26, 32

*United States v. Rockwell Int'l*,
    897 F.2d 1255 (3d Cir. 1990) ................................................................67

*United States v. RW Professional Leasing Servs. Corp.*,
    228 F.R.D. 158 (E.D.N.Y. 2005) ................................................................45

*United States v. Scheffer*,
    523 U.S. 303 (1998) ................................................................79

*United States v. Soliman*,
    No. 06-CR-236A, 2008 WL 5114230 (W.D.N.Y. Nov. 25, 2008) ............................22

*United States v. Stein*,
    541 F.3d 130 (2d Cir. 2008) ................................................................25, 27

*United States v. Stringer*,
    No. CR 03-432-HA, 2005 WL 8167079 (D. Or. Mar. 4, 2005) ............................80, 81

*United States v. Trout*,
    No. CR-05-149-C, 2006 WL 461047 (W.D. Ok. Feb. 24, 2006) ............................45

*United States v. W.R. Grace*,
    439 F. Supp. 2d 1125 (D. Mont. 2006) ................................................................80, 81

*United States v. Weisberg*,
    No. 08-CR-347 (NGG)(RML), 2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011) ............79

*United States v. Witt*,
    542 F. Supp. 696 (S.D.N.Y. 1982), *aff'd*, 697 F.2d 301 (2d Cir. 1982) ............21

*V. Mane Fils S.A. v. Int'l Flavors & Fragrances, Inc.*,
  249 F.R.D. 152 (D.N.J. 2008) ...........................................................................67, 68

*V5 Techs. v. Switch, Ltd.*,
  332 F.R.D. 356 (D. Nev. 2019) ..........................................................................52, 53

*Welsh v. United States*,
  404 F.2d 414 (5th Cir. 1968) ................................................................................22

*West v. Atkins*,
  487 U.S. 42 (1988) ................................................................................................26

*Westernbank Puerto Rico v. Kachkar*,
  No. 07-1606, 2009 WL 530131 (D.P.R. Feb. 9, 2009) .....................................77, 78

*Westinghouse Elec. Corp. v. Republic of Philippines*,
  951 F.2d 1414 (3d Cir. 1991) ........................................................................ *passim*

## Statutes

Foreign Corrupt Practices Act ...................................................................... *passim*

Securities Exchange Act Section 10A, 15 U.S.C. § 78j–1 .......................................50

## Other Sources

Abbe David Lowell & Christopher D. Man, *Federalizing Corporate Internal
  Investigations and the Erosion of Employees' Fifth Amendment Rights*, 40
  Geo. L. J. Ann, Rev. Crim. Proc. iii (2011) .........................................................28

Katrice Bridges Copeland, *The Yates Memo: Looking for "Individual
  Accountability" in All the Wrong Places*, 102 Iowa L. Rev. 1897 (2017) ............33

## Rules

Federal Rule of Criminal Procedure 17 ......................................................... *passim*

Federal Rule of Evidence 502 ....................................................................... *passim*

## Constitutional Provisions

Fourth Amendment ............................................................................................26, 31

Fifth Amendment ....................................................................................................32

Sixth Amendment .......................................................................................... *passim*

Fourteenth Amendment ....................................................................................12, 78

## PRELIMINARY STATEMENT

In this motion, Defendants ask the Court to compel Cognizant Technology Solutions Corporation ("Cognizant") to comply with Court-issued Subpoenas and produce materials that are necessary for the Defendants to fully and fairly present, at a forthcoming hearing ordered by the Court, evidence regarding whether the Government outsourced key aspects of its investigation to Cognizant (ECF No. 96, 104). The Subpoenas, issued under Federal Rule of Criminal Procedure 17, are designed to obtain evidence to show the extent to which Cognizant coordinated its investigation with, and assumed the investigative role of, the Government. After careful consideration, the Court granted the Subpoenas, amending them to ensure that the applicable legal requirements for specificity and burden had been satisfied.

But Cognizant's response to the Subpoenas has been demonstrably inadequate: Cognizant has refused to produce any documents responsive to certain of the Court-approved Subpoena requests and has employed extremely restricted date ranges, document custodians, and search terms in its collection and production of documents. Rewriting the Subpoenas to encompass what it wishes they said instead of what they do say, in the 27 weeks since Cognizant was served with the Court-authorized Subpoenas, it has produced only 199 non-duplicative documents. In order to do so, Cognizant refused to produce records covered by the plain language of the Subpoenas, improperly narrowed the number and date ranges of custodians searched, excluded from its searches certain forms of records (for example, electronic documents expressly set forth in the Subpoenas), and invoked the attorney-client privilege to shield records for which there is no valid claim of privilege. As a result, Cognizant has withheld vital information necessary to determine "the prosecution's role in CTS's . . . internal investigation." (ECF No. 96 at 10). Cognizant's refusal to produce—and, in some cases, even search for—documents clearly called for by the Subpoenas is all the more striking because even the small subset of responsive documents

produced to date under Cognizant's narrow, self-selected parameters reflects close coordination between Cognizant and the Government, including during the period immediately surrounding the Defendants' interviews.

Cognizant's production is further limited by its sweeping assertions of privilege, which are asserted notwithstanding the inapplicability of the privilege to certain of the communications at issue—communications that did not relate to the provision of legal advice (including communications with third-party accountants and public relations firms)—and, even more significantly, communications regarding subject matters as to which Cognizant has waived the privilege in the course of its cooperation with the Government.  Indeed, these invocations of privilege are particularly inappropriate, and most obviously waived, given that Schwartz, the Chief Legal Officer of Cognizant during the events at issue in the Indictment, is being prosecuted based entirely upon communications regarding the very same subjects as are discussed in the documents that Cognizant now seeks to shield from disclosure based upon privilege.  The result has been that the Government, based upon information provided by Cognizant, is using certain privileged communications as a sword, while Cognizant uses the privilege as a shield to deny the defense access to documents involving the very same subjects.  Furthermore, Cognizant has asserted privilege through a strikingly inadequate log, one that purports to advance privilege claims on a categorical, rather than document-by-document, basis and does not even provide the subject lines of the withheld communications, thus impairing Defendants' right to challenge those assertions.

Underlying this application are Government corporate enforcement policies that, especially at the time of the investigation at issue, specifically rewarded corporations like Cognizant for cooperating with the Government by conducting investigations and identifying "responsible" corporate officials.  The result of that policy, however, as an emerging body of caselaw

demonstrates, is profound. Corporations like Cognizant, acting in their self-interest, do not share the Government's obligation to be neutral, fair and open-minded, and are neither obligated nor incentivized to act in accordance with, let alone safeguard, the constitutional rights applicable to, for example, the questioning of criminal suspects, the ability to present a defense, and the disclosure of exculpatory evidence. Because such fundamental rights are at stake, this motion also raises important questions of why the Government opposed these Subpoenas in the first place and why Cognizant has now so aggressively sought to prevent the Defendants from obtaining information and evidence that would make clear whether the Government, in fact, outsourced its investigation to Cognizant.

In sum, this Court is on the verge of conducting a hearing that goes to the heart of whether the Defendants' fundamental constitutional rights have been violated by virtue of the way that the investigation in this case was conducted. Nevertheless, and despite the Court's order to produce information bearing directly on that inquiry, Cognizant is withholding necessary information that remains in its possession alone. To enable the Defendants to present the evidence that will allow the Court to conduct this outsourcing inquiry, and for the reasons set forth in more detail below, Cognizant should be compelled to conduct its search and production in conformity with the Subpoenas' terms and the Court's Orders.

**RELEVANT BACKGROUND AND PROCEDURAL HISTORY**

## I.     FACTUAL BACKGROUND

The Indictment in this case charges that the Defendants, as corporate officers of Cognizant, authorized a bribe payment to an unidentified Indian government official to secure and obtain a planning permit necessary for construction of a Cognizant office building in India. Ind. ¶¶ 3–4. The Indictment further alleges that the bribe was paid by Cognizant's contractor, Larsen & Toubro, Limited ("L&T"), and that Cognizant reimbursed L&T for payment of the alleged bribe through

3

falsified change orders that L&T submitted to Cognizant.  *Id.* ¶¶ 4–8.  But Cognizant is not just the focus of this case; it is also at the heart of the investigation of the matter.  The Company—in close coordination with and often at the request or direction of the Government—spent over two years investigating this case and presenting the fruits of its investigation to the Government, which used Cognizant's investigation as the basis for its prosecution of the Defendants.

### A.    Cognizant Initiates Its Investigation.

Cognizant's investigation began in early 2016, when a report was made to Cognizant's compliance hotline regarding potential kickbacks to a cafeteria vendor at Cognizant's India facilities.  In April 2016, Cognizant expanded the scope of the investigation, being handled by outside counsel at DLA Piper ("DLA"), to include alleged bribes paid by Cognizant's administration team, the group responsible for infrastructure and real estate at Cognizant's India facilities.  Schwartz, as Chief Legal and Corporate Affairs Officer, directed the early stages of the expanded investigation; encouraged employee cooperation; and provided regular reports to Cognizant's executive team, Board of Directors, and Audit Committee, including promptly directing that the Audit Committee be informed that an investigation was being launched.

In May 2016, Cognizant began collecting documents from custodians, initiated a forensic audit, and conducted initial interviews.  By June 2016, Cognizant, through its counsel, was contemplating self-disclosure to the Government.[1]  On August 8 and 20, 2016 (among other dates), DLA interviewed Srimanikandan Ramamoorthy, Cognizant's Vice President of Administration

---

[1] As explained more fully *infra* at I.C, that Cognizant's counsel was already contemplating self-disclosure to the Government in the early stages of the investigation is but one of many reasons why Cognizant should be required to search for documents dating back at least as far as the commencement of the investigation—as opposed to only searching for documents around the time of the Defendants' interviews and Schwartz's removal from the investigation, several months later. These early conversations about disclosure set the stage for, and are critical to understanding, the eventual cooperation between Cognizant and the Government.

during the relevant period (and "CC#1" in the Indictment), who was responsible for managing infrastructure on behalf of Cognizant in India.  Although he had not done so previously, in his August 20 interview, Ramamoorthy accused the Defendants of authorizing the bribe payment later alleged in the Indictment; as a result, the Defendants were immediately relieved of any responsibility for the conduct of the investigation.  On or around August 22, upon Cognizant's demand, Schwartz provided his MacBook Air, Lenovo laptop, and backup hard drive to Cognizant for forensic imaging, and Coburn provided his Lenovo laptop for forensic imaging.  In October 2016, Coburn's additional Lenovo laptop and two external hard drives were collected as well.

**B.    Schwartz and Coburn Interviews, Under Threat of Termination.**

DLA sought, as part of the investigation, to interview Schwartz and Coburn.  Under the terms of Cognizant's employee policies and Schwartz's and Coburn's employment agreements, which mandated cooperation with the investigation in order for them to maintain their employment with Cognizant, Defendants had no choice but to participate and answer DLA's questions or terminate their employment at Cognizant.  Indeed, ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████        Ex. C (CTS_R17_0000040).[2]   Similarly, ████████████████

████████████████████████████████████████████████████████████████

---

[2] Documents referred to herein are labeled in accordance with the Bates stamps provided by Cognizant and/or the Government and are provided herewith, under seal, appended to the accompanying Certification of Counsel.  Because Cognizant may wish to assert privilege over certain of these documents, Defendants are redacting references to them in the publicly filed version of this brief; those redactions should not, of course, be considered any admission or concession by Defendants that those privileges have been correctly asserted; Defendants show, below, that they are not.



Ex. D (CTS_R17_0000064).

[3] In sum, if Schwartz and Coburn wanted to keep their jobs, they had no choice but to participate in Cognizant's investigation, however onerous its rules, and however prosecutorial its questioning.

With this as background, on August 28, 2016, DLA interviewed Schwartz for the first time, setting strict ground rules regarding Schwartz's right to have counsel present for the interview, including insisting that Schwartz be represented by only a single lawyer and that such counsel not be allowed to speak during or take notes during the interview. On August 29, 2016, Coburn was interviewed by DLA without counsel present.

### C. Cognizant Self-Discloses to the Government, Coordinating Its Investigation with the Government.



Ex. F (CTS_R17_0000246), Ex. G (CTS_R17_0000953).

*Id.* Additionally, neither Cognizant nor the Government has disclosed whether there were prior conversations between Cognizant and the Government, even where pre-disclosure communications seem likely given the relationships involved. As just one example,

---

[3]

*See*, *e.g.*, Ex. E (CTS-0638406 ¶ 1(c)).

Karl Buch, the DLA partner leading Cognizant's investigation, was formerly an Assistant United States Attorney in the United States Attorney's Office for the District of New Jersey.  Moreover, Cognizant, as discussed above, had been considering self-disclosure for at least two and half months prior to this phone call.[4]

Despite the fact that Cognizant has to date produced relatively few documents, the limited production demonstrates very clearly that there was significant coordination among Cognizant, the DOJ and SEC.  This is especially true in the three weeks leading up to Schwartz's second interview on September 23, 2016, and to an anticipated second interview of Coburn, planned for September 28, 2016; critical information, however, remains undisclosed. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[4] Moreover, even absent direct communications, Cognizant and DLA would have understood the Government's expectations and directions concerning internal investigations, because the Government had made those expectations and directions clear in publicly available policies. *See infra* at 33-35.  It particularly bears noting that, throughout the course of Cognizant's cooperation with the Government, Buch and other DLA partners who conducted the investigation co-authored articles highlighting the FCPA Pilot Program launched in April 2016 and touting the benefits of self-disclosure and "full cooperation" which, significantly, included "[c]oordination of investigative steps a company intends to take as part of its internal investigation with the steps the DOJ may take as part of its investigation, including witness interviews."  The New FCPA Enforcement Policy Presumes Declination For Companies That Voluntarily Disclose, Cooperate and Remediate (Nov. 30, 2017), *available at* https://www.dlapiper.com/en/us/insights/ publications/2017/11/new-fcpa-corporate-enforcement-policy/; *see also* Declinations for Self-reporting on the Rise Under FCPA Pilot Program and Corporate Enforcement Policy (July 10, 2018), *available at* https://www.dlapiper.com/en/us/insights/publications/2018/07/global-anticorruption-newsletter/declinations-for-self-reporting/; DOJ Launches New FCPA Pilot Program to Encourage Voluntary Self-Disclosure of Misconduct: Key Takeaways (April 6, 2016), *available at* https://www.dlapiper.com/en/us/insights/publications/2016/04/doj-launches/.

The limited written communications between Cognizant and the Government that are available for this period also provide some insight into their close coordination, and, in particular, the Government's unquestioning reliance on Cognizant's investigative efforts.  For example, ████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ Ex. H (CTS_R17_0000248); ████████████████████

█████████████████████████████████████████████████████ Ex. I

(CTS_R17_0000251) █████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████ Ex. I (CTS_R17_0000251) ████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

**D.    While Coordinating with the Government, Cognizant Interviews Schwartz Again and Plans To Interview Coburn Again.**

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ Ex. J (CTS_R17_0000278) ██████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ certainly require further exploration through documents thus far withheld by Cognizant and in the hearing that will occur, per the Court's September 14, 2020 Order.

In advance of Schwartz's second interview on September 23, 2016, DLA again required Schwartz's lawyer, Josh Rievman, to adhere to certain "parameters" for the interview that dramatically limited counsel's ability of counsel to effectively represent him, including by prohibiting the presence of more than a single lawyer for Schwartz and requiring ████████ ████████████████████████████████████████ Ex. K (CTS-0103589). Understanding that if Schwartz did not agree to these terms and attend the interview, he would be fired, Rievman agreed.  What followed was an interview that was truly prosecutorial in nature. ██

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ Ex. J (CTS_R17_0000278).

As noted, DLA also planned a second interview of Coburn for September 28, 2016.  By that time, Coburn had retained counsel.  DLA set the same conditions for Coburn's second interview as it had for Schwartz's: only one lawyer would be allowed to be present, and that lawyer was prohibited from taking notes, asking questions, or otherwise speaking during the interview. Counsel for Coburn refused to allow the interview to proceed under such rules.  Accordingly, on

September 27, 2016, Coburn's counsel cancelled the interview and, instead, Coburn resigned from Cognizant.

### E.      Cognizant's Continued Coordination with the Government.

Cognizant continued to provide information to, and field questions and requests from, the Government in the immediate aftermath of Schwartz's second interview and Coburn's resignation.



