**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,

v.

GORDON J. COBURN and
STEVEN SCHWARTZ,

Defendants.

Crim. No. 19-120 (KM)

Hon. Kevin McNulty

**Confidential – Submitted Under Seal**

**REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANTS'
JOINT MOTION TO COMPEL COGNIZANT'S COMPLIANCE WITH
RULE 17(C) SUBPOENAS AND IN OPPOSITION TO COGNIZANT'S
CROSS-MOTION TO QUASH AND/OR MODIFY**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iv

PRELIMINARY STATEMENT .................................................................................. 1

LEGAL ARGUMENT ............................................................................................... 3

    I.     COGNIZANT SHOULD BE COMPELLED TO PRODUCE
          DOCUMENTS RESPONSIVE TO THE PLAIN LANGUAGE OF THE
          SUBPOENAS, AND ITS CROSS-MOTION TO QUASH SHOULD BE
          DENIED .............................................................................................................. 3

          A.    Cognizant Fails to Acknowledge, Let Alone Satisfy Its Burden of
               Showing, that the Subpoenas Are "Unreasonable or Oppressive,"
               Ignoring the *Nixon* Analysis that the Court Already Performed ................ 3

          B.    Cognizant's Narrow Interpretation of the Subpoenas Ignores Their
               Plain Language and Recycles the Government's Arguments
               Previously Rejected by the Court. .............................................................. 6

          C.    Cognizant's Narrow Interpretation of the Subpoenas Ignores the
               Purpose of the Outsourcing Hearing and Inappropriately Limits the
               Information That Will Be Available for Purposes of Deciding the
               Issues Before the Court. ............................................................................. 7

               1.    Cognizant Ignores the Two-Pronged *Connolly* Inquiry and
                    the Factors Relevant to the Threshold Outsourcing
                    Question. ........................................................................................ 8

               2.    Cognizant Mischaracterizes *Garrity* and the Defendants'
                    Interviews in an Effort to Avoid This Inquiry. ............................. 12

          D.    In Order To Comply with the Plain Language and Purpose of the
                Subpoenas, Cognizant Should Be Compelled to Remedy Its Failure
               to Search For And Produce Responsive Documents. .............................. 16

                1.    The Narrow Date Range Used by Cognizant Is Inconsistent
                    with the Terms of the Subpoenas and the Orders of the
                    Court. ........................................................................................... 16

               2.    Cognizant Should Be Compelled to Search the Files of
                    Certain Additional, Essential Custodians. .................................... 22

                3.    Cognizant Should Be Compelled to Search for and Produce
                    Text and Instant Messages. .......................................................... 25

i

Table of Contents (continued)

Page

4.      Cognizant Should Be Compelled to Search Using Essential
        Terms Under the Subpoenas. ....................................................... 27

II.     COGNIZANT SHOULD BE COMPELLED TO PRODUCE
        RESPONSIVE DOCUMENTS THAT IT IS IMPROPERLY
        WITHHOLDING BASED ON INVALID CLAIMS OF PRIVILEGE. ............. 28

        A.      Cognizant Does Not Dispute That It Provided the Government
                with Extensive Oral Downloads and Updates on "Key
                Developments." ................................................................................. 33

        B.      Cognizant's Selective Disclosures of Privileged Information
                Trigger Broad Subject Matter Waiver Under *Westinghouse*. ................... 34

        C.      Cognizant Cannot Move to Quash the Subpoenas on the Basis of
                Privilege and Work Product Protection That It Has Waived. .................... 36

        D.      Cognizant's Oral Downloads and Communications with the
                Government Result in Waiver as to Documents Related to the
                Events Charged in the Indictment And Other Investigation-Related
                Materials – Especially Underlying Interview Notes and
                Memoranda. ..................................................................................... 39

                1.      Cognizant's Waiver Extends to Its Interview Memoranda
                        and Notes. .................................................................... 40

                2.      Cognizant's Selective Disclosures Extend its Waiver to
                        Documents and Information Concerning the Events That
                        Form the Basis of the Charges in the Indictment and Other
                        Investigation-Related Materials. ................................... 43

        E.      Cognizant's Admissibility Arguments are Unfounded. ........................... 47

        F.      Cognizant's Various Other Attempts to Withhold Responsive
                Documents Are Unpersuasive ........................................................ 49

                1.      Cognizant Has Waived Privilege Over the April 2014 and
                        August 2016 Communications ....................................... 49

                2.      Cognizant Has Not Even Attempted to Show How the
                        Crime-Fraud Exception Applies. ................................... 51

                3.      The 502(d) Order Has No Bearing on Cognizant's Waiver
                        as to Third Parties. ...................................................... 52

        G.      Cognizant's Claims of Privilege Over Specific Categories of
                Documents Should Be Rejected .................................................... 54

Table of Contents (continued)

Page

      1.    Draft Public Disclosures and Press Releases Are Not Privileged. ...................................................................................... 54

      2.    Document Retention and Collection Materials Are Not Privileged. ...................................................................................... 55

      3.    Communications with Accounting and Public Relations Firms Are Not Privileged............................................................. 56

   H.    The Defendants' Constitutional Rights Outweigh Cognizant's Privilege and Work Product Claims. ......................................................... 58

III.    COGNIZANT'S PRIVILEGE LOG IS INADEQUATE. .................................... 61

CONCLUSION ....................................................................................................................... 62

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Banc of Ca. Sec. Litig.*,
  No. SA CV 17-00118-AG, 2018 WL 2373860 (C.D. Cal. May 23, 2018) ............................40

*Bethea v. Merchants Com. Bank*,
  No. 11-51, 2012 WL 5359536 (D.V.I. Oct. 31, 2012)............................................................61

*Bowman Dairy Co. v. United States*,
  341 U.S. 214 (1951)...............................................................................................................47

*Boyington v. Percheron Field Servs., LLC*,
  No. 3:14-CV-90, 2016 WL 6068813 (W.D. Pa. Oct. 14, 2016)............................................56

*Brady v. Maryland*,
  373 U.S. 83 (1963)...........................................................................................................7, 10

*Cellco P'ship v. Certain Underwriters at Lloyd's London*,
  No. CIV.A. 05-3158 (SRC), 2006 WL 1320067 (D.N.J. May 12, 2006)...............................57

*Chabot v. Walgreens Boots All., Inc.*,
  No. 1:18-CV-2118, 2020 WL 3410638 (M.D. Pa. June 11, 2020)...........................54, 55, 57

*Davis v. Alaska*,
  415 U.S. 308 (1974).............................................................................................................59

*Duran v. Equifirst Corp.*,
  No. 2:09-cv-03856, 2010 WL 918444 (D.N.J. March 12, 2010) ...........................................21

*Favors v. Cuomo*,
  285 F.R.D. 187 (E.D.N.Y. 2012) ...........................................................................................62

*Freedman v. Weatherford Int'l Ltd.*,
  No. 12 Civ. 2121 (LAK) (JCF), 2014 WL 3767034 (S.D.N.Y. July 25, 2014) ....................35

*Games2U, Inc. v. Game Truck Licensing, LLC*,
  No. MC-13-00053 (PHX) (GMS), 2013 WL 4046655 (D. Ariz. Aug. 9, 2013)...................61

*Garrity* [*v. New Jersey*,
  385 U.S. 493 (1967)] ........................................................................................................7, 14

*In re Grand Jury*,
  705 F.3d 133 (3d Cir. 2012)..................................................................................................51

*In re Grand Jury Investigation,*
445 F.3d 266 (3d Cir. 2006)...........................................................................51

*In re Grand Jury Investigation,*
599 F.2d 1224 (3d Cir. 1979)........................................................................37

*In re Grand Jury Subpoena,*
745 F.3d 681 (3d Cir. 2014).........................................................................51

*Greene v. Philadelphia Hous. Auth.,*
484 F. App'x 681 (3d Cir. 2012) .................................................................53

*Gruss v. Zwirn,*
No. 09 CIV. 6441(PGG) (MHD), 2013 WL 3481350 (S.D.N.Y. July 10, 2013)...................44

*Hostetler v. Dillard,*
No. 3:13-CV-351-DCB-MTP, 2014 WL 6871262 (S.D. Miss. Dec. 3, 2014) ......................53

*HPD Lab'ys, Inc. v. Clorox Co.,*
202 F.R.D. 410 (D.N.J. 2001)......................................................................56

*In re Hum. Tissue Prod. Liab. Litig.,*
255 F.R.D. 151 (D.N.J. 2008)......................................................................44

*John Doe Co. v. United States,*
350 F.3d 299 (2d Cir. 2003).....................................................................41, 42

*La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.,*
253 F.R.D. 300 (D.N.J. 2008).....................................................................57

*Major Tours, Inc. v. Colorel,*
No. 05-3091 (JBS/JS), 2009 WL 2413631 (D.N.J. Aug. 4, 2009) ............................56

*In re Martin Marietta Corp.,*
856 F.2d 619 (4th Cir. 1988) ...................................................................38, 44

*Millennium Labs., Inc. v. Am. Clinical Sols.,*
LLC, No. 11-cv-1299, 2012 WL 13103115 (M.D. Fla. Feb. 21, 2012) ......................53

*In re Processed Egg Prod. Antitrust Litig.,*
No. 08-MD-02002, 2014 WL 6388436 (E.D. Pa. Nov. 17, 2014) ...........................53

*In re Riddell Concussion Reduction Litig.,*
No. 13-7585 (JBS/JS), 2016 WL 7108455 (D.N.J. Dec. 5, 2016).......................54, 55

*Rigas v. United States,*
No. 11-CV-6964 (KMW), 2020 WL 2521530 (S.D.N.Y. May 15, 2020) ...................18, 19

*Robinson v. Time Warner, Inc.*,
    187 F.R.D. 144 (S.D.N.Y. 1999) ........................................................37

*Rock v. Arkansas*,
    483 U.S. 44 (1987).............................................................................58

*S.E.C. v. Beacon Hill Asset Mgmt. LLC*,
    231 F.R.D. 134 (S.D.N.Y. 2004) ......................................................45

*S.E.C. v. Thrasher*,
    No. 92 CIV. 6987 (JFK), 1996 WL 125661 (S.D.N.Y. Mar. 20, 1996) ................................61

*S.E.C. v. Vitesse Semiconductor Corp.*,
    No. 10 CV 9239 (JSR), 2011 WL 2899082 (S.D.N.Y. July 14, 2011)....................40, 41, 42

*In re Sealed Case*,
    676 F.2d at 825 ...........................................................................44, 46

*SEC v. Herrera*,
    324 F.R.D. 258 (S.D. Fla. 2017)....................................................37, 40

*SEC v. Schroeder*,
    03798 JW (HRL), 2009 WL 1125579 (N.D. Cal Apr. 27, 2009) ..........................41

*Shire LLC v. Amneal Pharms., LLC*,
    No. 2:11-cv-03781 (SRC) (CLW), 2014 WL 1509238 (D.N.J. Jan. 10, 2014)......................44

*Sportscare of Am., P.C. v. Multiplan, Inc.*,
    No. CIV.A. 2:10-4414, 2011 WL 589955 (D.N.J. Feb. 10, 2011) ..........................21

*Swidler & Berlin v. United States*,
    524 U.S. 399 (1998)..........................................................................59

*Taylor v. Illinois*,
    484 U.S. 400 (1988)..........................................................................59

*In re Teleglobe Commc'ns Corp.*,
    493 F.3d 345 (3d Cir. 2007)...........................................................35, 44

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*,
    No. 07-1299 (SRO)(MAS), 2012 WL 1585335 (D.N.J. May 4, 2012) ................................61

*United States v. Blumberg*,
    2017 WL 4790382 (D.N.J. Oct. 20, 2017)....................................... *passim*

*United States v. Brown*,
    No. 2:14-mj-7258, 2015 WL 8375184 (D.N.J. Dec. 8, 2015) .................................48

*United States v. Caruso*,
   948 F. Supp. 382 (D.N.J. 1996) ...................................................................................4

*United States v. Connolly*,
   No. 16 CR. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019) ........................... *passim*

*United States v. Criden*,
   633 F.2d 346 (3d Cir. 1980).........................................................................................59

*United States v. Cuthbertson*,
   630 F.2d 139 (3d Cir. 1980).....................................................................................47, 49

*United States v. Cuthbertson*,
   651 F.2d 189 (3d Cir. 1981).........................................................................................48

*United States v. Eisenhart*,
   43 F. App'x 500 (3d Cir. 2002) .....................................................................................5

*United States v. Ferguson*,
   No. 3:06CR137 (CFD), 2007 WL 4240782 (D. Conn. Nov. 30, 2007) ..........................18, 19

*United States v. Gas Pipe, Inc.*,
   No. 3:14- CR-298-M, 2018 WL 5262361 (N.D. Tex. June 18, 2018) .............................47, 48

*United States v. Huiltron Sanchez*,
   No. Cr. S-05-0443 WBS, 2007 WL 9606812 (E.D. Cal. Jan. 10, 2007) ...............................48

*United States v. Johnson*,
   No. CR 19-645 (SRC), 2020 WL 2611596 (D.N.J. May 22, 2020) ........................................48

*United States v. Marcus Schloss & Co.*,
   No. 88 CR. 796 (CSH), 1989 WL 62729 (S.D.N.Y. June 5, 1989).......................................60

*United States v. Messercola*,
   701 F. Supp. 482 (D.N.J. 1988) ................................................................................25, 47

*United States v. Misquitta*,
   No. CRIM. 10-185, 2011 WL 1337098 (W.D. Pa. Apr. 7, 2011) .........................................38

*United States v. Nixon*,
   418 U.S. 683 (1974).................................................................................................3, 4, 5, 38

*United States v. Nobles*,
   422 U.S. 225 (1975).....................................................................................................44

*United States v. Orena*,
   883 F. Supp. 849 (E.D.N.Y. 1995) .................................................................................5

*United States v. Oury*,
  08-cr-616 (D.N.J. 2009)................................................................53

*United States v. Poindexter*,
  727 F. Supp. 1501 (D.D.C. 1989) ..........................................5, 26

*United States v. Raddatz*,
  447 U.S. 667 (1980)....................................................................48

*United States v. Rainone*,
  32 F.3d 1203 (7th Cir. 1994) ......................................................58

*United States v. Reyes*,
  239 F.R.D. 591 (N.D. Cal. 2006)................................................38

*United States v. Rockwell Int'l*,
  897 F.2d 1255 (3d Cir. 1990)......................................................44

*United States v. Scheffer*,
  523 U.S. 303 (1998)....................................................................58

*United States v. Sorrentino*,
  14-cr-00558 (D.N.J. 2019)..........................................................53

*United States v. Stein*,
  541 F.3d 130 (2d Cir. 2008)........................................................18

*United States v. Stringer*,
  No. CR 03-432-HA, 2005 WL 8167079 (D. Or. Mar. 4, 2005) ............58

*United States v. Treacy*,
  No. S2 08 CR 366 (JSR), 2009 WL 812033 (S.D.N.Y. Mar. 24, 2009)................42

*United States v. Trenk*,
  385 F. App'x 254 (3d Cir. 2010) ................................................51

*United States v. Vangates*,
  287 F.3d 1315 (11th Cir. 2002) ..................................................13

*United States v. W.R. Grace*,
  439 F. Supp. 2d 1125 (D. Mont. 2006)..................................59, 60

*United States v. Wells Fargo Bank, N.A.*,
  132 F. Supp. 3d 558 (S.D.N.Y. 2015)....................................59, 60

*United States v. Witt*,
  542 F. Supp. 696 (S.D.N.Y. 1982), *aff'd*, 697 F.2d 301 (2d Cir. 1982) ................25

*V. Mane Fils S.A. v. Int'l Flavors & Fragrances, Inc.*,
      249 F.R.D. 152 (D.N.J. 2008) ................................................................44

*Westinghouse Elec. Corp. v. Republic of Philippines*,
      951 F.2d 1414 (3d Cir. 1991) ........................................................ *passim*

*Whitaker Chalk Swindle & Sawyer, LLP* v. *Dart Oil & Gas Corp.*,
      No. 408-CV-684-Y, 2009 WL 464989 (N.D. Tex. Feb. 23, 2009) .......................................53

**Rules**

Fed. R. Civ. P. 26 ....................................................................53

Fed. R. Civ. P. 26(a)(1) ..............................................................53

Fed. R. Civ. P. 502 ..............................................................34, 52, 53

Fed. R. Civ. P. 1101(d)(1) ............................................................48

Fed. R. Evid. 502(a) ..................................................................34

Rule 17 .......................................................................... *passim*

Rule 17(c) ........................................................................37, 38, 47

Rule 502(d) ......................................................................52, 53

## PRELIMINARY STATEMENT

In its Memorandum of Law in Support of its Cross-Motion to Quash and/or Modify Defendants' Rule 17 Subpoenas and in Opposition to Defendants' Motion to Compel (hereinafter, "CTS Br."), Cognizant Technology Solutions Corporation (hereinafter, "Cognizant") seeks to avoid its obligations to comply with duly authorized and properly issued Subpoenas of the Court that seek information relevant and necessary to a decision on the outsourcing issue that is before the Court.  Specifically, and after eight months and numerous meet-and-confer sessions that have resulted in Cognizant's production of less than 200 non-duplicative documents, Cognizant argues that it should not be required to produce *any* further documents.  In doing so, it completely ignores the plain language of the Subpoenas, the burden it bears to show that the Subpoenas are "unreasonable or oppressive," and even the nature of the outsourcing issue before the Court.

