# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

GORDON COBURN and STEVEN SCHWARTZ,

Defendants.

Civ. No. 2:19-cr-00120 (KM)

**OPINION**

<u>KEVIN MCNULTY, U.S.D.J.:</u>

This Opinion covers interrelated motions submitted to the Court, all revolving around subpoenas served by Defendants Gordon J. Coburn and Steven Schwartz on Cognizant Technology Solutions Corporation ("Cognizant") and Larsen & Toubro Construction Company ("L&T Construction").[1] These subpoenas are categorized as relating to motion practice, primarily investigative outsourcing ("Category A subpoenas"), which were issued in October 2020; and those directed more to the merits ("Category B subpoenas"), which were issued in April 2021.[2] In disputing the validity and breadth of these subpoenas, the parties have brought the following motions before this Court:

- Defendants' joint motion to compel Cognizant's compliance with the Category A subpoenas. (DE 150.)[3]

---

[1] Defendants are accused of violating the Foreign Corrupt Practices Act ("FCPA") while employed as Cognizant's Chief Legal Officer and President by conspiring to pay a $2 million bribe to obtain a permit for opening an office facility in India. L&T is independent of Cognizant and allegedly acted as a conduit for the bribe.

[2] The division between Categories A and B is far from neat. In general, however, I have considered the *Garrity* issues under Category A and the broader discovery concerning the investigation and the merits under Category B.

[3] "DE __" refers to the docket entry numbers in this case.

"Mot. To Compel Cognizant, Cat. A" refers to Defendants' brief in support of their joint motion to compel Cognizant's compliance with the Category A subpoenas. (DE 158.)

- Cognizant's cross-motion to quash the Category A subpoenas. (DE 169.)

- Cognizant's motion to quash Defendants' Category B subpoenas. (DE 197.)

- Defendants' cross-motion to compel Cognizant's compliance with the Category B subpoenas. (DE 211, 214.)

- Defendants' joint motion to compel L&T's compliance with the Category A and B subpoenas, (DE 167), or alternatively for the issuance of a letter rogatory, (DE 168).

- L&T's motion to quash Defendants' Category A and B subpoenas. (DE 188.)

- L&T's motion to maintain multiple filings by Defendant under seal. (DE 184.)

---

"Cross Mot. To Quash Cognizant Cat. A Subpoenas" refers to Cognizant's memorandum of law in support of its cross-motion to quash and/or modify Defendants' Category A subpoenas and in opposition to Defendants' motion to compel. (DE 169.)

"Mot. To Quash Cognizant Cat. B Subpoena" refers to Cognizant's memorandum of law in support of its motion to quash Defendants' Category B subpoena. (DE 197.)

"Cross Mot. To Compel Cognizant, Cat. B" refers to Defendants' memorandum of law in support of Defendants' opposition to Cognizant's motion to quash and Defendants' cross-motion to compel Cognizant's compliance with the Category B subpoena. (DE 214.)

"Mot. To Compel L&T" refers to Defendants' memorandum of law in support of Defendants' motion to compel L&T's compliance with the Category A and B subpoenas. (DE 167.)

"Mot. For Letter Rogatory" refers to Defendants' memorandum of law in support of Defendants' motion for issuance of letter rogatory. (DE 168.)

"Cross. Mot. To Quash L&T Subpoenas" refers to L&T Construction's memorandum of law in support of its opposition to Defendants' motion to compel compliance and its cross-motion to quash Defendants' subpoenas. (DE 188.)

"Mot. To Maintain Under Seal" refers to L&T's Construction's motions to maintain under seal (1) Defendants' motion to compel, supporting materials, and motion for issuance of letter rogatory (DE 184); and (2) Defendants' reply memorandum of law in further support of their motion to compel L&T's compliance, (DE 217.)

For the reasons stated herein, Cognizant will be required to comply, in part, with the subpoenas. L&T's compliance, however, will not be ordered, because jurisdiction is lacking. Defendants will be permitted to submit a proposed letter rogatory for L&T, and in the meantime, certain materials will be maintained under seal as requested. For guidance, I point out that this opinion should be read in conjunction with my opinion, also filed today, regarding the motion for related discovery from the government. As regards claims of privilege, I was able to rule broadly on many matters, but was unable to determine the scope of what remained in dispute; I therefore refer any remaining disputes over individual items to the Magistrate Judge, for resolution on an informal basis.

## I.    Background

In an opinion and order filed on September 14, 2020, I granted the issuance of Defendants' Category A subpoenas, as modified, "relevant to the narrow issue of investigative 'outsourcing,' as it relates to a potential pretrial motion for suppression of coerced statements of Coburn and Schwartz." (DE 96; Sept. 14 Op. at 12.) I noted that "any direct command that one defendant or the other be interviewed would be most relevant," but I allowed "some breathing room for the surrounding context." (*Id.* at 16.) Accordingly, I required Defendants to narrow their Category A subpoenas to records relevant to Cognizant's investigation and interview of Defendants prior to their being served. (*See id.* at 16-24.) On September 29, 2020, I ordered Defendants to further amend their subpoenas in line with this focus, requiring them to revise requests relating to the "investigation *and/or* interview of" a defendant to use the phrase "investigation *and* interview" instead. (DE 104 (emphasis added).) Following these revisions, I granted Defendants' application for issuance of the Category A subpoenas on October 6, 2020. (DE 108.)

As for the Category B subpoenas, I ordered their issuance ex parte on April 5, 2021, explicitly anticipating that any objections from Cognizant or L&T Construction would be asserted through a motion to quash. (DE 144; Op. at 1-2.) Additionally, I ordered that Defendants' motion for the issuance of the

subpoenas and the subpoenas themselves be maintained under seal, given concerns about revealing trial strategies. (DE 144; Op. at 2.)

## II.    Applicable Standards

### A.    Standards: Subpoenas Under Rule 17

A Rule 17 subpoena "is designed as an aid for obtaining relevant evidentiary material that the moving party may use at trial," *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980), and "for determination of an issue of fact raised by a pre-trial motion," 2 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 272 (4th ed. 2021). *See also United States v. Nixon*, 418 U.S. 683, 698-99 (1974) (noting that Rule 17's "chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials"). "A subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise." *Nixon*, 418 U.S. at 698. To clear this hurdle and compel production of documents before trial, a moving party must show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*Id.* at 699–700. The first three of these requirements may be shorthanded as "(1) relevancy; (2) admissibility; [and] (3) specificity." *Id.* at 700.

Nonetheless, the Third Circuit has cautioned that "[c]ourts must be careful that rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed. R. Crim. P. 16." *Cuthbertson*, 630 F.2d at 146. "[A]lthough a defendant's subpoena may be motivated only by the venerable principle of 'nothing ventured, nothing gained,' more is needed to sustain a subpoena than the defendant's own subjective belief (i.e., hope) that he or she may find something

4

useful by casting a subpoena upon the waters." *United States v. Eisenhart*, 43 F. App'x 500, 505 (3d Cir. 2002). As such, a party requesting materials under Rule 17 "must 'show the evidentiary nature of the requested materials with appropriate specificity' and 'do more than speculate about the relevancy of the materials being sought.'" *United States v. Onyenso*, No. CRIM. 12-602 CCC, 2013 WL 5322651, at *1 (D.N.J. Sept. 20, 2013) (quoting *United States v. Shinderman*, 232 F.R.D. 147, 150 (D. Maine 2005)).

### B.    Standards: Attorney-Client Privilege & Work Product

A further limit on what may be obtained by subpoena is a legitimate claim of privilege that is not waived. Here, the relevant privileges are the attorney-client privilege and the work product doctrine.

