## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. No. 19-120 (KM) |
| v. | |
| GORDON J. COBURN and STEVEN SCHWARTZ, | Hon. Kevin McNulty |
| Defendants. | **Confidential – Submitted Under Seal** |

## BRIEF IN SUPPORT OF DEFENDANT STEVEN SCHWARTZ'S MOTION TO SUPPRESS OR FOR OTHER RELIEF

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................ 1

RELEVANT BACKGROUND AND PROCEDURAL HISTORY ........................................... 3

    I.     FACTUAL BACKGROUND ................................................................................. 3

         A.     Cognizant Initiates Its Investigation. ............................................... 3

         B.     Schwartz Is Interviewed for the First Time, Under Threat of Termination. ...... 6

         C.     Cognizant Self-Discloses to the Government and, In Accordance with the Yates Memo, Coordinates Its Investigation with the Government to Avoid Its Own Prosecution. ......................................................................... 7

         D.     While Coordinating Closely and Extensively with the Government, Cognizant Interviews Schwartz Again Under Threat of Termination Despite Having Already Decided to Terminate Him. ............................................. 10

         E.     Cognizant's Coordination with the Government Continues, and Schwartz Resigns After Facing a Demand for a Third Interview and the Threat of Termination. ....................................................................... 14

         F.     Cognizant Provides the Government with a Roadmap for Its Investigation Before the Government Conducts a Single Interview. ................................... 18

         G.     Cognizant Continues to Cooperate Closely with the Government, Including Focusing on the Defendants, Through Declination, Defendants' Indictment, and Beyond. ................................................................... 19

         H.     Cognizant Is Rewarded with a Declination and its Cooperation and Coordination with the Government Continue Post-Indictment. ..................... 25

    II.    PROCEDURAL HISTORY ............................................................................... 28

         A.     The Defendants Raise the Issue of Cognizant's Actions in Performing the Government's Investigative Functions. ........................................... 28

         B.     The Court Issues Rule 17 Subpoenas to Cognizant, Then Rejects the Government's Attempt To Narrow the Subpoenas. ...................................... 29

         C.     Cognizant Resists the Subpoenas and Requires Multiple Court Orders To Compel Its Compliance. ................................................................. 31

LEGAL ARGUMENT .................................................................................................. 33

    I.     STATEMENTS MADE DURING SCHWARTZ'S AUGUST 28, 2016 AND SEPTEMBER 23, 2016 INTERVIEWS WERE COMPELLED AND SHOULD BE SUPPRESSED. ......................................................................................... 33

         A.     Under *Garrity*, the Fifth Amendment's Protection Against the Use of Compelled Statements Includes Statements Made Under the Threat of Termination. .................................................................................. 33

             1.     *Garrity* Covers Both Explicit and Implicit Threats of Termination. .. 35

             2.     Schwartz's Statements Were Compelled. ........................................ 38

Table of Contents (continued)

Page

B.   *Garrity* Protects Against Private Acts "Fairly Attributable to the Government." ............................................................................................. 46

   1.   There is Ample Evidence That Cognizant's "Internal" Investigation, Including Its Interviews of Schwartz, Is Fairly Attributable to the Government. ................................................................................. 51

      a.   Cognizant Faced Substantial Pressure to Cooperate With the Government and from Day One of its Investigation, Tailored Its Self-Disclosure and Cooperative Efforts, Including Schwartz's Interviews, to the DOJ Policies Then in Effect. ... 53

      b.   There Is Ample Reason to Believe That Cognizant's Interviews of Schwartz, Conducted Under Threat of Termination, Were Significantly Influenced by and Conducted During a Period of Close Coordination with the Government. ............................. 58

      c.   Cognizant's Investigative Activities, Including Witness Interviews, Bear the Hallmarks of State Action. ................... 65

         (1)   Cognizant Closely Coordinated Other Witness Interviews with the Government. ................................ 65

         (2)   Cognizant Performed Distinctly Prosecutorial Functions on Behalf of the Government Throughout Its Investigation. ................................................................ 68

         (3)   Cognizant Provided the Government with a Clear Investigative Roadmap, and the Government Ultimately Accepted the Results of Cognizant's Investigation in Lieu of Conducting Its Own Investigation. ................. 71

II.   ONCE *GARRITY* COMPULSION IS DEMONSTRATED, THE GOVERNMENT BEARS A HEAVY BURDEN TO PROVE THAT ITS SUBSEQUENT INVESTIGATION, GRAND JURY PRESENTATION, AND PROSECUTION WERE NOT TAINTED BY USE OF SCHWARTZ'S COMPELLED STATEMENTS. ............................................................................................. 74

   A.   Applicable Law ............................................................................... 74

   B.   Schwartz's Compelled Statements Require A *Kastigar* Hearing. ................. 79

III.   THE EVOLVING RECORD GIVES RISE TO A COLORABLE CLAIM THAT CONDUCT "FAIRLY ATTRIBUTABLE" TO THE GOVERNMENT IMPLICATES OTHER CONSTITUTIONAL RIGHTS. ........................................... 82

   A.   Cognizant's Investigation Implicates the Government's *Brady* obligations. . 85

   B.   Cognizant Has Violated Schwartz's *Brady* Rights Through Its Selective Disclosures to the Defense. ........................................................... 88

CONCLUSION ......................................................................................... 94

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bailey v. Henry Cnty.*,
 No. 119CV03504LMMRDC, 2021 WL 6113626 (N.D. Ga. May 10, 2021)..........................37

*Berger v. United States*,
 295 U.S. 78 (1935)...............................................................................................................88

*Blum v. Yaretsky*,
 457 U.S. 991 (1982)......................................................................................................47, 49

*Brady v. Maryland*,
 373 U.S. 83 (1963) ..................................................................................................... *passim*

*California v. Trombetta*,
 467 U.S. 479 (1984).............................................................................................................89

*Commonwealth v. Medina*,
 No. CP-51-CR-1210801-199, 2011 WL 3420487 (Pa. Com. Pl. Aug 2, 2011) ....................86

*D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*,
 279 F.3d 155 (2d Cir. 2002).................................................................................................35

*Dennis v. Sec'y Pennsylvania Dep't of Corr.*,
 834 F.3d 263 (3d Cir. 2016).................................................................................................85

*Evans v. Newton*,
 382 U.S. 296 (1966).............................................................................................................46

*Flagg v. Yonkers Sav. & Loan Ass'n*,
 396 F.3d 178 (2d Cir. 2005)............................................................................................47, 49

*Garrity v. New Jersey*,
 385 U.S. 493 (1967) .................................................................................................... *passim*

*Giglio v. United States*,
 405 U.S. 150 (1972).............................................................................................................85

*Gilman v. Marsh & McLennan Cos., Inc.*,
 826 F.3d 69 (2d Cir. 2016).........................................................................................48, 49, 66

*Kastigar v. United States*,
 406 U.S. 441 (1972) .................................................................................................... *passim*

*Kyles v. Whitley*,
    514 U.S. 419 (1995)..................................................................................85, 88

*Lefkowitz v. Turley*,
    414 U.S. 70 (1973)..........................................................................................34

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982)........................................................................................35

*McKinley v. City of Mansfield*,
    404 F.3d 418 (6th Cir. 2005) ...........................................................37, 39, 46

*Minnesota v. Murphy*,
    465 U.S. 420 (1984)..................................................................................34, 35

*Murphy v. Waterfront Commission*,
    378 U.S. 52 (1964)..........................................................................................75

*Pillsbury Co. v. Conboy*,
    459 U.S. 248 (1983)........................................................................................74

*United States ex rel. Sanney v. Montanye*,
    500 F.2d 411 (2d Cir. 1974)......................................................................48, 64

*Schledwitz v. United States*,
    169 F.3d 1003 (6th Cir. 1999) .........................................................................90

*Skinner v. Ry. Labor Executives' Ass'n*,
    489 U.S. 602 (1989)..................................................................................47, 89

*Smith v. Cain*,
    565 U.S. 73 (2012)..........................................................................................85

*State v. Aiken*,
    282 Ga. 132 (2007) ...........................................................................37, 38, 41

*State v. Graham*,
    136 Ohio St. 3d 125 (2013).............................................................................38

*State v. Jackson*,
    125 Ohio St. 3d 218 (2010).............................................................................76

*State v. Munoz*,
    103 N.M. 40 (1985) .........................................................................................76

*State v. Mzhickteno*,
    8 Kan. App. 2d 389 (1983) ..................................................................38, 41

*State v. Oatney*,
    369 Or. 555 (2022)......................................................................................75

*Strickler v. Greene*,
    527 U.S. 263 (1999)....................................................................................85

*Turner v. United States*,
    137 S. Ct. 1885, 198 L. Ed. 2d 443 (2017) ......................................85, 88

*United States v. Allen*,
    864 F.3d 63 (2d Cir. 2017).................................................75, 77, 78

*United States v. Antone*,
    603 F.2d 566 (5th Cir. 1979) ....................................................................88

*United States v. Bagley*,
    473 U.S. 667 (1985)..............................................................................85, 88

*United States v. Bender*,
    304 F.3d 161 (1st Cir. 2002) .....................................................................86

*United States v. Brooks*,
    966 F.2d 1500 (D.C. Cir. 1992) ...............................................................88

*United States v. Camacho*,
    739 F. Supp. 1504 (S.D. Fla. 1990) ........................................... *passim*

*United States v. Connolly*,
    No. 16 CR. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019) ........................... *passim*

*United States v. Cozzi*,
    613 F.3d 725 (7th Cir. 2010) ..............................................................75, 76

*United States v. Duronio*,
    02-933(JAG), 2006 WL 1457936 (D.N.J. May 23, 2006)......................47

*United States v. Ellison*,
    527 F. Supp. 3d 161 (D.P.R. 2021)...........................................................86

*United States v. Folad*,
    877 F.3d 250 (6th Cir. 2017) .....................................................................89

*United States v. French*,
    216 F. Supp. 3d 771 (W.D. Tex. 2016), *aff'd*, 708 F. App'x 205 (5th Cir. 2018) ......................................................................................................36

*United States v. Friedrick*,
    842 F.2d 382 (D.C. Cir. 1988) ...........................................................36, 39

*United States v. Goodpaster*,
    65 F. Supp. 3d 1016 (D. Or. 2014) ...............................................................38, 41

*United States v. Hampton*,
    775 F.2d 1479 (11th Cir 1985) ...............................................................................77

*United States v. Harris*,
    780 F. Supp. 385 (N.D.W.V. 1991), *aff'd* 973 F.2d 333 (4th Cir. 1992) ...................78, 79, 80

*United States v. Hubbell*,
    530 U.S. 27 (2000)...............................................................................................74, 75

*United States v. McDaniel*,
    482 F.2d 305 (8th Cir. 1973) ...............................................................................74, 76, 79

*United States v. McDonnel*,
    550 F.2d 1010 (5th Cir. 1977) ...............................................................................77

*United States v. Morris*,
    80 F.3d 1151 (7th Cir. 1996) ...............................................................................85

*United States v. Nelson*,
    979 F. Supp. 2d 123 (D.D.C. 2013) ...............................................................................90

*United States v. Nemes*,
    555 F.2d 51 (2d Cir. 1977)...............................................................................77

*United States v. Nesbitt*,
    No. 18-20703-CR, 2019 WL 1472284 (S.D. Fla. Mar. 12, 2019) ...............................37

*United States v. North*,
    920 F.2d 940 (D.C. Cir. 1990) ...............................................................................79, 80

*United States v. Ortino*,
    No. 19-CR-00142-WHO-1, 2019 WL 6493985 (N.D. Cal. Dec. 3, 2019) ...............................36

*United States v. Palumbo*,
    897 F.2d 245 (7th Cir. 1990) ...............................................................................78

*United States v. Pantone*,
    634 F.2d 716 (3d Cir. 1980)...............................................................................77

*United States v. Pelullo*,
    399 F.3d 197 (3d Cir. 2005)...............................................................................86

*United States v. Proano*,
    912 F.3d 431 (7th Cir. 2019) ...............................................................................34

*United States v. Renzi*,
    686 F. Supp. 2d 991 (D. Ariz. 2010), *aff'd*, 651 F.3d 1012 (9th Cir. 2011) ........................... 79

*United States v. Rinaldi*,
    808 F.2d 1579 (D.C. Cir.1987) ................................................................................................ 80

*United States v. Risha*,
    445 F.3d 298 (3d Cir. 2006) ................................................................................. 47, 85, 87, 88

*United States v. Semkiw*,
    712 F.2d 891 (3d Cir. 1983) ............................................................................................. 75, 76

*United States v. Skalsky*,
    616 F. Supp. 676 (D.N.J. 1985) ............................................................................................... 77

*United States v. Slough*,
    641 F.3d 544 (D.C. Cir. 2011) ....................................................................................... 75, 76, 79

*United States v. Smith*,
    580 F. Supp. 1418(D.N.J. 1984) ....................................................................................... 75, 77

*United States v. Smith*,
    821 F.3d 1293 (11th Cir. 2016) ...................................................................................... 36, 77

*United States v. Starusko*,
    729 F.2d 256 (3d Cir. 1984) ................................................................................................... 85

*United States v. Stein*,
    440 F. Supp. 2d 315 (S.D.N.Y. 2006) ...................................................................... 35, 36, 43, 59

*United States v. Stein*,
    541 F.3d 130 (2d Cir. 2008) ............................................................................................ *passim*

*United States v. Tantalo*,
    680 F.2d 903 (2d Cir. 1982) ................................................................................................... 78

*United States v. Trevino*,
    215 F. App'x 319 (5th Cir. 2007) ............................................................................... 36, 37, 43

*United States v. Waldon*,
    363 F.3d 1103 (11th Cir. 2004) ...................................................................................... 36, 39

*United States v. Zielezinksi*,
    740 F.2d 727 (9th Cir. 1984) ................................................................................................. 78

*Wearry v. Cain*,
    577 U.S. 385 (2016) ............................................................................................................... 85

*Wilson v. Beard*,
589 F.3d 651 (3d Cir. 2009)................................................................86

*Zeigler v. State*,
350 Ga. App. 716 (2019) .............................................................37, 42

**Other Authorities**

Abbe David Lowell & Christopher D. Man, *Federalizing Corporate Internal Investigations and the Erosion of Employees' Fifth Amendment Rights*, 40 Geo. L. J. Ann, Rev. Crim. Proc. iii (2011)................................................50

Assistant Attorney General Leslie R. Caldwell, Criminal Division Launches New FCPA Pilot Program (Apr. 5, 2016), *available at* https://www.justice.gov/archives/opa/blog/criminal-division-launches-new-fcpa-pilot-program ................................................................54

Cognizant Proxy Statement (Apr. 21, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1058290/000120677421001176 /ctsh3816981-def14a.htm................................................................58

Declinations for Self-reporting on the Rise Under FCPA Pilot Program and Corporate Enforcement Policy (July 10, 2018) (co-authored by *inter alia* Karl H. Buch), *available at* https://www.dlapiper.com/en/us/insights/publications/2018/07/global-anticorruption-newsletter/declinations-for-self-reporting/; ..............................55

DOJ Launches New FCPA Pilot Program to Encourage Voluntary Self-Disclosure of Misconduct: Key Takeaways (April 6, 2016) (co-authored by *inter alia* Jonathan W. Haray), *available at* https://www.dlapiper.com/en/us/insights/publications/2016/04/doj-launches/ .....................55

Enforcement Policy Presumes Declination For Companies That Voluntarily Disclose, Cooperate and Remediate (Nov. 30, 2017), *available at* https://www.dlapiper.com/en/us/insights/ publications/2017/11/new-fcpa-corporate-enforcement-policy/................................................................5, 57

Joshua L. Ray, *The Continuing Façade of FCPA Enforcement: A Critical Look at the Telia DPA*, 17 N.Y.U. J. L. & Bus. 547, 556 (2021)..........................................51

The New FCPA Enforcement Policy Presumes Declination For Companies That Voluntarily Disclose, Cooperate and Remediate (Nov. 30, 2017) (co-authored by *inter alia* Karl H. Buch, Gray Stratton, and Jonathan W. Haray), *available at* https://www.dlapiper.com/en/us/insights/ publications/2017/11/new-fcpa-corporate-enforcement-policy/................................................................55

Pilot Program and Corporate Enforcement Policy (July 10, 2018), *available at*
https://www.dlapiper.com/en/us/insights/publications/2018/07/global-
anticorruption-newsletter/declinations-for-self-reporting/; .......................................................5

Pilot Program to Encourage Voluntary Self-Disclosure of Misconduct: Key
Takeaways (April 6, 2016), *available at*
https://www.dlapiper.com/en/us/insights/publications/2016/04/doj-launches/ ........................5

SEC Charges Cognizant and Two Former Executives With FCPA Violations
(Feb. 15, 2019), *available at* https://www.sec.gov/news/press-release/2019-12 ...................26

**Rules**

Rule 16 ..............................................................................................................................56

Rule 17 ................................................................................................................... *passim*

## PRELIMINARY STATEMENT

The Indictment in this case charges that the Defendants, as corporate officers of Cognizant Technology Solutions Corporation ("Cognizant"), authorized the payment of a bribe to an unidentified Indian government official to obtain a planning permit necessary for the construction of an office building in India.  Ind. ¶¶ 3–4.  Specifically, the Indictment alleges that the bribe was paid by Cognizant's contractor, Larsen & Toubro, Limited ("L&T"), and that Cognizant reimbursed L&T for payment of the alleged bribe through false change orders that L&T submitted to Cognizant and that Cognizant paid.  *Id.* ¶¶ 4–8.  The Defendants have pled not guilty and vehemently deny these allegations, which they contend are totally without merit.

But Cognizant is not merely the Defendants' former employer and a central figure in this case.  And its lawyers and employees are not merely witnesses to the events alleged in the Indictment.  Rather, in close coordination with the Government—certainly with the Government's encouragement and often based upon the Government's explicit requests—Cognizant and its lawyers spent over two years investigating this case and presenting the fruits of its investigation to the Government.  As part of this process, and to a degree unprecedented in internal investigations, Cognizant took direction from and provided information to the prosecutors ultimately responsible for charging, and now trying, this case.  And those prosecutors, again to a degree never seen in criminal prosecutions, accepted the fruits of Cognizant's investigation, essentially charging the case as it was brought to them by Cognizant's lawyers, who as the representatives of a private party, operated without the constitutional constraints or obligations that apply to federal prosecutors and agents, including with respect to compelling the statements of the defendants.

Both the Government and Cognizant have argued, and will likely continue to argue, that there is nothing wrong with the Government interfacing with Cognizant's counsel and accepting the fruits of an internal investigation.  That is true, and the Defendants do not contend otherwise.

1

But that is not the issue.  Instead, the issue presented here is whether and when a company's conduct (by virtue of the incentives for the company, the involvement of the Government in its investigation, and the interaction between the two entities, overall) is "fairly attributable" to the Government for purposes of protecting the constitutional individual rights of targets of criminal investigations, and of criminal defendants.  In other words, this motion seeks to determine not whether either Cognizant's counsel or the Government did something "wrong" in their coordination of the investigation, but rather the consequences that flow when a private party, in pursuit of its own interests—and not subject to the Government's overarching goal of doing justice and discovering the truth—performs governmental functions in the way that Cognizant did here.

In this case, and on this record, with the benefit of precedent, discussed below, that is both well-established and continuing to emerge, there is every reason to explore that question further. The record here, developed with the benefit of discovery obtained through extremely hard-fought litigation from both Cognizant and the Government, which have mightily resisted turning over the information brought to bear below, and continue to do so, shows an extraordinary degree of coordination between the Government and Cognizant at every stage of the investigation of this matter.  It shows that in close coordination with the Government, and often at its specific request, encouragement or direction, Cognizant and its counsel insisted on employees' cooperation with the investigation, including Schwartz's August 28, 2016 and September 23, 2016 interviews; were guided by the Government with regard to the timing and substance of the interviews they performed; provided the Government with detailed updates, including witness interview readouts, credibility assessments, and summaries of key documents; and seized evidence and conducted forensic analyses addressed to evidentiary and related concerns of the Government.  Cognizant sought to identify and address defenses to the criminal case against the Defendants that the

Company and its counsel encouraged the Government to bring.  Ultimately, Cognizant and its lawyers—acting as the Government's investigators, created the road map for this investigation and prosecution.  And the record shows that the Government followed this road map religiously, undertaking no meaningful independent investigation and repeatedly deferring to Cognizant's self-serving narrative, a narrative which Cognizant crafted by improperly invoking the attorney-client privilege, though it had waived it, as this Court has found.

The record in this regard is already compelling, but it is not complete, including because the Defendants and the Court have not yet heard from Cognizant or its counsel, or from the Government lawyers who collaborated with them in the years before and after the case was charged.  When the Court has heard the evidence of the nature and full scope of the actions of both the Government and Cognizant at the hearing it has ordered, and the issues discussed below have been fully developed, then the Court will be able to make the findings that will dictate the appropriate relief to be accorded for the constitutional violations which occurred here.

## RELEVANT BACKGROUND AND PROCEDURAL HISTORY

### I.   FACTUAL BACKGROUND

#### A.   Cognizant Initiates Its Investigation.

Cognizant's investigation began in early 2016, when a report was made to its compliance hotline regarding potential kickbacks to a cafeteria vendor at its India facilities.  DLA Piper ("DLA"), despite having previously advised Cognizant on Foreign Corrupt Practices Act ("FCPA") matters, including FCPA matters in India,[1] was retained to perform an internal

---

[1] Both during the course of Cognizant's internal investigation, Ex. 1 (Sept. 13, 2016 email exchange between Josh Rievman and Brackett Denniston), and later, by letter dated November 4, 2018, Schwartz's counsel alerted first Cognizant and then the Government to DLA's conflict of interest in this regard.  In addition to DLA Piper's FCPA-specific conflict, counsel informed the Government that Dana Gilbert, Cognizant's Chief Compliance Officer at the time of the alleged misconduct—whose responsibilities included ensuring Cognizant's compliance with the FCPA—

investigation.   In April 2016, Cognizant expanded the scope of the investigation to include allegations of bribes paid by its administration team, the group responsible for infrastructure and real estate at its India facilities. Ex. 3 (CTS_R17_0005257-5258).[2]  Schwartz, as Chief Legal and Corporate Affairs Officer, directed the early stages of the expanded investigation, and, although the Government alleges that he sought to thwart the investigation, the record shows that, in fact, he consistently encouraged employee cooperation and provided regular reports to Cognizant's executive team, Board of Directors, and Audit Committee, including promptly directing that the Chief Compliance Officer, Dana Gilbert, inform the Audit Committee that an investigation was being launched.[3]

In May 2016, Cognizant began collecting documents from custodians, initiated a forensic audit, and conducted initial interviews.  By no later than June 2016, Cognizant, through its counsel, was already contemplating self-disclosure to the Government. Ex. 4 (CTS_R17_0005407).  Given the Government's widely publicized directions to corporations at the time, setting forth its expectations with regard to corporate investigations, Cognizant's desire to self-disclose promptly—and ultimately to "offer up" high-level personnel like the Defendants—is unsurprising.  Specifically, in September 2015, just months before the investigation began, the United States Department of Justice ("DOJ") released the so-called Yates Memo, which emphasized that "criminal and civil corporate

---

[2] Documents referred to herein are labeled in accordance with the Bates stamps provided by Cognizant and/or the Government and are provided herewith, under seal, appended to the accompanying Certification of Lawrence S. Lustberg.

