**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**v.**<br><br>**GORDON COBURN and STEVEN SCHWARTZ,**<br><br>　　　　　　　**Defendants.** | Civ. No. 2:19-cr-00120 (KM)<br><br>**Findings of Fact, Conclusions of Law, and ORDER** |

**KEVIN MCNULTY, U.S.D.J.:**

This matter comes before the Court on defendants' motions to suppress and for other relief pursuant to *Garrity v. State of N.J.*, 385 U.S. 493 (1967) and *Brady v. Maryland*, 373 U.S. 83 (1963). (DE 376, 377.)[1] Defendants filed their motions in July 2022, and an evidentiary hearing was held in April 2023. (DE 471, 472.) The parties subsequently submitted post-hearing briefs in May and June 2023. (DE 482, 485, 490.)

Defendants' *Garrity* motions seek suppression of statements they made during interviews with their employer, Cognizant Technology Solutions Corporation ("Cognizant"). The interviews were held as part of Cognizant's internal investigation into allegations of Foreign Corrupt Practices Act ("FCPA")

---

[1]　Citations to the record will be abbreviated as follows:

　　DE = Docket entry in this matter

　　DX = Defendants' evidentiary hearing exhibits

　　Schwartz Cert. = Certification of Steven Schwartz (DE 377-2)

　　Apr. 18 Tr. = Transcript of evidentiary hearing on April 18, 2023 (DE 473)

　　Apr. 19 Tr. = Transcript of evidentiary hearing on April 19, 2023 (DE 476)

　　Def. Br. = Defendants' post-hearing brief in support of their motions to suppress and for other relief (DE 482)

1

violations. Defendants argue that because the interviews were compelled, and because Cognizant's investigation is fairly attributable to the Government, the statements are inadmissible in a criminal proceeding against them.

The *Brady* motions, on the other hand, seek to compel the Government to search Cognizant's records for exculpatory material. Defendants argue that the Government has constructive possession of Cognizant's records relating to the investigation, and therefore the Government's obligation to produce all exculpatory evidence extends to evidence held by Cognizant.

To be sure, various government policies gave Cognizant an additional incentive to investigate and report corporate wrongdoing. Such incentives may provide fodder for cross-examination. They do not, however, render Cognizant a government actor for these purposes. For the reasons set forth below, the defendants' motions are **DENIED**.

## I.    Findings of Fact

The following findings of fact are drawn primarily from testimony and exhibits submitted by the defendants in connection with a two-day evidentiary hearing. (DE 473, 476.)

*The Yates Memo and the FCPA Pilot Program*

In September 2015, the U.S. Department of Justice ("DOJ") released the so-called "Yates Memo," formally entitled "Individual Accountability for Corporate Wrongdoing." (DX 47.) The Yates Memo emphasized that "criminal and civil corporate investigations should focus on individuals from the inception of the investigation" and alerted the public and the legal community that "in order to qualify for any cooperation credit, corporations must provide to the Department all relevant facts relating to the individuals responsible for the misconduct." (*Id.* 2-4.)

In April 2016, the DOJ launched its FCPA Pilot Program, which built on the policies outlined in the Yates Memo. (DX 48.) The program was designed to promote accountability for corporate crime "by motivating companies to voluntarily self-disclose FCPA-related misconduct" so as to "permit the prosecution of individuals whose criminal wrongdoing might otherwise never be

uncovered by or disclosed to law enforcement." (*Id.* 2.) Per the FCPA Pilot Program, a company's decision to self-disclose and cooperate with the Government in accordance with DOJ policies renders the company eligible for a range of potential benefits, up to and including a declination of prosecution. (*Id.* 8-9.)

*Beginning stages of Cognizant's investigation, leading to self-disclosure*

In early 2016, Cognizant began investigating allegations of bribe payments made on its behalf for the purpose of obtaining operating license renewals in India. (DX 61 at 1.) Cognizant retained the law firm DLA Piper ("DLA") to perform an internal investigation, which ultimately uncovered credible evidence that multiple Cognizant employees engaged in misconduct over a period of several years. (DX 53 at 1.) The DLA investigation was led by Karl Buch, a partner of the firm and former Assistant United States Attorney. (Apr. 18 Tr. 235:9-25.)

In August 2016, DLA interviewed Srimanikandan Ramamoorthy, Cognizant's Vice President of Administration, who was responsible for managing Cognizant's real estate projects in India. (DX 61 at 1.) During Ramamoorthy's interview on August 20, 2016, he stated that Cognizant's General Counsel, Steven Schwartz, and its President, Gordon Coburn, authorized a $2.5 million payment to Indian officials to obtain a planning permit for a Cognizant facility in Chennai. (*Id.*) Schwartz and Coburn were immediately removed from all aspects of DLA's pending internal investigation. (DX 29 at 13.)

