**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>GORDON J. COBURN and<br>STEVEN SCHWARTZ,<br><br>                    Defendants. | Crim. No. 19-120 (KM)<br><br>Hon. Kevin McNulty |

---

**BRIEF OF DEFENDANT STEVEN SCHWARTZ IN SUPPORT OF
OMNIBUS MOTIONS *IN LIMINE***

---

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................1

DISCUSSION......................................................................................................4

I.      THE GOVERNMENT SHOULD BE PRECLUDED UNDER FEDERAL
        RULES OF EVIDENCE 401, 402, AND 403 FROM INTRODUCING
        EVIDENCE RELATED TO MR. SCHWARTZ'S EYE SURGERY AND
        ATTENDANCE AT THE APRIL 22, 2014 NEW YORK METS GAME ........................4

        A.      Evidence Related to Mr. Schwartz's Attendance at the April 22, 2014
                Mets Game Should be Excluded................................................................9

                1.      Evidence of Mr. Schwartz's Attendance at the Mets Game Is
                        Irrelevant Under Rule 401 and, Therefore, Inadmissible Under
                        Rule 402..........................................................................9

                2.      Evidence Related to Mr. Schwartz's Attendance at the Mets Game
                        Is Also Inadmissible Under Rule 403 Because the Risks
                        Associated with Its Introduction Substantially Outweigh Its
                        Probative Value, If Any ........................................................11

        B.      Evidence Related to Mr. Schwartz's Eye Surgery Should be Excluded ...............15

                1.      Evidence of Mr. Schwartz's Eye Surgery Is Irrelevant Under Rule
                        401 and, Therefore, Inadmissible Under Rule 402....................................15

                2.      Evidence Related to Mr. Schwartz's Eye Surgery Is Inadmissible
                        Under Rule 403 Because the Risks Associated with Its
                        Introduction Substantially Outweigh Its Probative Value, If Any ............18

II.     THE COURT SHOULD EXCLUDE EVIDENCE OF MR. SCHWARTZ'S
        RESPONSES TO QUESTIONS, POSED DURING AN INTERNAL
        INVESTIGATION CONDUCTED BY COGNIZANT'S OUTSIDE
        COUNSEL, THAT CALLED FOR HYPOTHETICAL ANSWERS AND
        LEGAL CONCLUSIONS ................................................................................22

        A.      Cognizant's Counsel Asked, and Mr. Schwartz Answered, Hypothetical
                Questions and Questions Calling for Legal Conclusions .....................................22

        B.      Mr. Schwartz's Answers to Questions that Presented Hypothetical
                Situation and Called for Legal Conclusions Should Be Excluded Under
                Rules 401 and 402 ..............................................................................31

        C.      Mr. Schwartz's Answers to Questions That Presented Hypothetical
                Situations and Called for Legal Conclusions Should Be Excluded Under
                Rule 403..........................................................................................34

                1.      The Probative Value of the Statements Is Minimal...................................34

2.      The Statements' Limited Probative Value Is Significantly
        Outweighed by the Risk of Unfair Prejudice, Confusion, and
        Waste of Time...........................................................................................35

III.    L&T'S STATEMENTS TO THE NATIONAL STOCK EXCHANGE OF
        INDIA SHOULD BE ADMITTED PURSUANT TO FEDERAL RULE OF
        EVIDENCE 807 ............................................................................................40

        A.      L&T's Investigation and Voluntary Cooperation with the Government...............41

        B.      L&T's Public Statements Directly Contradict the Government's Core
                Theory in this Case ....................................................................................44

        C.      L&T's Statements Are Supported by Sufficient Guaranties of
                Trustworthiness..........................................................................................48

                1.      The Circumstances Under Which L&T's Statements to the
                        National Stock Exchange of India Were Made Support Their
                        Trustworthiness...........................................................................48

                2.      L&T's Statements Are Corroborated by a Multi-Year Investigation
                        Led by Reputable Law Firms and External Experts, Influenced by
                        the Government, and Validated by the Government's Own
                        Admissions in this Case ...............................................................51

        D.      L&T's Public Statements Are More Probative on the Point for Which
                They Are Offered than Any Other Evidence Defendants Can Obtain
                Through Reasonable Efforts .........................................................................54

        E.      Admitting the Statements Wil Serve the Interests of Justice and Promote
                the Truth-Seeking Function of the Trial .........................................................57

IV.     THE GOVERNMENT'S ADMISSION THAT NEITHER THE
        DEFENDANTS, THEIR CO-CONSPIRATORS, NOR THE
        GOVERNMENT ITSELF KNOWS KEY DETAILS OF THE BRIBE
        CONSPIRACY SHOULD BE ADMITTED AS A PARTY-OPPONENT
        ADMISSION ..................................................................................................59

        A.      The Government's Admissions .....................................................................59

        B.      The Government's Admissions Are Relevant ...................................................60

        C.      The Government's Statement Is Admissible as a Party-Opponent
                Admission ..................................................................................................62

V.      MR. SCHWARTZ JOINDER TO MOTIONS IN LIMINE MADE BY CO-
        DEFENDANT MR. COBURN .........................................................................64

        A.      Mr. Coburn's Motion in Limine No. 1...........................................................64

        B.      Mr. Coburn's Motion in Limine No. 2...........................................................64

        C.      Mr. Coburn's Motion in Limine No. 3...........................................................64

        D.      Mr. Coburn's Motion in Limine No. 4...........................................................64

E.     Mr. Coburn's Motion *in Limine* No. 5...................................................................65

F.     Mr. Coburn's Motion *in Limine* No. 9...................................................................66

CONCLUSION...........................................................................................................................67

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States* v. *Abel*,
  469 U.S. 45 (1984) .................................................................................11

*Ansell* v. *Green Acres Contracting Co., Inc.*,
  347 F.3d 515 (3d Cir. 2003) ..................................................................13

*United States* v. *Aranda-Diaz*,
  31 F. Supp. 3d 1285 (D.N.M. 2014) ......................................................18

*United States* v. *Bailey*,
  1998 WL 388802 (D.C. Cir. May 7, 1998) .............................................64

*United States* v. *Bakshinian*,
  65 F. Supp. 2d 1104 (C.D. Cal. 1999) ...................................................64

*United States* v. *Benjamin*,
  125 F. App'x 438 (3d Cir. 2005) ............................................................40

*Berckeley Inv. Grp., Ltd.* v. *Colkitt*,
  455 F.3d 195 (3d Cir. 2006) ..................................................................35

*Blancha* v. *Raymark Indus.*,
  972 F.2d 507 (3d Cir. 1992) ..................................................................21

*United States* v. *Bland*,
  237 F. App'x 268 (9th Cir. 2007) ...........................................................17

*United States* v. *Blood*,
  806 F.2d 1218 (4th Cir. 1986) ...............................................................64

*Bowers* v. *Nat'l Collegiate Athletic Ass'n*,
  563 F. Supp. 2d 508 (D.N.J. 2008) ..........................................................3

*Brecht* v. *Abrahamson*,
  507 U.S. 619 (1993) ...............................................................................16

*Brugler* v. *Unum Grp.*,
  2019 WL 4452226 (M.D. Pa. Sept. 17, 2019) ........................................19

*United States* v. *Candelaria-Gonzalez*,
  547 F.2d 291 (5th Cir. 1977) .................................................................37

*United States* v. *Carneglia*,
256 F.R.D. 384 (E.D.N.Y. 2009) ........................................................................50

*United States* v. *Chu Kong Yin*,
935 F.2d 990 (9th Cir. 1991) .............................................................................52

*Coleman* v. *Home Depot, Inc.*,
306 F.3d 1333 (3d Cir. 2002)......................................................................12, 15

*Dantzler (Margaret)* v. *S P Park, Inc.*,
1989 WL 97752 (E.D. Pa. Aug. 21, 1989) ........................................................19

*United States* v. *Desu*,
23 F.4th 224 (3d Cir. 2022) ................................................................................9

*United States* v. *Downing*,
753 F.2d 1224 (3d Cir. 1985)............................................................................20

*Draper* v. *Airco, Inc.*,
580 F.2d 91 (3d Cir. 1978)................................................................................13

*United States* v. *Escalante-Melgar*,
567 F. Supp. 3d 485 (D.N.J. 2021) .....................................................................9

*Escriba* v. *Foster Poultry Farms*,
793 F. Supp. 2d 1147 (E.D. Ca. 2011)...............................................................58

*SEC* v. *Espuelas*,
908 F. Supp. 2d 402 (S.D.N.Y. 2012) ................................................................51

*Finch* v. *Hercules Inc.*,
CIV. A. 92-251 MMS, 1995 WL 785100 (D. Del. Dec. 22, 1995) .......................14

*United States* v. *Full Play Goup, S.A.*,
2023 WL 1994196 (E.D.N.Y. Feb. 13, 2023)......................................................16

*United States* v. *Ganadonegro*,
854 F. Supp. 2d 1088 (D.N.M. 2012) ................................................................64

*United States* v. *Georgiou*,
777 F.3d 125 (3d Cir. 2015)..............................................................................19

*Gov't of Virgin Islands* v. *Archibald*,
987 F.2d 180 (3d Cir.1993)...............................................................................12

*Hal Roach Studios, Inc.* v. *Richard Feiner and Co., Inc.*,
896 F.2d 1542 (9th Cir. 1989) ..........................................................................51

*United States* v. *Harrison*,
   296 F.3d 994 (10th Cir. 2002) .......................................................52

*United States* v. *Hazelwood*,
   979 F.3d 398 (6th Cir. 2020) .......................................................9, 11

*United States* v. *Henderson*,
   2021 WL 2680004 (D.N.J. June 29, 2021) ......................................3

*United States* v. *Jimenez*,
   513 F.3d 62 (3d Cir. 2008)..........................................................21

*United States* v. *Johnson*,
   143 F. App'x 436 (3d Cir. 2005) ...........................................9, 11, 33

*United States* v. *Kalume*,
   684 F. App'x 80 (2d Cir. 2017) ....................................................12

*United States* v. *Kattar*,
   840 F.2d 118 (1st Cir. 1988).......................................................64

*United States* v. *Kellogg*,
   510 F.3d 188 (3d Cir. 2007).......................................................36

*United States* v. *Krasley*,
   21-1364, 2022 WL 2662045 (3d Cir. July 11, 2022), *cert. denied*, 143 S. Ct.
   840 (2023) ...........................................................................9

*United States* v. *Kubini*,
   2017 WL 2573872 (W.D. Pa. June 14, 2017)................................64

*United States* v. *Lattanzio*,
   CR 15-446 (KM), 2018 WL 1837856 (D.N.J. Apr. 16, 2018) ..............13

*Lauria* v. *Nat'l R.R. Passenger Corp.*,
   1997 WL 141870 (E.D. Pa. Mar. 24, 1997), *aff'd*, 145 F.3d 593 (3d Cir. 1998) ..................19

*United States* v. *Lenegan*,
   425 F. App'x 151 (3d Cir. 2011) ...................................................13

*United States* v. *Leo*,
   941 F.2d 181 (3d Cir. 1991).......................................................35

*United States* v. *Lepore*,
   1:15-cr-00367-WSD, 2016 WL 5110505 (N.D. Ga. Sept. 20, 2016) ....................18

*United States* v. *Littlefield*,
   840 F.2d 143 (1st Cir. 1988).......................................................18

*United States* v. *Loalza-Vasquez*,
    735 F.2d 153 (5th Cir. 1984) ...................................................................58

*Lopez* v. *Mulligan*,
    No. 12-cv-4976 (SRC), 2018 WL 297582 (D.N.J. Jan. 3, 2018) ...........................................10

*United States* v. *Loud Hawk*,
    474 U.S. 302 (1986) ...................................................................16

*Luce* v. *United States*,
    469 U.S. 38 (1984) ...................................................................3

*United States* v. *Machado*,
    886 F.3d 1070 (11th Cir. 2018) ...................................................................10

*United States* v. *Marion*,
    404 U.S. 307 (1971) (Douglas, J., concurring) ...................................................................16

*United States* v. *Martindale*,
    790 F.2d 1129 (4th Cir. 1986) ...................................................................17

*United States* v. *Mathis*,
    2012 WL 691586 (W.D. Pa. Mar. 1, 2012) ...................................................................19

*United States* v. *McDougald*,
    990 F.2d 259 (6th Cir. 1993) ...................................................................18

*United States* v. *Mitchell*,
    365 F.3d 215 (3d Cir. 2004) ...................................................................64

*United States* v. *Morgan*,
    581 F.2d 933 (D.C. Cir. 1978) ...................................................................64

*MSC Mediterranean Shipping Co. SA, Geneva* v. *Metal Worldwide, Inc.*,
    884 F. Supp. 2d 1277 (S.D. Fla. 2012) ...................................................................53

*United States* v. *Musaibli*,
    -- F. Supp. 3d --, 2022 WL 17832696 (E.D. Mich. 2022) ...................................................................53

*United States* v. *Nikolov*,
    1998 WL 205793 (9th Cir. Apr. 15, 1998) ...................................................................40

*Noble* v. *Al. Dept. of Env. Mgmt.*,
    872 F.2d 361 (11th Cir. 1989) ...................................................................58

*United States* v. *Norwood*,
    939 F. Supp. 1132 (D.N.J. 1996) ...................................................................20

*SEC* v. *Pattison*,
   2011 WL 2313267 (N.D. Ca. June 9, 2011) ...........................................................51

*United States* v. *Perez*,
   387 F.3d 201 (2d Cir. 2004) ...................................................................................18

*United States* v. *Prevezon Holdings, Ltd.*,
   319 F.R.D. 459 (S.D.N.Y. 2017) ...........................................................................58

*Quinn* v. *Wexford Health Sources, Inc.*,
   2020 WL 888048 (S.D. Ill. Feb. 24, 2020) ...........................................................53

*United States* v. *Reed*,
   647 F.2d 849 (8th Cir. 1981) ..................................................................................16

*Ridge* v. *Davis*,
   2022 WL 16737299 (S.D.N.Y. Nov. 7, 2022) .......................................................19

*United States* v. *Romano*,
   849 F.2d 812 (3d Cir. 1988) .....................................................................................3

*Rosales* v. *Kelly*,
   2011 WL 5873374 (S.D.N.Y. Nov. 14, 2011) .......................................................21

*United States* v. *Salerno*,
   937 F.2d 797 (2d Cir.), *opinion modified on reh'g*, 952 F.2d 623 (2d Cir.
   1991), *and amended*, 952 F.2d 624 (2d Cir. 1991), *and rev'd on other
   grounds*, 505 U.S. 317 (1992) ...............................................................................64

*United States* v. *Scarfo*,
   41 F.4th 136 (3d Cir. 2022) ......................................................................................9

*United States* v. *Schneider*,
   801 F.3d 186 (3d Cir. 2015) .............................................................................13, 14

*In re September 11 Litigation*,
   621 F. Supp. 2d 131 (S.D.N.Y. 2009) ...................................................................53

*United States* v. *Slatten*,
   865 F.3d 767 (D.C. Cir. 2017) ..........................................................................49, 52

*United States* v. *Smith*,
   2020 WL 5995100 (D.D.C. Oct. 9, 2020) .............................................................50

*United States* v. *Socony-Vacuum Oil Co., Inc.*,
   310 U.S. 150 (1940) ...............................................................................................13

*Sprint/United Management Co.* v. *Mendelsohn*,
552 U.S. 379 (2008).................................................................................12

*United States* v. *Sriyuth*,
98 F.3d 739 (3d Cir. 1996).......................................................................14

*United States* v. *Stevens*,
455 F. App'x 343 (4th Cir. 2011) .............................................................65

*Teen-Ed, Inc.* v. *Kimball Intern., Inc.*,
620 F. 2d 399 (3d Cir. 1980).....................................................................33

*United States* v. *Turner*,
718 F.3d 226 (3d Cir. 2013)................................................................49, 52

*Wezorek* v. *Allstate Ins. Co.*,
2007 WL 1816293 (E.D. Pa. June 22, 2007) ...........................................59

*United States* v. *Williams*,
464 F.3d 443 (3d Cir. 2006).....................................................................14

*United States* v. *Williams*,
ACM 39746, 2021 WL 955908 (A.F. Ct. Crim. App. Mar. 12, 2021), *cert.
denied sub nom. Willman* v. *United States*, 142 S. Ct. 2811 (2022).......17

*In re Worldcom, Inc.*,
357 B.R. 223 (Bankr. S.D.N.Y. 2006) ......................................................51

**Statutes**

15 U.S.C. § 78dd-1 .....................................................................................1

15 U.S.C. § 78dd-1(b)...............................................................................29

15 U.S.C. § 78ff(a)......................................................................................1

15 U.S.C. § 78ff(c)(2)(A) ...........................................................................1

15 U.S.C. § 78m(b)(2)(A)...........................................................................1

15 U.S.C. § 78m(b)(2)(B)...........................................................................1

15 U.S.C. § 78m(b)(5)................................................................................1

18 U.S.C. § 2 ...............................................................................................1

18 U.S.C. § 371 ...........................................................................................1

Companies Act, No. 18 of 2013, India Code, § 245(1), (7)........................51

**Rules**

Fed. R. Evid. 102 ................................................................................................................59

Fed. R. Evid. 104(a) ..............................................................................................................3

Fed. R. Evid. 401 ......................................................................................................8, 18, 21

Fed. R. Evid. 401 .........................................................................................................*passim*

Fed. R. Evid. 401(a) ...............................................................................................................9

Fed. R. Evid. 401(b) ..........................................................................................................9, 10

Fed. R. Evid. 402 ......................................................................................................8, 18, 21

Fed. R. Evid. 402 ............................................................................................9, 11, 15, 33

Fed. R. Evid. 403 ..........................................................................................................*passim*

Fed R. Evid. 403 ..................................................................................................................21

Fed. R. Evid. 801(d)(2)(A)-(D) ....................................................................................62, 64

Fed. R. Evid 803 ..................................................................................................................42

Fed. R. Evid 804 ............................................................................................................42, 49

Fed. R. Evid. 807 ....................................................................................................42, 49, 59

Fed. R. Evid. 807(a) .............................................................................................................49

Fed. R. Evid. 807(a)(2) ........................................................................................................58

Fed. R. Evid. 807(b) .............................................................................................................49

Fed. R. Evid. 902 ..................................................................................................................58

**Other Authorities**

"The Economic Times Continues to Grow, Daily Readership Crosses 1.1
    million," *Economic Times*, May 13, 2020
    (https://economictimes.indiatimes.com/industry/media/entertainment/media/et
    -continues-to-grow-daily-readership-crosses-1-1-
    m/articleshow/75705627.cms) ................................................................................48

Fitzpatrick & Thomas, *The Indian Securities Fraud Class Action: Is Class
    Arbitration the Answer?*, 40 Nw. J. Int'l L. & Bus. 203, 205 (2020) ......................................51

Prohibition of Fraudulent and Unfair Trade Practices Relating to Securities
   Market (July 17, 2003, last amended January 25, 2022) .......................................................51

Third Circuit Model Criminal Jury Instruction 3.06.................................................................52, 63

Third Circuit Model Criminal Jury Instruction 5.06.................................................................30

## PRELIMINARY STATEMENT

On February 14, 2019, Gordon Coburn and Steven Schwartz were charged with one count of conspiracy to violate the Foreign Corrupt Practices Act (the "FCPA") in violation of 15 U.S.C. §§ 78dd-1, 78ff(c)(2)(A), 78m(b)(5), 78ff(a), 78m(b)(2)(B), 78m(b)(5), and 78ff(a), and 18 U.S.C. § 371; three counts of violations of the FCPA in violation of 15 U.S.C. §§ 78dd-1 and 78ff(c)(2)(A), and 18 U.S.C. § 2; seven counts of falsifying books and records in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff(a), and 18 U.S.C. § 2; and one count of circumvention of required internal accounting controls in violation of 15 U.S.C. §§ 78m(b)(2)(B), 78m(b)(5), and 78ff(a), and 18 U.S.C. § 2.[1]  *See* ECF No. 1.  Trial is set for October 2, 2023.  ECF No. 442 at 2.  On April 13, 2023, the Court entered a Trial Scheduling Order agreed to by the parties.  *See* ECF No. 465.  That Order required that the parties file motions *in limine* on or before August 3, 2023.  *Id.* at 5.