█████████████ Ex. R (CTS_R17_0000311). ████████████████████████

██████████████████████████████████████████████

Ex. S (CTS_R17_0000427). █████████████████████████

████████████████████████████████████████ Ex. S (CTS_R17_0000427).

████████████████████████████████████

████████████████████████ Ex. T  (CTS_R17_0000319).

███████████████████████████████████████████████

█████████████████ 5 ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████ 6 On November 3, 2016, facing a demand for a third interview and the threat of termination, Schwartz resigned from Cognizant.

Though Cognizant has refused to provide any emails relating to its coordination with the Government after October 24, 2016, its investigation of Coburn and Schwartz, and its close

---

5 ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████ Ex. JJ.

6 ████████████████████████████████████████
███ See generally Exs. HH, II, JJ, and KK.

coordination with the Government with regard to that investigation, clearly continued after that date.  So, for example, 

Ex. U (DOJ-CTS-LTR-00000259-61)

Cognizant also demanded that Schwartz and his counsel relinquish his laptop to the company, and, in May 2017, demanded that Schwartz provide Cognizant all images and backups of Schwartz's laptop and personal hard drive and destroy all copies in his possession.  Ex. V (CTS-0103620).[7]

### F.    Cognizant Provides the Government with a Roadmap for Its Investigation.

During the course of its investigation, Cognizant (through DLA) provided the Government with oral downloads conveying summaries of the interviews it conducted (the "DLA Downloads").  In total, DLA provided oral downloads to the Government of at least 42 interviews of 19 different Cognizant employees.  DLA conducted no fewer than 28 of those interviews (including Schwartz's second interview) after Cognizant self-disclosed to, and began cooperating with, the Government.  Further, the timeline of events demonstrates that DLA provided the Government with the results

---

[7] The materials requested (but not yet produced) in response to the subpoena will reveal the extent of the Government's knowledge of and involvement in depriving Schwartz of his computer and with it, perhaps the best evidence of his actions and state of mind at the pertinent time, thus threatening to deny him a fair trial.  *See generally Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (internal citations and quotations omitted).

of its investigation before the Government conducted any of its own interviews of the same interviewees.  Indeed, based on the Government's disclosures, the first Government interview of Cognizant personnel did not occur until February 7, 2017, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[8]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

That is, the Government did not interview a single Cognizant witness until after DLA had completed all but one of the interviews upon which Cognizant briefed the Government.  And every one of the witnesses the Government interviewed ████████████████████████████

████████████████████████████████████████ had already been interviewed by DLA, and the substance of those interviews had apparently been conveyed to the Government.

**G.    Cognizant's Cooperation with the Government Through Declination and Defendants' Indictment, and Beyond.**

Cognizant's close cooperation with the Government continued throughout the over two-year investigation and was not limited to providing documents and interview summaries.  For example, ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[8] ████████████████████████████████████████████████████████

████████████████████ *See* Ex. HH.

████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ Ex. W.  The basis for the Government's accusations

was, of course, its ongoing exchange of information and collaboration with Cognizant concerning

the investigation of Schwartz and Coburn.

On February 13, 2019, the day before the Defendants were indicted, Cognizant entered into

a declination agreement with the DOJ.[9]  In that agreement, DOJ specifically cited "Cognizant's

thorough and comprehensive investigation [and] Cognizant's full and proactive cooperation in this

matter (including its provision of all known relevant facts about the misconduct) and its agreement

to continue to cooperate in the Department's ongoing investigations and any prosecutions that

might result."

## II.      PROCEDURAL HISTORY

### A.      The Government Refuses to Produce Records of Its Coordination with Cognizant and Invites Defendants to Seek Records Through Rule 17 Subpoenas to Cognizant.

Defendants Schwartz and Coburn tried to obtain much of the information sought in the

Subpoenas from the Government in an effort to resolve these issues without the need for Court

intervention.  On October 3, 2019, the Defendants sent a joint letter to the Government, setting

forth specific document requests, including, *inter alia*, requests for documents regarding the

Government's communications with Cognizant during the course of its investigation, as well as

findings from Cognizant's investigation that it provided to the Government.  (ECF No. 60 Ex. A).

---

[9] On February 15, 2019, Cognizant also settled related charges with the SEC and consented to a Cease and Desist Order which notes Cognizant's "self-disclosure, cooperation, and remedial efforts" and that Cognizant "timely shared the facts developed during the course of an internal investigation."  SEC Charges Cognizant and Two Former Executives With FCPA Violations (Feb. 15, 2019), *available at* https://www.sec.gov/news/press-release/2019-12.

Over seven weeks later, on November 27, 2019, the Government responded, refusing to produce the requested materials and instead inviting the Defendants to provide the legal basis and factual predicate for their requests.  (ECF No. 60 Ex. B).  Defendants did so by letter dated January 8, 2020, and included specific citations to discovery materials indicating that "DOJ and CTS appear to have jointly engaged in and shared core governmental investigative tasks, such as reviewing and analyzing data and other information; assessing the credibility of potential witnesses; and conducting employee interviews and conveying to DOJ detailed findings."  (ECF No. 70 Ex. B).

At that time—and even before seeking or receiving documents pursuant to any subpoena—the Defendants provided concrete examples of Cognizant's and the Government's coordination to further substantiate the Defendants' document requests, showing that Cognizant voluntarily "produced to DOJ more than one hundred thousand documents collected using agreed-upon search terms; created for DOJ's benefit spreadsheets and other summaries of relevant information; conducted and presented to DOJ in-depth legal analysis 'in furtherance of its cooperation,' and conducted more than 44 interviews of at least 19 employees and shared the results of those interviews with DOJ, in furtherance of DOJ's investigation into Messrs. Coburn and Schwartz; on some occasions this included assessments of employee credibility."  (*Id.*).

The Government responded that it "will not respond to each of the claims and/or requests in your most recent letters. Instead, we will await your discovery motions," and invited the Defendants to pursue Rule 17 subpoenas to obtain the requested materials from Cognizant.  (ECF No. 60, Ex. C ("To the extent you seek additional information, you are free to pursue it directly from the companies through Rule 17 subpoenas.")).

**B.     The Government Intervenes in an Attempt to Prevent the Issuance of the Subpoenas to Cognizant.**

On February 12 and 14, 2020, the Defendants accepted this invitation, filing applications

with the Court seeking issuance of Rule 17 subpoenas directed to Cognizant.  (ECF No. 70).  Each of the requests in Coburn's proposed subpoena and Request Nos. 1-10 of Schwartz's proposed subpoena sought specific, highly probative information relevant to the Government's outsourcing of key aspects of its investigation to Cognizant in advance of forthcoming motion practice addressed to that issue.  In support of their applications, the Defendants identified significant gaps in the discovery that the Government had produced thus far and explained why each of the subpoenas' requests satisfied the applicable standard set forth in *United States v. Nixon*, 418 U.S. 683 (1974).

On February 29, 2020, the Government, despite having invited the Defendants to seek the requested materials directly from Cognizant via Rule 17 subpoenas, filed a letter brief reversing course and opposing the Defendants' application.  (ECF No. 76).  The Government's opposition (in and of itself unusual in that it sought to quash a subpoena that sought documents from a third party) rested on the grounds that the Defendants' yet-to-be-filed outsourcing motions were, in the Government's view, without sufficient merit to warrant further inquiry.  The Government pointed out in its opposition that it "does not always take a position with respect to requests for Rule 17 subpoenas issued to third parties," but sought to justify its unusual intervention here on the basis that "the fundamental premise of the Defendants' application . . . targets the Government's conduct in investigating and prosecuting this case."  (ECF No. 76 at 1).  On March 10, 2020, the Defendants filed a reply setting forth "the good faith preliminary showing that the defense has already made, a showing which at least justifies the further inquiry that is the legitimate purpose of the requested subpoenas."  (ECF No. 78 at 5).

### C. The Court Amends and Issues Rule 17 Subpoenas to Cognizant, Then Rejects the Government's Attempt to Narrow the Subpoenas.

On September 14, 2020, the Court granted, in pertinent part, the Defendants' applications

for the issuance of Rule 17 subpoenas to Cognizant, though it required that several specific revisions be made to the so-called "category (a)" document requests—*i.e.*, those seeking information relevant to the Defendants' outsourcing claims—before they could be served.  (ECF No. 96).[10]  Thus, the Court instructed that several of the requests in the Defendants' proposed subpoenas be "limited to communications related to the investigation and interview of Schwartz [or Coburn]."  (ECF No. 96 at 16-24).  The Court also determined that, because it had "a less complete record than the one that was before Judge McMahon" in *United States v. Connolly*, No. 16 CR. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019), that it would "convene a hearing on the outsourcing itself."  (ECF No. 96 at 11 n.11).  The Court made clear that "[t]he hearings ordered by the Court here may alter the picture as to the 'outsourcing' claim," (ECF No. 96 at 10 n.10), and that the approved subpoena requests (as revised in accordance with the September 14 Order) would not be limited to the Defendants' interviews but instead were intended to allow "some breathing room for the surrounding context" as well.  (ECF No. 96 at 16).

By letter dated September 20, 2020, the Government again intervened, seeking to narrow the Court's September 14 Order, including by requesting that each request in the third-party subpoenas be revised to cover only "communications related to the interview of Schwartz [or Coburn], including any investigation of Schwartz [or Coburn] that led to his interview."  (ECF No. 99).  The Court rejected the Government's proposed modifications on September 29, 2020 and authorized the issuance of the Defendants' revised subpoenas "in the form proposed" by the Defendants on September 18, 2020 – *i.e.*, without the Government's requested limitations.  (ECF

---

[10] The Court deferred ruling, at the time, on Defendants' requests for so-called "category (b)" materials, which relate to the substance of the allegations against Defendants.  It has, since that time, issued such subpoenas following an *ex parte* application, which the Court expressly allowed in its September 14 Order.  (ECF No. 144.)

No. 104). Thus, the Court-approved subpoenas address the "investigation and interview[s]" of the Defendants.

### D. Cognizant Narrows the Scope of the Subpoenas, Withholds Responsive Non-Privileged Documents, and Produces a Deficient Privilege Log.

On October 13, 2020, the Defendants served Cognizant with the Court-approved Subpoenas, which, per the Court's September 14 and October 6 Orders (ECF No. 96, 108), included a compliance date of October 20, 2020. Cognizant sought and, with Defendants' consent, obtained extensions of time to respond to the Subpoenas on each of October 13 (ECF No. 113), November 19 (ECF No. 122), and December 22, 2020 (ECF No. 129). Meanwhile, Cognizant's counsel and the Defendants' counsel met and conferred on three separate occasions with regard to the scope of the Subpoenas in December 2020 before Cognizant began producing documents on January 8, 2021. ███████████

███████████████████████████████████████████

███████████████████

█████████████████

███████████████████ Ex. A. ███████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

*Id.* at 2. ██████████████████████████

███████████████████████████████████

██████████████████ *Id.* ███████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████ *Id.* at 2–3.

### 1.   Specific Categories of Records in Dispute

During telephonic meet-and-confers on March 4 and 11, 2021, counsel discussed their disagreement concerning the "proper scope" of the subpoenas, as well as other issues, including several specific deficiencies with Cognizant's collection and review parameters.  Though the parties resolved certain of those issues, they were unable to reach agreement on the disputes that form the basis for Part I of this motion.  Specifically, the parties presently disagree as to whether Cognizant, in the context of an inquiry into the extent of its cooperation with the Government, should be required to:

- Collect and produce materials relating to the "investigation *and* interviews" of the Defendants, as required by the Subpoenas, which include documents that clearly go beyond information related to Defendants' interviews alone;

- Collect and produce responsive materials from the start of the investigation through the date of the Indictment, as required by the subpoenas, rather than from Cognizant's self-selected and very limited date range of August 14, 2016 to October 24, 2016;

- Disclose all dates on which DLA Piper provided factual information concerning the interviews of the Defendants, and others, to the Government, including the identities of the participants at such meetings;

- Collect and produce information from certain specific custodians omitted by Cognizant, *including the Defendants*, as well as key personnel who were directly involved in conducting Cognizant's investigation;

- Search for materials using certain essential search terms, beyond those utilized by Cognizant, including certain specific terms in the subpoenas themselves, as well as others that are necessary to identify critical responsive documents;

- Collect and produce documents responsive to certain requests that were, Cognizant's objections notwithstanding, specifically approved by the Court, including Schwartz Requests No. 6 (communications regarding actions taken by way of cooperation as referenced in the declination letter) and No. 7 (communications regarding the facts set forth in the declination letter and the SEC settlement announcement), and Coburn Request No. 9 (materials regarding

information obtained during company interviews), requests with which Cognizant has unilaterally refused to comply based upon its own view of what should have been included within the Subpoenas; and

- Collect and produce all responsive communications, including text messages, as required by the subpoenas, and not unilaterally limit its production to only emails and electronic documents.

### 2.     Cognizant's Deficient Privilege Log

On March 23, 2021, Cognizant produced to the Defendants its privilege log, which is organized by category, providing only ██ general subject matter descriptions of the documents over which it is claiming protection, along with appendices that omit critical information necessary for the Defendants to meaningfully evaluate Cognizant's privilege and work product claims, including the subject lines and time stamps of emails and the document titles, file names, authors, and recipients/custodians of non-email documents withheld or redacted by Cognizant.

In a letter to Cognizant dated March 30, 2021, the Defendants identified various deficiencies with, and objections to, Cognizant's privilege log.  Ex. X.  Following a meet-and-confer between counsel on April 6, 2021, Cognizant sent a letter to the Defendants on April 9, 2021 memorializing Cognizant's position regarding the claimed deficiencies and objections raised in Defendants' March 30 letter.  Ex. B.



Ex. Y.  The new log, like the old log, remains fundamentally flawed, in that:

- The ██ general subject matter descriptions do not provide sufficient information to enable the defense to fairly assess Cognizant's privilege and work product claims, which, in this Circuit, must be asserted on a document-by-document basis;

- Contrary to the law, Cognizant omitted from its privilege log the subject lines of the emails it withheld and redacted, despite the fact that subject lines are not protected from disclosure unless they reveal privileged information;

- Cognizant improperly withheld or redacted documents that do not relate to the provision of legal advice;

- Cognizant improperly withheld or redacted documents that were disclosed to third-party accounting and communications firms; and

- Most notably, Cognizant withheld, redacted, or completely failed to log, documents and information for which it effected broad subject matter waivers through wide-ranging, repeated disclosures to the DOJ and SEC.

Finally, as is set forth in Section II.C, below, Defendants advised Cognizant that, even if its assertions of privilege and work product were correct, Defendants' constitutional right to the responsive materials outweighs Cognizant's privilege and work product claims, and thus trumps the privilege.

## LEGAL ARGUMENT

Federal Rule of Criminal Procedure 17 governs the issuance and enforcement of pretrial subpoenas in federal criminal proceedings. The "purpose of [Rule 17 is] to prevent delays during trial by providing 'a time and place *before* trial for the inspection of subpoenaed materials.'" *United States v. Messercola*, 701 F. Supp. 482, 485 (D.N.J. 1988) (quoting *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951)) (emphasis in original). Stated differently, "[a] pretrial subpoena issued in accordance with Rule 17(c) is used as a convenient and time saving tool for trial preparation." *Id.* "Given the difficulties inherent in preparing for a complex and lengthy criminal trial," as the trial in this matter is certain to be, "'the benefits that arise from requiring [pretrial] production . . . from a nonparty witness far outweigh the speculative inconveniences.'" *Id.* (quoting *United States v. Witt*, 542 F. Supp. 696, 698 (S.D.N.Y. 1982), *aff'd*, 697 F.2d 301 (2d Cir. 1982)).