*First*, as noted, Cognizant makes no effort to address (much less to meet) its burden of showing that compliance with the Subpoenas would be unreasonable or oppressive.  Instead, it fails even to acknowledge the applicable legal standard, instead advancing a narrative that extolls its efforts to gather documents, paltry though the results of those efforts have been.

*Second,* of course, those efforts are in fact inadequate because, rather than adhering to the plain language of the Subpoenas, Cognizant has sought to unilaterally rewrite them to say what Cognizant—and the Government—wishes they said, instead of what they actually do say.  To do this, Cognizant disregards the actual language of the Subpoenas in numerous respects, discussed below and in Defendants' Brief in Support of its Motion to Compel (hereinafter, "Def. Br."), including inappropriately constricting their overall scope and seeking to rewrite specific parameters, from date ranges to custodians to search terms to the inclusion of electronic media.  But its effort completely ignores the procedural history of those Subpoenas, including both the

careful analysis undertaken by the Court before issuing them and the Court's express rejection of arguments from the Government to limit them in just the way that Cognizant seeks.

*Third*, Cognizant fundamentally misstates the nature of the outsourcing inquiry at issue here, seeking to limit that inquiry in a way that is inconsistent with both the Court's expressed, open-minded approach to the issue and that fails to follow the applicable precedent. That precedent, consistent with the Court's determination to hold a hearing on the outsourcing issue, requires that there first be an inquiry into *whether* outsourcing occurred, which must encompass an inquiry into all of the relevant facts relating to the nature and extent of Cognizant's coordination with the Government in carrying out its investigation. At that point, if and when outsourcing is found, the Court can assess the constitutional implications of that finding, including, for example, whether the outsourcing gives rise to claims based on an unconstitutional interrogation of the Defendants, Cognizant's withholding of exculpatory information or any other constitutional violation. Cognizant's response seeks to turn that inquiry on its head, limiting the investigation of outsourcing to the specific facts involving only one of the potential constitutional violations at issue (though it seeks to limit the scope of that inquiry too). Of course, this makes no sense, as this Court has already determined, and as the relevant case law makes absolutely clear.

Indeed, Cognizant makes clear in its submission that its real goal—exactly like that of the Government—is to avoid the outsourcing inquiry altogether, initially by simply declaring it to be meritless, despite concrete and compelling facts to which the Defendants are able to point, even with the limited and incomplete record thus far provided. In a brief that reads like a Government filing in many ways, including by arguing the Defendants' guilt (though that is certainly not what this motion is about), Cognizant seeks to revisit the Court's decision to conduct this outsourcing inquiry at all. But its effort to pretermit the outsourcing inquiry should and must be rejected, and

in order for that inquiry to be a meaningful one, Cognizant should be required to comply with the Subpoenas duly authorized by the Court.

*Finally*, Cognizant completely fails to explain how, having provided the Government with significant amounts of privileged information, through both oral "downloads" of interviews and extensive production of privileged documents, it may now claim privilege with regard to the very same subject matters encompassed by those disclosures.  Indeed, even the limited information thus far obtained by the defense demonstrates that Cognizant's selective invocation of privilege— turning over to the Government and waiving privilege as to some documents, but asserting privilege as to others—serves to provide an incomplete, curated version of events.  Thus, as is set forth in the Defendants' Moving Brief and in detail below, concrete examples establish that the effect of Cognizant's selective waiver of privilege is to tell a story consistent with the Defendants' alleged guilt but not consistent with the facts.  The law specifically provides that selective assertions of privilege that cause prejudice to an adversary give rise to a broader subject matter waiver, and Cognizant's assertions of privilege should, therefore, be denied, both in service of the outsourcing inquiry which the Court has ordered and, more fundamentally, so that the Defendants may have a fair trial, including the opportunity to defend themselves vigorously by seeking materials beyond the curated version of events found in the discovery produced to date.

## LEGAL ARGUMENT

### I.  COGNIZANT SHOULD BE COMPELLED TO PRODUCE DOCUMENTS RESPONSIVE TO THE PLAIN LANGUAGE OF THE SUBPOENAS, AND ITS CROSS-MOTION TO QUASH SHOULD BE DENIED.

#### A.  Cognizant Fails to Acknowledge, Let Alone Satisfy Its Burden of Showing, that the Subpoenas Are "Unreasonable or Oppressive," Ignoring the *Nixon* Analysis that the Court Already Performed.

Cognizant's response to the Defendants' motion is plagued by a fundamental defect: Cognizant nowhere acknowledges the legal requirement that, in resisting the Subpoenas, it bears

the burden to demonstrate that the Subpoenas are "unreasonable or oppressive." *See Impounded*, 277 F.3d 407, 415 (3d Cir. 2002) ("The burden of production and the burden of persuasion to show that a subpoena was unreasonable lies with the party resisting it."); *United States v. Caruso*, 948 F. Supp. 382, 397 (D.N.J. 1996) ("'[a] subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise.") (quoting *United States v. Nixon*, 418 U.S. 683, 698 (1974)). Indeed, Cognizant does not even attempt to make this showing: nowhere in its Opposition does it even advance an argument that the Subpoenas are "unreasonable or oppressive." Nor could it, in good faith, do so, given its extensive production to the Government, described in the Defendants' prior submission. (*See* Def. Br. at 15, 44 n.20).

That Cognizant has not made this argument is understandable. After all, in this case, the Court has already determined, after having heard from the Government, that the *Nixon* requirements were met, even narrowing the Subpoenas to ensure that they would not be overbroad. In doing so, the Court made clear that it was fulfilling its responsibility "not merely to quash an overbroad subpoena, but to ensure that a Rule 17 subpoena is properly issued in the first place." (ECF No. 96 at 13). Further, with regard to the Subpoenas' scope in particular, the Court made clear that its "oversight function is critical; I will not, to borrow Defendants' terminology, outsource it to the companies being subpoenaed." (*Id.*). Thus, the Court proceeded to carefully analyze each of the *Nixon* requirements and found—after specifically revising the language of the document requests to narrow the Subpoenas—that they had been satisfied, including that the "specificity" requirement that is designed to prevent the issuance of subpoenas that amount to a "general 'fishing expedition'" had been satisfied. (*Id.* at 15 (quoting *Nixon*, 418 U.S. at 700)).

Cognizant, however, ignores the process that took place, instead launching a direct attack on the Court-approved Subpoenas by—in an echo of the Government's opposition to the issuance

of the Subpoenas in the first place—focusing its arguments on the Defendants' purported failure to satisfy the specificity prong of *Nixon*. Thus, just as the Government did (*see* ECF No. 76), Cognizant repeatedly (no fewer than seven times) characterizes the already-approved Subpoenas as a "fishing expedition."[1] In doing so, it not only rejects the Court's previous conclusion, but also turns the law of subpoenas on its head by seeking to transfer its burden to the Defendants to show, yet again, why the Subpoenas are sufficiently specific, insisting as it does that the Defendants identify with precision the substance of documents to which they have thus far been denied access. But this, of course, makes little sense and undermines the purpose of these or any other Rule 17 subpoenas. *See United States v. Poindexter*, 727 F. Supp. 1501, 1510 (D.D.C. 1989) (rejecting argument that "subpoena lacks adequate specificity" and amounts to a "fishing expedition" because "[t]he Court . . . will not place the defendant in the impossible position of having to provide exquisite specificity as a prerequisite to enforcement of the subpoena by the Court, while he is denied access to the documents in question, thus making it impossible for him to be more specific"); *see also United States v. Orena*, 883 F. Supp. 849, 868 (E.D.N.Y. 1995) (party arguing that a defendant's subpoena is "merely fishing" cannot place "an unreasonable burden" on defendant to provide specificity).

In any event, the Court, upon examining the categories of documents sought, correctly concluded that the Defendants provided sufficient specificity under *Nixon*. (ECF No. 96, 104).

---

[1] Cognizant's repeated citation to the Third Circuit's unpublished decision in *United States v. Eisenhart*, 43 F. App'x 500 (3d Cir. 2002), in support of its argument that the Defendants have embarked on a "fishing expedition," is unpersuasive. There, even after 15 months of discovery, the defendant was unable to identify any relevant evidence to be subpoenaed. *Id.* at 505 ("the subpoena was not aimed at relevant information"). In contrast, the Defendants' Subpoenas here target relevant evidence, as the Court found in its September 14 Order. (ECF No. 96 at 15 ("Schwartz has made a strong enough argument to require production of some category (a) documents . . . . [Those documents are] relevant to the outsourcing issue.")).

Cognizant provides no basis to overturn that decision.  Nor, obviously, does it show how the unspecified burden on Cognizant somehow outweighs the Defendants' fundamental right in a criminal case to obtain the materials necessary to mount a defense, a critical point that the Defendants raised in their Moving Brief (Def. Br. at 44-45 (citations omitted)), but which Cognizant does not even acknowledge, let alone attempt to rebut.  In sum, because Cognizant has not and cannot come close to shouldering its burden of showing that expanding its search to comply with the Subpoenas would be "unreasonable or oppressive" within the meaning of Rule 17, its Cross-Motion to Quash should be denied.

### B.   Cognizant's Narrow Interpretation of the Subpoenas Ignores Their Plain Language and Recycles the Government's Arguments Previously Rejected by the Court.

Beyond its failure to acknowledge or satisfy its legal burden in seeking to resist the Subpoenas, Cognizant's narrow framing of the scope of the Subpoenas ignores both their plain language and the procedural history that gave rise to, and explains, that language.  Thus, the Subpoenas here at issue specifically call for documents "related to the *investigation and* interview of Schwartz [and Coburn]."  (Def. Br. at 23-25 (citing ECF No. 96 at 16-24)) (emphasis added). This language was precise and purposeful and was the product of full briefing regarding the proper scope of the Subpoenas after they were revised by the Court in accordance with its ruling. Cognizant, however, contends that, despite this plain language, the Subpoenas do not cover documents concerning the "investigation."  (CTS Br. at 18 ("[M]atters related to the broader issue of whether Cognizant's entire investigation was the product of Government 'outsourcing' are irrelevant for Rule 17 purposes unless they are pertinent to the question of whether Defendants' statements in their interviews were coerced."))  This argument is, of course, exactly the same as the one that the Government offered—nearly verbatim—immediately following the Court's September 14 Order.  Specifically, the Government argued that the Court's Order "unambiguously

narrows the scope of the Defendants' Rule 17 subpoenas" to a "potential *Garrity* [*v. New Jersey*, 385 U.S. 493 (1967)] analysis" and thus requested that each request in the Subpoenas be revised to cover only "communications related to the interview of Schwartz [or Coburn], including any investigation of Schwartz [or Coburn] that led to his interview." (ECF No. 99 at 1). The Court, however, rejected the Government's argument, instead authorizing the issuance of the revised Subpoenas without the limitations advocated by the Government. (ECF No. 104). In doing so the Court approved Subpoenas that could, as intended, accomplish their stated goal of furthering the inquiries that follow from *United States v. Connolly*, No. 16 CR. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019), and *United States v. Blumberg*, No. 14-CR-458 (D.N.J.), by addressing both the "investigation *and* interview[s]" of the Defendants and expressly allowing "some breathing room for the surrounding context" of the investigation beyond the Defendants' interviews alone. (ECF No. 96 at 16).

The Court's ruling in this regard made perfect sense: the "surrounding context" is necessary so that the outsourcing inquiry is full, fair and meaningful, and allows the Court, if it finds outsourcing, to ascertain the full range of constitutional rights that are implicated. Thus, as the Defendants have explained, a number of fundamental rights are potentially implicated when a private party stands in the shoes of the Government, including not only the constitutional rights applicable to the questioning of criminal suspects, as in *Garrity* and *Connolly*, but also the disclosure of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), discussed in *Blumberg*, and the right to present a defense, guaranteed by the Due Process Clause and by the Sixth Amendment. (Def. Br. at 3, 25-36).

### C. Cognizant's Narrow Interpretation of the Subpoenas Ignores the Purpose of the Outsourcing Hearing and Inappropriately Limits the Information That Will Be Available for Purposes of Deciding the Issues Before the Court.

Beyond its disloyalty to the plain language of the Subpoenas, the inadequacy of

Cognizant's subpoena response, and the flawed interpretation of the Subpoenas upon which it rests, are exposed in the first sentence of its Opposition Brief. According to Cognizant, the Court in its September 14 Order "authorized Defendants to serve Rule 17 subpoenas on Cognizant concerning the 'narrow issue' of whether Defendants' statements in their interviews during Cognizant's internal investigation were coerced under *Garrity*." (CTS Br. at 1). Based on that incorrect premise, Cognizant admits that it did not collect, review and produce materials in accordance with the terms of the Court-approved Subpoenas, but rather confined its search for responsive materials to those that, in Cognizant's view, "would be relevant to a potential motion to suppress" (*id.* at 15), ultimately opining that the only "substantive legal issue presented" is "whether the Government coerced [Defendants'] interview statements under *Garrity*." (*Id.* at 20).

But that is not what the Court ordered, and Cognizant's proposed approach does not allow for consideration of the full scope of the legal issues to be presented to the Court in the outsourcing motion. As set forth below, Cognizant's effort to limit the inquiry to a *Garrity* issue not only ignores the Court's September 14 Order and the Subpoenas that it authorized, but it bypasses the first prong of the *Connolly* inquiry, which asks whether the Government outsourced its investigation—the very question that the Court has granted a hearing to address. (ECF No. 96 at 11 n.11).

### 1.   Cognizant Ignores the Two-Pronged *Connolly* Inquiry and the Factors Relevant to the Threshold Outsourcing Question.

As the Court's September 14 Order makes clear, the full scope of the Defendants' forthcoming outsourcing motion will depend upon the information that it seeks here; that information will define the contours of that motion, including the constitutional rights that are implicated by a private party like Cognizant standing in the shoes of the Government, whether those arise under the Fourth, Fifth, and Sixth Amendments. (*See* Def. Br. at 25-26, 30-32). To be

sure, the Court "focus[ed] on *Connolly* and *Garrity* themselves" in considering the potential bases for Defendants' motion that will flow from the information developed at the outsourcing hearing, and the process that will precede it.  (ECF No. 96 at 11 n.11).  But the Court was perfectly clear that those grounds may change depending upon how the evidence develops:  in the words of the Court, "[t]he hearings ordered by the Court here may alter the picture as to the 'outsourcing' claim."  Therefore, the Court determined to "convene a hearing on the outsourcing itself" in order to develop the complete record necessary for that determination to be made.  (*Id.* at 10 n.10, 11 n.11).