### 1. Outline of the Privilege

The Third Circuit has stated that the attorney-client privilege applies only if

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (I) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Grand Jury Investigation*, 599 F.2d 1224, 1233 (3d Cir.1979).

The party asserting the attorney-client privilege bears the burden to show that it applies. *See In re Grand Jury Empaneled Feb. 14, 1978*, 603 F.2d 469, 474 (3d Cir.1979). "Because the attorney-client privilege obstructs the truth-finding process, it is construed narrowly" and "protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423–24 (3d Cir. 1991) (internal quotation marks

and citations omitted); *see also Fisher v. United States*, 425 U.S. 391, 403 (1976) ("[S]ince the privilege has the effect of withholding relevant information from the fact-finder, . . . it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege"). Moreover, the privilege guards only against the disclosure of the protected communication, not against disclosure of facts underlying those communications. *See Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981).

The attorney-client privilege unquestionably applies to both corporations and individuals. *See Upjohn*, 449 U.S. 390; *Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 124 (3d Cir. 1986). However, because "a corporation must act through its agents," adjudicating claims of privilege "in the case of corporations . . . presents special problems." *Id.* (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985)). The privilege will extend to the communications of a corporation's management and employees when doing so would give effect to the purposes of the privilege, *see Upjohn*, 449 U.S. at 391, 394-95, and is "equally available to a corporation's in-house counsel." *Leonen v. Johns-Manville*, 135 F.R.D. 94, 98 (D.N.J. 1990) (citing *Hasso v. Retail Credit Company*, 58 F.R.D. 425, 427 (E.D. Pa. 1973) and *International Telephone and Telegraph Corporation v. United Telephone Company of Florida*, 60 F.R.D. 177, 185 (M.D. Fla. 1973)). However, the privilege's protections vanish where the communication is not in furtherance of the securing of *legal* advice. Advice that is predominantly concerned with corporate business, technical issues, or public relations is not protected. *See e.g.*, *Dejewski v. Nat'l Beverage Corp.*, No. 19-CV-14532-ES-ESK, 2021 WL 118929, at *1-2 (D.N.J. Jan. 12, 2021); *Louisiana Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 305-06 (D.N.J. 2008).

The work product doctrine safeguards documents from discovery where such documents are "materials prepared or collected by an attorney 'in the

course of preparation for possible litigation.'"[4] *In re Grand Jury Investigation*, 599 F.2d at 1228 (quoting *Hickman v. Taylor*, 329 U.S. 495, 505 (1947)); *see also* Fed. R. Civ. P. 26(b)(3) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative"). The party asserting work product protection bears the burden of showing that the doctrine applies. *See Conoco, Inc. v. U.S. Dep't of Justice*, 687 F.2d 724, 730 (3d Cir.1982). Courts in this Circuit have generally applied a two-pronged inquiry for determining whether a document should be protected under the work-product doctrine—first, looking to whether "litigation could reasonably have been anticipated" at the time the document was made, and second, looking to whether the document was "prepared or obtained because of the prospect of litigation." *In re Gabapentin Patent Litig.*, 214 F.R.D. 178, 183-84 (D.N.J. 2003) (citations omitted). Documents created in the ordinary course of business are not protected by the work-product doctrine. *Id.* at 184. Since, like other privileges, work product protections may "obstruct the search for truth," both it and the attorney-client privilege "should be recognized only when necessary to achieve their respective purposes." *In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011).

## 2. Waiver of the privilege

Although disclosure of ostensibly privileged communications to a third party "has long been considered inconsistent with an assertion of the privilege," a waiver of attorney-client privilege does not necessarily constitute a waiver of work product protection, or vice versa. *See Westinghouse*, 951 F.2d at 1424, 1428. Generally, the attorney-client privilege aims to promote frank, honest communication between client and lawyer, and it is thus waived when a client discloses otherwise privileged communications to a third party. Such third-party disclosures usually imply that the clients "would also have divulged [the information] to their attorneys, even without the protection of the privilege,"

---

[4]    This doctrine applies in both criminal and civil litigation. *See United States v. Nobles*, 422 U.S. 225, 236 (1975).

and thus that "the basic justification for the privilege no longer applies." *Id.* at 1424 (internal quotation marks and citation omitted). On the other hand, however, where such "disclosure to a third party is necessary for the client to obtain informed legal advice," such disclosure will not trigger a waiver of the privilege. *Id.*

For work product protections to be waived, disclosure to a third party must be such as would "enable an adversary to gain access to the information." *Id.* at 1428. Such disclosure inherently negates the secrecy rationale of these protections, i.e., to guard "the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation" and "enabl[e] attorneys to prepare cases without fear that their work product will be used against their clients." *Id.* (citing *Hickman*, 329 U.S. at 510-11).

Thus, disclosure of communications may waive both attorney-client and work product protections "if that disclosure undermines the purpose behind each privilege." *Chevron*, 633 F.3d at 165. In *Westinghouse*, for example, the Third Circuit held that a corporation's voluntary disclosure of summary findings from its internal investigation and audit to DOJ and the SEC while under investigation by both agencies waived both attorney-client privilege and work product protections. 951 F.2d at 1418-19, 1426, 1428.

If there is a waiver, the court must determine its scope. "When a disclosure waives privilege or work-product protection, that waiver will extend to undisclosed documents or communications if: 1) the waiver is intentional; 2) the disclosed and undisclosed communications or information concern the same subject matter; and 3) they ought in fairness be considered together." *Shire LLC v. Amneal Pharms.*, LLC, No. 2:11-CV-03781, 2014 WL 1509238, at *6 (D.N.J. Jan. 10, 2014) (citing Fed. R. Evid. 502(a) (providing for subject matter waiver "[w]hen the disclosure is made . . . to a federal office or agency")). This "subject matter waiver" is most often found by courts in this District "when the privilege-holder has attempted to use the privilege as both 'a sword' and 'a shield' or when the party attacking the privilege will be prejudiced

at trial." *Id.* (quoting *Koch Materials Company v. Shore Slurry Seal, Inc.*, 208 F.R.D. 109, 120 (D.N.J. 2002)); *see also Westinghouse*, 951 F.2d at 1426 n.12 (noting that where a partial waiver disadvantages the disclosing party's adversary "by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject").

### III.    DISCUSSION: Privilege and Waiver

I next consider Cognizant's assertion of privilege with respect to certain documents. This discussion is pertinent to both the Category A and Category B subpoenas.

### A.    Privilege log

Defendants argue that Cognizant's privilege log, listing 18 categories of documents that were withheld or redacted, cannot be meaningfully reviewed. Defendants object that the log describes the subject matter by category, rather than document-by-document; fails to include all withheld or redacted emails; and does not include email subject lines.[5] (Mot. To Compel Cognizant, Cat. A at 59-61.) Cognizant responds that its privilege log was sufficiently precise— including the date and time, the author or sender, the recipients, and the file type of every withheld or redacted document—and that its categorical approach to the privilege log is an appropriate response to subpoenas that specifically "targeted privileged documents" pertaining to an investigation conducted and supervised by attorneys. (Cross Mot. To Quash Cognizant Cat. A Subpoenas at 34-37.)