[3] Schwartz's support for the investigation is revealed in documents withheld, either as privileged or otherwise, by Cognizant but available to the defense from other sources.  (*See* ECF No. 150 at 56-58, Exs. DD-1, DD-2, FF, GG; ECF No. 202 at 29-32).

is married to a DLA partner who previously served as the Cognizant relationship partner.  Ex. 2 (Nov. 4, 2018 Letter to Government).  Based on discovery received to date, Ms. Gilbert is likely to be a Government witness at trial.

investigations should focus on individuals from the inception of the investigation" and alerted the public and the legal community that "in order to qualify for any cooperation credit, corporations must provide to the Department all relevant facts relating to the individuals responsible for the misconduct."  Memorandum from Sally Quillian Yates, Deputy Att'y Gen., U.S. Dep't of Justice to All U.S. Att'ys, *et al.*, Individual Accountability for Corporate Wrongdoing, at 2-3 (Sept. 9, 2015) ("Yates Memo") .  Then, in April 2016, precisely when Cognizant began its investigation, the DOJ launched its FCPA Pilot Program, through which it "motivate[d] companies to voluntarily self-disclose FCPA-related misconduct" and "encourage[d] companies to disclose FCPA misconduct to permit the prosecution of individuals."  Memorandum from Andrew Weissmann, Chief, Fraud Section Criminal Division, The Fraud Section's Foreign Corrupt Practices Act Enforcement Plan and Guidance at 2 (April 5, 2016); *see also* Assistant Attorney General Leslie R. Caldwell, Criminal Division Launches New FCPA Pilot Program (Apr. 5, 2016) (FCPA Pilot Program "should encourage voluntary corporate self-disclosure of overseas bribery, and thus more prosecutions of the individuals responsible").[4]

On August 8 and 20, 2016 (among other dates), DLA interviewed Srimanikandan

---

[4] Throughout the course of Cognizant's cooperation with the Government, Karl Buch and other DLA attorneys who conducted the investigation, including Jonathan Haray and Grayson Stratton, co-authored articles highlighting the FCPA Pilot Program and other operative DOJ policies, touting the benefits of self-disclosure and "full cooperation" which, significantly, included "[c]oordination of investigative steps a company intends to take as part of its internal investigation with the steps the DOJ may take as part of its investigation, including witness interviews."  The New FCPA Enforcement Policy Presumes Declination For Companies That Voluntarily Disclose, Cooperate and Remediate (Nov. 30, 2017), *available at* https://www.dlapiper.com/en/us/insights/publications/2017/11/new-fcpa-corporate-enforcement-policy/; *see also* Declinations for Self-reporting on the Rise Under FCPA Pilot Program and Corporate Enforcement Policy (July 10, 2018),  *available at*  https://www.dlapiper.com/en/us/insights/publications/2018/07/global-anticorruption-newsletter/declinations-for-self-reporting/;  DOJ Launches New FCPA Pilot Program to Encourage Voluntary Self-Disclosure of Misconduct: Key Takeaways (April 6, 2016), *available at* https://www.dlapiper.com/en/us/insights/publications/2016/04/doj-launches/.

Ramamoorthy ("Mani"), Cognizant's Vice President of Administration during the relevant period (and "CC#1" in the Indictment), who was responsible for managing Cognizant's real estate projects in India.  Ex. 3 (CTS_R17_0005257-5258).  Although he had not done so in his initial interview, in his August 20 interview, Mani accused the Defendants of authorizing the bribe payment later alleged in the Indictment.[5]  As a result, the Defendants were immediately relieved of any responsibility for the conduct of the investigation.  *Id.*  And on August 22 and 24, upon Cognizant's demand, Schwartz provided his MacBook Air laptop, Lenovo laptop, and backup hard drive to Cognizant for forensic imaging.  Ex. 5 (CTS_R17_0005195).  There is no suggestion that Schwartz resisted efforts to turn over these devices or otherwise sought to hide or delete any documents.

### B.    Schwartz Is Interviewed for the First Time, Under Threat of Termination.

As Cognizant itself described it to the Government, "[t]he Company underlined insisted on cooperation (including interviews) from both Schwartz and Coburn" as part of the investigation.  Ex. 6 (CTS_R17_0005311) (emphasis in original).  Under the terms of Cognizant's employee policies and Schwartz's employment agreement, both of which mandated cooperation with the investigation in order for him to maintain his employment with Cognizant, Schwartz faced a simple choice: sit for the interviews or be fired.  Cognizant's Code of Business Conduct and Ethics provided that: "Employees, officers and Directors are expected to cooperate fully with any inquiry or investigation by the Company regarding an alleged violation of this Code.  Failure to cooperate

---

[5] Cognizant has stated that, "[p]rior to that date, there were no allegations implicating Schwartz or Coburn in the investigation DLA was conducting" and that Mani's August 20 interview was "the first time Cognizant learned of allegations relating to a $2 million bribe payment to obtain the planning permit and the first allegation that Coburn and Schwartz had information of improper payments."  (ECF No. 169 at 6).  During a call on August 3, 2016 and again in his August 8, 2016 interview, Mani made allegations related to a separate $300,000 bribe payment to obtain electricity at the same Indian facility—KITS.

with any such inquiry or investigation may result in disciplinary action, up to and including discharge." Ex. 7 (CTS_R17_0000040). Similarly, Cognizant's Core Values and Standards of Business Conduct stated that: "As part of our commitment to our stakeholders, we are also expected to cooperate fully with any investigation into any actual or potential violation" of Cognizant's Standards and Company policies. Ex. 8 (CTS_R17_0000064). Employees, including Schwartz, were required to certify compliance with the Code, acknowledging that violation of Cognizant's standards could subject them to disciplinary action, including "termination or legal action."[6] In sum, Schwartz well understood that if he wanted to keep his job, he had no choice but to participate in Cognizant's investigation, including subjecting himself to an interview.

With this as background, on August 28, 2016, DLA interviewed Schwartz for the first time. The DLA attorneys who interviewed Schwartz set and enforced strict ground rules for the interview, including prohibiting Schwartz from having more than one lawyer at the interview and, most egregiously, not allowing that lawyer to speak or take notes during the interview. Certification of Steven E. Schwartz ("Schwartz Cert.") ¶ 6.

**C.      Cognizant Self-Discloses to the Government and, In Accordance with the Yates Memo, Coordinates Its Investigation with the Government to Avoid Its Own Prosecution.**

On August 31, 2016, DLA requested a call with the Government to effect its self-disclosure. Ex. 11 (CTS_R17_0000246); Ex. 12 (CTS_R17_0000953). On the following day, September 1, 2016, Cognizant (through DLA) self-disclosed to the Government potential FCPA violations. *Id.* Although the defense is not, pending the forthcoming evidentiary hearing, privy to the details of that

---

[6] Schwartz's employment agreement incorporates Cognizant's Core Values and Standards of Business Conduct by reference and provides that "Cause [for termination] shall mean . . . (iii) failure by the Employee to observe material policies of the Company applicable to the Employee." Ex. 9 (Schwartz's employment agreement); *see also* Ex. 10 (CTS-0638406 ¶ 1(c) (Coburn's employment agreement with the identical provision).

conversation, documents recently produced by Cognizant make clear that DLA and Cognizant were aware of and guided by the policies and criteria established in the Yates Memo and FCPA Pilot Program before Cognizant self-disclosed to the Government.  For example, a draft script prepared the day prior to Cognizant's self-disclosure reveals that Cognizant planned to ask the Government "to be considered for inclusion in the FCPA Pilot Program" on their very first call[7] and that Cognizant's Board had, the day prior, "charged DLA with voluntarily reporting this matter to the DOJ and SEC, along with its stated intention to cooperate fully with the government, including with respect to the continued investigations of individuals pursuant to the Yates Memo and related criteria in the FCPA Pilot Program." Ex. 13 (CTS_R17_0005220) ("The Company intends to fully cooperate with the DOJ and the SEC.").

The documents that Cognizant produced in response to this Court's September 2020 and January 24, 2022 Orders reveal the overwhelming coordination between Cognizant and the Government that immediately followed.  This coordination appears to have been particularly pronounced during the three weeks leading up to Schwartz's second interview on September 23, 2016, when, following Cognizant's self-disclosure, Cognizant and the Government communicated on at least eight separate days, often more than once per day, for a total of no fewer than 19 telephone calls (the substance of which will certainly be the subject of the forthcoming hearing) and email exchanges: on September 8 (emails and call with DOJ); September 9 (email to DOJ);

---

[7] Neither Cognizant nor the Government has disclosed whether there were earlier communications between the two, whether via phone call, text, or otherwise.  This is among the issues that should be addressed at the forthcoming hearing, particularly given Cognizant's conspicuous non-denials of such communications when the issue was raised in prior briefing.  (*See* ECF No. 202 at 19) ("[I]n response to the Defendants' request that the Court require Cognizant to search for materials dated prior to August 31, 2016, the day on which Cognizant claims it first contacted the DOJ and SEC about making a self-disclosure, Cognizant does not actually deny 'that there may have been earlier communications to the Government," but merely asserts that the Defendants "have failed to identify' them.") (citing ECF No. 169 at 8)).

September 14 (emails and calls with DOJ and SEC); September 15 (call with DOJ and SEC); September 20 (email with DOJ); September 21 (email with DOJ); September 22 (emails with DOJ and SEC); and September 23 (emails and call with DOJ and SEC).  Exs. 14, 15, 16, 17, 18.

Indeed, although what has been provided is limited, the written communications between Cognizant and the Government that are available for the period leading up to Schwartz's second interview on September 23, 2106 provide concrete, non-speculative insight into the close coordination between them, and, in particular, into the Government's substantial reliance on, and encouragement of, Cognizant's investigative efforts.  For example, DLA emailed DOJ on September 8 to notify the Government that DLA had left a voicemail to "follow up on a question [DOJ] asked us last week" and then sent a list of four personal email addresses "in response to [DOJ's] request during our call last week."  Ex. 14 (CTS_R17_0000248).  Although the precise nature of these requests, and DLA's responses to them, will be explored at the hearing, it is clear that Cognizant was at the time in the process of complying with the Government's request to be advised of upcoming interviews and solicited input on either whether to proceed with these interviews, what questions to ask, or both.  Ex. 15 (CTS_R17_0000251) (Sept. 9, 2016 email from DLA to DOJ: "As you requested, I write to let you know that we intend to interview Lakshmi Narayanan, Cognizant's Vice Chairman of the Board, on Monday.  Please let me know if you have any questions.").  It is also clear that Cognizant provided frequent updates to the Government in real time, including on September 14 when Cognizant discovered notes on Schwartz's laptop from April 22, 2014 that would be a focus of questioning at Schwartz's second interview the following week.  Ex. 15 (CTS_R17_0000251) (Sept. 14, 2016 email from DLA to DOJ: "Please let me know if you are available for a call with John [Haray], Gray [Stratton] and me [Karl Buch] between 2-4 pm today.  We would like to raise some recent developments with you."); *see also* Ex. 3

(CTS_R17_0005257) (DLA "[i]nformed DOJ/SEC about Schwartz's notes" on September 14, 2016); Ex. 6 (CTS_R17_0005306) (DLA touting to the Government having turned "over the former General Counsel's facially privileged (but incriminating) notes of the April 2014 conference calls within days of discovering them").

The specific details of what was discussed during the "number [of] conference calls" that DLA had with the Government in the weeks leading up to Schwartz's second interview have not yet been revealed, but the close coordination between Cognizant and the Government during this period is undeniable.  Ex. 19 (CTS_R17_0005168) (DLA talking points for "October 6, 2016 Joint DOJ/USAO DNJ/SEC Meeting").  Thus, by its own account, during this period, DLA shared with the Government, among other things: "1. Key points from witness interviews; 2. Steven Schwartz's notes from the April 22, 2014 conference call; 3. Personal email and identifying information for a number of Cognizant associates; 4. Upcoming interviews; [and] 5. Information about witnesses and their counsel."  Ex. 19 (CTS_R17_0005168).

**D.    While Coordinating Closely and Extensively with the Government, Cognizant Interviews Schwartz Again Under Threat of Termination Despite Having Already Decided to Terminate Him.**

By no later than September 20, 2016, three days before its second interview of  Schwartz, Cognizant had apparently already made the decision to terminate Schwartz and Coburn.  A draft press release prepared by Cognizant's public relations firm, and reviewed and edited by Cognizant and DLA on September 20, announced both of their terminations.  Ex. 20 (CTS_R17_0004226) ("Coburn and Schwartz along with Sridhar Thiruvengadam … were terminated. … Based on information learned in the early stage of the investigation, the Company concluded that these executives violated significant company policies and made the decision to terminate them.").

Following an "all hands meeting at DLA" the following day (*id.*), however, Cognizant revised the press release to remove the anticipated publication date of September 29—*i.e.*, after

Schwartz's planned interview on September 23 and Coburn's planned interview of September 28—but still included modified language regarding the plans to terminate Schwartz and Coburn. This language remained in updated draft press releases prepared on both September 21 and September 22.  Ex. 21 (CTS_R17_0004273) (Sept. 21, 2016 email attaching revised draft press release); Ex. 22 (CTS_R17_0004279) (Sept. 22, 2016 draft press release: "Mehta replaces Gordon Coburn, whose employment has been terminated. The Company has also terminated the employment of Steven Schwartz, Executive Vice President, Chief Legal and Corporate Affairs Officer. … Cognizant has voluntarily notified the United States Department of Justice and United States Securities and Exchange Commission and is keeping both agencies informed as the investigation continues.").  But, even as these termination decisions were already made, Cognizant and its counsel—in what appears to be an obvious effort to deliver on the expectations and priorities of the Government—did not alert Schwartz to his impending termination and instead compelled him, on pain of termination, Schwartz Cert. ¶¶ 3-7, to continue cooperating, including by sitting for a second interview on September 23, 2016.

On the morning of that second interview, DLA sent an email to the Government requesting a call for shortly after the interview concluded that afternoon.  Ex. 16 (CTS_R17_0000278) (Sept. 23, 2016 email from DLA to DOJ and SEC: "Are you available for a short call this afternoon for a quick update.").  And in advance of this second interview, DLA again required Schwartz's lawyer, Joshua Rievman, Esq., to adhere to certain "parameters" for the interview that severely limited counsel's ability to represent him effectively, including by prohibiting the presence of more than a single lawyer for Schwartz and requiring "that the lawyer will not take notes, ask questions, or otherwise disrupt the interview."  Ex. 23 (CTS-0103589).  Understanding that, if Schwartz did not agree to these terms and attend the interview, he would be fired (and without knowing, of

course, that Cognizant had already made the decision to fire him), Rievman acquiesced.  *Id.*

What followed was an interview clearly designed to elicit statements for use in the Government's prosecution of Schwartz.  As reflected in the interview summary that DLA prepared and then shared with the Government, Buch's questioning of Schwartz extended far beyond gathering the facts that would be germane to the internal investigation and instead went to issues specifically tailored to a criminal prosecution.  Buch probed Schwartz, for example, regarding "willful blindness" and "facilitation payments"—terms that have special significance in FCPA criminal prosecutions but little to do with the actions that Cognizant should or should not take following an internal investigation—and sought to elicit admissions that might bear on Schwartz's potential criminal culpability, including by asking a series of questions focused on the April 22, 2014 notes that DLA had shared and discussed with the Government—but not Schwartz—the week before, including some questions that were hypothetical and others that sought specifics in an obvious effort to utilize standard prosecutorial tactics to trap Schwartz into misstatements before he was shown the note, which had been written two-and-a-half years prior to the interview:

Q: Are the references to $2 million and $670,000 in the notes facilitation payments?

A: They are not.

Q: Were you aware that Cognizant's receipt of favorable license and permit results could be an improper benefit?

A: Yes.

Q: Had you been competent that week, would the call have put you on notice that an improper payment was substantially likely to occur?

A: Yes.

Q: Did you understand that someone who fails to pursue a red flag could be found to have violated the FCPA?

A: Yes.

Q: If you were aware during this week, would you agree that this would be willful blindness?

A: Absolutely.

Q: After the surgery, did you know you were out of it? And if so, did you do anything to go back and look at what you were working on to see if there were any issues that needed following up?

A: Yes, I knew I was out of it. No, I did not go back to look for open issues. The week was a blur.

Q: Are you aware that this is a potential criminal violation?

A: Yes, I am aware.

Ex. 24 (CTS_R17_0004380-4381).[8]  As set forth above, on the same day as Schwartz's second interview, DLA provided a real-time update to the Government.  Ex. 16 (CTS_R17_0000278).  The details of the Government's and Cognizant's interactions on this call have not yet been disclosed.[9]

---

[8] As reflected above, DLA included in its memorandum of Schwartz's September 23 interview, which was conveyed orally to the Government, what purport to be verbatim transcripts of various of Buch's questions and Schwartz's answers on these subjects—a practice that DLA did not use when preparing any other interview memoranda.  Ex. 24 (CTS_R17_0004373-4377; CTS_R17_0004380-4382).  DLA also noted at the beginning of its memorandum of Schwartz's September 23 interview that "certain of Schwartz's phrasing and word choices have been retained to enhance the clarity of the discussion reflected in this memorandum"—again deviating, with respect to Schwartz, a putative criminal defendant, from DLA's practice when preparing other interview memoranda.  Ex. 24 (CTS_R17_0004363).  Meanwhile, Schwartz, whose counsel was not allowed to take notes of the interview, has effectively been deprived of the ability to challenge Cognizant's version of the interview, which he disputes.

[9] A hearing is also needed to determine the critical information of when DLA orally provided the Government with the summaries of each of the interviews it conducted during its investigation, including Schwartz's interviews on August 28, 2016 and September 23, 2016.  *See infra* Section I(F).  Although the Government's disclosures reveal that it received information about Schwartz's interviews from DLA on nine separate occasions, Exs. 25-26, the Government has steadfastly refused to provide the defense with the dates of any of those oral downloads.  Indeed, as recently as June 15, 2022, the prosecution expressly refused to provide this information.  Ex. 27 (June 15, 2022 Email from Government) ("We are not going to provide that information.  We don't see the relevance in the dates of our meetings with company counsel . . . .").  But the defense had requested

E.     **Cognizant's Coordination with the Government Continues, and Schwartz Resigns After Facing a Demand for a Third Interview and the Threat of Termination.**

Cognizant continued to provide information to, and field questions and requests from, the Government in the immediate aftermath of Schwartz's second interview.  For example, on September 28, 2016, the day after Coburn resigned, DLA shared a yet-unknown "significant development" with the DOJ and SEC.  Ex. 28 (CTS_R17_0000267) (September 28, 2016 email from DLA to DOJ and SEC: "Can I please ask you for your availability today for a call to discuss a significant development that we would like to share with you?").  Later that same day, DOJ requested an additional call with DLA and the SEC to discuss follow-up questions or perhaps instructions—the specifics of which, again, can be explored at the evidentiary hearing ordered by the Court.  Ex. 29 (CTS_R17_0000245) ("Karl: Do you have time to pop back on a call with Paul, Oz and I for some follow up?").  Subsequently, from September 29 to 30, DLA and the Government exchanged numerous emails and had several calls at the Government's request, in response to the Government's "questions" and "follow up."  Ex. 30 (CTS_R17_0000268) (Sept. 29, 2016 email from DOJ to DLA: "Karl – Do you have a few minutes tomorrow for some quick questions?"); Ex. 28 (CTS_R17_0000266) (Sept. 29 and 30, 2016 emails from DLA to DOJ and SEC attaching "an updated (inclusive) list of personal email addresses that we have identified to date" and noting "[a]s we identify additional accounts, we will pass them to you."); Ex. 18 (CTS_R17_00000499) (Sept. 29, 2016 email from DLA to DOJ: "Here is the email that we

---

this information it will shed light on the extent to which Cognizant's investigation informed the Government's investigation by providing the substance of interviews before the Government undertook them. For example, it would be significant if Cognizant's "downloads" to the Government of Schwartz's first interview (provided on five separate occasions) occurred prior to the second interview (or in anticipation of a third one) because it would suggest coordination between Cognizant and the Government with respect to those interviews.  The Government's approach to the issue has deprived the defense of that information.

discussed earlier today."); Ex. 17 (CTS_R17_0000262) (Sept. 30, 2016 email from DLA to DOJ: "Hi Kevin – Are you available for a quick call with me?").

On October 6, 2016, DLA participated in an in-person meeting with the DOJ and SEC, hosted by the DOJ in Washington, D.C.  Ex. 31 (CTS_R17_0000297).  As revealed by the nine-page summary that DLA prepared in advance of this meeting, one of the topics discussed was "Individual Remediation (Employment) Issues."  Ex. 19 (CTS_R17_0005174).  DLA highlighted that "Gordon Coburn has resigned"; that "Steven Schwartz's duties have been substantially circumscribed"; and, most notably, that "[t]he Company wants to begin taking employment decisions *subject to any concerns you may have about that*"—specifically identifying Schwartz as among the "specific employees" to be discussed with the Government.  *Id.* (emphasis added). During the October 6, 2016 meeting, DLA also "advised the Government that counsel planned to do an additional (third) interview of Steven Schwartz … and had requested medical records from Schwartz related to his purported alibi concerning the basal cell procedure that he had performed in April 2014."  Ex. 32 (June 15, 2022 Letter from Government at 1-2).

The Government, in response, "asked DLA if 'we' had exhausted everything around Schwartz's claim of not remembering the events he was asked about during his initial interview, and whether Schwartz was in the office the week of those events."  *Id.*  Later that same day, DOJ emailed Buch, asking "do you all have time for a follow up call with us tomorrow?  We have some requests we'd like to make."  Ex. 33 (CTS_R17_0000311).  Buch responded that he had "some additional information that I learned today that I would like to provide to you" and proposed a time for a call.  Ex. 34 (CTS_R17_0000427).  DOJ replied "we have a short list of requests and it shouldn't take long on our end, but we'd be interested to hear about the additional information as well." Ex. 34 (CTS_R17_0000427).

On October 13, 2016, Cognizant scheduled a call with the Government for the following Monday (October 17) "to discuss documents and other items."  Ex. 35 (CTS_R17_0000319). DLA's talking points for the October 17 call began with a list of five then-"Pending DOJ Requests": (1) "Additional emails/hot docs relating to the $2.5M payment"; (2) "Bank record information relating to potentially improper payments (CKC ███████—as to which DLA said it could "work on a production format that will make them understandable and useable for the DOJ"; (3) "Custodial files for identified custodians"; (4) "Check on Litigation hold coverage over all 12 facilities worked on by L&T"; and (5) "Coordinate Mani interview in mid-November."  Ex. 37 (CTS_R17_0005177).  With respect to the fifth DOJ request ("Coordinate Mani interview in mid-November.").  DLA's talking points reference its "last call" with the Government, during which it was discussed that DLA "will work with Mani and his lawyer should he wish to retain counsel" and remarked that "once he [Mani] is lawyered up, we hope he will continue to cooperate with the company and with the DOJ. We will ask that he cooperate."  *Id.*[10]

---

[10] This strong evidence of coordination between Cognizant and the Government stands in stark contrast to the representations that the Government has consistently made to the defense in this matter.  On various occasions, including in rebuffing the Defendants' requests for responsive materials, opposing issuance of Rule 17 subpoenas directed to Cognizant, and, most recently, in correspondence responding to the Court's March 23, 2022 Order to "produce any and all communications that reflect any direction of Cognizant's investigative efforts"—the Government informed the Defendants that it had "concluded that [it] do[es] not have communications reflecting 'direction' of Cognizant's investigation."  Ex. 32 (June 15, 2022 Letter from Government); (ECF No. 60, Ex. B at 2) ("The Government did not provide guidance, instructions, or make requests to CTS . . . concerning the sequence, substance, or manner of their interviews of current or former company employees."); (ECF No. 70, Ex. C at 2) ("Because the Government did not provide CTS 'guidance, requests, or instructions' concerning its interviews of company employees, information responsive to this request does not exist."); (ECF No. 76 at 8) ("the Government has consistently maintained that: (1) the Defendants' 'outsourcing' claim has no merit; (2) the Government is not in possession of many of the documents the Defendants seek because those documents either do not exist or are in the sole custody of Cognizant; and (3) the information sought is not required to be disclosed by any rule, statute, or other authority and is neither exculpatory nor material to the defense.").

During Cognizant's scheduled call with the Government on October 17, 2016, Cognizant, through DLA, also gave detailed oral accounts (as above, "downloads") of Schwartz's and Coburn's interviews to the Government.  (ECF No. 169 at 11, 17).  And immediately following the October 17 call, Cognizant conducted a series of interviews in which it asked various employees pointed questions concerning both Schwartz and Coburn, including during Cognizant's interviews of Sridhar Thiruvengadam ("T. Sridhar")—Cognizant's then-Chief Operating Officer and CC#2 in the Indictment—on October 19, and P. Ganesh—then Associate Vice President of Cognizant India's Corporate Real Estate Department—on October 20.[11]  Exs. 37-38 (CTS_R17_0004541-4549; CTS_R17_0004462-4467).