Cognizant insisted that Schwartz and Coburn cooperate with the internal investigation, in particular by submitting to interviews. (DX 29 at 13.) Cognizant's Code of Business Conduct and Ethics provided that failure by an employee to cooperate fully with any inquiry or investigation by the company could result in disciplinary action, including discharge. (DE 377, Ex. 7 at 6.) Schwartz himself had overseen many investigations at Cognizant and was involved in enforcing Cognizant's policy requiring employees to sit for interviews. (Schwartz Cert. ¶3.) The policy was "well-known at Cognizant," and

employees generally "complied with demands for investigation interviews
because they knew that they otherwise faced the threat of termination." (*Id.*)

On August 28, 2016, DLA conducted its first interview with Schwartz.
(Schwartz Cert. ¶7.) The DLA attorneys who interviewed Schwartz, including
Buch, set and enforced strict ground rules for the interview, including
prohibiting Schwartz from having more than one lawyer present and not
allowing that lawyer to take notes or ask questions. (Apr. 19 Tr. 301:3-24.)
Coburn was also interviewed by DLA in August 2016 but did not have a lawyer
present. (*Id.* 374:21-375:4.)

On September 1, 2016, DLA contacted an attorney at the Department of
Justice ("DOJ"). (DX 54.) During a meeting on the following day, DLA self-
disclosed, on behalf of Cognizant, Cognizant's potential FCPA violations. (Apr.
18 Tr. 261:19-262:1.) DLA also informed the Government of the company's
intention to "fully cooperate with the DOJ and the SEC" and asked that
Cognizant "be considered for inclusion in the FCPA Pilot Program." (DX 56 at
2.) DLA had engaged in no contact with the Government on behalf of Cognizant
prior to those communications. (Apr. 18 Tr. 153:18-154:1; Apr. 19 Tr. 271:15-
272:2.)

*Cognizant's communications with the Government prior to Schwartz's
second interview*

Between September 1, 2016, and September 23, 2016, when Schwartz
was interviewed for the second time, Cognizant's lawyers communicated with
the Government on at least eight separate days via email exchanges and
telephone calls. (DX 2, 3, 12, 54.) During these communications, the
Government asked questions of the Cognizant lawyers and made requests.
(Apr. 18 Tr. 88:3-6.) Cognizant provided employees' personal email addresses to
the Government in response to a request made during one of their calls (DX 2),
and Cognizant advised the Government of upcoming employee interviews in
response to another Government request. (Apr. 18 Tr. 38:15-39:17; DX 3.)

Cognizant also provided the Government prompt updates on
developments in the investigation. For instance, on September 14, 2016,

Cognizant informed the Government that it had discovered notes on Schwartz's laptop from an April 2014 conference call, during which the alleged bribe appears to have been discussed. (DX 3 at 1; Apr. 18 Tr. 43:20-44:16.) Cognizant turned over those notes to the Government within days of discovering them. (DX 29 at 8.) Cognizant also advised the Government during its September 14 call that it planned to interview Schwartz and Coburn a second time the following week. (Apr. 19 Tr. 286:7-12, 20-25.) Cognizant may have told the Government during this call that its lawyers were going to ask Schwartz about the notes on his laptop. (Apr. 18 Tr. 155:6-8.)

      *Schwartz's second interview and the resignations of Schwartz and Coburn*

      By September 20, 2016, Cognizant was at least seriously contemplating terminating both Schwartz and Coburn. A draft press release prepared that day by Cognizant's public relations firm announced both of their terminations, and the draft was shared with four employees who reported to either Schwartz or Coburn. (DX 13; Apr. 19 Tr. 400:18-21.) Buch and Cognizant's then-CEO, Francisco D'Souza, both testified credibly that the company had developed a contingency plan to terminate Schwartz and Coburn but that, at that time, "an actual decision had not been made." (*Id.* 400:12-23; 290:2-14.) Following an "all hands meeting at DLA" the following day, on September 21, 2016, Cognizant revised the press release to remove the anticipated publication date of September 29, 2016. (DX 13.)

      Kevin Gingras, a DOJ attorney who was assigned to the case in September 2016, testified credibly that he was never advised that "Cognizant was holding off on effecting any termination [of Schwartz] so that they could get additional information from Mr. Schwartz and reinterview him." (Apr. 18 Tr. 52:19-53:11.) Gingras testified that he did not know whether Cognizant had made a decision to terminate Schwartz prior to his second interview. (*Id.* 52:19-22.)

      DLA's second interview with Schwartz occurred on September 23, 2016. For this second interview, DLA imposed the same ground rules as it had for the first interview. (Apr. 19 Tr. 301:3-24.) As reflected in the interview summary

that DLA prepared and then shared with the Government, Buch probed Schwartz as to whether the payments at issue were "facilitation payments" and whether Schwartz's conduct amounted to "willful blindness." (DX 57 at 18-19.) The summary provided to the Government contained a verbatim transcript of various of Buch's questions and Schwartz's answers on those subjects. (DX 57.) On the same day as Schwartz's interview, DLA had a call with the Government to provide an update. (DE 377, Ex. 16.)

DLA planned to interview Coburn a second time in late September 2016, but Coburn resigned prior to that scheduled interview. (Apr 19. 375:5-7; DX 11.) On September 28, 2016, the day of Coburn's resignation, DLA requested a call with the Government to discuss a "significant development." (DE 377, Ex. 28.) After that call, DLA and the Government had several additional meetings at the Government's request to discuss some "follow up" and "quick questions." (DE 377, Ex. 30.)