This brief is respectfully submitted in support of defendant Steven Schwartz's motions *in limine*.  For the reasons set forth below, these motions should be granted, both in order to ensure that only admissible evidence is presented to the jury in this complex case and so that the trial of this matter, despite those complexities, moves forward in an efficient fashion.  In particular, Mr. Schwartz requests that the Court enter an order: (1) excluding evidence regarding Mr. Schwartz's attendance at a Mets game on April 22, 2014; video of Mr. Schwartz at the April 22, 2014 Mets game; and information regarding Mr. Schwartz's eye surgery on April 24, 2014; (2) excluding evidence of answers given by Mr. Schwartz to questions posed by counsel for Cognizant Technology Solutions Corporation ("Cognizant" or the "Company") during interviews

---

[1]   Counts 1–4 and Count 12 charge both Mr. Coburn and Mr. Schwartz.  Counts 5, 6, 8, 10, and 11 charge Mr. Coburn alone, and Counts 7 and 9 charge Mr. Schwartz alone.

held on August 28, 2016 and September 23, 2016 to the extent the questions posed (or answers given) referred to hypothetical scenarios or called for legal conclusions; (3) allowing to be admitted into evidence statements made by Larsen & Toubro Ltd. ("L&T") concerning its investigation into the alleged bribery scheme charged in this case, including formal public statements made to the Indian stock exchange to the effect that its investigation did not find evidence of a bribe payment; and (4) allowing to be admitted into evidence the Government's admission that neither the defendants, their co-conspirators, nor the Government itself knows key details of the alleged bribe conspiracy in this case.

In addition, Mr. Schwartz respectfully joins Mr. Coburn's omnibus motions *in limine*, insofar as they seek an order: (a) excluding certain statements of the defendants and certain portions of Cognizant's internal policies concerning the definition of particular legal terms (Coburn motion in limine ("MIL") #1); (b) excluding references to, or evidence about, Cognizant's outsourcing jobs or using less expensive foreign labor (Coburn MIL #2); (c) excluding references to, or evidence about, Mr. Coburn's decisions or views relating to Cognizant's compliance budget (Coburn MIL #3); (d) excluding references to, or evidence about, Mr. Coburn's compensation while employed at Cognizant and his overall net worth (Coburn MIL #4), including with respect to Mr. Schwartz's compensation while employed at Cognizant and his net worth; (e) excluding references to, or evidence about, Mr. Coburn's refusal to sit for a second interview as part of Cognizant's internal investigation and the circumstances of his subsequent resignation (Coburn MIL #5), including with respect to Mr. Schwartz's termination of his second interview and refusal to sit for a third interview, and the circumstances of his subsequent resignation; and (f) admitting exculpatory statements reflected in FBI-302 reports of L&T witnesses whom the Government has had the opportunity to question but are unavailable to testify (Coburn MIL #9).

Under Federal Rule of Evidence 104(a), "[t]he court must decide any preliminary questions about whether a witness is qualified, a privilege exists, or evidence is admissible."  Fed. R. Evid. 104(a).  A motion *in limine* provides an avenue for such an inquiry and "is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions."  *Bowers* v. *Nat'l Collegiate Athletic Ass'n*, 563 F. Supp. 2d 508, 531 (D.N.J. 2008) (quoting *Bradley* v. *Pittsburg Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990)); *see also United States* v. *Romano*, 849 F.2d 812, 815 (3d Cir. 1988) ("A trial judge has a duty to limit the jury's exposure to only that which is probative and relevant and must attempt to screen from the jury any proffer that it deems irrelevant.");  *United States* v. *Henderson*, 2021 WL 2680004, at *1 (D.N.J. June 29, 2021). Specifically, *in limine* motions provide the Court with the opportunity, among other things, "to exclude anticipated prejudicial evidence before the evidence is actually offered."  *Luce* v. *United States*, 469 U.S. 38, 40 n.2 (1984).

## DISCUSSION

I.   **THE GOVERNMENT SHOULD BE PRECLUDED UNDER FEDERAL RULES OF EVIDENCE 401, 402, AND 403 FROM INTRODUCING EVIDENCE RELATED TO MR. SCHWARTZ'S EYE SURGERY AND ATTENDANCE AT THE APRIL 22, 2014 NEW YORK METS GAME**

On June 30, 2023, the Government provided the defense with its preliminary exhibit list, which includes, among other things, numerous medical records related to an eye surgery that Mr. Schwartz had in April 2014, as well as evidence of Mr. Schwartz's attendance at an April 22, 2014 New York Mets baseball game—including both a six-hour video of the entire game and post-game coverage, which shows Mr. Schwartz and his family sitting in the second row behind home plate, and StubHub records reflecting that Mr. Schwartz purchased tickets costing approximately $1,500 for the game several weeks beforehand for himself and his family.   As discussed below, this evidence, which Cognizant's outside counsel DLA Piper ("DLA") obtained in an apparent attempt to disprove statements Mr. Schwartz purportedly made during his September 23, 2016 interview[2] as part of Cognizant's internal investigation, not only has little if any relevance to the charges in this case and Mr. Schwartz's defenses to them, but presents

---

[2]   Interview memoranda drafted by DLA after the August 28, 2016 and September 23, 2016 interviews of Mr. Schwartz presumably provide a preview of the testimony the Court can expect to hear at trial, as more than seven years will have passed between the interviews and the trial.  Any trial witnesses from DLA are unlikely to have a clear recollection of interviews in August and September 2016 and will thus necessarily testify with reference to the memoranda.   As the Court recognized in its July 20, 2023 opinion on the *Garrity/Connolly/Brady* motion practice, DLA insisted that Mr. Schwartz agree to terms for the interview that essentially ensured that DLA would control the record of their questions and Mr. Schwartz's answers, so that the only contemporaneous record of Mr. Schwartz's statements during the DLA interviews would be DLA's attorney notes and memoranda.  *See* ECF No. 495 at 4, 5 ("The DLA attorneys who interviewed Schwartz, including Buch, set and enforced strict ground rules for the interview, including prohibiting Schwartz from having more than one lawyer present and not allowing that lawyer to take notes or ask questions."). While Mr. Schwartz understands that these memoranda likely reflect the testimony that will be given at trial, he contests the quotations attributed to him, and nothing in this motion should be read to imply otherwise.

4

significant risks of unfair prejudice, confusion of the issues, and unnecessary delay—including by occasioning precisely the type of mini-trial that Federal Rule of Evidence 403 is designed to avoid. As a result, the Government should be precluded from introducing this evidence at trial.

## RELEVANT BACKGROUND

As the Court is aware, in April 2016, Cognizant retained DLA to conduct an internal investigation into allegations of potential bribes paid to unnamed and unidentified government officials in India.  As part of this investigation, DLA interviewed Mr. Schwartz, Cognizant's then-Chief Legal and Corporate Affairs Officer, on August 28, 2016 and again on September 23, 2016.  During his September 23, 2016 interview, DLA questioned Mr. Schwartz about notes allegedly found on his laptop computer in the days before that interview which purportedly summarize conference calls that occurred on April 22, 2014 (together with another call on April 21, the "April 2014 calls").  The Government alleges that during these April 2014 calls, Mr. Coburn and Mr. Schwartz authorized the alleged bribe payment that forms the basis for the Indictment and agreed to conceal that payment in Cognizant's books and records.

Without any recollection of the April 2014 calls, including when they occurred and who was present for them or, any recollection whatsoever of the notes that purport to describe them, and without any notice from Cognizant or DLA that he would be questioned about them during his interview, Mr. Schwartz did his best to remember on September 23, 2016, what was discussed on calls that had occurred over two years before, but he had no real recollection of the calls and told his interviewers as much.  When pressed about his lack of recollection, Mr. Schwartz did share facts regarding a significant event that occurred during that time period—that is, he told his questioners that he learned at around the time of the April 2014 calls that he was at risk of losing his left eye due to a cancerous condition and spent that week preparing for eye surgery,

which he underwent on April 24, 2014.  Ex. 1, September 23, 2016 Steven Schwartz Interview

Memorandum, CTS_R17_0004363 at 4374 ("Schwartz said his 'entire week' of April 21 was

'dealing with eye surgery' that took place on April 24. He said that the week leading up to surgery

was not good."); *id.* at 4378 ("at the beginning of the week in which [the] April 21–22 calls

occurred, [Schwartz] learned that he might lose his eye")).[3]

The Government has made clear that it intends to introduce evidence at the

upcoming trial relating both to Mr. Schwartz's eye surgery on April 24, 2014 and his attendance

at an April 22, 2014 Mets game against the St. Louis Cardinals earlier that week.  Specifically, the

Government has pre-marked as trial exhibits the following documents related to Mr. Schwartz's

medical condition and resulting eye surgery:

| GX | Description | Ex. & Record Reference |
|---|---|---|
| 87. | March 31, 2014 Dermatopathology Report | Ex. 2, ROBINSON-00000042 |
| 88. | March 31, 2014 Diagnostic Report from Dermpath Diagnostics | Ex. 3, DOLPHIN-00000011-12 |
| 89. | April 4, 2014 Letter from Dr. David S. Becker to Dr. Bruce Robinson | Ex. 4, ROBINSON-00000040 |
| 108. | April 21, 2014 Notes of Dr. Kip Dolphin | Ex. 5, DOLPHIN-00000003 |
| 118. | April 24, 2014 Letter from Dr. David S. Becker to Dr. Bruce Robinson | Ex. 6, ROBINSON-00000039 |
| 119. | April 24, 2014 Email from Steven Schwartz to Francisco D'Souza, "Re: Fmr. Gov. Bill Richardson (D-NM)"[4] | Ex. 7, CTS-0011056-58 |

---

[3]   All citations of the form "Ex." are citations to exhibits to the Sieber Declaration.
[4]   Although not apparent from the title of the document, this email, Ex. 7, GX 119, along with the email of the same subject line the following day, Ex. 9, GX 121, are exchanges between Mr. Schwartz and his boss, Cognizant CEO Francisco D'Souza, regarding the surgery.

| 120. | April 24, 2014 Notes of Dr. Kip Dolphin | Ex. 8, DOLPHIN-00000004 |
|---|---|---|
| 121. | April 25, 2014 Email from Steven Schwartz to Francisco D'Souza, "Re: Fmr. Gov. Bill Richardson (D-NM)" | Ex. 9, CTS-0010946-48 |
| 126. | June 19, 2014 Notes of Dr. Kip Dolphin | Ex. 10, DOLPHIN-00000009 |
| 130. | July 9, 2014 Letter from Murray A. Meltzer to Dr. Bruce Robinson | Ex. 11, ROBINSON-00000037-38 |
| 154. | November 13, 2014 Notes of Dr. Kip Dolphin | Ex. 12, DOLPHIN-00000010 |
| 225. | October 13, 2016 Letter from Dr. Bruce Robinson | Ex. 13, ROBINSON-00000035 |
| 227. | Medical Records of Dr. David Becker | Ex. 14, BECKER-00000001-12 |

The Government has also identified on its preliminary exhibit list the following video footage and related documentation reflecting Mr. Schwartz's attendance at a New York Mets baseball game on April 22, 2014:

| GX | Description | Ex. & Record Reference |
|---|---|---|
| 113. | April 22, 2014 Video of New York Mets v. St. Louis Cardinals Baseball Game | Ex. 15, DOJ-NBC-00000001 |
| 116. | April 23, 2014 Email from Steven Schwartz to Steven Papera, "Re: Mets - Cards" | Ex. 16, CTS-0010832 |
| 228. | StubHub Records | Ex. 17, STUBHUB-0000000006 |

The Government has previewed its purpose in seeking to introduce these exhibits: to rebut what it, and DLA, denominated Mr. Schwartz's purported "amnesia defense" by calling

7

into question the seriousness of his eye surgery, and to demonstrate his consciousness of guilt by somehow casting his lack of recollection regarding the April 2014 calls as a false exculpatory statement.  *See* Exs. 18–20, DOJ-EH-0000000145 at 151–52, DOJ-EH-0000000203 at 209, June 15, 2022 Letter from G. Moody *et al.* to T. Wells *et al.* at 1–2.  In fact, however, Mr. Schwartz did not, never has, and never will assert an "amnesia defense"—a term that DLA coined and the Government adopted while the two worked together to investigate Mr. Schwartz.[5]  Nor does evidence related to Mr. Schwartz's eye surgery and attendance at a Mets game with his family in April 2014 satisfy the relevance standard of Rules 401 and 402 or come close to passing a Rule 403 balancing test, as it has little, if any, probative value, on the one hand, and poses a significant risk of unfair prejudice, confusion of the issues, and unnecessary delay, on the other.  Mr. Schwartz respectfully submits that this evidence should be precluded, including to avoid the collateral mini-trials that would otherwise necessarily result.

---

[5]  Following Mr. Schwartz's September 23, 2016 interview, the Government and Cognizant worked together to investigate what they described as Mr. Schwartz's "amnesia defense," including collecting the evidence that is the subject of this motion—namely Mr. Schwartz's medical records, doctor notes and interviews, video footage from the Mets game, and verification of his ticket purchase for that game. Ex. 21, ECF No. 473, Apr. 18, 2023 Hr'g Tr. at 76:12–17, 223:6–23; Ex. 22, ECF No. 476, Apr. 19, 2023 Hr'g Tr. at 322:24–323:3; Ex. 19, DOJ-EH-0000000203 at 209.  During an October 6, 2016 meeting, DLA informed the Government that it had requested that Mr. Schwartz make available his medical records related to his eye surgery, and, in response, the Government asked DLA if "we [DLA and the Government] exhausted everything around him not remembering the events he was asked about during his initial interview." Ex. 20, Letter from G. Moody *et al.* to T. Wells *et al.* (June 15, 2022) at 1–2); Ex. 21, ECF No. 473, Apr. 18, 2023 Hr'g Tr. at 76:12–77:4.  The Government also shared with DLA during a March 19, 2018 call that "the consciousness of guilt aspect here" is "crucial for us [the Government]" and will likely be "an area of the trial that is heavily litigated." Ex. 18, DOJ-EH-0000000145 at 151–52.