"Generally, . . . '[a] subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise." *United States v. Caruso*, 948 F. Supp. 382, 397 (D.N.J. 1996) (quoting *Nixon*, 418 U.S. at 698). "The burden of production and the burden of

persuasion to show that a subpoena was unreasonable lies with the party resisting it." *Impounded*, 277 F.3d 407, 415 (3d Cir. 2002).  And, although decisions regarding the enforcement of a Rule 17 subpoena are committed to the discretion of the court, *see Nixon*, 418 U.S. at 702, because Rule 17 implicates constitutional considerations, "the breadth of the court's discretion is narrowed by the defendant's Fifth and Sixth Amendment rights," *United States v. Howard*, No. 12-1, 2014 WL 1249512, at *1 (E.D. La. Mar. 26, 2014) (citing *Welsh v. United States*, 404 F.2d 414, 417 (5th Cir. 1968)); *In re Martin Marietta Corp.*, 856 F.2d 619, 621 (4th Cir. 1988) ("Rule 17(c) implements the Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor."); *United States v. Beckford*, 964 F. Supp. 1010, 1016 (E.D. Va. 1997) ("Rule 17(c) reflects the command of the Sixth Amendment that the full power and processes of the courts are available to defendants in criminal cases to help them defend against the charges brought by the Government."); *see also United States v. Cruz-Jiminez*, 977 F.2d 95, 101 (3d Cir. 1992) ("[W]e believe that in determining whether to grant or deny a Rule 17(b) subpoena . . . a district court's discretion is plainly limited by the constitutional considerations involved.").

Here, those constitutional rights are squarely implicated by the Defendants' need to obtain the specific evidence at issue for the distinct purpose of fully and fairly litigating their pretrial motions.  *See*, *e.g.*, *United States v. Llanez-Garcia*, 735 F.3d 483, 493 (6th Cir. 2013) ("Rule 17(c) . . . implements a criminal defendant's constitutional right 'to have compulsory process for obtaining witnesses in his favor' by providing a means to subpoena witnesses and documents for a trial *or a hearing*.") (citations omitted) (emphasis added); *United States v. Soliman*, No. 06-CR-236A, 2008 WL 5114230, at *2 (W.D.N.Y. Nov. 25, 2008) ("While subpoenas are usually used for compelling production of evidence for a trial, it can be used for compelling production to determine an issue of fact raised in a pretrial motion").  Indeed, this is

even more so where, as here, the issues to be raised in those motions themselves implicate

fundamental constitutional rights, as Defendants' forthcoming motions certainly do.

I.     COGNIZANT SHOULD BE COMPELLED TO PRODUCE DOCUMENTS
       RESPONSIVE TO THE PLAIN LANGUAGE OF THE SUBPOENAS AND THE
       COURT'S SEPTEMBER 14 AND SEPTEMBER 29 ORDERS.

       A.     Cognizant Improperly Narrowed the Court-Authorized Subpoenas and
              Orders.

       Cognizant's subpoena response was flawed first, and most fundamentally, because it

unilaterally narrowed the scope of documents for which it searched and thereby refused to produce

documents responsive to the plain language of the Subpoenas and the Court's Orders.  Specifically,

Cognizant has erroneously maintained throughout the course of numerous meet-and-confers that

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████     Ex. A.  But this narrow view is flatly inconsistent with the plain language

and clear intent of this Court's Orders, and indeed with the purpose of the Subpoenas in advance

of the forthcoming outsourcing hearing.

       Cognizant's reformulation of the Subpoenas' scope is inconsistent with the September 14

Order's express terms and the plain language of the Court-approved subpoenas themselves.

*See*, *e.g.*, *U.S. Bank. Nat. Ass'n v. PHL Variable Ins. Co.*, No. 12-cv-6811(CM)(JCF), 2013 WL

1728998, at *2 (S.D.N.Y. Apr. 22, 2013) ("It is axiomatic that interpretation of the scope of a

subpoena must focus on the text of the document."); *Flatow v. The Islamic Republic of Iran*, 196

F.R.D. 203, 206 (D.D.C. 2000) ("An analysis of [a subpoena's scope] must begin with the text of

the subpoena."), *aff'd*, 305 F.3d 1249 (D.C. Cir. 2002).   Under the terms of this Court's

September 14 Order, the Subpoenas, even after revision, were to be "limited to communications

related to the *investigation and interview* of Schwartz [and Coburn]."  (ECF No. 96 at 16-24 (emphasis added)).  This language was not inadvertent.  After full briefing regarding the proper scope of the subpoenas, the Court revised the subpoenas submitted by Defendants in accordance with its own ruling.  Additionally, the September 14 Order explicitly set forth that the Subpoenas were not limited to documents related to the interviews themselves, but rather, allowed "some breathing room for the surrounding context" (*id*. at 16) by expressly permitted inquiry into the investigation as well.

Displeased with the scope of the Subpoenas with which it was served, Cognizant has attempted to rewrite them, including writing certain requests out of them entirely.  Indeed, Cognizant's position that the Subpoenas do not cover documents concerning the "investigation"—despite their plain language—is the same argument that the Government made, and that this Court rejected, following the September 14 Order.   Specifically, the Government argued that the Defendants "broadened the scope of the [September 14] Order" by virtue of the revised subpoenas submitted to the Court and requested that each request be further revised to cover only "communications related to the *interview* of Schwartz [or Coburn], including any investigation of Schwartz [or Coburn] *that led to his interview*."  (ECF No. 99 at 1 (emphasis added)).  But the Court carefully considered and specifically rejected the Government's argument, authorizing the issuance of the revised Subpoenas without the limitations advocated by the Government—the very same limitations that Cognizant now seeks to unilaterally read into the subpoenas.  (ECF No. 104).  The Court also specifically revised several of the subpoena requests in response to the briefing, rejecting further arguments that what remained was not within the scope of the Court's Order. *See id*.

The Court's rejection of the Government's proposed modifications was exactly right:

24

having granted a hearing to address the issue of "outsourcing" raised by the Defendants, *see* ECF No. 96 at 11 n.11 ("I will convene a hearing on the outsourcing itself."), the Court specifically instructed the Defendants to include language in the subpoenas that would, in the Court's words, be "relevant to the outsourcing issue," *id.* at 15.  The full scope of the outsourcing issue will be discussed in the motion that will follow the complete production of documents at issue here and the hearing ordered by the Court.[11]  But to provide critical background for evaluating this motion to compel, it is first necessary to set forth a brief overview of the Defendants' forthcoming argument on outsourcing.

> **B.    Cognizant's Full Compliance with the Subpoenas Is Critical for the Forthcoming Motion Practice Concerning Outsourcing.**

In order to perform the outsourcing inquiry, the Court will need to first address the threshold question of whether the Government, in fact, "outsourced" its investigation—the very question the Court has granted a hearing to address—and then second, it can determine whether (and, if so, which of) Cognizant's Constitutional violations are attributable to the Government as a result of that outsourcing.

With respect to the first question, whether the Government outsourced its investigation, familiar and well-settled legal principles make clear that the Government is responsible for the actions of private parties who step into the shoes of the Government.  *See*, *e.g.*, *United States v. Stein*, 541 F.3d 130, 136 (2d Cir. 2008) ("Actions of a private entity are attributable to the State if there is a sufficiently close nexus between the State and the challenged action of the . . . entity so that the action of the latter may be fairly treated as that of the State itself . . . . Such responsibility

---

[11] *See* 3/3/20 Transcript ("Tr.") at 11-12 ("THE COURT: . . . But aren't [Defendants] right about the logical order? I mean, doesn't it make sense that we not decide the [outsourcing] motion once with incomplete information, complete our information, and then decide it again? . . . Let them get whatever it is they're entitled to and once they've got that, use it in whatever manner is appropriate in the motion practice.").

is normally found when the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.") (internal quotations and citations omitted); *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006) (to assess the extent of *Brady* obligations, courts inquire "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence."); *United States v. Duronio*, No. CRIM.A.02-933 (JAG), 2006 WL 1457936, at *3 (D.N.J. May 23, 2006) ("To determine whether an entity is acting on the government's behalf, courts have looked to factors such as whether the entity assists the prosecution before and during trial, and whether the entity conducts interrelated or independent investigations from the government . . . [C]ourts have found team efforts and joint investigations where the entity and the federal government 'pooled their investigative energies to a considerable extent' and the 'entire effort was marked by [a] spirit of cooperation.'") (citation omitted).[12]

---

[12] Indeed, this concept of holding the Government responsible for the actions of private parties is common in numerous areas of federal law. *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 55–56 (1988) (attributing to the State a physician's actions because "the State delegated that function" to the physician to provide medical services to inmates); *United States v. DiTomasso*, 932 F.3d 58, 67 (2d Cir. 2019) ("A 'search conducted by private individuals at the instigation of a government officer or authority' may sometimes be attributable to the government 'for purposes of the Fourth Amendment.'") (citation omitted); *Fabrikant v. French*, 691 F.3d 193, 211 (2d Cir. 2012) (concluding that animal rescue organizations are state actors for purposes of 42 U.S.C. § 1983 when they perform surgery on animals in their care); *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 492 (2d Cir. 2009) ("One way that a private entity may be considered a state actor for constitutional purposes is by 'exercis[ing] powers that are 'traditionally the exclusive prerogative of the State.' 'State action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity.'") (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1005 (1982), *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353 (1974), and *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004)); *Saleh v. Titan Corp.*, 580 F.3d 1, 9 (D.C. Cir. 2009) (holding that acts of a private service contractor integrated into military combat amounted to state action).

The first aspect of that inquiry requires, as the Court made clear in its September 14 Order, an assessment of the way in which "the investigation" was conducted: the communications between, and the conduct of, both Cognizant and the Government during the course of the investigation will reveal the bases for determining whether Cognizant's conduct can be fairly attributed to the Government.  *See*, *e.g.*, *Stein*, 541 F.3d at 152 n.11 ("'[S]tate action' includes both conduct by the government and conduct by [the company] that is fairly attributable to the government.").  That is true regardless of the specific constitutional violation at issue, which can result from an unconstitutional interrogation, as in *Connolly*, 2019 WL 2120523 (citing *United States v. Kastigar*, 406 U.S. 441 (1972) and *Garrity v. New Jersey*, 385 U.S. 493 (1967)), or from the infringement of other rights, such as the Due Process principles of *Brady v. Maryland*, 373 U.S. 83 (1963).  *See United States v. Blumberg*, No. 14-CR-458, ECF No. 248 at *241 (D.N.J. Mar. 13, 2018) ("This hearing is not about whether or not there is exculpatory evidence within ConvergEx's files. . . . This hearing is about whether the Government has a duty to make them look for that and give it to you, and get it and then give it to you, and that is borne out of whether or not ConvergEx is in fact part of the prosecution team.").

Accordingly, in *Connolly*, then-Chief Judge McMahon identified numerous factors that bore upon whether the Government had outsourced its investigative function to company counsel. To be sure, those factors included a number that addressed the circumstances of the interview of the defendant.  For example:

- The Government directed the company and its counsel "whom to interview and when," *Connolly*, 2019 WL 2120523, at *12;

- Company counsel provided the Government with timely, detailed information from interviews, including assessments of credibility, *see id.*; and

- The defendant "was compelled, upon pain of losing his job, to sit for" multiple interviews with company counsel, *id*. at *11.

Indeed, as Chief Judge McMahon highlighted:

> [T]he government often will defer its interviews of the witnesses until after the corporate internal investigators can conduct their own interviews. Given the employees' fear of termination by their employer, the government knows that the corporation can be more effective in persuading its employees to speak than it could be, and the government knows all too well that it can then use its leverage over the company to compel the company to tell it what the employees say, even if that requires the waiver of the attorney-client privilege or work product doctrine.

*Id.* (citing Abbe David Lowell & Christopher D. Man, *Federalizing Corporate Internal Investigations and the Erosion of Employees' Fifth Amendment Rights*, 40 Geo. L. J. Ann, Rev. Crim. Proc. iii (2011)).

Each of these is precisely what happened here, and the *Connolly* Court also looked to factors well beyond those surrounding the interview itself to determine whether the *investigation* had in fact been outsourced, including:

- That the company faced "the threat of ruin" if it failed to cooperate with the Government, but its cooperation resulted in a "conspicuous success," *id*. at *8, 13;

- That company counsel "digested the vast information it collected, highlighted the most important nuggets, and shared a blueprint for what prosecutors should expect," *id*. at *12;

- That the company's "investigation pretty much *was* the Government's investigation" as "[t]he Government's investigatory strategy . . . was to let the [company] carry its water for it," including that the Government waited until the company had completed its interviews before beginning its own interviews and did not interview company witnesses beyond those interviewed by company counsel, *see id*. at *9, 13; and

- That company counsel "did everything that the Government could, should, and would have done had the Government been doing its own work," *id*. at *12.

In sum, the court in *Connolly*, based on the record before it, concluded that "the Government outsourced the important developmental stage of its investigation to [the] Bank—the original target of that investigation—and then built its own 'investigation' into specific employees, such as [defendant], on a very firm foundation constructed for it by the Bank and its lawyers." *Id.* at *12.

With respect to the first prong of the *Connolly* inquiry—whether the Government

outsourced its investigation—this Court has already announced that "[b]ecause I have a less complete record than the one that was before Judge McMahon, I will convene a hearing on the outsourcing itself." (ECF No. 96 at 11 n.11). Consistent with *Connolly*, this Court's inquiry will include, *inter alia*, examining:

- <u>Substantial pressure to cooperate</u>. The extent to which Cognizant faced "substantial pressure . . . to cooperate in every conceivable way with the Government," *Connolly*, 2019 WL 2120523, at *8, and whether it "decided that it would go all-in with cooperation" in light of the "draconian consequences that would likely ensue if it did not," *id*. at *2;

- <u>Alignment of priorities and interests</u>. The extent to which Cognizant was aware of, and shaped its investigation to fit, the Government's specific priorities for the investigation, including identifying individuals for prosecution, in order for Cognizant to realize the full benefits of cooperating with and furnishing its work to the Government, consistent with then-operative DOJ policy initiatives, *see id*. at *13 ("the company's interest in cooperating was perfectly aligned with the Government's interest in outsourcing its investigative functions . . . This massive amount of pressure is highly relevant to any assessment of the sufficiency of the nexus between the Government and [the company's] 'internal' investigation.");

- <u>Coordination of efforts</u>. The extent to which the interviews that Cognizant conducted, whether of the Defendants or of others, were guided by the Government's suggestions, requests, or direction as to timing, subject matter, or tone, *see id*. at *12 ("[T]he Government told [the company] whom to interview and when"); *id*. at *7 (the Bank's counsel "provided the Government with real time updates about facts gleaned from employee interviews" and "did 'everything in its power to facilitate the [Government's own] interviews of relevant current and former [company] employees,' which included 'actively encourag[ing] its employees (current and former) to participate in interviews with regulators.'") (citation omitted);

- <u>Providing an investigative roadmap</u>. The extent to which the Government's subsequent interviews of the same interviewees followed a roadmap that had already been provided by virtue of Cognizant's prior interviews, *see id*. at *9 ("It is hard not to conclude that the Government did not conduct a single interview of its own without first using a road map that" the company's counsel provided, "illuminating just how the Government should 'investigate' the case against certain [company] employees, including [the defendant].);" *id*. at *12 (the Bank "digested the vast information it collected, highlighted the most important nuggets, and shared a blueprint for what prosecutors should expect should they finally" conduct interviews on their own);

- <u>Emphasizing particular evidence</u>. The extent to which Cognizant conducted the process of collecting, reviewing, selecting, and producing documents in

conjunction with the Government and to emphasize certain materials that Cognizant believed would satisfy the Government's investigative priorities; *see id.* at \*7 ("The [company's] efforts to cooperate . . . [were] not [ ] limited to the raw transmission of documents and data" and the "[company] did not simply respond to Government document requests by producing responsive documents for the Government's review" but instead "flagged notable . . . evidence or information that [it] believed would be of particular interest to the Government" and "also complemented [document] productions with facts learned from [the company's] own interviews of relevant employees."(internal quotation marks and citations omitted)); and, critically,

- The Government's acceptance of the results of Cognizant's investigation, in lieu of performing an independent investigation of its own.  The extent to which the Government, rather than truly conducting an "independent" investigation, unquestioningly accepted the facts as conveyed by Cognizant—and did not pursue materials not provided by Cognizant, even when the existence and availability of those materials was obvious (including because they were clearly the result of indefensible privilege invocations)—without performing its own investigation or reasonably following up on leads produced in Cognizant's, *see id.* at \*12 ("The fact that the record contains very little evidence about the Government's own independent investigative efforts during the first three years of [the company's] 'voluntary' investigation renders the inference [that the Government outsourced its investigation] all the more compelling"); *id.* at \*9 ("One critically important issue is just what the Government was doing during the [period between the commencement of the company's investigation] and [the company's] eventual entry into a DPA with DOJ . . . Did the Government conduct a substantive parallel investigation to the 'internal' investigation at [the company], or did it simply give direction [to the company and its counsel], take the results of their labor (which appears to have been fully disclosed to Government lawyers), and save itself the trouble of doing its own work?").