Cognizant's response fails to acknowledge these aspects of the Court's September 14 Order in any way.  Instead, it ignores the very purpose of the hearing ordered by the Court:  to address the threshold inquiry of "outsourcing itself"—*i.e.*, whether the evidence shows outsourcing such that Cognizant's actions should be deemed those of the Government.  This is, as Defendants have shown, the first prong of the inquiry, under both *Connolly* and *Blumberg*.  (Def. Br. at 25-30).  Instead, Cognizant jumps directly to the second *Connolly* inquiry—whether the actions of Cognizant, as the Government's agent, violated the Defendants' constitutional rights—eschewing the analysis that the *Connolly* court undertook when evaluating whether the Government had there outsourced its investigative function to company counsel in the first place.  (*Id.*).  Specifically, although the defendant's outsourcing claim in *Connolly* was (unlike here) focused exclusively on *Garrity*—the defendant argued that his interview statements to company counsel "were both 'fairly attributable' to the Government and 'compelled,' thereby violating his constitutional right against self-incrimination," *Connolly*, 2019 WL 2120523, at *10—the *Connolly* court considered factors well beyond the defendant's interviews in concluding that the Government's investigation had, in fact, been outsourced, and that the company's and its counsel's actions were therefore fairly

attributable to the Government.  *Id.* at *2 ("The issue raised by [the defendant's] motion is just exactly how much the investigation conducted by [company counsel] was a substitute for investigative efforts by Government attorneys."); *id.* ("For Purpose[s] of This Motion, the Court Finds that [the] Bank Investigation is 'Fairly Attributable to the Government."); *id.* at *12 ("rather than conduct its own investigation, the Government outsourced the important developmental stage of its investigation to [the] Bank—the original target of that investigation—and then built its own 'investigation' into specific employees, such as [the defendant], on a very firm foundation constructed for it by the Bank and its lawyers").[2]

Thus, before reaching the constitutional implications that resulted, the *Connolly* court engaged in a thorough analysis of whether the Government had, in fact, outsourced its investigation to company counsel.  Among other things, the court:

- Considered the conduct of, and the communications and level of coordination between, the company and its counsel, on the one hand, and the Government, on the other, throughout the course of the five-year-long investigation, including during time periods well after the defendant's interviews by company counsel, continuing through the company's entry into a deferred prosecution agreement with the Government.  *Id.* at *4 (as the investigation progressed, the "Bank representatives and counsel continued to update the Government about their findings and coordinate next steps, as to [the defendant] and others"); *id.* at *5 ("The limited record reflects that the Government and [company counsel] discussed [the defendant], in real time and at least to a limited extent, as the Bank's internal investigation progressed."); *id.* at *11 (after the defendant's interviews with company counsel, and "as [the] Bank's investigation progressed, the Government continued to discuss [the defendant] by name in meetings with Bank investigators"); *id.* at *8, *12 ("[i]n the DPA, DOJ touted the benefits of the cooperation that [the] Bank and [company counsel] provided" and "[n]ot surprisingly, when it came time to resolve its case against [the] Bank, the Government credited [company counsel] for its extensive support of its own investigative efforts.").

---

[2] Likewise, in *Blumberg*, where *Brady*, rather than *Garrity* rights were at issue, Judge Linares—after ordering "significant discovery"—held an evidentiary hearing to determine "the extent to which the Government outsourced and/or delegated discovery and investigation tasks to" company counsel.  (Def. Br. at 31 (citing *Blumberg*, No. 14-CR-458, ECF No. 113 at 2)).

- Identified as another "critically important issue" to the outsourcing inquiry "just what the Government was doing during the five years between" the initiation of the investigation in 2010 and the Bank's entry into a deferred prosecution agreement in 2015, highlighting that the record contained "very little evidence about the Government's own independent investigative efforts" and that the Government "did not interview anyone at [the] Bank until late 2013—three and a half years after" the investigation commenced. *Id.* at *9, *12-13; *see also id.* at *9 ("It is hard not to conclude that the Government did not conduct a single interview of its own without first using a road map that [company counsel] provided—illuminating just how the Government should 'investigate' the case against certain [] Bank employees, including [defendant].").

- Emphasized that the "massive amount of pressure" that companies face to cooperate "is highly relevant to any assessment of the sufficiency of the nexus between the Government and [the] Bank's 'internal' investigation," particularly insofar as the company's private interests are "aligned with the Government's interest." *Id.* at *13; *see also id.* at *8 (company counsel "was candid about the context in which all of this occurred, as well as the substantial pressure [the] Bank faced to cooperate in every conceivable way with the Government"); *id.* at *7 (the "Bank would not have been eligible for cooperation credit had it not done these things") (citing Filip Memorandum §§ 9-28.700, 9-28.720(a)).[3]

Significantly, then, the outsourcing inquiry undertaken by the court in *Connolly* went well beyond the parameters that Cognizant seeks to impose on the development of the issue here. That is, even with its focus on a potential *Garrity* violation,[4] the *Connolly* court considered numerous factors beyond the defendant's interviews in arriving at its conclusion that the Government had outsourced its investigation. These factors, identified by the Defendants in their Moving Brief as critical to the outsourcing inquiry, (Def. Br. at 29-30), are left completely unaddressed by Cognizant in its attempt to defend its unilaterally narrowed response to the Court-approved Subpoenas, and indeed, to foreclose the *Connolly* inquiry altogether. Cognizant should not be

---

[3] As is discussed further below, Cognizant's attempt to dismiss "as a matter of law" the relevance of DOJ policies to the outsourcing inquiry (CTS Br. at 26, n.16) misstates the law, as reflected in *Connolly* itself.

[4] Of course, it bears emphasis that while the defendant in *Connolly* claimed a violation of his *Garrity* rights, Judge McMahon did not purport to define the full range of constitutional rights that may arise as a result of a finding of outsourcing.

permitted to so short-circuit this Court's forthcoming inquiry; instead, Cognizant should be required to comply fully with the Court-approved Subpoenas as issued so that the question as to which the Court has ordered a hearing to address—whether the Government outsourced its investigation—can be evaluated on a full and fair evidentiary record. (ECF No. 96 at 11 n.11) ("Because I have a less complete record than the one that was before Judge McMahon, I will convene a hearing on the outsourcing itself."); *see also* March 3, 2020 Tr. at 11-12 ("THE COURT: . . . But aren't [Defendants] right about the logical order? I mean, doesn't it make sense that we not decide the [outsourcing] motion once with incomplete information, complete our information, and then decide it again? . . . Let them get whatever it is they're entitled to and once they've got that, use it in whatever manner is appropriate in the motion practice.").

### 2. Cognizant Mischaracterizes *Garrity* and the Defendants' Interviews in an Effort to Avoid This Inquiry.

Beyond overlooking the threshold outsourcing inquiry, Cognizant goes a step further and urges the Court—though the Court has repeatedly said it would not do this—to predetermine the outcome of this process, repeating the Government's refrain that Defendants have "proffered no evidence" that their interviews were coerced and thus have no chance of succeeding on their pretrial motions. (CTS Br. at 2 ("The documents that were captured contain no evidence that Defendants' interviews were coerced or 'Government-engineered' in any way."); *id.* at 31 ("Defendants have proffered no evidence that their interviews truly were the product of coercion (much less Government coercion).")). Cognizant's approach in this regard is, again, identical to that taken by the Government in (unsuccessfully) opposing issuance of the Rule 17 Subpoenas in the first place, (ECF No. 76), and then seeking (again unsuccessfully) to limit them in order to prevent the Defendants from gathering information for their defense. (ECF No. 83 at 2-3; ECF No. 96 at 16).

In any event, Cognizant's characterization of the record—even without the benefit of the evidence that will come from compliance with the Subpoenas—is demonstrably wrong.  In fact, Defendants quoted and attached to their moving papers specific evidence that provides significant indicia of coercion; these include Cognizant employee policies and the Defendants' employment agreements mandating cooperation with the investigation in order for them to maintain their employment with Cognizant (Def. Br. at 5-6, Exs. C, D, E), and an email exchange between DLA and Schwartz's then-counsel, Josh Rievman, memorializing the draconian "parameters" that Cognizant imposed for the Defendants' interviews, including a prohibition on the presence of more than a single lawyer and requirements "that the lawyer will not take notes, ask questions, or otherwise disrupt the interview." (Def. Br. at 8-10, Ex. K).  Certainly, given Cognizant's superior leverage, Defendants understood that, if they did not agree to these terms and submit to the interviews, they would be fired.  (Def. Br. at 5-6, 9-10).[5]  In other words, the Defendants' interviews were squarely, as the Court put it, "under the implicit compulsion of 'cooperate or be fired'" within the meaning of *Garrity*—though the Defendants, of course, need not make that showing at this stage.  (ECF No. 96 at 10).

In this regard, Cognizant's suggestion that the Defendants can only prevail on the merits of a *Garrity* claim if they were explicitly "threatened with termination" (CTS Br. at 9, 31) is inconsistent with the law, which, as this Court correctly observed, turns on "implicit compulsion" (ECF No. 96 at 10) and does not require an explicit threat. *See also, e.g.*, *United States v. Vangates*,

---

[5] In its Opposition Brief, Cognizant claims that Schwartz "asked to be interviewed as soon as possible," and, without basis, that he was "eager" to be interviewed.  (CTS Br. at 2, 7).  Setting aside that these considerations are not relevant under *Garrity*, which only asks whether a defendant was compelled to sit for an interview under the threat of termination, the fact that Schwartz knew the interviews were compulsory and wanted to schedule them promptly to get them over with and move the investigation forward does not in any way change the reality that he was compelled by Cognizant to sit for the interviews.

287 F.2d 1315, 1321 (11th Cir. 2002) ("[S]elf-executing *Garrity* immunity . . . may arise without an explicit threat of employment sanctions.") (citing, *inter alia*, *Garrity*, 385 U.S. at 496 ("Subtle pressures may be as telling as coarse and vulgar ones.")); *Connolly*, 2019 WL 2120523, at *3 (S.D.N.Y. May 2, 2019) (emphasizing provision in employee policy stating that employees "must fully cooperate with . . . internal and external examinations, investigations and other reviews" or risk "disciplinary action" as supporting finding that defendant had a "reasonable" and "subjective understanding" that he had no choice but to be interviewed or else risk termination, and finding *Garrity* violation notwithstanding no direct threat that defendant would be fired).

Cognizant also seeks to advance the Government's ultimate arguments at this early stage, contending that there is "no evidence" that the Government was anything more than a passive observer during the period surrounding the Defendants' interviews. (CTS Br. at 2, 31-32). But to the contrary, the communications thus far provided for the period leading up to, on the day of, and immediately after Schwartz's second interview, reflect extensive coordination with the Government, including "questions," "requests," and "follow up" from the Government in response to Cognizant's frequent, real-time updates. (Def. Br. at 6-12, 32-33 (setting forth, *inter alia*, at least 29 communications between DLA and the Government in the less than four weeks leading up to Schwartz's second interview on September 23, 2016 and Coburn's planned second interview on September 28, including email and telephone communications on the very day of Schwartz's interview)).[6] This provides, at minimum, good reason to believe that there is much more that

---

[6] Cognizant's assertion that the Defendants attached "only two of these communications as exhibits" to their Joint Motion is simply inaccurate. (*See* Lustberg Cert., Exs. H, I, J, L, M, N). But in any event, Cognizant does not—as it could not—contest that the Defendants have accurately described the frequency of communications between Cognizant and the Government during this period, and in fact has itself attached additional examples of the communications to which the Defendants were referring, further demonstrating the active role the Government played during the timeframe surrounding Cognizant's interviews of the Defendants. (*See* Solano Cert., Exs. 12-

remains to be discovered about the subject of these Subpoenas, all of which can be presented to the Court for adjudication when the discovery stage of the process is complete.

Finally, Cognizant's gratuitous, highly misleading portrayal of Schwartz's interviews, though irrelevant to its opposition to these discovery motions (and, revealingly, more of an effort to prosecute the case than to appear as the subject of a third party subpoena), merits a brief response. Cognizant references Schwartz's second interview and particularly a discussion during that interview of notes dated April 22, 2014 which it had obtained from Schwartz's laptop (CTS Br. at 8). But it selectively quotes from those notes, pointedly omitting the exculpatory portions in which Schwartz indicates that he, in fact, contemporaneously reported the April 2014 conversation—during which the Defendants are alleged to have learned of and then authorized payment of the bribe demand that forms the basis for the Indictment against them, *see* Ind. ¶¶ 12-13—to Lakshmi Narayanan, Cognizant's former CEO and, at the time, Vice Chairman of the Board as well as Cognizant India's Chairman of the Board, and noted that:

- "we are taking the right approach" (*i.e.*, by not paying a bribe);

- it was the "right stand for us to say [it was] their [*i.e.*, L&T's] problem," and

- "anything other than real estate we should not pay."

(Def. Br. at 75, Ex. MM). That is, Cognizant not only grossly mischaracterizes Schwartz's interview, but also selectively excludes the obviously exculpatory portions of the notes. While Cognizant rhetorically asks how Schwartz could have been compelled against his will to sit for his interviews (CTS Br. at 32), ignoring the express terms of his employment agreement and Cognizant's Code of Conduct, as well as his real-life experience as Cognizant's Chief Legal

---

15). And, of course, further communications may well be contained in the electronic communications not yet provided. *See infra* at I.D.1.

Officer to whom Corporate Security reported, a better rhetorical question might be why Cognizant has gone to such great lengths in a prosecutorial attempt to argue the Defendants' guilt, weaving a highly curated narrative, in the context of a motion to compel compliance with Subpoenas.

> **D.    In Order To Comply with the Plain Language and Purpose of the Subpoenas, Cognizant Should Be Compelled to Remedy Its Failure to Search For And Produce Responsive Documents.**

>> **1.    The Narrow Date Range Used by Cognizant Is Inconsistent with the Terms of the Subpoenas and the Orders of the Court.**

In an effort to justify its unilateral decision to limit the date range of its searches for responsive documents to the narrow time period between August 14, 2016 and October 24, 2016—less than ten weeks of an investigation that spanned over two years—Cognizant explains that its "search focused on the time period when, if there had been any 'Government engineering' *of Defendants' interviews*, it would have occurred."  (CTS Br. at 19 (emphasis added)).  Obviously, this argument is just another expression of Cognizant's unduly narrow interpretation of the Subpoenas, which is wrong for the reasons set forth above and in the Defendants' Moving Brief. Nor do Cognizant's more specific arguments in support of using this narrow date range fare any better.

*First* and foremost, Cognizant's searches must go beyond these ten weeks because the Court-approved subpoena requests on their face require it.  (*See* Def. Br. at 37-38).  Indeed, Cognizant acknowledges that "the Court approved Subpoenas that requested communications concerning Cognizant's cooperation with DOJ after February 2019 and communications pertaining to DOJ's February 2019 declination letter" and thus required the production of materials dated over two years after Cognizant's self-selected cut-off date of October 24, 2016.  (CTS Br. at 24).  Nonetheless, Cognizant insists that those requests are somehow "beyond the scope of discovery authorized by the September 14 Decision."  (CTS Br. at 24).  But that position expressly

disregards that the Court, in its September 14 Order, explicitly approved those precise requests (ECF No. 96 at 19-20). Cognizant's position is no less than an obvious effort to rewrite the Subpoenas to fit the reformulated "scope" that it desires.

Cognizant argues that "Defendants simply have not established that communications between Cognizant and DOJ in or around February 2019 could retroactively have any bearing on whether interviews conducted two years earlier were coerced by the Government." (CTS Br. at 24). But leaving aside that this position again misplaces the burden applicable to this motion, seeking to impose it upon the Defendants without ever showing that the Subpoenas are unreasonable or oppressive, and further leaving aside that the Court has already rejected this argument by approving requests that expressly call for such communications, this position again is based upon inappropriately limiting the outsourcing inquiry to the question of whether the Defendants' interviews were coerced. As the Defendants have explained (and Cognizant ignores), communications between Cognizant and the Government during that key time when Cognizant likely would have emphasized to the Government its cooperative efforts in an effort to get the best result possible, bear directly on the outsourcing inquiry, as the Court implicitly recognized in approving them, over objection. (Def. Br. at 38).

Indeed, the court in *Connolly* looked to precisely this type of evidence, devoting an entire section of its opinion to a report submitted by company counsel shortly before the company entered into a deferred prosecution agreement with the Government. The report, as described by the court, "provide[d] an exhaustive overview of the Bank's substantial cooperation with the Government" throughout the Bank's multi-year investigation and led the court to conclude that the "Bank's investigation pretty much was the Government's investigation." *Connolly*, 2019 WL 2120523 at *8-9, *see id.* at *13 ("The Government's investigatory strategy up to that point was to let the Bank

17

carry its water for it.").  In exactly the same way, the communications between the Government and Cognizant in late 2018 and early 2019 may well reveal important details about the nature of the company's relationship with the Government, particularly at the time when they are most likely to have been discussed, as the Government was making charging decisions.[7]

*Second*, as the Defendants showed in their Moving Brief, evidence of Cognizant discussing its incentives or motivation to self-disclose during the early stages of the investigation—which Cognizant's self-selected date range also excludes—is significant to this inquiry and responsive to the Subpoenas.  Such evidence would, for example, specifically include communications in which Cognizant discussed maximizing its cooperation credit and shaping its investigation in accordance with the Government's specific priorities and interests, *e.g.*, by identifying individual company officers for the Government to prosecute, consistent with then-operative DOJ policies.  (Def. Br. at 38-41).[8]

---

[7] The *Connolly* court also emphasized in its outsourcing analysis the terms of the deferred prosecution itself and the Government's crediting of company counsel for its extensive cooperative efforts.  *See id.* at *12 ("Not surprisingly, when it came time to resolve its case against [the] Bank, the Government credited [company counsel] for its extensive support of its own investigative efforts."); *id.* at *8 ("the investigation was a conspicuous success for [the] Bank" and "DOJ touted the benefits of the cooperation" that the company and its counsel provided in the DPA).  But the corresponding evidence in this case, which is called for by the Subpoenas, would be excluded under Cognizant's approach.