Although presented categorically, Cognizant's privilege log is sufficient. Under the circumstances, it represents a reasonable and less burdensome approach to the privilege log. Consider, for example, a hypothetical request for "all communications between client and lawyer for the purposes of obtaining legal advice." In such a case, the court might not find it reasonable to put the

---

[5]    In total, Cognizant withheld 1,241 documents and redacted 57. (Mot. To Compel Cognizant, Cat. A at 55-56.)

subpoenaed party to the burden of a document-by-document description. This is not that extreme case, of course. But Defendants do make requests which, on their face, implicate Cognizant's legal affairs and would naturally yield a large volume of privileged documents. Cognizant's approach, though categorical, is not offhand. Cognizant has provided 66 pages of detail to substantiate its privilege claims; a line-item version of that log would very likely be much longer and repetitive, and would not provide much, if any, additional information.

Moreover, Defendants fail to explain what, precisely, about this categorical approach prevents them from meaningfully reviewing privilege assertions within the framework of Rule 17. Instead, they rely on precedent dealing with civil discovery and Fed. R. Civ. P. 26(b)(5), under which courts of this Circuit have refused to allow a categorical privilege log without a specific showing of undue burden. *See, e.g.*, *Bethea v. Merchants Com. Bank*, No. 11-51, 2012 WL 5359536, at *2 (D.V.I. Oct. 31, 2012); *Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, No. CIV.A. 07-1299 SRC, 2012 WL 1585335, at *4 (D.N.J. May 4, 2012). Such precedent is entwined with the very different principles governing civil discovery and, of course, the civil procedure rules themselves. It does not apply to a criminal case, and in any event is primarily concerned with an issue not present here: claims of attorney-client privilege based on "a single, blanket assertion." *United States v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d Cir. 1990).

Requiring Cognizant to create a new, expanded privilege log, asserting the same privilege in relation to each of the hundreds of withheld documents would serve no useful purpose. Defendant's motion on this point is thus denied. What I will do, however, is order that whatever disputes over privilege remain, after limitation of the scope of the subpoenas and my more general privilege rulings, be brought before the Magistrate Judge. A conference format, guided by the principles announced in this opinion, is likely to produce more concrete results than further refinement of the privilege log.

### B.    Privilege Assertion and Waiver

Defendants argue that Cognizant has improperly withheld or redacted documents, including those concerning conversations in which Schwartz allegedly authorized the payment of bribes, claiming attorney-client privilege. Such documents, according to Defendants, "may contain facts or material unrelated to the provision of legal advice," and in any event, any privilege was waived by Cognizant's disclosure of these documents to the Government. (Mot. To Compel Cognizant, Cat. A at 61, 63-64, 74-78.) Indeed, they claim that Cognizant has waived any privilege regarding the entire subject of Cognizant's internal investigation and must also disclose documents revealing all statements made by Cognizant employees describing conversations with Schwartz related to this investigation. (*Id.* at 64-74.) Cognizant maintains that it properly asserted attorney-client privilege over documents containing legal advice or otherwise within the permissible ambit of the privilege. (Cross Mot. To Quash Cognizant Cat. A Subpoenas at 37-40.) Moreover, it urges that it did not effectuate a subject matter waiver of attorney client privilege over the entire internal investigation simply by cooperating with DOJ or disclosing portions of investigative documents. (*Id.* at 41-50.)

### 1. Privilege assertion

The first category in dispute consists of Cognizant's draft press releases and public disclosures. I agree with Defendants that these materials were not created for the predominant purpose of obtaining legal advice, or in order to prepare for litigation. *See In re Grand Jury Investigation*, 599 F.2d at 1233. Instead, they fall squarely within the type of non-legal, business or public relations advice that are not privileged. *See Fisher*, 425 U.S. at 403; *Westinghouse*, 951 F.2d at 1423–24. Similarly, Cognizant's communications with public relations firms Finsbury and CLS Strategies concerning "public disclosure, communications, potential litigation and related legal strategy" relevant to Cognizant's internal investigation, (Mot. To Compel Cognizant, Cat. A at 76-77,) are not protected by either privilege because they bear too tenuous

a connection to the provision of legal advice or confidential preparations for litigation. *See e.g.*, *Dejewski*, No. 19-CV-14532-ES-ESK, 2021 WL 118929, at *1-2; *Louisiana Mun. Police Emps. Ret. Sys.*, 253 F.R.D. at 305-06.

A second disputed category of documents consists of Cognizant's records pertaining to document retention and collection policies. Documents relating to legal advice concerning the formulation of such policies are facially privileged and will not be produced. More generally, Cognizant represents that certain records were made when Cognizant was facing criminal and civil liability in connection with the allegations against Defendants. According to Cognizant, they include (1) communications among Cognizant's executives, in-house counsel, and outside counsel; and (2) litigation hold memoranda and other documents that relate to the areas to be investigated and the custodians and document sources to be searched. (Cross Mot. To Quash Cognizant Cat. A Subpoenas at 38-39.) Such records clearly pertain to litigation strategy and the provision of legal advice in advance of litigation, and were created at a time when litigation was reasonably anticipated. Thus, Cognizant's assertion of attorney client and work product privilege over them is proper. *See Upjohn*, 449 U.S. at 391, 394-95; *Leonen*, 135 F.R.D. at 98; *In re Gabapentin Patent Litig.*, 214 F.R.D. at 183-84.

A caveat: I will require that the document retention policies themselves, and the dates of their promulgation, be produced, as they do not bear the earmarks of privilege and are relevant to understanding the document production itself.

A third disputed category consists of Cognizant's communications with the accounting firm E&Y concerning Cognizant's internal investigation and related updates given to the Board of Directors, DOJ, and SEC (Mot. To Compel Cognizant, Cat. A at 76), are closely related to the provision of legal advice. Indeed, the nature of the allegations against Defendants and the scope of Cognizant's internal investigation would understandably make accounting expertise vital to any law firm representing Cognizant. *See United States v.*

12

*Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (holding that a client's communications to an accountant employed by the client's attorney were reasonably related to the legal representation and remained privileged). As to those communications, the privilege is appropriately asserted.

A fourth, more general category consists of Cognizant's internal investigation. As to the existence of the privilege as such, this category is less controversial; by its nature it consists of attorneys' fact gathering for the purpose of rendering legal advice. Here, the real issue is the scope of any waiver of the privilege.

### 2. Waiver

I next turn to Defendants' argument that Cognizant effected a subject matter waiver over broad categories of documents—namely, any communications regarding conduct alleged in the indictment and any materials related to Cognizant's internal investigation—by disclosing a summary of its investigation's findings to DOJ. While Defendants characterize this waiver too expansively, I agree that there was a significant waiver here.

To begin with, Cognizant may not now claim privilege over materials that it furnished to the Government. These disclosures, referred to as the "DLA Downloads" in the parties' briefing, consist of "detailed accounts of 42 interviews of 19 Cognizant employees, including Defendants." (Mot. To Compel Cognizant, Cat. A at 68-69.) By disclosing this information to the Government while under threat of prosecution, Cognizant handed these materials to a potential adversary and destroyed any confidentiality they may have had, undermining the purpose of both attorney-client and work-product privileges. *See Chevron*, 633 F.3d at 165 (holding that "purposeful disclosure of [] purportedly privileged material to a third-party" may waive attorney-client and work product privileges "if that disclosure undermines the purpose behind each privilege").

The next question concerns the breadth of the waiver. Cognizant's voluntary turnover of materials or revelation of the fruits of its investigation to

the DOJ also entailed a waiver of the privilege as to communications that "concern the same subject matter" and "ought in fairness be considered together" with the actual disclosures to DOJ. *Shire LLC v. Amneal Pharms.*, LLC, No. 2:11-CV-03781, 2014 WL 1509238, at *6 (D.N.J. Jan. 10, 2014) (citing Fed. R. Evid. 502(a)).