Throughout this period, Cognizant, through DLA and Brackett Denniston—another attorney retained by Cognizant in August 2016 to assist with the investigation—"doggedly" (Cognizant's term) pressured Schwartz to sit for a third interview.  And Schwartz's then-counsel informed Schwartz that during a meeting on October 24, 2016, Buch and Denniston emphasized Schwartz's obligation to cooperate, expressly stating that Schwartz would not keep his job if he did not continue his interview.  Schwartz Cert. ¶ 4.  On November 3, 2016, facing a demand for a third interview and the explicit threat of termination, Schwartz resigned from Cognizant.  *Id.* at ¶ 7.  Cognizant would later tout this outcome to the Government as the result of its significant cooperative efforts, in furtherance of the Government's stated priorities:

> Cognizant has done everything within its power to investigate and root out misconduct at the Company, including … [d]oggedly persisting in securing additional interviews with both the President and the General Counsel, leading to their eventual resignations (external counsel has shared some details about that persistence with the Department already).

---

[11] In the months that followed, and during course of its investigation, Cognizant continued to ask questions specifically concerning Schwartz to numerous other interviewees as well, including after Schwartz had been terminated. *See generally* Exs. 39, 26, 40, 41.

Ex. 6 (CTS_R17_0005299, -5306); *see also* Ex. 32 (June 15, 2022 Letter from Government at 2) ("In the course of describing the company's proactive cooperation, company counsel highlighted that DLA had persisted in securing additional interviews with the president (Coburn) and general counsel (Schwartz) of Cognizant, which [company counsel] described as a distinguishing factor in the Company's cooperation."); Ex. 6 (CTS_R17_0005317) (highlighting the "speed with which the Company moved forward against these senior executives (including sidelining them, pressuring them to cooperate, and ultimately separating with them)"); Ex. 3 (CTS_R17_0005278) (emphasizing "the speed in which the Company came to DOJ/SEC (even before we found Schwartz's notes), and the individual remediation pursued, including that of the President, GC, COO, CFO, AVP Real Estate, India GC, Global Head of Procurement."); Ex. 6 (CTS_R17_0005311) ("The Company insisted on cooperation (including interviews) from both Schwartz and Coburn. Both resigned after DLA confronted Schwartz with his notes of the April 2014 telephone call, and before completing additional follow-up interviews.") (emphasis in original).

### F.   Cognizant Provides the Government with a Roadmap for Its Investigation Before the Government Conducts a Single Interview.

During the course of its investigation, Cognizant (through DLA) provided the Government with oral downloads conveying summaries of the interviews it conducted (the "DLA Downloads"). In total, DLA provided oral downloads to the Government of at least 45 interviews of 20 different Cognizant employees; 30 of those interviews (including Schwartz's second interview) were conducted after Cognizant self-disclosed to, and was coordinating closely with, the Government. Further, and significantly under the case law discussed below, it appears—though again, it is not clear, *see supra* at 13, n. 9—that DLA provided the Government with the results of its investigation before the Government conducted *any* of its own interviews of the same interviewees. Based on

the Government's disclosures, the first Government interview of Cognizant personnel did not occur until February 7, 2017, three weeks *after* DLA had completed 44 of the 45 interviews it downloaded to the Government and following a period during which the Government regularly met with and received interview briefings from DLA, and coordinated significant investigative activities with DLA, as detailed above.[12]  By that date, the Government had in its possession all of the witness statements, documents, and investigative conclusions that DLA had been regularly feeding it for the previous five months. In other words, the Government did not interview a single Cognizant witness until after DLA had completed all but one of the interviews upon which Cognizant briefed the Government.  And every one of the witnesses the Government interviewed (except one, a ministerial witness who provided information regarding Cognizant's IT systems rather than on any substantive matter) had already been interviewed by DLA, and the substance of those interviews had apparently been conveyed to the Government, before the Government conducted its own interviews.

### G. Cognizant Continues to Cooperate Closely with the Government, Including Focusing on the Defendants, Through Declination, Defendants' Indictment, and Beyond.

Cognizant's close coordination with the Government continued throughout the over two-year investigation and went far beyond the provision of documents and interview summaries. Indeed, the materials that Cognizant has produced following the Court's January 24, 2022 Order illustrate that Cognizant continued to collect and provide to the Government Schwartz-specific materials, even after his resignation on November 3, 2016.  This occurred on no fewer than 16 separate occasions up through January 2019, one month before Schwartz was indicted.  The

---

[12] While DLA completed 44 of 45 interviews by January 12, 2017, it conducted one additional interview of Cognizant's Chief Security Officer Henry Shiembob nearly 15 months later on April 5, 2018.  *See* Ex. 39.

Company also provided to the Government its credibility assessments of witnesses it interviewed; purported to review materials for exculpatory information and discussed its assessments with the Government; and made relevance determinations throughout this period, including on February 14, 2019, the date the Indictment was unsealed.

By May 10, 2018, Cognizant had, again in its own words, provided to the Government: "(1) 10 in-person subject matter briefings; (2) More than 40 telephonic investigation updates; (3) 8-10 subject matter / hot doc binders; [and] (4) More than 20 interview readouts." Ex. 6 (CTS_R17_0005307). As reflected in the presentation that Cognizant made to the Government that day, entitled "Filip Factors & FCPA Corporate Enforcement Policy[13] Presentation, " prepared for the express purpose of arguing for the declination that Cognizant sought from the outset, Cognizant's cooperative efforts included doing "everything it can responsibly do to provide key evidence involving its former General Counsel" and providing "further cooperation <u>specific to Steven Schwartz</u>, including: Investigating his alleged amnesia defense … Collecting a number of Apple 2014 notes and producing those documents to assist the government's efforts to authenticate his April 2014 notes; and Conducting a forensic deletion analysis on Schwartz's laptop." Ex. 6 (CTS_R17_0005308) (emphasis in original).

Other cooperative efforts touted by Cognizant further highlight its close coordination with

---

[13] By this time, the FCPA Pilot Program that DOJ launched at the beginning of Cognizant's investigation in April 2016 had concluded and DOJ had announced, in November 2017, the establishment of a new FCPA Corporate Enforcement Policy that expanded upon the priorities and criteria established as part of the Pilot Program. DLA and Cognizant repeatedly reference in their May 10, 2018 presentation the "priorities" and "objectives" of the operative DOJ policies, including that "[t]he FCPA Corporate Enforcement Policy makes clear that the DOJ's <u>policy and priority</u> in FCPA matters is for companies to come in and self-disclose the matters, which is rewarded by a presumption that voluntary disclosure, full cooperation, and remediation will result in a corporate declination." Ex. 6 (CTS_R17_0005301-02) ("Cognizant did everything the DOJ could have asked for here.") (emphasis in original).

the Government and the significant extent to which the Government incentivized and encouraged Cognizant to investigate this matter as a criminal case on the Government's behalf.  For example, Cognizant sought favorable treatment based upon its:

- "Coordinating the retention of individual counsel and facilitating government interviews of key witnesses" Ex. 6 (CTS_R17_0005307);

- "Providing witness interview readouts and custodial files to DOJ to facilitate productive discussions with key witnesses" *id.*;

- "Swiftly seizing recoverable media and business records from custodians" Ex. 6 (CTS_R17_0005305);

- "Producing over 100,000 pages to the DOJ … the Company made every effort not to just 'data dump' these documents on the DOJ, but has presented them in a way that makes clear the key findings and important documents" Ex. 6 (CTS_R17_0005307);

- "Providing travel information to the DOJ for its now-former ██████████████ – which facilitated DOJ's service of a grand jury subpoena" *id.*; and

- "Using the full weight of the Company's commercial leverage to try to gain information from L&T and other third parties" Ex. 6 (CTS_R17_0005306).

To be clear, these are just examples among many included in one of the numerous presentations that Cognizant made to the Government during the investigation.  Additional evidence —most notably, the notes of Cognizant's attorneys that were used to prepare for meetings with the Government, as well as a recent Government disclosure in response to the Court's directive that the Government "produce any and all communications that reflect any direction of Cognizant's investigative efforts" (ECF No. 319)—makes even clearer that Cognizant assumed a prosecutorial role in this matter.  These documents show that:

- DLA shared with the Government not only detailed summaries of the interviews that it (DLA) conducted, but also credibility assessments of key witnesses that the Government had not yet interviewed itself.  Ex. 43 (CTS_R17_0005246) (DLA memo dated Feb. 3, 2017 re: "Government Meeting Talking Points": "We expect that you may find that Raj [Ghosh] is a difficult witness – at times inconsistent, unclear and circular. Karen [McLoughlin] has no memory of Raj telling her about a demand. Given Raj's inability to remember and restate what he told Karen, her lack of recall was not unreasonable."); Ex. 3 (CTS_R17_0005257) (DLA talking points for May 1, 2018 meeting with DOJ and SEC: "We have reason to doubt Deepa's credibility"); Ex. 32 (June 15, 2022 Letter from Government at 2) ("During the [February 14, 2017 call with the Government], DLA stated that [Sridhar] Thiruvengadam's testimony has evolved and his memory has gotten better.").

- DLA identified for the Government, in response to its requests, potential witnesses on specific subject matters.  Ex. 44 (CTS_R17_0005207) (DLA talking points for "July 13, 2018 DOJ Meeting": "Open Requests" from the Government included "Backup Tapes"; "Tandberg Logs"; and identifying potential "Tandberg Record Custodian/Witness" and "Finance Witness(es).").

- DLA and the Government worked together to sequence witness interviews, and the Government provided feedback and direction to DLA regarding the manner in which it was conducting interviews, responding to follow-up requests, and identifying employees to be interviewed.  Ex. 32 (June 15, 2022 Letter from Government at 2) ("The Government advised that it would be helpful if DLA kept track of documents shown to the witness for the first time. … The Government also noted that it wanted to interview Thirduvengadam first. … The Government thereafter asked DLA whether, for any future witness interviews

DLA conducted, DLA could first speak with the Government before showing a witness a document that he/she might not have received. DLA said yes."); (*id.* at 3) ("DOJ advised DLA that it (DOJ) would get back to them on whether to proceed" with requests from witnesses' counsel following interviews); (*id.*) ("the Government asked DLA to track down" an employee who had not yet been interviewed, "get an answer from him" on whether he was on an April 2014 call with Schwartz, Coburn, T. Sridhar, and Ramamoorthy, and "requested a summary from the interview").

- DLA collected, reviewed and selectively produced to the Government custodial files, including those of Schwartz, making "relevance" (as opposed to merely "responsiveness") determinations on behalf of the Government throughout the investigation, right up to the day of the Indictment.  Ex. 5 (CTS_R17_0005195) (June 20, 2018 "Talking Points re Collection and Review of Key Custodians": detailing the collection and review of Schwartz-specific devices and materials and noting that "[a]pplication of these searches resulted in 21,021 documents to be reviewed from Schwartz's custodial files, 362 of which were tagged as relevant" (*i.e.*, 1.7%)); Ex. 45 (CTS_R17_0005204) (Dec. 19, 2018 email from Gray Stratton (DLA) to Karl Buch re: "DOJ TPs (Schwartz Data)": "We have completed that review [proposed to the Government by DLA] of Schwartz's documents from Aug. to Nov. 2016 and found no additional relevant documents."); Ex. 46 (CTS_R17_0005203) (Jan. 4, 2019 email from Stratton to Buch re: "DOJ TPs": "We have completed our review of Schwartz data. We found no new relevant content in that data"); Ex. 47 (CTS_R17_0005202) (Feb. 14, 2019 email from Stratton to Buch re: "DOJ TPs Regarding Schwartz Production": "We asked Schwartz to produce to us all company documents. We then reviewed those documents for relevancy and produced the relevant,

non-priv materials to DOJ. The gaps in this bates range are company documents produced by Schwartz that were not relevant to the investigation.").

- In response to repeated Government requests, DLA compiled information and conducted forensic analyses that addressed evidentiary and related concerns expressed by the Government concerning the information that it believed was necessary for the investigation and planned prosecution of Schwartz.  Ex. 48 (CTS_R17_0005192) (June 22, 2017 DLA memo titled "Responses to Government Questions": "Government Questions" included "Phone records relating to Dana/Frank conversations with Schwartz?"; "What were the date ranges for the Coburn and Schwartz page turns?"; "Download of interviews covering Schwartz's state of mind around April 21-22, 2014."); Ex. 49 (CTS_R17_0005224) (July 9, 2018 "Talking Points re Deletion Analysis": "Questions asked" by the Government included: "Determine whether it was possible to see if four specific email attachments sent to Coburn appeared on either Coburn's or Schwartz's devices and if the files were ever opened."; "Any evidence of mass deletion"; "Any unusual user activity or data hidden from collection"; "Any business-related chats between Coburn and Schwartz regarding the email attachments"; "All apple notes on Schwartz's MacBook Air"); Ex. 44 (CTS_R17_0005207) (DLA talking points for "July 13, 2018 DOJ Meeting": identifying among "Open Requests" the creation of "Revised Tandberg Logs" and describing "detailed findings" in connection with "Schwartz Deletion Analysis", including that DLA reviewed "all apple notes on Schwartz's MacBook Air … but did not find anything directly relevant to the investigation.").

- Cognizant assumed a distinctly prosecutorial function, albeit one unencumbered by the constitutional requirements imposed upon the Government, and re-reviewed, purportedly

for exculpatory information, Schwartz material that had previously been withheld and redacted.  Cognizant then discussed its findings with the Government, which does not appear ever to have objected to or questioned Cognizant's decisions as to privilege or as to whether materials were exculpatory.  *See infra* at III; Ex. 50 (CTS_R17_0005206) (Nov. 21, 2018 email from Stratton to Buch re: "DOJ TPS [Talking Points]": "We still have a few open non-subpoena requests. We are working through these. Notably – We are re-reviewing all previously withheld and redacted Schwartz materials. We've seen nothing exculpatory but we are still going through these. We anticipate having further discussion with you once we're through these."); *id.* ("Our final numbers are lower than our preliminary numbers … none exculpatory for Schwartz).").  Notably, these revelations regarding Cognizant's review of Schwartz-specific material for exculpatory information appear to be directly contrary to the Government's prior representation that it "did not request or direct CTS … 'to search for, identify, and/or produce exculpatory and/or impeachment information.'"  (ECF No. 60, Ex. B at 2).

In each of these respects, and others to be adduced at the hearing on this matter, Cognizant played a distinctly prosecutorial role, performing essential investigative functions.

### H. Cognizant Is Rewarded with a Declination and its Cooperation and Coordination with the Government Continue Post-Indictment.

Ultimately, "the extensive and proactive cooperation provided by the Company to support DOJ's investigation of these former executives [Schwartz and Coburn]" was rewarded.  Ex. 6 (CTS_R17_0005317).  On February 13, 2019, the day before the Defendants were indicted, Cognizant entered into a declination agreement with the DOJ.[14]  (ECF No. 79-13).  In that

---

[14] On February 15, 2019, Cognizant also settled related charges with the SEC and consented to a Cease and Desist Order which notes Cognizant's "self-disclosure, cooperation, and remedial efforts" and that Cognizant "timely shared the facts developed during the course of an internal

agreement, DOJ specifically cited "Cognizant's thorough and comprehensive investigation [and] Cognizant's full and proactive cooperation in this matter (including its provision of all known relevant facts about the misconduct) and its agreement to continue to cooperate in the Department's ongoing investigations and any prosecutions that might result." *Id.*

> As this Court has described it:
>
> Cognizant signed a declination agreement with DOJ that cited Cognizant's voluntary disclosure, its "thorough and comprehensive investigation," and its "full and proactive cooperation" with the government. Cognizant agreed that it would continue to cooperate fully and provide the government with "any information" requested. It could not have anticipated, at least vis-à-vis the government, that it could shield anything. It is not surprising that Cognizant waived its privilege; by doing so, it dodged a bullet.

(ECF No. 339 at 4).   Indeed, Cognizant had made clear to the Government long ago "that the Company wants to see the perpetrators held accountable."  Ex. 6 (CTS_R17_0005308) (Talking Points for May 10, 2018 Presentation to the Government: "Cognizant's exemplary cooperation – particularly with respect to the bad actors involved – makes clear that the Company wants to see the perpetrators held accountable.  If the Department has any questions about whether the Company would continue to cooperate if the DOJ were to issue a declination – we can tell you right now that the Company is committed to continued cooperation.").  Consistent with that desire and its agreement "to continue to cooperate fully and provide the government with 'any information' requested," (ECF No. 339), Cognizant's cooperation has continued post-Indictment: the Company and its counsel have engaged in ongoing efforts to assist in the Government's prosecution of Schwartz.  Meanwhile, the Government, for its part, has never taken any steps to limit Cognizant's prosecutorial activities in any way.

To the contrary,  as the Court has seen, throughout this case, Cognizant and the Government

---

investigation."   SEC Charges Cognizant and Two Former Executives With FCPA Violations (Feb. 15, 2019), *available at* https://www.sec.gov/news/press-release/2019-12.

continue to work together in an effort to secure the Defendants' convictions.  For example, Cognizant's litigation posture has been to take the side of the Government without qualification or exception, consistently advocating the Government's position, even as it seeks to prejudice Schwartz's ability to defend himself.  Thus, the protracted, heavily litigated Rule 17 motion practice described below is appropriately viewed as a continuation of Cognizant's cooperation and coordination with the Government, especially insofar as Cognizant continually offers arguments on behalf of the Government, including prematurely addressing the merits of this motion by advocating that the Defendants' interviews were not coerced and that "[t]he facts here are a far cry from the 'coordination' and 'outsourcing' seen in *Connolly* and do not constitute 'a close nexus of state action' sufficient to make Defendants' interviews 'Government-engineered interviews.'" (ECF No. 169 at 31-33).  Nor has Cognizant's advocacy for the Government's position been unrequited: for its part, the Government has offered arguments on behalf of Cognizant, contending, for example, that "the Defendants have not satisfied the *Nixon* Standard" for the "Rule 17(c) subpoenas directed to Cognizant," even as it admitted that the Government "does not always take a position with respect to requests for Rule 17 subpoenas issued to third parties."  (ECF No. 76).

As well, Cognizant has continued its extraordinary pattern of interfering with Schwartz's criminal defense in alarming ways, including by intruding into the defense camp and seeking information from Schwartz's attorneys and investigators directly relevant to Schwartz's defense in this criminal prosecution—actions which, though brought to its attention, the Government has consistently refused to prevent, criticize or in any way address.[15]  Nor has the Government weighed

---

[15] To remind the Court, beginning in at least July 2020, Cognizant received information from Stephen Ward, the lead investigator for Schwartz's defense, who, among other things, regularly participated in defense strategy meetings, including numerous in-depth meetings with Schwartz himself to discuss defense theories, potential investigative steps and defense strategy; located witnesses and conducted interviews; and worked to obtain evidence in India, among other critical

in with respect to Cognizant's repeated resistance to providing information to the defense, even when ordered to provide such information by the Court and even when the effect of such resistance has been, in the words of the Court, to "serve only to delay this case." (ECF No. 339 at 5). Indeed, the Government has even remained on the sidelines when its cooperator, Cognizant, hired Schwartz's former prospective counsel as its own counsel, thus necessitating a motion to disqualify (ECF No. 285), which is pending.

## II.   PROCEDURAL HISTORY

### A.   The Defendants Raise the Issue of Cognizant's Actions in Performing the Government's Investigative Functions.

From the outset of this prosecution, the Defendants raised the potential constitutional ramifications of the manner in which Cognizant had stepped into the shoes of the Government by performing the investigation that was designed to be and in fact became the backbone of this prosecution. On October 3, 2019, the Defendants sent a joint letter to the Government, setting forth specific document requests, including, *inter alia*, requests for documents regarding the

---

roles as a key member of the defense team. When Schwartz alerted the Government to this apparent violation of Schwartz's Sixth Amendment right to counsel and his Fifth Amendment right to due process, given Cognizant's ongoing cooperation agreement with the Government, the Government refused to provide any information about the nature and extent of Cognizant's unauthorized contacts with members the defense team, what information Cognizant obtained, or whether the Government was aware of or involved in those contacts, instead insisting that it will not "take any actions to intervene in that matter," nor "answer your questions," and required the defense to file an application with the Court for that information. (ECF No. 160-4). The Court granted that application, holding that "the influence that the Government may have wielded is important," and ordering the Government "to produce all communications between itself and Cognizant … that are relevant to the investigation of Defendants Schwartz and Coburn." (ECF No. 262). Upon the Government's motion for reconsideration (ECF No. 271), which Schwartz opposed in part and joined in part (ECF No. 286 at 12), the Court, noting that "there is some smoke that may betoken fire," modified the date range for that required production and ordered the Government to certify to the Court that such production has been complete, (ECF No. 319), which, on June 17, 2022—some three months later—the Government has represented it has now done. (ECF No. 366). The Government's disclosures in that respect are extremely significant to this motion, and are cited throughout this brief.

28

Government's coordination with Cognizant during the course of its investigation, as well as findings from Cognizant's investigation that it provided to the Government.  (ECF No. 60, Ex. A).  In a series of letters in the months that followed, the Government refused to produce the requested materials, instead inviting the Defendants to move for Rule 17 subpoenas to obtain the requested materials from Cognizant.  (ECF No. 60, Ex. C ("To the extent you seek additional information, you are free to pursue it directly from the companies through Rule 17 subpoenas.")).

On February 12 and 14, 2020, the Defendants accepted the Government's invitation, filing applications with the Court seeking issuance of Rule 17 subpoenas directed to Cognizant.  (ECF No. 70).  The proposed subpoenas sought specific information relevant to the Government's coordination with, and reliance upon, Cognizant to conduct key aspects of the investigation.  On February 29, 2020, the Government, despite having invited the Defendants to seek the requested materials directly from Cognizant via Rule 17 subpoenas, filed a letter brief opposing the Defendants' application.  (ECF No. 76).  The Government's opposition (in and of itself unusual in that it sought to quash a subpoena that sought documents from a third party) rested on the grounds that the Defendants' yet-to-be-filed motion (*i.e.*, this motion) was, in the Government's view, without sufficient merit to warrant further inquiry.  The Government pointed out in its opposition, which sought to pretermit the entire inquiry that is now before the Court before the issue had even been explored, that it "does not always take a position with respect to requests for Rule 17 subpoenas issued to third parties," but sought to justify its unusual intervention here on the basis that "the fundamental premise of the Defendants' application … targets the Government's conduct in investigating and prosecuting this case."  (ECF No. 76 at 1).

**B.    The Court Issues Rule 17 Subpoenas to Cognizant, Then Rejects the Government's Attempt To Narrow the Subpoenas.**

On September 14, 2020, the Court granted, in pertinent part, the Defendants' applications

for the issuance of Rule 17 subpoenas to Cognizant, though it required that several specific revisions be made to the so-called "category (a)" document requests—*i.e.*, those seeking information relevant to this motion—before they could be served.  (ECF No. 96).[16]  Thus, the Court instructed that several of the requests in the Defendants' proposed subpoenas be "limited to communications related to the investigation and interview of Schwartz [or Coburn]."  (ECF No. 96 at 16-24).  The Court also determined that, because it had "a less complete record than the one that was before Judge McMahon" in *United States v. Connolly*, No. 16 CR. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019), it would "convene a hearing on the outsourcing itself."  (ECF No. 96 at 11 n.11).  The Court made clear that "[t]he hearings ordered by the Court here may alter the picture as to the 'outsourcing' claim," (ECF No. 96 at 10 n.10), and that the approved subpoena requests (as revised in accordance with the September 14 Order) were intended to allow "some breathing room for the surrounding context." (ECF No. 96 at 16; *see also* ECF No. 268 at 3).

By letter dated September 20, 2020, the Government again intervened, seeking to narrow the Court's September 14 Order, including by requesting that each request in the third-party subpoenas be revised to cover only "communications related to the interview of Schwartz [or Coburn], including any investigation of Schwartz [or Coburn] that led to his interview."  (ECF No. 99).  By Order dated September 29, 2020, the Court rejected the Government's proposed modifications and authorized the issuance of the Defendants' revised subpoenas "in the form proposed" by the Defendants on September 18, 2020—*i.e.*, without the Government's requested limitations.  (ECF No. 104).