On October 6, 2016, DLA participated in an in-person meeting with the DOJ and the SEC, during which DLA shared that Coburn had resigned, that Schwartz's "duties ha[d] been substantially circumscribed," and that Cognizant wanted "to begin taking employment decisions subject to any concerns [the Government] may have about that." (DX 18 at 7.) DLA told the Government that Cognizant's preferred course was for Schwartz "to resign or we'll terminate him," but that they wanted to do an additional third interview with him to elicit more information. (DX 19 at 4.) DLA also shared that it had requested medical records from Schwartz to corroborate his statement that he did not remember taking the notes found on his laptop because of a medical issue he was then experiencing. (*Id.* at 4-5.)

Cognizant insisted that Schwartz participate in a third interview if he was to have "any hope of keeping [his] job." (Schwartz Cert. ¶4.) Rather than be fired or forced to interview a third time, Schwartz resigned. (*Id.* ¶7.) Cognizant later touted Schwartz's and Coburn's resignations as having resulted from its actions in conformity with the DOJ policies. (DX 29 at 8.)

*Cognizant's continued communications with the Government and production of documents*

After the October 6, 2016, meeting, the Government requested a "follow up call" to share a "short list of requests" and hear additional information from DLA. (DX 22 at 7, 9.) DLA's talking points for the call, which was scheduled for October 17, include a list of five "Pending DOJ requests," including a request for Cognizant to provide "hot docs" relating to the alleged $2.5 million bribe payment. (DX 23 at 1.) Another pending DOJ request was to coordinate a DOJ interview with Ramamoorthy in mid-November. (*Id.*) Buch testified that Cognizant had told the Government that it would pay for Ramamoorthy to obtain counsel, and that this was the Government's request to facilitate an interview with him once he was represented. (Apr. 19 Tr. 330:6-331:12.)

During a meeting in February 2017, the Government requested that DLA first speak with the Government before showing any witness documents that the witness might not have seen previously. (DX 20 at 2; Apr. 19 Tr. 332:6-22.) Buch testified, however, that there were instances in which DLA showed documents to a witness that the witness had not seen, despite the Government's admonition. (Apr. 19 Tr. 335:3-17.)

During a DLA presentation to the Government in December 2017, Cognizant shared other planned employment actions regarding key witnesses, including Ramamoorthy and Sridhar Thiruvengadam, Cognizant's Chief Operating Officer. (DX 16 at 13-14.) After learning of Cognizant's plans to terminate Ramamoorthy and Thiruvengadam, a DOJ attorney told DLA that the Government would "get back to" DLA on that issue, noting that "[a]t the end of the day, it's your decision." (*Id.*)

Over the course of its investigation, Cognizant (through DLA) produced over 100,000 pages of documents to the Government. Cognizant "made every effort not to just 'data dump' these documents on the DOJ" and instead "presented them in a way that ma[de] clear the key findings and important documents." (DX 29 at 9.) The documents provided to the Government included oral downloads conveying summaries of certain of the interviews DLA

conducted. Of the 95 interviews conducted to investigate Ramamoorthy's bribery allegations, Cognizant provided oral downloads to the Government of 45 interviews of 18 different individuals. (Apr. 19 Tr. 340:10-341:1; Apr. 18 Tr. 160:7-162:11; DX 61.)

In a presentation to the Government on May 10, 2018, in which Cognizant sought a declination of a corporate prosecution, Cognizant emphasized that it had "done everything it can responsibly do to provide key evidence involving its former General Counsel." (DX 29 at 10.) This included investigating Schwartz's "alleged amnesia defense" by collecting medical records, collecting and producing relevant notes of Schwartz's, and conducting a forensic deletion analysis of his laptop. (*Id.*) Cognizant also emphasized that it helped the Government "authenticate" certain documents and facilitated the Government's ability to interview certain individuals. (DX 17 at 6-7.) Finally, Cognizant touted to the Government its decision not to immediately terminate Coburn, Schwartz, and other key witnesses, which would likely have made it impossible for the Government to speak to those individuals. (DX 17 at 4; Apr. 18 Tr. 64:5-10.)

On February 13, 2019, the day before Schwartz and Coburn were indicted, Cognizant entered into a declination agreement with the DOJ. (DX 67.) Cognizant was required to disgorge close to $20 million, representing all profits fairly attributable to the bribery conduct. (DX 67.) Cognizant also agreed to pay a civil penalty of $6 million to the SEC. (*Id.*)

*The DOJ investigation*

The Government began to conduct its own interviews of Cognizant personnel and other witnesses on February 7, 2017. (Apr. 18 Tr. 219:17-19.) It appears that, at that point, Cognizant had already provided downloads of its employee interviews to the Government. (Apr. 19 Tr. 339:1-5.) Prior to February 2017, however, the Government did its own investigative work independent of Cognizant, including preparing draft chronologies of documents Cognizant had produced; issuing preservation notices to various internet service providers and to L&T (the company that allegedly paid the bribe to the government official on

behalf of Cognizant); and issuing grand jury subpoenas to JPMorgan and Verizon. (Apr. 18 Tr. 219:23-221:7.)