## ARGUMENT

A.    **Evidence Related to Mr. Schwartz's Attendance at the April 22, 2014 Mets Game Should be Excluded**

1.    **Evidence of Mr. Schwartz's Attendance at the Mets Game Is Irrelevant Under Rule 401 and, Therefore, Inadmissible Under Rule 402**

Evidence of Mr. Schwartz's attendance at the New York Mets game on April 22, 2014 should be excluded because, to put it simply, it is entirely irrelevant.  It is well established that "[e]vidence is relevant" and thus, admissible, if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401(a)–(b); *see, e.g.*, *United States* v. *Desu*, 23 F.4th 224, 233 (3d Cir. 2022); *United States* v. *Escalante-Melgar*, 567 F. Supp. 3d 485, 491 (D.N.J. 2021).  In a criminal case, evidence is relevant where it makes it "more or less likely" that the defendant committed the offenses charged.  *United States* v. *Johnson*, 143 F. App'x 436, 438 (3d Cir. 2005) ("Relevant evidence is any evidence that tends to make the existence of a material fact more or less likely"); *United States* v. *Krasley*, 2022 WL 2662045, at *4 (3d Cir. July 11, 2022), *cert. denied*, 143 S. Ct. 840 (2023) (evidence was relevant under Rule 401 where it "made it more likely" that defendant committed the crimes charged); *United States* v. *Hazelwood*, 979 F.3d 398, 409 (6th Cir. 2020) ("In a criminal case, a fact is 'of consequence' if it makes it more or less likely that the defendant committed the charged conduct.").  Thus, the operative inquiries under Rule 401 are whether the evidence "possesses sufficient probative value to justify receiving it in evidence" and "tend[s] to prove the matter sought to be proved[.]"  Fed. R. Evid. 401 advisory committee's note to 1972 proposed rules.  Ultimately, pursuant to Rule 402, "evidence which is not relevant is not admissible."  Fed. R. Evid. 402 advisory committee's note to 1972 proposed rules; *see also United States* v. *Scarfo*, 41 F.4th 136, 180 (3d Cir. 2022); *Lopez* v. *Mulligan*, 2018 WL 297582, at *2 (D.N.J. Jan. 3, 2018).

There is, of course, no dispute that Mr. Schwartz in fact attended the April 22, 2014 Mets game.  But the question is "so what?"  How does the fact that Mr. Schwartz attended the Mets game bear upon whether he authorized a bribe to Indian officials?  How, even, does it bear upon the honesty of his statement that he did not recall the details of two brief work calls during that same week when asked about them 2 ½  years later?  Assuming the Government's theory is that Mr. Schwartz would not have attended a Mets game the same week as the surgery about which he was justifiably concerned, this supposition is so attenuated as to be "of [no] consequence in determining th[is] action."  Fed. R. Evid 401(b); *see, e.g.*, *United States* v. *Machado*, 886 F.3d 1070, 1085 (11th Cir. 2018) (affirming district court's exclusion of evidence "because it was too attenuated from the legally relevant point of [the defendant's] intent and it had a strong potential to confuse the jury").

For example, the game was between the Mets and the St. Louis Cardinals, *see* Exs. 15, GX-113; Ex. 17, GX-228; a Rule 104 hearing would reveal that these tickets were purchased because one of Mr. Schwartz's sons is a huge Cardinals fan; that Mr. Schwartz often purchases tickets for his family when the Cardinals come to town, regardless of what is happening in Mr. Schwartz's life; and that the Cardinals only played four games at Citi Field that year on four consecutive days from April 21 through April 24, 2014, which means that Mr. Schwartz could only have attended a Mets vs. Cardinals game with his family during that week that ended up being central to this case.  And even more to the point, as the Government's proposed exhibits show, Mr. Schwartz purchased the Mets tickets on April 1, 2014, Ex. 17, GX-228, before his eye surgery had even been scheduled.  *See* Ex. 4, GX-89.

Does the fact that Mr. Schwartz went ahead and—ever the generous and dutiful father—attended this baseball game with his family show that he in fact recalled other events from

that week 2 ½ years earlier?  Does it show that the eye surgery that was scheduled after the tickets were purchased, and occurred after the game, was not a serious concern to Mr. Schwartz?  Does it otherwise show that he authorized a bribe that week?  Of course, it shows none of these things. Indeed, it shows nothing at all.  And these questions are not ones that go to the weight of this testimony; instead, there is absolutely nothing about this evidence that "makes it more or less likely" that Mr. Schwartz committed the offense alleged, or lied about his ability to recall the April 2014 calls, rendering the evidence irrelevant under Rule 401 and inadmissible under Rule 402. *See Johnson*, 143 F. App'x at 438; *Hazelwood*, 979 F.3d at 409.  In the performance of its fundamental role to exclude irrelevant evidence at trial, *see United States* v. *Abel,* 469 U.S. 45, 54 (1984) ("A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403"), the Court should preclude its admissibility at trial, and thus avoid the side-show that admitting it would occasion.

2. **Evidence Related to Mr. Schwartz's Attendance at the Mets Game Is Also Inadmissible Under Rule 403 Because the Risks Associated with Its Introduction Substantially Outweigh Its Probative Value, If Any**

Why, then, does the Government seek to present this evidence to the jury, including video footage depicting Mr. Schwartz and his family sitting in the second row behind home plate, Ex. 15, GX-113, email correspondence with a colleague the day after the game and a day before his surgery, confirming his attendance in those seats, Ex. 16, GX-116 ("Yep" in response to whether he was at the game and that it was a "good game for [his] boys (Cards fans)"), and StubHub records reflecting that Mr. Schwartz paid approximately $1,500 for his tickets, Ex. 17, GX-228?  Beyond the way in which these facts are cumulative of each other, which itself negates their probative value, *see United States* v. *Kalume*, 684 F. App'x 80, 82–83 (2d Cir. 2017)

(affirming district court's ruling excluding video footage, finding that "whatever probative value the video had" was "cumulative of evidence already before the jury."), the reason is obvious: it is an effort to visit undue prejudice on Mr. Schwartz as a privileged man who can afford to sit behind home plate, and thus to inflame the jury against him.  But that is precisely what Federal Rule of Evidence 403 prohibits.

Pursuant to Rule 403, evidence must be excluded if "its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  The Third Circuit requires "that a cost/benefit analysis must be employed to determine whether or not to admit evidence"—in which the probative value of the evidence at issue is weighed against the likely prejudice—as "relevance alone does not ensure its admissibility." *Coleman* v. *Home Depot, Inc.*, 306 F.3d 1333, 1343–44 (3d Cir. 2002).  In other words, even assuming that the evidence at issue is somehow relevant under Rule 401—for the reasons set forth above, it is not—Rule 403 requires "balancing the probative value of and need for the evidence against the harm likely to result from its admission."  Fed. R. Evid. 403 advisory committee's note to the 1972 proposed rules; *see also Gov't of Virgin Islands* v. *Archibald*, 987 F.2d 180, 186 (3d Cir. 1993) ("When weighing the Rule 403 factors, courts 'must appraise the genuine need for the challenged evidence and balance that necessity against the risk of prejudice to the defendant.'").  This balancing test requires a fact-intensive, context-specific inquiry.  *Sprint/United Management Co.* v. *Mendelsohn*, 552 U.S. 379, 388 (2008).

The Third Circuit has defined "unfair prejudice" for purposes of Rule 403 to mean "an undue tendency to suggest decision on an improper basis, commonly . . . an emotional one." *United States* v. *Schneider*, 801 F.3d 186, 198 (3d Cir. 2015) (citing Fed. R. Evid. 403 advisory

committee's note to 1972 proposed rules)); *see also Ansell* v. *Green Acres Contracting Co., Inc.*, 347 F.3d 515, 525 (3d Cir. 2003) ("prejudice . . . [is] *unfair* prejudice . . . prejudice of the sort which cloud[s] impartial scrutiny and reasoned evaluation of the facts, which inhibit[s] neutral application of principles of law to the facts as found"). When evaluating the risk of unfair prejudice, the focus of the inquiry "must be on unfairness in the sense that the proponent would secure an advantage that results from the likelihood the evidence would persuade by illegitimate means." *United States* v. *Lenegan*, 425 F. App'x 151, 156 (3d Cir. 2011) (quoting *United States* v. *Blyden*, 964 F.2d 1375, 1379 (3d Cir. 1992)).

Here, the potential unfair prejudice that would result were the Government's three exhibits related to the April 22, 2014 Mets game presented to the jury is abundantly clear. As this Court has explained, "[a]dmission of lifestyle evidence carries a danger of appealing to class resentments," inflaming the jury, and thus "can deprive th[e] defendant of a fair trial." *United States* v. *Lattanzio*, 2018 WL 1837856, at *14 (D.N.J. Apr. 16, 2018) (quoting *United States* v. *Williams*, 705 F. App'x 869, 873–74 (11th Cir. 2017)); *see also Draper* v. *Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978) (noting that inappropriate references to a defendant's wealth can be prejudicial). Those dangers are readily apparent here, as evidence related to Mr. Schwartz's having purchased the kind of pricey, coveted seats that most jurors could not afford is either meant to show, or certainly risks being used to depict, Mr. Schwartz as some kind of "fat cat" whom jurors should not like and should therefore convict. *See United States* v. *Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 239 (1940) ("appeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them."); *Finch* v. *Hercules Inc.*, 1995 WL 785100, at *10 (D. Del. Dec. 22, 1995) (excluding evidence of defendant's financial wealth as it "would serve to prejudice the jury against defendant and its senior officers by portraying them as

'avaricious fat cats who can afford to pay a sizable judgment.'"). Thus, this evidence runs the very real risk of evoking "strong adverse" emotions that could improperly influence the jury's assessment of the law and facts. *See Schneider*, 801 F.3d at 198 (under Rule 403, "unfair prejudice means 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one'"); *United States* v. *Sriyuth*, 98 F.3d 739, 748 (3d Cir. 1996) ("[A] significant danger of undue prejudice will be found to exist where there are 'substantial possibilities . . . that a jury will harbor strong adverse sensitivity' to the challenged evidence."). It should thus be excluded under Rule 403.

Furthermore, as noted, the "potential for an unnecessary mini-trial on the issue" also demands the exclusion of evidence under Rule 403. *E.g.*, *United States* v. *Williams*, 464 F.3d 443, 448 (3d Cir. 2006). And such a mini-trial would be precisely the result of admitting the Mets game evidence at trial: for example, insofar as the Government intends to suggest that Mr. Schwartz's attendance at the Mets game is inconsistent with his statements 2 ½ years later regarding the impact that his eye surgery had on him the same week, the jury would be forced to sit through the nearly four-hours of video footage of the game itself, captured in the Government's proposed exhibit, Ex. 15, GX-113, to evaluate Mr. Schwartz's appearance throughout, including whether he looked happy or sad, distracted or focused, and so on, and perhaps comparing those images to others taken at other Mets games that Mr. Schwartz attended with his family. It would require an exploration of whether one who had surgery later in the week that he feared could be serious, could also reasonably attend and enjoy a Mets game. It would also likely require evidence of how important the attendance at this Mets game was to Mr. Schwartz and his family, and of how he raised his children. All of that, of course, would be an immense waste of time and a true side-show, unrelated to the events at issue here. For these reasons as well, this evidence should be

excluded under Rule 403.  *See*, *e.g.*, *Coleman*, 306 F.3d at 1346–37 (upholding the exclusion of evidence under Rule 403 where undue delay and waste of time outweighed the evidence's low probative value because the evidence "would certainly have involved a great deal of testimony–a trial within a trial in fact.").

**B.     Evidence Related to Mr. Schwartz's Eye Surgery Should Be Excluded**

**1.     Evidence of Mr. Schwartz's Eye Surgery Is Irrelevant Under Rule 401 and, Therefore, Inadmissible Under Rule 402**

The thirteen (13) medical records and correspondence related to Mr. Schwartz's eye surgery in April 2014 that the Government has pre-marked as trial exhibits, like those reflecting his attendance at the Mets game that same week, have no conceivable relevance under Rule 401 and, thus, cannot be admitted under Rule 402.  Nothing about Mr. Schwartz's eye surgery on April 24, 2014, or his doctor's visits in the weeks and months that preceded and followed that surgery, sheds any direct light on the central issues at the upcoming trial:  whether Mr. Schwartz authorized a bribe payment to an Indian government official in April 2014, or signed false certifications months and years later.

The Government has previewed that it intends to introduce this evidence, though, as purportedly indicative of Mr. Schwartz's consciousness of guilt, presumably by calling into question Mr. Schwartz's views relating to the seriousness of his eye surgery and thus the veracity of his alleged statements—made during his September 23, 2016 interview—that he did not remember certain aspects of the April 2014 calls or any part of the notes that purport to describe them in part because he was focused on other things (*i.e.*, the surgery) that week.  *See* Exs. 18–20, DOJ-EH-0000000145 at 151–52, DOJ-EH-0000000203 at 209, Letter from G. Moody *et al.* to T. Wells *et al.* (June 15, 2022) at 1–2.  But in fact, there is no basis for treating Mr. Schwartz's

statements about his eye surgery as false exculpatory statements that would pass the relevancy test of Rules 401 and 402.

As the Court knows, and the Government's own exhibits reveal, the April 21 and 22, 2014 calls—which Mr. Schwartz joined for a total of 33 minutes over two days—took place over 2 ½ years before the interview in which Mr. Schwartz was questioned about their content. *See* Ex. 45–46, GX-105, GX-111.  In other words, given the significant passage of time between the events of April 2014 and DLA's questioning about them over two years later, it is far from surprising, and, indeed, is consistent with the caselaw's understanding of human memory, that Mr. Schwartz would not recall the April 2014 calls or the notes that purport to describe them—as he consistently stated when questioned during his September 23, 2016 interview.  *See*, *e.g.*, *United States* v. *Marion*, 404 U.S. 307, 331 n.3 (1971) ("Memory grows dim with the passage of time.") (Douglas, J., concurring); *United States* v. *Full Play Goup, S.A.*, 2023 WL 1994196, at *12 (E.D.N.Y. Feb. 13, 2023) (witness's inability to recall substance of events that occurred years prior was "consistent with the limits and idiosyncrasies of human memory").[6]

Under these circumstances, then, there is no basis for casting his failure to recall the details of two brief work calls, while remembering his eye surgery of that same week, as a false exculpatory statement that demonstrates consciousness of guilt, as opposed to an attempt by Mr. Schwartz to be as responsive as possible to the questions he was being asked—that is, by sharing

---

[6]   *See generally Brecht* v. *Abrahamson*, 507 U.S. 619, 637 (1993) (noting that the "erosion of memory" that accompanies the passage of time makes obtaining convictions on retrial more difficult); *United States* v. *Loud Hawk*, 474 U.S. 302, 315 (1986) ("It is the Government that bears the burden of proving its case beyond a reasonable doubt.  The passage of time may make it difficult or impossible for the Government to carry out this burden."); *United States* v. *Reed*, 647 F.2d 849, 853 (8th Cir. 1981) ("That the government must prove, beyond a reasonable doubt, as part of its perjury prosecution . . . events now more than ten years in the past, only makes the government's case that much more difficult").

that his overwhelming memory of the week of the April 2014 calls was the surgery he indisputably

had.  The Government has not and cannot show either of the two requirements for the admission

of a purported false exculpatory statement:  (1) that his statement—that he did not recall the phone

calls, or that he had a "bad week" as a result of his eye surgery—was actually false; or (2) that it

was exculpatory.  *See United States* v. *Williams*, 2021 WL 955908, at *15 (A.F. Ct. Crim. App.

Mar. 12, 2021), *cert. denied sub nom. Willman* v. *United States*, 142 S. Ct. 2811 (2022) ("A false

exculpatory statement has—by its terms—two fundamental requirements:  first, the statement must

be false, and, second, it must tend to be exculpatory.  In order for a statement to be found to be

false, there must ordinarily be some evidence of its falsity."); *United States* v. *Bland*, 237 F. App'x

268, 269–70 (9th Cir. 2007) (holding that the district court erred in admitting co-conspirator's false

exculpatory statements where "the government failed to show that [the] 'false exculpatory

statements' were, in fact, false."); *United States* v. *Martindale*, 790 F.2d 1129, 1132 (4th Cir. 1986)

(finding admissible a defendant's false exculpatory statements "shown to be false and fabricated").

Showing that Mr. Schwartz's statement that he did not recall aspects of the April 2014 calls was

false would require that he in fact did recall them.  But his eye surgery—like his presence at the

Mets game—makes it no more or less likely that his statement about his recollection of the calls

was true or false.

Nor did, or can, Mr. Schwartz's references during his September 23, 2016 interview

to his eye surgery amount to a purported "amnesia defense," which Mr. Schwartz is not claiming.

His lack of recollection of specific conference calls, when asked years later, while he did recall a

surgery that was a material event to him around the same time, simply does not make it "more or

less probable" that Mr. Schwartz committed the crimes with which he is charged.  *See* Fed. R.

Evid. 401.  As such, this evidence is not the type of false exculpatory evidence upon which a jury

can rely, and it should be excluded under Rules 401 and 402. *See, e.g.*, *United States* v. *McDougald*, 990 F.2d 259, 263–64 (6th Cir. 1993), *opinion supplemented on denial of reh'g* (June 16, 1993) (risk of allowing testimony related to defendant's false exculpatory statements, which were "as hospitable to an interpretation consistent with his innocence as with the government's theory of guilt" was "simply too great that an innocent man [was] convicted."); *United States* v. *Littlefield*, 840 F.2d 143, 149 (1st Cir. 1988) ("For an allegedly false exculpatory statement to be of any value in the factfinder's deliberations, we think it either must involve a matter collateral to the facts establishing guilt or should be so incredible that its very implausibility suggests that it was created to conceal guilt." (citations omitted)); *United States* v. *Perez*, 387 F.3d 201, 209 (2d Cir. 2004) (evidence of a defendant's consciousness of guilt "is admissible if the court . . . decides that the evidence is relevant and satisfies Rule 403"); *United States* v. *Lepore*, 2016 WL 5110505, at *2 (N.D. Ga. Sept. 20, 2016) ("Sometimes the evidence of false exculpatory statements is excludable because a necessary inference is implausible under the circumstances." (quoting 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:4 (4th ed. May 2016 Update) (cleaned up)).