Thus, given the case law identifying the factors relevant to determining state action in general, and outsourcing of criminal investigations in particular, this Court will not be in a position to adjudicate the question of outsourcing based on the improperly narrowed response by Cognizant thus far to the Subpoenas.  Rather, Cognizant must fully comply with the Subpoenas as issued so that outsourcing can be assessed on a full and fair record.

Once outsourcing is established, the Court can then address the constitutional protections that flow from that finding.  Courts have already identified numerous fundamental rights that are implicated when a private party stands in the shoes of the Government.  For example, outsourcing

could implicate Fifth and Sixth Amendment rights as in *Garrity* and *Connolly* itself, *i.e.*, whether the interviews were coerced such that, had they been conducted by the Government, they would not have been admissible.  *Id.* at *10–12; 385 U.S. at 496-97.  It also could implicate Fourth Amendment rights as in *Skinner v. Railway Labor Executives' Ass'n*, where the United States Supreme Court stated that "[w]hether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities . . . The fact that the Government has not compelled a private party to perform a search does not, by itself, establish that the search is a private one."  489 U.S. 602, 614–15 (1989) (finding that the Government "did more than adopt a passive position toward the underlying private conduct").

A determination that the Government outsourced its investigation to Cognizant could also implicate such fundamental Due Process rights as those embodied in *Brady* and its progeny.  In *Blumberg*, No. 14-cr-458 (JLL), the defendant filed a pre-trial motion seeking an order compelling the Government to search the files of ConvergEx, the cooperating company, for *Brady* materials, arguing that the Government had "used ConvergEx and its counsel as both a sword and a shield," and had "effectively deputized ConvergEx as a member of the investigative team and delegated to ConvergEx's counsel numerous investigative tasks," which "enabled the Government to ignore additional unproduced *Brady* materials in ConvergEx's files."  *Id.*, ECF No. 96-1 at 5, 15–16 (D.N.J. Feb. 24, 2016).  In response, Judge Linares held an evidentiary hearing, noting that the motion raised "questions regarding the exact relationship between the Government and ConvergEx . . . and also the extent to which the Government outsourced and/or delegated discovery and investigation tasks to ConvergEx." *Id.*, ECF No. 113 at 2 (D.N.J. June 7, 2016).  *Blumberg* thus makes clear that, once outsourcing is established, the Government has an obligation to search the

company's files for *Brady* material, as it would be obligated to do with respect to the files of any other member of its investigation team.  *See Risha*, 445 F.3d at 303 ("There is no question that the government's duty to disclose under *Brady* reaches beyond evidence in the prosecutor's actual possession.").

Outsourcing raises other Fifth Amendment Due Process issues as well, including when a company that is standing in the shoes of the Government seizes, and then spoliates, critical evidence, which may deprive the defendant of his fundamental right to present evidence in his own defense.  *See*, *e.g*., *California v. Trombetta,* 467 U.S. 479, 488 (1984) (the Due Process Clause imposes a duty on law enforcement to preserve "evidence that might be expected to play a significant role in the suspect's defense"); *United States v. Folad*, 877 F.3d 250, 253 (6th Cir. 2017) (the failure to preserve evidence that was "apparently exculpatory at the time it was destroyed . . . violates due process regardless of the government's good or bad faith").

Even based upon the small subset of responsive documents produced to date under Cognizant's exceedingly narrow, self-selected parameters, there is reason to believe that Cognizant's conduct amounts to Government action.  Indeed, this is apparent, based upon the Government's involvement in and unquestioning deference to Cognizant's investigation, which ultimately limited what steps the Government took and what information it received and considered.  Thus, DLA and the Government coordinated immediately upon Cognizant's self-disclosure and Cognizant focused its efforts throughout the investigation on developing a narrative that would satisfy the Government.  Indeed, those few documents that Cognizant has produced in response to the Subpoenas at least preliminarily reflect that

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████   *See supra* at I.C-E.

Defendants have, at the very least, established that further exploration of the facts is warranted.  Indeed, Defendants submit that there is, at minimum, reason to believe that further disclosures will demonstrate, as the evidence already appears to show, that the Government unquestioningly accepted Cognizant's work—including by interviewing only a subset of those individuals who DLA had already interviewed, and in many cases following the same roadmap DLA provided.  In sum, as the Court has contemplated, more facts require development in this regard, but this is far from the "rabbit hole" and "fishing expedition" that the Government describes it to be.  (3/3/20 Tr. at 10–11).  Nor is it, as the Government has argued, reliant on "an unsupported hunch" that has "no merit."  (ECF No. 76 at 4).

It is worth noting in this regard that Cognizant's motive to undertake and, as much as possible, complete the Government's investigation is apparent.  As a public corporation facing the specter of potential FCPA criminal charges, it had little choice but to cooperate with the Government, including pointing the finger at employees like Coburn and Schwartz.  *See*, *e.g*., Katrice Bridges Copeland, *The Yates Memo: Looking for "Individual Accountability" in All the Wrong Places*, 102 Iowa L. Rev. 1897, 1900 (2017) ("[I]f a corporation refuses to turn over culpable employees and all of the facts about those employees, it will likely be ineligible for a DPA and will face indictment.").  And Cognizant was particularly incentivized by the DOJ to do so at the time, as in September 2015, approximately six months before the investigation began, the DOJ released the Yates Memo, which emphasized the need to "fully leverage its resources to identify culpable individuals at all levels in corporate cases" and alerted the public and the legal

33

community that, *inter alia*, "in order to qualify for any cooperation credit, corporations must provide to the Department all relevant facts relating to the individuals responsible for the misconduct . . . If a company seeking cooperation credit declines to learn of such facts or to provide the Department with complete factual information about individual wrongdoers, its cooperation will not be considered a mitigating factor."   Memorandum from Sally Quillian Yates, Deputy Att'y Gen., U.S. Dep't of Justice to All U.S. Att'ys, *et al.*, Individual Accountability for Corporate Wrongdoing, at 2–3 (Sept. 9, 2015) ("Yates Memo").[13]

Moreover, in April 2016, precisely when Cognizant began its investigation, the DOJ launched its FCPA Pilot Program, through which it "motivate[d] companies to voluntarily self-disclose FCPA-related misconduct" and "encourage[d] companies to disclose FCPA misconduct to permit the prosecution of individuals."   Memorandum from Andrew Weissmann, Chief, Fraud Section Criminal Division, The Fraud Section's Foreign Corrupt Practices Act Enforcement Plan and Guidance at 2 (April 5, 2016); *see also* Assistant Attorney General Leslie R. Caldwell, Criminal Division Launches New FCPA Pilot Program (Apr. 5, 2016) (the FCPA Pilot Program "should encourage voluntary corporate self-disclosure of overseas bribery, and thus more prosecutions of the individuals responsible").   The DOJ's FCPA Corporate Enforcement policy

---

[13] Defendants believe that the evidence will further establish that the DOJ did not so carefully adhere to the Yates Memo, which also requires that "Department attorneys should be proactively investigating individuals at every step of the process - before, during, and after any corporate cooperation . . . [and] should vigorously review any information provided by companies and compare it to the results of their own investigation, in order to best ensure that the information provided is indeed complete."   Yates Memo at 4.   The record, sparse as it is, already points to evidence that this did not occur here: the DOJ only began interviewing Cognizant employees after Cognizant had done so and had provided the fruits of its investigation to the DOJ, and the DOJ and did not seek the information Cognizant withheld under patently erroneous claims of privilege or that would have been suggested by way of normal follow-up.   These and other issues will be further explored in the course of the hearing to be held in this matter but the fundamental point is this: the Government allowed Cognizant to perform its investigation and then simply followed in its tracks.

further set forth a presumption of a declination for companies that voluntarily self-disclosed and fully cooperated.  Justice Manual § 9-47.120.[14]

Thus, under these newly released and widely-publicized DOJ policy initiatives, Cognizant, its counsel, and the Government all understood that Cognizant would be rewarded for developing a case against individuals—particularly corporate officers—whom it alleged were involved in the conduct at issue.[15]  Cognizant knew it needed to do so in order to satisfy the Government that it had reported "all facts related to involvement in the criminal activity by the company's officers, employees, or agents," which DOJ policy "required for a company to receive maximum credit for full cooperation."  Justice Manual § 9-47.120; *see also id.* at § 9-28.1300 ("In deciding whether to charge a corporation, prosecutors should consider whether charges against the individuals responsible for the corporation's malfeasance will adequately satisfy the goals of federal prosecution."); U.S. Sentencing Guidelines §8C2.5(g), App. Note 13 ("A prime test of whether the organization has disclosed all pertinent information is whether the information is sufficient for law enforcement personnel to identify the nature and extent of the offense and the individual(s) responsible for the criminal conduct.").  That these principles were at the core of Cognizant's (and its counsel's) thinking is, again, becoming clear from the limited materials produced in response to the Subpoenas, notwithstanding Cognizant's efforts to limit the Defendants' and the Court's visibility into it by limiting the Subpoenas and inappropriately invoking privilege.

In sum, the focus of the forthcoming outsourcing motion will be whether, and to what

---

[14] The DOJ website highlights Cognizant as one of the fourteen declinations that it issued under the FCPA Corporate Enforcement Policy.  *See* https://www.justice.gov/criminal-fraud/ corporate-enforcement-policy/declinations.

[15] One of the DLA partners who led Cognizant's investigation ███████████████████ co-authored an article dated April 6, 2016 about the FCPA Pilot Program and its requirements.  *See supra* at 7 n.4.

extent, Cognizant effectively functioned as an arm of the Government, and the resulting implications for Defendants' constitutional rights, including those under *Garrity*, *Brady*, the Due Process Clause, and other provisions. Moreover, this course of action deprived the Defendants of the kind of fair and impartial investigation that the Government, but not a private party, is required to perform. After all, as the United States Supreme Court long ago made clear in *Berger v. United States*, "[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." 295 U.S. 78, 88 (1935). On the other hand, private parties, like Cognizant, and their attorneys, unbounded by such concerns, will be inclined to do exactly what they did here: provide a curated narrative in order to minimize the company's own exposure to liability while pointing the figure at others, like the Defendants, in satisfaction of the Government's policy objectives.[16] But to allow the defense access to the evidence needed to fully and fairly demonstrate that this is, in fact, what occurred, Cognizant must be compelled to comply with the Subpoenas that this Court authorized.

---

[16] Beyond the benefits that companies like Cognizant receive by "cooperating" with the Government, including identifying those whom it determines to be culpable, individuals who work at those companies and contribute to the desired outcome can realize significant benefits as well, including in ways that Government prosecutors and agents never could. Indeed, as set forth in a proxy statement that Cognizant filed with the SEC on April 21, 2021: "in recognition of his contributions to successfully resolving the company's Foreign Corrupt Practices Act matter in 2019, the committee provided a further additional equity award in 2020 consisting of $1,000,000 of RSUs [Restricted Stock Units]" to Matthew Friedrich, who served as Cognizant's Executive Vice President, General Counsel, Chief Corporate Affairs Officer and Secretary from May 2017 through January 2021. This recent disclosure further underscores the inadequacy of Cognizant's self-selected end-date of October 24, 2016 for its collection and search in response to the Subpoenas, as discussed below, and provides a basis for requiring Cognizant to search custodial files such as Friedrich's for responsive documents. *See* Cognizant Proxy Statement (Apr. 21, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1058290/000120677421001176/ctsh3816981-def14a.htm.

**C.     The Narrow Date Range Used By Cognizant Is Inconsistent with the Terms of the Subpoenas and the Orders of the Court.**

Consistent with its unduly narrow view of the proper scope of the Subpoenas, and its desire to unilaterally rewrite the Subpoenas to meet its needs, Cognizant has taken the position that ███ ████████████████████████████████████████████████████████████████████████████ ██████████████ Ex. A at 2.  That position is unreasonable in several ways, set forth below.

**1.     The Court-Approved Subpoena Requests on Their Face Extend Beyond Cognizant's Narrow Date Range.**

To begin, the Court itself authorized the issuance of the Subpoenas, which included specific requests that, by their terms, extend beyond Cognizant's self-selected date range.  Specifically, Schwartz Request No. 6 seeks communications between Cognizant and DOJ concerning Cognizant's continued cooperation with DOJ consistent with the company's agreement in February 2019 to "continue to fully cooperate in the Department's ongoing investigations and any prosecutions that might result."  Despite the Court's express grant of this request, Cognizant limited its scope to the narrow time period of August 14, 2016 to October 24, 2016, and thus did not produce any documents responsive to Schwartz Request No. 6.

Similarly, Schwartz Request No. 7 seeks communications between Cognizant and DOJ pertaining to the February 2019 declination agreement and SEC Order.  Again, ████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ Ex. A at 3.  But that is not and cannot be a proper basis for objecting, as Schwartz Request No. 7, like Schwartz Request No. 6, was expressly authorized by the Court.[17]  Indeed, the invalidity of

---

[17] ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

Cognizant's objection exposes the inappropriateness of its position regarding the scope of the Subpoenas overall, as its argument depends upon reading Requests like No. 7 out of the Subpoenas in order to fit the reformulated "scope" that Cognizant desires. Along similar lines, Coburn Request No. 7 seeks documents pertaining to the benefits Cognizant would receive as a result of its cooperation with DOJ, "including records related to DOJ's February 13, 2019 decision to decline to prosecute" Cognizant. Accordingly, by imposing its self-selected date range, Cognizant is effectively reading out of the Subpoena these Court-approved Requests.

Cognizant should thus be compelled to collect and produce the full scope of documents responsive to these Requests, documents that could very well shed light on the collaboration between Cognizant and the Government based upon communications between the two at a key time, when Cognizant likely would have emphasized to the Government its cooperative efforts, and hence the extent to which the Government outsourced its investigation to Cognizant.

### 2. Cognizant's Search Should Extend Back to April 2016, When the Investigation Commenced.

In addition to being facially incompatible with specific Court-approved requests, Cognizant's self-selected date range of August 14, 2016 to October 24, 2016 fundamentally fails to fulfill the purposes of the Subpoenas, which is to reveal evidence of whether the investigation was outsourced. (ECF No. 96 at 11 n.11). Consistent with *Connolly*, discussed above, evidence from the beginning of the investigation in April 2016 through, at least, the Indictment in February 2019, including evidence that either pre- or post-dates the Defendants' interviews, is relevant to this inquiry and to the forthcoming hearing ordered by the Court.

_____

███████████████████████████████████████████ Ex. A at 3 & n.4. But, again, it cannot be the case that requests explicitly approved by the Court are somehow beyond the scope of the Court's Order. To the extent that Cognizant has also raised privilege and burden objections to these requests, those objections are meritless for the reasons discussed *infra* at I.C and II.B.

████████████████████████████████████

████████████████████████████████████

████████████████████████ Of course, that claim can and should be challenged, and tested.  But even if Cognizant's first written communication with the Government was, in fact, ███████, that would not preclude the existence of earlier-dated documents responsive to the Subpoenas and relevant to the outsourcing issue—including documents dated prior to August 14, 2016, the start date Cognizant unilaterally selected for its collection.

Such documents clearly exist.  Indeed, ██████████, DLA had already conducted ██ witness interviews.  Documents associated with these and other key investigative events likely contain responsive information bearing directly on the outsourcing inquiry.  For example, evidence that the interviews conducted during this period were encouraged or compelled is directly responsive to Schwartz Request No. 4 and Coburn Request No. 8.  And evidence that DLA's preparations for and questioning during those interviews were conducted in accordance with Cognizant's resolve to cooperate with the Government, as discussed above, is also relevant.