[8] In a footnote, Cognizant cites two cases in an attempt to rebut the Defendants' argument that DOJ policies are relevant evidence in understanding Cognizant's incentives and motivations. (CTS Br. at 26 n.16 (citing *Rigas v. United States*, No. 11-CV-6964 (KMW), 2020 WL 2521530 (S.D.N.Y. May 15, 2020), and *United States v. Ferguson*, No. 3:06CR137 (CFD), 2007 WL 4240782 (D. Conn. Nov. 30, 2007))).  Both cases stand for the uncontroversial proposition that DOJ policies, *standing alone*, cannot establish outsourcing.  *See Rigas*, 2020 WL 2521530, at *18 ("Without more, these policies do not prove that the Government directed Adelphia to restrict the Rigases' access to fee advancement, or that Adelphia's attempts to comply with them were state action."); *Ferguson*, 2007 WL 4240782, at *6 (holding that the Thompson Memorandum alone was insufficient to establish government coercion).  But neither case stands for the proposition that DOJ policies cannot, "as a matter of law," along with other facts of the sort that the Defendants seek here, establish state action, or outsourcing, as Cognizant argues.  Indeed, such an argument is expressly contradicted by the seminal decision of the Second Circuit in *United States v. Stein*,

Along these lines, in response to the Defendants' request that the Court require Cognizant to search for materials dated prior to August 31, 2016, the day on which Cognizant claims it first contacted the DOJ and SEC about making a self-disclosure, Cognizant does not actually deny "that there may have been earlier communications to the Government," but merely asserts that the Defendants "have failed to identify" them.  (CTS Br. 8; *id.* at 25 (Defendants "do not cite any evidence to support the claim that there might have been earlier contact with the Government")).  But that glaring non-denial is an effort to undermine the whole purpose of the Subpoenas, which is to find out whether there is any such evidence, and if so, what it is.  And given the relationships between Cognizant's counsel and the DOJ and SEC, and the fact that Cognizant had been considering self-disclosure since at least June 2016 (Def. Br. at 4, 6-7, 39-40)—a fact that Cognizant does not dispute—there is certainly a reasonable basis to conclude that there may well be earlier communications between Cognizant's counsel and the Government.[9]  As just one

---

541 F.3d 130, 135 (2d Cir. 2008), which held that the Thompson Memorandum, in conjunction with the Government's conduct in pressuring a company to condition, cap, and ultimately cease advancing legal fees to defendants, contributed to a finding of state action.  Neither *Rigas* nor *Ferguson* is to the contrary and, of course, *Connolly* itself emphasized that the "massive amount of pressure" that companies face to cooperate "is highly relevant to any assessment of the sufficiency of the nexus between the Government and [the] Bank's 'internal' investigation." *Connolly*, 2019 WL 2120523 at *13; *see also id.* at *7 (the "Bank would not have been eligible for cooperation credit had it not done these things") (citing Filip Memorandum §§ 9-28.700, 9-28.720(a)).  In sum, evidence of Cognizant's attempts to comply with and mold its investigation to fit DOJ guidance is among the factors directly relevant to and supportive of the Defendants' forthcoming outsourcing motion, and contrary to Cognizant's view, should be produced in response to the Subpoenas.

[9] Cognizant's contention that because "Schwartz supervised the investigation up until August 20," he necessarily "would have been aware of any contact with the Government during that period" (CTS Br. at 8) rests on flawed logic.  To be sure, Schwartz was involved in the early phases of the investigation, but the record is clear that it was Dana Gilbert, Cognizant's then-General Counsel of North America and Chief Compliance Officer, and not Schwartz, who was in charge of the day-to-day operation of the investigation, in particular the interactions with and the management of DLA, including what was communicated from DLA to Schwartz (among others).  Moreover, the Subpoenas seek documents to which Schwartz, separated from Cognizant and deprived of his laptop, does not have access, though his involvement in the early stages of the investigation, and

example, Cognizant does not dispute that by August 31, 2016, DLA had already conducted 22 witness interviews; documents associated with these and other key investigative events would therefore very likely contain responsive information bearing directly on whether there was, in fact, the outsourcing that is the subject of this inquiry, including whether the interviews conducted during this period were encouraged or compelled by the Government, or at least conducted in accordance with Cognizant's resolve to cooperate with the federal authorities.

*Third*, and perhaps even more obviously, evidence of outsourcing after October 24, 2016 should certainly be produced, as numerous events bearing directly on the "investigation and interviews of" Schwartz and Coburn in fact occurred *after* that arbitrary cut-off date— notwithstanding Cognizant's attempt to again minimize those "events" as having "no plausible connection to the question of whether Defendants' interviews were 'outsourced' by DOJ." (CTS Br. at 26-27). For example, Cognizant collected and produced to the Government documents and records specific to the Defendants on numerous occasions between December 2016 and January 2019;[10] Cognizant demanded that Schwartz's counsel produce to it (and then searched) a forensic image of Schwartz's company-issued laptop and data on a personal hard drive in May 2017; Cognizant gathered information about the Defendants from other interviewees during that time period; the Government requested in a December 2017 letter, and Cognizant provided in the months that followed, documents and information specific to Defendants (Lustberg Cert. Ex. QQ);

---

knowledge of Cognizant only serve to emphasize the factual basis for and good faith nature of this inquiry, which is, then, far from the "fishing expedition" described by Cognizant.

[10] In their Moving Brief, the Defendants noted that the Defendant-specific productions to the Government continued until August 2018 (Def. Br. at 42), but materials produced by Cognizant to the defense on July 2, 2021 make clear that such productions actually continued on at least nine additional occasions. Thus, Cognizant produced to the Government Schwartz-specific materials on no fewer than 16 separate occasions after October 24, 2016, its self-selected cutoff date—all the way through January 23, 2019, the month before the Defendants were indicted.

and Cognizant even provided a series of oral downloads to the Government specifically about the interviews of the Defendants, all after Cognizant's self-selected end-date of October 24, 2016. (Def. Br. at 41-44).  Indeed, the arbitrariness of Cognizant's selection of October 24 is underscored by its acknowledgement, for the first time, of "the fact that there were 'downloads' of Defendants' interviews in 2018," (CTS Br. at 26), an admission that is inconsistent with its prior representation that October 17, 2016 was the date of the first and only DLA download dedicated to the Defendants' interviews (*see* Def. Br. at 41)—a representation that served as the rationale for Cognizant's October 24 cut-off date.  (Lustberg Cert. ¶ 46).  But the point is that all of this information would reveal the extent to which these significant actions and others, although after October 24, 2016, were suggested or dictated by the Government.

*Finally*, nowhere in its Opposition Brief does Cognizant oppose the Defendants' request for the Court to compel Cognizant to simply "[d]isclose all dates on which DLA Piper provided factual information to the Government concerning its interviews of the Defendants and other interviewees during the course of the investigation, including the identities of the participants at such meetings," (Def. Br. at 19, 42, 83), dates which evidence Cognizant's coordination with the Government both before and after the Defendants' interviews.  By declining to oppose this request for relief, Cognizant concedes that aspect of the Defendants' motion to compel, and it too should be granted.  *See, e.g.*, *Sportscare of Am., P.C. v. Multiplan, Inc.*, No. CIV.A. 2:10-4414, 2011 WL 589955, at *1 (D.N.J. Feb. 10, 2011) ("[F]ailure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue."); *Duran v. Equifirst Corp.*, No. 2:09-cv-03856, 2010 WL 918444, at *3 (D.N.J. March 12, 2010) ("The absence of argument on this and other issues constitutes waiver.").

## 2. Cognizant Should Be Compelled to Search the Files of Certain Additional, Essential Custodians.

Cognizant's selection of custodians was also unjustifiably limited, and its Opposition Brief confirms why that is so. To begin, Cognizant's assertion that it collected and reviewed documents from those custodians "most reasonably likely to have been involved in communications with the DOJ or SEC" (CTS Br. at 27-28) exposes one of the fundamental flaws with its selection, search and production as a whole: Cognizant overlooked (or disregarded) that the subpoena requests extend beyond—and in some cases do not contemplate at all—direct communications with the Government.[11] By unilaterally limiting its selection of custodians on this basis, Cognizant ignores the plain language of the Subpoenas in an effort to narrow (or circumvent entirely) the scope of its obligations and limit the Defendants' access to documents critical to their defense. Unsurprisingly, this has resulted in a production of only 199 non-duplicative documents. (Def. Br. at 1, 18).[12]

Cognizant's steadfast refusal to search the Defendants' own custodial files for responsive documents is particularly vexing. Indeed, despite repeatedly pointing out in its Opposition Brief that "Schwartz supervised the investigation" for several months (CTS Br. at 8, 25), and that "DLA conducted searches of Coburn and Schwartz's laptop computers" (*id*. at 8), Cognizant nevertheless refuses to search the Defendants' custodial files on the theory that there is no "plausible reason to

---

[11] For example, Schwartz Request No. 4 requires the production of "[c]ommunications *between CTS and its employees* regarding CTS and/or government interviews concerning the subject matter of the Allegations," which plainly encompasses internal communications that did not directly reach the Government. (ECF No. 106-2 at 3-4). Cognizant's own characterization of the Subpoenas acknowledges that they call for documents extending beyond communications with the Government. (CTS Br. at 14 ("Cognizant communications with its employees concerning interviews regarding the allegations against Defendants"; "[c]ommunications and other documents concerning findings from Cognizant's investigation provided to DOJ"; and "[m]emoranda and notes of information obtained during Cognizant's interviews")).

[12] Cognizant's claim that it produced 343 documents in response to the Subpoenas (CTS Br. at 17) is misleading, as 144 of those are duplicates.

conclude that a collection and review of Defendants' documents—including Schwartz's laptop—are likely to contain materials pertinent to the question of whether their interviews were coerced under *Garrity*." (*Id.* at 28). That position is incorrect for familiar reasons: again, the Subpoenas seek "information relating to the investigation and interviews of" Schwartz and Coburn—they do not call for Cognizant to limit its search to documents that it believes evidence coercion. (*See, e.g.*, ECF No. 106-2 at 2 (Schwartz Request 1), 3 (Schwartz Requests 2, 4a, 4b), 4 (Schwartz Requests 5-7)).[13] Moreover, Cognizant's rationale that the timing of Schwartz's involvement in the investigation justifies excluding his files from the scope of the Subpoenas is once again based on the flawed premise that the Subpoenas are limited to express "discussions regarding the so-called 'outsourcing' of [Schwartz's and Coburn's] interviews." (CTS Br. at 28). But, as set forth above, that is incorrect. The Court should require the production of these materials.

Cognizant also gives short shrift to the Defendants' request that it search the custodial files of Robert Molina, Henry Shiembob, and Maureen Breakiron-Evans, falsely claiming that the Defendants have "done little more than to identify these three individuals by their titles and generally state that they were involved in the investigation." (*Id.*). But that contention ignores Schwartz's knowledge of these individuals' specific roles, as a result of which the Defendants were able to provide the specific information they did in requesting the search of each of these custodians' files during the meet and confer process and in their Moving Brief (Def. Br. at 47-49; Solano Cert. Ex. 29 at 3). Molina was identified by the Defendants as senior director for Global Security at Cognizant during the relevant period, participating in internal investigation interviews

---

[13] Cognizant's assertion that "evidence of coercion, if it existed, would be within [Defendants'] control" (CTS Br. at 31) is particularly troubling to the extent that Cognizant required Schwartz to surrender his laptop and an image of the laptop, where such evidence would exist. Today, Schwartz no longer has possession of the laptop or image, and Cognizant still will not confirm or deny that it has preserved or retained them.

and involved in day-to-day management of the internal investigation (Def. Br. at 47-48); Shiembob was identified as Chief Security Officer during the relevant period and among those overseeing Cognizant's internal investigation and communicating with outside counsel (*id.* at 48-49); and Breakiron-Evans was identified as having served as chair of Cognizant's Audit Committee, which admittedly played a central role in the investigation following Schwartz's dismissal.  (*Id.* at 49; CTS Br. at 6 ("the Audit Committee assumed oversight for the investigation")).  Indeed, Cognizant's Opposition Brief does not refute the Defendants' assertions that these custodians would likely have documents responsive to specific subpoena requests.  (Def. Br. at 48 (identifying Schwartz Requests 2 and 4, Coburn Requests 5 and 8)).  Cognizant cannot, then, justify its refusal to search its files for responsive information.

Finally, Cognizant's argument that the Defendants "have offered nothing to suggest that either E&Y or PwC had independent communications with DOJ or SEC" (CTS Br. at 29) again ignores that the Subpoenas are not limited to direct communications with the Government (*e.g.*, Schwartz Request Nos. 2, 4, 5), a misunderstanding that pervades its analysis.  (ECF No. 106-2 at 3-4).  Cognizant's primary basis for refusing to search files of its contract auditors is its claim that the documents would all be subject to privilege.  (CTS Br. at 29 (claiming that all of E&Y's communications are privileged)).  While this may be a basis to withhold documents identified as responsive, and which in fact involved communications made with the purpose of obtaining legal advice, it is not a grounds to avoid performing the searches at all.  As discussed in the Defendants' Moving Brief (Def. Br. at 54-82) and below, *see infra* at II.C.3, Cognizant also has no basis to continue to assert privilege over these documents.

In sum, Cognizant's approach to the Subpoenas stands in glaring contrast to the efforts it undertook during its voluntary cooperation with the Government.  While, on multiple occasions,

Cognizant collected, reviewed, and produced—and discussed with—the Government hundreds of thousands of documents that were specifically focused on materials concerning (and collected from) Schwartz and Coburn, (Def. Br. at 12, 15; Ex. U), it now refuses even to undertake a search of the Defendants' files, or those of others most involved in the internal investigation here at issue. Particularly in light of the serious charges pending against the Defendants, Cognizant's unsupportable refusal to fulfill its obligations under the Court-issued Subpoenas ought not be permitted.  And this is true even if the Subpoenas are uncomfortable for Cognizant.  *See United States v. Messercola*, 701 F. Supp. 482, 485 (D.N.J. 1988) ("'[T]he benefits that arise from requiring [pretrial] production . . . from a nonparty witness far outweigh the speculative inconveniences.'") (quoting *United States v. Witt*, 542 F. Supp. 696, 698 (S.D.N.Y. 1982), *aff'd*, 697 F.2d 301 (2d Cir. 1982)).

### 3. Cognizant Should Be Compelled to Search for and Produce Text and Instant Messages.

The Schwartz Subpoena explicitly defined "communications" to include text messages and instant messages, which Cognizant acknowledges (CTS Br. at 15)—and the Defendants identified and attached to their moving papers specific record evidence reflecting—that Cognizant employees, and it appears DLA and the DOJ as well, communicated via those means, including during the time period immediately surrounding the Defendants' interviews in August and September 2016.  (*See* Lustberg Cert. Exs. BB, CC).  Thus, Cognizant's assertion that the Defendants' "purported reasons" for requesting that Cognizant search text and instant messages are based "upon nothing more than their conjecture" (CTS Br. at 30), simply ignores the record.

Furthermore, Cognizant's basis for that assertion—that the Defendants have not identified a "smoking gun" text or instant message that shows "outsourcing or coordination between Cognizant and DOJ regarding DLA's interviews of the Defendants" (*id.*)—misses the point of a

subpoena.  The Defendants' inability to provide a full accounting of the substance of messages to which they have not been granted access is not evidence that such documents do not exist; it is merely confirmation that Cognizant has refused to produce them, despite Court-approved Subpoenas requiring that they do so and clear indications that these means of communication were used by the relevant people at the relevant time, including for business purposes.[14]  (*See, e.g.*, Lustberg Cert. Ex. BB); *see Poindexter*, 727 F. Supp. at 1510 ("The Court . . . will not place the defendant in the impossible position of having to provide exquisite specificity as a prerequisite to enforcement of the subpoena by the Court, while he is denied access to the documents in question, thus making it impossible for him to be more specific.").

Cognizant's position reflects that it continues to read the Subpoenas as it would like them to read, not as they actually are.  The Subpoenas do not call for Cognizant to search for messages that Cognizant believes evidence or discuss "purported outsourcing or coordination between Cognizant and DOJ regarding DLA's interviews of the Defendants."  (CTS Br. at 30).  Rather, as approved by this Court following motion practice and careful review and tailoring, the Subpoenas direct Cognizant to identify and produce specific categories of communications, including text and instant messages, "relating to the investigation and interviews" of the Defendants.  The Court should not allow Cognizant to simply disregard the language of the Subpoenas, particularly in the face of clear evidence that text and instant messages were, in fact, used by and between pertinent

---

[14] Cognizant does not deny that its counsel and the Government communicated via text message for business purposes.  (CTS Br. at 30, n.19).  Given the record evidence demonstrating the exchange of cell phone numbers between Kevin Gingras (DOJ) and Karl Buch (DLA), and the fact that all communications between Buch and Cognizant personnel appear to have been conducted on Buch's cell phone, Cognizant should be compelled to search text messages using the tailored search terms designed to identify information necessary for the forthcoming hearing and pretrial motion practice.

custodians; Cognizant should be compelled to search for and produce "communications" as that term is defined in the Court-approved Subpoenas.