First, to the extent that summaries of interviews were conveyed to the government, whether orally or in writing, the privilege is waived as to all memoranda, notes, summaries, or other records of the interviews themselves.[6] Second, to the extent the summaries directly conveyed the contents of documents or communications, those underlying documents or communications themselves are within the scope of the waiver. Third, the waiver extends to documents and communications that were reviewed and formed any part of the basis of any presentation, oral or written, to the DOJ in connection with this investigation.

### IV.    DISCUSSION: Defendants' Motion to Compel Cognizant's Compliance with Category A Subpoenas (DE 150) & Cognizant's Cross-Motion to Quash (DE 169)

I focus here on the Category A subpoenas. The chief underlying substantive issues involve (a) any government direction of (b) coerced interviews by Cognizant, a private company, in the style described in *Garrity v. New Jersey*, 385 U.S. 493 (1967).[7] These must be read against the background

---

[6]    Cognizant appears to concede this point somewhat in acknowledging that it "may be required to turn over portions of their memoranda of Defendants' interviews to the extent those memoranda were read out to the Government." (Cross Mot. To Quash Cognizant Cat. A Subpoenas at 47-48.)

[7]    The Supreme Court in *Garrity* held that where a government employee is given a choice "between self-incrimination or job forfeiture," incriminatory statements by that employee are the result of coercion and therefore inadmissible in a criminal trial. 385 U.S. at 495-96. This rule "applies with equal vigor to private conduct where the actions of a private employer in obtaining statements are 'fairly attributable to the government,'" i.e., when "there is a sufficiently close nexus between the state and the challenged action." *United States v. Connolly*, No. 16 CR. 0370 (CM), 2019 WL 2120523, at *10 (S.D.N.Y. May 2, 2019) (quoting first *United States v. Stein*, 541 F.3d 130, 152 n.11 (2d Cir. 2008), then *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).

of information already available to the Defendants as a result of voluntary disclosures by the government and the accompanying opinion compelling discovery of communications and documents furnished as between the government and Cognizant.

### A.    Proper scope of the subpoenas

Defendants contend that Cognizant, as the subpoenaed party, has "attempted to rewrite" the subpoenas by narrowing their scope to include only "documents relevant to the DOJ's purported involvement in the Investigation as it relates to Defendants' interviews—rather than documents concerning the Investigation broadly or documents concerning Cognizant's inquiry into Defendants generally." (Mot. To Compel Cognizant, Cat. A at 24-24.) Moreover, they argue that Cognizant improperly limited (1) the date range of documents to be searched; (2) the number of custodians from whom documents were requested; (3) the search terms used to identify relevant documents; and (4) the nature of communications to only email communications. (*Id.* at 37-53.) In contrast, Cognizant maintains that the subpoenas were concerned only with "the narrow issue of investigative 'outsourcing,' as it relates to a potential pretrial motion for suppression of coerced statements of Coburn and Schwartz," and thus was limited to documents relevant "to the question of whether Defendants' statements in their interviews were coerced" under *Garrity.* (Cross Mot. To Quash Cognizant Cat. A Subpoenas at 18.) Cognizant argues that Defendants are attempting an "'unreasonable or oppressive' expansion of discovery" by requesting searches of broader date ranges, additional custodians, different search terms, and communications beyond email. (*Id.* at 46-51.)

Defendants themselves seem to be rewriting the subpoenas in asking for such a broad swath of material. Per the September 14, 2020, opinion of this Court, the relevant issues to which the subpoenas are directed are (a) whether Defendants' interviews were "government-engineered," and therefore fairly attributable to the government, and (b) whether the interviews were coerced,

15

classically, "in the *Garrity* sense of 'submit or be fired.'" Op. at 10-11. I did of course allow some breathing space; a document that does not contain an overt admission, or which contained some lesser degree of coercion, might nevertheless be relevant to demonstrate that *Garrity*-style coercion occurred, or, more critically, that the government pulled the strings to implement investigative techniques that would violate the Constitution if done directly by the government.

The Court, in its initial, pre-issuance narrowing of the subpoenas, was proceeding *ex parte*, without the benefit of an adversary presentation, and performing what amounted to a rough initial edit, explicitly subject to the inevitable motions to quash. I therefore will not disregard Cognizant's arguments simply because they do not conform to the scope of the subpoenas as issued; that is in the nature of a motion to quash. I take Defendants to mean, however, that Cognizant's arguments for narrowing the scope of the subpoenas go too far. Broadly, I find that Cognizant's focus on materials relevant to Cognizant's internal investigation and Defendants' interviews is better tailored to the case law and my prior opinion than Defendants' request for "documents concerning the Investigation broadly or documents concerning Cognizant's inquiry into Defendants generally."

With the above general principles in mind, I consider Cognizant's challenges to the scope of the Category A subpoenas.

### 1. Date range of documents

Cognizant has primarily produced documents from what it defines as the "Relevant Time Period," namely August 14, 2016, through October 24, 2016, a timeframe that Defendants claim is "unduly narrow" and "unreasonable."[8]

---

[8]    Cognizant represents that it conducted searches of documents dated more broadly from April 1 through October 24, 2016, in two instances: (1) a collection and review of documents from Karl Buch, a DLA Piper partner, "to confirm that there were no communications with DOJ or SEC concerning the investigation before August 31, 2016"; and (2) a search of all five DLA custodians' emails for communications with the DOJ or SEC. (Cross Mot. To Quash Cognizant Cat. A Subpoenas at 16 n.11.) Neither search yielded any documents. (*Id.*)

(Cross Mot. To Quash Cognizant Cat. A Subpoenas at 16-17; Mot. To Compel Cognizant, Cat. A at 37.) Defendants argue that Cognizant should produce documents from April 2016, when the investigation began, to February 2019, when Defendants were indicted. (Mot. To Compel Cognizant, Cat. A at 38.) Cognizant argues that its narrower "Relevant Time Period" is sufficient because it covers "when Defendants' interviews could have been coerced and 'Government engineered,'" because it encompasses (1) DLA Piper's ("DLA") August 20, 2016 interview of Srimanikandan Ramamoorthy, Cognizant's Vice President of Corporate Workplace Services and Corporate Real Estate in India, in which he implicated Defendants in the alleged bribery scheme; (2) DLA's interviews of Defendants in August and September, 2016;[9] (3) Cognizant's disclosure of its investigation to DOJ and SEC on September 1, 2016;[10] and (4) DLA's disclosure of the "preliminary findings" of Cognizant's investigation— "including information learned through Schwartz's and Coburn's interviews"— to DOJ on October 17, 2016. (Cross Mot. To Quash Cognizant Cat. A Subpoenas at 5-11, 23-24.) Moreover, Cognizant maintains that, in asking for a broader date range, Defendants are on a more speculative quest that will inevitably produce a large number of records irrelevant to the issue. (*Id.* at 24-27.)

    Cognizant has indeed unilaterally limited the date range for searches. The "Relevant Time Period" used by Cognizant, however, would appear to capture the lion's share of relevant documents—it covers the period of Defendants' interviews and Cognizant's disclosure of its internal investigation to the DOJ. Still, Cognizant's starting date of August 2016 would screen out potentially relevant documents from April–August 2016—*i.e.,* from when

---

[9]    Specifically, DLA interviewed Schwartz on August 28 and September 23, 2016, and interviewed Coburn on August 29, 2016. (Cross Mot. To Quash Cognizant Cat. A Subpoenas at 7-9.)

[10]    Cognizant first contacted DOJ and SEC a day earlier on August 31, 2016, in order "to arrange a voluntary self-disclosure to both agencies." (Cross Mot. To Quash Cognizant Cat. A Subpoenas at 7-8.)