---

[16] The Court subsequently issued subpoenas for what have become known as "category (b)" materials, which relate to the merits of the allegations against Defendants, necessary for trial, as opposed to for this motion practice.  (ECF No. 144.)

### C.    Cognizant Resists the Subpoenas and Requires Multiple Court Orders To Compel Its Compliance.

On October 13, 2020, the Defendants served Cognizant with the Court-approved subpoenas, which, per the Court's September 14 and October 6 Orders (ECF Nos. 96, 108), required compliance by October 20, 2020.[17]  Cognizant sought and obtained numerous extensions of time to respond to the subpoenas, eventually objecting to the majority of the subpoena requests. Accordingly, on April 30, 2021, Defendants filed a Motion to Compel Compliance with Rule 17(c) Subpoenas, which, in combination with the motions concerning the category (b) subpoenas, and Cognizant's Motion to Quash, involved several rounds of briefing by both the Defendants and Cognizant.  (ECF No. 150, 169, 197, 211, 214).  On January 24, 2022, this Court granted the Defendants' motion in part, ruling, *inter alia*, requiring Cognizant to expand its production date range back to April 2016 and include text messages and communications from Cognizant's internal messaging system.  (ECF No. 268).  Additionally, and significantly, the Court found that Cognizant had waived its attorney-client privilege as to the materials it disclosed to the Government and as to communications concerning the same subject matter.  (*Id*. at 13-14).  The Court highlighted Cognizant's "obvious incentives to shift blame," and held that, because Cognizant "performed an investigation for the purpose of exculpating itself, [] it is fair to require it to disclose its evidence in a more evenhanded manner."  (*Id*. at 23-24).  Accordingly, the Court also ordered Cognizant to produce numerous categories of documents over which Cognizant had asserted privilege, such as draft press releases, document retention and collection policies, and interview summaries, including "memoranda, notes, summaries, or other records of the interviews

---

[17] It was nearly 18 months later, on April 13, 2022, that Cognizant ultimately certified that it had substantially completed its productions responsive to the category (a) subpoenas.  Nonetheless, certain category (a) subpoena disputes remain the subject of ongoing litigation. (*See* ECF Nos. 365, 370, 375.) And Cognizant has still not certified its substantial compliance with the category (b) subpoenas.

themselves," as well as other underlying documents or communications that were conveyed verbally to the Government, and "documents and communications that were reviewed and formed any part of the basis of any presentation, oral or written, to the DOJ in connection with this investigation." (*Id*.).

The Defendants sought limited reconsideration of the narrow issue of the documents sought by category (b) Subpoena Request No. 9, (ECF No. 267) which the Court granted (ECF No. 320). Cognizant sought an extension, which was granted, to file its own motion for reconsideration (ECF No. 290) with respect to certain materials pertaining to Cognizant's public relations strategy, but this Court denied Cognizant's motion  (ECF No. 320) and those materials, which are particularly revealing of Cognizant's intentions, and actions, are cited liberally throughout this submission.  Notwithstanding this Court's Orders (ECF Nos. 268 & 320) Cognizant's productions still remained deficient, as it continued to redact extensively from dozens of key documents, including the very interview memoranda that formed the basis for the Court's finding of a "significant" subject matter waiver.  (ECF No. 268).  After the Defendants raised this deficiency, and the Court considered simultaneous briefs to address this dispute, it ruled in the Defendants' favor, characterizing Cognizant's response as a "second motion for reconsideration," (ECF No. 339 at 2, n.2), and ultimately rejecting Cognizant's argument and ordering Cognizant "to produce the interview memoranda and the notes used to prepare the DLA downloads without resort to redaction."  (*Id.*).  As the Court noted, "this is not a discovery dispute between parties to a civil lawsuit; it is a valid attempt to obtain by subpoena evidence relevant to the defense of criminal charges."  (*Id*. at 4).  In particular, the Court concluded:

> It is not surprising that Cognizant waived its privilege; by doing so, it dodged a bullet. The materials at issue here fall within this waiver thanks to Cognizant's own intentional conduct and must in fairness be disclosed to Defendants. Moreover, since these documents were foundational to Cognizant's presentation to the government and privilege over them was waived, Cognizant is not entitled to redact them. Cognizant's exhaustively-briefed objections to disclosure I have already

> considered; they now serve only to delay this case. In that spirit, I reject this motion
> for 'clarification' and will require full compliance with the subpoenas, as narrowed
> by my prior decisions, within 14 days.

(*Id*. at 5). Cognizant eventually did produce those unredacted materials, and not surprisingly, the newly revealed and unredacted documents show critical facts about DLA's interviews of Schwartz and others that were withheld from the Government, as well as Cognizant's close coordination with the Government throughout the investigation.

## LEGAL ARGUMENT

**I.    STATEMENTS MADE DURING SCHWARTZ'S AUGUST 28, 2016 AND SEPTEMBER 23, 2016 INTERVIEWS WERE COMPELLED AND SHOULD BE SUPPRESSED.**

As anticipated by the Court, (ECF No. 96 at 11-12, 15), Defendant Steven Schwartz here moves to suppress certain of his statements, pursuant to the dictates of *Garrity v. New Jersey*, 385 U.S. 493 (1967), and for broader relief based upon the taint of the unconstitutional actions that require relief under *Garrity*.  As set forth in greater detail below, the motion to suppress should be granted because the requirements of *Garrity* have been met: first, Schwartz's statements to Cognizant were compelled, within the meaning of *Garrity* and its progeny; and second, Cognizant's actions in compelling Schwartz to become a witness against himself through those compelled statements are "fairly attributable" to the Government under the governing case law. Each of these requirements is described, and the evidence thus far available brought to bear, below. But as to each, additional proofs will be adduced at the hearing to be convened on this subject by the Court.

### A.    Under *Garrity*, the Fifth Amendment's Protection Against the Use of Compelled Statements Includes Statements Made Under the Threat of Termination.

The Fifth Amendment provides, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  "It has long been held that

this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (citing *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)).  In such proceedings, "'a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. …  Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution.'" *Id.* (quoting *Lefkowitz*, 414 U.S. at 78) (alteration in original).

In *Garrity*, the Supreme Court held that statements obtained from police officer defendants who were questioned during an internal investigation, in which the officers were subject to termination if they refused to answer questions, were compelled for Fifth Amendment purposes, and therefore inadmissible at their subsequent criminal trial.  385 U.S. at 494.  The Court concluded that the choice given the officers—either to "forfeit their jobs or to incriminate themselves"—was "a choice between the rock and the whirlpool" and, thus, the statements were products of "coercion" under the Fifth Amendment.  *Id.* at 496-97; *see also id.* at 497 ("The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent."); *see also United States v. Proano*, 912 F.3d 431, 437 (7th Cir. 2019) (the defendant "spoke to [the investigators] under the threat of job loss, and his statements were thus compelled and *Garrity*-protected.").  As this Court has summarized it, "The Supreme Court in *Garrity* held that where a[n] … employee is given a choice 'between self-incrimination or job forfeiture,' incriminatory statements by that employee are the result of coercion and

therefore inadmissible in a criminal trial."  (ECF No. 268 at 14 n.7).

Most significantly for purposes of this case, courts have extended this rule to private conduct where there is a sufficiently "close nexus" between the Government and a private employer's actions such that the employer's actions in obtaining the statements are "fairly attributable to the government."  *United States v. Stein*, 541 F.3d 130, 146-151 (2d Cir. 2008) ("*Stein II*"); *see also* (ECF No. 96 at 11) ("Where, as here, a private employer conducted the interview, there is another step to the analysis; under the Second Circuit's approach, statements obtained in a coerced interview may be suppressed only if the interview is 'fairly attributable' to the government.") (quoting *Connolly*, 2019 WL 2120523, at *10-11); *D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 161 (2d Cir. 2002) ("the Fifth Amendment restricts only governmental conduct, and will constrain a private entity only insofar as its actions are found to be 'fairly attributable' to the government") (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982)); *United States v. Stein*, 440 F. Supp. 2d 315, 326 (S.D.N.Y. 2006) ("*Stein I*") ("It no longer may be doubted that economic coercion to secure a waiver of the privilege against self-incrimination, where it is attributable to the government, violates the Fifth Amendment if the pressure is sufficient to 'deprive[ ] [the accused] of his free choice to admit, to deny, or to refuse to answer.'") (quoting *Garrity*, 385 U.S. at 496).  This issue is discussed further in Section I(B), below.

### 1.    *Garrity* Covers Both Explicit and Implicit Threats of Termination.

As this Court has already held, under *Garrity* and its progeny, the threat of termination need not be explicit.  (*See* ECF No. 96 at 10) ("Interviews by an employer under the implicit compulsion of 'cooperate or be fired' may be suppressed as involuntary under *Garrity*"); *see also Murphy*, 465 U.S. at 435 (concluding that statements may be "compelled and inadmissible" when a threat is made either "expressly or by implication"); *Garrity*, 385 U.S. at 496 ("Subtle pressures

may be as telling as coarse and vulgar ones."); *United States v. Trevino*, 215 F. App'x 319, 321 (5th Cir. 2007) (rejecting the requirement of an "explicit threat" and finding that "[n]either *Indorato* or *Garrity* rules out the possibility that implied threats could violate a defendant's *Garrity* rights"); *United States v. French*, 216 F. Supp. 3d 771, 776 (W.D. Tex. 2016), *aff'd*, 708 F. App'x 205 (5th Cir. 2018) ("*Garrity* may apply even where there is no explicit threat of removal from office for an individual's failure to answer questions."); *United States v. Ortino*, No. 19-CR-00142-WHO-1, 2019 WL 6493985, at *6 (N.D. Cal. Dec. 3, 2019) (rejecting requirement that "the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment."); *United States v. Camacho*, 739 F. Supp. 1504, 1520 (S.D. Fla. 1990) ("*Garrity* may be applied to render statements inadmissible even where the threat of termination is implied rather than explicit.").

   To assess whether statements were compelled for *Garrity* purposes in cases where the threat is not explicit, courts generally apply a two-pronged test: (1) whether the defendant "'subjectively believed that he would lose his job if he refused to answer questions'"; and (2) whether "'his belief was objectively reasonable.'"  *United States v. Smith*, 821 F.3d 1293, 1303 (11th Cir. 2016) (quoting *United States v. Waldon,* 363 F.3d 1103, 1112 (11th Cir. 2004)).  Thus, the appropriate standard for an "employee['s] claim[] that a statement was coerced by a threat of employment termination" is whether "the belief that termination would follow a refusal to speak was both objectively reasonable and subjectively held."  *Stein I*, 440 F. Supp. 2d at 328.  That is, the employee asserting that a statement was "compelled in violation of the Fifth Amendment must adduce evidence *both* that the individual subjectively believed that he or she had no real choice but to speak *and* that a reasonable person in that position would have felt the same way."  *Id.* (emphasis in original); *United States v. Friedrick,* 842 F.2d 382, 395 (D.C. Cir. 1988) ("Under the

*Garrity-Lefkowitz-Murphy* line of authority, [defendant] must have in fact believed his … statements to be compelled on threat of loss of job and this belief must have been objectively reasonable."); *see also McKinley v. City of Mansfield*, 404 F.3d 418, 436 (6th Cir. 2005) ("[I]f McKinley reasonably believed that Defendants would impose substantial penalties on him—such as job loss or disciplinary sanctions—if he refused to answer the questions put to him in the second interview, he was compelled to incriminate himself in violation of the Fifth Amendment.") (footnote omitted); *Bailey v. Henry Cnty.*, No. 119CV03504LMMRDC, 2021 WL 6113626, at *14 (N.D. Ga. May 10, 2021) ("First, the [employee] must have subjectively believed that he was compelled to give a statement upon threat of loss of job. Second, this belief must have been *objectively reasonable* at the time the statement was made.") (internal quotation marks and citation omitted); *United States v. Nesbitt*, No. 18-20703-CR, 2019 WL 1472284, at *4 (S.D. Fla. Mar. 12, 2019) ("In cases with no direct threat of termination, the Eleventh Circuit uses a two-prong test: (1) a defendant must have subjectively believed that she was compelled to give the statement, and (2) this belief must have been objectively reasonable at the time the statement was made.").

To make this determination, courts will consider the "totality of the facts and circumstances surrounding the statements made."  *Camacho*, 739 F. Supp. at 1515; *see also Trevino*, 215 F. App'x at 322 ("Thus, to determine whether [the interviewee's] *Garrity* rights were violated, we must look at the surrounding circumstances, specifically focusing on whether the questioning was coercive."); *State v. Aiken*, 282 Ga. 132, 135-36 (2007) (affirming suppression of statements and holding that courts should employ a "totality of the circumstances test for evaluating whether the defendant's statement was coerced"); *Zeigler v. State*, 350 Ga. App. 716, 720-21 (2019) (concluding that, in a case of an "*implied* threat[] of job loss" the trial court erred in denying motion

to suppress where "under the totality of the circumstances" the defendant's "subjective belief that she would be terminated if she did not answer the agents' questions was … objectively reasonable").

Accordingly, courts have granted motions to suppress statements under *Garrity* where the two-prong test was satisfied, even where defendants were merely "subject to discipline"—even short of termination—for refusal to cooperate in an internal investigation.  *See*, *e.g.*, *United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1029 (D. Or. 2014) (granting defendant's motion to suppress statements where defendant was subject to regulation and workplace policies that "required him to 'cooperate in any postal investigation, including Office of Inspector General investigations' and that provided for 'appropriate disciplinary measures' should he not cooperate"); *Camacho*, 739 F. Supp. at 1518 (that defendants "who refused to answer questions would be subject to disciplinary measures including termination"  "provide[d] a further basis for these Defendants to have reasonably believed that they were compelled to waive their Fifth Amendment rights during their interviews"); *State v. Graham*, 136 Ohio St. 3d 125 (2013) (granting motion to suppress where defendants received a "Notice of Investigatory Interview" informing them that their failure to cooperate "would subject them to disciplinary action up to and including termination."); *Aiken,* 282 Ga. at 135-36 (affirming suppression of statements and holding that courts should consider "whether the defendant was aware of any statutes, ordinances, manuals, or policies that required cooperation and provided generally, without specifying a penalty, that an employee could be subject to discipline for failing to cooperate."); *State v. Mzhickteno*, 8 Kan. App. 2d 389, 390 (1983) (affirming suppression of statements where "the alternative to refusal [to answer] was 'some type of disciplinary measures.'").

## 2.    Schwartz's Statements Were Compelled.

In this case, there can be no serious dispute that Schwartz was compelled to sit for his

August 28, 2016 and September 23, 2016 interviews.  Indeed, Cognizant has admitted as much, telling the Government that "[t]he Company insisted on cooperation (including interviews) from both Schwartz and Coburn" as part of the investigation.  Ex. 6 (CTS_R17_0005311) (emphasis in original); Ex. 32 (June 15, 2022 Letter from Government at 2) ("In the course of describing the company's proactive cooperation, company counsel highlighted that DLA had persisted in securing additional interviews with the president (Coburn) and general counsel (Schwartz) of Cognizant, which [company counsel] described as a distinguishing factor in the Company's cooperation."); Ex. 6 (CTS_R17_0005306) (Cognizant description of it "[d]oggedly persisting in securing additional interviews with both the President and the General Counsel, leading to their eventual resignations (external counsel has shared some details about that persistence with the Department already)").  The evidence is, and will be at the hearing on this matter, both that Schwartz subjectively believed that he was compelled to sit for these interviews and that his belief was objectively reasonable.  *See Waldon,* 363 F.3d at 1112; *McKinley,* 404 F.3d at 436; *Friedrick,* 842 F.2d at 395.

*First*, Schwartz subjectively believed that he had no choice but to submit to his interviews and answer DLA's questions or else be fired.  Schwartz Cert. ¶ 4 ("I absolutely believed that I would be terminated if I did not sit for the interviews Cognizant requested.").  Having served as Cognizant's top legal officer for over a decade by that time—as General Counsel from 2003 to 2013, and thereafter as Chief Legal and Corporate Affairs Officer—Schwartz was acutely aware of his obligation to cooperate, and of the consequences if he did not, up to and including termination.  Schwartz Cert. ¶¶ 2-3.  Indeed, Schwartz himself oversaw several internal investigations in his roles at Cognizant; was involved in discussions with members of leadership from Cognizant's Human Resources, Corporate Security, and Compliance functions about

employees' obligation to cooperate, including by submitting to interviews requested by the Company or its counsel; and was directly involved in overseeing the preparation and enforcement of the policies and agreements that memorialized those obligations.  Schwartz Cert. ¶ 3.

*Second*, the objective reasonableness of Schwartz's belief is clear from the record.  Both Cognizant's employee policies and Schwartz's employment agreement—relevant portions of which Schwartz reviewed with his then-counsel prior to his interviews on August 28, 2016 and September 23, 2016—specifically mandated cooperation with the investigation in order for him to maintain his employment with Cognizant or otherwise to avoid discipline.  Schwartz Cert. ¶ 4. Cognizant's Code of Business Conduct and Ethics expressly provided that: "Employees, officers and Directors are expected to cooperate fully with any inquiry or investigation by the Company regarding an alleged violation of this Code.  Failure to cooperate with any such inquiry or investigation may result in disciplinary action, up to and including discharge."   Ex. 7 (CTS_R17_0000040).  Employees and officers, including Schwartz, were thus required to certify compliance with the Code, acknowledging that violation of Cognizant's standards could subject them to disciplinary action, including "termination or legal action."  Ex. 6 (CTS_R17_0005309) (Schwartz "certified annually to compliance with the Code of Ethics").  Similarly, Cognizant's Core Values and Standards of Business Conduct stated that: "As part of our commitment to our stakeholders, we are also expected to cooperate fully with any investigation into any actual or potential violation" of Cognizant's Standards and Company policies. Ex. 8 (CTS_R17_0000064).

Schwartz certified accordingly.  Exs. 51-52 (CTS-0102721, CTS-0102750) (Schwartz certifications of commitment to the Core Values and Standards of Business Conduct, including that the failure to adhere to them could result in disciplinary action "up to and including termination").  And his employment agreement incorporated Cognizant's Standards by reference

40

and provided, for example, that "Cause [for termination] shall mean . . . (iii) failure by the Employee to observe material policies of the Company applicable to the Employee."  *See*, *e.g.*, Ex. 10 (CTS-0638406 ¶ 1(c)); Schwartz Cert. ¶ 4 ("I knew that my employment agreement provided that, if I did not participate in those interviews, I could be terminated for cause, which was defined to include the failure to observe Cognizant's policies.").

Courts have found such language sufficient to support a finding that a defendant's interview was coerced, and have suppressed statements under *Garrity* even where the defendant was only generally subject to discipline if he failed to cooperate.  *See, e.g., Connolly*, 2019 WL 2120523, at *3 (finding that defendant "did not have discretion to refuse to talk to the investigative team" where his company's employee policy, titled "Global Compliance Core Principles," imposed an obligation to cooperate with investigations and provided that employees who violated company policies "may be subject to disciplinary action up to and including termination of employment[ ]"); *Goodpaster*, 65 F. Supp. 3d at 1029 (granting motion to suppress where defendant was subject to policies that required cooperation in investigations and "provided for 'appropriate disciplinary measures' should he not cooperate"); *Camacho*, 739 F. Supp. at 1518 (evidence that defendants "who refused to answer questions would be subject to disciplinary measures including termination" under operative policies "provide[d] a further basis for these Defendants to have reasonably believed that they were compelled to waive their Fifth Amendment rights during their interviews"); *Aiken,* 282 Ga. at 135-36 (affirming suppression of statements and holding that courts should consider "whether the defendant was aware of any statutes, ordinances, manuals, or policies that required cooperation and provided generally, without specifying a penalty, that an employee could be subject to discipline for failing to cooperate."); *Mzhickteno*, 8 Kan. App. 2d at 390 (affirming suppression of statements where

"the alternative to refusal [to answer] was 'some type of disciplinary measures.'"); *Zeigler*, 350 Ga. App. at 717 (concluding that trial court erred in finding that defendant's subjective belief that she would be terminated was not objectively reasonable when defendant read and understood employer's policies providing for potential discipline for "refusal to comply with an internal investigation").

In this case, Cognizant and its counsel made abundantly clear during the investigation that the obligation to cooperate imposed by the Company's policies and employment agreements extended to interviews and would be enforced.  To be sure, Schwartz and other Cognizant employees were already aware that this was so, as the requirement that employees sit for interviews was "well-known at Cognizant, and … employees complied with demands for investigation interviews because they knew that they otherwise faced the threat of termination under Cognizant's policies."  Schwartz Cert. ¶ 3.  DLA also explicitly told interviewees in this very investigation that, consistent with Cognizant's policies that required employees' cooperation, the consequence of failing to sit for their DLA interview and answer DLA's questions could be up to termination. Indeed, during a meeting with Schwartz's then-counsel the month following Schwartz's September 23 interview, Buch and Denniston emphasized Schwartz's continuing obligation to cooperate and expressly stated that Schwartz would lose his job if he refused to sit for another session, an edict that was duly relayed to Schwartz.  Schwartz Cert. ¶ 4.

Cognizant would later tout to the Government that its efforts in "[d]oggedly persisting in securing additional interviews with" Schwartz and Coburn, "pressuring them to cooperate," and "insist[ing] on cooperation (including interviews) from both Schwartz and Coburn" led to their resignations—conceding, in effect, that their interviews were coerced. Ex. 6 (CTS_R17_00005299, -5306) ("Cognizant has done everything within its power to investigate and

root out misconduct at the Company, including . . . [d]oggedly persisting in securing additional interviews with both the President and the General Counsel, leading to their eventual resignations (external counsel has shared some details about that persistence with the Department already)."); (*id.* at -5317) (highlighting the "speed with which the Company moved forward against these senior executives (including sidelining them, pressuring them to cooperate, and ultimately separating with them)"); (*id.* at -5311) ("The Company <u>insisted</u> on cooperation (including interviews) from both Schwartz and Coburn. Both resigned after DLA confronted Schwartz with his notes of the April 2014 telephone call, and before completing additional follow-up interviews.") (emphasis in original); *see also Stein I*, 440 F. Supp. 2d at 321 (emphasizing that the defendant's employer had in its "final submission to the DOJ argued that it had fully cooperated by, among other things, 'pressuring current and former personnel to cooperate fully with the investigation'").

The circumstances surrounding Schwartz's interviews, including the draconian "parameters" that Cognizant imposed for them and the decidedly coercive questioning that ensued, make even clearer that Schwartz's statements during those interviews were compelled.  *See Trevino*, 215 F. App'x at 322 ("[T]o determine whether [the interviewee's] *Garrity* rights were violated, we must look at the surrounding circumstances, specifically focusing on whether the questioning was coercive."); *Camacho*, 739 F. Supp. at 1515 ("[I]n determining whether the Defendants' statements were made voluntarily or were the product of coercion, we must examine the totality of the circumstances surrounding the statements.").

Specifically, in advance of Schwartz's interviews, DLA insisted that his then-lawyer, Joshua Rievman, adhere to "parameters" that dramatically limited Rievman's ability to represent Schwartz effectively, including by prohibiting the presence of more than a single lawyer for

Schwartz and requiring "that the lawyer will not take notes, ask questions, or otherwise disrupt the interview." Ex. 23 (CTS-0103589).[18]  Understanding that he and Schwartz had "no choice" but to agree to these "most unusual rules"—rules which essentially deprived Schwartz of the effective assistance of counsel, which the Government, of course, would never impose, and which Cognizant refused to adjust when Rievman sought to negotiate them in advance of Schwartz's interviews, Schwartz Cert. ¶ 6—Rievman acquiesced, making clear that Cognizant controlled the circumstances of the interviews to which Schwartz was forced to submit although Cognizant was not allowing for "an acceptable witness situation."  Ex. 23 (CTS-0103589).; *see also* Schwartz Cert. ¶ 6 ("I knew my choice was to either live with the rules and be interviewed or refuse and be terminated.").