In May 2018, the DOJ prosecution team traveled to Singapore to interview employees of L&T. (Apr. 18 Tr. 221:21-23.) The Government met with counsel for L&T before May 2018 to gather documents and information. (*Id.* 158:17-20.)

In addition, the Government independently investigated Schwartz's claim that he was experiencing a medical issue during the week of the April 2014 call and could not remember taking the notes found on his laptop. The Government interviewed Schwartz's doctor, obtained Schwartz's medical records, and obtained video footage and other evidence verifying his attendance at a baseball game during the week of the call. (Apr. 18 Tr. 223:6-23.)

Finally, the Government served a subpoena on Cognizant in November 2018. (Apr. 18 Tr. 200:13-18.) The Government decided to issue a subpoena to ensure that Cognizant "would produce what's responsive, not what they deemed relevant" or "interesting." (*Id.* 201:1-10.) David Last, a DOJ attorney who joined the prosecution team in April 2018, testified that he "was very clear" with DLA that "it was our job as the prosecutor to determine what would be exculpatory or inculpatory or otherwise." (Apr. 18 Tr. 205:9-13.)

The subpoena was served several days after a call between DLA and the Government in which the Government sought to inquire about the "lines" that had been drawn in Cognizant's privilege log, which it had produced in January 2018. (DX 42; Apr. 18 Tr. 198:25-199:22.) Specifically, the Government wanted to ensure that all documents that were responsive and nonprivileged were produced, as it was obligated to make determinations regarding exculpatory material. (*Id.*) DLA did not provide the Government with this requested information, however, and instead asserted privilege over how it determined where to draw these lines. (*Id.* 207:3-8.)

Following the November 5, 2018 call, DLA re-reviewed all previously withheld and redacted materials for exculpatory information. (DX 46; Apr. 19 Tr. 362:8-12.) During DLA's call with the Government on November 21, 2018,

Buch told the Government that DLA had found "nothing new" and "nothing exculpatory" in its re-review of these materials. (DX 83.) Buch testified that the Government did not ask DLA to conduct this review, but that it did so "at the company's direction." (Apr. 19 Tr. 362:8-15; 363:5-13.)

## II. Conclusions of Law

### A. *Garrity* motions

I will first discuss the defendants' *Garrity* motions to suppress the statements they made in their interviews with Cognizant.

In *Garrity*, the Supreme Court held that the government may not elicit statements from its employees for use in subsequent criminal proceedings by threatening those government employees with termination. *Garrity*, 385 U.S. at 500. *Garrity* involved police officers who were questioned by the state Attorney General under threat of removal if they refused to answer. *Id.* at 495. The Court held that "[t]he choice imposed on [the officers] was one between self-incrimination or job forfeiture," and thus the statements were constitutionally inadmissible in future criminal actions against the officers. *Id.* at 496. *See* United States Constitution, Amend. V (No person "shall be compelled in any criminal case to be a witness against himself.")

The *Garrity* rule has been cautiously extended beyond the context of government employment. "While *Garrity* involved the conduct of a government employer, the *Garrity* rule applies with equal vigor to private conduct where the actions of a private employer in obtaining statements are 'fairly attributable to the government.'" *United States v. Connolly*, No. 16 CR. 0370 (CM), 2019 WL 2120523, at *10 (S.D.N.Y. May 2, 2019) (quoting *United States v. Stein*, 541 F.3d 130, 152 n.11 (2d Cir. 2008)). It is the defendant's burden to demonstrate that the actions of his or her private employer are fairly attributable to the government in order to qualify for *Garrity* protection. *Connolly*, *supra* at *11.

"Actions of a private entity are attributable to the State if 'there is a sufficiently close nexus between the State and the challenged action of the ... entity so that the action of the latter may be fairly treated as that of the State

itself.'" *Stein, supra* at 146 (quoting *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 351 (1974)). Decisions of the Supreme Court reveal that "[a] nexus of state action exists between a private entity and the state when the state exercises coercive power, is entwined in the management or control of the private actor, or provides the private actor with *significant encouragement,* either overt or covert, or when the private actor operates as a *willful participant in joint activity* with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is *entwined with governmental policies.*" *Stein,* 541 F.3d at 147 (emphasis in original and citation omitted).

"It is not enough, however, that there be a close nexus between the state and the actions undertaken by a private entity; the Government must influence the specific conduct of which the party complains." *Connolly,* 2019 WL 2120523, at *11 (citing *Desiderio v. Nat'l Ass'n of Securities Dealers, Inc.,* 191 F.3d 198, 206–07 (2d Cir. 1999)). In the *Garrity* context, where a private employer undertakes an internal investigation and interviews employees as part of that investigation, it is not enough that the investigation as a whole is "*generally* fairly attributable to the Government." *Connolly, supra* at *12. Rather, the interviews themselves "must have been Government-engineered interviews." *Id.* In addition, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives." *Blum v. Yaretsky,* 457 U.S. 991, 1004–05 (1982). With this legal framework in mind, I turn to the interviews in question.