## 2. Evidence Related to Mr. Schwartz's Eye Surgery Is Inadmissible Under Rule 403 Because the Risks Associated with Its Introduction Substantially Outweigh Its Probative Value, If Any

Even assuming that the medical records and emails the Government seeks to introduce at trial have some limited probative value, they must be excluded under Rule 403 because their introduction would have an overwhelmingly unfair prejudicial effect that significantly outweighs any limited probative value. *See* Fed. R. Evid. 403; *United States* v. *Aranda-Diaz*, 31 F. Supp. 3d 1285, 1291 (D.N.M. 2014) (excluding defendant's statements that were probative of consciousness of guilt, but presented a substantial danger of unfair prejudice and confusion of the issues); *United States* v. *Mathis*, 2012 WL 691586, at *3 (W.D. Pa. Mar. 1, 2012) (prohibiting the

Government from introducing evidence of defendant's consciousness of guilt where its "limited probative value [wa]s substantially outweighed by the danger of unfair prejudice to defendant.").

Indeed, as discussed above, courts routinely prohibit the introduction of evidence like this that would, at best, cause confusion and result in mini-trials addressed to collateral issues. *See, e.g., Ridge* v. *Davis*, 2022 WL 16737299, at *10 (S.D.N.Y. Nov. 7, 2022) (precluding admission of medical records under Rule 403 where they had "limited probative value" and would be "highly prejudicial and . . . likely to confuse the issues"); *Lauria* v. *Nat'l R.R. Passenger Corp.*, 1997 WL 141870, at *2 (E.D. Pa. Mar. 24, 1997), *aff'd*, 145 F.3d 593 (3d Cir. 1998) (granting motion *in limine* to preclude personnel and medical records under Rule 403 because their probative value was "substantially outweighed by the prejudicial effect"); *Dantzler (Margaret)* v. *S P Park, Inc.*, 1989 WL 97752, at *4 (E.D. Pa. Aug. 21, 1989) (explaining that, while information of the "plaintiff's prior medical condition is relevant to the issue of damages," the reading of this information into evidence "can result in unfair prejudice and result in the introduction of collateral issues"); *see generally United States* v. *Georgiou*, 777 F.3d 125, 144 (3d Cir. 2015) ("Federal Rule of Evidence 403 authorizes a district court to 'exclude collateral matters that are likely to confuse the issues.'" (quoting *United States* v. *Casoni*, 950 F.2d 893, 919 (3d Cir.1991)); *Brugler* v. *Unum Grp.*, 2019 WL 4452226, at *12 (M.D. Pa. Sept. 17, 2019) (same).

That introduction of Mr. Schwartz's medical records related to his April 24, 2014 eye surgery would result in a mini-trial could not be clearer. As the Government's proposed trial exhibits show, Mr. Schwartz was diagnosed in 2014 with skin cancer—specifically, basal cell carcinoma on his lower left eyelid. Exs. 2–4, 6, 14, GX-87, GX-88, GX-89, GX-118, GX-227. Given the cancer's "close proximity to the globe" of the eye, Mr. Schwartz's doctor recommended that he promptly undergo Mohs surgery and oculoplastic closure—a procedure that, for Mr.

Schwartz, was beset with complications during the week of his surgery and thereafter.  Exs. 10–

13, GX-126, GX-130, GX-154, GX-225.  The facts related to those complications, the process

leading up to and immediately following Mr. Schwartz's surgery, and various other collateral

issues, such as Mr. Schwartz's temperament and how he reacts to medical issues, would

necessarily be the subject of significant litigation at trial—including potential testimony by

multiple expert medical witnesses—if the Government were permitted to introduce the medical

records identified on its preliminary exhibit list.  The mini-trial that would ensue would include

testimony and evidence regarding, for example, technical complexities associated with basal cell

carcinoma and Mohs surgery, particularly when near the eye; the particular symptoms and side-

effects that Mr. Schwartz endured as a result of his medical condition and subsequent surgery; the

stress associated with Mr. Schwartz's diagnosis and surgery; and the impact of that stress on his

memory and ability to form long-term memories, such as those about which he was questioned by

DLA in his September 23, 2016 interview.  *See, e.g.*, *United States* v. *Norwood*, 939 F. Supp. 1132,

1137–38 (D.N.J. 1996) (admitting expert testimony on the issue of how "an intense level of stress

impairs memory" and the "'forgetting curve' phenomenon, [pursuant to which] memory weakens

at a non-constant rate with the passage of time, with most of the forgetting taking place within the

first hours following the event, and certainly within the first few days following the event"); *see*

*also United States* v. *Downing*, 753 F.2d 1224, 1231–32 (3d Cir. 1985) (Rule 702 permits

defendant to present expert testimony regarding memory formation and stress).

       In other words, unless the Government is precluded from introducing at trial the

extraneous medical records that it has pre-marked as exhibits, precisely the type of unnecessary,

time-consuming, and distracting mini-trial that Rule 403 guards against would result.  *See, e.g.*,

*United States* v. *Jimenez*, 513 F.3d 62, 76 (3d Cir. 2008) (finding that the "marginal relevance and

the risk of delay and confusion created by a mini-trial to explain the evidence" supported the district court's ruling limiting testimony under Rule 403); *Blancha* v. *Raymark Indus.*, 972 F.2d 507, 516 (3d Cir. 1992) ("evidence may be excluded when its admission would lead to litigation of collateral issues, thereby creating a side issue which might distract the jury from the main issues"); *Rosales* v. *Kelly*, 2011 WL 5873374, at *3 (S.D.N.Y. Nov. 14, 2011) (granting motion *in limine* to preclude medical records and finding that "any probative value that the disputed medical record may have is substantially outweighed by the danger for this evidence to confuse the jury"). This evidence should not be allowed.

*          *          *

In sum, in determining whether evidence related to Mr. Schwartz's eye surgery and attendance at the April 22, 2014 Mets game should be admitted at the trial of this matter, the Court must first inquire whether the evidence meets the relevance standard of Rules 401 and 402; as set forth above, for both types of evidence, this proposed evidence fails that test. Second, and only if that threshold standard is met, the Court must then weigh probative value, if any, against the very real prejudice that will result if this evidence is presented to the jury. That prejudice includes not only the delay associated with inevitable mini-trials that will be necessitated by the issues raised by these exhibits, but also the significant risk of unfair prejudice, confusion of the issues, and misleading the jury. Accordingly, Mr. Schwartz respectfully submits that the outcome of these tests is clear, and that Rules 401, 402 and 403 require that GX-87, GX-88, GX-89, GX-108, GX-113, GX-116, GX-118, GX-119, GX-120, GX-121, GX-126, GX-130, GX-154, GX-225, GX-227, and GX-228, and any evidence of the medical procedure reflected therein, be precluded at trial.

II.   **THE COURT SHOULD EXCLUDE EVIDENCE OF MR. SCHWARTZ'S RESPONSES TO QUESTIONS, POSED DURING AN INTERNAL INVESTIGATION CONDUCTED BY COGNIZANT'S OUTSIDE COUNSEL, THAT CALLED FOR HYPOTHETICAL ANSWERS AND LEGAL CONCLUSIONS**

### RELEVANT BACKGROUND

A.   **Cognizant's Counsel Asked, and Mr. Schwartz Answered, Hypothetical Questions and Questions Calling for Legal Conclusions**

In 2016, as part of its internal investigation and cooperation with the Government, Cognizant's outside counsel at DLA interviewed a number of Cognizant employees, including Mr. Schwartz. Mr. Schwartz was interviewed twice, once on August 28, 2016 and again on September 23, 2016.[7] During both interviews, Mr. Schwartz was compelled to answer questions about hypothetical scenarios, including questions about how he "might have" acted under certain circumstances. In some instances, the hypothetical questions directly contradicted Mr. Schwartz's prior answers and also assumed circumstances different from the ones actually present. In other instances, Cognizant's outside counsel asked Mr. Schwartz questions that called for legal conclusions, including his personal views on whether certain actions or inactions "would have" violated the FCPA, or, conversely, to confirm that his actions or inactions did not satisfy particular legal defenses, including in relation to legal issues on which the Court will instruct the jury and on which the jury will apply those legal instructions to the facts.

Mr. Schwartz was asked questions that both presented hypothetical scenarios and called for legal conclusions. In answering these questions, Mr. Schwartz was not asked for (and did not offer) any meaningful legal analysis. Rather, during both interviews, Mr. Schwartz provided off-the-cuff legal conclusions without either being asked to provide or providing a legal

---

[7]   As noted in footnote 2, *supra*, Mr. Schwartz contests the quotations attributed to him in the DLA interview memoranda.

rationale for his answers.  For example, Mr. Schwartz was asked about another alleged bribe demand at the KITS facility, different from the $2 million bribe demand directly at issue in this case.  The DLA interview memo reports the following answer: "Schwartz's 'heart sank' because he did not know if the payment had been made, and if it had been made it would be a clear violation of the Foreign Corrupt Practices Act ('FCPA')."  *Id.* at 4365; *see also* August 28, 2016 Steven Schwartz Interview Memorandum, Ex. 23, August 28, 2016 Steven Schwartz Interview Memorandum, CTS_R17_0004324 at 4326.  Thus, Mr. Schwartz was apparently asked both to answer a hypothetical question ("he did not know if the payment had been made") and to state a legal conclusion ("it would be a clear violation" of the FCPA).  Ex. 1, CTS_R17_0004363 at 4365. Moreover, Mr. Schwartz was not asked to explain (and did not offer any explanation of) his view or elaborate on which provision of the FCPA would have been violated and why.  According to DLA's interview memorandum, Schwartz was soon asked another hypothetical question: "Schwartz was asked if an offer would also be a violation and he acknowledged that it would be." *Id*.  Once more, Mr. Schwartz was not asked to and did not offer any explanation for this conclusion or the facts or factors relevant to it, or any analysis of which particular part of the statute might be violated by an offer to pay a demand.

On multiple occasions, Mr. Schwartz's alleged answers to DLA's purported questions included statements about how he might have acted or what he might have been thinking under certain circumstances.  Many of these questions posed hypothetical scenarios about potentially improper payments.  During his second interview, Mr. Schwartz proactively raised with the DLA interviewers an instance in which Anand Bhushan, then-General Counsel of Cognizant India, had communicated in writing that Cognizant had been asked to pay $250,000 to Indian government officials to resolve a regulatory issue.  Ex. 1, CTS_R17_0004363 at 4366.  Mr.

Schwartz told the questioners that he had reported this incident to Dana Gilbert, Cognizant's Chief Compliance Officer, to the Audit Committee, and to the full Board of Directors, in part because the request for the improper payment conveyed by Mr. Bhushan was specific, concrete, and in writing. *Id.*

Then, according to the interview memo, Mr. Schwartz was asked a hypothetical question "as to whether it would be any different if Bhushan had made an oral request to authorize payment." *Id.* at 4366. The section of the DLA interview memo recording Mr. Schwartz's alleged answer makes clear the unusual and confusing nature of the question and his answer:

> Upon consideration as to whether it would be any different if Bhushan had made an oral request to authorize payment, after a pause, Schwartz responded, "if it were a serious question," then his response would be the same. "This was more than a rhetorical question." In this situation, "we were really being asked to do this…. This wasn't just a question asked for [Schwartz] to say no. [Bhushan] was serious about it."

*Id.* Here, in addition to a hypothetical question having been posed to Mr. Schwartz, the DLA memo writer apparently seeks to set a scene (noting that Mr. Schwartz answered the question "after a pause") when framing Mr. Schwartz's alleged answer.

According to the memo, Mr. Schwartz then proactively raised another instance in which Mr. Bhushan had communicated a request for an improper payment to him in writing, this time for $10,000. *Id.* at 4367. Once again, the interview memo reveals the confusing nature of the counterfactual hypothetical the DLA interviewers asked him in response:

> Schwartz again considered whether he would have done the same thing if Bhushan had mentioned the USD 10 K request to him orally. Schwartz said that in this case, based on how Bhushan said it, he would have responded the same.

*Id.* According to the interview memo, Mr. Schwartz is again asked how he would have handled an oral demand that did not occur, and his alleged answer contains the confusing phrase "based on

how Bhushan said it," a phrase that has no clear meaning when the memo had previously reported that the request was in writing.

The DLA interviewers eventually turned their questioning to the April 2014 calls that the Indictment alleges occurred among Mr. Schwartz, Mr. Coburn, Sridhar Thiruvengadam ("Sridhar"), and Srimanikandan Ramamoorthy ("Mani"), in which Mr. Schwartz and Mr. Coburn allegedly approved the payment of a bribe.  During a prior, August 28, 2016 interview, Mr. Schwartz had given his recollection of what he recalled as an in-person meeting with Mr. Coburn, as reported in that interview memo:

> When asked if he remembered a conversation with Coburn, Sridhar, Mani about payment of a bribe, Schwartz responded that he remembered only one conversation with Coburn - he believed in 2014 - and he did not remember the word bribe being used. Coburn said he was having a challenge getting approvals on a real estate transaction. Schwartz said he didn't know what the facility was. Coburn asked two questions. He asked "I can't make a payment to help with these approvals?" Schwartz said, "correct." Coburn then asked "and I can't do that through a third party?" Schwartz answered, "correct." Schwartz said he did not remember what facility the conversation concerned.
>
> Schwartz said the conversation was short and, to his knowledge, involved only Schwartz and Coburn.  Schwartz was walking by his office and Coburn called him in. Coburn did not indicate what the potential payment would have addressed or to whom it might be paid. Coburn did not say anything about L&T or any other third party. He did not mention the amount. When asked if he thought Coburn was telling him about something he was doing or there was an actual demand, Schwartz said he took it as a rhetorical question. He said people do this to him and other lawyers all the time. They want the lawyers to be the bad guy. Coburn had never considered doing it before and was not considering it then, he said.

August 28, 2016 Steven Schwartz Interview Memorandum, Ex. 23, CTS_R17_0004324 at 4332.

The memoranda of both interviews cite Mr. Schwartz as consistently having only a recollection of an in-person conversation with Mr. Coburn and no recollection of a telephone or

video conversation with Mr. Coburn, Sridhar, and Mani. *E.g.*, August 28, 2016 Steven Schwartz Interview Memorandum, Ex. 23, CTS_R17_0004324 at 4335 ("Schwartz did not remember a meeting with Mani, Coburn, and Sridhar concerning the potential KITS payment."); *id.* at 4336 ("Schwartz indicated he did not remember the call referenced in the email."); *id.* ("Schwartz did not remember the topic of conversation in this call."); Ex. 1, CTS_R17_0004363 at 4372 ("He was asked if he remembered when he was questioned about a conversation with Coburn, Sridhar and Mani about getting permits at KITS. He remembered saying no."); *id.* at 4374 ("Schwartz repeated that he did not remember such a call."); *id.* ("Schwartz did not recall having calls on April 22 with Mani, Coburn, and Sridhar . . . "); *id.* at 4375 ("Schwartz claimed that he did not remember the calls referenced in these emails."); *id.* at 4378 ("He claimed that he still did not remember the calls.").

But despite Mr. Schwartz's repeated, consistent statements that he did not remember any such calls, the DLA interviewers repeatedly asked Mr. Schwartz hypothetical questions that assumed the calls had occurred, in direction contravention of Mr. Schwartz's answers. The interview memo states:

> When asked if he did anything about the bribery-related red flags raised on the call, Schwartz said he did not remember taking any actions or going to anyone about them. He was asked what should be done with this kind of information. He responded that he should have reported it up because it was serious. He said it would be a violation of policy if they made an improper payment. When asked if having a discussion to consider making an improper payment was a violation of CTS policy, he did not respond verbally but moved his head and shoulders as if to indicate maybe. Schwartz admitted that the Board and the Audit Committee would want to know about a demand for a USD 2 M payment and under normal circumstances, he would report it up.

*Id.* at 4378. The questioning continued, again as recorded in the interview memo:

> He was asked, "What should the Company do about this?" "Is it a gross failure?" Schwartz replied that he did not know. Schwartz said

> he would have told the participants on the call that they could not
> make an improper payment but he has no notes or memorandum that
> reflects such advice and nothing to corroborate his story. He
> indicated, however, that he had said no to smaller amounts in the
> past and his history at the company supported his position.

*Id.* Again, the DLA interviewers' hypothetical questions ignored Mr. Schwartz's prior statements about his recollection.

According to the interview memo, the DLA interviewers then returned to asking questions that presented hypothetical scenarios and called for legal conclusions. First, the DLA lawyers showed Mr. Schwartz Cognizant's anti-corruption policy and directed him to review certain prohibitions in the policy "against turning a 'blind eye' toward potentially improper payments." *Id.* at 4379. Then, despite Mr. Schwartz's having previously stated that he did not remember the calls and had undergone a surgery that week, the DLA lawyers apparently posed questions that assumed the opposite of his prior statements and, in doing so, asked him to address the legal concept of willful blindness. The DLA memo records Mr. Schwartz's answer as: "Schwartz admitted that if he had been 'with it' when he was on the April call then it would be appropriate to conclude that he turned a blind eye." *Id.*

Then, the DLA interviewers continued to ask hypothetical questions that contradicted Mr. Schwartz's prior statements. Mr. Schwartz's purported answer, which, as noted, he disputes, is reported in the interview memo:

> "I don't love the note, but if I remembered this, I would have gone
> to Internal Audit. I would have gone to Frank and asked them to
> look into Real Estate." He said if he had a memory of it, then
> Steven's lawyer would know about it. He said if he had been "with
> it" that week, he would have reported it.

*Id.*

27

Mr. Schwartz was also asked questions that asked him to interpret the notes he had allegedly taken of the April 22, 2014 call—notes that he did not remember taking[8]—while also asking him to assume he had been "with it."  For instance, according to the interview memo, "He was asked if lines 12 and 13 of his notes were red flags. He said yes they would be if he were 'with it.'"  *Id.* at 4380.

Mr. Schwartz was also asked questions that called for him to draw a legal conclusion about the notes he did not remember:

> Q:      Are the references to $2 million and $670,000 in the notes facilitation payments?
>
> A:      They are not.