Likewise, evidence of Cognizant's discussing its incentives or motivation to self-disclose—whether internally, with its lawyers, or with the Government—or strategizing about what it would do to maximize its cooperation credit and shape its investigation in accordance with the Government's specific priorities and interests, *e.g.*, by identifying individual company officers for the Government to prosecute, consistent with then-operative DOJ policies, would also be responsive to the Subpoenas.  Certainly, the specific DLA attorneys whom Cognizant retained to lead the investigation were acutely aware of the Government's priorities and interests in that regard: as noted, Karl Buch was a former Assistant United States Attorney in the U.S. Attorney's Office for the District of New Jersey, another DLA partner was formerly Assistant Chief Litigation

Counsel in the SEC, and both published articles touting the benefits of self-disclosure and cooperation under the DOJ's FCPA Pilot Program that came into effect in early April 2016. *See supra* at 7 n.7. Accordingly, documents prior to August 2016—starting from the beginning of the investigation in April—could bear significantly on the outsourcing inquiry. Given (1) the substantial pressure that Cognizant faced to cooperate, (2) the fact that it had been considering self-disclosure for at least two and half months prior, and (3) the relationships between Cognizant's counsel and the DOJ and SEC, Cognizant should conduct a search of documents created prior to August 31, 2016 and produce responsive documents, including those bearing upon whether Cognizant's counsel communicated with the Government prior to August 31, 2016 about the investigation and potential self-disclosure.

But Cognizant has not, in response to the Subpoenas, produced any documents concerning these topics, in part based upon its erroneous privilege claims, *see infra* II.B, but also due to the artificially constricted date range and narrow group of custodial files that Cognizant selected for its search. Indeed, Cognizant has flatly refused to collect or review documents from the custodial files of not only Schwartz, Cognizant's Chief Legal Officer at the time, but also other key Cognizant personnel involved in overseeing the investigation. Additionally, and over the Defendants' objections, ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Ex. A at 5.

Accordingly, Cognizant should be required to search for materials beginning April 1, 2016—when the investigation commenced.  And that search should include each DLA custodian who was involved in the early stages of Cognizant's investigation, as well as all relevant Cognizant custodians, including the Defendants and other key personnel improperly omitted from Cognizant's initial search, as discussed below in greater detail.

### 3. Cognizant's Search Should Extend Beyond October 24, 2016, Through At Least February 14, 2019, the Date of the Indictment.

Beyond refusing to search for responsive materials earlier than August 14, 2016, Cognizant's use of an October 24, 2016 cut-off date as the last day for which it would search in response to the Subpoenas is similarly arbitrary and misguided.  This is so for at least three reasons.

*First*, it appears to rest on a false premise: that October 17, 2016—one week prior to Cognizant's self-selected cut-off date—was the first and only oral download by DLA to the Government specifically dedicated to Coburn's and Schwartz's interviews.  Lustberg Cert. ¶ 46.

Ex. Z

[18] Ex. JJ.  Thus, the rationale for the date arbitrarily set by Cognizant, after

---

[18] Both the Government and Cognizant have refused to answer Defendants' repeated requests for

which it refused to search for documents, fails.

*Second*, however, and more fundamentally, it is clear that Cognizant's self-selected end date for its search cannot satisfy the intent of the Subpoenas as written and authorized by the Court. Indeed, even the incomplete discovery produced to date reflects that numerous events bearing directly on the "investigation and interviews of" Schwartz and Coburn in fact occurred *after* October 24, 2016.  After all, Schwartz did not resign from Cognizant until the following week, on November 3, 2016.  And Cognizant's investigation of the Defendants obviously continued well past October 2016.  ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████  Ex. U (DOJ-CTS-LTR-00000259).[19]

Likewise, in May 2017, Cognizant, through Goodwin, demanded the return of any Cognizant data retained by Schwartz and Steptoe, Schwartz's then-counsel, including an image of Schwartz's company-issued laptop and data on a personal hard drive—further indicating that the investigation of Schwartz was ongoing.  Ex. V (CTS-0103620).  On June 1, 2017, Cognizant, through Goodwin, reiterated that demand, warning that any deletion by Schwartz of such data before it was turned over to Cognizant's counsel "could also conceivably be viewed by DOJ or

---

the specific dates on which all such downloads occurred.  In the face of the facts that this basic information must be readily available to them and is critical to the forthcoming outsourcing hearing, there is simply no justifiable basis for Cognizant to continue to conceal it from the Defendants.  Cognizant should thus be compelled to disclose all dates on which DLA provided factual information to the Government concerning its interviews of the Defendants and other interviewees during the course of the investigation, including the identities of the participants at such meetings.

[19] ██████████████████████████████████████████████████████████

██████████████████████████████  *Id.*

SEC as obstruction of justice given those investigations." Ex. AA. Cognizant also withheld, for several months, the advancement of Schwartz's legal fees, and even threatened to cut off such payments entirely, despite an express contractual obligation to advance them, unless and until he provided the forensic image of his laptop and the data thereon. As a result, by August 2017, Schwartz's counsel had provided to Goodwin the forensic image of Schwartz's laptop and hard drive and confirmed that it destroyed all backups/copies in the possession of Steptoe and its outside E-Discovery vendor, in exchange for Cognizant's willingness to fulfill its contractual duty to advance Schwartz's legal fees. Ex. RR (CTS-0103628).

Moreover,  Thus, communications regarding efforts to seek information, including information related to the Defendants that came from other interviewees, would not be captured under Cognizant's date range. That is, Cognizant's proposed date range is unreasonable because, as the evidence makes clear and as Cognizant has already admitted, *See* Ex. Z; Ex. JJ.

Documents that would bear upon the Government's involvement in or knowledge of any of these events—all of which are central to the "investigation and interviews" of Schwartz and Coburn but occurred after Cognizant's self-selected end-date of October 24, 2016—are in Cognizant's possession and would obviously be relevant both to whether there was outsourcing and what constitutional violations followed therefrom. Indeed, there really is no dispute that Cognizant's investigation continued well past its self-selected cutoff date, and based on the volume of communication between Cognizant's counsel and the Government that has already been disclosed, it is entirely reasonable to conclude that there are additional indicia of outsourcing from

the post-October 24, 2016 period, including, for example, Government requests that Cognizant use specific search terms, or Government indications that it would not pursue further investigation on a given topic in light of the information that Cognizant had provided.  Such evidence, even if it post-dated the interviews, would demonstrate that the overall investigation itself, including but not limited to Defendants' interviews, had been effectively outsourced—exactly the type of crucial "context" that the Court intentionally allowed "breathing room" to develop.  (ECF No. 96 at 16.)

*Third*, as explained above, specific requests in the Court-approved Subpoenas extend, by their terms, into 2018 and 2019, and thus well past Cognizant's self-selected end-date of October 24, 2016, notwithstanding Cognizant's flat refusal to comply with them.  And the topics to which those requests are addressed—Cognizant's continued cooperation with the Government (Schwartz Request No. 6) and communications with the Government relating to the February 2019 declination agreement and SEC Order (Coburn and Schwartz Requests No. 7)—are likely to yield information bearing directly on the outsourcing inquiry (which is why the Court approved them). Indeed, in negotiating Cognizant's resolution with the Government into 2019, Cognizant's counsel surely touted the extent of the company's cooperation with the Government in an effort to obtain the best result possible.  Such communications, and any notes reflecting them, must be searched for and produced in accordance with the Subpoenas' express terms.

Further, any purported burden upon Cognizant of expanding its search beyond October 24, 2016 is minimal, given Cognizant's central role in this case and the hundreds of thousands of documents that it has already collected, reviewed, searched, and produced to the Government over a multi-year period.[20]  And even more critically, any alleged burden on Cognizant cannot outweigh

---

[20] The burden of further searches is also minimal when viewed through the lens of Cognizant's expenditure in cooperating with the Government.  For example, public filings show that Cognizant spent $79 million between 2016 and 2018 on costs related to the FCPA investigation.

the Defendants' fundamental Due Process rights as criminal defendants to obtain the materials necessary to mount a defense, given the important liberty interests at stake. *See United States v. Trout*, No. CR-05-149-C, 2006 WL 461047, at *3 (W.D. Ok. Feb. 24, 2006) (denying criminal defendant access to documents sought by Rule 17 subpoena "is more likely oppressive and unreasonable [to the criminal defendant], given that her liberty is at stake from accusations made by her former employer" than it would be to subpoena recipient).[21]   Indeed, the Court already determined in its September 14 Order that the Defendants' revised subpoenas satisfy the *Nixon* test, including its "specificity" requirement that is designed to prevent the issuance of subpoenas that amount to a "general 'fishing expedition.'"  (ECF No. 96 at 15 (quoting *Nixon*, 418 U.S. at 700)).  That is, in performing its *Nixon* analysis, the Court has already considered problems of undue burden, and, in fact, narrowed the Subpoenas to ensure that they would not be overbroad. *See id.* at 16-20; *see also United States v. McClure*, No. 10–028, 2010 WL 3523030, at *2 (E.D. La. Sept. 1, 2010) (stating that the specificity element of the *Nixon* test "seems to require an absence of undue cost, burden, or delay associated with excessively broad requests" and holding that subpoena in question was "adequately specific to prevent any undue burden or delay associated with vague or excessively broad subpoena requests"); *United States v. RW Professional Leasing Servs. Corp.*, 228 F.R.D. 158, 162-64 (E.D.N.Y. 2005) (equating Rule 17's requirement

---

*See* Cognizant 2018 Form 10-K *available at* https://cognizant.q4cdn.com/123993165/files/Financial/2018/q4-form-10k.pdf.

[21] Although Cognizant has stated that it objects to expanding its search in response to the Subpoenas as burdensome, it has not articulated with any concreteness what its claimed burden would be.  In any event, the Subpoenas are not, under the law, unduly burdensome, and Cognizant cannot possibly shoulder its burden of showing that expanding its search to comply with the Subpoenas would be "unreasonable or oppressive" within the meaning of Rule 17, particularly given the hundreds of thousands of documents it voluntarily produced to the Government in this very case.  *Impounded*, 277 F.3d at 415; *Caruso*, 948 F. Supp. at 397 (quoting *Nixon*, 418 U.S. at 698).

that a subpoena not be "unreasonable or oppressive" with the three-part *Nixon* test and analyzing burdensomeness in the context of *Nixon*'s specificity requirement).

In sum, although the limited evidence that Defendants have obtained to date provides strong indicia of the Government's close coordination with, and reliance on, Cognizant, *see supra* at I.B, significant gaps in the factual record remain that can and must be filled in compliance with the Subpoenas. Accordingly, Cognizant should be compelled to collect and produce responsive materials from the start of the investigation in April 2016 through at least the date of the Indictment in February 2019, rather than from its own self-selected and unjustifiably narrow date range of August 14, 2016 to October 24, 2016.

### D.   Cognizant Should Be Compelled to Search the Files of Additional Custodians.

In addition to restricting its search to an unduly narrow date range, Cognizant's selection of custodians was also unjustifiably limited and omitted several essential individuals whose custodial files are certain to contain responsive documents, including (1) the Defendants; (2) key Cognizant personnel who oversaw the investigation; and (3) Cognizant's accounting firms, which played a central role in the investigation and likely had insight into Cognizant's interactions with the Government. Cognizant should be compelled to search for and produce responsive materials from these essential custodians' files.

#### 1.   The Defendants.

In response to the Defendants' request that their custodial files be searched for responsive materials, Cognizant claimed that it was under the impression that it need not have done so because it understood that Schwartz still possesses his company-issued laptop and thus has any and all potentially responsive information in his possession. Lustberg Cert. ¶ 47. That is not true. To the contrary, upon his resignation from the company, Schwartz returned his company-issued work computers. And, at Cognizant's demand, in August 2017, Schwartz's counsel surrendered to

46

Cognizant the only remaining forensic image Schwartz possessed of his laptop and, though

Schwartz has retained certain documents ███████████████████████████████,

Cognizant has not made the broader dataset from Schwartz's laptop available to him since.[22]

Naturally, the Defendants' custodial files will contain "information relating to the

investigation and interviews of" Schwartz and Coburn, including responsive communications

before and after their interviews and documents regarding the collection and imaging of their

laptops, personal hard drives, and other electronic devices. Indeed, given Coburn's and Schwartz's

positions as Cognizant's President and Chief Legal Officer, respectively, the Defendants were

involved in the investigation from DLA's retention in April 2016 until August 20, 2016. Thus,

the Defendants' custodial files will also contain uniquely responsive information regarding

significant investigative events that occurred during the early stages of the investigation. Though

complex privilege issues may arise, including with regard to Cognizant's waiver of any such

privileges, *see infra* at II.B, that does not justify Cognizant's refusal to even search for responsive

documents from the Defendants themselves, which can then be assessed for privilege to the extent

it may or may not apply to any particular responsive document.

### 2. Additional Cognizant Custodians: Robert Molina, Henry Shiembob, and Maureen Breakiron-Evans.

Cognizant should also be required to search the custodial files of key Cognizant personnel

who had significant responsibility for the investigation, including Robert Molina, Henry

Shiembob, and Maureen Breakiron-Evans—whose files the Defendants specifically asked

---

[22] To date, Cognizant has not confirmed that it has even preserved or retained custody of Schwartz's laptop or the image thereof. Leaving aside any evidence of outsourcing that is thus being made unavailable as a result, if these items have been lost or destroyed, that will deprive Schwartz of uniquely probative information regarding his actions and state of mind at the time of the events in question, raising questions of spoliation and, to the extent that the Government was aware of Cognizant's actions in this regard, violations of the Due Process right to a fair trial, among other constitutional problems.

Cognizant to search both before and after Cognizant identified on February 26, 2021 the custodians from whom it was willing to collect and review documents. Ex. A at 3-7. Molina served as a senior director for Global Security at Cognizant during the relevant period, participated in internal investigation interviews, and was involved in day-to-day management of the internal investigation. Thus, his custodial files likely contain documents responsive to, at minimum, Schwartz Request No. 2 and Coburn Request No. 5 (memoranda of Cognizant interviews) and Schwartz Request No. 4 and Coburn Request No. 8 (communications between Cognizant and its employees regarding interviews, including communications addressed to employee cooperation with or participation in investigations). But Cognizant did not produce any documents responsive to those requests and refused to search Molina's files on the basis that any responsive communications supposedly would have been captured through searching DLA custodians' files. Lustberg Cert. ¶ 48. Molina, however, did not appear in a single document that was produced, and searching DLA custodians obviously would not capture internal Cognizant communications responsive to the Subpoenas.

Henry Shiembob served as Cognizant's Chief Security Officer during the relevant period and was among those overseeing Cognizant's internal investigation and communicating with outside counsel, including regarding document preservation and collection efforts. Like Molina, Shiembob's custodial files likely contain documents responsive to Schwartz Request Nos. 2 and 4 and Coburn Request Nos. 5 and 8, and yet not a single document involving Shiembob was produced. Cognizant did not search Shiembob's files because, according to Cognizant, Shiembob was only involved in the investigation until August 2016, and thus his files would fall outside of the date ranges Cognizant applied for its search. Lustberg Cert. ¶ 48. For the reasons explained

above, Cognizant should be required to search all relevant Cognizant custodians, including Shiembob, from April 2016 forward.

Maureen Breakiron-Evans is a member of Cognizant's Board of Directors and served as the chair of Cognizant's Audit Committee during the relevant period.  As chair of the Audit Committee, Breakiron-Evans oversaw the internal investigation both prior to and following Schwartz's removal from the investigation on August 20, 2016.  Breakiron-Evans thus very likely had relevant non-privileged discussions regarding the investigation and Cognizant's cooperation efforts with, among others, fellow Board members, including Chairman John Klein, as well as Cognizant personnel.  Notwithstanding Cognizant's claims to the contrary, given her unique role, Breakiron-Evans' custodial files are not cumulative of those that Cognizant agreed to search, Lustberg Cert. ¶ 48, which again, would not capture non-privileged internal communications.[23]

### 3.    Cognizant's Accounting Firms.

Cognizant's accounting firms—Ernst & Young ("E&Y") and PricewaterhouseCoopers ("PwC")—also likely possess documents responsive to the Subpoenas, many of which will not be privileged.   Given the unique and central role that both accounting firms played in the investigation, they would be aware of, and potentially involved in, Cognizant's interactions with and efforts to satisfy the Government, including by stepping into its shoes (and thus of the facts and circumstances that bear upon outsourcing).  Thus, Cognizant's refusal to search E&Y and PwC

---

[23] In this regard, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Ex. A at 2.  But this objection, in addition to improperly raising burden concerns that were already addressed by the Court in its September 14 Order, as discussed below, puts the cart before the horse and certainly does not justify Cognizant's refusal to search key custodians like Breakiron-Evans whose responsive documents will almost certainly include non-privileged communications.

records on the ground that any production would be cumulative and unduly burdensome.  Lustberg Cert. ¶ 48.