### 4. Cognizant Should Be Compelled to Search Using Essential Terms Under the Subpoenas.

The search terms that Cognizant utilized for its search and collection are facially inadequate, and Cognizant's conclusory assertion that the Defendants did not articulate a "proper reason" as to why that is so, or why "any of the additional search terms [Defendants'] proposed are reasonably likely to produce documents relevant to Government coercion question," should be rejected. (CTS Br. at 30). Following a meet and confer process, Cognizant refused to supplement its search for responsive documents with critical terms that come directly from the Subpoenas themselves, including, most notably, "cooperation" and "interview," which Cognizant itself argues is the focus of the Subpoenas. (*See, e.g.*, ECF No. 106-2 (Schwartz Requests 3-4(a), 6 (cooperation); 1-2, 4-7 (interview))). Indeed, each of the twelve terms that the Defendants proposed be added to Cognizant's searches, and which Cognizant rejected without justification, is directly tied to the inquiry underlying the Subpoenas and, indeed, to the language of the Subpoenas themselves. Thus, for example, the Court specifically authorized a search for documents and information relating to, *inter alia*, interviews (*interview*) of the Defendants (*Steven*, *Steve*, *Gordon*) by Cognizant, which the Defendants argue was done in the context of the Government outsourcing its investigation of potential bribes in India (*India*) to obtain a planning permit for the KITS facility (*KITS*), as alleged by the U.S. Attorney's Office for the District of New Jersey (*DNJ*), represented by Assistant United States Attorneys Nicholas Grippo (*Nick*) and Osmar Benvenuto (*Oz*). Likewise, the Court has stated that it will hold a hearing to determine whether outsourcing in fact occurred in connection with Cognizant's cooperation (*cooperat!*) with Government prosecutors

(*prosecut!*) under DOJ policies, including the widely publicized Yates Memo (*Yates*).  Searches using these terms are not, then, part of a far-fetched fishing expedition.

Nonetheless, although Cognizant represents to the Court that it has searched for the Defendants' names and used "expansive search terms to collect and review documents" (CTS Br. at 17), even a cursory review of Cognizant's February 26, 2021 letter memorializing its search parameters reveals that, in truth, it has done nothing of the sort.  For example, with respect to the Defendants' names, Cognizant only used the terms "Schwartz" and "Coburn," completely disregarding Defendants' first names and nicknames, which are at least as likely to have been used by colleagues and Cognizant's counsel involved in the investigation.  (*See* Lustberg Cert. Ex. A at 4).  Moreover, though several of the Subpoenas' requests extend beyond—and in some cases do not even seek—direct communications with the Government, Cognizant limited each of its searches of even internal Cognizant custodians by requiring that there be either a Government email address in the To/From/CC/BCC fields or the name of a Government employee or agency in the document.  (*Id.*).

Cognizant's search and selection process has thus been overly narrow; at the very least, it should be compelled to apply the additional search terms the Defendants have identified, all of which are specifically and narrowly tailored to the Subpoenas' requests.

## II.    COGNIZANT SHOULD BE COMPELLED TO PRODUCE RESPONSIVE DOCUMENTS THAT IT IS IMPROPERLY WITHHOLDING BASED ON INVALID CLAIMS OF PRIVILEGE.

Cognizant is not just seeking to limit its production of documents relevant to the outsourcing inquiry by advancing an unduly narrow reading of the September 14 Order and Court-issued Subpoenas.  (*Supra* at I.B-C).  It is also withholding responsive documents based on invalid privilege claims, in some instances where the privilege never applied, and in other cases where it may have applied but has been waived.

Cognizant clearly made a calculated, tactical decision to provide the Government with specific, detailed and voluminous information obtained during its interviews (including mental impressions of counsel), while at the same time deciding to withhold other information learned in the same interviews.  Cognizant has accordingly selectively invoked privilege in a way that has presented a one-sided view of the underlying conduct.  That selective invocation compels waiver of the privilege, both as a matter of fairness and as a matter of law, and the breadth of Cognizant's disclosures to the Government makes that waiver applicable to documents related to the events charged in the Indictment and other investigation-related materials.   At a bare minimum, however—and as reflected in the cases cited in Cognizant's own brief—the waiver extends to the specific documents (notes and interview memos) that formed the basis for Cognizant's extensive and detailed oral disclosures to the Government.

In their Moving Brief, the Defendants presented specific and concrete instances in which Cognizant's assertions of privilege created a false and misleading picture of the Defendants' conduct.  Specifically, the defense—which had access to a limited set of documents available to Schwartz after his departure from Cognizant—showed that Cognizant produced documents and invoked privilege in a way that deprived the Government (and by extension the defense) of material information.



██████████████████████

# ORIGINAL

**From:** "Coburn, Gordon (Cognizant)" <Gordon.Coburn@cognizant.com>
**Date:** Tuesday, July 19, 2016 at 6:44 PM
**To:** Cognizant Corp <SSchwartz@Cognizant.com>, "Gilbert, Dana (Cognizant)"
<dgilbert@cognizant.com>, "D'Souza, Francisco (Cognizant)" <FDSouza@cognizant.com>
**Cc:** Karen McLoughlin <Karen.McLoughlin@cognizant.com>
**Subject:** RE: Audit Committee Meeting

███████████████████████████████████████

**From:** Schwartz, Steven (Cognizant)
**Sent:** Tuesday, July 19, 2016 1:54 PM
**To:** Coburn, Gordon (Cognizant) <Gordon.Coburn@cognizant.com>; Gilbert, Dana (Cognizant)
<dgilbert@cognizant.com>; D'Souza, Francisco (Cognizant) <FDSouza@cognizant.com>
**Cc:** McLoughlin, Karen (Cognizant) <Karen.McLoughlin@cognizant.com>
**Subject:** Audit Committee Meeting

ATTORNEY COMMUNICATION
PRIVILEGED & CONFIDENTIAL

Frank and Gordon,

█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████

Best,

Steven

**Steven E. Schwartz**
**Executive Vice President, Chief Legal and Corporate Affairs Officer**
Cognizant Technology Solutions| 500 Frank W. Burr Blvd.| Teaneck, NJ 07666
Ph: (201) 678-2759 | sschwarz@cognizant.com

████████████████████

Cognizant, however, produced these emails with the exculpatory portions redacted, as

follows:[15]

---

[15] Differing timestamps in the different versions of these emails (*i.e.*, July 19, 2016 at 6:44 PM
versus July 19, 2016 at 10:45 PM) are the result of these emails having been obtained from

**AS PRODUCED**

| From: | Coburn, Gordon (Cognizant) <gcoburn@cognizant.com> |
|---|---|
| Sent: | Tuesday, July 19, 2016 10:45 PM |
| To: | Schwartz, Steven (Cognizant) <SSchwartz@Cognizant.com>; Gilbert, Dana (Cognizant) <DGilbert@cognizant.com>; D'Souza, Francisco (Cognizant) <FDSouza@cognizant.com> |
| Cc: | McLoughlin, Karen (Cognizant) <Karen.McLoughlin@cognizant.com> |
| Subject: | RE: Audit Committee Meeting |

## Privileged

**From:** Schwartz, Steven (Cognizant)
**Sent:** Tuesday, July 19, 2016 1:54 PM
**To:** Coburn, Gordon (Cognizant) <Gordon.Coburn@cognizant.com>; Gilbert, Dana (Cognizant) <dgilbert@cognizant.com>; D'Souza, Francisco (Cognizant) <FDSouza@cognizant.com>
**Cc:** McLoughlin, Karen (Cognizant) <Karen.McLoughlin@cognizant.com>
**Subject:** Audit Committee Meeting

ATTORNEY COMMUNICATION
PRIVILEGED & CONFIDENTIAL

Frank and Gordon,

# Privileged

Best,

Steven

**Steven E. Schwartz**
**Executive Vice President, Chief Legal and Corporate Affairs Officer**
Cognizant Technology Solutions| 500 Frank W. Burr Blvd.| Teaneck, NJ 07666
Ph: (201) 678-2759 | sschwarz@cognizant.com

(Lustberg Cert. Ex. DD-1).

These are only two of several examples of Cognizant's selective productions (and redactions) to the Government, and their importance cannot be overstated. Particularly when viewed together with the "interview downloads" that Cognizant provided to the Government, these are concrete examples of a selective invocation of privilege that contributed to a one-sided account

different sources and therefore having different metadata. Those differences are likely attributable to differences in time zones.

of the relevant facts and operated to deprive Schwartz and Coburn of information critical to their defense.

Cognizant's response to these documents—which represent only two examples among many of Cognizant's selective invocation of privilege—is to ignore them.  These documents, which go to the heart of the defense's argument of selective invocation and waiver, are mentioned only once, in a footnote, in Cognizant's entire brief.  (CTS Br. at 40 n.29).  And even there, Cognizant's sole argument is that these documents were outside of its self-imposed "date range relevant to the *Garrity* inquiry."  (*Id*.).  But that date range cannot, of course, be used to justify Cognizant's improper and selective invocation of privilege, the issue here, and Cognizant's other attempts to defend its assertions of privilege ignore the defense's arguments, the law, or both.[16]

### A.    Cognizant Does Not Dispute That It Provided the Government with Extensive Oral Downloads and Updates on "Key Developments."

In its Opposition Brief, Cognizant does not dispute that, as a factual matter, it provided the Government detailed accounts of 42 interviews of 19 Cognizant employees.  Nor does it dispute that the information provided to the Government concerned both the subject matter of the underlying allegations and Cognizant's investigation of them.  Now, however, in response to the Defendants' Subpoenas—which request documents relating to the very same subject matter (the alleged misconduct and Cognizant's investigation of it)—Cognizant asserts privilege to avoid disclosure.

---

[16] Notably, even as Cognizant brushes aside these documents, it argues that "although [the Defense Motion] is long on rhetoric, accusing Cognizant of advancing a particular narrative of events . . . it is short on any particularized, concrete explanation of any 'selective' or 'misleading' conduct." (CTS Br. at 48).  But both of the examples cited above are, of course, exactly such particularized and concrete examples of Cognizant's selective and misleading conduct, invoking privilege in some instances but not others to suggest a particular narrative of events.

But the law in this circuit is clear:  "privilege will be waived *as to all communications on the same subject*" where strategic disclosures of privileged information to the Government "disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story."  *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1426 n.12 (3d Cir. 1991) (emphasis added).[17]  Here, Cognizant's broad and one-sided disclosures to the Government compel an accordingly broad waiver of privilege as to the same subject matter, or, at a bare minimum, a waiver as to interview-related materials that formed the basis of Cognizant's downloads.

### B.   Cognizant's Selective Disclosures of Privileged Information Trigger Broad Subject Matter Waiver Under *Westinghouse*.

As noted, subject matter waiver occurs when one party has disadvantaged another by presenting a "one-sided story" through the selective invocation of privilege.  *See Westinghouse*, 951 F.2d at 1426 n.12.   In *Westinghouse*, like here, the company conducted an internal investigation into allegations that it had obtained contracts by bribing foreign officials, and thereafter disclosed certain otherwise-privileged documents to the DOJ.  *Id*. at 1417.

The Third Circuit found Westinghouse's strategic disclosures to be incompatible with the underlying goals of the attorney-client privilege and work product protection, and rejected Westinghouse's later attempts to shield certain investigation-related material as privileged, finding that any previously existing protection had been waived.  *Id*. at 1425, 1429.  As directly applicable here, the court stated that, if the selective nature of those disclosures acted to "disadvantage"

---

[17] This standard for subject matter waiver is embodied in Federal Rule of Evidence 502.  *See* Fed. R. Evid. 502(a) advisory committee's note (explaining that subject matter waiver of privilege or work product is appropriate in "those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary" where "a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner").

another party, an even broader waiver—extending to "all communications on the same subject"—would apply.  *Id.* at 1426 n.12.  This case presents exactly the circumstances described in *Westinghouse*[18] and gives rise to the full waiver contemplated in that case to address the unfairness of an adverse party's selective presentation of the facts.  *See also In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 361 (3d Cir. 2007) ("When one party takes advantage of another by selectively disclosing otherwise privileged communications, courts broaden the waiver as necessary to eliminate the advantage.").

Unable to meaningfully distinguish *Westinghouse*, Cognizant simply ignores it, relying instead on *Freedman v. Weatherford Int'l Ltd.*, No. 12 Civ. 2121 (LAK) (JCF), 2014 WL 3767034, at *4 (S.D.N.Y. July 25, 2014).  But in *Freedman* the court found "no indication that [the party asserting privilege] sought to use disclosure [to the SEC] to their advantage in this and related litigation.  To the contrary, they resisted its production."[19]  Thus, in *Freedman*, unlike this case, there was no suggestion, let alone evidence, of selective waiver causing disadvantage to the party seeking disclosure, and the court declined to order the production of material beyond the scope of what had already been produced to the SEC.  *Id.*

Here, by contrast, there is already significant evidence that Cognizant selectively presented the Government with a curated and one-sided narrative in order to secure favorable treatment.  So,

---

[18] Cognizant's description of *Westinghouse* as a case where "waiver [was] found only as to documents provided to DOJ and SEC," (CTS Br. at 49), is misleading, in that the moving party did not seek documents beyond those that were disclosed to the DOJ and SEC; the case certainly did not thereby set a limit on the scope of privilege waiver.  *Westinghouse*, 951 F.2d at 1420.  In any event, Cognizant to this day is still asserting privilege over the category of documents that were ordered produced in *Westinghouse*, including interview memos read to the DOJ and SEC.

[19] Notably, the court in *Freedman* ordered production of materials disclosed to the SEC and any "underlying" materials referenced therein, finding waiver of attorney-client privilege and work product protection based on disclosures made by the company's Audit Committee to the SEC.  *See* 2013 WL 6628964, at *2.  Thus the court, without addressing selective disclosure, ordered the production of many of the same documents Cognizant asserts privilege over here.  *Id.*

for example, the defense has shown that Cognizant redacted evidence that Schwartz originally reported the FCPA issue to Cognizant's Board of Directors and the Audit Committee and thereafter proactively kept them updated on the same, and that Cognizant failed to produce documents in which Schwartz encourages a supposed co-conspirator to cooperate with the investigation. There is, accordingly, every reason to apply the broader waiver described in *Westinghouse*, which is binding Third Circuit precedent.

Cognizant next tries to distinguish *Westinghouse* by arguing that Cognizant is "plainly not Defendants' adversary," and that a finding of waiver would therefore be somehow inappropriate. (CTS Br. at 48). But that claim borders on the absurd. Any fair reading of the record available here—limited as it is by Cognizant's invalid invocations of privilege—shows that Cognizant, under a regime that encouraged companies to "serve up" executives, provided the Government with a roadmap to the Defendants' indictment. (Def. Br. at 12-13). In arguing (in a footnote) that these facts are outside the scope of a potential *Garrity* motion (which as set forth above, is both irrelevant to the privilege analysis and wrong as a matter of understanding the scope of the Subpoenas), Cognizant fails to address specific and concrete evidence of its one-sided presentation of privileged information. Further evidence of Cognizant's posture towards the defendants can be found in Cognizant's Opposition Brief, which reads as though it were drafted by the Government, rather than a truly disinterested third party attempting to challenge a subpoena. On this record, Cognizant cannot fairly claim that it is not actually adverse to the Defendants.

### C.    Cognizant Cannot Move to Quash the Subpoenas on the Basis of Privilege and Work Product Protection That It Has Waived.

Cognizant's Cross-Motion to Quash does not raise any distinct arguments, beyond reiterating its vague and unsupported privilege claims. Ignoring *Westinghouse*, Cognizant moves to quash based on distinguishable cases that do not involve issues—much less findings—of third-

party privilege waiver.  (*See* CTS Br. at 34, 43 (citing *In re Grand Jury Investigation*, 599 F.2d

1224, 1229-30 (3d Cir. 1979) (granting motion to quash, but without evaluating defendants' waiver

arguments); *SEC v. Herrera*, 324 F.R.D. 258, 267 (S.D. Fla. 2017) (finding, without discussion of

waiver, that defendants were not entitled to additional interview materials beyond those disclosed

to the SEC); *Robinson v. Time Warner, Inc.*, 187 F.R.D. 144, 146 (S.D.N.Y. 1999) (evaluating

waiver arguments based on party's efforts to put privileged materials "at issue" in the case, not

based on disclosure to a third party))).   None of these cases shed light on the issue raised here:

whether (and, if so, to what extent) Cognizant's broad disclosures to the Government effect a

waiver.  Certainly there is nothing in those cases that supports an argument that there was no such

subject matter waiver here, where so obviously there was.