Cognizant opened its investigation to when Defendants' interviews began. That preceding time period is well-defined, and documents from that earlier period could establish whether, *before* interviewing Defendants, Cognizant was coerced by the government to present Defendants with a *Garrity*-style ultimatum. I will therefore accept that expansion of the time frame.

Substantially weaker and more speculative are Defendants' arguments for documents dating from *after* their interviews. The issue, remember, is not "outsourcing" per se—*i.e.,* whether any of the information now in the government's possession was originally gathered by Cognizant—but rather, whether Cognizant performed some unconstitutional act on the government's behalf. Thus far, the only clear allegation of such a (potentially) unconstitutional act is the *Garrity* claim. Now one cannot dismiss the *possibility* that records created after Defendants' interviews might have some retrospective relevance. Such speculation is insufficient, however, to support a search of records from a period of over two years after the alleged violation occurred. *See Eisenhart,* 43 F. App'x at 505. Without more, Defendants have failed to show the "evidentiary nature" of materials dated after October 2016 "with appropriate specificity" under Rule 17 standards. *See Onyenso,* No. CRIM. 12-602 CCC, 2013 WL 5322651, at *1 (quoting *Shinderman,* 232 F.R.D. at 150). I therefore accept Cognizant's cutoff date of October 24, 2016.

### 2. Custodians

Defendants argue that Cognizant's selection of custodians whose documents were searched "omitted several essential individuals whose custodial files are certain to contain responsive documents," in particular: (1) "Defendants' custodial files," i.e., computer files from their company-issued laptops and electronic devices that they returned to Cognizant; (2) files from Cognizant employees "who had significant responsibility for the investigation," including Robert Molina, Henry Shiembob, and Maureen Breakiron-Evans;[11]

---

[11] At the time of Cognizant's investigation into Defendants' conduct, Molina served as Cognizant's senior director for global security, Shiembob served as its Chief

and (3) Cognizant's accounting firms, Ernst & Young ("E&Y") and PricewaterhouseCoopers ("PwC"). (Mot. To Compel Cognizant, Cat. A at 46-49.) Cognizant responds that the 22 custodians from whom it did obtain documents were those "most reasonably likely to have been involved in communications with the DOJ or SEC" and that Defendants have failed to demonstrate that searches of these additional custodians/files would yield "materials pertinent to the question of whether their interviews were coerced." (Cross Mot. To Quash Cognizant Cat. A Subpoenas at 27-28.)

Here, too, Defendants seek a potentially dramatic expansion in the scope of records sought yet fail to offer much specificity as to why this expansion is necessary to capture evidence relevant to the outsourcing/*Garrity* question. Defendants have not provided any particularized reason to believe that the former electronic devices, the named Cognizant executives, or Cognizant's accounting firms would have any evidence that Cognizant coerced incriminating statements from Defendants at the behest of the Government. I reiterate that we are not applying a civil discovery standard, but the far more focused standards of Rule 17. Defendants offer no more than unsupported opinions that these additional custodians would "[n]aturally" or "likely" possess records relevant to the Category A subpoenas that were not included in the documents possessed by the other custodians. (Mot. To Compel Cognizant, Cat. A at 47-49). Such speculative assertions that persons possess unidentified evidence do not demonstrate that Defendants are entitled to such records as part of an inquiry into investigative outsourcing or that Cognizant has failed to comply with the subpoenas. *See Eisenhart*, 43 F. App'x at 505 (upholding the quashing of the defendant's Rule 17 subpoena where "he was neither able to identify relevant evidence to be subpoenaed, nor provide a sufficient foundation" to conclude that the subpoena "targeted relevant evidence"); *see also United States v. Smukler*, No. CR 17-563-02, 2018 WL 3632148, at *4

---

Security Officer, and Breakiron-Evans was a member of its Board of Directors and the chair of its Audit Committee. (Mot. To Compel Cognizant, Cat. A at 47-49.)

(E.D. Pa. July 31, 2018) (concluding that "defendant's broad assertions that the requested discovery is material are insufficient to warrant issuance of subpoenas under Rule 17(c)"). Looking at the issue from the other side, Cognizant's choice of twenty-two document custodians appears reasonably calculated to uncover evidence relevant to the Category A Subpoenas and, without any more particularized identification of documents sought or the persons who possess them, appears sufficient to fulfill the subpoena requests. *See United States v. Blumberg*, No. CV 14-458 (JLL), 2017 WL 4790382, at *3 (D.N.J. Oct. 20, 2017) (rejecting defendant's Rule 17 subpoena requests where defendant sought additional documents that were duplicative of those already in his possession based on "only the possibility that relevant information may exist" in such documents).

### 3. Search Terms

Defendants argue that the list of search terms selected by Cognizant is "facially inadequate" and omits "essential terms that come directly from the Subpoenas themselves." (Mot. To Compel Cognizant, Cat. A at 51.) Specifically, Defendants argue that Cognizant should use the following search terms: "Interview"; "DNJ"; "prosecut!"; "Yates"; "cooperat!"; "India"; "KITS"; and the first names/nicknames "Steven," "Steve," "Gordon," "Oz," and "Nick." (*Id.* at 51-52.) Cognizant argues that the search terms it did use were designed to identify categories of information relevant to the question of coercion or government outsourcing, "specifically, communications with DOJ or SEC concerning Cognizant's investigation or Defendants, and internal documents concerning or reflecting such communications."[12] (Cross Mot. To Quash Cognizant Cat. A Subpoenas at 29-30.) Moreover, Cognizant maintains that Defendants have failed to show that Cognizant's search terms were inadequate or that

---

[12]    For a list of the search terms employed by Cognizant, *see* DE 150-5. Cognizant also represents that it searched for "certain discrete categories of responsive documents, like its employee policies, on an ad hoc basis." (Cog Brief Cat A ISO 30 n.18.)

Defendants' additional search terms are reasonably likely to identify relevant documents. (*Id.* at 30.)

I agree that Cognizant's search terms appear to be reasonably calculated to produce relevant material. More to the point, I must agree with Cognizant that Defendants' proposed search terms sweep far more broadly than is justified, and I do not propose to edit them. The proposed search terms, involving, *e.g.,* first names and nicknames, or the country of India, would tend to yield vast numbers of documents that are irrelevant to the issue. Defendants offer no method of limiting their search results or of incorporating the proposed search terms into the strings of search terms and limiters already used by Cognizant.

The cases cited by Defendants are not persuasive, because those subpoenaed parties did not demonstrate that they had performed a reasonable search. Indeed, those searches were shown to have failed to turn up known, relevant documents. *See V5 Techs. v. Switch, Ltd.*, 332 F.R.D. 356, 367 (D. Nev. 2019) (compelling a nonparty to search for records utilizing plaintiff's proposed search terms because the nonparty failed to provide a detailed account of the search conducted and failed to produce specific discoverable documents that plaintiff had previously identified); *Bailey Indus., Inc. v. CLJP, Inc.*, 270 F.R.D. 662, 671 (N.D. Fla. 2010) (compelling a defendant to search for records utilizing plaintiff's proposed search terms because defendant's production was "evidently incomplete," did not include "obviously relevant search terms," and lacked specific discoverable documents that plaintiff had previously identified).

Defendants' claim that the additional search terms would yield records relevant to the issues underlying the Category A subpoenas remains speculative. Accordingly, I will not grant Defendants' application to expand the search terms that Cognizant used.