Not surprisingly, perhaps, given the parameters imposed, Buch's and Denniston's questioning during Schwartz's interviews was as coercive as the preconditions that preceded them—and, particularly in the case of Schwartz's September 23 interview, self-evidently designed to elicit statements for use in the Government's prosecution of Schwartz.[19]  Denniston was "particularly angry and hostile," cutting Schwartz off when he began to discuss matters that were

---

[18] DLA imposed the same "parameters" for Schwartz's first interview on August 28, 2016, insisting that Schwartz be represented by only one lawyer and that such lawyer not be allowed to speak or take notes during the interview.  Schwartz Cert. ¶ 6.  The extent to which these "parameters" were discussed with the Government will be among the topics to be explored at the hearing on this motion, as discussed *infra*.

[19] That Schwartz's September 23 interview was designed not to investigate facts but to elicit statements for use in the Government's prosecution of Schwartz becomes all the more apparent upon the revelation that Cognizant and DLA had already decided in the days immediately leading up to Schwartz's September 23 interview that he would be terminated.  Exs. 20, 22 (CTS_R17_0004201, -4279).  But committed as they were to delivering information to the Government as it had promised to do, *see infra* at Section I(B), Cognizant and its counsel did not alert Schwartz to his impending termination and instead compelled him to continue cooperating under false pretenses, including by sitting for a second interview that was distinctly prosecutorial in nature.

not in line with what the interviewers (and Cognizant) wanted to hear, slamming his fist on the table, and pointing his finger in Schwartz's face.  Schwartz Cert. ¶ 6; *see also, e.g.*, Ex. 24 (CTS_R17_0004364) ("Schwartz indicated that he relied on Dana [Gilbert] to apprise him of the risks in India, but he said that Dana did not tell him much. The interviewer pointed out that it appeared he was 'trying to have it both ways.'").  That Schwartz nonetheless remained is powerful, though unnecessary, evidence of just how compelled the interview was.

Meanwhile, Buch's questioning was focused on issues specifically tailored to a criminal prosecution: he probed Schwartz, for example, regarding "facilitation payments"—a term that has special significance in FCPA prosecutions— and "willful blindness," a criminal issue, and sought to elicit admissions, often through leading questions, that might bear on Schwartz's potential criminal culpability, even going so far as to ask Schwartz, following a series of hypothetical questions, whether he "was aware that this is a potential criminal violation."   Ex. 24 (CTS_R17_0004363-4382).   After over three hours of this questioning, throughout which Rievman could not interject given the "parameters" that DLA and Cognizant had imposed in advance, Rievman decided it was finally time to pause the interview, which Cognizant asked to continue at a later date.  Ex. 24 (CTS_R17_0004382); Schwartz Cert. ¶ 7.[20]  Then, on November

---

[20] As part of its long-running effort to advance the Government's position, in essence prematurely briefing the merits of this motion (to which is it not a party), Cognizant suggested in briefing on motions to compel subpoena compliance and cross-motions to quash that Rievman's ability to terminate Schwartz's September 23 interview before DLA had completed its questioning indicates that Schwartz's other statements during that interview must not have been compelled.  (ECF No. 169 at 9, 32).  That argument, in addition to lacking any legal foundation, ignores that Rievman did not, in fact, terminate the interview, but only paused it, as he discussed with DLA the continuation of Schwartz's interview at a third session, which—as Cognizant bragged—DLA "doggedly" pursued until Schwartz resigned, facing an explicit threat of termination and realizing that he had no other alternative to protect his Fifth Amendment rights. Schwartz Cert. ¶ 7.  And Cognizant's related argument—that, according to Cognizant, Schwartz "asked to be interviewed as soon as possible," and, without basis, that he was "eager" to be interviewed—similarly misses the point. (ECF No. 169 at 9, 32).  Setting aside that these considerations are not relevant under

3, 2016, facing a demand for the continuation of his second interview and the explicit threat of termination, Schwartz resigned from Cognizant.  Schwartz Cert. ¶ 7.

In sum, the record is clear: Schwartz's August 28, 2016 and September 23, 2016 interviews were coerced in the *Garrity* sense of 'submit or be fired.'"  (ECF No. 96 at 11); (*see also id.* at 10) ("Interviews by an employer under the implicit compulsion of 'cooperate or be fired' may be suppressed as involuntary under *Garrity*"); *McKinley*, 404 F.3d at 436 ("if [the interviewee] reasonably believed that Defendants would impose substantial penalties on him — such as job loss or disciplinary sanctions — if he refused to answer the questions put to him in the second interview, he was compelled to incriminate himself in violation of the Fifth Amendment"); *Camacho*, 739 F. Supp. at 1515 ("An examination of the circumstances surrounding the statements … compels the conclusion that the statements of Defendants … were given under the clear threat of termination and therefore must be suppressed.").  Schwartz thus readily meets the first requirement of the *Garrity* test.

### B. *Garrity* Protects Against Private Acts "Fairly Attributable to the Government."

As discussed, *Garrity*'s constitutional protections are not limited to government employees but may, under appropriate circumstances, extend to employees in the private sector.  This occurs when there is a "sufficiently close nexus" between the Government and a private employer's actions such that the employer's actions are "fairly attributable to the government."  *Stein II*, 541 F.3d at 146-51; *Evans v. Newton*, 382 U.S. 296, 299 (1966) ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental

---

*Garrity*, which, as set forth above, only asks whether a defendant was compelled to sit for an interview under the threat of discipline up to and including termination, the fact that Schwartz knew the interviews were compulsory and wanted to schedule them promptly to get them over with and move the investigation forward does not in an way change the reality that he was compelled by Cognizant to sit for the interviews.  Schwartz Cert. ¶ 5.

character as to become subject to the constitutional limitations placed upon state action . . .").  In this Court's words, the *Garrity* exclusionary rule "'applies with equal vigor to private conduct where the actions of a private employer in obtaining statements are fairly attributable to the government, *i.e.*, when there is a sufficiently close nexus between the state and the challenged action.'"  (ECF No. 268 at 14 n.7) (quoting *Garrity*, 385 U.S. at 495-96; *Connolly*, 2019 WL 2120523, at *10); *see also Stein II*, 541 F.3d at 152 n.11 ("'[S]tate action includes both conduct by the government and conduct by [a private employer] that is fairly attributable to the government.").

This kind of "close nexus" between the Government and a private employer is not limited to circumstances in which "the State 'has exercised coercive power," but may also arise when the Government "has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'"  *Stein II*, 541 F.3d at 147 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).  Thus, a "sufficiently close nexus" exists between action of a private employer and the Government when the Government:

> provides the private actor with *significant encouragement,* either overt or covert, or when the private actor operates as a *willful participant in joint activity* with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is *entwined with governmental policies.*

*Stein II*, 541 F.3d at 147 (emphasis in original) (quoting *Flagg v. Yonkers Sav. & Loan Ass'n,* 396 F.3d 178, 187 (2d Cir. 2005)).[21]

---

[21]  *See also Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 615 (1989) (concluding that there was state action where "the Government did more than adopt a passive position toward the underlying private conduct" and where it "made plain not only its strong preference for [the private conduct], but also its desire to share the fruits of such intrusions"); *United States v. Risha*, 445 F.3d 298, 304-05 (3d Cir. 2006) (noting that, in determining whether *Brady* obligations extend beyond federal prosecutors, courts assess, *inter alia*, "whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control.'"); *United States v. Duronio*, No. CRIM.A.02-933(JAG), 2006 WL 1457936, at *3 (D.N.J. May 23, 2006) ("To determine whether an entity is acting on the government's behalf, courts have looked to factors

In this analysis, "[t]he 'controlling factor' is not whether the state actually directed the constitutionally prohibited conduct, but rather whether the state 'involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement.'" *Connolly*, 2019 WL 2120523, at *11 (quoting *United States ex rel. Sanney v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974)).  In this regard, it is not necessary for the Government to expressly direct the private conduct: "The state's involvement is no less real for having been indirect and no less impermissible for having been concealed.  The state is prohibited in either event from compelling a statement through economically coercive means, whether they are direct or indirect." *Montanye*, 500 F.2d at 415.  In *Montanye*, for example, where the State requested that the private employer conduct a polygraph examination of the defendant, the court stated that it did not "perceive any consequence flowing from the fact that the threat … was conveyed through a private employer, admittedly acting as an agent for the police, rather than through a person on the public payroll." *See id.* at 413, 415.[22]  Likewise, in *Gilman v. Marsh & McLennan Cos., Inc.*, 826 F.3d 69 (2d Cir. 2016), the court noted that, while the specific facts of that case did not support a finding of coercion, the Government would have been responsible for the private employer's interviews during a corporate internal investigation if the government had "'forced' [the private employer] to demand interviews, 'intervened' in [its] decisionmaking, 'steered' [it] to request interviews, or

---

such as whether the entity assists the prosecution before and during trial, and whether the entity conducts interrelated or independent investigations from the government. … [C]ourts have found team efforts and joint investigations where the entity and the federal government 'pooled their investigative energies to a considerable extent' and the 'entire effort was marked by [a] spirit of cooperation.'").

[22]  The *Montanye* court ultimately concluded under the facts of that case that the economic sanction was not "substantial" for *Garrity* purposes because the employee had worked for the employer for only one or two days at the time of the polygraph examination.  500 F.2d at 415-16.  That, of course, is not the case here: Schwartz had worked for Cognizant for nearly 15 years at the time of his interviews in August and September 2016.

'supervised' the interview requests." *Id.* at 76.

In *Stein II*, the Second Circuit Court of Appeals held that the actions of a private entity, KPMG, were fairly attributable to the Government where the Government encouraged KPMG to condition, cap, and ultimately stop advancing legal fees to defendants based on DOJ policies concerning the prosecution of business organizations.  541 F.3d at 136, 147.  The court explained:

> KPMG's adoption and enforcement of the Fees Policy amounted to "state action" because KPMG "operate[d] as a willful participant in joint activity" with the government, and because the USAO "significant[ly] encourage[d]" KPMG to withhold legal fees from defendants upon indictment.  *Flagg*, 396 F.3d at 187.  The government brought home to KPMG that its survival depended on its role in a joint project with the government to advance government prosecutions.  The government is therefore legally "responsible for the specific conduct of which the [criminal defendants] complain[ ]."  *Blum*, 457 U.S. at 1004 (emphasis omitted).

*Id.* at 147 (footnote omitted).  In reaching its conclusion that the private employer's actions "amounted to state action," the Court of Appeals specifically noted the fact that KPMG faced potential prosecution.  *Id.*  The court explained that "KPMG faced ruin by indictment and reasonably believed it must do everything in its power to avoid it. The government's threat of indictment was easily sufficient to convert its adversary [KPMG] into its agent." *Id.* at 151.

As this Court knows, the leading case in this area, based upon these precedents and others, is *United States v. Connolly*, where Chief Judge McMahon of the Southern District of New York found that the private employer's internal investigation was "fairly attributable" to the Government for *Garrity* purposes where the Government "built its own 'investigation' into specific employees, such as [defendant], on a very firm foundation constructed for it by the Bank and its lawyers." 2019 WL 2120523, at *12.  In reaching this conclusion, Chief Judge McMahon looked to a number of factors that bore upon whether the Bank's investigative function was "fairly attributable" to the Government for *Garrity* purposes.  These factors, which expressly did *not* require a showing that the Government intentionally delegated its functions to a private party, focused on the company's

motives and actions, and on whether its conduct demonstrated that it had aligned its interests with the Government's—essentially stepping into the Government's shoes to avoid negative consequences for itself.  Thus, the court considered:

- The "massive amount of pressure" faced by the Company, including that the company faced "the threat of ruin" if it failed to cooperate with the Government, which "is highly relevant to any assessment of the sufficiency of the nexus between the Government and [the] Bank's 'internal' investigation," particularly insofar as the company's private interests are "aligned with the Government's interest," *id.* at *13;

- That company counsel "digested the vast information it collected, highlighted the most important nuggets, and shared a blueprint for what prosecutors should expect," *id.* at *12;

- That the company's "investigation pretty much *was* the Government's investigation" as "[t]he Government's investigatory strategy . . . was to let the [company] carry its water for it," emphasizing that the Government waited until the company had completed its interviews before beginning its own interviews and did not interview company witnesses beyond those interviewed by company counsel, *see id.* at *9, 13 (emphasis in original);

- That it was "no ordinary 'outside' investigation.  [The] Bank did not respond to the Government's subpoenas by turning over documents without comment, and its employees were not subjected to government or regulatory depositions on notice, at which they were defended by company counsel."  But, rather, "[the] Bank did the opposite—it effectively deposed their employees by company counsel and then turned over the resulting questions and answers to the investigating agencies," *id.* at *12; and

- That company counsel "did everything that the Government could, should, and would have done had the Government been doing its own work," *id.*

Focusing on the interviews conducted by the Company, in particular, Chief Judge McMahon noted that:

> [T]he government often will defer its interviews of the witnesses until after the corporate internal investigators can conduct their own interviews. Given the employees' fear of termination by their employer, the government knows that the corporation can be more effective in persuading its employees to speak than it could be, and the government knows all too well that it can then use its leverage over the company to compel the company to tell it what the employees say, even if that requires the waiver of the attorney-client privilege or work product doctrine.

*Id.* (citing Abbe David Lowell & Christopher D. Man, *Federalizing Corporate Internal*

*Investigations and the Erosion of Employees' Fifth Amendment Rights*, 40 Geo. L. J. Ann, Rev. Crim. Proc. iii (2011)).[23]

In determining whether the interviews of the defendant were "fairly attributable" to the Government, Chief Judge McMahon also focused on the particular circumstances of the interviews, including:

- whether and the extent to which the Government directed the company to perform the interviews, *Connolly*, 2019 WL 2120523, at *12;

- whether and the extent to which company counsel provided the government with timely, detailed information from interviews, including assessments of credibility, *see id.*; and

- whether and the extent to which the defendant "was compelled, upon pain of losing his job, to sit for" multiple interviews with company counsel, *id.* at *11.

### 1. There is Ample Evidence That Cognizant's "Internal" Investigation, Including Its Interviews of Schwartz, Is Fairly Attributable to the Government.

From the moment Cognizant learned of potential FCPA violations in 2016, it acted with a single purpose: to do whatever it took—in line with what the Government asked and what it understood the Government expected—to avoid prosecution. The DOJ policies in effect at the time provided a clear blueprint for Cognizant to follow in order to achieve that goal. If Cognizant promptly self-disclosed to the Government, focused its investigation on individuals, and fully cooperated with the Government's stated priorities and requests, including by coordinating witness

---

[23] *See also* Joshua L. Ray, *The Continuing Façade of FCPA Enforcement: A Critical Look at the Telia DPA*, 17 N.Y.U. J. L. & Bus. 547, 556 (2021) ("The overall purpose of the Yates Memo was to strengthen the DOJ's pursuit of individual corporate wrongdoing, by, in part, denying companies any cooperation credit unless they 'completely disclose to the [DOJ] all relevant facts about individual misconduct.' The predictable effect of this policy shift has been to further ratchet up the pressure on corporate defendants to not only decline to challenge law enforcement's allegations, but to gear internal investigations towards identifying evidence of their employees' personal guilt, even where it may not be clear that such guilt exists. And since a company's fate turns on finding evidence its employees did something wrong, it is unsurprising that investigations—usually led by outside counsel with duties to the company—generally find just that.").

interviews and furnishing facts that would permit the prosecution of high-ranking individuals within the company, then Cognizant would be eligible for a corporate declination. Ultimately, Cognizant, in its own words, accurately described itself as having done "everything the DOJ could have asked for" in this regard. Ex. 6 (CTS_R17_0005302).

In close coordination with the Government, and often at its specific request, encouragement or direction, Cognizant and its counsel insisted on employees' cooperation with the investigation, including Schwartz's August 28, 2016 and September 23, 2016 interviews. Exs. 36, 6 (CTS_R17_0005177, CTS_R17_0005307); provided the Government with detailed updates, including witness interview readouts, credibility assessments, and summaries of key documents, Exs. 15, 3, 16, 6, 43 (CTS_R17_0000251, CTS_R17_0005257, CTS_R17_0000278, CTS_R17_0005307, CTS_R17_0005246); seized evidence and conducted forensic analyses addressed to evidentiary and related concerns of the Government, Ex. 48 (CTS_R17_0005192); purported to review materials collected from Schwartz for exculpatory information and discussed their assessments with the Government, Ex. 50 (CTS_R17_0005206); coordinated the Government's subsequent interviews of the same witnesses whose Cognizant-led interviews had been summarized for the Government, Exs. 36, 6 (CTS_R17_0005177, CTS_R17_0005307); facilitated the Government's service of grand jury subpoenas, Ex. 6 (CTS_R17_0005307); and identified potential Government witnesses for trial Ex. 4 (CTS_R17_0005207).

Cognizant, in other words, functioned, for all intents and purposes, as the Defendants' investigating prosecutor throughout its two-plus-year investigation. Its efforts were rewarded in February 2019 with the declination agreement that the Company's investigation was deliberately tailored to obtain. As set forth in more detail below, there is ample, non-speculative reason to believe that Cognizant's investigative activities had all of the hallmarks of state action identified

in the case law; indeed, the extensive record already developed—though there is, as noted, more to learn—makes it clear that there is a "sufficiently close nexus" between the Government and Cognizant's conduct during its investigation, including Schwartz's interviews, such that Cognizant's actions in obtaining Schwartz's statements are "fairly attributable to the government." *Stein II*, 541 F.3d at 146.

> **a.     Cognizant Faced Substantial Pressure to Cooperate With the Government and from Day One of its Investigation, Tailored Its Self-Disclosure and Cooperative Efforts, Including Schwartz's Interviews, to the DOJ Policies Then in Effect.**

There really is no question that Cognizant faced substantial pressure to cooperate with the Government. As Cognizant itself put it: "Suffice it to say, if the Company were prosecuted, it would be very detrimental to [the] Company's business." Ex. 6 (CTS_R17_0005313) ("Given the nature of Cognizant's business as a trusted technology services provider, we believe there would be client and customer flight if the Company were prosecuted, which would impact the business, Cognizant's employees, and potentially shareholders."); Ex. 6 (CTS_R17_0005314) ("Issuing a declination for Cognizant would be mindful of that potential collateral damage, and would be consistent with Department's FCPA Corporate Enforcement Policy goals of focusing on bad actors."). In other words, Cognizant, a publicly-traded company confronted with the specter of significant FCPA charges, faced, in the words of Chief Judge McMahon, "the threat of ruin" if it failed to cooperate with the Government. *Connolly*, 2019 WL 2120523, at *12. This enormous pressure to cooperate, caused by the enormous financial and reputational consequences of potential indictment, is "highly relevant to any assessment of the sufficiency of the nexus between the Government and [the private company]'s 'internal' investigation." *Id.*; *see also Stein II*, 541 F.3d at 151 ("The threat of [ruinous indictment] brings significant pressure to bear on corporations, and that threat provides a sufficient nexus between a private entity's employment decision at the

government's behest and the government itself.") (alteration in original) (citation omitted).

The historical context in which Cognizant thus made the decision to "go all-in with cooperation" and "cooperate in every conceivable way with the Government" informs why it did so. *Connolly*, 2019 WL 2120523, at *2, *8. In September 2015, just months before Cognizant's investigation began, the DOJ released the Yates Memo, which emphasized that "criminal and civil corporate investigations should focus on individuals from the inception of the investigation" and alerted the public and the legal community that, "in order to qualify for *any* cooperation credit, corporations must provide to the Department all relevant facts relating to the individuals responsible for the misconduct." Yates Memo at 2-3 (emphasis added). Shortly thereafter, in April 2016, DOJ launched its FCPA Pilot Program, through which it also "motivate[d] companies to voluntarily self-disclose FCPA-related misconduct" and "encourage[d] companies to disclose FCPA misconduct to permit the prosecution of individuals"—specifically, by making clear that the companies that did so would "qualify for the full range of potential mitigation credit" and be "consider[ed for] a declination of prosecution." Memorandum from Andrew Weissmann, Chief, Fraud Section Criminal Division, The Fraud Section's Foreign Corrupt Practices Act Enforcement Plan and Guidance at 2, 8 (April 5, 2016); *see also* Assistant Attorney General Leslie R. Caldwell, Criminal Division Launches New FCPA Pilot Program (Apr. 5, 2016), *available at* https://www.justice.gov/archives/opa/blog/criminal-division-launches-new-fcpa-pilot-program (the FCPA Pilot Program "should encourage voluntary corporate self-disclosure of overseas bribery, and thus more prosecutions of the individuals responsible").

Unsurprisingly, in light of these widely publicized[24] directions to corporations at the time—

---

[24] In particular, and as noted above, the DLA attorneys who conducted Cognizant's investigation were aware of the priorities and expectations set forth in the Yates Memo, the FCPA Pilot Program, and later the FCPA Enforcement Policy, as they co-authored articles about each during the course

and given the "obvious incentives to shift blame" that they provided (ECF No. 263 at 23)—
Cognizant and its counsel made a "remarkably quick" decision to self-disclose to the Government
upon learning of alleged FCPA violations involving senior Company executives.   Ex. 6
(CTS_R17_0005299); (*id.* at -5302) (highlighting in discussion of "DOJ's policies and priorities"
the "extraordinary speed" of Cognizant's self-disclosure, "less than two weeks from learning of
the allegations (and before the Company found Schwartz's notes)").   And when they did, they
were explicit that Cognizant's investigative activities were (and would continue to be) guided by
the policies, expectations and stated priorities set forth in the Yates Memo[25] and FCPA Pilot

_____

of the investigation—even touting the benefits of self-disclosure and "full cooperation" which,
significantly, included "[c]oordination of investigative steps a company intends to take as part of
its internal investigation with the steps the DOJ may take as part of its investigation, including
witness interviews."  The New FCPA Enforcement Policy Presumes Declination For Companies
That Voluntarily Disclose, Cooperate and Remediate (Nov. 30, 2017) (co-authored by *inter alia*
Karl   H.   Buch,   Gray   Stratton,   and   Jonathan   W.   Haray),   *available   at*
https://www.dlapiper.com/en/us/insights/ publications/2017/11/new-fcpa-corporate-enforcement-
policy/; *see also* Declinations for Self-reporting on the Rise Under FCPA Pilot Program and
Corporate Enforcement Policy (July 10, 2018) (co-authored by *inter alia* Karl H. Buch), *available
at*       https://www.dlapiper.com/en/us/insights/publications/2018/07/global-anticorruption-
newsletter/declinations-for-self-reporting/; DOJ Launches New FCPA Pilot Program to Encourage
Voluntary Self-Disclosure of Misconduct: Key Takeaways (April 6, 2016) (co-authored by *inter
alia*       Jonathan       W.       Haray),       *available       at*
https://www.dlapiper.com/en/us/insights/publications/2016/04/doj-launches/.

[25]   At the evidentiary hearing, Schwartz will test whether the Government itself adhered to the
Yates Memo, which requires that "Department attorneys should be proactively investigating
individuals at every step of the process - before, during, and after any corporate cooperation . . .
[and] should vigorously review any information provided by companies and compare it to the
results of their own investigation, in order to best ensure that the information provided is indeed
complete."  Yates Memo at 4.  The record already points to evidence that this did not occur here:
DOJ began interviewing Cognizant employees only *after* Cognizant had done so and had provided
the fruits of its investigation to DOJ, and DOJ did not issue a subpoena to Cognizant until well
after Cognizant's cooperation was complete and had been provided to the Government, Ex. 53
(DOJ-00000027); nor did DOJ even attempt to seek information that Cognizant withheld under
patently erroneous claims of privilege or that would have been suggested by way of the most
normal follow-up.  Ex. 54 (July 1, 2022 Letter to Government); Ex. 2 (Nov. 4, 2018 Letter to
Government); Ex. 55 (Jan. 10, 2020 Letter to Government); Ex. 56 (Jan. 15, 2020 Letter from
Government).   Indeed, even after Schwartz successfully challenged certain of Cognizant's
privilege assertions, (ECF No. 268) (finding broad privilege waiver over documents forming the

Program.