To start, the record establishes that the interviews of Coburn and Schwartz by DLA were compelled. Cognizant's policies required employees to cooperate fully with internal investigations or face potential termination. (DE 377, Ex. 7 at 6). Cognizant insisted that both defendants comply with the company's requests for interviews, which did in fact lead to their eventual resignations. (DX 29 at 8). The Government does not appear to dispute that the defendants' statements were involuntary. The real dispute, then, is over

whether Cognizant's actions in coercing these statements from the defendants are fairly attributable to the Government.

Cognizant's decision to self-disclose its potential FCPA violations, investigate its employees, and feed the fruits of that investigation to the Government was surely made in the context of its hope of benefit under the Yates Memo and the FCPA Pilot Program. Cognizant asked to be considered for inclusion in the FCPA Pilot Program in its first call with the Government regarding this matter (DX 56 at 2), and DLA evidently tailored the investigation in part to fit the priorities stated in the Program and the Yates Memo (DX 29).

The mere existence of such voluntary disclosure policies, however, does not amount to "such significant encouragement" by the Government that any interview conducted by Cognizant "must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004–05. That Cognizant was acting in furtherance of generally applicable Government policies does not render all of its actions state actions. *See Desiderio*, 191 F.3d at 207 (private college's disciplining of a student was not state action even though state law required the college to formulate a disciplinary code and have it approved by the state). Some additional and more specific state involvement in the interviews is required.

I first note a significant timing issue. The Government did not learn of or become involved in this matter until Cognizant, through DLA, self-disclosed on September 1, 2016. (Apr. 18 Tr. 153:18-154:1; Apr. 19 Tr. 271:15-272:2.) Thus, at a minimum, Coburn's sole interview with DLA and Schwartz's first interview, both of which took place in August 2016, cannot be construed as "Government-engineered interviews." *Connolly*, 2019 WL 2120523, at *12. The Government had no knowledge of the investigation when those interviews occurred.[2]

---

[2]    Citing to *Connolly*, the defendants argue that they need not show that the Government expressly directed or overtly engineered the interviews of the private employer to qualify for *Garrity* protection. (Def. Br. 63.) *Connolly* does not bind this Court, but in any event the defendants are reading too much into it. True, Chief Judge McMahon noted that "[t]he 'controlling factor' is not whether the state directed the constitutionally prohibited conduct, but whether the state 'involved itself in the use of

The remaining discussion is therefore most relevant to Schwartz's second interview on September 23, 2016. The record shows that in the three weeks between Cognizant's initial self-disclosure and that interview (*i.e.,* the period September 1–23), Cognizant's lawyers and the Government communicated regularly. (DX 2, 3, 12, 54.) During that period, Cognizant turned over Schwartz's notes to the Government, shared updates on its investigation and responded to questions from the DOJ team. (DX 3 at 1; Apr. 18 Tr. 43:20-44:16.) In addition, Cognizant complied with the Government's requests to be furnished employees' personal email addresses and to be apprised of upcoming employee interviews. (Apr. 18 Tr. 88:3-6; DX 2.)

Critically, however, there is literally no document or testimony establishing that the Government provided any direction to Cognizant with respect to Schwartz's second interview. *See Gilman v. Marsh & McLennan Companies, Inc.,* 826 F.3d 69, 76 (2d Cir. 2016) (employer's actions were not attributable to the state where there was "no evidence that the AG 'forced' [the employer] to demand interviews, 'intervened' in [the employer]'s decision making, 'steered' [the employer] to request interviews, or 'supervised' the interview requests.") *Cf. Connolly*, 2019 WL 2120523, at *11-12 (company's investigation was fairly attributable to the Government where the Government told the company "whom to interview and when," instructed the company to interview the defendant specifically, and directed the company's counsel on

---

a substantial economic threat to coerce a person into furnishing an incriminating statement.'" *Connolly*, 2019 WL 2120523, at *11 (quoting *United States ex rel. Sanney v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974), *cert. denied*, 419 U.S. 1027 (1974)). In *Montanye*, however, the Second Circuit was merely explaining that compelled statements may be inadmissible in a criminal proceeding even if the compulsion was "conveyed through a private employer, admittedly acting as an agent for the police, rather than through a person on the public payroll." *Id.* at 415. The Court emphasized that "[t]he state is prohibited in either event from compelling a statement through economically coercive means, *whether they are direct or indirect.*" *Id.* (Emphasis added.) Thus, in this case, while defendants need not show that the Government itself compelled their statements by interviewing them, they must show that the Government indirectly did so by engineering the interviews from behind the scenes.

"the precise manner in which he should ask his questions"). Indeed, the evidence is overwhelmingly to the contrary. Although Cognizant volunteered the information that it planned to interview Schwartz a second time, the Government did not ask Cognizant to conduct this interview. (Apr. 18 Tr. 154:2-6.) And while Cognizant may have told the Government of its intent to question Schwartz about the laptop notes, the Government did not instruct Cognizant to cover this or any other topic. Nor did Cognizant seek or obtain the Government's input on its planned questions. (*Id.* 154:10-155:14.) As Gingras explained, "I would not have opined or given them direction, both because I knew not to do that and it was so early in the case, I don't know how I possibly could have felt empowered to tell them what to say or how to ask things, not knowing anything about the case." (*Id.* 155:10-14.)