*Id.*  Here, the DLA lawyers were apparently attempting to neutralize a potential defense based on the facilitation payment exception to the anti-bribery provisions of the FCPA.  15 U.S.C. § 78dd–1(b) (FCPA's prohibition "shall not apply to any facilitating or expediting payment to a foreign official, political party, or party official the purpose of which is to expedite or to secure the performance of a routine governmental action by a foreign official, political party, or party official.").  If the DLA lawyers are permitted to testify as to this questioning, the jury will be faced with an exchange, the accuracy of which Mr. Schwartz contests, asking Mr. Schwartz to draw a legal conclusion, premised on notes he stated he did not remember taking of a call he also did not remember, and using the same legal terms on which the Court will eventually instruct the jury.

The DLA lawyers continued to pose hypothetical after hypothetical, all inconsistent with Mr. Schwartz's earlier statements, now seeking to hone in on the elements of a willful blindness theory:

---

[8]    *E.g.*, Ex. 1, CTS_R17_0004363 at 4376 ("'I'm not denying these are my notes.' He added, 'but I don't remember.' He said he does not remember the week."); *id.* at 4378 ("Schwartz said he could not remember and he did not know what the references meant.")

> Q:   Had you been competent that week, would the call have put
>       you on notice that an improper payment was substantially
>       likely to occur?
>
> A:   Yes.

*Id.* Here, in asking Mr. Schwartz, had he been competent, whether he would have been on notice

that an improper payment was "substantially likely" to occur, the DLA lawyers were using an

identical concept to the Third Circuit's model jury instruction on willful blindness, which requires

a defendant to believe there was a "high probability" that a fact or circumstance existed. Third

Circuit Model Criminal Jury Instruction 5.06 ("Willful Blindness") (defendant's subjective belief

that there was a "high probability" that a circumstance existed is a necessary element to establish

willful blindness).

The DLA lawyers then asked Mr. Schwartz to draw a direct legal conclusion as to

whether he had violated the FCPA, as reported in the interview memo:

> Q:   Did you understand that someone who fails to pursue a red
>       flag could be found to have violated the FCPA?
>
> A:   Yes.

Ex. 1, CTS_R17_0004363 at 4380–81. Of course, whether Mr. Schwartz violated the FCPA is the

ultimate legal issue in this case, and the Court will instruct the jurors in detail on the statute. The

question from DLA contains no explanation whatsoever of what "found to have violated the

FCPA" might mean, and the Indictment does not charge Mr. Schwartz with "fail[ing] to pursue a

red flag." The jurors will have no way to evaluate Mr. Schwartz's alleged answer.

Next, the DLA lawyers returned to questioning Mr. Schwartz on willful blindness,

while once again ignoring Mr. Schwartz's prior factual answers. According to DLA's memo, the

exchange was as follows:

> Q:   If you were aware during this week, would you agree that
>       this would be willful blindness?

A:      Absolutely.

*Id.* at 4381.  Willful blindness is a theory of liability that the Government may pursue at trial and

on which the Court may, if the required conditions are met, instruct the jury.  The jurors, however,

will have no way of knowing whether, when Mr. Schwartz allegedly answered a hypothetical

question using the same legal term with a one-word answer, he understood "willful blindness" in

the manner in which they will be instructed, or in a more colloquial sense, or indeed if he

understood its meaning at all.

There is more.  Counts Six through Eight of the Indictment charge Mr. Schwartz

and Mr. Coburn with violations of the books and records provisions of the FCPA for allegedly

providing false Sarbanes-Oxley ("SOX") certifications.  Not content to limit their questioning to

the very legal concepts on which the Court will instruct the jury, the DLA lawyers asked

hypothetical questions about what would eventually become the charges themselves.  As DLA's

memo states:

> Q:      You sign a SOX certification every year in which you
> represent that you have evaluated internal controls and
> reported deficiencies in internal controls.  Would failing to
> report the call be a violation of that certificate?
>
> A:      Yes, and I would have reported it if I was in my right mind.

Ex. 1, CTS_R17_0004363 at 4381–82.[9]  Here, the DLA lawyers, in the guise of a hypothetical,

asked Mr. Schwartz, in effect, whether he was guilty of what would later become a charged count.

None of this was an accident.  As the Court has found, Cognizant and DLA were

not neutral questioners or reporters of what was asked or said; they were motivated to protect the

---

[9]   This is a particularly powerful example of DLA's skewed reporting of the interview; in fact,
Mr. Schwartz and Mr. Coburn immediately reported the call to Lakshmi Narayanan, the Vice
Chair of Cognizant's Board.  DLA apparently did not focus its interview on that portion of the
note or Mr. Schwartz's explanation of it.

Company by building a case against its senior executives.  ECF No. 263 at 23–24 (noting Cognizant's "obvious incentives to shift blame" and that Cognizant "performed an investigation for the purpose of exculpating itself").  As the Court has found, the interviews were not voluntary, as Mr. Schwartz sat for them under penalty of termination.  ECF No. 495 at 11 ("To start, the record establishes that the interviews of Coburn and Schwartz by DLA were compelled.  Cognizant's policies required employees to cooperate fully with internal investigations or face potential termination.").  The interviews were conducted by a former Assistant United States Attorney, Karl Buch, who phrased the questions in the language of the criminal law, in which Mr. Schwartz, as a corporate lawyer, had no particular expertise.  And Mr. Schwartz's counsel was permitted neither to interpose objections nor to take any notes in order to make his own record of the interview.  ECF No. 495 at 4 ("The DLA attorneys who interviewed Schwartz, including Buch, set and enforced strict ground rules for the interview, including prohibiting Schwartz from having more than one lawyer present and not allowing that lawyer to take notes or ask questions.").

## ARGUMENT

**B.**     **Mr. Schwartz's Answers to Questions that Presented Hypothetical Situation and Called for Legal Conclusions Should Be Excluded Under Rules 401 and 402**

As explained above, *see supra* Section I.A.1., evidence that "has any tendency to make a fact more or less probable than it would be without the evidence" is relevant if "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  In a criminal case, evidence is relevant where it makes it "more or less likely" that the defendant committed the offenses charged.  *See Johnson*, 143 F. App'x at 438.  The operative inquiries under Rule 401 are whether the evidence "possesses sufficient probative value to justify receiving it into evidence" and "tend[s] to prove the matter sought to be proved."  Fed. R. Evid. 401 advisory committee's note to 1972 proposed rules.  "Irrelevant evidence is not admissible."  Fed. R. Evid. 402.

Mr. Schwartz's answers to questions posing hypothetical scenarios are irrelevant because they would not assist the jury in determining whether it is more or less likely that he committed the offenses with which he is charged.  When considering the propriety of admitting such questions and answers, it is useful to consider whether the Court would permit such questioning of a defendant who chose to testify in a criminal case.  It is hard to believe that the Court would permit a criminal defendant to be asked hypothetical questions that, like those posed here, were based on events that the defendant said he did not remember or went further and were based on asserted facts that the defendant had denied.  The reason is clear: a fact witness, much less a criminal defendant, cannot offer an answer with any real relevance or probative value to a hypothetical question based on facts he does not recall or denies.  Indeed, such questioning would strain to the breaking point even the greater tolerance for hypothetical questions in examinations of expert witnesses.  *Teen-Ed, Inc.* v. *Kimball Intern., Inc.*, 620 F. 2d 399, 404 (3d Cir. 1980) (noting that the "essential difference" between lay and expert testimony "is that a qualified expert may answer hypothetical questions").

In effect, the DLA interviewers asked Mr. Schwartz, in 2016, to conduct thought experiments, based on hypothetical scenarios he had denied or asserted facts that he did not recall, and then to provide answers as to what he might have thought or how he might have acted, under those hypothetical scenarios, in 2014.  Such questions might have been interesting to a company investigating its Chief Legal Officer, but it is hard to see how they can be relevant or admissible under the Federal Rules of Evidence.

Moreover, the relevance and probative value of allowing such questions and answers in this case is diminished even further here, where (i) the questioning will not occur in open court with the chance for defense counsel to object and for the Court to rule; (ii) the

questioning did not occur with any of the other protections of the courtroom (or even the lesser protections of an interview conducted by the Government, as the Court has found, due to the strict prohibitions in place during the interviews); (iii) the questions were asked in 2016 about Mr. Schwartz's conduct and state of mind in 2014; and (iv) the DLA witness at trial will testify seven years after the interviews took place.

Furthermore, Mr. Schwartz's purported answers to questions that asked him to draw legal conclusions regarding the governing law at issue in this case likewise would provide minimal probative value at trial and are accordingly irrelevant.  Again, it is instructive to consider how the Court would rule on such questioning at trial.  And, again, the questioning took place under the circumstances discussed directly above, with none of the due process protections of the courtroom.

The questions and answers that called for legal conclusions are irrelevant because Mr. Schwartz's answers to questions about whether his hypothetical conduct (again, with those hypotheticals consistently contradicting his prior statements) amounted to willful blindness, made out a facilitation payment defense under the FCPA, or violated the books and records provisions of the FCPA, when none of those legal topics were explored in a way that can ensure consistency with the Court's jury instructions, on their terms do not proceed from facts (but instead from hypotheticals) and seek a legal conclusion rather than a factual answer.  They therefore cannot and do not have "any tendency to make a fact more or less probable than it would be without the evidence."  Instead, they threaten to invade the province of the Court to instruct the jury on the law and of the jury to apply the facts to the law.  *See Berckeley Inv. Grp., Ltd.* v. *Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (prohibiting legal opinion testimony "because it would usurp the District Court's pivotal role in explaining the law to the jury"); *United States* v. *Leo*, 941 F.2d 181, 196 (3d Cir. 1991) (stating that "it is not permissible for a witness to testify as to the governing law

33

since it is the district court's duty to explain the law to the jury").  Simply put, even assuming that they are accurately reported, which Mr. Schwartz disputes, his off-the-cuff answers, frequently limited to one word or a handful of words, to questions as to whether hypothetical conduct (which he did not recall or denied) matched or did not match certain legal principles that were only vaguely described in the questions, if at all, are irrelevant to the jury's determination of the facts of this case because they seek a legal conclusion, not a factual answer.

C.   **Mr. Schwartz's Answers to Questions That Presented Hypothetical Situations and Called for Legal Conclusions Should Be Excluded Under Rule 403**

As explained above, *see supra* Section I.A.2., evidence must be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.

1.   **The Probative Value of the Statements Is Minimal**

For all the same reasons stated above regarding relevance under Rule 401, the probative value, for the purpose of Rule 403's balancing test, of Mr. Schwartz's answers to questions that presented hypothetical situations and called for legal conclusions is minimal at best. DLA's hypothetical questions, which consistently proceeded from premises that contradicted Mr. Schwartz's prior statements and his limited recollection, can prove nothing, other than how Mr. Schwartz thought he might have acted under conditions that he denied or could not recall.  DLA's questions that go a step further by calling for a legal conclusion also could not and did not generate answers with probative value.  They were non-factual, both because—even if they were accurately reported—they proceeded from hypothetical facts directly contrary to Mr. Schwartz's prior statements, and because they did not seek factual answers, but instead sought Mr. Schwartz's conclusions as to the law, such as whether Mr. Schwartz was willfully blind.

### 2.   The Statements' Limited Probative Value Is Significantly Outweighed by the Risk of Unfair Prejudice, Confusion, and Waste of Time

Any minimal probative value that Mr. Schwartz's answers to questions presenting hypothetical situations and calling for legal conclusions might possibly have is significantly outweighed by the risk of unfair prejudice, jury confusion, and waste of time.

Mr. Schwartz's answers to hypothetical questions are very likely to confuse the jury, thereby unfairly prejudicing Mr. Schwartz.  Specifically, the likeliest effect of admitting these statements at trial would be to distort jurors' perceptions on the critical issue of what Mr. Schwartz knew or believed in 2014.  For example, questions that asked Mr. Schwartz to analyze hypothetical situations, such as whether certain lines from notes of the April 22, 2014 call would be "red flags," *see* Ex. 1, CTS_R17_0004363 at 4380, are very likely to confuse the jury regarding Mr. Schwartz's state of mind in 2016, when he was asked those questions, as compared to 2014, when the call at issue took place, while providing little, if any, probative value in determining Mr. Schwartz's conduct and state of mind in 2014.  While, of course, a person may state something at a later date that bears upon their state of mind at an earlier date, that is not what DLA's questions elicited.  Instead, as discussed above, DLA's questions were thought experiments, based on hypothetical facts that Mr. Schwartz denied or did not recall, that sought his answers in 2016 as to what he might have thought or did, if those hypothetical scenarios had obtained in 2014.  Jurors will necessarily be confused as to whether Mr. Schwartz's answers speak to his state of mind and conduct in 2016 or 2014.  As a result, the questions fail Rule 403's balancing test.

Moreover, a number of the questions Mr. Schwartz answered were unfairly prejudicial because they sought speculative responses that rested upon an assumption of guilt, known in the caselaw as guilt-assuming hypotheticals.  Guilt-assuming hypotheticals are questions, which assume either that the defendant has committed certain acts that are part and

parcel of a crime, as the questions did here, or go further to assume the defendant's guilt.  These questions are most commonly encountered in the caselaw concerning character witnesses.  *E.g.*, *United States* v. *Kellogg*, 510 F.3d 188, 192 (3d Cir. 2007) ("Sir, would you agree with me that a person who knows that a laboratory used one particular analytical method, but then who reports out a completely different analytical method on final reports of analysis to its customers, would your opinion be different about that person being [a] law abiding citizen?") (alteration in original).  Courts universally express a deep concern that such questions undermine the presumption of innocence and are unfairly prejudicial to defendants.  *E.g.*, *United States* v. *Candelaria-Gonzalez*, 547 F.2d 291, 294 (5th Cir. 1977) ("These hypothetical questions struck at the very heart of the presumption of innocence which is fundamental to Anglo-Saxon concepts of fair trial.  We think that the risk of prejudice to defendant's basic rights from such questions requires reversal.  The questions put have no place in a criminal trial."); *Kellogg* at 194 (collecting cases and stating: "Generally, the reason given for these holdings is that a guilt-assuming hypothetical impairs the presumption of innocence and thus violates the defendant's due process rights.  A few Courts have also noted that an alternative basis for holding guilt-assuming hypotheticals are improper is that they are unfairly prejudicial to the defendant, which would indeed seem to follow necessarily from a conclusion that there had been a due process violation.") (citations omitted).

In *Kellogg*, the Third Circuit countenanced a very narrow permissible scope for such questions, forbidding them to be asked of reputation character witnesses, *id.* at 196, but permitting them to be asked of opinion character witnesses, *id.*  And even then, the Third Circuit warned that such questioning may, as here, "prove problematic if it arises in circumstances that implicate the presumption of innocence or otherwise undermine due process."  *Id.*  In *Kellogg*, which again did not address the substantially more fraught question whether a criminal defendant

36

himself or herself may be asked a guilt-assuming hypothetical, the Third Circuit found the limited questioning of an opinion character witness using guilt-assuming hypotheticals acceptable only because "its hypothetical nature was so emphasized as to allay any real concern about undermining the presumption of [defendant's] innocence." *Id.* That is obviously not the case here. Indeed, if guilt-assuming hypotheticals are permissible in only such narrow circumstances and broadly impermissible, then (though the defense has located no caselaw directly on point) they are impermissible *a fortiori* in the context of testimony as to the interview of a criminal defendant, where the prejudice arising from such questions is so patent and the resulting threat to the presumption of innocence so profound.

As just one example of the impermissible guilt-assuming hypotheticals with which Mr. Schwartz was confronted during his September 23, 2016 interview, we can turn to the question in which DLA asked Mr. Schwartz about his SOX certification:

> Q:    You sign a SOX certification every year in which you represent that you have evaluated internal controls and reported deficiencies in internal controls. Would failing to report the call be a violation of that certificate?
>
> A:    Yes, and I would have reported it if I was in my right mind.

Ex. 1, CTS_R17_0004363 at 4381–82. This question, and Mr. Schwartz's purported answer, even assuming they are accurately reported, is guilt-assuming in that its premise is that he failed to report a call on which a bribe demand was both discussed and approved. This is true of many of DLA's questions, which asked Mr. Schwartz to assume that he was on a call during which a bribe demand was discussed (which he said he did not recall) and, according to DLA, approved (which he categorically denies), thereby assuming his guilt.[10] Under the caselaw, and in light of the

---

[10]    *E.g.*, *id.* at 4380 ("Q: Had you been competent that week, would the call have put you on notice that an improper payment was substantially likely to occur? A: Yes."); *id.* at 4381 ("Q: Did

fundamental nature of the presumption of innocence, any such guilt-assuming hypothetical questions and Mr. Schwartz's answers should be precluded at trial as unfairly prejudicial.

In addition, Mr. Schwartz's answers to questions calling for legal conclusions are likely to confuse the issues and mislead the jury which could easily be confused into misunderstanding them as specific admissions of guilt, rather than abstract comments in response to general, imprecise, speculative questions about the law that Mr. Schwartz may not have understood in the same way as the jury will be instructed. Mr. Schwartz's responses to questions that asked him to offer a legal conclusion as to what would constitute a red flag, willful blindness, a facilitation payment, or a violation of the books and records provision of the FCPA have scant or no probative value, but rather would tend to muddle the jury's understanding and application of the law to the evidence admitted at trial. Under the balancing that the Court must conduct to weigh these interests, the danger of unfair prejudice and confusing the jury that would result from presenting Mr. Schwartz's answers to hypothetical questions calling for legal conclusions substantially outweighs any limited probative value. *Cf. United States* v. *Nikolov*, 1998 WL 205793, at *2 (9th Cir. Apr. 15, 1998) (finding that, while a lay witness' testimony was not probative of any fact in issue, it was not unfairly prejudicial, and thus not inadmissible, *only because* the statements were general and *specifically avoided* drawing legal conclusions). Moreover, as discussed above, exchanges in which Mr. Schwartz was asked to offer legal conclusions invade the provinces of both the Court and the jury, a concern which weighs against admissibility on both sides of the Rule 403 balance, in that such answers lack probative value and risk confusion of the issues and misleading the jury.