According  to  Cognizant, ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████  Ex. B at 5.  E&Y conducted Cognizant's forensic accounting during the internal investigation and documents prepared by E&Y were produced to the Government following the internal investigation, and accordingly would not be subject to privilege, which would have been waived.

As for PwC, it served as Cognizant's independent, external auditors during the relevant period, and in this capacity, audited the company's internal investigation and was provided by Cognizant frequent and contemporaneous updates on the results of the company's investigation pursuant to Section 10A of the Securities Exchange Act, 15 U.S.C. § 78j–1.  And, as discussed below, given PwC's status as an independent, external auditor with differing interests than those of Cognizant, its responsive documents cannot be privileged.  *See Medinol, Ltd. v. Boston Scientific Corp.*, 214 F.R.D. 113, 115-17 (S.D.N.Y. 2002) (sharing special litigation committee materials with outside auditor waived work product protection because outside auditor's interests "were not necessarily united with those of [the company]; they were independent of them" and "disclosures to [the outside auditor] as independent auditors did not . . . serve the privacy interests that the work product doctrine was intended to protect"); *In re Pfizer Inc. Securities Litigation*, No. 90 Civ. 1260 (SS), 1993 WL 561125, at *7 (S.D.N.Y. Dec. 23, 1993) (rejecting assertion of privilege over documents provided to independent auditor because "[d]isclosure of documents to an outside accountant destroys the confidentiality seal required of communications protected by

the attorney-client privilege, notwithstanding that the federal securities laws require an independent audit").

Accordingly, Cognizant should be compelled to search the custodial files of the Defendants, Robert Molina, Henry Shiembob, Maureen Breakiron-Evans, and Cognizant's accounting firms, E&Y and PwC—each of which are likely to yield responsive materials bearing directly on the outsourcing inquiry.

### E.   Cognizant Should Be Compelled to Expand Its Search to Include Essential Search Terms Omitted from Those Cognizant Self-Selected.

The search terms that Cognizant applied to collect and review documents for responsiveness to the Subpoenas were, like the custodians that Cognizant self-selected, facially inadequate.  *See* Ex. A at 4-7.  Indeed, the search terms that Cognizant unilaterally selected, applied, and refused to supplement omit essential terms that come directly from the Subpoenas themselves—including "interview," which appears fifteen times in Schwartz's Subpoena, and "cooperation," which appears four times—and likewise omit first names and nicknames, which of course resulted in a collection and production that cannot satisfy the basic requirements of the subpoenas.

Accordingly, in order to ensure that its search captures the critical documents the Court intended Cognizant to produce upon authorizing the Subpoenas, the Court should order Cognizant to search the following additional terms, each of which the Defendants proposed, but Cognizant rejected without explanation:

- Interview

- DNJ

- prosecut!

- Yates

- cooperat!

- India

- KITS

- The following first names and nicknames: Steven, Steve (Schwartz); Gordon (Coburn); Oz (Oscar Benvenuto's nickname); Nick (Grippo).

*See Bailey Indus., Inc. v. CLJP, Inc.*, 270 F.R.D. 662, 671 (N.D. Fla. 2010) (granting motion to compel and requiring subpoena recipient to use additional specific search terms upon concluding that "sufficient reason exists to believe that" subpoena response to was "incomplete" because recipient "did not include obviously relevant search terms"); *V5 Techs. v. Switch, Ltd.*, 332 F.R.D. 356, 367 (D. Nev. 2019) (granting motion to compel and requiring subpoena recipient to use "at a minimum the search terms [the subpoenaing party] proposed").

## F. Cognizant Should Be Compelled to Search for and Produce Communications as Defined in the Subpoena, and Thus Not Limit Its Search to Only Email Communications.

Schwartz's Subpoena expressly defines "communications" to include not only emails but also text messages, instant messages, and notes, among others. And the Coburn Subpoena repeatedly requests correspondence and information exchanged between Cognizant and the Government without limitation as to medium. But Cognizant refused to collect and review text messages or Cognizant's internal messaging system and simply claimed without further explanation that text messages would likely not have been used. Lustberg Cert. ¶ 49. ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ Ex. BB (CTS-0012253-54); Ex. CC (CTS_R17_0000986).[24] Thus, because

---

[24] ████████████████████████████  Ex. I (CTS_R17_0000251),

Cognizant's refusal to search for responsive text messages and other non-email communications not only disregards the Subpoenas' express terms, but also is premised on an assertion that is belied by the facts, Cognizant should be compelled to search for and produce "communications" as defined in the Court-approved Subpoenas.  *See Nugent v. Scott Fetzer Co.*, No. 19-14759, 2020 WL 1322268, at *11 n. 14 (E.D. La. March 20, 2020) ("caution[ing]" the subpoena recipient in claiming that no responsive documents exist that that subpoena defined "communications" broadly and "urg[ing]" that the recipient "check all of his devices—phones, desktop, computer, laptops, tabled, USB stick, etcetera, with this instruction in mind"); *Strand v. USANA Health Sci., Inc.*, No. 2:17-cv-00925-HCN-PMW, 2019 WL 6324629, at *3 (D. Utah Nov. 26, 2019) (rejecting argument that subpoena's definition of "communications", which included text messages and instant messages among 17 listed categories, was overbroad, concluding that "nothing in th[is] definition[] . . . would make [it] overbroad to the point of creating an undue burden"); *V5 Techs.*, 332 F.R.D. at 367 (noting that the subpoena "defin[ed] broadly 'communications' and 'documents'" and so "its scope also covers [the nonparty's] personal email accounts and text messages").

In sum, this Court is on the verge of conducting an inquiry as to whether the Defendants' fundamental constitutional rights have been violated, and despite the Court's order to produce information bearing directly on that inquiry, potentially critical evidence remains in the possession of Cognizant alone.  To enable the Defendants to present a full record with regard to its outsourcing argument—as to which some, but far from all, relevant evidence has already come to light—

Cognizant must be compelled to conduct its search and production in conformity with the Subpoenas' terms and the Court's Orders.

## II.    COGNIZANT SHOULD BE COMPELLED TO PRODUCE THE RESPONSIVE DOCUMENTS IT WITHHELD OR REDACTED ON THE BASIS OF ERRONEOUS PRIVILEGE AND WORK PRODUCT ASSERTIONS.

This case presents unique and significant privilege issues that bear directly on the outsourcing issue and on Defendants' right to mount a defense.  These issues arise in part out of the fact that Schwartz was the Chief Legal Officer of Cognizant during the events at issue, and that the Defendants are being prosecuted in connection with communications in which Schwartz participated in his capacity as a lawyer.  Indeed, a central component—if not *the* central component—of the Government's case revolves around two disputed conversations in which Schwartz, as Cognizant's Chief Legal Officer, is alleged to have authorized the payment of a bribe.

Although those calls would otherwise clearly be privileged in that Schwartz was participating in his capacity as a lawyer, Cognizant waived that privilege by sharing its version of the content of that conversation with the Government and allowing its employees to describe them to the Government.  But this clear waiver notwithstanding, Cognizant is still inappropriately asserting privilege over other, related communications regarding the same subject matter, thus depriving the defense (and the Government) of correspondence and information—including statements by Schwartz and Coburn themselves—that go directly to the allegations charged in the Indictment.

But the privilege issues are not limited to issues surrounding the alleged crime.  They also extend to issues surrounding the investigation of the alleged crime, and in particular to issues relating to Cognizant's conduct of its internal investigation and the transmittal of the results of that investigation to the Government.  Again, Schwartz's position as Cognizant's Chief Legal Officer is central to the analysis.  As Chief Legal Officer, Schwartz played a role in initiating and

overseeing the internal investigation that over time led to the charges against him in this case.  And the Government has indicated an intention of using Schwartz's conduct in overseeing (and eventually being removed from) the internal investigation as evidence of "consciousness of guilt." In doing so, the Government has again relied on documents provided to it by Cognizant and statements made by Cognizant employees.  And again Cognizant, by providing that information to the Government and allowing its employees to describe communications with Schwartz, has decided to waive privilege.

Nevertheless, and despite having clearly waived privilege over these events and communications, Cognizant now asserts privilege over other conversations related to the investigation that clearly show Schwartz's efforts to cooperate with and advance the same investigation.  *See infra* at II.  By selectively waiving privilege and thereby allowing the Government access to evidence that, as part of a self-serving narrative and out-of-context, are made to appear "incriminating," while preventing the defense from accessing other material information, including exculpatory evidence, Cognizant has engaged in the kind of "*Brady* laundering" that can occur when the Government relies on a private party to conduct its investigation.[25]

Against the backdrop of these issues, on April 17, 2021, Cognizant produced its revised privilege log, ███████████████████████████████████████████████████

---

[25] The term "*Brady* laundering" has been used where the Government delegates its investigatory role to an interested third-party who then does not fulfill the constitutional duty to obtain and produce exculpatory material.  *See*, *e.g.*, Law360, "Ex-ConvergEx Exec Accuses DOJ Of 'Brady Laundering'" (March 12, 2018), *available at* https://www.law360.com/articles/1020912/ex-convergex-exec-accuses-doj-of-brady-laundering ("by having the company's lawyers do the evidence-sifting work of agents and prosecutors, the DOJ was able to turn a blind eye toward exculpatory material, a move he dubbed '*Brady* laundering' – the U.S. Supreme Court's ruling in *Brady v. Maryland* requires prosecutors to turn such evidence over when they have it.").

█████████████████████████████████████████████████

███████████████ [26] Ex. Y.  The Court should reject Cognizant's privilege and work product assertions because (1) Cognizant has failed to provide sufficient information for Defendants to meaningfully review the privilege log; (2) Cognizant has improperly withheld or redacted documents to which neither the attorney-client privilege nor the work product doctrine applies; (3) Cognizant has waived privilege with respect to the subject matter of numerous categories of responsive documents; and (4) Defendants' constitutional right to the materials outweighs any applicable privilege or work product protection.

In addition to invoking the privilege in an inaccurate and unsupported manner, Cognizant also withheld responsive documents from its productions to the Government—which gaps persisted when the Government produced the same materials to Defendants in discovery—and from its production and logs in response to Defendants' Rule 17 Subpoenas.  To be clear, Defendants' concern with Cognizant's inaccurate and unsupported invocation of the privilege and failure to produce responsive documents is not merely theoretical.  As set forth below, Schwartz is in possession of certain specific documents that show that Cognizant has withheld and redacted both documents relating to subject matter for which privilege has been waived and also documents to which privilege does not apply, including documents containing exculpatory information.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[26] Cognizant produced the April 17, 2021 privilege log three and a half weeks after it produced an earlier version of the log on March 23, 2021, ██████████████████████████████ ████████████████████████ The revised privilege log purported to rectify several deficiencies described by Defendants through the meet-and-confer process.



███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

Despite the fact that these emails are clearly relevant and material to the defense and contain no substantive legal advice—and that whatever privilege attached to the subject matter had been waived through voluntary disclosure to the Government—Cognizant did not produce these emails and does not appear even to have logged them.  Indeed, Schwartz is only aware of them because he possessed them independently of Cognizant's production, and but for that fact, no one other than Cognizant would know that Cognizant was not producing relevant and exculpatory documents.

And these are just ██ examples of a pattern of highly suspect privilege and work product assertions by Cognizant that prejudice Defendants and inhibit their ability to fairly and completely defend themselves.  Defendants happen to be aware of these examples and some others, but of

course are not privy to every erroneous or inappropriate assertion of privilege and work product protections in the millions of documents reviewed by Cognizant but never produced to the Government or Defendants; indeed, Schwartz has been specifically prevented from knowing the full range of such documents as a result of Cognizant having compelled Schwartz's counsel to relinquish his laptop, which they had obtained in order to defend him because it contained evidence of his contemporaneous communications.   Cognizant's selective and strategic invocation of privilege and its failure to properly log supposedly privileged communications has thus had the effect of misleading, intentionally or otherwise, the Government and Defendants, undermining the discovery process, and depriving Defendants of *Brady* material.  *See Blumberg*, ECF No. 113 at 2 (D.N.J. June 7, 2016) (holding an evidentiary hearing to determine "the extent to which the Government outsourced and/or delegated discovery and investigation tasks to ConvergEx.").  For this reason, and those that follow, the Court should compel Cognizant to produce all responsive materials that were improperly withheld on the basis of privilege or the work product doctrine and ensure that Cognizant not deprive Defendants of their constitutionally protected right to present a complete defense.

### A.    Cognizant Has Thwarted Defendants' Ability to Fairly Evaluate its Privilege and Work Product Assertions.

Initially, Cognizant's April 17, 2021 category-based privilege log severely curtails Defendants' ability to meaningfully review the veracity of its assertions.[28]  Thus, the ██ general subject matter descriptions included on Cognizant's categorical log do not provide sufficient

---

[28] Schwartz informed Cognizant of several flaws in its March 23, 2021 privilege log by letter dated March 30, 2021.  *See* Ex. X. ████████████████████████████████████████████
████████████████████████████████████████  *See* Ex. B.  On April 17, 2021, Cognizant provided Defendants with a revised privilege log.  As described below, however, many of the same fundamental flaws persist.

information to enable the defense to fairly assess Cognizant's privilege and work product claims which, to be clear, must be "asserted on a document by document basis." *In re Hum. Tissue Prods. Liab. Litig.*, 255 F.R.D. 151, 164 (D.N.J. 2008), *aff'd*, No. CIV. 06-135, 2009 WL 1097671 (D.N.J. Apr. 23, 2009); *see Schaeffer v. Tracey*, No. 15-CV-08836-MCA-SCM, 2017 WL 465913, at *4 (D.N.J. Feb. 2, 2017) (privilege waived where privilege log "included only generic subject matter descriptions that do not adequately 'describe the nature of the . . . communications . . . in a manner that . . . will enable other parties to assess the claim' as required by Rule 26(b)(5)") (citation omitted).  Indeed, "[t]he Third Circuit has rejected 'broadside invocation[s] of privilege' which fail to 'designate with particularity the specific documents or file to which the claim of privilege applie[s],'" particularly where, as here, the responding party cannot establish that creating a sufficiently detailed document-by-document log would be unduly burdensome.  *Torres v. Kuzniasz*, 936 F. Supp. 1201, 1208-09 (D.N.J. 1996) (quoting *United States v. O'Neill*, 619 F.2d 222, 225 (3d Cir. 1980)); *see Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, No. 07-1299 (SRO)(MAS), 2012 WL 1585335, at *4 (D.N.J. May 4, 2012) (requiring document-by-document privilege log because responding party did not establish that doing so would be unduly burdensome where "the privilege log is narrow in scope, potentially resulting in a few thousand documents").

Additionally, the privilege log omits the subject lines of the emails it withheld or redacted. This basic information is critical to Defendants' ability to evaluate Cognizant's privilege and work product assertions.  Subject lines are not protected from disclosure unless they reveal privileged information; consistent with the law and industry standards, they are the type of information customarily included on privilege logs.  *See*, *e.g.*, *Favors v. Cuomo*, 285 F.R.D. 187, 223 (E.D.N.Y. 2012) ("[G]iven today's litigation technology, there is no good reason why privilege logs should not include—where to do so would not itself reveal privilege or protected

60

information—other readily accessible metadata for electronic documents, including, but not limited to . . . subject line[s] . . . and a description of any attachments.") (citation omitted); *Glennon v. Wing Enterprises, Inc.*, No. 10-0324 (JAP), 2010 WL 4782773, at *14 (D.N.J. Nov. 17, 2010) ("A proper privilege log must include, for each withheld document, . . . the subject of the document . . .") (citation omitted); *Ingersoll-Rand Co. v. Barnett*, No. 05-1636 (DRD), 2007 WL 203944, at *3 (D.N.J. Jan. 24, 2017) (same).

Cognizant should be compelled to revise its privilege log in accordance with settled Third Circuit law, and all future productions should contain an accompanying privilege log that permits Defendants to meaningfully review its privilege and work product assertions.

### B.     Cognizant Has Improperly Asserted Privilege or Work Product Protection Over Vast Categories of Responsive Documents.