Cognizant's reliance on *United States v. Blumberg* is also misplaced.  (*See* CTS Br. at 33-

34 (citing No. 14-458 (JLL), 2017 WL 4790382, at *3 (D.N.J. Oct. 20, 2017))).   As an initial

matter, the *Blumberg* defendant's Rule 17(c) subpoena did not seek documents directly from

ConvergEx, the company to which the defendant claimed the Government improperly outsourced

its investigation.  Rather, the defendant sought documents from a third-party shareholder who was

interviewed as part of the investigation, and did so only after ConvergEx had already produced

"significant discovery"—in the form of "notes . . . interview memoranda, and meeting records"—

in preparation for the outsourcing hearing.  2017 WL 4790382, at *1, 7.  The *Blumberg* court

accordingly found that the defendant was not entitled to a duplicative production of the same

documents, which had largely already been produced by ConvergEx.

Here, by contrast, Cognizant has *not* produced the requested documents, either to the

Government or to the defense; indeed, the documents that Cognizant has already produced to the

Government were expressly carved out of the Subpoenas.  (*See* ECF No. 96 at 15 (finding

Defendants' Subpoenas compliant under the *Nixon* standard and noting that "Schwartz has attempted to avoid redundancy, requesting items only 'to the extent not produced to the USA or DOJ'")). Rather, the documents here sought are precisely of the type ConvergEx produced ahead of the outsourcing hearing in that case.

It is true that in *Blumber*g, the court found that the defendant was not entitled to documents beyond what had already been produced to the Government, but that is only because the defendant did not make the showing required by *Westinghouse* that he had suffered any disadvantage from ConvergEx's disclosures. As a result, the broad subject matter waiver contemplated by the Third Circuit in *Westinghouse* was not triggered, and the court did not order production *beyond the interview memos and meeting notes that had already been produced. See Blumberg*, 2017 WL 4790382, at *7 (citing *United States v. Misquitta*, No. CRIM. 10-185, 2011 WL 1337098, at *2 (W.D. Pa. Apr. 7, 2011) ("Although withholding additional information can lead to a waiver of privilege if Defendant is disadvantaged by this withholding, that issue has not been briefed or argued by either party.")). In *Blumberg*, in other words, the defense already had much of the material sought here.

By contrast, Cognizant's selective disclosures here clearly waived privilege and work product protection as both the disclosed materials themselves and all materials relating to the same subject matter. *See In re Martin Marietta Corp.*, 856 F.2d 619, 624 (4th Cir. 1988) (recognizing that a subpoena should be quashed or modified if it calls for privileged matter, except when the privilege has been waived by disclosure). The authorities upon which Cognizant itself relies make clear that a motion to quash a Rule 17(c) subpoena cannot be based on privilege or work product protection that has been waived. (CTS Br. at 34 (citing *United States v. Reyes*, 239 F.R.D. 591, 603, 606 (N.D. Cal. 2006) (quashing subpoena on the basis of evidentiary concerns, but rejecting

alternative grounds to quash on the basis of privilege and work product assertions, where "[i]n accord with every appellate court that has considered the issue in the last twenty-five years," selective disclosures to the Government waived such privilege))).  Cognizant's motion to quash must accordingly be denied.

> **D.** **Cognizant's Oral Downloads and Communications with the Government Result in Waiver as to Documents Related to the Events Charged in the Indictment And Other Investigation-Related Materials – Especially Underlying Interview Notes and Memoranda.**

At page 47 of its Opposition, Cognizant essentially acknowledges that it "may be required to turn over portions of their memoranda of Defendants' interviews to the extent those memoranda were read out to the Government."  (CTS Br. at 47).  But even these documents, over which privilege has been waived under any reading of the case law, have not been produced.  And, as discussed below, Cognizant's waiver is not limited to the specific information provided to the Government through its oral downloads; the waiver extends, at the very least, to the full notes and draft memoranda regarding the interviews.

Moreover, Cognizant has continued to assert privilege over other documents and information relating to its internal investigation and events that form the basis of the charges in the Indictment, over which privilege has unquestionably been waived.  Specifically, Cognizant continues to assert privilege over documents and information relating to other interviews that it conducted, responsive emails relating to its internal investigation, the April 21 and 22, 2014 telephone calls on which Schwartz and Coburn are falsely accused of authorizing a bribe, and over August 2016 conversations in which Schwartz is falsely said to have demonstrated "consciousness of guilt."

**1.      Cognizant's Waiver Extends to Its Interview Memoranda and Notes.**

Cognizant's oral disclosures to the Government—as reflected in the letters summarizing these downloads provided to the defense by the Government—were extensive, selective, and provided for the purpose of obtaining cooperation credit.[20]  As such, they effected a broad waiver that extends, at the very least, to the full set of interview memoranda and attorney notes underlying the Cognizant employees' interviews that were orally disclosed to the Government.

The law in this regard is clear:  courts frequently hold that when companies provide oral summaries of interviews conducted during an investigation to the Government, those disclosures waive attorney-client privilege or work product protection over underlying notes and related memoranda.  *See In re Banc of Ca. Sec. Litig.*, No. SA CV 17-00118-AG (DFMx), 2018 WL 2373860, at *1 (C.D. Cal. May 23, 2018); *SEC v. Herrera*, 324 F.R.D. 260;[21] *S.E.C. v. Vitesse Semiconductor Corp.*, No. 10 CV 9239 (JSR), 2011 WL 2899082, at *3 (S.D.N.Y. July 14, 2011).

---

[20] As but one example of its selective disclosures, Cognizant admits that it withheld as privileged from its oral downloads to the Government certain statements made in the Defendants' interviews. (*See e.g.*, Lustberg Cert. Ex II (June 24, 2019 DLA Download letter at 68) ("Schwartz was asked about DLA Piper's internal investigation.  At the time DLA provided this information to the Government, DLA stated that the company is asserting privilege with respect to this.")).  This effort to selectively assert privilege occurred in the face of the fact that Cognizant had otherwise disclosed without reservation Schwartz's interview testimony "about DLA Piper's internal investigation," elsewhere in the downloads. (*See id.* at 66, 68-69, 72, 78) (describing Schwartz's interview testimony regarding his role in the internal investigation and Schwartz's involvement in earlier interviews of alleged co-conspirator Srimanikandan Ramamoorthy—as well as the substance of those interviews—while Schwartz was still a part of the investigation)).

[21] Cognizant's attempt to distinguish *SEC v. Herrera* is particularly unavailing.  (CTS Br. at 47). In *Herrera*, the court held that oral summaries of witness interviews provided to the SEC effected waiver as to the underlying interview notes and memoranda of the disclosed interviews, but not as to other witness interviews that were omitted from the oral downloads.  324 F.R.D. at 264.  But the *Herrera* defendants sought disclosure of those additional interview memos and notes only because they had been disclosed to a third-party auditor, not on the basis of subject matter waiver. By contrast, the Defendants here assert that Cognizant's oral downloads to the Government effected broad subject matter waiver over Cognizant's internal investigation, including all interviews of Cognizant employees, whether or not those particular interviews were disclosed through oral downloads.

The cases upon which Cognizant relies to contest the disclosure of underlying interview memoranda and attorney notes due to waiver are distinguishable in that they did not involve selective oral disclosures of interview summaries to the Government and, critically, did not identify concrete examples of the disadvantage to the defendants that resulted from those disclosures, which is the trigger for subject matter waiver.

For example, in *SEC v. Schroeder*, cited by Cognizant, (CTS Br. at 45), the court found "nothing in the record to suggest that there had been any impropriety" in the form of privilege manipulation or otherwise, when the investigating company disclosed meticulously prepared "final" memoranda from all of the internal interviews it conducted directly to the SEC. No. C07-03798 JW (HRL), 2009 WL 1125579, at *1, 7-8 (N.D. Cal Apr. 27, 2009). Because the defendants could not show that they had been disadvantaged through these disclosures, the court found no subject matter waiver that would entitle the defendants to underlying notes which had not been disclosed to the SEC.[22] *See id.* at *7. By contrast, where an investigating company provided the SEC with selective oral "downloads" of internal interviews it conducted, the court in *Vitesse* compelled production of handwritten underlying notes that had not been produced to the SEC in order to "level the playing field" for the defendants. 2011 WL 2899082, at *3. There, the court found that there was a likelihood that selective disclosure to the Government might disadvantage the defendants in their litigation against the Government. So too here. (*See* Def. Br. at 70).[23]

_____

[22] Further, the defendants in *Schroeder* had already been provided the same written "final" memoranda from those interviews that had been provided to the SEC—memoranda that had been prepared by attorneys who had been present at the interviews themselves. *Id.* at *5. Cognizant concedes that the Defendants in this action have been provided no comparable record of the interviews conducted. The Defendants have received only Government summaries of DLA's oral accounts of select portions of its interview memoranda—furthering their disadvantage here. (*See* CTS Br. at 45).

[23] The instant case is also fundamentally distinct from *John Doe Co. v. United States*, 350 F.3d

Case 2:19-cr-00120-KM   Document 232   Filed 10/15/21   Page 52 of 73 PageID: 11167

*United States v. Treacy*, also cited by Cognizant, actually undercuts its position as to the discoverability of underlying interview notes and memoranda. (CTS Br. at 45-46 (citing No. S2 08 CR 366 (JSR), 2009 WL 812033 (S.D.N.Y. Mar. 24, 2009)). In *Treacy*, the court found that Akin Gump had not waived privilege as to certain interview memoranda when it provided oral presentations about its internal investigation to the Government because "the overwhelming bulk" of those statements were "summaries, impressions, and conclusions . . . that did not convey any specific information directly attributable to any of these witnesses" and were not even "organized in a witness-specific fashion." 2009 WL 812033, at *2-3. Here, by contrast, the oral downloads at issue conveyed detailed and selective factual information attributable to specific Cognizant employees as provided during identified interviews.[24]

And in *Treacy*, where Akin Gump did provide detailed oral recitations of an interview to the Government, the court ordered the firm to furnish the underlying memorandum. *Id*. at *1. That is, where an investigating firm makes selective oral disclosures of witness-specific interviews to the Government, as Cognizant did here, both *Treacy* and *Vitesse* require that full underlying memoranda and notes be produced, especially where the inherently selective nature of the oral downloads at issue creates an information disparity that may serve to disadvantage another party.

---

299, 303 (2d Cir. 2003), another case cited by Cognizant, because of the evidence of Cognizant's intentional, selective invocation of privilege in a way that unfairly disadvantaged the Defendants. (CTS Br. at 45). In *Doe*, the Government sought the attorney notes underlying a letter the defendant company had submitted to the Government summarizing discussions its counsel had with ATF agents. The court found that the Government was not entitled to the notes sought on a waiver theory because "[i]t is impossible to see how the U.S. Attorney is subjected to any unfairness as the result of its own receipt of the Letter." *John Doe Co.*, 350 F.3d at 304.

[24] (*See, e.g.*, Lustberg Cert. Ex. II (P. Ganesh's DLA Download) (relaying information gathered from DLA Piper's interviews of P. Ganesh in a witness-specific fashion that directly attributes statements to him and specifically noting that the Government received information about some, but not all, of DLA's P. Ganesh interviews)).

Whether or not Cognizant's selective invocation of privilege provides for a broader subject matter waiver—which the record shows it does—there is no reasonable reading of the case law that allows Cognizant to assert privilege over notes and interview memos already orally disclosed to the Government.

### 2. Cognizant's Selective Disclosures Extend its Waiver to Documents and Information Concerning the Events That Form the Basis of the Charges in the Indictment and Other Investigation-Related Materials.

Although, as noted, Cognizant essentially concedes that the oral downloads it made to the Government require it to turn over "underlying memoranda or notes of [employee] interview[s] that were read to the Government," (CTS Br. at 47), it has not yet produced those memoranda or notes, and should be ordered to do so.  But Cognizant's waiver also extends to the subject matter of the downloads that were shared with the Government:  the events that form the basis of the charges in the Indictment (including, but not limited to, responsive materials relating to activities on key dates); other interviews that DLA conducted; and responsive emails relating to its internal investigation.  The record also establishes that Cognizant's counsel made additional and substantial oral disclosures about the subjects that form the basis of the indictment through meetings and phone calls with the Government in which Cognizant's counsel shared "key developments" and other privileged materials.  These communications also result in waiver of the privilege with respect to the subjects of those disclosures.

In arguing that its waiver should be limited, Cognizant first claims that "Defendants have not cited any authority suggesting that the scope of that waiver extends to either (1) portions of the memoranda not read to the Government, or (2) memoranda of other employees' interviews."  (*Id*.). Cognizant is wrong, and notably fails to address the Defendants' cited cases in which courts compelled disclosure of documents and information beyond what was read to the Government. (Def. Br. at 65-66).  So, for example, Cognizant does not address:

- *Martin Marietta Corp.*, which held that, because the investigating company made disclosures "in a direct attempt to settle active controversies" with the United States Attorney and the Department of Defense, it waived privilege not only as to the materials actually disclosed, but also as to "all of the company's non-opinion work-product relating to the investigation that it conducted." 856 F.2d at 625-26 (citing *United States v. Nobles*, 422 U.S. 225, 238 (1975)).

- *Gruss v. Zwirn*, in which the investigating company was compelled to produce "interview notes and summaries" underlying several PowerPoint presentations provided to the SEC, regardless of whether those precise notes and summaries were themselves read to the Government. No. 09 CIV. 6441(PGG) (MHD), 2013 WL 3481350, at *13 (S.D.N.Y. July 10, 2013), or;

- *In re Sealed Case*, in which the court ordered disclosure of "notes [] material to the investigation" and other documents identified in a report made to the SEC—including documents that had not been shared with the SEC—on a subject matter waiver theory, reasoning that such additional disclosure was necessary for a "fair evaluation of the representations" that the company made to the SEC. 676 F.2d 793, 824 (D.C. Cir. 1982).

Indeed, and as noted, courts in this circuit routinely recognize that the selective invocation of privilege engenders a subject matter waiver that captures the subjects addressed in the materials shared with third parties. *See V. Mane Fils S.A. v. Int'l Flavors & Fragrances, Inc.*, 249 F.R.D. 152, 154-55 (D.N.J. 2008) (use of privilege as a "sword and a shield" entitled disadvantaged party to "any and all of the documents surrounding" opinion letters drafted by counsel, "as well as the opinions themselves"); *In re Hum. Tissue Prod. Liab. Litig.*, 255 F.R.D. 151, 160-61 (D.N.J. 2008) (compelling disclosure of broader set of documents because a party "cannot on the one hand implicitly rely on the fruits of [its] background investigation" for its own purposes "while at the same time depriving Plaintiffs of access to this information on the basis of privilege"); *see also In re Teleglobe Commc'ns Corp.*, 493 F.3d at 378 (endorsing "disadvantage" test for broad subject matter waiver); *United States v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d Cir. 1990) (endorsing subject matter waiver in instances of selective redaction); *Shire LLC v. Amneal Pharms., LLC*, No.

44

2:11-cv-03781 (SRC) (CLW), 2014 WL 1509238, at *6 (D.N.J. Jan. 10, 2014) (reiterating "disadvantage" test for broad subject matter waiver).[25]

Here, the interviews that were orally downloaded to the Government and the communications of other privileged information by Cognizant's counsel concerned the events that form the basis of the charges in the Indictment—including, but not limited to, the delays regarding the KITS Planning Permit, the April 2014 and August 2016 conversations, and the variation requests that were prepared for the KITS project. It also waived privilege over investigation-related materials, such as the content of the other interviews DLA conducted and communications relating to its investigation. Based on the cases cited above, the disclosures of this information waived the privilege with respect to documents and information concerning these subjects. Unable to meaningfully distinguish this precedent, Cognizant pivots to the irrelevant argument that the Defendants do not need documents relating to the events that form the basis for the charges in the Indictment because they already have "all the information from Cognizant regarding employee interviews" that was provided to the DOJ. (CTS Br. at 49). The argument misses the point for at least two reasons.