### 4. Communications other than emails

Defendants next argue that Cognizant's searches for communications were improperly limited to email only. They argue that (1) their subpoenas

either expressly or implicitly authorize searches of "communications" beyond email; and (2) Cognizant "refused to collect and review text messages or Cognizant's internal messaging system" and "claimed without further explanation that text messages would likely not have been used" despite record evidence to the contrary. (Mot. To Compel Cognizant, Cat. A at 52-53.) Cognizant maintains that Defendants' request is based solely on "their conjecture that relevant communications may be found in Cognizant's custodians' text and instant messages" and thus constitutes the kind of "fishing expedition" barred by Rule 17. (Cross Mot. To Quash Cognizant Cat. A Subpoenas at 30-31.)

In this instance, I must agree with Defendants that Cognizant's interpretation of the term "communications" is unduly narrow. Cognizant offers no reason to believe that relevant communications would be confined to the medium of email, and it seems that communications concerning Defendants' interviews and investigative outsourcing would be no less likely to take place via text message or the company's internal messaging system. Such a search is thus properly encompassed by the Category A subpoenas and is not a "fishing expedition" within the meaning of Rule 17.

Accordingly, Defendant's motion to compel production of responsive internal and text messages is granted.

## V.    DISCUSSION: Cognizant's Motion to Quash Category B Subpoena (DE 197) & Defendants' Cross-Motion to Compel Compliance (DE 211)

Cognizant argues that the Category B subpoena should be quashed under *Nixon*: first, because it is "facially overbroad and makes no effort to identify specific, admissible evidence," and second, because it "improperly seeks entire categories of documents that are already covered by the hundreds of thousands of Cognizant-produced pages that Defendants either already possess or should possess." (Mot. To Quash Cognizant Cat. B Subpoena at 9.) I understand the second objection to be moot, because Cognizant itself has

defined the subpoenas to exclude material already produced to the government and shared with the defense.

Many of Defendants' Category B subpoena requests go well beyond what it calls "targeted requests." Rather, the subpoena, civil-discovery-style, seeks disclosure of wide swaths of documents, many identified generically or by topic. Many requests seem to rest on the tautological foundation that the evidence obtained, if favorable, would be helpful. *Nixon* and Rule 17 make clear that a subpoena must more specifically seek documents that are evidentiary, relevant, and necessary for Defendants to "properly prepare for trial," *Nixon*, 418 U.S. at 699-700, and must do so "with appropriate specificity," *Onyenso*, No. CRIM. 12-602 CCC, 2013 WL 5322651 at *1 (quoting *Shinderman*, 232 F.R.D. at 150). *See also Cuthbertson*, 651 F.2d at 195 (holding that only "exculpatory *evidence* in the possession of third parties . . . is retrievable under a rule 17(c) subpoena; naked exculpatory material held by third parties that does not rise to the dignity of admissible evidence simply is not within the rule" (emphasis added)). Moreover, a "general assertion" or "mere hope that some exculpatory material might turn up" is insufficient to justify a subpoena's enforcement. *Cuthbertson*, 630 F.2d at 146. Thus, only those of Defendants' subpoena requests that meet these requirements may be enforced; those which cross the line into being "unreasonable or oppressive" are instead subject to be quashed. *Nixon*, 418 U.S. at 698.

These subpoena requests exceed what is typical by orders of magnitude. After careful consideration, however, I find it appropriate to strike the Rule 17 balance in favor of granting more discovery than is typical. That decision is informed by several considerations. First, Cognizant, though a corporation, is in a position similar to that of an ordinary cooperating witness. That status calls for some latitude, given the obvious incentives to shift blame. Second, the charged offenses were allegedly committed by Cognizant's corporate officials, for the benefit of Cognizant. Thus, Cognizant may rightly be called on to bear burdens that would not be appropriate for an uninvolved third party. Third,

Cognizant has already performed an investigation for the purpose of exculpating itself, and it is fair to require it to disclose its evidence in a more evenhanded manner. Fourth, Cognizant's investigation has already resulted in the production of a significant amount of material to the government. The government, which had every incentive to gather relevant evidence to avoid surprise at trial, has furnished extensive discovery, which need not be duplicated, so it is only the incremental burden of further production that is at stake here. Fifth, the particular allegations here dictate that many of the relevant events and much of the relevant evidence would be situated in India. The COVID pandemic has placed severe limits on travel, and certain evidence may lie beyond the jurisdictional reach of the Court. Accordingly, there is an increased need to obtain such evidence as may be available from more readily accessible sources, because it may not be otherwise obtainable.

I therefore give the Rule 17 concepts of relevance, admissibility, and specificity a broad interpretation when weighing them against the burden on Cognizant. As for relevance, Defendants plausibly state that DOJ's case "hinges on two key allegations": (1) Defendants' authorization of Cognizant India to authorize L&T to pay a bribe in an April 2014 videoconference call; and (2) Defendants' authorization of Cognizant India to pay L&T "manufactured expenses" to reimburse L&T for the bribe. (Cross Mot. To Compel Cognizant, Cat. B at 2-3, 24.) Those issues are my touchstone.

The Category B requests fall into eight rough categories. I have granted those requests which appear to be aimed directly at evidence pertinent to the two main issues, identified above. ███████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ .

First, I consider Category B subpoena requests 28–31, concerning Cognizant's internal investigation. These may to some extent subsume other requests, and many responsive documents may already have been produced to the government and shared with the defense. Almost by definition, Cognizant's investigation was pertinent to the government's allegations. It was intended to dissuade the government from pursuing criminal charges against the corporation, and instead focus its attention on the two individuals here. Request 28 is quashed, given the broad swath of information sought without clear relevance or necessity. However, I will grant Defendants' motion to compel compliance with the Requests 29, 30, and 31. Request 31 is phrased overbroadly, and Cognizant's compliance is required only to the extent that the requested text messages concern the subject matter of the allegations against Defendants and are not subject to a valid claim of attorney-client privilege. I note again the broad extent to which the privilege is waived. (*See* subsection A.b.2, *supra.*)[13]

Second, I consider subpoena requests 1, 2, and 3, concerning payment or reimbursement of bribes. While Request 1 is tailored to "documents and communications concerning payments requested by, or made directly or indirectly to, any Indian Official regarding the KITS project," Request 2 ██████ ████████████████████████████████████████████████████. Thus, in assessing the relevance of the materials that Defendants request, I will grant Defendants' motion to compel compliance with Request 1, but will quash Request 2. By the same logic, I will grant Defendants' motion to compel as to subparts (a) through (c) of Request 3—narrowed as they are to variation requests and cost estimates associated with the KITS project—but quash subparts (d) and (e), ███████████████████████████████████████.

---

[13]   The claim of privilege as to Request 29 is particularly ill-taken. On its face it only covers materials that were already read or summarized to DOJ, and so any privilege has been waived. (Mot. To Quash Cognizant Cat. B Subpoena at 16.)

Third, I consider Requests 4, 5, and 6, ███████████████████
███████. These exceed the limits of *Nixon* and Rule 17 to the extent they seek
documents of tenuous relevance or necessity to the defense. Request 4 crosses
this boundary in subparts (c), (e), (g), and (i), ██████████████████



██████████. Accordingly, Cognizant's motion to quash is granted as to
subparts (c), (e), (g), and (i) of Request 4 but Defendants' motion to compel is
granted as to the remaining subparts of Request 4, all of which are tethered to
the allegations in the indictment against Defendants. Similarly, I will grant
Defendants' motion to compel compliance with Request 5 because it seeks only
materials of explicit relevance to the indictment's allegations, but will grant
Cognizant's motion to quash Request 6, which is too broad and speculative,
and also redundant of Requests 1 and 3.