Indeed, lest Cognizant's intentions in conducting its investigation be in any way unclear, a draft script prepared on August 31, 2016—three days after Cognizant compelled Schwartz to sit for his first interview under threat of termination, and one day before its self-disclosure to the Government on September 1, 2016—reveals that Cognizant planned to ask the Government "to be considered for inclusion in the FCPA Pilot Program" in its counsel's very first self-disclosure call.[26]  In advance of that call, Cognizant's Board had "charged DLA with voluntarily reporting this matter to the DOJ and SEC, along with its stated intention to cooperate fully with the government, including with respect to the continued investigations of individuals pursuant to the Yates Memo and related criteria in the FCPA Pilot Program."  Ex. 13 (CTS_R17_0005220) ("The Company intends to fully cooperate with the DOJ and the SEC.").  Although the details of the conversation between Cognizant and the Government and those leading up to it will be among the key matters to be addressed at the hearing ordered by the Court, there really can be no question but that Cognizant's investigative activities, including its interviews of Schwartz, were at the very least  "significantly encourage[d]" by and "entwined with governmental policies" in a manner that makes them fairly attributed to the Government.  *Stein II*, 541 F.3d at 147 ("A nexus of state action

---

foundation of information conveyed to the Government), the Government still did not ask the company to apply that privilege waiver to documents it had withheld from the Government, and it has not done so to this day, notwithstanding its Rule 16 obligations.  Ex. 54 (July 1, 2022 Letter to Government).  These and other issues will be further explored in the course of the hearing to be held in this matter, but the fundamental point is this:  the Government encouraged and pushed Cognizant to perform its investigation and then blindly followed in its tracks.

[26] While it is apparent on the existing record that Cognizant contemplated self-disclosing to the Government from the outset and at least as early as June 2016, Ex. 4 (CTS_R17_0005407), the hearing ordered by this Court may discern when, precisely, self-disclosure was first discussed by Cognizant and its counsel, and what specifically was discussed, particularly during the period leading up to Schwartz's interviews on August 28, 2016 and September 23, 2016.

56

exists between a private entity and the state when the state . . . provides the private actor with *significant encouragement*, either overt or covert . . . has been delegated a public function by the state, or is *entwined with governmental policies*.") (emphasis in original).

The extent to which DOJ policies guided Cognizant and its counsel is most clearly illustrated in Cognizant's May 10, 2018 presentation to the Government, entitled "Filip Factors & FCPA Corporate Enforcement Policy[27] Presentation."   Ex. 6 (CTS_R17_0005299).   In that presentation, prepared for the express purpose of arguing for the declination of prosecution that Cognizant sought from the beginning, Cognizant detailed "extensive and proactive cooperation provided by the Company to support DOJ's investigation of these former executives [Schwartz and Coburn]"—including, as discussed above, Schwartz's interviews under threat of termination. Cognizant made explicit throughout that its efforts were in furtherance of "DOJ's policies and priorities governing FCPA prosecutions of corporations." Ex. 6 (CTS_R17_0005299). Cognizant and its counsel emphasized, for example, that:

- "The Yates Memo requires companies to '<u>provide all relevant facts relating to individuals responsible for the misconduct</u>' in order to qualify for cooperation credit. Cognizant has gone above and beyond that here.  The Company has repeatedly and proactively provided the Government with information regarding the individual bad actors, including incriminating information." Ex. 6 (CTS_R17_0005315) (emphasis in original);

---

[27] By this time, the FCPA Pilot Program launched in April 2016 had become part of the FCPA Corporate Enforcement Policy that expanded upon the priorities and criteria established as part of the Pilot Program.  As noted above, Buch and other DLA partners who conducted the investigation co-authored an article in November 2017 about the FCPA Corporate Enforcement Policy, touting the "incentives for companies to self-disclose potential FCPA misconduct and cooperate with federal prosecutors" and identified among the expectations for companies "to receive credit for full cooperation the "[c]oordination of investigative steps a company intends to take as part of its internal investigation with the steps the DOJ may take as part of its investigation, including witness interviews."  The New FCPA Enforcement Policy Presumes Declination For Companies That Voluntarily Disclose, Cooperate and Remediate (Nov. 30, 2017), *available at* https://www.dlapiper.com/en/us/insights/ publications/2017/11/new-fcpa-corporate-enforcement-policy/.

- "The FCPA Corporate Enforcement Policy makes clear that the DOJ's <u>policy and priority</u> in FCPA matters is for companies to come in and self-disclose the matters, which is rewarded by a presumption that voluntary disclosure, full cooperation, and remediation will result in a corporate declination. Cognizant did everything the DOJ could have asked for here." Ex. 6 (CTS_R17_0005301-02) (emphasis in original);

- "In addition to fulfilling the objectives of the Yates Memo, a declination will also move the ball forward toward one of the stated goals of the FCPA Corporate Enforcement Policy: <u>to enhance the DOJ's ability to identify and punish culpable individuals</u>." Ex. 6 (CTS_R17_0005315) (emphasis in original);

- "A declination here would be fair to the Company, would be consistent with DOJ precedent, would still allow the DOJ to prosecute the bad actors, and would incentivize voluntary reporting in the way envisioned by the new DOJ policy." Ex. 6 (CTS_R17_0005319).

In other words, Cognizant and its counsel were open about the purpose of their cooperative efforts, and, having set out to obtain maximum cooperation credit under the policies that guided them, they expressly tailored their investigative activities, and their determination to blame the two Defendants in this case, to the expectations and stated priorities of then-operative DOJ policies in pursuit of a corporate declination.[28]

> **b.  There Is Ample Reason to Believe That Cognizant's Interviews of Schwartz, Conducted Under Threat of Termination, Were Significantly Influenced by and Conducted During a Period of Close Coordination with the Government.**

In touting its cooperation with the Government, Cognizant placed particular emphasis on

---

[28]  Beyond the benefits that companies like Cognizant receive by "cooperating" with the Government, including identifying those whom it determines to be culpable, individuals who work at those companies and contribute to the desired outcome can realize significant benefits as well, including in ways that Government prosecutors and agents never could.  Indeed, as set forth in a proxy statement that Cognizant filed with the SEC on April 21, 2021: "in recognition of his contributions to successfully resolving the company's Foreign Corrupt Practices Act matter in 2019, the committee provided a further additional equity award in 2020 consisting of $1,000,000 of RSUs [Restricted Stock Units]" to Cognizant's Executive Vice President, General Counsel, Chief Corporate Affairs Officer and Secretary from May 2017 through January 2021.  *See* Cognizant Proxy Statement (Apr. 21, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1058290/000120677421001176 /ctsh3816981-def14a.htm.

its handling of Schwartz's interviews.   Indeed, and according to Cognizant itself, DLA's persistence in securing Schwartz's interviews was "a distinguishing factor in the Company's cooperation."  Ex. 32 (June 15, 2022 Letter from Government at 2) ("company counsel highlighted that DLA had persisted in securing additional interviews with the president (Coburn) and general counsel (Schwartz) of Cognizant, which [company counsel] described as a distinguishing factor in the Company's cooperation.");  Ex. 6  (CTS_R17_0005311)  ("The  Company  insisted  on cooperation (including interviews) from both Schwartz and Coburn.") (emphasis in original); Ex. 6 (CTS_R17_0005306) (emphasizing Cognizant's efforts in "[d]oggedly persisting in securing additional interviews with both the President and the General Counsel, leading to their eventual resignations (external counsel has shared some details about that persistence with the Department already).").   Those statements alone reflect that Cognizant's actions in coercing Schwartz's statements were, at minimum, "significantly encouraged" by, and thus fairly attributable to, the Government through its policies.   *See, e.g.*, *Stein I*, 440 F. Supp. 2d at 337 ("This Court finds that the government, both through the Thompson Memorandum and the actions of the USAO, quite deliberately coerced, and in any case significantly encouraged, KPMG to pressure its employees to surrender their Fifth Amendment rights. . . .   KPMG's actions in this regard are 'fairly attributable' to the United States.").

The record developed to date reveals an exceedingly close nexus between the Government and Cognizant.   In particular, the documents that Cognizant has so reluctantly produced, in response to extensive motion practice and multiple Orders of this Court, overwhelmingly demonstrate coordination between Cognizant and the Government immediately following the Company's self-disclosure on September 1, 2016.   During the three weeks leading up to Schwartz's second interview on September 23, 2016, Cognizant and the Government

communicated on at least eight separate days, often more than once in a total of no fewer than 21 phone calls and email exchanges.  Exs. 14, 15, 16, 17, 18.

Although many of the communications were oral, the written communications between Cognizant and the Government provide insight into the close coordination between the two, and, in particular, demonstrate that Cognizant continued to provide information to, and field questions and requests from, the Government.  For example, DLA emailed DOJ on September 8, 2016, to notify it that DLA had left a voicemail to "follow up on a question [DOJ] asked us last week," and then sent a list of four personal email addresses "in response to [DOJ's] request during our call last week,"  Ex. 14 (CTS_R17_0000248).  While the precise nature of these requests, and DLA's responses to them, are not yet known, there is reason to believe the contacts that took place are directly relevant to the *Garrity* analysis.  For example, the written requests show that Cognizant complied with the Government's request to be advised of upcoming interviews.   Ex. 15 (CTS_R17_0000251) (Sept. 9, 2016 email from DLA to DOJ:  "As you requested, I write to let you know that we intend to interview Lakshmi Narayanan, Cognizant's Vice Chairman of the Board, on Monday.  Please let me know if you have any questions.").  Likewise, Cognizant provided frequent updates to the Government in real time, including on September 14, 2016, when Cognizant discovered notes on Schwartz's laptop from April 22, 2014.  Those notes, the existence of which appears to have immediately become the subject of discussion between the Government and DLA lawyers, became a focus of questioning at Schwartz's second interview the very next week. Ex. 15 (CTS_R17_0000251) (Sept. 14, 2016 email from DLA to DOJ: "Please let me know if you are available for a call with John [Haray], Gray [Stratton] and me [Karl Buch] between 2-4 pm today.  We would like to raise some recent developments with you."); *see also* Ex. 3 (CTS_R17_0005257) (DLA "[i]nformed DOJ/SEC about Schwartz's notes" on September 14,

2016); Ex. 6 (CTS_R17_0005306) (DLA touting to the Government having turned "over the former General Counsel's facially privileged (but incriminating) notes of the April 2014 conference calls within days of discovering them").

In the weeks leading up to Schwartz's second interview on September 23, 2016, DLA, again in its own words, had a "number [of] conference calls" with the Government.  Ex. 19 (CTS_R17_0005168) (DLA talking points for "October 6, 2016 Joint DOJ/USAO DNJ/SEC Meeting").  Of particular significance, on the morning of Schwartz's second interview, and before the interview even began, DLA sent an email to the Government requesting a call shortly after Schwartz's interview concluded that afternoon.  Ex. 16 (CTS_R17_0000278) (Sept. 23, 2016 email from DLA to DOJ and SEC:  "Are you available for a short call this afternoon for a quick update.").  While the specific details of what was discussed during this call and the numerous other communications—no fewer than 6 calls and 15 emails—leading up to Schwartz's second interview will be revealed only at the evidentiary hearing, the close coordination between Cognizant and the Government during this period is undeniable.  Indeed, the evidence already adduced shows that DLA shared at least the following with the Government: "1. Key points from witness interviews; 2. Steven Schwartz's notes from the April 22, 2014 conference call; 3. Personal email and identifying information for a number of Cognizant associates; 4. Upcoming interviews; [and] 5. Information about witnesses and their counsel."  Ex. 19 (CTS_R17_0005168).

Significantly, the record also reveals that Cognizant decided to terminate Schwartz's employment *before* his second interview, but he was nevertheless compelled to attend and answer questions.  Draft press releases dated September 20 and 22, 2016, produced by Cognizant after significant litigation pursuant to the Court's Order, reveal that Cognizant decided to terminate Schwartz at least three days before his second interview on September 23, 2016.  Ex. 20

(CTS_R17_00004226) (Sept. 20, 2016 draft press release: "Coburn and Schwartz along with Sridhar Thiruvengadam . . . were terminated . . . .  Based on information learned in the early stage of the investigation, the Company concluded that these executives violated significant company policies and made the decision to terminate them."); Ex. 22 (CTS_R17_0004279) (draft press release dated September 22, 2016, and updated following an "all hands meeting at DLA," expressly states that Cognizant "has also terminated the employment of Steven Schwartz, Executive Vice President, Chief Legal and Corporate Affairs Officer.").

But, in fact, Cognizant—closely coordinating with the Government, particularly with regard to the interviews of Schwartz—did not alert Schwartz to his impending termination, but instead compelled him to sit for the second interview the day after it drafted the press release announcing Schwartz's termination.  This is an extraordinarily important fact, for it at least tends to show that the interview, far from being sought by the Company for the purpose of determining whether or not to terminate Schwartz, was in fact designed to elicit statements from Schwartz for Cognizant to pass on to the Government for use in a future criminal prosecution.  *Connolly*, 2019 WL 2120523, at *12 ("[T]he government often will defer its interviews of the witnesses until after the corporate internal investigators can conduct their own interviews. Given the employees' fear of termination by their employer, the government knows that the corporation can be more effective in persuading its employees to speak than it could be ….").

Indeed, Schwartz's second interview was conducted in a manner designed to further the Government's prosecution of him, far beyond furthering the factfinding necessary for an internal investigation.  Buch, himself a former Assistant United States Attorney in the United States Attorney's Office for the District of New Jersey, asked Schwartz a series of leading questions touching on "facilitation payments," a term that has unique significance in FCPA prosecutions,

and "willful blindness," a concept uniquely relevant to criminal prosecutions. Ex. 24 (CTS_R17_0004363-4382). He further repeatedly "pointed out" and "test[ed]" the "inconsistencies" that DLA perceived, and sought to elicit admissions that might bear on Schwartz's potential *criminal* culpability, even going so far as to ask Schwartz, following a series of hypothetical questions, whether he "was aware that this is a potential criminal violation." Ex. 24 (CTS_R17_0004363-4382).

The coordination between the Government and Cognizant did not end with Schwartz's second interview. On October 6, 2016, less than two weeks after that interview, Cognizant, through its counsel, had an in-person meeting with the DOJ and SEC. While the precise content of this meeting is as yet unknown, documents that Cognizant has now produced reflect that Cognizant and the Government were continuing to discuss the investigation of Schwartz, including his status at the Company and, importantly, the Government's direction regarding the questioning of Schwartz. According to DLA's preparation documents for the meeting, DLA highlighted that "Gordon Coburn has resigned"; that "Steven Schwartz's duties have been substantially circumscribed"; and, most notably, that "[t]he Company wants to begin taking employment decisions *subject to any concerns you may have about that*," specifically identifying Schwartz as among the "specific employees" to be discussed with the Government. *Id.* (emphasis added).

Moreover, there is also evidence of the Government directing Cognizant's questioning. Thus, Cognizant "advised the Government that counsel planned to do an additional (third) interview of Steven Schwartz . . . and had requested medical records from Schwartz related to his purported alibi concerning the basal cell procedure that he had performed in April 2014." Ex. 32 (June 15, 2022 Letter from Government). In response, the Government "asked DLA if 'we' had exhausted everything around Schwartz's claim of not remembering the events he was asked about

during his initial interview, and whether Schwartz was in the office the week of those events." (*Id.*); the Government's use of the word "we" is telling, suggesting a joint effort.  Later that same day, Kevin Gingras, a Trial Attorney in DOJ's Fraud Section, emailed Buch—with Osmar Benvenuto, an Assistant United States Attorney in the United States Attorney's Office for the District of New Jersey, copied—saying "do you all have time for a follow up call with us tomorrow?  We have some requests we'd like to make."  Ex. 33 (CTS_R17_0000311).  Buch responded that he has "some additional information that I learned today that I would like to provide to you" and proposed a time for a call.  Ex. 34 (CTS_R17_0000427).  Gingras replied "we have a short list of requests and it shouldn't take long on our end, but we'd be interested to hear about the additional information as well."  Ex. 34 (CTS_R17_0000427).

This close coordination between Cognizant and the Government, specifically surrounding Schwartz's interviews, provides ample basis to believe that the Government "'involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement.'"  *Connolly*, 2019 WL 2120523, at *11 (quoting *Montanye*, 500 F.2d at 415).  Indeed, these facts strongly suggest that the Government was intimately involved in Cognizant's investigation.

To be clear, it is not Mr. Schwartz's position that this coordination was improper or unlawful.  Cognizant was well within its rights to take the steps it took, and the Government had every reason to accept Cognizant's help.  But, however permissible, or even salutary, the Government and Cognizant's actions, they have constitutional implications.  Here, those constitutional implications require that the Court provide for an appropriate remedy for conduct that is, in fact, fairly attributable to the Government.

64

### c. Cognizant's Investigative Activities, Including Witness Interviews, Bear the Hallmarks of State Action.

The evidence, at the very least, strongly suggests that Cognizant's activities are "fairly attributable" to the Government within the meaning of *Garrity* and its progeny, including this Court's prior ruling on the subject. *See* ECF No. 268 at 14 n.7 (quoting *Garrity*, 385 U.S. at 495-96); *see also Connolly*, 2019 WL 2120523, at *2 ("The issue raised by [the defendant's] motion is just exactly how much the investigation conducted by [company counsel] was a substitute for investigative efforts by Government attorneys.").

### (1) Cognizant Closely Coordinated Other Witness Interviews with the Government.

The evidence of close coordination between Cognizant and the Government includes, but is not limited to, Schwartz's interviews. Cognizant conducted a number of employee interviews, and even the current documentary record illustrates significant ways in which Cognizant coordinated its efforts with the Government throughout.

For example, in addition to mandating cooperation with the Company's in-house attorneys and DLA, Cognizant also actively encouraged its employees to cooperate with the Government. *See Connolly*, 2019 WL 2120523, at *7 (citation omitted) (alterations in original) (in finding private employer's actions "fairly attributable" to the Government, noting that the Bank did "everything in its power to facilitate the [Government's own] interviews of relevant current and former … Bank employees[,] which included actively encourag[ing] its employees (current and former) to participate in interviews with regulators"). Here, Cognizant coordinated its employees' cooperation throughout the investigation, including in connection with interviews. Ex. 36 (CTS_R17_0005177) (talking points for October 17, 2016 call with the DOJ, which included "Coordinate Mani interview in mid-November," and discussing that Cognizant would "work with Mani and his lawyer should he wish to retain counsel" and remarked that "once he [Mani] is

lawyered up, we hope he will continue to cooperate with the company and with the DOJ. We will ask that he cooperate."); Ex. 6 (CTS_R17_0005307) ("Coordinating the retention of individual counsel and facilitating government interviews of key witnesses").

The Government also requested to be apprised of Cognizant's interviews of its employees, and Cognizant complied with that request. Ex. 15 (CTS_R17_0000251) (Sept. 9, 2016 email from DLA to DOJ: "As you requested, I write to let you know that we intend to interview Lakshmi Narayanan, Cognizant's Vice Chairman of the Board, on Monday.  Please let me know if you have any questions."); *see Gilman*, 826 F.3d 69 at 76 (noting that whether the Government "'forced' [the private employer] to demand interviews, 'intervened' in [its] decisionmaking, 'steered' [it] to request interviews, or 'supervised' the interview requests" is relevant to assessing whether the private employer's actions are fairly attributable to the Government).   Cognizant and the Government also appear to have worked together to sequence employee interviews.  Ex. 32 (June 15, 2022 Letter from Government at 2) ("The Government also noted that it wanted to interview [Sridhar] Thiruvengadam first."); *see also Connolly*, 2019 WL 2120523, at *6 ("On September 9, 2014, as the Bank's internal investigation was drawing to a close, [the] Bank's counsel sought the Government's "permission" to interview [defendant], who still worked at the Bank, for a fourth time.").  As in *Connolly*, it was, then,  "the Government [that] told [the] Bank whom to interview and when." 2019 WL 2120523, at *12.

The Government also provided feedback and clear direction to DLA regarding the manner in which DLA was conducting interviews (including highly specific instructions as to the use of documents), responding to follow-up requests, and identifying additional employees to be interviewed.  Ex. 32 (June 15, 2022 Letter from Government at 2) ("The Government advised that it would be helpful if DLA kept track of documents shown to the witness for the first time . . . .

The Government thereafter asked DLA whether, for any future witness interviews DLA conducted, DLA could first speak with the Government before showing a witness a document that he/she might not have received. DLA said yes.").  In another example, as the Government recently revealed, "DOJ advised DLA that it (DOJ) would get back to them on whether to proceed" with a request from witnesses' counsel "for a debrief regarding statements that their respective clients [Raj Ghosh and Sridhar Thiruvengadam] had previously made to DLA prior to retaining counsel." (*Id.* at 3); *see also id.* ("the Government asked DLA to track down" an employee who had not yet been interviewed, "get an answer from him" on whether he was on an April 2014 call with Schwartz, Coburn, T. Sridhar, and Ramamoorthy, and "requested a summary from the interview").

Throughout its investigation, Cognizant provided real-time updates to the Government regarding employee interviews (especially Schwartz's) and other key factual developments, an important factor under *Connolly*.  2019 WL 2120523, at *7 (noting that the Bank's counsel "provided the Government with real time updates about facts gleaned from employee interviews"). *See, e.g.*, Ex. 15 (CTS_R17_0000251) (Sept. 14, 2016 email from DLA to DOJ: "Please let me know if you are available for a call with John [Haray], Gray [Stratton] and me [Karl Buch] between 2-4 pm today.  We would like to raise some recent developments with you."); *see also* Ex. 3 (CTS_R17_0005257) (DLA "[i]nformed DOJ/SEC about Schwartz's notes" on September 14, 2016); Ex. 16 (CTS_R17_0000278) (Sept. 23, 2016 email from DLA to DOJ and SEC:  "Are you available for a short call this afternoon for a quick update.").  Thus, by May 10, 2018, Cognizant and DLA had provided "[m]ore than 40 telephonic investigation updates" to the Government.  Ex. 6 (CTS_R17_0005307).

Moreover, in reporting out these updates about employee interviews, Cognizant—very specifically seeking to assist the Government in a way that is both unusual and obviously bespeaks

being a member of the prosecution team—shared its credibility assessments. Ex. 43 (CTS_R17_0005246) (DLA memo dated Feb. 3, 2017 re: "Government Meeting Talking Points": "We expect that you may find that Raj [Ghosh] is a difficult witness – at times inconsistent, unclear and circular. Karen [McLoughlin] has no memory of Raj telling her about a demand. Given Raj's inability to remember and restate what he told Karen, her lack of recall was not unreasonable."); Ex. 3 (CTS_R17_0005257) (DLA talking points for May 1, 2018 meeting with DOJ and SEC: "We have reason to doubt Deepa's credibility"); Ex. 32 (June 15, 2022 Letter from Government at 2) ("During the [February 14, 2017 call with the Government], DLA stated that [Sridhar] Thiruvengadam's testimony has evolved and his memory has gotten better."); Ex. 26 (June 24, 2019 Letter from Government at 58) ("DLA stated that Ramamoorthy is a truth-teller, but that the Government should make its own judgment."); (*id.* at 86) ("DLA Piper noted that Sridhar was very cagey, was not telling the truth").

Certainly, Cognizant's investigation, through its attorneys at DLA, was "no ordinary 'outside' investigation." *Connolly*, 2019 WL 2120523, at *12. As in *Connolly*, Cognizant stepped outside of its role as an employer or neutral witness and into the shoes of the Government: Cognizant "did not respond to the Government's subpoenas by turning over documents without comment, and its employees were not subjected to government or regulatory depositions on notice, at which they were defended by company counsel. Indeed, [Cognizant] did the opposite—it effectively deposed [its] employees by company counsel and then turned over the resulting questions and answers to the investigating agencies." *See id.* at *12. Its actions are thus "fairly attributable" to the prosecution.

### (2) Cognizant Performed Distinctly Prosecutorial Functions on Behalf of the Government Throughout Its Investigation.

On the current record, there is ample reason to believe—and therefore ample reason to

further explore the extent to which—Cognizant assumed fundamental prosecutorial functions, such as gathering evidence to be used by the Government, conducting interviews designed to elicit incriminating statements for use at trial, investigating and rebutting potential defenses, reviewing documents to determine relevance, and making credibility assessments.  For example, Cognizant collected, reviewed, categorized, and selectively produced documents to the Government that it believed to be relevant and, importantly, emphasized certain materials that Cognizant believed would satisfy the Government's investigative priorities.  And that is exactly what occurred in *Connolly*, where the court explained:

> The Bank's efforts to cooperate ... [were] not [ ] limited to the raw transmission of documents and data. In other words, [the] Bank did not simply respond to Government document requests by producing responsive documents for the Government's review. Instead, [the] Bank flagged notable ... evidence or information that [it] believed would be of particular interest to the Government.  It also complement[ed] [document] productions with facts learned from [the] Bank's own interviews of relevant employees.