Even as the case progressed, the Government "never at any point" asked Cognizant to "ask any witness" any "specific question." (Apr. 19 Tr. 277:19-278:6.) Nor is there any evidence that the Government ever instructed Cognizant to select a particular witness for an interview. It does appear that the Government sought to discourage Cognizant from showing witnesses documents that they had not seen before while interviewing them, in order to protect the integrity of the Government's own, later interviews. (DX 20 at 2; Apr. 19 Tr. 335:8-11). Cognizant, however, did not entirely comply with that request. Buch testified, "we [*i.e.,* Cognizant] had an independent investigation that we were conducting, and we needed to be able to show documents to witnesses because there were multiple reasons why we were conducting the investigation." (Apr. 19 Tr. 335:11-14.)

The defendants emphasize that during Schwartz's second interview, Buch asked about "facilitation payments" and "willful blindness." (Def. Br. 70-71.) According to the defendants, those terms have specific significance in FCPA criminal prosecutions, and so it can be inferred that Buch was attempting to elicit statements that the Government could use in its eventual prosecution against Schwartz. Buch testified, however, that those issues were relevant for a number of reasons unrelated to a criminal investigation. (Apr. 19

Tr. 310:9-16.) For instance, Buch explained that Cognizant had a policy regarding facilitation payments, and Buch wanted to understand whether Schwartz had violated that policy. (Apr. 19 Tr. 308:19-24.)

Cognizant surely acted, as defendants say, in the hope of obtaining a declination of prosecution. That of course is different from saying that the Government directed Cognizant's activation, but even on its own terms, the defendants' single-issue framing of the issue is exaggerated. Cognizant had ample reasons of its own to investigate this misconduct. Buch testified that Cognizant conducted its investigation "for a variety of reasons . . . including potential securities litigation, employment litigation . . . [and] shareholder derivative lawsuits." (Apr. 19 Tr. 310:9-13.) As the Second Circuit has explained, "a company is not prohibited from cooperating, and typically has supremely reasonable, independent interests for conducting an internal investigation and for cooperating with a governmental investigation, even when employees suspected of crime end up jettisoned." *Gilman,* 826 F.3d at 77. "[A]cts that are taken by a private company in response to government action, and that have as one goal obtaining better treatment from the government," do not, as a categorical rule, "amount to state action." *Id.* Such a rule "would be incompatible with corporate governance and modern regulation." *Id.* Consequently, while avoiding an indictment was presumably an important objective of Cognizant's internal investigation, that fact does not transform Cognizant's investigation into the Government's investigation.[3]

The defendants argue that the operative Government policies encouraged Cognizant to hold off on terminating Schwartz in order to compel him to sit for a second interview. (Def. Br. 69-70.) Assuming such an incentive existed, what is still lacking is more focused proof that Cognizant conducted the interview(s)

---

[3]      The defendants point out that contemporaneous notes of meetings between DLA and the Government use the term "we" when referring to investigative activities undertaken by DLA in the months following Cognizant's self-disclosure. (Def Br. 28-29.) While not entirely inconsequential, this is inadequate evidence that Cognizant was acting on behalf of the Government.

in response to government pressure. Government policies alone do not entail that a company's action in furtherance of such policies amounts to state action. There is no evidence, for example, that Cognizant informed the Government that it had decided to terminate Schwartz before the second interview or that the Government encouraged or dictated that course of action. (Apr. 18 Tr. 53:8-11.)[4]

The defendants suggest that the Government did not truly conduct a parallel, independent investigation, but instead outsourced it to Cognizant. (Def. Br. 76.) As a comparison, they cite *Connolly*, in which Chief Judge McMahon of the Southern District of New York noted that the record contained "very little evidence about the Government's own independent investigative efforts" during the first three years of the company's investigation. 2019 WL 2120523, at *12. There, however, the Government did not interview any employees until three and a half years after the Government first opened its investigation. *Id.* Chief Judge McMahon concluded that the Government effectively "outsourced" its investigation to the company's lawyers, such that the company's actions were fairly attributable to the Government. *Id.* at *10.

Assuming *arguendo* that this Court would follow *Connolly*, I find it highly distinguishable. As Judge McMahon saw it, the government had virtually abdicated in favor of the company. But where the government in *Connolly* waited three and a half years before conducting its first interview, the Government here waited only five months, and it had reasonable justifications for the delay. (Apr. 18 Tr. 219:17-19.) Before the Government started conducting interviews, it first followed the routine and prudent course of gathering documentary evidence. The record shows that the Government analyzed the voluminous records it was receiving from Cognizant, sought to

---

[4]    Cognizant informed the Government of planned employment decisions regarding other key players witnesses, including Ramamoorthy and Thiruvengadam, and the record suggests that the Government may have commented regarding those plans. (DX 16 at 13-14.) The Government made it clear, however, that those decisions were Cognizant's to make "[a]t the end of the day." (*Id.*)

preserve additional data by issuing preservation notices, and issued subpoenas to gather more information. (Apr. 19 Tr. 219:23-221:7.) Thus the record suggests that the DOJ team waited to interview witnesses until it had a solid understanding of the documents that would form the basis of those interviews. (Apr. 18 Tr. 114:6-10.) Document review was time consuming, requiring the Government to hire a third-party vendor to help with this portion of the investigation. (*Id.* 136:1-6.)