---

you have an obligation to report this potential improper payment? A: Yes, in my right mind I would have had an obligation to report and would have reported it.").

Finally, admitting Mr. Schwartz's responses to hypothetical questions and legal conclusions would result in a waste of time that substantially outweighs any limited probative value.  If the statements were admitted, Mr. Schwartz would need to rebut that evidence with proof of his actual understanding of and adherence to the FCPA in both 2014 and 2016 in order to contextualize the responses to hypothetical questions and speculative legal conclusions that he made while being interviewed.  Courts in this jurisdiction have frequently excluded evidence that would lead to such wasteful litigation of extraneous issues.  *E.g. United States* v. *Benjamin*, 125 F. App'x 438, 440 (3d Cir. 2005) (finding district court's refusal to allow cross-examination of witness on extraneous issues to be reasonable given "considerations such as undue waste of time and confusion of the issues under Rule 403").

For the foregoing reasons, Mr. Schwartz respectfully requests that the Court exclude from evidence questions put to him during interviews by Cognizant's outside counsel that presented hypothetical scenarios or called for legal conclusions and his answers to those questions.

### III.    L&T'S STATEMENTS TO THE NATIONAL STOCK EXCHANGE OF INDIA SHOULD BE ADMITTED PURSUANT TO FEDERAL RULE OF EVIDENCE 807

The Government's theory of the case is that L&T Construction, a unit of L&T, facilitated the payment of a bribe to an Indian official and then sought and received reimbursement for that bribe from the Indian subsidiary of Cognizant.  During the multi-year investigation into the charges in this case, L&T and its outside counsel, Debevoise & Plimpton LLP ("Debevoise"), provided to the Government tens of thousands of L&T documents, oral and written summaries of findings from the extensive internal investigation they conducted, and access to key L&T witnesses from India—all voluntarily, but pursuant to targeted, repeated requests from the Government.  L&T's findings, like its employees' testimony when later interviewed by the Government, do not, however, align with the Government's theory of prosecution.  Indeed, in 2019—after the Indictment in this matter was unsealed—L&T made a series of public statements to the National Stock Exchange of India unequivocally denying any involvement in making, facilitating, or even knowing about the alleged bribe that is the centerpiece of the Government's case.

L&T's denials, of course, are powerfully exculpatory as to the defendants here.  If L&T—following extensive investigative efforts led by well-respected U.S. and Indian law firms and then reviewed by external experts—uncovered no evidence of the alleged improper payments, it is significantly less likely that a bribe was paid and therefore less likely that the conspiracy of which defendants are accused existed.  L&T's statements to the National Stock Exchange of India—which defendants acknowledge are hearsay not subject to the exceptions in Federal Rules of Evidence 803 or 804—must therefore in fairness be admitted pursuant to Federal Rule of Evidence 807 so that they can be presented to and considered by the jury at defendants' upcoming criminal trial.

**RELEVANT BACKGROUND**

**A.      L&T's Investigation and Voluntary Cooperation with the Government**

On October 5, 2016, the Government issued a preservation request to L&T Infotech—a majority-owned subsidiary of L&T located in Edison, New Jersey—in its investigation underlying this case.  Ex. 24, LT00005782 at 5797.  By the end of October 2016, L&T had retained both U.S. and Indian outside counsel and advised the Government that it would voluntarily comply with the document preservation request.  *Id.*  On February 23, 2017, L&T further informed the Government that it would voluntarily undertake an internal investigation into the alleged conduct at issue.  *Id.*

During the course of its internal investigation, L&T obtained and analyzed extensive documentation concerning several Cognizant construction projects in India, including the KITS facility project at issue in this case.  After receiving the Government's preservation request, L&T sent preservation notices to at least 69 custodians, imaged 29 hard drives, and restored 88 back-up tapes for 12 key custodians.  *Id.* at 5798.  L&T collected and uploaded for searching and review a total of 485.3 gigabytes of mail and user files—more than 1.2 million total documents—after filtering for Cognizant or "CTS" references within the 1997 to 2016 date range. *Id.*  It further undertook a full forensic accounting.  *Id.* at 5799, 5802.  By June 22, 2017, L&T completed the first, *id.* at 5797, of at least nine document productions to the Government.

On July 27, 2017, Debevoise, on behalf of L&T, presented to the Government an "Interim Update" on the progress of the company's internal investigation.  *Id.* at 5782.  At the time of that interim presentation, L&T had identified at least 104,278 documents for review and had conducted interviews of 32 individuals and consultants.  *Id.* at 5802.  In addition to detailing L&T's document collection efforts, the interim presentation outlined L&T's initial analysis and conclusions regarding construction permitting approvals, variation claims that account for changes

to building design or work outside the initial scope of construction, and the use of consultants for statutory approvals on projects.  *Id.* at 5801.  The construction of Cognizant's KITS facility was deemed a "priority project."  *Id.* at 5800.

In the nine months following Debevoise's July 2017 presentation to the Government, L&T continued to provide the Government with additional details of its investigative findings.  For example, L&T annotated its interim presentation to include notes and citations for the factual basis of certain conclusions, Ex. 25, DOJ-LT-LTR-00000021 at 21, and it answered the Government's written follow-up questions regarding its presentation, Ex. 26, DOJ-LT-LTR-00000023.  L&T also shared with the Government the search terms it used to collect documents for its internal review.  Ex. 27, DOJ-LT-LTR-00000055.  L&T suggested that the Government interview three key L&T employees, Ex. 28, DOJ-LT-LTR-00000030 at 31, and the Government ultimately interviewed those three employees (as well as one other employee), Exs. 29–31, DOJ-302-00000144 at 149 (S.N. Subrahmanyan), DOJ-302-00000152 at 157 (Balaji Subramanian), DOJ-302-00000192 at 198 (Ramesh Vadivelu).  L&T also responded to additional inquiries from the Government, including by creating a chart detailing all of the statutory approvals obtained from Indian authorities for three Cognizant construction projects in India, including the KITS project. Exs. 32–33, DOJ-LT-LTR-00000039 at 40, DOJ-LT-LTR-00000042.

The Government, for its part, actively engaged with Debevoise during this period of extensive cooperation, as revealed by DOJ paralegal notes of calls and meetings with L&T and Cognizant that the Government provided to the defense in advance of the April 18–19 evidentiary hearing.  At various points, the Government requested that L&T and Debevoise focus (and in some cases expand) their investigative efforts on specific topics that ultimately formed the basis for the Indictment.  For example, during a call with the Government on October 5, 2017, Debevoise

reported that it had added 385,000 records to its review (beyond the 105,000 reviewed as of July 2017) in response to the Government having "encourag[ed]" Debevoise "to continue looking at the KITS project," particularly communications between March and June 2014.  Ex. 35, DOJ-EH-0000000095 at 95.  Debevoise also advised that it had manually reviewed all emails from six specific custodians without applying any search terms beyond "Cognizant" and "CTS"—thus making "sure to capture every document that referred to [C]ognizant."  Ex. 36, DOJ-EH-0000000142 at 142.  And Debevoise told the Government that they were "using every tool that [L&T and its counsel] can think of to find additional information"; in response, the Government agreed that "[c]learly [L&T and Debevoise were] taking a comprehensive look."  Ex. 35, DOJ-EH-0000000095 at 96; *see also* Ex. 36, DOJ-EH-0000000142.

During a subsequent call with the Government on December 7, 2017, Debevoise advised that, despite extensive efforts undertaken in response to the Government's requests to "look harder at March to June 2014, looking for a possible payment on the KITS project" and focus "on earlier 2014 and late 2013 months to find a demand for a payment from an official," Debevoise's and L&T's "review did not yield new findings."  Ex. 36, DOJ-EH-0000000142 at 142.  More specifically, their "brute force review"—which "reach[ed] beyond the obvious places" and was conducted by 18 reviewers who analyzed approximately 350,000 documents—did not uncover any "correspondence from late 2013 or early 2014 regarding payments" and revealed "nothing from [March through June] 2014 relating to payments or the claim process [Debevoise and the Government] discussed" previously.  *Id.* at 142–144.  The Government noted its "appreciat[ion of] the scope and nature of what [L&T and Debevoise] accomplished," but expressed "surprise[] given the effort and scope" that L&T and its counsel had not found the corroborating evidence that the Government sought.  *Id.* at 143.  The Government thus proposed

"steer[ing] [L&T and Debevoise] in certain directions in a bit more targeted fashion." *Id.* Those efforts, like the Government's prior attempts, did not result in L&T or Debevoise uncovering any evidence of the alleged bribe at the center of the Government's case.[11]

**B.     L&T's Public Statements Directly Contradict the Government's Core Theory in this Case**

The Indictment in this matter was issued on February 14, 2019.  It alleges that L&T, referred to throughout the Indictment as the "Construction Company," received a bribe demand from an unidentified Indian government official; conveyed that bribe demand to Cognizant; hired a third-party consultant to make the alleged bribe payment; and demanded reimbursement for that payment through falsified change orders.  ECF No. 1 ¶¶ 1(e), 4–8, 11–14, 23–26.  The day after the Indictment was issued, the Government announced in a press release that it would not prosecute Cognizant for its involvement in the alleged bribe; this announcement was issued alongside the SEC's press release regarding its settlement with Cognizant.  Ex. 37, Press Release 19-127, Department of Justice, Former President and Former Chief Legal Officer of Publicly Traded Fortune 200 Technology Services Company Indicted in Connection with Alleged Multi-Million Dollar Foreign Bribery Scheme at 2 (Feb. 15, 2019); Ex. 38, Press Release 2019-12, Securities and Exchange Commission, SEC Charges Cognizant and Two Former Executives with FCPA Violations (Feb. 15, 2019).

Days after the Indictment was unsealed, L&T initiated a series of public statements denying in unequivocal terms any involvement in the improper payments alleged in the Indictment

---

[11]   In response to the Government's question regarding a change order request from L&T to Cognizant for "statutory approvals," Debevoise reported that they had been told that "this was an effort to claim additional money because of delays to the project" and that L&T "chose the statutory approvals as the section because they knew [Cognizant] would not pay a delay claim." *Id.*  In other words, L&T's investigation produced evidence that directly rebutted the Government's theory of the case in a manner that, as discussed below, is corroborative of L&T's statements to the National Stock Exchange of India.

and in Cognizant's settlement with the SEC.  L&T's first known public statement about this matter came in a February 18, 2019 letter it sent to the National Stock Exchange of India, on which shares of L&T are publicly traded.  L&T, through its Company Secretary, N. Hariharan, stated:

> We wish to clarify that Cognizant Technology Solutions ("CTS"), a longtime customer of Larsen & Toubro, ha[s] reached a settlement with the U.S. Department of Justice . . . and the U.S. Securities and Exchange Commission . . . in which it . . . acknowledged violations of the U.S. Foreign Corrupt Practices Act ("FCPA") in connection with certain construction projects in India.  This settlement appears to arise from an internal investigation by CTS that it first announced on September 30, 2016.
>
> While we cannot comment on Cognizant's decision to enter into these settlements, *we are not aware of any evidence that supports our involvement in making the alleged improper payments*.  We confirm that neither we nor any of our employees are a party to the proceedings brought in the United States.

Ex. 39, Feb. 18, 2019 Letter from N. Hariharan to National Stock Exchange of India Limited (emphasis added).

On February 28, 2019, L&T further informed the National Stock Exchange of India that:

> During [L&T's] Audit Committee meeting held on 27th February 2019, the management presented all details of the Company's construction contracts with CTS, including particulars of development relating to the recent settlement between CTS and SEC and the ongoing proceedings before Department of Justice, USA (DOJ)[.]
>
> In this connection, the Company also briefed the Audit Committee of the management-initiated investigation conducted by leading law firms in USA and India with the help of forensic experts from Hong Kong in 2017.
>
> While noting that there was no evidence of the involvement of the Company or any of its executives as alleged based on information provided, the Audit Committee decided to seek assistance of an external expert to review the details of investigations conducted on behalf of the Company in 2017, based on which it will decide the future course of action.

Ex. 40, Feb. 28, 2019 Letter from N. Hariharan to National Stock Exchange of India Limited.

L&T's denial of involvement in or evidence of the alleged bribe was widely reported in the press. A March 2, 2019 newspaper article in the *Business Standard*[12] stated:

> It was alleged that the amount of the bribe, which is said to be about $3.64 million, was paid through L&T, according to several sources in the know. *However, L&T denied the allegation and said the company was not aware of any evidence that supported its involvement in making the "improper" payments.*

Ex. 41, T. E. Narasimhan, "L&T to Seek External Help on Cognizant Bribery Case," *Business Standard*, Mar. 2, 2019 (emphasis added).

In a March 28, 2019 interview with *The Economic Times*, L&T's CEO, Sekharipuram Narayanan Subrahmanyan, denied that L&T had any role in the alleged improper payments. Ex. 34, Rachita Prasad & Jochelle Mendonca, "L&T 'Unfairly Doubted' for Alleged Role in Cognizant Bribery Case: Subrahmanyan," *Economic Times*, Mar. 28, 2019 ("Cognizant paid a $25-million fine and blamed somebody. Department of Justice (US) lets them go. Now, how am I to defend myself? Is there a letter to me accusing me of these things[?]"). And on October 24, 2019, L&T submitted a supplemental letter to the National Stock Exchange of India stating that the external experts it had engaged to review L&T's investigatory findings had concluded their work. Ex. 42, Oct. 24, 2019 Letter from N. Hariharan to National Stock Exchange of India. In particular, L&T informed the National Stock Exchange of India that:

> As directed by the Audit Committee, external experts were appointed to review the details of an earlier investigation conducted on behalf of the Company. The report of the external experts was received and discussed in the Audit Committee meetings held on August 21, 2019 and October 22, 2019. The Audit Committee has concluded that there was no sufficient evidence to support the allegations of the Company's involvement in making alleged improper payments at the direction of Cognizant Technology Solutions.

---

[12] *Business Standard* is one of the most widely circulated English-language newspapers in India. *See* "The Economic Times Continues to Grow, Daily Readership Crosses 1.1 million," *Economic Times*, May 13, 2020 (https://economictimes.indiatimes.com/industry/media/entertainment/media/et-continues-to-grow-daily-readership-crosses-1-1-m/articleshow/75705627.cms).

*Id.* L&T's three statements to the National Stock Exchange of India form the basis for this motion.

## ARGUMENT

Federal Rule of Evidence 807(a), the "residual" hearsay exception, provides:

> Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804: (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).[13]  This exception "was designed to encourage the progressive growth and development of federal evidentiary law by giving courts the flexibility to deal with new evidentiary situations which may not be pigeon-holed elsewhere." *United States* v. *Slatten*, 865 F.3d 767, 806 (D.C. Cir. 2017) (citation omitted).  "The determination of whether a document is sufficiently trustworthy to be admitted under Rule 807 is a highly fact-specific inquiry." *Turner*, 718 F.3d at 233.

Notably, Rule 807 was amended in 2019 "to fix a number of problems that the courts" were encountering in its application.  *See* Fed. R. Evid. 807 advisory committee note to 2019 amendments.  Under the amended rule, a court "should proceed directly to a determination of whether the hearsay is supported by guarantees of trustworthiness." *Id.*  "The amendment specifically requires the court to consider corroborating evidence in the trustworthiness enquiry." *Id.*  Additionally, the amended "rule provides that the focus for trustworthiness is on circumstantial guarantees surrounding the making of the statement itself, as well as any independent evidence

---

[13]   Rule 807(b) requires that the statement's proponent "give[] an adverse party reasonable notice of the intent to offer the statement—including its substance and the declarant's name—so that the party has a fair opportunity to meet it.  The notice must be provided in writing before the trial . . . ."  Defendants listed L&T's three statements to the Indian stock exchange on their July 24, 2023 preliminary exhibit lists and give notice of their intent to offer the statements by way of this motion.

corroborating the statement." *Id.*[14]  The residual hearsay exception thus "should be read to exclude unreliable hearsay but to admit reliable hearsay . . . . Such 'reliable hearsay' has, of course, the effect of promoting the truth-seeking function of a criminal trial and, therefore, ought to be presented to the finders of facts."  *United States* v. *Carneglia*, 256 F.R.D. 384, 392 (E.D.N.Y. 2009) (cleaned up).

As set forth below, L&T's statements to the National Stock Exchange of India are both supported by sufficient guarantees of trustworthiness and more probative on the point for which they are offered than any other evidence defendants can obtain through reasonable efforts. Accordingly, they should be admitted under Rule 807.