This Court should reject Cognizant's attorney-client privilege and work product assertions and grant Defendants' motion to compel because Cognizant has (1) improperly withheld or redacted communications that do not relate to the provision of legal advice; (2) improperly withheld or redacted communications that were disclosed to third-party accountants and public relations firms; and (3) effected broad subject matter waivers over vast categories of documents through wide-ranging, repeated disclosures to the DOJ and SEC.

The attorney-client privilege is intended to "encourage full and frank communications between attorneys and their clients."  See *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991) (citation omitted).  But when used as a shield against disclosure, it obstructs the truth-finding process and should be construed narrowly to protect only disclosures that are necessary to obtain legal advice. *Id.* at 1423–24; *see In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir. 1979) (privilege claims "are, at best, 'indirect and speculative,' [and] must be 'strictly confined within the narrowest possible limits'" (citation

omitted)).  Accordingly, the attorney-client privilege protects only communications and not facts. *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir. 1994) ("The client . . . may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.").  Further, while "legal advice given to a client is protected by the privilege, business advice generally is not."  *La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 305 (D.N.J. 2008).  Likewise, work product protection, which is intended to enable counsel to prepare cases without fear that their work product will be used against their clients, *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947), may not be leveraged to shield facts from discovery.

Furthermore, the disclosure of otherwise privileged communications to a third party— including an adversary such as the Government—waives the privilege.  *See Westinghouse*, 951 F.2d at 1424; *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 361 (3d Cir. 2007) ("Disclosing a communication to a third party unquestionably waives the privilege.").  Similarly, the disclosure of work product to a third party constitutes waiver and enables an adversary to access the protected information.  *See Westinghouse*, 951 F.2d at 1428.  Indeed, because work product protection must be "strictly construed" and may be overcome by a showing of substantial need, *id.* at 1429, "the standard for waiving the work-product doctrine should be no more stringent than the standard for waiving the attorney-client privilege," *id.* at 1429–30 (voluntary disclosures to DOJ and SEC waived work product protection).

In violation of these principles, Cognizant has withheld or redacted vast categories of documents (1) that may contain facts or material unrelated to the provision of legal advice, or (2) for which attorney-client privilege or work product protection has been waived through disclosure to third parties.  This Court should compel production of such documents.

1.     **Cognizant Has Improperly Withheld or Redacted Documents Containing Facts and Material Unrelated to the Provision of Legal Advice.**

Cognizant has claimed privilege and work product protection over categories of documents that do not contain legal advice, █████████████████████████████████████, *see* Ex. Y at Cat. 3–7, and ███████████████████████████████████ *id*. at Cat. 1–2, 11–13. Cognizant's privilege assertions should be rejected.

A party cannot claim privilege over draft public disclosures and press releases unless it can show that the drafts were "made for the purpose of giving or receiving [legal] advice." *Chabot v. Walgreens Boots All., Inc.*, No. 1:18-CV-2118, 2020 WL 3410638, at *8 (M.D. Pa. June 11, 2020); *see In re Riddell Concussion Reduction Litig.*, No. 13-7585 (JBS/JS), 2016 WL 7108455, at *7 (D.N.J. Dec. 5, 2016) (press releases and responses to media inquiries not privileged as they reflected "corporate 'messaging' concerns and not legal issues or advice"); *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, No. 07-md-01871, 2009 WL 4641707, at *10 (E.D. Pa. Dec. 7, 2009) (draft public statements sent for attorney review not privileged because "the company's primary purpose in creating these draft public statements was not to obtain legal advice or to defend against lawsuits"). "A press release which merely 'reflects' an attorney's comments, i.e. integrates the comments without exposing the substance of the advice itself, is not privileged." *Chabot*, 2020 WL 3410638, at *9 n.2. ██████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████

Similarly, Cognizant is without authority to ████████████████████████████████ ████████████████████████  While document hold notices themselves may contain material subject to the attorney-client privilege or work product doctrine, "this bar does not extend to information

surrounding preservation efforts." *Boyington v. Percheron Field Servs., LLC*, No. 3:14-CV-90, 2016 WL 6068813, at *12 (W.D. Pa. Oct. 14, 2016) (ordering production of "list of the individuals and custodians who received a litigation-hold notice," including "the date each notice was issued and the categories of data Defendant has targeted for preservation as well as the steps Defendant has taken to date to preserve this data"). An opposing party is "entitled to know which categories of electronic storage information employees were instructed to preserve and collect, and what specific actions they were instructed to undertake to that end." *Major Tours, Inc. v. Colorel*, No. 05-3091 (JBS/JS), 2009 WL 2413631, at *2 (D.N.J. Aug. 4, 2009); *see also In re eBay Seller Antitrust Litig.*, No. C 07-01882 JF (RS), 2007 WL 2852364, at *2 (N.D. Cal. Oct. 2, 2007) ("Although plaintiffs may not be entitled to probe into what exactly eBay's employees were *told* by its attorneys, they are certainly entitled to know what eBay's employees are *doing* with respect to collecting and preserving ESI.") (emphasis in original).

Cognizant's boilerplate justifications are insufficient to sustain its burden to show that draft public disclosures, press releases, and document retention and collection materials relate primarily to the provision of legal advice. To the extent that the communications or documents were not made for the primary purpose of legal advice, they are not protected and must be produced. However, "any edits or notations bearing the primary purpose of legal advice may be segregated and redacted." *Chabot*, 2020 WL 3410638, at *9. Accordingly, this Court should compel Cognizant to produce, or redact appropriately, its draft public disclosures, press releases, and document retention and collection materials to which Defendants are entitled.

### 2.    Cognizant Has Effected a Broad Subject Matter Waiver Through Extensive and Deliberate Prior Disclosures to the Government.

Cognizant's extensive and deliberate disclosures to the Government—including the DLA

Downloads, as discussed above,[29] and many of its document productions—effected a broad subject matter waiver of all topics covered in those disclosures.  Accordingly, and particularly to the extent that Cognizant is now invoking those waived claims of privilege in a way that deprives Schwartz and Coburn of material directly relevant to their defense, this Court should compel Cognizant to produce responsive communications and documents relating to that same subject matter.

Under longstanding Third Circuit precedent, a company waives privilege and work product protection where it previously disclosed protected information to a government agency. *See Westinghouse*, 951 F.2d at 1429–31 (company "waived the attorney-client privilege and the work-product doctrine when it disclosed otherwise protected documents to the SEC and to the DOJ.").  Indeed, courts have consistently held that "[a]ny voluntary disclosure . . . to a third party breaches the confidentiality of the attorney-client relationship and therefore waives the privilege, not only as to the specific communication disclosed but often *as to all other communications relating to the same subject matter*."  *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982) (emphasis added); *see also In re Martin Marietta Corp.*, 856 F.2d at 623–25 (rejecting argument that waiver should be limited to information actually disclosed to the government because "the waiver [wa]s comprehensive" and encompassed "details underlying" the information disclosed, including "all of the company's non-opinion work-product relating to the investigation that it conducted").  Indeed, as *Westinghouse* noted, where waiver "disadvantage[s] the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject."  951 F.2d at 1426 n.12; *see also Gruss v. Zwirn*, No. 09 Civ. 6441-(PGG)(MHD), 2013 WL 3481350, at *12 (S.D.N.Y.

---

July 10, 2013) ("[W]hen a party selectively discloses attorney-client communications to an adverse government entity, the privilege is waived not only as to the materials provided, but also as to the underlying source materials.").

The fundamental principle underlying these decisions is that privilege may not be used as both a "sword and a shield" and privilege holders may not prejudice the opposing party by making only favorable disclosures. *Shire LLC v. Amneal Pharms., LLC*, No. 2:11-cv-03781 (SRC)(CLW), 2014 WL 1509238, at *6 (D.N.J. Jan. 10, 2014) (quoting *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 208 F.R.D. 109, 120 (D.N.J. 2002)).  Cognizant, the subject of a government investigation, elected to waive privilege by supplying detailed and copious—albeit selective and carefully chosen—oral downloads and making extensive, and again selective, document productions to the Government.  It cannot now invoke attorney-client privilege and work product protection to shield materials concerning the very same subject matter from disclosure to Defendants, whom the Government charged and is prosecuting based on the curated version of facts that Cognizant provided.

> **a.** **Cognizant Effected Subject Matter Waiver Over Any Privilege Asserted With Regard to the Conduct Alleged in the Indictment by Sharing With the Government Facts Relating to Precisely That Conduct.**

As is briefly discussed above, the Indictment against Coburn and Schwartz is based in large part on a video conference call in which both participated, but critically, in which Schwartz did so in his capacity as Chief Legal Officer of Cognizant.  *See* Ind. ¶¶ 2, 6.  Evidence of that call was provided by Cognizant to the Government notwithstanding that it was certainly privileged.  Likewise, Cognizant has produced to the Government—and the Government has made clear that it intends to use at trial—evidence against Schwartz and Coburn that arose in privileged conversations that took place as part of Cognizant's internal investigation.

But it cannot be that Cognizant can both waive privilege in order to provide to the Government a particular narrative of events, and simultaneously assert the same privilege as a shield to prevent the Defendants from fully exploring either the facts of the underlying case or the investigation of those facts.  Put another way, Cognizant cannot invoke, or not invoke, privilege assertions in an way that allows it to produce certain otherwise-privileged communications while withholding others concerning the same subject matter.

Rather, under those circumstances, a complete subject matter waiver should be found.  *See*, *e.g.*, *Shire LLC*, 2014 WL 1509238, at *6 ("In this District, a subject matter waiver is found 'when the privilege-holder has attempted to use the privilege as both a 'sword' and 'a shield' or when the party attacking the privilege will be prejudiced at trial.'") (quoting *Koch Materials Co.*, 208 F.R.D. at 120); *In re Hum. Tissue Prods. Liab. Litig.*, 255 F.R.D. at 158("It goes without saying that privilege may not be used both as a sword and a shield."); *V. Mane Fils S.A. v. Int'l Flavors & Fragrances, Inc.*, 249 F.R.D. 152, 155 (D.N.J. 2008) (finding broad subject matter waiver because "the privilege cannot be used as both a sword and a shield").  That is, "[w]hen one party takes advantage of another by selectively disclosing otherwise privileged communications, courts broaden the waiver as necessary to eliminate the advantage."  *In re Teleglobe Commc'ns Corp.*, 493 F.3d at 361; *see also United States v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d Cir. 1990) ("It has been held that the disclosure of any meaningful part of a purportedly privileged communication "'waives the privilege as to the whole.'") (citations omitted); *In re Leslie Fay Cos. Sec. Litig.*, 161 F.R.D. 274, 282 (S.D.N.Y. 1995) ("Based principally on notions of fairness, courts have imposed such a 'subject matter waiver' most often when the privilege-holder has attempted to use the privilege as both 'a sword' and 'a shield' or when the party attacking the privilege will be prejudiced at trial.").

In sum, as here, "where a party is attempting to gain an advantage or make offensive use through intentional disclosure, there must be a full subject matter waiver." *V. Mane Fils S.A.*, 249 F.R.D. at 155.  The facts here demand no less.  Cognizant's privilege assertions should, in these unique circumstances, be rejected in their entirety.

> **b.    Cognizant Effected Subject Matter Waiver over Its Internal Investigation by Providing Detailed Oral Downloads to the Government.**



[30]  Thus, under *Westinghouse* and its progeny, the DLA Downloads effected subject matter waivers of privilege and work product protection over all materials relating to the internal investigation.  The DLA Downloads were sweeping in scope. Among the topics disclosed to the Government were ███████████████████████

[31]  Accordingly, Cognizant waived privilege and work product protection over its entire

internal investigation.  *See Westinghouse*, 951 F.2d at 1426 n.12, 1429–31.

At the very least, Cognizant's waiver extends to responsive materials relating to the following topics:

*All Cognizant Employees' DLA Interviews*.  Cognizant waived privilege over documents relating to all of its employees' interviews with DLA ("DLA Interviews") because ███████████ ███████████████████████████████████████████████ This waiver includes, among other things, communications relating to Schwartz's and Coburn's interviews, as ███████████ ██████████████████████████████████████████████████████████████████ ████████████████████[32]

This waiver certainly applies to disclosure of the underlying interview memoranda and attorney notes of the DLA Interviews.  Courts frequently hold that when oral summaries of interviews conducted during an investigation are provided to the Government, as here, such disclosures waive any attorney-client privilege or work product protection over the underlying interview notes and related memoranda.  *See In re Banc of Ca. Sec. Litig.*, No. SA CV 17-00118-AG (DFMx), 2018 WL 2373860, at *1 (C.D. Cal. May 23, 2018) (firm's "disclosure of summaries of . . . witness interviews acted to waive any work product or attorney-client privilege over any

---



[32] As noted below, and although Cognizant has consistently refused to provide the dates of all DLA Downloads, ████████████████████████████████████████████ which purported to limit Cognizant's privilege waiver to select documents that it had intentionally disclosed to the Government.

notes or memoranda memorializing those interviews"); *United States Sec. & Exch. Comm'n v. Herrera*, 324 F.R.D. 258, 260 (S.D. Fla. 2017) (finding waiver and granting defendants' motion to compel law firm's interview notes and memoranda concerning internal investigation with respect to witnesses for whom the law firm voluntarily provided oral summaries to the SEC); *S.E.C. v. Vitesse Semiconductor Corp.*, No. 10 CV 9239 (JSR), 2011 WL 2899082, at *3 (S.D.N.Y. July 14, 2011) (granting motion to compel production of handwritten notes of interviews taken during internal investigation because company "waived the privilege by providing very detailed oral summaries to the SEC").

*Responsive Emails Relating to Cognizant's Internal Investigation*.  As a result of the DLA Downloads, Cognizant also waived privilege over all emails relating to its internal investigation.[33] This includes Schwartz's and Coburn's emails concerning the internal investigation between at least April 27, 2016 (when the investigation began) and August 20, 2016 (when they were removed from the investigation).

Through the DLA Downloads, ████████████████████████████████████ ████████████████████████████ and thus can no longer claim privilege as to its internal investigation.  Yet it withheld on the basis of privilege or the work product doctrine numerous communications with Schwartz and Coburn ████████████████████████████████ ████████████████████████████████████████

_____

[33] This waiver encompasses documents to and from all individuals who participated in Cognizant's internal investigation, including ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

█████████████████████████████████ *See* Ex. Y at Cat. 8 and 9.  Moreover, despite the

fact that Defendants were involved in the internal investigation as early as April 2016, Cognizant's

privilege log identifies ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ Put simply, there must be

additional responsive documents in these categories beyond those Cognizant has produced or

logged.  By continuing to assert privilege and work product protection over Defendants' and other

employees' emails concerning the internal investigation, Cognizant has continued its practice of

presenting a curated version of the facts, both to the Government and to the defense.  Because of

Cognizant's subject matter waiver, responsive employee emails are not privileged and must be

disclosed.

_Responsive Materials Relating to Activities on Specific Key Dates_. ███████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████[34]  As a result, Cognizant waived privilege over all documents and

---

[34] ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

responsive communications concerning these events.

In sum, based upon Cognizant's broad subject matter waiver, this Court should compel it to produce all responsive communications and documents relating to the internal investigation it conducted, or at the very least, to the specific areas discussed above.