First—and even assuming that the Defendants are in possession of the same set of materials that Cognizant provided to the Government—there is compelling evidence that Cognizant

---

[25] Cognizant's description of *S.E.C. v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 143 (S.D.N.Y. 2004), is misleading, insofar as it suggests that the materials that were disclosed to the SEC were not related to the same subject matter as those sought by the defendants, and thus could not serve as a basis for subject matter waiver. (CTS Br. at 45). In *Beacon Hill*, the court rejected the SEC's attempt to obtain materials from Beacon Hill based on an argument that Beacon Hill had effected a subject matter waiver through public disclosures, finding that the SEC had "made no attempt" to connect the material disclosed to the subject matter of the materials sought. *Id.* Unlike this case, Beacon Hill's prior disclosures to the public, shareholders, and the SEC were made in completely different contexts and did not clearly relate to the same subject as the additional documents requested, as a result of which subject matter waiver did not apply to compel their disclosure.

selectively withheld meaningful evidence from both the Defendants and the Government, such that providing the defense the same selective disclosures it provided to the Government would not solve the problem.  Second, the point of this motion—and of a defendant's right to subpoena documents and otherwise mount a defense more generally—is not to insure parity of information as between the Government and the defense.  The point is that Cognizant is in possession of material concerning its investigation and events that form the basis of the charges against the Defendants, that any privilege claimed over that material has been waived, and that the law therefore requires that it be produced.  That is the point that Cognizant misses, and fails in its Opposition to meaningfully address.

Cognizant next argues that it has not, as a factual matter, presented a "one-sided story" that has disadvantaged the defense. *Westinghouse*, 951 F.2d at 1426 n.12.  But as demonstrated above and in the Defendants' Moving Brief, that is exactly what is has done.  The record amply supports a conclusion (or at the very least a strong inference) that Cognizant has waived privilege and disclosed information to the Government in a way that is both one-sided and designed to curry favor with the Government.  That selective waiver has created an unfairness that the Court can and should correct by compelling Cognizant to produce documents and information concerning the subject matter of the disclosed interviews and other oral disclosures made by Cognizant's counsel—the events that form the basis of the charges in the Indictment (including on key dates in April 2014 and August 2016), interview memoranda and attorney notes of all interviews DLA conducted, and responsive emails relating to Cognizant's internal investigation, regardless of whether they were disclosed to the Government. *See In re Sealed Case*, 676 F.2d at 825 (finding "substantial likelihood" that company had attempted to "manipulate its privilege[] by withholding vital documents while making a great pretense of full disclosure of their contents [to investigating

agencies].  It does not deserve the protections enjoyed by those who use the adversary system for its legitimate ends").

### E.     Cognizant's Admissibility Arguments are Unfounded.

Unable to distinguish the Defendants' cases compelling disclosure of underlying interview materials in analogous circumstances, Cognizant argues that the "interview memoranda created by DLA . . . are not discoverable under Rule 17" and are inadmissible.  (CTS Br. at 50).  Cognizant is wrong both in articulating the relevant standard and in applying it.

First, while Rule 17(c) is intended for use in procuring evidentiary materials, "[t]hat is not to say that the materials thus subpoenaed must actually be used in evidence.  It is only required that a good-faith effort be made to obtain evidence."  *Bowman Dairy Co. v. United States*, 341 U.S. 214, 219-20 (1951).  This means simply that "[t]he test for enforcement is whether the subpoena constitutes a good faith effort to obtain identified evidence rather than a general 'fishing expedition' that attempts to use the rule as a discovery device."  *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980) (citing *Bowman*, 341 U.S. at 220-21); *see also United States v. Gas Pipe, Inc.*, No. 3:14- CR-298-M, 2018 WL 5262361, at *3 (N.D. Tex. June 18, 2018) ("Defendants have shown with adequate specificity that the documents sought . . . would be relevant and may be admissible . . . where Defendants have set forth what the [would-be subpoenaed] materials contain") (citation and quotation omitted; alteration in original); *Messercola*, 701 F. Supp. at 485-86 ("[T]he evidentiary justification for this subpoena . . . [is] that the photograph was evidentiary and relevant to establish the relationship between Messercola and [the subpoena recipient]").

Defendants here seek to obtain information that, the record shows, provided the blueprint for (and the backbone of) the Government's subsequent investigation, which the Government acknowledges consisted of re-interviewing some (but not all) of the witnesses interviewed by Cognizant and essentially no one else.  So, for example, the Government, after receiving

downloads from DLA, did not interview many witnesses who contradicted relevant parts of Cognizant's narrative). [26]

Moreover, this Court has already made the modifications necessary to ensure that the Subpoenas comply with Rule 17. (Def. Br. at 45 (citing ECF No. 96 at 15)). Specifically, this Court noted that "there is reason to believe [the requested documents] would be [] admissible in a hearing on a potential motion to suppress defendants' statements in interviews." (ECF No. 96 at 15). And indeed, Cognizant's suggestion that the materials at issue here constitute inadmissible hearsay (CTS Br. at 50), is simply incorrect: hearsay is generally admissible at pretrial hearings to determine the admissibility of evidence. *United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."); *United States v. Johnson*, No. CR 19-645 (SRC), 2020 WL 2611596, at *2 n.4 (D.N.J. May 22, 2020) ("Pursuant to Federal Rule of Evidence 1101(d)(1), the Court may admit hearsay testimony given at the pre-trial evidentiary hearing to determine questions of fact raised by the instant motion to suppress.").[27] For all of these reasons, the

---

[26] As another example of the disturbing interplay between Cognizant's selective disclosures and the Government's willingness to rely on them, the Government does not itself appear to have interviewed P. Ganesh, notwithstanding the fact that Cognizant informed the Government that it did not include certain of P. Ganesh's interviews in the download, (*see* Lustberg Cert. Ex. II (P. Ganesh's DLA Downloads at 24 n.1), and that, in those interviews for which the Government did receive oral downloads, P. Ganesh contradicted the allegations in the Indictment. (*See id.* at 27-29).

[27] Cognizant's cases about admissibility are irrelevant inasmuch as they concern evidentiary rules in effect at trial rather than in pre-trial proceedings. *See United States v. Cuthbertson*, 651 F.2d 189, 192 (3d Cir. 1981) (evaluating Rule 17 subpoena seeking to obtain interview materials for use at trial); *United States v. Brown*, No. 2:14-mj-7258, 2015 WL 8375184, at *1 (D.N.J. Dec. 8, 2015) (same); *United States v. Huiltron Sanchez*, No. Cr. S-05-0443 WBS, 2007 WL 9606812, at *1-2 (E.D. Cal. Jan. 10, 2007) (same). Moreover, even were DLA Piper's underlying interview notes and memoranda to be held to the same admissibility standard as they would be at trial (which they would not be), they clearly would be admissible, at the very least, to impeach those interviewees' statements, should they testify inconsistently at trial. Certainly, this Court may order

48

underlying interview memoranda and attorney notes generated during all of DLA's internal investigation interviews are fully discoverable under the Defendants' Rule 17 Subpoenas, and should accordingly be disclosed.

### F. Cognizant's Various Other Attempts to Withhold Responsive Documents Are Unpersuasive.

Cognizant next offers arguments to the effect that it has not in fact waived privilege—and is therefore not subject to a broader privilege waiver—because the communications it did share with the Government are not privileged to begin with, or because whatever privilege existed is subject to the crime-fraud exception.  Both arguments are without merit.

### 1. Cognizant Has Waived Privilege Over the April 2014 and August 2016 Communications.

In their Moving Brief, the Defendants argued that Cognizant's oral downloads to the Government effected a waiver and that Cognizant's disclosure of a selective set of materials concerning Schwartz's April 2014 and August 2016 communications waived privilege over related materials.  (Def. Br. at 74-75).  In response, Cognizant argues that because there has been no "finding" that the April 2014 and August 2016 communications were privileged, the disclosure of their content to the Government cannot form the basis for waiver.  (CTS Br. at 41-43).

But Cognizant cannot be its own unchecked arbiter of its invocations of privilege.  Certainly, and at a bare minimum, the record here—even without the additional documents sought—already shows that Cognizant has simultaneously (i) provided at least arguably privileged material to the Government (for example by providing notes of privileged communications

---

them produced pretrial to "aid its preparation for ruling on whether these statements will be produced to the defendants at trial [in] an attempt to avoid unnecessary delay and disruption of the trial."  *Cuthbertson*, 630 F.2d at 144-45 (finding no abuse of discretion by district court when it compelled disclosure of interview materials sought in a Rule 17 subpoena for pretrial *in camera* review).

between attorney and client); and (ii) withheld and selectively redacted other documents and information relating to precisely the same subject matter based on privilege.  (Def. Br. at 75-76).

In response, Cognizant first argues that the April 2014 communications (in which the Defendants are alleged to have approved a bribe) and the August 2016 communications (in which the Defendants react to being removed from Cognizant's internal investigation) are not privileged to begin with, such that producing them does not constitute a waiver.

With respect to the April 2014 communications concerning authorization of the alleged bribe, even the *Government's* version of events is centered around a set of facts that involve Schwartz, Cognizant's Chief Legal Officer, being looped into a conversation about whether Cognizant could take the legal position that L&T was responsible for confronting the Indian Government official about the demanded bribe.   There can be no question that these communications—which called for the interpretation of contractual language—were otherwise privileged, and that Cognizant waived that privileged in sharing its version of the conversation with the Government and allowing its employees to testify about it.[28]  *See* Ind. ¶¶ 3, 11-15.

There are, in short, two possibilities, either of which requires that the documents related to the April 2014 and August 2016 communications be produced.  On the one hand, if these documents and the communications they reflect are not privileged, there is no basis on which Cognizant can withhold documents relating to the same subject matter.  If, on the other hand, the communications are privileged, Cognizant's has waived that privilege by producing documents reflecting those communications and allowing its employees to testify about them.  What Cognizant cannot do is have it both ways:   waiving privilege over certain communications

---

[28] Cognizant does not even attempt to explain how the April 2014 note that Schwartz allegedly authored (quoted only in part by Cognizant at (CTS Br. at 8) and reproduced in full at Lustberg Cert. Ex. MM) fails to reflect legal advice.

concerning a particular subject matter and then asserting it over other communications involving the very same subject matter.

### 2. Cognizant Has Not Even Attempted to Show How the Crime-Fraud Exception Applies.

Cognizant next argues, in the alternative, that "it appears" that the April 2014 and August 2016 communications are subject to the crime-fraud exception such that their disclosure does not effectuate a waiver.  (CTS Br. at 42).  But Cognizant—both hedging and engaging in theoretical musing with its use of the phrase "it appears"—does not even attempt to flesh out how these communications are purportedly covered by the crime fraud exception, *i.e.*, how the elements of that exception have been met.  *See In re Grand Jury Subpoena*, 745 F.3d 681, 693 (3d Cir. 2014) ("[F]or advice to be used 'in furtherance' of a crime or fraud, the advice must advance, or the client must intend the advice to advance, the client's criminal or fraudulent purpose . . . The advice cannot merely relate to the crime or fraud."); *In re Grand Jury*, 705 F.3d 133 (3d Cir. 2012) (noting that the standard for showing that "there is a reasonable basis to suspect that the privilege holder was committing or intending to commit a crime or fraud . . . is intended to reasonably demanding"); *United States v. Trenk*, 385 F. App'x 254, 257 (3d Cir. 2010) (noting that, even if the party seeking to apply the exception has made the initial showing, the decision "whether to *apply* the crime-fraud exception is a separate, more demanding undertaking") (emphasis in original); *In re Grand Jury Investigation*, 445 F.3d 266, 274 (3d Cir. 2006) ("The burden to make the necessary showing for the crime-fraud exception falls on the party who seeks application of the exception.").

Cognizant's musings are in any event irrelevant.  Again, there are only two possibilities: either the crime-fraud exception applies to the 2014 and 2016 communications, in which case all communications falling under the exception should be produced, or it does not, in which case the privilege was waived with production.  Cognizant cannot have it both ways.

3.     **The 502(d) Order Has No Bearing on Cognizant's Waiver as to Third Parties.**

Once again simply ignoring arguments that it cannot rebut, Cognizant does not meaningfully engage with the Defendants' arguments based on the text, legislative history, and application of Federal Rule of Evidence 502.  Simply put, the Rule 502(d) Order between Cognizant and the Government does not bear upon waiver as to third parties like the Defendants, and Cognizant's arguments to the contrary, (CTS Br. at 48), find no support in the law.

First, and as a threshold matter, Cognizant cannot plausibly claim the protection of a Rule 502(d) Order for documents produced before the Order was signed.  The chronology is clear: Cognizant and the Government entered into an agreement to limit the waiver of privileged communications as between them on April 26, 2018, and Judge Salas endorsed that agreement on April 30, 2018 by way of a Rule 502(d) Order.  The Order was not retroactive, and therefore had no effect on Cognizant's waiver of privilege and work product protection for subjects disclosed to the Government prior to April 30, 2018, including the subjects covered in the oral downloads of the interviews of Cognizant employees (including the Defendants); documents relating to the April 21 and 22, 2014 calls in which the Defendants are alleged to have approved a bribe; and communications and documents relating to conversations in 2016 when Schwartz and Coburn were relieved of any oversight over the internal investigation.  (Def. Br. at 74-76).  Cognizant has not produced these documents and has not sought to explain how the waiver could be affected by a non-retroactive order that did not exist when the documents were produced.

Second, Cognizant's arguments concerning documents produced *after* the entry of the Rule 502(d) Order—again relegated to a footnote (CTS Br. at 48 n.21)—misconstrue the language, purpose and application of the Rule.  Specifically, as Defendants have argued (Def. Br. at 73):

- The legislative history and application of Rule 502 clearly indicate that the Rule was drafted to protect against privilege waivers caused by inadvertent disclosures, not

intentional ones. (*Id.* at 73); *Hostetler v. Dillard*, No. 3:13-CV-351-DCB-MTP, 2014 WL 6871262, at *4 (S.D. Miss. Dec. 3, 2014) ("Although Fed. R. Evid. 502(d) is not expressly limited to unintentional disclosures, the purpose and intent of Rule 502 is to protect litigants from inadvertent disclosures.").

- The few courts that have found that Rule 502 allows for agreements and orders governing the effect of an intentional disclosure—including the cases cited by Cognizant—have done so in limited circumstances, not present here, in which disclosure was either judicially compelled or mandated by Federal Rule of Civil Procedure 26. *See, e.g.*, *Greene v. Philadelphia Hous. Auth.*, 484 F. App'x 681, 686 (3d Cir. 2012) ("[T]he judicially-compelled disclosure of information, later determined to be privileged, may not result in a waiver of the privilege."); *Whitaker Chalk Swindle & Sawyer, LLP* v. *Dart Oil & Gas Corp.*, No. 408-CV-684-Y, 2009 WL 464989, at *4 (N.D. Tex. Feb. 23, 2009) (ordering that disclosures that were required by Fed. R. Civ. P. 26(a)(1) be made without privilege being waived); *In re Processed Egg Prod. Antitrust Litig.*, No. 08-MD-02002, 2014 WL 6388436, at *6-8 (E.D. Pa. Nov. 17, 2014) (holding that Rule 502 permitted limited intentional disclosures pursuant to a settlement agreement between the parties in the MDL context).

Finally, in criminal cases, courts have endorsed Rule 502(d) orders only *post*-indictment, such that the defendants in those cases had an opportunity to challenge the entry of those orders. *See, e.g.*, *United States v. Sorrentino*, 14-cr-00558 (D.N.J. 2019); *United States v. Blumberg*, 14-cr-00458 (D.N.J. 2017); *United States v. Oury*, 08-cr-616 (D.N.J. 2009). Here, the Rule 502(d) Order was entered *before* the grand jury returned the Indictment, at a time when the Defendants had no knowledge of (much less an opportunity to challenge) the Rule 502(d) Order before it went into effect. Allowing Cognizant to wield the Rule 502(d) Order in a manner that precludes further production does not comport with basic notions of due process and fundamental fairness, even as it jeopardizes the Defendants' constitutional right to present a complete defense. *See Millennium Labs., Inc. v. Am. Clinical Sols.*, LLC, No. 11-cv-1299, 2012 WL 13103115, at *2 (M.D. Fla. Feb. 21, 2012) ("Elemental notions of due process and fairness counsel against actions affecting the rights of unknown individuals who have had no opportunity to agree to or even be heard as to the issues."). The Rule 502(d) Order, in short, has no bearing whatsoever on the issues raised here.