Fourth, I consider Requests 7, 8, and 9, which nominally seek evidence
concerning change order requests but clearly include materials of more
dubious relevance. I will grant Cognizant's motion to quash subparts (b) and (c)
of Request 7—████████████████████████—and also strike
those subparts from inclusion with materials sought in Request 8. Moreover, I
will also grant Cognizant's motion to quash Request 9. The Request 9
designation of ██████████████████████████████████
██████████████ is quite general and lacks a sufficiently close connection to
the indictment's allegations. In sum, then, I will only grant Defendant's motion
to compel compliance with subpart (a) of Request 7 and with Request 8,
amended to exclude subparts (b) and (c) of Request 7.

Fifth, I consider Requests 10 through 19, in which Defendants seek
evidence concerning Cognizant's internal controls. Requests 12 through 19 are
granted. Requests 10 and 11 require some additional discussion. Request 10(b)
asks for, ████████████████████████████████████, while



subparts 10(d), (e), (f), and (g) ████████████████████████████ ████████████████████████████████████████████████████████████ ██████████. Similarly, all but the first clause of Request 11 seek materials that are not squarely relevant or necessary to the defense, ████████████████████ ████████████████████████████████████████████. I grant Cognizant's motion to quash Request 10(b), and (d) through (g), and all of Request 11, *except* for the Board of Directors and Audit Committee meeting materials that explicitly concern the subject matter of the indictment's allegations.[14]

Sixth, I consider Requests 20 through 23, which seek evidence concerning potential witnesses. I will grant Defendant's motion to compel compliance with Request 20, seeking organizational charts. I deny it as to Request 21, ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████. Requests 22 and 23 facially seek privileged materials and are therefore denied.[15]

Seventh, Requests 24 through 27 ████████████████████████████ ██████████████████████████. They far exceed the bounds of relevance and necessity, and the Court is unable to extract whatever permissible requests may lurk within, to the extent not already covered by other requests. I will therefore grant Cognizant's motion to quash.

Finally, Defendants' requests ████████████████████████████████████, Requests 32 and 33, follow the same pattern as already discussed. They seek broad categories of documents, with little specificity as to how such materials

---

[14]    To the extent individual items may be subject to a remaining privilege objection, such disputes may be resolved by the Magistrate Judge, guided by the principles in this opinion.

[15]    I repeat that certain of these materials may already have been produced to the government. If so, the privilege is waived, and the government, if it has not already done so, shall share these with the defense.

will yield relevant, necessary evidence, relying heavily on only a "general assertion" that exculpatory materials may "turn up." *See Cuthbertson*, 630 F.2d at 146. I will grant Cognizant's motion to quash as to these.

### VI.   DISCUSSION: Defendants' Motion to Compel L&T's Compliance with Subpoenas (DE 167) & L&T's Cross-Motion to Quash (DE 188)

I turn to the subpoenas directed to L&T Construction.

The disputed issues between Defendants and L&T require some brief context on the corporate structure of L&T Construction and Defendants' attempts at serving these subpoenas. L&T Construction is based in Chennai, India and is a division of L&T Ltd., based in Mumbai, India. (Mot. To Compel L&T at 4; Cross. Mot. To Quash L&T Subpoenas at 3.). While L&T Construction has no offices, employees, or operations in the United States, L&T Ltd. maintains at least one office in Edison, New Jersey.[16] (Mot. To Compel L&T at 4-5; Cross. Mot. To Quash L&T Subpoenas at 3-4.) L&T Ltd. conducts business in the U.S. under the name "Larsen & Toubro Limited, Inc." and lists in its corporate filings a registered agent located at the office in Edison. (Mot. To Compel L&T at 6.) Multiple companies associated with L&T Ltd. also have offices at the same address, including L&T Infotech Ltd., a majority-owned subsidiary headquartered in Mumbai, India, and L&T Technology Services Ltd., also a majority-owned subsidiary that is headquartered in Vadodara, India. (Mot. To Compel L&T at 6-7; Mot. To Quash L&T Subpoenas at 5-6.) L&T Infotech Ltd.'s registered agent is also located at the office in Edison. (Mot. To Compel L&T at 7.)

Following the issuance of Defendants' Category A subpoenas to L&T Construction in October 2020, Coburn attempted to serve L&T Construction by delivering his subpoena to an employee of L&T Infotech Ltd. in Edison, but the

---

[16]    Defendants represent that L&T Ltd. has "at least eight offices in the United States," while L&T Construction maintains that the seven other offices that Defendants refer to "in fact belong to partially-owned subsidiaries of L&T Ltd." (Mot. To Quash L&T Subpoenas at 5 n.1.)

employee stated that "L&T Infotech is 'not affiliated with Larsen & Toubro Construction' and refused to accept service." (Mot. To Compel L&T at 18.) Counsel for L&T Construction subsequently contacted defense counsel, confirming that L&T Infotech Ltd. would not accept service on L&T Construction's behalf and that the latter was "not subject to the jurisdiction of the United States District Court for the District of New Jersey." (*Id.* at 18.) Similarly, U.S. counsel for L&T Ltd. subsequently stated that it would not accept service of Defendants' consolidated Category A and Category B subpoenas or authorize counsel to do so on its behalf, arguing that none of the entities subpoenaed were required or authorized to accept service on behalf of L&T Construction and reiterating that U.S. courts, including this one, lack jurisdiction over L&T Construction.[17] (*Id.* at 19-20.)

Moving to compel L&T Construction's compliance with these subpoenas,[18] Defendants argue that (1) service on L&T Ltd. via its registered agent and on L&T Infotech at the office in Edison, New Jersey was proper and sufficient to compel production of any responsive documents; and (2) this Court has specific personal jurisdiction over L&T Ltd. "because L&T Ltd. purposefully availed itself of the forum by cooperating with the DOJ's investigation in the United States." (Mot. To Compel L&T at 22, 24-25, 27, 29-30, 38.) L&T Construction responds that this Court lacks personal jurisdiction because it did not purposefully avail itself of the forum and argues that Defendants are trying to circumvent personal jurisdiction requirements by

---

[17]    Defendants also attempted to enlist the Government's help in obtaining the subpoenaed records from L&T Construction, either through a direct request or through the Mutual Legal Assistance Treaty ("MLAT") process; though the Government said it would not object if Defendants "filed an application," it would not "pursue an MLAT to India or take other steps to assist the defense." Status Conf. Tr. at 41, Jan. 6, 2021, DE 137.

[18]    Specifically, Defendant's move to compel the compliance of L&T Ltd., Larsen & Toubro Limited, Inc., and L&T Infotech, Ltd., referring to them as members of "the L&T corporate family." (Mot. To Compel L&T at 1-2.)

subpoenaing employees at the offices of L&T Ltd. and L&T Infotech in New Jersey. (Mot. To Quash L&T Subpoenas at 10, 11-12, 14, 20-22.)

I focus here on the baseline issue of personal jurisdiction. *See generally In re Sealed Case*, 932 F.3d 915, 922 (D.C. Cir. 2019) (applying the minimum contacts framework to determine if personal jurisdiction existed for grand jury subpoenas and subpoenas obtained under the Patriot Act); *In re Auto. Refinishing Paint*, 229 F.R.D. 482, 487 (E.D. Pa. 2005) (applying the minimum contacts framework to determine if personal jurisdiction existed for a civil subpoena.). The two types of personal jurisdiction are general jurisdiction and specific jurisdiction, *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 & n. 9 (1984); Defendants invoke only the latter. The Third Circuit applies a three-part test in determining whether specific jurisdiction over a company exists: (1) a company "must have 'purposefully directed [its] activities' at the forum"; (2) "the litigation must 'arise out of or relate to' at least one of those activities"; and (3) "if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise 'comport[s] with 'fair play and substantial justice.'" *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007) (citations omitted).