2019 WL 2120523, at *7 (internal quotation marks and citations omitted).

In May 2018, outlining its cooperation efforts, Cognizant specifically boasted that it had "[p]roduc[ed] over 100,000 pages to the DOJ . . . [and] made every effort not to just 'data dump' these documents on the DOJ, but has presented them in a way that makes clear the key findings and important documents."  Ex. 6 (CTS_R17_0005307).  As reflected in the presentation that Cognizant made to the Government entitled "Filip Factors & FCPA Corporate Enforcement Policy Presentation," Cognizant's cooperative efforts included doing "everything it can responsibly do to provide key evidence involving its former General Counsel" and providing "further cooperation specific to Steven Schwartz, including: Investigating his alleged amnesia defense . . . Collecting a number of Apple 2014 notes and producing those documents to assist the government's efforts to authenticate his April 2014 notes; and Conducting a forensic deletion analysis on Schwartz's laptop."  Ex. 6 (CTS_R17_0005308) (emphasis in original).  Cognizant's role as the Government's

69

investigator could not be more clearly stated.[29]

DLA also compiled information and conducted forensic analyses directly addressed to remedying certain concerns that the Government had articulated, again acting like a member of the prosecution team.  Ex. 48 (CTS_R17_0005192) (June 22, 2017 DLA memo titled "Responses to Government Questions": "Government Questions" included "Phone records relating to Dana/Frank conversations with Schwartz?"; "What were the date ranges for the Coburn and Schwartz page turns?"; "Download of interviews covering Schwartz's state of mind around April 21-22, 2014.").

Finally, DLA at least purported to take responsibility for some of the Government's *Brady*-related obligations.  Specifically, because Cognizant withheld information and documents from the Government under unchallenged claims of privilege, DLA re-reviewed withheld material, specifically related to Schwartz, for exculpatory information and discussed its findings with the Government.  Ex. 50 (CTS_R17_0005206) (Nov. 21, 2018 email from Stratton to Buch re: "DOJ TPS [Talking Points]": "We still have a few open non-subpoena requests. We are working through

---

[29] As part of this role, Cognizant made what it labeled "relevance" (as opposed to mere responsiveness) determinations on behalf of the Government with respect to the documents and files it was collecting, including from Schwartz.  Ex. 5 (CTS_R17_0005195) (June 22, 2018 "Talking Points re Collection and Review of Key Custodians": detailing the collection and review of Schwartz-specific devices and materials and noting that "[a]pplication of these searches resulted in 21,021 documents to be reviewed from Schwartz's custodial files, 362 of which were tagged as relevant"); Ex. 45 (CTS_R17_0005204) (Dec. 19, 2018 email from Gray Stratton (DLA) to Karl Buch re: "DOJ TPs (Schwartz Data)": "We have completed that review [proposed to the Government by DLA] of Schwartz's documents from Aug. to Nov. 2016 and found no additional relevant documents."); Ex. 46 (CTS_R17_0005203) (Jan. 4, 2019 email from Stratton to Buch re: "DOJ TPs": "We have completed our review of Schwartz data. We found no new relevant content in that data"); Ex. 47 (CTS_R17_0005202) (Feb. 14, 2019 email from Stratton to Buch re: "DOJ TPs Regarding Schwartz Production": "We asked Schwartz to produce to us all company documents. We then reviewed those documents for relevancy and produced the relevant, non-priv materials to DOJ. The gaps in this bates range are company documents produced by Schwartz that were not relevant to the investigation.").

these. Notably – We are re-reviewing all previously withheld and redacted Schwartz materials. We've seen nothing exculpatory but we are still going through these. We anticipate having further discussion with you once we're through these."); *id.* ("Our final numbers are lower than our preliminary numbers . . . none exculpatory for Schwartz).").[30] Thus, based on the evidence already produced—it is clear that Cognizant assumed functions reserved for the Government, including the critical role of reviewing evidence for purposes of complying with Constitutional obligations.

> **(3)** **Cognizant Provided the Government with a Clear Investigative Roadmap, and the Government Ultimately Accepted the Results of Cognizant's Investigation in Lieu of Conducting Its Own Investigation.**

For over two years, Cognizant stepped into the shoes of the Government in investigating this case.  When it ultimately presented the fruits of its investigation to the Government, the Government then turned around and clearly used Cognizant's investigation as the basis for this prosecution.  Indeed, the Government's investigation and subsequent interviews of the same interviewees followed what the *Connolly* court aptly denominated a "road map" that had already been provided by Cognizant's prior investigation.  *See Connolly*, 2019 WL 2120523, at *9 ("It is hard not to conclude that the Government did not conduct a single interview of its own without first using a road map that" the company's counsel provided, "illuminating just how the Government should 'investigate' the case against certain [company] employees, including [the defendant].").

The evidence of this is clear: in total, DLA provided oral downloads to the Government of at least 45 interviews of 20 different Cognizant employees.[31]  DLA provided the Government with

---

[30] Of course, as is discussed in Section III below, the documents thus far obtained by the defense show that, in fact, Cognizant withheld exculpatory information from the Government, and thus from the defense.

[31]  The Government provided the defense with summaries of the DLA Downloads in four letters

the results of its investigation, and, it appears (though this is not certain, downloads of its interviews, *before* the Government conducted *any* of its own interviews of the same interviewees. That is, by the time the Government conducted its first interview of Cognizant personnel on February 7, 2017, the Government had in its possession all of the witness statements, documents, and investigative conclusions that DLA had been preparing and providing to it for the past five months.  Every one of the Cognizant employee witnesses whom the Government interviewed (except one, who was only interviewed about Cognizant's IT systems and not any substantive matter) had already been interviewed by DLA, and the substance of those interviews had already been conveyed to the Government before the Government conducted its interviews.  Put another way, with the exception of a single, ministerial witness, the Government's investigation did not go one step beyond Cognizant's, and every material piece of evidence now relied on by the Government (every witness, every document, every statement of the Defendants) had been previewed for the Government by Cognizant.  As the *Connolly* court recognized, this is compelling evidence that Cognizant effectively acted as a prosecutor-by-proxy, and it should accordingly be subject to the same constitutional requirements that pertain to the Government.

The sequence of events—including the Government's failure to conduct a single interview until after DLA had completed all but one of its interviews[32] and provided summaries to the Government—demonstrate that there was no Governmental "parallel investigation" occurring during the time Cognizant was conducting its investigation.  *See Connolly*, 2019 WL 2120523, at *9 ("One critically important issue is just what the Government was doing during the [period

---

dated June 14 (Ex. 39), June 24 (Ex. 26), July 24 (Ex. 40), and November 20, 2019 (Ex. 41).
[32] On April 5, 2018, over one year after DLA completed all other Cognizant employee interviews, DLA conducted an additional interview of Cognizant's Chief Security Officer, Henry Shiembob. Ex. 39 (June 14, 2019 Letter from Government at 15-16).

between the commencement of the company's investigation] and [the] Bank's eventual entry into a DPA with DOJ …. Did the Government conduct a substantive parallel investigation to the "internal" investigation at [the] Bank, or did it simply give direction to [the Bank and its counsel], take the results of their labor (which appears to have been fully disclosed to Government lawyers), and save itself the trouble of doing its own work?").  Here, "the record contains very little evidence about the Government's own independent investigative efforts" during Cognizant's investigation. *Id.*

The evidence thus far produced, over the objection of the Government, and in the face of mighty resistance by Cognizant, already illustrates the overwhelming "coordination" between the Government and Cognizant, as well as the Government's "significant encouragement" at every stage, and Cognizant's successful effort to become deeply "entwined with" the Government and thus to avoid its own prosecution, in line with the then-effective governmental policies, such as the Yates Memo and the FCPA Pilot Program.  *Stein II*, 541 F.3d at 147 ("A nexus of state action exists … when the state exercises coercive power, is entwined in the management or control of the private actor, or provides the private actor with *significant encouragement,* either overt or covert, …, or is *entwined with governmental policies.*") (emphasis in original); *see also Connolly*, 2019 WL 2120523, at *10 ("[A] close nexus of state action exists between a private entity and the state when a governmental actor … provides the private [actor] with significant encouragement, either over or covert … or … entwines the private actor in governmental policies.").  Because a "sufficiently close nexus" thus exists between Cognizant and the Government, Cognizant's actions in compelling Schwartz's statements are "fairly attributable" to the Government, and are accordingly subject to the constitutional constraints of *Garrity*.  *Stein II*, 541 F.3d at 146-51.  They should be suppressed.

II.   **ONCE *GARRITY* COMPULSION IS DEMONSTRATED, THE GOVERNMENT BEARS A HEAVY BURDEN TO PROVE THAT ITS SUBSEQUENT INVESTIGATION, GRAND JURY PRESENTATION, AND PROSECUTION WERE NOT TAINTED BY USE OF SCHWARTZ'S COMPELLED STATEMENTS.**

A.   **Applicable Law**

*Garrity* and its progeny apply the Fifth Amendment to the use of "compelled" statements in a subsequent criminal proceeding such that "[a]ny use, direct or indirect, of a defendant's compelled statements is unconstitutional under the Fifth Amendment's self-incrimination clause." *Connolly*, 2019 WL 2120523, at *15 (citing *Kastigar v. United States*, 406 U.S. 441, 453 (1972)). And as the Supreme Court has explained, "[t]he privilege afforded [by the Fifth Amendment] not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime."  *United States v. Hubbell*, 530 U.S. 27, 38 (2000).

In *Kastigar*, the Supreme Court imposed a "total prohibition" on the use of compelled testimony as a "comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures."  406 U.S. at 460.  The rationale for this rule is clear and compelling: the Fifth Amendment's protection against self-incrimination must "leave[] the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege."  *Id.* at 462; *see also Pillsbury Co. v. Conboy,* 459 U.S. 248 (1983) (same).

As a result, *Kastigar* prohibits both the Government's use of the compelled statements themselves and any derivative use of the compelled statements, including "assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy."  *United States v.*

74

*McDaniel*, 482 F.2d 305, 311 (8th Cir. 1973).  Because of this prohibition, "the government must show that it has not and will not use the compelled testimony or its fruits against the defendant *in any manner* in connection with the federal prosecution."  *United States v. Smith*, 580 F. Supp. 1418, 1421(D.N.J. 1984) (emphasis in original) (citing *Murphy v. Waterfront Commission*, 378 U.S. 52, 79 (1964)); *id.* ("The government's burden is not limited to a showing that it will not use the testimony directly (for example, introducing it into evidence) or indirectly (for example, as a means to other evidence).  It also has the 'affirmative duty' of showing that it did not and will not exploit the immunized testimony in more subtle, elusive ways."); *United States v. Semkiw*, 712 F.2d 891, 895 (3d Cir. 1983) (noting that under *Kastigar*, a defendant's compelled testimony cannot be "used against him in any respect"); *see also  United States v. Cozzi*, 613 F.3d 725, 730 (7th Cir. 2010) ("There is no question that *Kastigar* bars not only evidentiary use of compelled testimony but also non-evidentiary, or derivative, use of the same.").

So, for example, under *Kastigar* the Government cannot use compelled statements to "develop investigatory leads, to focus an investigation on a witness …, or to motivate another witness to give incriminating testimony."  *United States v. Slough*, 641 F.3d 544, 549 (D.C. Cir. 2011) (citation omitted); *see also Hubbell*, 530 U.S. at 42 (because the defendant's compelled disclosure "was the first step in the chain of evidence that led to [the criminal] prosecution" against him, the prosecution violated his Fifth Amendment privilege); *United States v. Allen*, 864 F.3d 63, 69 (2d Cir. 2017) (reversing defendants' judgments of conviction and dismissing the indictment; finding, in part, that the Government failed to satisfy its burden under *Kastigar* that the defendants' compelled testimony did not "shape, alter, or affect the evidence used by the government," specifically, the testimony of a key cooperator); *State v. Oatney*, 369 Or. 555, 574 (2022) (explaining that the Government violates *Kastigar* where it uses compelled testimony to "motivate

another witness to give incriminating testimony" or where the "content of a witness's subsequent testimony is 'shaped, altered, or affected' by such exposure.") (citations omitted).

Even a prosecutor's mere exposure to compelled testimony may give rise to a *Kastigar* violation. For example, in *United States v. Semkiw*, the Third Circuit remanded for an evidentiary hearing because the district court failed to make factual findings regarding whether the prosecutor made any use of the inadmissible testimony in the preparation and conduct of the trial.  712 F.2d at 895; *see also Slough*, 641 F.3d 544-55 ("We thus vacate and remand the case for the court to determine, as to each defendant, what evidence—if any—the government presented against him that was tainted as to him").  Likewise, in *United States v. McDaniel*, the Eighth Circuit found that the district court failed to consider "the immeasurable subjective effect" that reading compelled testimony had on the prosecutor's trial preparation, and thus concluded that "the court's finding that the government had fulfilled the burden of proof required by *Kastigar* cannot stand."  482 F.2d at 312.[33]

Under the law, "[o]nce the defendant shows that he made a protected statement," *Cozzi*, 613 F.3d at 728, prosecutors bear the "burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." *Kastigar*,

---

[33] Similarly, in *State v. Jackson*, 125 Ohio St. 3d 218, 223 (2010), the Supreme Court of Ohio held that "[t]he state makes derivative use of a *Garrity* statement when the prosecutor reviews the statement in preparation for trial" and that "the prosecutor's possession of [the defendant's] *Garrity* statement during trial preparation constituted an improper use within the meaning of *Garrity*."  The court concluded that "the state failed to meet its burden to show that it did not use [the defendant's] *Garrity* statement either before the grand jury or during trial preparation," and therefore, the court reversed and reinstated the trial court's order dismissing the indictment.  *Id.* at 226; *see also State v. Munoz*, 103 N.M. 40, 43-44 (1985) (reversing the defendant's convictions and concluding that "the State did not and cannot meet its burden of disproving taint and showing an independent source for its evidence" when it was "undisputed that the district attorney not only had 'access' to defendant's immunized testimony, but heard defendant's original immunized testimony when it was given and read a transcript of that testimony prior to defendant's trial").

406 U.S. at 460.  The Government's burden is a "heavy" one—it is "not limited to a negation of taint," but rather, "it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."  *Id.* at 460-61; *see also United States v. Pantone*, 634 F.2d 716, 721 (3d Cir. 1980) ("*Kastigar* underscored the principle that the presumption of use must be more than negated; the government has the duty to prove affirmatively that its evidence is derived from an independent source."); *Allen*, 864 F.3d at 91 ("When a witness has been compelled to testify relating to matters for which he is later prosecuted, the government bears the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources.") (internal quotation marks and citation omitted).

The Government can satisfy its "heavy burden" only with "clear and convincing evidence." *Smith*, 580 F. Supp. at 1422 (citation omitted); *accord United States v. Skalsky*, 616 F. Supp. 676, 679 (D.N.J. 1985) ("If a defendant is prosecuted following a grant of use and derivative use immunity, the government must establish, by clear and convincing evidence, … that the evidence it uses to prosecute is derived from legitimate sources independent of the immunized testimony.").[34]  Conclusory denials of taint are insufficient to sustain the Government's burden. *See*, *e.g.*, *United States v. Hampton*, 775 F.2d 1479, 1487 (11th Cir 1985) ("Obviously, the government's conclusory denials of direct or derivative use are insufficient even to negate taint, much less to carry the government's affirmative burden of tracing all evidence presented to wholly independent sources." (internal quotation marks omitted)); *United States v. Nemes*, 555 F.2d 51,

---

[34]  Courts in other jurisdictions have applied a preponderance of the evidence standard.  *See, e.g.*, *Allen*, 864 F.3d at 92; *United States v. McDonnel*, 550 F.2d 1010, 1012 (5th Cir. 1977).  While this Court should follow the standard applied in the District of New Jersey in *Smith* and *Skalsky*, Schwartz respectfully submits that the Government here cannot meet its burden under either standard.

55 (2d Cir. 1977) (vacating judgment of conviction and remanding for a *Kastigar* hearing because "[p]lainly the prosecutor's assertion that the [compelled] testimony was not used is inadequate."); *United States v. Tantalo*, 680 F.2d 903, 908 (2d Cir. 1982) ("[T]he heavy burden cast upon the Government ... is not satisfied by the prosecution's assertion that immunized testimony was not used. Such disclaimer provides an inadequate basis for the denial of a motion to dismiss an indictment.").

Finally, "[t]he logic of *Kastigar* . . . applies to grand jury proceedings as well as to trials." *United States v. Palumbo*, 897 F.2d 245, 249 (7th Cir. 1990). Thus, the Second Circuit in *Allen* made clear that dismissal of an indictment is necessary where tainted evidence derived from the defendant's inadmissible statements was included in the Government's presentation to the grand jury. *See* 864 F.3d at 98-100; *see also United States v. Harris*, 780 F. Supp. 385, 393 (N.D.W.V. 1991), *aff'd* 973 F.2d 333 (4th Cir. 1992) (dismissing before trial an indictment that was based on coerced testimony because "[w]here immunized testimony is used before a grand jury . . . the grand jury process itself is violated and corrupted."). And again, where a defendant demonstrates that compelled testimony was presented to the grand jury, "[t]he government must make a 'strict showing' that the indictment was obtained independent of" the compelled testimony. *Palumbo*, 897 F.2d at 249. If the Government cannot demonstrate that the evidence presented to the grand jury "was derived from a legitimate source wholly independent of the compelled testimony," then the indictment must be dismissed. *See id.* at 250-51; *see also United States v. Zielezinksi*, 740 F.2d 727, 733 (9th Cir. 1984) ("We cannot permit convictions to stand where indictments are tainted").[35]

---

[35] The Government will often seek to satisfy its burden under *Kastigar* by demonstrating that it has taken "[t]he usual precautions" to protect a defendant from "ill effects of h[is] compelled statement … by insulat[ing] a prosecutor and/investigator who is familiar with the immunized

### B.    Schwartz's Compelled Statements Require A *Kastigar* Hearing.

Schwartz's statements at his August 28, 2016 and September 23, 2016 interviews were

compelled in violation of *Garrity* and must be suppressed.  But beyond the suppression of those

statements, and in order to determine whether broader relief is warranted, the Court should also,

as part of its inquiry, conduct a *Kastigar* hearing.  At that hearing, the Court will determine

whether, and if so the extent to which, the Government's investigation, grand jury presentation,

and prosecution have been tainted by use of Schwartz's compelled testimony. *See McDaniel*, 482

F.2d at 312 ("Ordinarily, the question whether the prosecutor has made any use, direct or indirect,

of the compelled testimony can and should be fully explored by an appropriate hearing before

trial.").[36]

_____

statement from subsequent prosecution of the compelled witness or to seal the incriminating documents." *Harris*, 973 F.2d at 337 ("Unless the government relies solely upon evidence obtained prior to the immunized testimony, the principles of *Kastigar* generally require (as a practical matter) a showing that prosecuting officials and their agents were aware of the immunity problem and followed reliable procedures for segregating the immunized testimony and its fruits from officials pursuing any subsequent investigations.").  There is no indication in the record that the Government did so here. And notably, "insulating prosecutors from exposure" would not, standing alone, "automatically prove[] that immunized testimony was not used against the defendant," as   "*Kastigar* is … violated whenever the prosecution puts on a witness whose testimony is shaped, directly or indirectly, by compelled testimony, regardless of *how or by whom* he was exposed to that compelled testimony." *United States v. North*, 920 F.2d 940, 942 (D.C. Cir. 1990).  Thus, "an inquiry is … necessary into whether the content of witnesses' testimony was derived from or motivated by the immunized testimony." *Id.*  Accordingly, the extent to which other witnesses in this case have been exposed to Schwartz's compelled statements will also be a subject of inquiry at a future *Kastigar* hearing.

[36] Indeed, "[a] person compelled to give testimony against himself is entitled to a *Kastigar* hearing in any subsequent prosecution and the Government must affirmatively establish a legitimate source for the prosecution wholly independent of the compelled testimony."  *United States v. Renzi*, 686 F. Supp. 2d 991, 994 (D. Ariz. 2010), *aff'd*, 651 F.3d 1012 (9th Cir. 2011); *Harris*, 973 F.2d at 336 (noting that a district court "must" hold a *Kastigar* hearing to "allow the government the opportunity to demonstrate that all its evidence came from sources independent of the compelled testimony"); *Slough*, 641 F.3d at 549 ("The defendants moved to dismiss the indictment as tainted. As required by *Kastigar* …, the district court held a hearing to determine the existence and extent of any taint."); *North*, 920 F.2d at 944-46 (holding that "the district judge denied the defendant a hearing to which the Constitution entitled him" and that the prosecution must prove at a *Kastigar*

Although the full extent to which the Government made use of Schwartz's compelled testimony during its investigation, grand jury presentation, and in the course of this criminal prosecution will be determined at a future *Kastigar* hearing, even the existing record is telling and makes clear how difficult it will be for the Government to meet its burden in this case.  After all, the compelled testimony at issue comes from the Defendant himself, elicited by Cognizant for the purpose of developing facts that could be used to indict and then prosecute him.  (*See* ECF No. 268 at 24-25) (finding that the purpose of Cognizant's investigation was to "dissuade the government from pursuing criminal charges against the corporation, and instead focus its attention on the two individuals here.").   Indeed, the fruits of this unlawful interrogation were orally downloaded to the Government on nine separate occasions.  *See supra* at 13, n.9

It is obvious, and not at all surprising, that the Government has used Schwartz's statements during its investigation and in this very prosecution.  As just one example, the Government asked key witnesses, including Dana Gilbert and Francisco D'Souza, questions about a medical procedure that Schwartz had in April 2014—a procedure that DLA and the Government only learned about from Schwartz at his September 23, 2016 interview.  That procedure, and other statements made by Schwartz during his interview, thus became a specific focus of Cognizant's extensive cooperative efforts and thus of the Government's investigation.  *See* Ex. 57 (DOJ-302-00000054) (Dana Gilbert's October 5, 2017 FBI interview: "GILBERT was unaware of any medical issues related to SCHWARTZ."); Ex. 53 (DOJ-302-00000027-28) (Francisco D'Souza's

---

hearing "the presence or absence of causal links between the immunized testimony and the proffered testimony. That is a factual inquiry; indeed, it is the central purpose of a *Kastigar* hearing.") (internal citation omitted); *id.* at 943 ("Most important, the defendant is entitled to a *hearing* at which he would be able to challenge the prosecution's case for non-use.") (emphasis in original).  At such a hearing, the Court must make "specific findings on the independent nature of the allegedly untainted evidence."  *Harris*, 973 F.2d at 337 (citing *United States v. Rinaldi,* 808 F.2d 1579, 1584 (D.C. Cir.1987)).