It is true that Cognizant proffered the key findings of its investigation, rather than performing a simple "data dump" of 100,000 pages of documents. Nevertheless, Gingras testified persuasively that the Government did not simply accept the company's "version of events." (Apr. 18 Tr. 112:13-19.) As he explained, "[w]e're not on the same team, and I understand they have an agenda. They want corporation credit, and they want a certain result at the end of the day. But we're doing our own – we're taking our own steps to understand the case and focus our investigation on where we're trying to go." (*Id.*) Accordingly, while Cognizant digested its results, the Government did not simply adopt or build on Cognizant's investigation. I cannot conclude that Cognizant did the Government's work for it to the point that it stepped into the role of the state. *Cf. Connolly*, 2019 WL 2120523, at *12 (noting that the company's counsel "did everything that the Government could, should, and would have done had the Government been doing its own work.")

In sum, there is insufficient evidence that Cognizant's internal investigation as a whole, and its interviews of the defendants specifically, are fairly attributable to the Government. I will therefore deny the defendants' motions to suppress pursuant to *Garrity*.

### B. *Brady* motions

I now turn to the defendants' motions (I will call them the *Brady* motions), which seek to compel the Government to search Cognizant's corporate files for exculpatory material. These motions are made pursuant to *Brady v. Maryland*, which held that the prosecution's suppression of evidence

17

favorable to a criminal defendant violates due process when the evidence is material to guilt or punishment. 373 U.S. at 87.

"There is no question that the government's duty to disclose under *Brady* reaches beyond evidence in the prosecutor's actual possession." *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006). Indeed, "the Supreme Court has made clear that prosecutors have 'a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Id.* (Quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). The critical inquiry is whether a prosecutor may be deemed to have "constructive possession" of the evidence, meaning that, "although a prosecutor has no actual knowledge, he should nevertheless have known that the material at issue was in existence." *Risha, supra.*[5]

In *Risha*, the Third Circuit discussed constructive possession of evidence held by state authorities in connection with a federal prosecution for arson. The Court identified three factors to be considered when evaluating constructive knowledge: "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence." 445 F.3d at 304.

This Court has not discovered any binding authority holding that the prosecution had constructive possession of evidence held by a private company.[6] In *United States v. Holovacko*, which involved an internal Merrill Lynch investigation into one of its employees, the Third Circuit applied the

---

[5]    To be clear, the Government subpoenaed and otherwise obtained from Cognizant a large amount of material pertinent to its investigation. The Government concedes that it is obligated to review that material, which is in the Government's possession, for exculpatory evidence. At issue is the existence, or not, of a further obligation to search Cognizant's files.

[6]    *But see* discussion of two out-of-circuit cases at pp. 21–22, *infra.*

18

*Risha* factors and concluded that the Government was not required to produce documents held by the company. 781 Fed. Appx. 100, 105 (2019). The Court noted that "[i]t would be particularly unusual to find prosecutors in constructive possession of evidence held by Merrill Lynch, a private party, since private parties' interests in this context 'are often far from identical to—or even congruent with—the government's interests.'" *Id.* (quoting *United States v. Joselyn*, 206 F.3d 144, 154 (1st Cir. 2000)). I analyze the *Risha* factors against this backdrop.

Starting with the first *Risha* factor, I find that Cognizant did not act on behalf of or under the control of the Government. As discussed in connection with the *Garrity* motion, above, the Government did not direct Cognizant to interview witnesses, instruct Cognizant as to the content of those interviews, or instruct Cognizant with respect to its employment decisions. While the Government did ask for updates on the investigation and make other requests from time to time, the DOJ attorneys knew that Cognizant was steering the ship as to its own investigation. (*See* Apr. 18 Tr. 80:11-19 (Gingras) ("I knew that we were not to direct the company's investigation. My AUSA partner knew that as well . . . . we're usually trying to be very careful not to cross a line and be perceived as directing the company to do something.") Cognizant also did not always comply with the Government's requests, as it had its own priorities, privileges, and so on.

It cannot be denied that Cognizant, in its own interest, cooperated with the Government by sharing a large amount of information it gathered as part of its investigation.[7] The evidence fails to establish, however, either that the government had the power to access to the files of Cognizant or that Cognizant relinquished its role as an independent actor. For instance, as the defendants point out, Cognizant asserted its privilege over evidence in its possession in response to a Government subpoena. (Apr. 19 Tr. 369:6-14.) This is one "clear

---

[7]    And, as noted above, such material was subject to *Brady* review once in the possession of the Government.

indication of [Cognizant's] independence." *See United States v. Graham*, 484 F.3d 413, 417–18 (6th Cir. 2007). Even as Cognizant acted in a manner that furthered the Government's interests, it acted of its own volition, and did not step into the shoes of the Government. *See also United States v. Garcia,* 509 F. App'x 40, 43 (2d Cir. 2013) ("[T]his Court has never held that the 'prosecution team' includes cooperating witnesses.")