## C.   L&T's Statements Are Supported by Sufficient Guaranties of Trustworthiness

### 1.   The Circumstances Under Which L&T's Statements to the National Stock Exchange of India Were Made Support Their Trustworthiness

The totality of the circumstances surrounding L&T's public denials of involvement in the alleged bribe payment at the heart of the Government's case support their reliability.  To begin, the fact that the statements were made to the National Stock Exchange of India—a regulated body of which L&T is a member—is itself indicative of their trustworthiness.  The Securities and Exchange Board of India has promulgated regulations that bear similarities to U.S. securities laws and prohibit, among other things, multiple categories of securities fraud, including "knowing misrepresentation[s] of the truth or concealment of material fact," "representation[s] made in a reckless and careless manner whether [they] be true or false," and "act[s] of an issuer of securities giving out misinformation that affects the market price of a security, resulting in investors being effectively misled even though they did not rely on the statement itself or anything derived from

---

[14]   The 2019 Amendments "leave some doubt . . . as to whether the residual hearsay exception remains 'extremely narrow,'" as some courts had previously interpreted it to be.  *United States* v. *Smith*, 2020 WL 5995100, at *5 (D.D.C. Oct. 9, 2020).

it other than the market price." *See* Prohibition of Fraudulent and Unfair Trade Practices Relating to Securities Market at 2(c)(1, 5, 9), 3 (July 17, 2003, last amended January 25, 2022).  And India's Companies Act of 2013 permits securities fraud class actions for injunctive and declaratory relief against corporations, as well as compensatory damages from the company, its directors, and its auditors.  Companies Act, No. 18 of 2013, INDIA CODE, § 245(1), (7).  India's securities fraud scheme has thus been described as "one of the most robust private enforcement regimes for securities fraud violations in the world."  Fitzpatrick & Thomas, *The Indian Securities Fraud Class Action: Is Class Arbitration the Answer?*, 40 Nw. J. Int'l L. & Bus. 203, 205 (2020).

Significantly, courts routinely admit similar public statements and filings when made to the SEC as sufficiently trustworthy under Rule 807.  *See, e.g.*, *Hal Roach Studios, Inc.* v. *Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1551–52 (9th Cir. 1989) (admitting securities registration statement under Rule 807); *SEC* v. *Espuelas*, 908 F. Supp. 2d 402, 410 n.6 (S.D.N.Y. 2012) (restatement of revenues filed with SEC admissible under predecessor to Rule 807); *SEC* v. *Pattison*, 2011 WL 2313267, at *13 (N.D. Ca. June 9, 2011) (revision of company's securities filings admissible under Rule 807); *In re Worldcom, Inc.*, 357 B.R. 223, 229 (Bankr. S.D.N.Y. 2006) (balance sheet filed with SEC admissible under Rule 807 given that "intense public scrutiny involved in the restatement of [the company's] financial[s] adequately ensured that the results were trustworthy").  L&T's statements to the analogous Indian authorities should be treated no differently, especially considering the public scrutiny L&T was under after Cognizant's resolution.

Moreover, that L&T's statements to the National Stock Exchange of India, made three separate times over the course of nine months, are consistent with each other further supports their reliability.  Indeed, courts place significant weight on the consistency of the declarant's narrative when evaluating trustworthiness under Rule 807.  *See, e.g.*, *Slatten*, 865 F.3d at 808

("Consistency supports the reliability of [the] multiple statements and, consequently, [their] veracity."); *United States* v. *Harrison*, 296 F.3d 994, 1005 (10th Cir. 2002) (noting that under Rule 807, "the consistency of the declarant's statements" is "a factor that we find particularly persuasive"); *cf. United States* v. *Turner*, 718 F.3d 226, 233 (3d Cir. 2013) (relying on bank records' internal consistency in admitting them under Rule 807).[15]  In this case, L&T's narrative has also remained consistent in filings with this Court.  On July 6, 2021, in its brief in opposition to defendants' motion to compel L&T's compliance with Rule 17 subpoenas, L&T reaffirmed its prior denials of wrongdoing to the National Stock Exchange of India and specifically noted that "the consistent basis" for "L&T Ltd.'s public denials in India of wrongdoing" was that "L&T Ltd. found *no* evidence of bribery."  ECF No. 188-1 at 3 (emphasis in original); *see also id.* at 9–10 (reiterating L&T's three statements to the National Stock Exchange of India and stating that "[e]ach of these statements is premised solely on the *absence* of evidence of a purported bribe" (emphasis in original)); *id.* at 25 ("L&T Ltd.'s statements to Indian exchanges . . . are premised on the *absence* of evidence." (emphasis in original)).[16]

    Finally, as is discussed further below, the extensive investigatory efforts underlying L&T's public statements to the National Stock Exchange of India—efforts that the Government itself lauded and helped steer, *see supra* at Section III.A—provide further guarantees of

---

[15]   L&T's statements to the National Stock Exchange of India were signed by L&T's Executive Vice President and Company Secretary.  The fact that the statements were signed by a specific individual also weighs in favor of trustworthiness.  *See generally United States* v. *Chu Kong Yin*, 935 F.2d 990, 1000 (9th Cir. 1991) (finding Hong Kong police records not admissible because there was no evidence the records were prepared by persons with first-hand knowledge of the relevant convictions and because the Government did not make the names and addresses of the declarants available to the defendant before trial).

[16]   Counsel's language is legally significant: the "absence of evidence" may alone create the reasonable doubt that can underlie an acquittal.  *See* Third Circuit Model Criminal Jury Instruction 3.06, (reasonable doubt "may arise from the evidence, *or from the lack of evidence*, or from the nature of the evidence") (emphasis added).

trustworthiness. *See, e.g.*, *MSC Mediterranean Shipping Co. SA, Geneva* v. *Metal Worldwide, Inc.*, 884 F. Supp. 2d 1277, 1282 (S.D. Fla. 2012) (reports from Indian Customs Department detailing its investigation into contents of shipping containers and containing witness statements admissible under Rule 807 because witnesses understood they were taking part in a serious, official, and formal investigation, and the reports were more probative than any other evidence that could be obtained through reasonable efforts); *In re September 11 Litigation*, 621 F. Supp. 2d 131, 163 (S.D.N.Y. 2009) (finding prior testimony under oath from "a highly-scrutinized, public proceeding" of FBI agents about their observations in carrying out investigations regarding airport and airplane security potentially admissible under Rule 807); *United States* v. *Musaibli*, -- F. Supp. 3d --, 2022 WL 17832696, at *6 (E.D. Mich. 2022) (admitting FBI 302 containing statements of interviewees under Rule 807 because the statements had circumstantial guarantees of trustworthiness); *Quinn* v. *Wexford Health Sources, Inc.*, 2020 WL 888048, at *2 (S.D. Ill. Feb. 24, 2020) (admitting prison officials' investigation report because it was compiled contemporaneously with the facts at issue and was signed by the investigator).

> **2.      L&T's Statements Are Corroborated by a Multi-Year Investigation Led by Reputable Law Firms and External Experts, Influenced by the Government, and Validated by the Government's Own Admissions in this Case**

L&T's public denials of wrongdoing to the National Stock Exchange of India are also corroborated by an abundance of evidence—from L&T's underlying investigation and its employees' testimony during Government interviews to the Government's own admissions in this case. First, L&T's statements to the National Stock Exchange of India were expressly premised on the company's years-long internal investigation that preceded them, led by prominent U.S. and Indian outside counsel and forensic experts. The scope and depth of that investigation in and of itself provides sufficient guarantees of trustworthiness. *See supra* at Section III.A.

L&T's investigative efforts also occurred in connection with, and were shaped by, the Government. Indeed, during the course of the company's extensive cooperation with the Government, L&T and Debevoise acceded to the Government's requests to "look harder" for evidence of a bribe payment in connection with the KITS facility, ultimately reviewing hundreds of thousands of additional documents and fielding numerous, targeted follow-up requests and questions from the Government. *See* Ex. 36, DOJ-EH-0000000142 at 142–43; Ex. 26, DOJ-LT-LTR-00000023; Ex. 24, LT00005782 at 5802. The outcome of those efforts were the same—L&T and Debevoise again uncovered no evidence of the alleged improper payments—and Debevoise communicated this to the Government on multiple occasions. *See* Exs. 35–36, DOJ-EH-0000000095, DOJ-EH-0000000142.

Second, L&T's public denials of wrongdoing are also consistent with the statements of L&T's own employees in interviews with the Government.[17] L&T's witnesses consistently denied knowledge of or participation in the improper payments alleged in the Indictment. Exs. 29–31, DOJ-302-00000144 at 149 (L&T's CEO, S.N. Subrahmanyan "did not hear of a demand from the government" about the relevant planning permit and "did not have any internal conversations at L&T about a demand payment to the government"), DOJ-302-00000152 at 157 (Balaji Subramanian stated that L&T "assisted with the planning permit by submitting documents promptly; however, there was nothing else that L&T could have done"), DOJ-302-00000192 at 198 (Ramesh Vadivelu stated that "[t]here was nothing that L&T could do to expedite the planning permit"). And they also directly contradicted the Government's theory that a "statutory approvals" line item in an L&T change order request for the KITS project was actually

---

[17] The admissibility of these statements is the subject of a separate motion *in limine* filed by Mr. Coburn, which Mr. Schwartz hereby joins.

a reimbursement for the alleged bribe.  ECF No. 1 ¶ 23.  According to the L&T employees interviewed by the Government, that line item had nothing to do with any improper payment to a Government official, but instead reflected a charge for indirect costs resulting from L&T's extended stay at the KITS site due to delays associated with obtaining the planning permit.  Exs. 30–31, DOJ-302-00000152 at 157 (Balaji Subramanian stated that L&T sought reimbursement from Cognizant due to delay expenses), DOJ-302-00000192 at 200–01 (Vadivelu stated that the "statutory approval" line item that the Government alleges was the means by which Cognizant reimbursed L&T for the alleged bribe was not, in fact, for statutory approvals, but for expenses caused by the extended delay, which L&T knew Cognizant would not reimburse if labeled as "extended stay expenses").  Debevoise advised the Government that the L&T personnel with whom they spoke likewise told them the "statutory approvals" line item "was an effort to claim additional money because of delays to the project" and that L&T "chose the statutory approvals as the section because they knew [Cognizant] would not pay a delay claim."  Ex. 36, DOJ-EH-0000000142 at 143.

Moreover, the Government's own admissions during this case, both in briefing and to the Court, corroborate L&T's statements regarding the absence of evidence regarding the details of the purported bribe.  *See infra* at Section IV.  Thus, in its opposition to defendants' motion for a bill of particulars, the Government acknowledged that it does not know who made the alleged illegal payment to an Indian government official, does not know the identity of the Indian government official who received the alleged illegal payment, and does not know the details of the alleged illegal payment, to the extent a payment was made at all.  *See id.*; ECF No. 61 at 13, 51–53.  These representations, which the Government has never sought to supplement or correct, are

thus additional, highly corroborative evidence that L&T's statements to the National Stock Exchange of India are sufficiently trustworthy to be admitted under Rule 807.

**D.   L&T's Public Statements Are More Probative on the Point for Which They Are Offered than Any Other Evidence Defendants Can Obtain Through Reasonable Efforts**

L&T's consistent, public denials of wrongdoing in its statements to the National Stock Exchange of India—premised on the absence of evidence of a bribe—directly contradict the Government's theory of prosecution in this case.  That is, the Government alleges that L&T received a bribe demand from an Indian government official to secure a planning permit for the KITS facility; conveyed that bribe demand to Cognizant, which authorized it; hired a third-party consultant to make the alleged bribe payment; and then demanded and received reimbursement for the bribe through falsified change orders approved by Cognizant.  ECF No. 1 ¶¶ 1(e), 4–8, 11–13, 24–26.  Thus, if L&T—following an extensive, multi-year investigation conducted by leading outside law firms, forensic experts, and consultants—uncovered no evidence of the improper payments that it is alleged to have facilitated, paid for, and recouped from Cognizant, it is significantly less likely that a bribe was paid and therefore less likely that the conspiracy of which defendants are accused existed at all.  L&T's public statements to the National Stock Exchange of India are therefore highly exculpatory, probative evidence that bear upon the core allegations in this case. [18]

Recognizing this fact, defendants have made repeated, extensive, but unsuccessful efforts to obtain this evidence in ways other than L&T's statements.  These efforts have included:

---

[18]   Defendants recognize that the actual payment of a bribe is not an element of the offenses with which they are charged.  But whether or not a bribe was in fact paid is highly relevant to the charged offenses—particularly where, as here, the Government has affirmatively alleged that a bribe *was* paid and then reimbursed.

- *Rule 17 Subpoenas*: Defendants first filed applications for Rule 17 subpoenas to L&T in February 2020. The Court approved narrowed versions of those subpoenas and, in October 2020, the Clerk of the Court signed two Rule 17 subpoenas to L&T (one from Mr. Schwartz, and another from Mr. Coburn, respectively), returnable later that same month. Counsel for L&T and its subsidiaries refused to accept service of or comply with the subpoenas. On March 18, 2021, defendants then submitted a supplemental application to the Court for a Rule 17 subpoena to L&T, this time focused on materials relevant to the upcoming trial. ECF No. 143. On April 5, 2021, the Court approved that subpoena and consolidated it with the earlier subpoenas, "authoriz[ing] issuance of the subpoenas in their proposed form." ECF No. 144 at 2. But when defendants attempted to serve the subpoenas on L&T and its subsidiaries, L&T and its counsel again refused to accept service.

- *Motion to Compel*: Because the L&T entities refused to accept service of or comply with the Rule 17 subpoenas, defendants moved to compel L&T's compliance, and L&T cross-moved to quash. ECF Nos. 167, 188. The Court held that L&T was not subject to personal jurisdiction in New Jersey and thus denied defendants' motion to compel and granted L&T's cross-motion to quash. ECF Nos. 264, 268.

- *U.S.—India MLAT*: On December 15, 2020, in an effort to avoid judicial intervention, defendants sought the Government's help in obtaining the subpoenaed records from L&T, either through a direct request or through the Mutual Legal Assistance Treaty ("MLAT") process. Ex. 43, Letter from N. Lewin to N. Grippo *et al.* (Dec. 15, 2020) at 2. At a status conference on January 6, 2021, the Court directed the Government to explain whether it intended to assist the defense in obtaining materials from L&T, and the Government responded as follows: "If defense counsel files an application, I don't envision us getting in the way or objecting, but this is really not our issue. . . . We are certainly not going to pursue an MLAT to India or take other steps to assist the defense in this regard. With that said, if they file an application, we are not going to get in the way but this does not seem to be a fight that the government should or will jump into." Ex. 44, ECF No. 137, Jan. 6, 2021 Status Conf. Tr. at 41:13–24.

- *Motions for Issuance of Letters Rogatory and Rule 15 Depositions*: Defendants thus moved on June 15, 2021 for issuance of a letter rogatory to effectuate the subpoenas directed to L&T and on August 11, 2022 for issuance of a letter rogatory to depose seven material and otherwise unavailable defense witnesses in India. ECF Nos. 168, 396. On December 2, 2022, the Court granted defendants' motion and the Letter Rogatory was promptly issued and transmitted to India. Unfortunately, and despite defendants' best efforts to move the progress forward as expeditiously as possible, India still has yet to act on the Letter Rogatory. Given the length of time it typically takes for execution of letters rogatory—according to the State

Department's website, "a year or more"—defendants fear that the October 2, 2023 trial date will arrive long before India has acted.

In short, defendants have exhausted every avenue available to them to obtain alternative, non-hearsay evidence from L&T—Rule 17 subpoenas, Rule 15 depositions, letters rogatory, and invocation of the U.S.-India MLAT—but have been stymied at every turn. Thus, L&T's statements to the National Stock Exchange of India are, as the Rule requires, *see* Fed. R. Evid. 807(a)(2), the most probative evidence available to defendants through "reasonable efforts" for the point for which they are offered: L&T's conclusion, following an extensive investigation, that there was no evidence of the bribe alleged in the Indictment.[19]  Courts routinely admit evidence under Rule 807 where, as here, the declarant lies beyond the reach of U.S. jurisdiction and the party seeking admission of that evidence has expended every alternative avenue.  *See, e.g.*, *United States* v. *Loalza-Vasquez*, 735 F.2d 153, 157–58 (5th Cir. 1984) (teletype message concerning authorization by Panamanian government for boarding of Panamanian shrimp boat was admissible because the Panamanian official who gave the requisite permission was not subject to subpoena power and thus there was no non-hearsay alternative probative on the issue); *Noble* v. *Al. Dept. of Env. Mgmt.*, 872 F.2d 361, 366 (11th Cir. 1989) (residual hearsay exception applies when evidence is "unreasonably difficult to get from a declarant"); *United States* v. *Prevezon Holdings, Ltd.*, 319 F.R.D. 459, 465–67 (S.D.N.Y. 2017) (Russian bank records admissible because Russian government spurned the United States' request for any relevant alternative evidence); *Escriba* v. *Foster Poultry Farms*, 793 F. Supp. 2d 1147, 1157 (E.D. Ca. 2011) (Guatemalan doctor's notes admissible because they were more probative than any other evidence

---

[19]  L&T's public statements to the National Stock Exchange of India are self-authenticating pursuant to Rule 902 and/or can otherwise be appropriately authenticated at trial through evidence sufficient to support a finding that the statements are what they purport to be.

that the proponent can procure through reasonable efforts—*i.e.*, depositions in Guatemala, special questions by deposition upon written interrogatories, letters rogatory, requests for international judicial assistance).  This requirement of the Rule is therefore satisfied.

**E.      Admitting the Statements Wil Serve the Interests of Justice and Promote the Truth-Seeking Function of the Trial**

Although the requirement that a statement admitted under Rule 807 must serve "the general purposes of these rules and the interests of justice" was deleted by the 2019 Amendments, those considerations are still relevant to the analysis, as Rule 102 requires that all Rules of Evidence "be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination."  Fed. R. Evid. 102; *see* Fed. R. Evid. 807 advisory committee note to 2019 amendments ("The requirements that residual hearsay must be evidence of a material fact and that its admission will best serve the purposes of these rules and the interests of justice have been deleted.  These requirements have proved to be superfluous in that they are already found in other rules.  See Rules 102, 401.").