*See generally id.*

███████████████████████████████████████████

███████████████████████   *See* FED. R. EVID. 502 advisory committee's note  (Rule 502(d) "does not provide a basis for a court to enable parties to agree to a selective waiver of the privilege, such as to a federal agency conducting an investigation, while preserving the privilege as against other parties seeking the information.") (citation omitted).  Indeed, in another case denying a Rule 502(d) order that sought to explicitly bind non-parties, the court noted that "[e]lemental notions of due process and fairness counsel against actions affecting the rights of unknown individuals who have had no opportunity to agree to or even be heard as to the issues."  *Millennium Labs., Inc. v. Am. Clinical Sols., LLC*, No. 11-cv-1299, 2012 WL 13103115, at *2 (M.D. Fla. Feb. 21, 2012).  *Second*, Rule 502 applies only to inadvertent disclosures – not selective, intentional disclosures, such as the ones Cognizant made here in an effort to obtain favorable treatment.  *See*, *e.g.*, *Smith v. Best Buy Stores, L.P.*, No. 16-cv-296, 2017 WL 3484158, at *3–4 (D. Idaho Aug. 14, 2017); *Hologram USA, Inc. v. Pulse Evolution Corp.*, No. 14-cv-772, 2016 WL 3654285, at *2 (D. Nev. July 5, 2016); *Holloway v. Wells Fargo Bank, N.A.*, No. 12-cv-2184, 2013 WL 6912690, at *2–3 (N.D. Tex. Dec. 30, 2013); *Potomac Elec. Power Co. & Subsidiaries v. United States*, 107 Fed. Cl. 725, 732 (2012).[35]

---

[35] Indeed, the legislative history of Rule 502 and case law make clear that Rules 502(d) and (e) were intended to limit the consequences of inadvertent, rather than intentional, production of privileged information.  *See* FED. R. EVID. 502 advisory committee's note (explaining that the rule has "two major purposes":  (1) "[i]t resolves some longstanding disputes in the courts about the effect of certain disclosures of communications or information protected by the attorney-client privilege or as work product—specifically those disputes involving inadvertent disclosure and subject matter waiver"; and (2) "[i]t responds to the widespread complaint that litigation costs necessary to protect against waiver of attorney-client privilege or work product have become prohibitive due to the concern that any disclosure (however innocent or minimal) will operate as a subject matter waiver of all protected communications or information."); *see also Irth Sols., LLC v. Windstream Commc'ns LLC*, No. 2:16-CV-219, 2017 WL 3276021, at *6 (S.D. Ohio Aug. 2, 2017) (citing advisory committee's note); *Hostetler v. Dillard*, No. 3:13-CV-351-DCB-MTP, 2014 WL 6871262, at *4 (S.D. Miss. Dec. 3, 2014) (quoting the same).

Rule 502 cannot operate to permit a company being investigated by the Government to intentionally produce "selected privileged" documents that portray a favorable narrative as to the company, while simultaneously withholding other privileged documents necessary to prepare a defense, or to exculpate criminal defendants, one of whom was the company's Chief Legal Officer, whose communications would be particularly susceptible of privilege claims.  Nor, especially, should the Rule be interpreted to limit the constitutional rights of criminal defendants to obtain defense evidence where, as here, Defendants had no opportunity to challenge ███████. Defendants' constitutional right to access such information can and must trump ███████ ████████████████████████████████████████—and Cognizant's selective waiver of privilege—is ineffective as to Cognizant's obligation to produce responsive documents to Defendants.

█ ████████████
████████████████
████████████████
████████████████

Cognizant's waiver of privilege and work product protection over the topics discussed in those otherwise privileged documents was not, therefore, undone by ████████ Those topics include the following:

████████████████
████████████████
████████████████
████████ [36] ████████

_____

[36] ████████████████



Ex. NN ███████████████ Ex. OO █████████████████

Ex. QQ  (DOJ-CTS-LTR-00000227).

[37] *See*, *e.g.*, Ex. MM (CTS-0000123) ██████████████).

75

[REDACTED]

[REDACTED] *See* Ex. PP (CTS-0050374). [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] *see* Ex. NN (DOJ-302-00000024), [REDACTED][38] [REDACTED]

[REDACTED]

[REDACTED][39] [REDACTED]

### 3. Cognizant's Privilege and Work Product Assertions over Communications with Third-Party Accounting and Public Relations Firms Should Be Rejected.

Cognizant erroneously withheld or redacted communications where privilege has been waived by the presence of third-party accountants and public relations firms. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] *See* Ex. Y at Cat. 1. [REDACTED]

[REDACTED]

[REDACTED]

---

[38] *See* Ex. QQ (DOJ-CTS-LTR-00000244) [REDACTED]

[REDACTED]

[39] [REDACTED]

█████████████████████ *Id.* at Cat. 5.

Disclosure to a third party waives privilege unless that third party's involvement in the communication was "necessary to the lawyer's provision of legal advice." *La. Mun. Police Emps. Ret. Sys.*, 253 F.R.D. at 312 (defining "necessary" to legal advice as "translat[ing] [information] into understandable terms" for the attorney, and finding privilege waived for failure to explain how consultant was necessary to the provision of legal advice as opposed to providing financial analysis). "'If what is sought is not legal advice but only [the third party's] service[s], or if the advice sought is the [third party's], rather than the lawyer's, no privilege exists.'" *Id.* at 312 (quoting *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)). Based upon these principles, courts have routinely found that the presence of external accountants and public relations or communications firms waives the privilege. *See Cottillion v. United Ref. Co.*, 279 F.R.D. 290, 312 (W.D. Pa. 2011); *Rowe v. E.I. duPont de Nemours & Co.*, No. CIV.06-1810-RMD-AMD, 2008 WL 4514092, at *9 & n.17 (D.N.J. Sept. 30, 2008); *Westernbank Puerto Rico v. Kachkar*, No. 07-1606 (ADC/BJM), 2009 WL 530131, at *3 (D.P.R. Feb. 9, 2009) ("Disclosure to outside auditors generally waives the attorney-client privilege.").

Here, Cognizant's privilege log, which contains vague descriptions of the withheld or redacted materials and conclusory recitations of the protective standard for each entry, fails to articulate with any specificity its basis for withholding or redacting responsive communications with third parties. Indeed, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex B at 5. Cognizant has failed to articulate how these third parties were necessary to providing legal advice.

And it has flatly refused Defendants' request to supply copies of the third-parties' engagement letters.  *Id.* at 5 n.6; *see also La. Mun. Police Emps. Ret. Sys.*, 253 F.R.D. at 313 (third party consultant broke the privilege where "the retainer agreement specifically details the four obligations that [the consultant] would undertake . . . and none involve legal advice").  By way of its vague, categorical privilege log, Cognizant has thus failed to show that the presence of third-party auditors and public relations firms on these communications was necessary to the provision of legal advice.  Accordingly, the Court should compel production of these non-privileged communications.

### C.  Defendants' Constitutional Right to the Responsive Materials Outweighs Cognizant's Privilege and Work Product Claims.

Finally, even assuming Cognizant's assertions of privilege and work product withstand scrutiny, which they do not, its claims must nonetheless give way to Defendants' constitutional right to present a complete defense.  The Supreme Court has long held that evidentiary privileges are disfavored, particularly where they obstruct production of evidence in criminal trials. *See United States v. Criden*, 633 F.2d 346, 357–58 (3d Cir. 1980) (compiling cases and noting that "[c]ourts must tread carefully on the hallowed ground where . . . the free flow of information and the fair administration of criminal justice[] conflict") (citing *Herbert v. Lando*, 441 U.S. 153, 175 (1979) ("Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances.")).  This is because "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," whether through the Sixth Amendment's Compulsory Process or Confrontation Clauses or through the Fourteenth Amendment Due Process Clause.  *Crane*, 476 U.S. at 690 (internal quotations and citations omitted); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987).

Accordingly, courts engage in a balancing test when addressing the conflict between the

assertion of privileges by third parties on the one hand and the vindication of criminal defendants' constitutional rights on the other. The result has been a series of significant holdings that make clear that the nondisclosure of evidence on account of privilege is unconstitutional where it "significantly undermine[s] fundamental elements" of the defense. *United States v. Scheffer*, 523 U.S. 303, 315 (1998); *see also Criden*, 633 F.2d at 358 (upholding criminal defendant's Fifth and Sixth Amendment rights to disclosure of evidence over journalists' "conflicting interests" in privilege).

That is certainly the case here. Schwartz was the Chief Legal Officer of Cognizant during the events at issue in the Indictment and is being prosecuted in connection with the very communications that Cognizant now seeks to shield from disclosure—communications that, as Schwartz has long maintained, demonstrate his actual intent and actions at the time. Indeed, that Schwartz is himself an attorney, and that the documents at issue go to the heart of the Government's allegations against him, is an "exceptional circumstance" requiring disclosure, notwithstanding Cognizant's otherwise viable privilege claims regarding communications with him. *See United States v. Weisberg*, No. 08-CR-347 (NGG)(RML), 2011 WL 1327689, at *5 (E.D.N.Y. Apr. 5, 2011) (ordering production or *in camera* review of potentially privileged documents relating to defendant-attorney's work at issue in the case). Cognizant's assertions of attorney-client privilege and work product protection must, therefore, give way to Defendants' Sixth Amendment right to present a complete defense. [40]

---

[40] Just as Defendants' Sixth Amendment right to present a complete defense trumps Cognizant's claims of privilege, so, too, do Defendants' *Brady* rights. Cognizant's repeated failure to produce exculpatory materials to the Government under the guise of privilege has severely limited Defendants' access to such exculpatory materials. As the record continues to develop, Defendants will be prepared to demonstrate to the Court that the exculpatory nature of these documents, within the meaning of *Brady*, outweighs any claims of privilege or work product protection. *See United States v. Gupta*, 848 F. Supp. 2d 491, 496 (S.D.N.Y. 2012) (defendant's "substantial need" for

1.      **Defendants' Sixth Amendment Right to Present a Complete Defense Trumps Cognizant's Attorney-Client Privilege Assertions.**

First, the materials sought in the Subpoenas are integral to Defendants' ability to present a complete defense and their constitutional right to do so overrides even a legitimate claim of attorney-client privilege.  Indeed, the law is clear that the attorney-client privilege, "hallowed as it is, yet not found in the Constitution, might have to yield" if its enforcement would curtail Sixth Amendment rights.  *United States v. Rainone*, 32 F.3d 1203, 1206 (7th Cir. 1994); *see United States v. W.R. Grace*, 439 F. Supp. 2d 1125, 1145 (D. Mont. 2006) (compelling production of privileged documents having probative value to defense because "the law requires that the [attorney-client] privilege yield where its invocation is incompatible" with Sixth Amendment right to present a defense).  If "there is a strong likelihood that the [third party's privileged] files contain exculpatory material that would be helpful and relevant to the defense . . . defendant's due process rights to access such information outweigh any claim of attorney-client privilege."  *United States v. Stringer*, No. CR 03-432-HA, 2005 WL 8167079, at *2 (D. Or. Mar. 4, 2005) (upholding defendant's due process right to obtain privileged statements that he had made based on plausible showing that they would likely be "meaningful and favorable to his defense"); *see also Morales v. Portuondo*, 154 F. Supp. 2d 706, 731 (S.D.N.Y. 2001) ("[T]he attorney-client privilege must not stand in the way of the truth").

---

SEC interview memoranda potentially containing *Brady* material trumped work product assertion despite the fact that summaries thereof had already been produced, and memoranda were "classic work product" which may reveal mental processes); *Lisle v. McDaniel*, No. 203-cv-1005-JCM-LRL, 2006 WL 3253488, at *3–4 (D. Nev. Nov. 8, 2006) (work product protection does not preclude production of potential *Brady* material); *United States v. Anderson*, No. CR02-0423C, 2004 WL 7339793, at *2 (W.D. Wash. July 23, 2004) (work product protection "has no effect on the government's duty under *Brady*, which is rooted in constitutional due process"); *United States v. Peitz*, No. 01-CR 852, 2002 WL 31101681, at *8 (N.D. Ill. Sept. 20, 2002) (despite valid claim of attorney-client privilege, the prosecution is "obliged to disclose evidence that would be useful and favorable" within that privileged document).

Here, any purported benefit to Cognizant of maintaining the privilege with regard to subject matters as to which it has already disclosed materials to third parties—DOJ and the SEC, with both of whom Cognizant already settled—is extremely weak, if not entirely specious.  By contrast, the value of these materials to Defendants—who are unable to obtain them from another source—is clear, particularly with regard to the defense's allegations of prosecutorial outsourcing, *see supra* at 25-36, as well as given the exculpatory nature of the materials withheld by Cognizant.  Even were Cognizant's privilege assertions valid, they cannot justify the constitutionally-significant harm that Defendants would suffer on account of being denied materials essential to defending their liberty.

### 2. Defendants' Substantial Need for These Materials Overcomes Any Work Product Protection.

Similarly, Defendants' substantial need for these materials outweighs Cognizant's blanket assertion of work product protection.  As with the attorney-client privilege, work product protection may be overcome when it conflicts with a defendant's constitutional rights. *See Stringer*, 2005 WL 8167079, at *2 (upholding defendant's due process right to obtain work product material); *W.R. Grace*, 439 F. Supp. 2d at 1143–45 (work product protection may be "sacrificed" where in conflict with Sixth Amendment right to present a complete defense).  But this is even more appropriate given that the work product doctrine provides only a qualified protection. *See Westinghouse*, 951 F.2d at 1429.

Thus, even in the civil context, where a defendant's liberty is not at stake, work product protection may be overcome by a demonstration of "substantial need" and a showing that the equivalent of those materials cannot be obtained absent undue hardship.  *Id.*  In the criminal context, the threshold for demonstrating a "substantial need" is lower, and the party seeking protection may be required to provide more than abstract "policy objections" to disclosure.

*See United States v. Marcus Schloss & Co.*, No. 88 CR. 796 (CSH), 1989 WL 62729, at *3–4 (S.D.N.Y. June 5, 1989). In *Marcus Schloss*, for example, the court rejected the argument that disclosing work product would "inhibit defense attorneys from note-taking during interviews." *Id*. at *4. Rather, as here, because the party represented by the law firm had already settled claims with the Government, the court held that the party would suffer no prejudice from disclosure. *Id*. at *2–3. Accordingly, the court ordered disclosure of the law firm's interview notes to the criminal defendant who had a substantial need for the materials. *Id*. at *4.

Here, Defendants will indisputably have a "substantial need" for materials at issue which contain exculpatory material, either because they show that the Government in fact outsourced its investigation to Cognizant, or because they tend to exculpate Defendants. The constitutionally protected rights at stake, then, far outweigh the value of work product protections to Cognizant, which has already settled its related claims with the Government. *See supra* at 14 & n.9. Accordingly, the Court should compel production of the documents sought in the Subpoenas that implicate Defendants' Constitutional rights.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant their motion to compel compliance with the Rule 17 Subpoenas issued to Cognizant and enter an order requiring that Cognizant:

     (i)     Collect and produce responsive materials from April 1, 2016 through at least February 14, 2019;

     (ii)    Collect and produce responsive materials from the custodial files of the Defendants, and the other unsearched custodians described above;

     (iii)   Collect and produce responsive materials using the following additional search terms set forth above;

     (iv)   Collect and produce documents responsive to Schwartz Request Nos. 4(a), 6, and 7, and Coburn Request Nos. 7, 8, and 9;

     (v)     Collect and produce responsive communications as defined in Schwartz's Rule 17 subpoena, specifically including text messages, instant messages, and other non-email communications;

     (vi)     Disclose all dates on which DLA Piper provided factual information to the Government concerning its interviews of the Defendants and other interviewees during the course of the investigation, including the identities of the participants at such meetings;

     (vii)     Produce a revised, document-by-document privilege log that includes email subject lines and otherwise permits the Defendants to meaningfully review Cognizant's privilege and work product assertions, and conform to this directive subsequent privilege logs in connection with this matter;

     (viii)     Produce all responsive draft public disclosures, press releases, and document retention and collection materials; and

     (ix)     Produce all responsive materials over which Cognizant has waived privilege and work product protection.  This includes all responsive materials relating to the subject matter of the conduct alleged in the Indictment and Cognizant's internal investigation, including, without limitation, Cognizant employees' interviews with DLA, emails relating to Cognizant's internal investigation, the events of April 21 and 22, 2014 and August 20 and 21, 2016, and communications involving third-party accounting and public relations firms.

Dated:  April 30, 2021                          Respectfully submitted,

                                                s/ Lawrence S. Lustberg
                                                Lawrence S. Lustberg
                                                Daniel B. Weinstein
                                                John D. Haggerty
                                                **GIBBONS P.C.**
                                                One Gateway Center
                                                Newark, New Jersey 07102
                                                (973) 596-4500
                                                llustberg@gibbonslaw.com


**KRIEGER KIM & LEWIN LLP**                     **BOHRER PLLC**

Nicholas J. Lewin                               Jeremy I. Bohrer
Alexandra Messiter                              Amir Toossi
500 Fifth Avenue                                Adam Yaeger
New York, New York 11215                        Jonathan E. Jason
(212) 390-9559                                  Arthur T. Tergesen
                                                One Penn Plaza, Suite 2520
                                                New York, New York 10119
                                                (212) 303-3314

*Attorneys for Defendant*                       *Attorneys for Defendant*
*Gordon J. Coburn*                              *Steven Schwartz*