G.    **Cognizant's Claims of Privilege Over Specific Categories of Documents Should Be Rejected.**

In addition to the broader arguments addressed above, Cognizant asserts privilege and work product protection over specific categories of documents and communications, including: (1) draft public disclosures and press releases; (2) information regarding document retention and collection; and (3) communications with third-party accounting and public relations firms. Cognizant has not, however, met its burden to show that these materials are related to the provision of legal advice, and therefore its privilege assertions should be rejected.[29]

1.    **Draft Public Disclosures and Press Releases Are Not Privileged.**

Cognizant cannot, as it seeks to do, (CTS Br. at 37-38), claim privilege over its draft public disclosures and press releases merely because they may contain attorney comments. Indeed, courts in this circuit routinely reject privilege assertions based on the mere inclusion of attorney comments. *See Chabot v. Walgreens Boots All., Inc.*, No. 1:18-CV-2118, 2020 WL 3410638, at *9 n.2 (M.D. Pa. June 11, 2020) ("A press release which merely 'reflects' an attorney's comments, i.e. integrates the comments without exposing the substance of the advice itself, is not privileged."); *In re Riddell Concussion Reduction Litig.*, No. 13-7585 (JBS/JS), 2016 WL 7108455, at *9 (D.N.J. Dec. 5, 2016) ("[A]lthough [the] edits appear to be made by a lawyer, the edits are of a factual nature and do not involve legal advice or opinions"). Thus, a party asserting privilege must be able to show that the challenged documents were "made for the purpose of giving or receiving [legal] advice." *Chabot*, 2020 WL 3410638, at *8 . And "[f]or an entire document

---

[29] Cognizant's repeatedly asserts that, beyond privilege, these categories of withheld documents are irrelevant to "the *Garrity* issues." (CTS Br. at 12, 39-41). But, as noted above, that argument is based entirely upon its incorrect interpretation of the scope of the Subpoenas and the Court's Order. (*See supra* at I). Its argument accordingly fails on this basis as well.

to be privileged, the attorney must be primarily rendering legal advice on the document as a whole." *Id.* at *8. Cognizant makes no such showing.

In the face of this precedent, Cognizant's primary argument as to why the draft public disclosures and press releases are privileged hinges on when the communications were made rather than what they say. (*See* CTS Br. at 37-38). But the fact that several Cognizant shareholders commenced litigation against the company just days after its September 30, 2016 Form 8-K filing does not alone render the contents of the documents Cognizant is withholding privileged. Nor does Cognizant's privilege log—arranged by category—provide information that would allow the Court and counsel to determine whether the drafts are, in fact, primarily related to the provision of legal advice. If anything, the drafts' proximity to the Form 8-K filing indicates that at least certain of the communications pertain to the kind of "corporate messaging concerns" that courts consider non-privileged. *See Riddell*, 2016 WL 7108455, at *7-9. And, of course, the mere fact that the Form 8-K references litigation does not automatically render prior drafts privileged. *See id.* at *5 ("[M]erely because a legal issue can be identified . . . does not justify shielding the communications from discovery.").[30]

## 2.     Document Retention and Collection Materials Are Not Privileged.

Cognizant's arguments regarding its obligation to produce materials related to document retention and collection are inapplicable because they related to documents that have not been requested. That is, Cognizant argues that document hold notices and attorney communications

---

[30] Cognizant's attempt to distinguish *Riddell* is unavailing. (CTS Br. at 38, n.26). In fact, the *Riddell* court specifically stated that contents of draft press releases and communications regarding such releases are not privileged. 2016 WL 7108455, at *7-9 (the content of press releases and responses to media inquiries "address corporate 'messaging' concerns and not legal issues or advice. . . . [T]he purpose of [the contested] documents relate to standard [public relations] and messaging issues rather than legal advice"). As Cognizant points out, only documents evidencing legal advice are entitled the protection of the privilege.

need not be produced.  (CTS Br. at 39).  But Defendants readily acknowledge that document hold notices themselves may contain material subject to the attorney-client privilege or work product doctrine.  (Def. Br. at 63).  And as Cognizant concedes, courts have held that materials relating to the process associated with data preservation efforts—*i.e.,* "data-preservation steps"—are not privileged and must be disclosed.  (CTS Br. at 38 (citing *Boyington v. Percheron Field Servs., LLC*, No. 3:14-CV-90, 2016 WL 6068813, at *11-12 (W.D. Pa. Oct. 14, 2016) ("Defendant cannot show that the attorney-client privilege or work-product doctrine apply to the information surrounding the [data] preservation efforts."))).  And while an attorney's formulation and communication of a legal hold may be protected, the scope of the hold and the instructions provided to those executing a hold are not.  *See Boyington*, 2016 WL 6068813, at *12; *Major Tours, Inc. v. Colorel*, No. 05-3091 (JBS/JS), 2009 WL 2413631, at *2 (D.N.J. Aug. 4, 2009) ("[P]laintiffs are entitled to know which categories of electronic storage information employees were instructed to preserve and collect, and what specific actions they were instructed to undertake to that end.").  Cognizant has not and cannot cite to any binding authority to contradict this premise and should thus be compelled to produce the data collection and preservation materials that have been sought.

### 3. Communications with Accounting and Public Relations Firms Are Not Privileged.

In refusing to produce communications with third-party accounting and public relations firms, including E&Y, Finsbury, and CLS, Cognizant does not address the test for whether disclosures to third parties merit the protection of the privilege.  *See HPD Lab'ys, Inc. v. Clorox Co.*, 202 F.R.D. 410, 414 (D.N.J. 2001) (noting that, to qualify for protection, statements to and from third parties must "be made in confidence for the purpose of obtaining legal advice *from the lawyer*") (emphasis in original).  Cognizant's privilege log does not assert the basic facts necessary

to establish that the privilege applies, in that the third party communications, listed by category in the privilege log, contain only vague, boilerplate justifications that do not specify whether (and if so how) these documents were made for the purpose of obtaining legal advice, or what role the third parties played in the process.  (*See* Lustberg Cert. Ex. Y, Cat. E, CTS Privilege Log (describing subjects of third party communications as relating to "[p]ublic disclosure, communications, potential litigation and related legal strategy re:  the Investigation.")).

Instead, Cognizant argues that *all communications* with third party firms are categorically privileged because the firms were retained "in connection with the investigation."  (CTS Br. at 40).  But the starting point is precisely the opposite.  *See, e.g.*, *La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 309 (D.N.J. 2008) ("Generally, the voluntary disclosure of an attorney-client communication to a third party waives the attorney-client privilege.").  And privilege designations are not self-executing, s*ee Cellco P'ship v. Certain Underwriters at Lloyd's London*, No. CIV.A. 05-3158 (SRC), 2006 WL 1320067, at *2 (D.N.J. May 12, 2006); rather, "[t]o protect the privilege, the party claiming a third party as an agent, bears the burden of showing that the person in question worked at the direction of the lawyer, and performed tasks relevant to the client's obtaining legal advice, while responsibility remained with the lawyer," *id.* (internal citation omitted).  Cognizant has not, in either its privilege log or its response to the Defendants' motion or cross-motion, made any attempt to meet that test.  It thus should be compelled to produce responsive communications with third-party accounting and public relations firms, including E&Y, Finsbury, and CLS.[31]

---

[31] Of course, Cognizant may redact any portions of communications with the third-party firms that actually contain privileged communications.  *See Chabot*, 2020 WL 3410638, at *8 ("If the document is not made for the primary purpose of communicating legal advice or is not itself a legal instrument, any edits or notations bearing the primary purpose of legal advice may be segregated and redacted.").  But that, not the wholesale withholding of the documents at issue, is

**H.      The Defendants' Constitutional Rights Outweigh Cognizant's Privilege and Work Product Claims.**

Cognizant also fails to meaningfully address the Defendants' assertion that their constitutional right to present a complete defense outweighs Cognizant's privilege and work product claims.  Indeed, Cognizant appears to argue that the Defendants' Sixth and Fourteenth Amendment rights are *irrelevant* to the analysis, such that there is no constitutional interest to weigh.  (*See* CTS Br. at 51-52).

But that radical position ignores that courts routinely recognize that the attorney-client privilege, "hallowed as it is, yet not found in the Constitution, might have to yield" if its enforcement would curtail criminal defendants' constitutional rights.  *United States v. Rainone*, 32 F.3d 1203, 1206 (7th Cir. 1994).  Indeed, if "there is a strong likelihood that the [third party's privileged] files contain exculpatory material that would be helpful and relevant to the defense . . . that defendant's due process rights to access such information outweigh any claim of attorney-client privilege." *United States v. Stringer*, No. CR 03-432-HA, 2005 WL 8167079, at *2 (D. Or. Mar. 4, 2005).  Nondisclosure of evidence on privilege grounds is, then, unconstitutional where it "significantly undermine[s] fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 315 (1998).

Whether or not the weighing of interests is specifically labeled a "balancing test," both the Supreme Court and the Third Circuit regularly weigh competing concerns when addressing conflicts between criminal defendants' constitutional rights, on the one hand, and evidentiary rules and privileges, on the other.[32]  Indeed, the very case to which Cognizant points in its effort to

---

the appropriate way to address this possibility.

[32] *See, e.g.*, *Rock v. Arkansas*, 483 U.S. 44, 51-52, 55-56 (1987) (holding that *per se* rule excluding all hypnotically refreshed testimony violated criminal defendant's right to testify under the Fifth, Sixth, and Fourteenth Amendments and observing that when "applying its evidentiary rules a State

discredit this weighing of interests—*Swidler & Berlin v. United States*—explicitly reserved the question whether "exceptional circumstances implicating a criminal defendant's constitutional rights might warrant breaching the privilege."  524 U.S. 399, 408 n.3 (1998).  Here, moreover, Cognizant's interest in the privilege is particularly weak given the extensive disclosures it has already made to the DOJ and SEC, discussed above with reference to specific examples.  By contrast, the Defendants (one of whom was the Chief Legal Officer of Cognizant, whose own statements are being withheld from him as privileged) cannot obtain the necessary information sought in these Court-approved Subpoenas from any other source.

In arguing that its privilege claims cannot be overcome by the Defendants' constitutional rights, Cognizant relies primarily on an inapposite civil case that raises none of the constitutional issues present here.[33]  (*See* CTS Br. at 51 (citing *United States v. Wells Fargo Bank, N.A.*, 132 F. Supp. 3d 558, 559 (S.D.N.Y. 2015))).  Cognizant points to dicta in *Wells Fargo* criticizing one of the Defendants' authorities, *United States v. W.R. Grace*, 439 F. Supp. 2d 1125, 1145 (D. Mont. 2006), where a district court compelled production of privileged materials to a criminal defendant based on his constitutional right to present a complete defense.  But, as *Wells Fargo* explicitly

---

must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify"); *Davis v. Alaska*, 415 U.S. 308, 319 (1974) (finding that state evidentiary rule rendering juvenile convictions inadmissible is "outweighed by" criminal defendant's constitutional rights); *United States v. Criden*, 633 F.2d 346, 359-60 (3d Cir. 1980) (applying balancing test to hold that criminal defendant's Fifth and Sixth Amendment rights were important countervailing constitutional interests that outweighed third-party journalists' privilege).

[33] Cognizant's additional authorities do not support the claim that constitutional rights may *never* be considered when they conflict with privilege; rather, they support the proposition that the inquiry is highly context-dependent.  *See, e.g., Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (finding the "State's position that the [Sixth] Amendment is simply irrelevant" to privilege analysis to be "extreme" and "unacceptable.").

recognized, *Grace*, unlike *Wells Fargo*, "was a criminal case, and its analysis was based explicitly on a criminal defendant's rights under the Sixth Amendment." *Id.* at 561, 565.[34]

      Particularly in the context of work product protection, the Defendants have shown that (especially where, as here, the party asserting the privilege has already, like Cognizant, settled claims with the Government), any claim of withholding can be overcome by the Defendants' constitutional right to present a complete defense, including their "substantial need" for the materials at issue. *See United States v. Marcus Schloss & Co.*, No. 88 CR. 796 (CSH), 1989 WL 62729, at *2-4 (S.D.N.Y. June 5, 1989). Cognizant responds by alleging that "Defendants here provide no support for their conclusory assertion that Cognizant has withheld 'exculpatory' materials from the Government," and that the present circumstances are not sufficiently "exceptional" to justify disclosure of work product. (CTS Br. at 52 & n.35). But again, the Defendants have cited a number of specific examples in which Cognizant withheld materials that are clearly exculpatory (and certainly material to the defense) on the basis of selective assertions of privilege. (Def. Br. at 56-59). That Cognizant declines to confront those examples does not mean they—and likely other similar materials withheld by Cognizant—do not exist. In sum, Cognizant's documented attempt to present a "one-sided" version of the facts while invoking privilege in a way that impairs the Defendants' constitutional right to present a complete defense poses exactly the type of "exceptional" circumstances in which the privilege simply must, in the interest of a fair trial, give way under the case law.

---

[34] Notably, *Wells Fargo* also clearly acknowledged the qualified nature of the work product doctrine, which is much more easily overcome than attorney-client privilege, even outside of the criminal context. *Id.* at 563.

### III.    COGNIZANT'S PRIVILEGE LOG IS INADEQUATE.

For the reasons discussed in the Defendants' Moving Brief, Cognizant's privilege log—which is arranged by category rather than individual entries—has in this case limited the Defendants' ability to meaningfully review Cognizant's privilege and work product claims.  But rather than address the specific issues raised, Cognizant offers arguments that are unsupported by the law and the facts of this case.

First, Cognizant argues that defendants' challenges to the log are grounded in "outdated case law."  (CTS Br. at 35-36).  In fact, the cases cited in the Defendants' Moving Brief represent the prevailing law in the Third Circuit.  (Def. Br. at 60 (citing cases)).   "[I]n this circuit, a categorical privilege log may be permissible only where the responding party has established undue burden with specificity."  *Bethea v. Merchants Com. Bank*, No. 11-51, 2012 WL 5359536, at *2 (D.V.I. Oct. 31, 2012) (citing *Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, No. 07-1299 (SRO)(MAS), 2012 WL 1585335 (D.N.J. May 4, 2012)).   But Cognizant makes no attempt whatsoever to explain how providing a document-by-document privilege log would constitute an undue burden.

Nor does Cognizant address the Defendants' argument that a privilege log that describes documents only by category is particularly inappropriate in this case, where the stakes—including the Defendants' fundamental constitutional rights—are so high and the number of documents at issue is relatively small.  *See Tyco Healthcare Grp. LP,* 2012 WL 1585335, at *4 (requiring a document-by-document privilege log where the log was "narrow in scope, potentially resulting in a few thousand documents").

In support of its position, Cognizant again relies upon non-controlling decisions (s*ee* CTS Br. at 35-36 (citing *Games2U, Inc. v. Game Truck Licensing, LLC*, No. MC-13-00053 (PHX) (GMS), 2013 WL 4046655, *7 (D. Ariz. Aug. 9, 2013); *S.E.C. v. Thrasher*, No. 92 CIV. 6987

(JFK), 1996 WL 125661, at *1-2 (S.D.N.Y. Mar. 20, 1996))), and cites to what it characterizes as a trend towards categorical privilege logs.  But whether or not that trend exists, Cognizant cites no authority for its application to criminal cases.  (*See* CTS Br. at 35-36).  And Cognizant's theory that a categorical privilege log is appropriate here because the Subpoenas seek privileged documents evaporates in the face of the Defendants' argument that any privilege has been waived, as discussed above.  If anything, Cognizant's hazy and inconsistent invocations of the privilege make an individualized log more, rather than less, essential in this case.

Finally, even if a categorical log were appropriate in this case based on some unspecified burden, Cognizant has not meaningfully addressed its failure to provide the subject lines of the emails marked as withheld or redacted.  Its one-line reference in a footnote to the alleged "additional burden" of providing subject lines, (*id.* at 37 n.25), certainly does not excuse its failure to provide them here.  *See, e.g.*, *Favors v. Cuomo*, 285 F.R.D. 187, 223 (E.D.N.Y. 2012) ("[G]iven today's litigation technology, there is no good reason why privilege logs should not include—where to do so would not itself reveal privilege or protected information—other readily accessible metadata for electronic documents, including, but not limited to . . . subject line[s] . . . and a description of any attachments.") (citation omitted).[35]

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court grant their motion to compel compliance with the Rule 17 Subpoenas issued to Cognizant and deny Cognizant's cross-motion to modify or quash.

---

[35] Cognizant's unsupported assertion that subject lines "*could* contain privileged information," (*id.* at 36) (emphasis added), is clearly insufficient.  Of course, that is true of every email ever logged, and if the subject lines are in fact privileged (and there is no reason to believe they are), they can easily be redacted; otherwise, they would provide particularly probative information in terms of assessing the propriety of a privilege assertion.

Dated:  July 23, 2021

Respectfully submitted,

s/ Lawrence S. Lustberg
Lawrence S. Lustberg
Daniel B. Weinstein
John D. Haggerty
Anne M. Collart
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com

**KRIEGER KIM & LEWIN LLP**

Nicholas J. Lewin
Alexandra Messiter
500 Fifth Avenue
New York, New York 11215
(212) 390-9559

*Attorneys for Defendant*
*Gordon J. Coburn*

**BOHRER PLLC**

Jeremy I. Bohrer
Amir Toossi
Adam Yaeger
Jonathan E. Jason
One Penn Plaza, Suite 2520
New York, New York 10119
(212) 303-3314

*Attorneys for Defendant*
*Steven Schwartz*