To establish the first element, Defendants must show that L&T Construction intentionally targeted New Jersey, and thus "purposefully avail[ed] itself of the privilege of conducting activities within the forum State."[19] *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021); *see also O'Connor*, 496 F.3d at 317 ("[W]hat is necessary is a deliberate targeting of the forum"). No clear approach has emerged in our jurisprudence to determine if a non-resident corporation is subject to jurisdiction in the forum where its subsidiary or distributor is located, but the Supreme Court in

---

[19]    Defendants briefly suggest that contacts with the United States as a whole must be considered. (Mot. To Compel L&T at 37) *See generally Rickman v. BMW of N. Am. LLC*, No. CV1804363KMJBC, 2021 WL 1904740, at *5 (D.N.J. May 11, 2021).Since L&T Construction has no presence in the US and L&T Ltd.'s sole office appears to be in NJ, it makes no difference to the analysis.

*Daimler AG v. Bauman* allowed that corporate relationships "may be relevant to the existence of specific jurisdiction." 571 U.S. 117, 135 n.13. (2014). Spurred by this language, courts have thus used a parent-subsidiary relationship "to show that the parent purposefully availed itself of the subsidiary's forum."

Here however, L&T Construction's corporate structure suggests the reverse: that neither it nor its parent L&T Ltd. are subject to specific jurisdiction arising from the events of this case. Indeed, despite Defendants' argument to the contrary, L&T Construction's cooperation with U.S. investigators does not show that it "purposefully availed" itself of New Jersey law or that it purposefully directed its activities at New Jersey. Rather, it shows only voluntary cooperation with federal law enforcement, no more and no less. Further, L&T Construction's commercial activities are not directed at all toward New Jersey—it has no offices within the state—and so specific jurisdiction, if it exists, can only be asserted based on the activities of L&T Ltd. L&T Infotech is a majority-owned subsidiary of L&T Ltd., and thus its activities within the state of New Jersey have no obvious relevance to L&T Construction's activities; neither party has offered authority to support the idea that jurisdiction over one corporate subsidiary may be established through the actions of another.

L&T Ltd.'s activities in New Jersey lack any clear relationship to the instant litigation that would justify specific jurisdiction. As reflected in the Indictment, L&T Construction's work on the KITS project took place entirely in India and it was retained pursuant to a contract with another Indian company that was governed by Indian law. There is no indication that L&T Ltd.'s offices or employees in the U.S. had any contact with L&T Construction regarding this project or had any involvement in the KITS project at the center of the indictment. In short, even to the extent that L&T Ltd. has deliberately targeted its activities at the forum, the instant litigation does not arise out of or relate to such activities and attributing such activities to L&T Construction for jurisdictional purposes would not comport with "fair play and substantial justice." *O'Connor*, 496 F.3d at 317 (3d Cir. 2007). Accordingly, L&T Construction's cross-motion to quash Defendants' subpoenas is granted.

## VII.    DISCUSSION: Motion for Letter Rogatory (DE 168)

No doubt anticipating the possibility that they might not prevail on their motion to compel L&T Construction's compliance, Defendants moved in the alternative for the issuance of a letter rogatory. (Mot. For Letter Rogatory at 10.) L&T Construction "reserve[d] its right to object to the specific requests made by any letter rogatory if and when this Court considers Defendants' application and/or in an appropriate forum in India." (Mot. To Quash L&T Subpoenas at 30 n.17.)

A party seeking the issuance of a letter rogatory "is asking the United States, through this Court, to request the assistance of a foreign country in obtaining discovery." *Abraxis BioScience, LLC v. Actavis, LLC*, No. 2:16-cv-1925 (JMV), 2017 WL 2293347, at *2 (D.N.J. May 25, 2017); *see also* 28 U.S.C. § 1781(b)(2) (providing that a letter rogatory may be transmitted directly by a United States court "to the foreign or international tribunal, officer, or agency to whom it is addressed.").

> A letter rogatory is defined as the medium, in effect, whereby one country, speaking through one of its courts, requests another country, acting through its own courts and by methods of court procedure peculiar thereto and entirely within the latter's control, to assist the administration of justice in the former country; such request being made, and being usually granted, by reason of the comity existing between nations in ordinary peaceful times.

*Id.* (quoting *DBMS Consultants Ltd. v. Computer Assoc., Int'l*, 131 F.RD. 367, 369 (D. Mass. 1990)). "The standard for issuance of a letter rogatory is the same as if the evidence were located in the United States," thus requiring Defendants to satisfy both "the requirements of Fed. R. Crim. P. 17 and [*United States v. Nixon*] to obtain evidence . . .  that is located abroad." *United States v. Hoskins*, No. 3:12CR238 JBA, 2015 WL 4874921, at *5 (D. Conn. Aug. 14, 2015).

While this Court lacks personal jurisdiction, an Indian court acting pursuant to letters rogatory would face no such impediment. However, Defendants have offered this path only as an alternative, and L&T

Construction, because jurisdiction is lacking, has not articulated with precision its objections to hypothetical letters rogatory.

Initially, I can state that I would not approve the issuance of a letter rogatory regarding Defendants' requests in their Category A subpoenas relating to the *Garrity* issue. There is simply no threshold showing of how materials held by L&T Construction would reflect on whether the Government outsourced its investigation to Cognizant in a manner that made it responsible for any coerced interviews of Defendants.

The above analysis, however, indicates that many of Defendants' other requests may not be beyond the scope of Rule 17, and so may be the subject of a valid letter rogatory. For example, subpoena Requests 1(a), 4(b), and 4(f) mirror requests made to Cognizant that I approved above. Defendants may submit a proposed letter rogatory, narrowed to requests complying with the constraints of Rule 17 and *Nixon*, as discussed in this opinion. Whether compliance may be secured within a reasonable time, and what should be done if it cannot, is an issue for another day.

## VIII.    L&T's Motion to Maintain Certain Filings Under Seal (DE 184)

L&T Construction moves to maintain the Defendants' Motion to Compel L&T's Compliance, supporting memoranda of law and exhibits, and Defendants' Motion for Issuance of Letters Rogatory under seal in redacted form until I have ruled upon Defendants' Motion to Compel and L&T Construction's Motion to Quash. Further, L&T Construction requests that I provisionally restrict access to the unsealed version of these until this application by L&T Construction is resolved. (Mot. To Maintain Under Seal at 1-2.) Given the above discussion of these motions, I order that these materials remain under seal until final resolution of Defendants' motion for letter rogatory is reached.

## CONCLUSION

For the reasons set forth above, Defendant's motion to compel Cognizant's compliance is **GRANTED in part** and **DENIED in part**. Defendant's

motion to compel L&T's compliance is **DENIED**. I will authorize submission of a proposed letter rogatory and will provisionally keep the requested records under seal until that motion is resolved. Compliance with the subpoenas, as limited by this Opinion, shall occur within 21 days unless the deadline is excused. The existence of a dispute over a particular item shall not relieve the subpoenaed party of the obligation to produce others timely. Defense counsel shall, immediately upon receipt of such materials, make a copy and supply it to the government, without redactions or withholding of any kind.

A separate order will issue.

Dated: February 1, 2022

/s/ Kevin McNulty
**Hon. Kevin McNulty**
**United States District Judge**