October 4, 2017 FBI Interview: "SCHWARTZ told D'SOUZA that SCHWARTZ was having a procedure done related to a skin condition or basal cell."); Ex. 32 (June 15, 2022 Letter from Government at 2) (when discussing the planned third interview of Schwartz, the Government "asked DLA if 'we' had exhausted everything around Schwartz's claim of not remembering the events he was asked about during his initial interview, and whether Schwartz was in the office the week of those events"); *id.* at 1-2 (Cognizant advised the Government that it "had requested medical records from Schwartz related to his purported alibi concerning the basal cell procedure that he had performed in April 2014."); *see also* Ex. 48 (CTS_R17_0005192) ("Download of interviews covering Schwartz's state of mind around April 21-22, 2014."); Ex. 6 (CTS_R17_0005308) (touting in presentation to Government the Company's "further cooperation specific to Steven Schwartz, including: Investigating his alleged amnesia defense . . ..) (emphasis in original).[37]

Likewise, Schwartz's first, coerced, interview was made the basis of subsequent questioning of other witnesses, thus showing how it tainted the process.  For example, Schwartz's statements regarding his lack of recollection of the amount of the proposed bribe payment and, more generally, of what was said on the pertinent April 2014 calls, Ex. 59 (CTS_R17_0004332), were immediately made the subject of questioning of Mr. Coburn.  Ex. 60 (CTS_R17_0004732-33).  And statements in Schwartz's second interview about internal audits of the real estate function

---

[37] Following Schwartz's September 23, 2016 interview, DLA also asked other witnesses questions derived from Schwartz's statements about his medical procedure in April 2014, including Karen McLouglin and Sridhar Thiruvengadam.  *See* Ex. 58 (CTS_R17_0004536) (Cognizant's October 3, 2016 Interview Memorandum of Karen McLoughlin: "McLoughlin did not recall that Schwartz had had surgery around that time, or any indication that he was not lucid or competent."); Ex. 37 (CTS_R17_0004545) (Cognizant's October 19, 2016 Interview Memorandum of Sridhar Thiruvengadam: "Sridhar also did not recall Schwartz having any health problems around this time [April 2014].").

at Cognizant, Ex. 61 (CTS_R17_0004803, CTS_R17_0004798, CTS_R17_0004799), were promptly made an aspect of the questioning of Steven Casari, Vice President of Internal Audit at Cognizant. Ex. 62 (CTS_R17_0004515-4527); Ex. 26 (June 24, 2019 Letter from Government at 8-17).

In sum, the key inquiry at a future *Kastigar* hearing in this matter will not be *whether* the Government used Schwartz's compelled testimony, but rather, the extent to which it did, and whether the Government can meet its burden of showing that this testimony did not taint the proceedings in any way. The result of that inquiry will, in turn, affect the remedy to be imposed, up to and including dismissal of the charges.

## III. THE EVOLVING RECORD GIVES RISE TO A COLORABLE CLAIM THAT CONDUCT "FAIRLY ATTRIBUTABLE" TO THE GOVERNMENT IMPLICATES OTHER CONSTITUTIONAL RIGHTS.

The consequences of Cognizant's close collaboration with the Government in investigating this case do not begin and end with the Fifth Amendment rights at issue in *Garrity* and *Connolly*. *See supra* Sections I-II. Rather, private action, when fairly attributed to the Government, can also have implications for other constitutional rights, such as the Due Process right embodied in the Government's responsibility to disclose exculpatory information to the defense under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. From the outset of this matter, the Defendants have consistently argued that Cognizant's conduct in stepping into the shoes of the Government by performing and then delivering the results of this investigation constituted state action, and thus required the disclosure of information discovered during the course of this investigation that is favorable to the defense. Initially, the defense position was articulated in multiple discovery requests seeking discovery in general and exculpatory information in particular. (*See, e.g.*, ECF No. 60, Ex. A at 1-2); (ECF No. 70, Ex. B at 2-6). But the Government refused to produce the requested materials and thus required the Defendants to pursue those materials from Cognizant

and L&T through subpoenas.  (ECF No. 60, Ex. C).  The Defendants thus moved for issuance of Rule 17(c) subpoenas addressed to Cognizant, seeking pretrial production of information relating to its internal investigation, as well as to the defenses in the case, including evidence concerning reimbursement of alleged bribe payments, change order requests and other exculpatory information.  (ECF No. 70 at 17, 21-25, 28). Although it had invited the application, and notwithstanding that the subpoenas were directed to a third party, the Government opposed them. (ECF No. 76).  In September 2020, the Court granted the subpoena requests, "limited to communications related to the investigation and interview of Schwartz [or Coburn]."  ECF No. 96 at 16-24.  With regard to *Brady*, in particular, the Court held that, while "the hearings ordered by the Court may alter the picture as to the 'outsourcing' claim," on the record then before the Court, "Defendants ha[d] not made any threshold showing that the prosecution failed in its *Brady* obligations, and the prosecution is not generally answerable under *Brady* for facts and documents that were concealed from it by third parties."  (ECF No. 96 at 10, n.10).

In response to the Rule 17 subpoenas, Cognizant produced a small number of documents but objected to the majority of the subpoena requests.  Defendants then filed a Motion to Compel, arguing that Cognizant had stepped into the shoes of the Government in conducting its investigation, and that the scope of the subpoenas should not limited to the Government's involvement in Cognizant's interviews of the Defendants, but should encompass the full range of applicable constitutional rights, including those arising under *Brady*.  (ECF No. 158 at 23-36). Cognizant cross-moved to quash, arguing that the subpoenas called for privileged material as to which there was no waiver, and that they exceeded the Court's strict limitations of the subpoenas to questions going to whether Defendants' statements during their interviews by Cognizant should be suppressed.  (*See, e.g.*, ECF No. 169 at 18, 33-51).

In its January 24, 2022 Opinion, later docketed at ECF No. 268, the Court found that Cognizant had waived privilege as to the materials it disclosed to the Government and communications concerning the same subject-matter.  (*Id.* at 13-14).  While the Court continued to take the position that, at this juncture, the "outsourcing" inquiry should be focused on whether "*Garrity*-style coercion occurred" specifically with respect to the Defendants' interviews, (*id.* at 15-16), it made clear that it "did of course allow some breathing space" for arguments implicating other constitutional rights.  (*Id.* at 16).  Notably, the Court also highlighted Cognizant's "obvious incentives to shift blame," and held that, because Cognizant "performed an investigation for the purpose of exculpating itself, [] it is fair to require it to disclose its evidence in a more evenhanded manner."  (*Id.* at 23-24).  As a result, the Court also ordered Cognizant to produce numerous categories of documents over which it had asserted privilege, such as draft press releases, document retention and collection policies, and interview summaries, including "memoranda, notes, summaries, or other records of the interviews themselves," as well as other underlying documents or communications that were conveyed verbally to the Government, and "documents and communications that were reviewed and formed any part of the basis of any presentation, oral or written, to the DOJ in connection with this investigation."  (*Id.* at 23-24).  These documents obtained in recent months, through hard-fought litigation in the face of Cognizant's ongoing efforts to withhold information from the defense (as it had from the Government) provide the Court with a far more extensive—though still not complete—record upon which to assess both the extent of Cognizant's assumption of Government functions, on the one hand, and its failure to adhere to the rules applicable to prosecutors, including *Brady*, on the other.  Consistent with the Court's prior direction, these issues should be fully aired during the forthcoming hearing, after which the Court will be in a position to order appropriate relief.

### A.      Cognizant's Investigation Implicates the Government's *Brady* obligations.

A determination that the actions of Cognizant and its counsel are, as discussed above, "fairly attributable" to the Government does not implicate only the rights protected by *Garrity* and cases applying it, like *Connolly*.   It also implicates the fundamental rights embodied in *Brady* and its progeny, which hold that the Government's failure to disclose evidence favorable to a criminal defendant violates that defendant's right to Due Process.   *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also, e.g., Turner v. United States*, 137 S. Ct. 1885, 1888, 198 L. Ed. 2d 443 (2017); *Wearry v. Cain*, 577 U.S. 385, 392 (2016); *Smith v. Cain*, 565 U.S. 73, 75 (2012).   To establish a *Brady* violation, a defendant must show that "(1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment."   *Risha*, 445 F.3d at 303.   "Exculpatory evidence includes material that goes to the heart of the defendant's guilt or innocence as well as that which might well alter the jury's judgment of the credibility of a crucial prosecution witness."   *United States v. Starusko*, 729 F.2d 256, 260 (3d Cir. 1984) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).   Or, as the Supreme Court has put it, material exculpatory evidence is any that, if suppressed, would "undermine the confidence in the outcome of a trial."   *United States v. Bagley*, 473 U.S. 667, 678 (1985).

Beyond disclosure, the law is clear that, in order to comply with *Brady*, prosecutors must "'learn of any favorable evidence [to the defense] known to the others acting on the government's behalf . . . including the police,'" who (like Cognizant here) conducted the investigation for the Government.   *Dennis v. Sec'y Pennsylvania Dep't of Corr.*, 834 F.3d 263, 284 (3d Cir. 2016) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)).   While the Government is under no obligation to learn of information possessed by those wholly disconnected from the investigation and prosecution, *see United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996), there is precisely such an obligation for those "acting on the government's behalf in the case."   *Kyles v. Whitley*, 514

U.S. 419, 437 (1995) (prosecutors "have a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case"); *see also Folino*, 705 F.3d at 128 (same); *Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009) (*Brady* "require[s] the disclosure by the prosecution not only of information actually known to the prosecutor, but of all information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution."); *United States v. Ellison*, 527 F. Supp. 3d 161, 166 (D.P.R. 2021) (quoting *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002)) ("'To comply with *Brady* the individual prosecutor has a duty to find any evidence favorable to the defendant that was known to those acting on the government's behalf. Such persons include other members of the prosecuting team, including police investigators working for the prosecution.'"); *Commonwealth v. Medina*, No. CP-51-CR-1210801-199, 2011 WL 3420487 (Pa. Com. Pl. Aug 2, 2011) (in reversing murder conviction where prosecution failed to disclose favorable evidence within the knowledge of others acting on the Government's behalf, stating that "[p]rosecutors have an affirmative obligation to learn of any favorable evidence known to the others acting on the government's behalf in the case when agencies conduct a joint investigation or share labor or resources." (internal quotation marks omitted); *cf. United States v. Pelullo*, 399 F.3d 197, 218 (3d Cir. 2005) (Government under no obligation to search files of Pension and Welfare Benefits Administration because it was not engaged in a joint investigation and did not otherwise share labor and resources with the prosecution).

To be clear, the category of those acting on the Government's behalf and involved in an investigation or prosecution can extend beyond governmental agencies.  For example, in *Blumberg*, No. 14-cr-458 (JLL), the defendant filed a pre-trial motion seeking an order compelling the Government to search the files of ConvergEx, a company that, like Cognizant here, was

cooperating in a Government investigation, for *Brady* materials; the defense argued there, as here, that the Government had "used ConvergEx and its counsel as both a sword and a shield," and had "effectively deputized ConvergEx as a member of the investigative team and delegated to ConvergEx's counsel numerous investigative tasks," which "enabled the Government to ignore additional unproduced *Brady* materials in ConvergEx's files."  *Id.*, (ECF No. 96-1 at 5, 15-16) (D.N.J. Feb. 24, 2016).  In response, Judge Linares held an evidentiary hearing, noting that the motion raised "questions regarding the exact relationship between the Government and ConvergEx . . . and also the extent to which the Government outsourced and/or delegated discovery and investigation tasks to ConvergEx." *Id.*, (ECF No. 113 at 2) (D.N.J. June 7, 2016).  *Blumberg* thus makes clear that, once a defendant has established that a private actor performed the discovery and investigation tasks of the Government, the Government has an obligation to search the company's files for *Brady* material, as it would be obligated to do with respect to the files of any other member of its investigation team.

As the Third Circuit stated in *United States v. Risha*, upon which this Court has previously relied, (*see* ECF No. 96), "There is no question that the government's duty to disclose under *Brady* reaches beyond evidence in the prosecutor's actual possession." 445 F.3d at 303.  The Court in *Risha* analyzed the issue of whether evidence was suppressed within the meaning of *Brady* by looking to whether the Government had some form of constructive possession over the exculpatory information, 445 F.3d at 303-306.  But as this Court has held, "*Risha* does not mandate [] a rigid ticking of boxes" and instead "guide[s] a more flexible 'case-by-case analysis.'"  (ECF No. 96 at 6).  Thus, as the Court has recognized, the analysis is "a more general inquiry" into how closely the prosecution worked with the third party, *id*, noting in particular that "joint fact gathering may be enough to establish constructive possession" by the Government of the materials of "the

87

prosecution's investigative partner[.]"  *Id.* at 7.  *See also United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979) (imputing State's knowledge to Federal prosecutorial team because they had "pooled their investigative energies to a considerable extent" and the effort overall was "marked by [the] spirit of cooperation."); *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (prosecution must search files of other agencies if they are "closely aligned with the prosecution" or have a "close working relationship").

      **B.**    **Cognizant Has Violated Schwartz's *Brady* Rights Through Its Selective Disclosures to the Defense.**

The Government has constructive possession of evidence and information known to Cognizant—even if it has as yet made no efforts to search Cognizant's investigative files for exculpatory information.  *See Risha*, 445 F.3d at 304.  As discussed in detail above, *see supra,* Section I.B., because Cognizant stepped into the shoes of the Government throughout its investigation, its conduct is fairly attributable to the Government; this implicates the full range of constitutional rights afforded to individuals facing investigation and prosecution by the Government.  And *Brady*-related rights are particularly pertinent in cases like this one where, as the Court has correctly observed, Cognizant's efforts were calculated "to dissuade the government from pursuing criminal charges against the corporation, and instead focus its attention on the two individuals here."   (ECF No. 268 at 25).   But whatever Cognizant's interest in withholding exculpatory information, this is not an interest consistent with the Government's interests, and its obligations.  *See Kyles v. Whitley*, 514 U.S. 419, 439 (1995)  (the Government's "'interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done'") (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)); *Turner*, 137 S. Ct. at 1893 ("the *Brady* rule's '"overriding concern [is] with the justice of the finding of guilt"') (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

While the full extent of the *Brady* information that Cognizant failed to produce remains to be seen, it is already clear that Cognizant's productions to the Government, and thus the Government's productions to the defense, did not include documents that any reasonable prosecutor would have disclosed.  Indeed, Cognizant utilized the attorney-client privilege as a means to prevent both the Government and the Defendants from accessing exculpatory information.  Newly-unredacted interview summaries—obtained only recently after multiple court orders directing their disclosure—thus reveal exculpatory evidence that was previously masked behind a "privileged" banner and withheld from Schwartz, in violation of *Brady* and in derogation of Schwartz's right to a fair trial.[38]  This includes significant portions of Schwartz's interview in which he described his practices and views with respect to payments to foreign officials, all of which comported with applicable law.  *See, e.g.*, Ex. 64 (CTS_R17_4707) ([Q:] Is the notion that if someone says – facilitation payment or payment to a GO – it would [g]et your attention?  [A:]

---

[38] Cognizant's conduct in substantially performing the Government's investigatory role in this case may also implicate other rights beyond *Brady*.  For example, with respect to the search of Schwartz's laptop files, it could also implicate Fourth Amendment rights as in *Skinny v. Railway Labor Executives' Ass'n*, where the United States Supreme Court stated that "[w]hether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities . . . The fact that the Government has not compelled a private party to perform a search does not, by itself, establish that the search is a private one."  489 U.S. 602, 614-15 (1989) (finding that the Government "did more than adopt a passive position toward the underlying private conduct").

Furthermore, state action during internal investigations raises other Fifth Amendment Due Process issues, including when a company that is standing in the shoes of the Government spoliates critical evidence, which may deprive the defendant of his fundamental right to present evidence in his own defense.  *See, e.g.*, *California v. Trombetta*, 467 U.S. 479, 488 (1984) (Due Process Clause imposes a duty on law enforcement to preserve "evidence that might be expected to play a significant role in the suspect's defense"); *United States v. Folad*, 877 F.3d 250, 253 (6th Cir. 2017) (failure to preserve evidence that was "apparently exculpatory at the time it was destroyed . . . violates due process regardless of the government's good or bad faith.").  That appears to be the case here, where Cognizant admits that it has failed to preserve texts and emails from critical witnesses during critical periods. *See* Ex. 63 (May 4, 2022 Letter from Cognizant's counsel to defense counsel).

Yes.  I'm of the view that there should be no payments.  Ever.  . . .  FCPA language.  To gain business.  Our code we allow it if people do certain things.  My view is that we should never tolerate it and just stop it."); Ex. 61 (CTS_R17_4805) (Schwartz discussing Coburn declining other bribe requests.  "GC said no immediately.  This was huge.  Same with ███████.  GC said no.  Culture he thought was at Cognizant was they would not do this.").

Cognizant also withheld from the Government the portion of Schwartz's interview in which he discussed how he reported the KITS power bribe demand to the Board.  Ex. 61 (CTS_R17_4802) ("After Monday call SS and Dana got on with Frank and Karen, then got on with head of AC [Audit Committee] and every member of the Board except 1.  Reported up because of amount, specificity, and ongoing investigation.").  This information is, obviously, completely consistent with innocence and, whatever the Government's view of its weight, should certainly have been disclosed.  *Schledwitz v. United States*, 169 F.3d 1003, 1014 (6th Cir. 1999) ("[T]he Supreme Court has pronounced that if a prosecutor has doubt about certain evidence's exculpatory value, the prosecutor should err on the side of disclosure."); *United States v. Nelson*, 979 F. Supp. 2d 123, 135 n.9 (D.D.C. 2013) ("The government's denigration of the weight of the evidence and its persuasiveness at trial is unavailing. The critical inquiry for prejudice is whether the evidence is material.").

Likewise, Cognizant did not convey to the Government, and redacted as privileged in its initial productions of Rule 17 documents to Schwartz, the fact that Mani disclosed that Schwartz suggested that Cognizant not pay L&T until L&T explained the "incidental expenses" in the KITS power change order.  Ex. 65 (CTS_R17_4600) ("we should not pay anything to L&T until we have more clarification about what these payments were for.  They're bold enough to tell use that they have made a USD 300,000 facilitation payment.  To me, those are not facilitation payments.").

This statement not only contradicts other statements by Mani, the Government's star witness, but also demonstrates that, far from showing the requisite criminal intent or an agreement to violate the law, Schwartz was seeking greater clarity and transparency with respect to certain charges and change orders related to the facility at issue in the Indictment.  Cognizant redacted a similarly exculpatory passage from T. Sridhar's interview memo, which it chose not to convey to the Government.  Ex. 66 (CTS_R17_0004676) ("If this call did occur, Steven would have said zero tolerance on doing anything to get the approval or outside the scope.  Everyone agreed that there will be no payments to GOs. . . the 4/21/2014 call with Gordon, Steve and Mani was about freezing money for L&T, not about the demand for payment by GO."); Ex. 67 (CTS_R17_4792) (responding to the question of, if there is a payment, how did Schwartz say it should be reflected in the papers:  "I don't think he mentioned anything on that call.  I think he mentioned if he has to push back L&T on the contractual terms he would talk to L&T.").

Cognizant also withheld from the Government statements by Steve Casari, Cognizant's Vice President of Internal Audit, about efforts by the legal team to develop standard FCPA language and other controls for contracts with vendors.  Ex. 68 (CTS_R17_4886, 4888) ("I remember there were actions that needed to be done – Legal was going to come up with standard language again.  There were follow ups to clarify statements that were made by guys in procurement – ████ . . .  Appropriate anti-corruption reps, audit rights, termination rights . . . I thought it was done . . . This went hand in hand with trying to get FCPA language into our infra contracts.").  The same is true of statements by Karen McLoughlin, Cognizant's Chief Financial Officer, who discussed Schwartz's approach to a prior bribe solicitation related to the ████ ████.  Ex. 69 (CTS_R17_4905) ("████████████████████████████"); *see also* Ex. 61 (CTS_R17_4800) (Schwartz September 23, 2016 interview, discussing ████████ bribe

request: "███ said if we pay 1 of 2 lawyers and we pay them $250k the problem goes away. [Schwartz] said no, we will fight it.  This was a minimum of 250M to clear up the problem prospectively.  Or over 1B retrospectively.  The GO was ultimately arrested.").  Again, the exculpatory nature of this newly-discovered information, which reflects not only Schwartz's refusal to engage in bribery, but the knowledge of Schwartz's stance on bribery throughout the Cognizant c-suite and which Cognizant withheld until the Court ordered that it be produced, is obvious.

These recent disclosures confirm what Schwartz has long suspected:  that Cognizant, through the inappropriate and strategic use of the attorney-client privilege, among other means, provided a skewed narrative to the Government, which is supported with a presentation that, far from "evenhanded," (ECF No. 268 at 24), was only possible because, as this Court has held, Cognizant used privilege as both "'a sword' and 'a shield,'" (*id.* at 8) (citing cases), withholding communications that "concern[ed] the same subject matter"  as that which had been disclosed to the Government, and which "ought, in fairness be considered together" with that which was actually disclosed.  (*Id*. at 14) (citations omitted).

Cognizant thus withheld clearly exculpatory evidence that would have undermined its version of events.  There are many examples of this, even aside from the previously redacted materials which have now been provided:

- An April 27, 2016 email from Schwartz to members of the Cognizant team, copying senior members of his legal department (Dana Gilbert and Joelle Quilla), as well as DLA, instructing that both in-house and outside counsel at DLA should be copied on all communications relating to the investigation of alleged KITS bribes.  Ex. 70.

- Select portions of a July 2016 email chain in which Schwartz suggested to D'Souza and Coburn that Schwartz and Gilbert update certain members of the Audit Committee, including its Chair Maureen Breakiron-Evans, regarding the then-ongoing internal investigation into allegations of improper payments.  Coburn agreed and suggested that Schwartz and Gilbert also update the full Audit Committee at the next committee meeting,

to which Schwartz and D'Souza agreed; Cognizant redacted Schwartz's first email and Coburn's response and withheld Schwartz's and D'Souza's subsequent agreement.  Ex. 72 (CTS-0008350 (redacted version produced by Cognizant to Government); Ex. 71 (without Cognizant's redactions).

- A draft email, sent to Schwartz by Gilbert for Schwartz to send to P. Ganesh, then Associate Vice President of the India Corporate Real Estate Department, requesting Ganesh's cooperation in the internal investigation, including the collection of documents and records and their production to E&Y, to which Schwartz responded within minutes, indicating his intention to send the email without question or hesitation, which he did immediately and without edits.  Exs. 72, 73.

- An August 9, 2016 email from Schwartz to in-house and external legal counsel at DLA (Dana Gilbert and Karl Buch, respectively) in which Schwartz encourages outside counsel's involvement in the investigation and recommends involving senior leadership at the company, including D'Souza and McLoughlin.  Ex. 74.

These documents are extraordinarily valuable to the defense: Schwartz's suggestion that he update the Audit Committee about the FCPA investigation, and Coburn's agreement with that suggestion, are clearly relevant to show that they were not concealing information or impeding the investigation, but rather were transparent within the organization, a fact obviously inconsistent with guilt.  *See* Ex. 72.  Likewise, the July 2016 emails among Schwartz, Gilbert, and P. Ganesh regarding the investigation progress and transmission of documents to E&Y, evidence Schwartz's efforts to advance the investigation transparently and through cooperation with others.  These documents, and others like them, are particularly crucial to the extent that Cognizant has suggested to the Government—and the Government presumably intends to argue at trial—that the Defendants here sought to hinder rather than promote and support the investigation.  The existence of these documents is inconsistent with that narrative, and it is troubling that Cognizant—even after purporting to review Schwartz's documents for exculpatory material—failed to identify and produce them.

In sum, Cognizant acted as a private prosecutor in this case.  It gathered documents and testimony, it made credibility assessments, and it assigned blame.  But it did all of these things and

more without being subject to the constraints and obligations that our system imposes on those who enforce the laws, including those that are articulated in *Brady* and its progeny.  And the Government, for its part, acquiesced in this effort and allowed—indeed encouraged—Cognizant to assume functions routinely reserved to the Government, and then adopted Cognizant's findings as its own.

On this record, with Cognizant continuing to resist further discovery, the Government not even asking Cognizant for it and even going so far as to object to the Defendants' attempts to procure such discovery, there is no reason to believe that Cognizant's files do not contain further information that is exculpatory and material to the defense, and every reason to believe they do. The purpose of the hearing sought in this motion is to determine how that material can be brought to light, and what consequences flow from its existence and suppression.

## CONCLUSION

For the foregoing reasons, Schwartz respectfully requests that the Court grant this motion, suppress his statements made during his interviews on August 28, 2016 and September 23, 2016, and order such other relief as is required.

Dated:  July 8, 2022

Respectfully submitted,

s/ Lawrence S. Lustberg
_____
Lawrence S. Lustberg
John D. Haggerty
Anne M. Collart
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Theodore V. Wells, Jr.

Roberto Finzi
Justin D. Lerer
Kyle T. Sieber
1285 Avenue of the Americas
New York, New York 10119
(212) 373-3000

**BOHRER PLLC**
Jeremy I. Bohrer
Adam C. Yaeger
Jonathan E. Jason
10 Grand Central, Suite 2101
New York, New York 10017
(212) 303-3314

*Attorneys for Defendant*
*Steven Schwartz*