Turning to the second factor, the evidence does not establish that Cognizant and the Government worked jointly, or as an investigative team. While Cognizant shared the fruits of its own investigation with the Government, it does not appear that the two entities conducted any investigatory activities together. The Government, for its part, took a number of independent investigative steps, issuing 25 grand jury subpoenas (Apr. 18 Tr. 224:7-8); conducting 23 witness interviews (*Id.* 219:1-16); meeting with counsel for L&T to gather documents and information (*Id.* 158:5-20); travelling to Singapore to interview L&T employees (*Id.* 221:21-23); and obtaining medical records and video footage relevant to Schwartz's defense of lack of memory, as well as interviewing Schwartz's doctors. (*Id.* 223:6-23.) Cognizant did assist in facilitating the arrangements for the Government to interview of certain witnesses (DX 17 at 6-7), and assisted the Government in finding an expert on Indian contracting processes (Apr. 18 Tr. 88:22-89:3), but Cognizant was otherwise not involved in the Government's investigative efforts.[8] *See United States v. Reyeros*, 537 F.3d 270, 283 (3d Cir. 2008) (prosecutors did not have constructive possession of documents filed by co-defendant with Colombian court where Colombian officials facilitated the prosecution's interview of co-defendant but did not participate in that interview).

As for the third *Risha* factor, the Government did not have ready access to Cognizant's evidence. Again, while Cognizant shared much of its evidence

---

[8]    DLA was present as counsel for one interview of a technical witness but was not present for any other Cognizant employee interview. (Apr. 18 Tr. 219:8-16.)

with the Government, it chose what to reveal. It did not simply turn over its corporate files or all material relevant to the investigation. Nor did the government simply trust it to do so, opting instead to serve subpoenas. Cognizant asserted claims of privilege over some responsive materials. Although defendants argue that certain of Cognizant's privilege assertions could have been "easily overcome" by the Government's use of a "taint" or "filter" team (Def. Br. 90), "the mere fact that documents may be obtainable is insufficient to establish constructive possession." *Reyeros*, 537 F.3d at 284.

The defendants cite two cases in which the prosecution was held to have constructive possession of materials held by third parties. (Def. Br. 86.) Both are readily distinguishable.

In *McCormick v. Parker*, a child reported to law enforcement that she had been raped, which prompted a child services investigator to bring the child to a hospital for examination. 821 F.3d 1240, 1243 (10th Cir. 2016). The Tenth Circuit held that the sexual assault nurse examiner who performed the examination on the child, and later testified in court, was part of the prosecution team for *Brady* purposes. *Id.* at 1247. In reaching this conclusion, the Court emphasized that the nurse examined the child "at the behest of law enforcement as part of a criminal investigation," and that the nurse kept a record of the exam to prepare herself to testify later. *Id.* The nurse thus functioned as an investigator of sorts, gathering information for the Government for use at trial in a future prosecution.

In *United States v. Rosenschein*, a New Mexico district court held that the prosecution had constructive possession of evidence held by the National Center for Missing and Exploited Children ("NCMEC"). No. CR 16-4571 JCH, 2019 WL 2298810, at *1 (D.N.M. May 30, 2019), *clarified on denial of reconsideration*, No. CR 16-4571 JCH, 2020 WL 2750247 (D.N.M. May 27, 2020). NCMEC is a federally created nonprofit organization that is statutorily required to assist law enforcement in locating and recovering missing and exploited children. *Id.* NCMEC conducted an investigation into the facts in

*Rosenschein*, as it was statutorily obligated to do, and provided the information it gathered to the government in aid of the prosecution. *Id.* at 7.

In both *McCormick* and *Rosenschein*, the Government directed the third party to act, and the third party obeyed, not in furtherance of its own investigation, but with the exclusive purpose of furthering the Government's investigation. And in *Rosenschein*, the third party, NCMEC, was required by statute to comply with the Government's requests.

Here, however, Cognizant made an independent decision to conduct an internal investigation. It desired leniency under the Yates Memo and the FCPA Pilot Program, but did not act at the Government's direction and had its own additional reasons for conducting the investigation. For its part, the Government is adamant that it performed its own investigation and did not direct Cognizant's efforts. Adhering to *Risha*, I conclude that the Government cannot be deemed to have constructive possession of the documents held in Cognizant's corporate files. While the Government was required to, and apparently did, perform a *Brady* review of the documents it did possess, including those obtained from Cognizant, it is not required to search the corporate files of Cognizant.

Defendants are not without recourse, however. I have granted them considerable leeway to use Rule 17 subpoenas to obtain from Cognizant evidentiary materials that may be useful to the defense, and they have done so.

### III.  ORDER

Accordingly, IT IS this 20th day of July, 2023

ORDERED that the defendants' motions to suppress and for other relief (DE 376, 377) are **DENIED**.

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**