To that end, admitting L&T's statements to the National Stock Exchange of India is essential to "ensure fundamental fairness in the administration of justice."  *Wezorek* v. *Allstate Ins. Co.*, 2007 WL 1816293, at *5 (E.D. Pa. June 22, 2007).  Having previously acknowledged that it does not know the identity of the Indian official who sought the alleged bribe, the identity of the intermediary who allegedly made the improper payment, or the details surrounding the alleged bribe payment itself, the Government has nevertheless chosen to credit and rely upon the results of Cognizant's internal investigation, which supports the Government's theory of

prosecution that a bribe was paid and then reimbursed,[20] while ignoring the results of L&T's investigation, which directly contradict that theory.  Thus, if L&T's statements to the National Stock Exchange of India denying any involvement in or evidence regarding the alleged bribe are not presented to the jury, the Government will "have the unfettered ability to present [its] one-sided version of events."  *Id.*  But if they are, the defense will be able "to present its version of the transaction, which ultimately aids the fact-finder in determining the truth."  *Id.*  The Court should therefore permit defendants to introduce L&T's statements pursuant to Rule 807 in the interests of justice and in furtherance of the truth-seeking function of criminal trials.

---

[20]   This was so despite knowing that Cognizant had an "agenda" and was providing a self-serving "version of events."  Ex. 21, ECF No. 473, Apr. 18, 2023 Hr'g Tr. at 112:13–17 (Gingras).

IV.  **THE GOVERNMENT'S ADMISSION THAT NEITHER THE DEFENDANTS, THEIR CO-CONSPIRATORS, NOR THE GOVERNMENT ITSELF KNOWS KEY DETAILS OF THE BRIBE CONSPIRACY SHOULD BE ADMITTED AS A PARTY-OPPONENT ADMISSION**

### RELEVANT BACKGROUND

A.  **The Government's Admissions**

The Indictment alleges that, in 2014, defendants authorized L&T to pay a bribe to an Indian government official on Cognizant's behalf in order to obtain a planning permit that was required for the construction of the KITS campus in Chennai, India.  Specifically, the Indictment alleges that issuance of the planning permit was delayed, ECF No. 1 ¶¶ 9–10, and that the defendants authorized payment of a bribe to secure the permit, *id.* ¶¶ 11–13.

The discovery produced by the Government, however, is virtually devoid of details regarding the payment of the alleged bribe.  For this reason, on November 15, 2019, Mr. Schwartz moved for a bill of particulars, requesting, among other things, that the Government disclose the name of the Indian government official or officials who demanded the bribe, the name of the consultant or consultants who served as intermediaries for the payment of the bribe, and the details of the bribe payment.  ECF No. 57-1 at 24, 27–30.

In its brief opposing issuance of a bill of particulars, the Government responded with a categorical admission that the defendants and their alleged co-conspirators did not know any of these key details and a further admission that the Government itself had been unable to ascertain this information: "[N]either the Defendants, nor CC#1 and CC#2, knew the identity of the government official[s] who sought the bribe, the individuals who served as the intermediary and paid it, or the details of the bribe payments.  Likewise, to date, the Government's investigation

has not uncovered this information."  ECF No. 61 at 13 (second alteration in original).  Defendants

seek to admit this statement as a party-opponent admission pursuant to Rule 801(d)(2)(A)–(D).[21]

## ARGUMENT

### B.      The Government's Admissions Are Relevant

As explained above, *see supra* Section I.A.1., evidence is relevant if "it has any

tendency to make a fact more or less probable than it would be without the evidence" and "the fact

is of consequence in determining the action."  Fed. R. Evid. 401.

The Government's admission that neither the defendants nor their alleged co-

conspirators knew "the identity of the government official[s] who sought the bribe, the individuals

who served as the intermediary and paid it, or the details of the bribe payments" is clearly relevant.

Indeed, that the defendants and their alleged co-conspirators, as the Government has admitted, did

not know basic details of the alleged bribery conspiracy makes it less probable that they actually

entered into that conspiracy and authorized the alleged bribe.  This is true for at least two reasons.

First, in the context of the Government's allegations, the fact that the conspirators did not know

key details of the bribe payment makes it less likely that they would have authorized it.  After all,

if neither the defendants nor their alleged co-conspirators knew these details, there would have

---

[21]   It is worth noting that this was not a stray or casual admission by the Government, which made
multiple similar admissions in its opposition to the defendants' motions for a bill of particulars.
*E.g.*, ECF No. 61 at 48 ("The Indictment does *not* allege that the Defendants knew the identity
of the foreign government officials, the third-party consultant, any other intermediaries that
may have facilitated the bribe payments, or any details concerning the actual bribe payments
to foreign officials.") (emphasis in original); *id.* at 51 ("Beyond that, there simply is no
additional information to give the Defendants.  Based on the detail in the Indictment and the
detail included within the discovery, the Defendants have the information the Government has
concerning the bribe payments, participants, and details.  Because the Government at this point
does not possess evidence sufficient to identify the specific foreign official or the third-party
consultant involved in the bribe payment, and because such evidence is not necessary to prove
an FCPA bribery offense, the Defendants do not require these particulars to prepare for trial
. . . .").

been less reason for them to believe that the bribe demand had actually occurred, was really holding up the planning permit, or was made by someone who in fact had the ability to move the permit approval along, and therefore less reason for them to authorize payment of a $2 million bribe.  Second, it is a common sense proposition that individuals who engage in a crime usually know at least some important details of the crime.  Because, as the Government has admitted, the Defendants and their co-conspirators did not know basic details of the alleged bribe payment, it is less likely that they authorized it.  In fact, while these details may not be required for the Government to prove the elements of the charged crimes, it is equally true that the Defendants' lack of knowledge of these key facts, standing alone, could support a reasonable juror's conclusion that the Government has not proved its case beyond a reasonable doubt.  *See* Third Circuit Model Criminal Jury Instruction 3.06, (reasonable doubt "may arise from the evidence, *or from the lack of evidence*, or from the nature of the evidence") (emphasis added).  Thus, the Government's admission as to the Defendants' lack of knowledge of the details of the alleged bribe payment is clearly relevant.

It is also relevant that the Government, despite years of investigation, has itself been unable to uncover these same details.  Put another way, the Government's inability, by its own admission, to uncover the basic details of the payment of the bribe lends at least some support to the argument that no bribe was ever paid,[22] and this, in turn, suggests that the Defendants never agreed to pay a bribe.  Defendants are entitled to make these points as well, and the Government's admission as to its lack of knowledge of the basic details of the alleged bribe payment is relevant to that argument.

---

[22]  The strength of the defense's argument that no bribe was ever paid is further bolstered by L&T's repeated denials of the same.  *See supra* Section III.

### C.    The Government's Statement Is Admissible as a Party-Opponent Admission

A statement "offered against an opposing party" and either "made by the party,"
"adopted" by the party, or "made by the party's agent,"[23] is admissible as non-hearsay pursuant to
Rule 801.   Fed. R. Evid. 801(d)(2)(A)-(D).   Government admissions in criminal proceedings
qualify under Rule 801(d)(2) as statements of a party opponent.   *E.g.*, *United States* v. *Bailey*, 1998
WL 388802, at *1–2 (D.C. Cir. May 7, 1998); *United States* v. *Kattar*, 840 F.2d 118, 131 (1st Cir.
1988); *United States* v. *Morgan*, 581 F.2d 933, 937–38 (D.C. Cir. 1978).

Some Circuits have held that government admissions are generally admissible as
statements of party opponents.   Others allow their admission only in certain defined
circumstances.[24]   The Third Circuit has not yet addressed this issue, but caselaw suggests that
courts in this Circuit will generally admit such statements without the need to show particular
circumstances.   *See United States* v. *Mitchell*, 365 F.3d 215, 256 (3d Cir. 2004) ("We assume, but
do not decide, that the solicitation would have been admissible at trial for its contents as a non-
hearsay admission of a party opponent (the government)."); *United States* v. *Kubini*, 2017 WL

---

[23]   A prosecutor is considered an agent of the government, and prosecutors' statements thus
constitute government admissions.   *United States* v. *Ganadonegro*, 854 F. Supp. 2d 1088, 1118
(D.N.M. 2012) ("[C]ourts have almost uniformly concluded that government attorneys,
including Department of Justice attorneys, are agents under" Rule 801(d)(2)(D).); *see
also United States* v. *Bakshinian*, 65 F. Supp. 2d 1104, 1105–06 (C.D. Cal. 1999).

[24]   There is a circuit split regarding whether government admissions are generally admissible into
evidence at trial as party-opponent statements or whether they are admissible only under
specific circumstances.   The First Circuit and D.C. Circuit allow prosecutors' statements to be
admitted broadly.   *See Kattar*, 840 F.2d at 131; *Bailey*, 1998 WL 388802, at *2.   The Second
Circuit applies a three-part test for admitting prior statements of prosecutors under Rule
801(d)(2), which centers on whether the prior statement "involves an assertion of fact
inconsistent with similar assertions in a subsequent trial."   *United States* v. *Salerno*, 937 F.2d
797, 810–11 (2d Cir.), *opinion modified on reh'g*, 952 F.2d 623 (2d Cir. 1991), *and amended*,
952 F.2d 624 (2d Cir. 1991), *and rev'd on other grounds*, 505 U.S. 317 (1992) (citing and
quoting *United States* v. *McKeon*, 738  F.2d 26 (2d Cir. 1984)).   The Fourth Circuit has not
adopted the Second Circuit's three-part test, but has adopted the Second Circuit's reasoning as
laid out in *McKeon*.   *See United States* v. *Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986).

2573872, at \*23 n.23 (W.D. Pa. June 14, 2017) ("Although the Rules of Evidence do not directly apply to sentencing proceedings, the Court believes that the 5K1.1 motion contains admissions by a party opponent.").

Here, the Government has stated in a court filing that neither the Defendants, their co-conspirators, nor the Government itself knew or knows "the identity of the government official[s] who sought the bribe, the individuals who served as the intermediary and paid it, or the details of the bribe payments."  This statement is a clear party-opponent statement, admissible against the Government at trial under Rule 801(d)(2).[25]

For the foregoing reasons, Defendant Steven Schwartz respectfully requests that the Court allow into evidence the Government's statement that: "[N]either the Defendants, nor CC#1 and CC#2, knew the identity of the government official[s] who sought the bribe, the individuals who served as the intermediary and paid it, or the details of the bribe payments. Likewise, to date, the Government's investigation has not uncovered this information."

---

[25] Admitting the Government's statement presents no danger of unfair prejudice to the Government.  The Government proactively made these admissions in a brief filed with this Court in a successful attempt to defeat the defendants' motions for a bill of particulars.  *See United States* v. *Stevens*, 455 F. App'x 343, 346 (4th Cir. 2011) (finding admission of a party's own stipulation of facts did not unfairly prejudice that party).  Admission of the Government's statement into evidence is also highly unlikely to confuse or mislead the jury.  Instead, and to the contrary, without a specific acknowledgment that neither the defendants, their co-conspirators, nor the Government know basic facts about the alleged bribery scheme, the jury might be confused as to what details the defendants did or did not know about the alleged bribe.  Since the probative value of the statement at issue is high and the risk of unfair prejudice is either nonexistent or low, the statement should not be excluded under Rule 403.

## V.   MR. SCHWARTZ JOINDER TO MOTIONS IN LIMINE MADE BY CO-DEFENDANT MR. COBURN

### A.   Mr. Coburn's Motion *in Limine* No. 1

Mr. Schwartz respectfully joins in Mr. Coburn's August 3, 2023 motion *in limine* to exclude certain statements of the defendants and certain portions of Cognizant's internal policies concerning the definition of particular legal terms.

### B.   Mr. Coburn's Motion *in Limine* No. 2

Mr. Schwartz respectfully joins in Mr. Coburn's August 3, 2023 motion *in limine* to exclude references to, or evidence about, Cognizant's outsourcing jobs or using less expensive foreign labor.

### C.   Mr. Coburn's Motion *in Limine* No. 3

Mr. Schwartz respectfully joins in Mr. Coburn's August 3, 2023 motion *in limine* to exclude references to, or evidence about, Mr. Coburn's decisions or views relating to Cognizant's compliance budget.

### D.   Mr. Coburn's Motion *in Limine* No. 4

Mr. Schwartz respectfully joins in Mr. Coburn's August 3, 2023 motion *in limine* to exclude references to, or evidence about, Mr. Coburn's compensation while employed at Cognizant and his overall net worth, including as applied to Mr. Schwartz's compensation while employed at Cognizant and his overall net worth.  As with Mr. Coburn, Mr. Schwartz's compensation structure was complex in both design and practice.  *See, e.g.*, Exs. 48–49, CTS-0101575 (Cognizant Compensation Committee 2014 Bonus Payment Plan), CTS-0101576 (Cognizant Compensation Committee 2015 Executive compensation Plan).  For the same reasons set forth in Mr. Coburn's motion, such information is irrelevant to the charges and would serve no purpose other than to prejudice Mr. Schwartz by appealing to class bias, and to put the details of

Mr. Schwartz's actual compensation, and how that compensation was reached, before the jury with the appropriate context would require a mini-trial on the issue.

      **E.**      **Mr. Coburn's Motion *in Limine* No. 5**

      Mr. Schwartz respectfully joins in Mr. Coburn's August 3, 2023 motion *in limine* to exclude references to, or evidence about, Mr. Coburn's refusal to sit for a second interview as part of Cognizant's internal investigation and the circumstances of his subsequent resignation, including as applied to Mr. Schwartz's termination of his second interview and refusal to sit for a third interview, and the circumstances of his subsequent resignation.  As Mr. Coburn explains with respect to his own follow-up interview request from Cognizant and subsequent resignation, Cognizant prohibited Mr. Schwartz's lawyer from speaking or taking notes during his interviews. Ex. 47, CTS-0103589; ECF No. 495 at 3, 5.  Mr. Schwartz was required to cooperate fully with Cognizant's interview demands or face termination.  ECF No. 495 at 3–4, 6, 11.  Mr. Schwartz terminated his second interview, refused to sit for an additional interview, and instead resigned from Cognizant, *id.* at 6, all on the advice of counsel.  For the same reasons set forth in Mr. Coburn's motion, under these circumstances, Mr. Schwartz's decision to terminate his second interview and resign rather than sit for a third interview is not relevant to any issue properly before the jury, but rather only demonstrates his choice to follow his counsel's advice and remain silent in the face of Cognizant's unreasonable restrictions.  If there is any minimal probative value, it is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time.

### F.     Mr. Coburn's Motion *in Limine* No. 9

Mr. Schwartz respectfully joins in Mr. Coburn's August 3, 2023 motion *in limine* to admit exculpatory statements reflected in FBI-302 reports of L&T witnesses whom the Government has had the opportunity to question but are unavailable to testify.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Mr. Schwartz's omnibus motions *in limine* and enter an order: (1) excluding evidence regarding Mr. Schwartz's attendance at a Mets game on April 22, 2014; video of Mr. Schwartz at the April 22, 2014 Mets game; and information regarding Mr. Schwartz's eye surgery on April 24, 2014; (2) excluding evidence of answers given by Mr. Schwartz to questions posed by counsel for Cognizant during interviews held on August 28, 2016 and September 23, 2016 to the extent the questions posed (or answers given) referred to hypothetical scenarios or called for legal conclusions; (3) allowing to be admitted into evidence statements made by L&T concerning its investigation into the alleged bribery scheme charged in this case, including formal public statements made to the Indian stock exchange to the effect that its investigation did not find evidence of a bribe payment; and (4) allowing to be admitted into evidence the Government's admission that neither the defendants, their co-conspirators, nor the Government itself knows key details of the alleged bribery conspiracy in this case.

The Court should also grant Mr. Coburn's omnibus motions *in limine*, in which Mr. Schwartz hereby joins insofar as they seek an order: (a) excluding certain statements of the defendants and certain portions of Cognizant's internal policies concerning the definition of particular legal terms (Coburn MIL #1); (b) excluding references to, or evidence about, Cognizant's outsourcing jobs or using less expensive foreign labor (Coburn MIL #2); (c) excluding references to, or evidence about, Mr. Coburn's decisions or views relating to Cognizant's compliance budget (Coburn MIL #3); (d) excluding references to, or evidence about, Mr. Coburn's compensation while employed at Cognizant and his overall net worth (Coburn MIL #4), including with respect to Mr. Schwartz's compensation while employed at Cognizant and his net worth; (e) excluding references to, or evidence about, Mr. Coburn's refusal to sit for a second interview as

part of Cognizant's internal investigation and the circumstances of his subsequent resignation (Coburn MIL #5), including with respect to Mr. Schwartz's termination of his second interview and refusal to sit for a third interview, and the circumstances of his subsequent resignation; and (f) admitting exculpatory statements reflected in FBI-302 reports of L&T witnesses whom the Government has had the opportunity to question but are unavailable to testify (Coburn MIL #9).

Dated:  August 3, 2023                      Respectfully submitted,

                                            /s/ *Justin D. Lerer*
                                            Theodore V. Wells, Jr.
                                            Roberto Finzi
                                            Justin D. Lerer
                                            Kyle T. Sieber
                                            **PAUL, WEISS, RIFKIND, WHARTON &
                                            GARRISON LLP**
                                            1285 Avenue of the Americas
                                            New York, New York 10019-6064
                                            (212) 373-3000
                                            jlerer@paulweiss.com

                                            **GIBBONS P.C.**
                                            Lawrence S. Lustberg
                                            John D. Haggerty
                                            Anne M. Collart
                                            One Gateway Center
                                            Newark, New Jersey 07102
                                            (973) 596-4500

                                            **BOHRER PLLC**
                                            Jeremy I. Bohrer
                                            Jonathan E. Jason
                                            10 Grand Central, Suite 2101
                                            New York, New York 10017
                                            (212) 303-3314

                                            *Attorneys for Defendant
                                            Steven Schwartz*