# EXHIBIT 18

**2018.03.19 – DLA Piper Call**

DLA: Karl Buch, Gray Stratton

DOJ: Kevin Gingras, Courtney Howard (AUSA), Osmar Benvenuto (AUSA), Rachelle Linsenmayer

Kevin: We appreciate you getting on the phone. We had a number of items we wanted to catch up on. Karl, we had mentioned since my trial is done we are back on and trying to make headway on this in the next 6 weeks. I also talked to Kathy Rundler to let her know we understand the company wants any resolution we have to be wrapped up around the same time so I let her know our timeline. She said she understood and you guys are going to get back to us on dates for a filip factors presentation in April.

We're speaking with Matt Beck. We're going to try to get Mani in here the first week of April. We're working on the visa issue with the FBI.

Karl: He looped me in. I said, given the government's timing, maybe you could make it happen faster. For us to do it would be the middle of April.

Kevin: With that, there were a few things. A lot stem from the letter that Bruck and I sent mid-December and you guys have been producing some of the items we asked for, then. Before that, we wanted to follow up on the expert witness that you guys were helping us find regarding the permitting process in the real estate world in India or Chennai.

Gray: We have a name but I think we need another one. Sowmya Holenarasipur.

I haven't been in contact with her, but getting a cold call from you might be off-putting. I can call her and make an introduction to see if this is something she would want to do or not.

This is the one I wasn't so sure on and we will circle back with our outside counsel to see if there is another name that would work but I'm happy to call and give her your name and number.

Courtney: Why do you think she would not be a good fit?

Karl: She's not one of the top firms in the country.

Gray: She seemed okay but not someone you would look at as a top person. She seems to have an expertise in Bangalore. Permitting varies state to state so it might not be the best fit but she might be a good stepping stone.

Kevin: If you're still looking for a Tamil Nadu connection, I would much prefer someone with a working knowledge of Tamil Nadu.

Courtney: I agree. What are her qualifications? Is she a lawyer?

Karl: A real estate lawyer.

Kevin: When I had asked them to look, I asked for a lawyer with experience in the real estate industry and Bruck and I thought DLA might have a better angle.

Karl: The name of the firm is her name, associates. It's a leading real estate firm based in southern India. A corporate lawyer 20 years of experience. Represent leading builders.

Kevin: Let us talk. She might be work talking to then we will reach back out to you to contact her.

Courtney: Are there additional steps, Karl, you can take—I agree with Kevin that it doesn't make sense for us to talk to her if she's' not familiar with the state. Are you planning on taking steps to find someone from a top firm?

Karl: We are going to get back on the phone with our company lawyer to see if he can find someone in Tamil Nadu. I can call her and find out whether she represents L&T at all because that's a non-starter, then gauge her willingness to entertain representing you guys.

Kevin: Or at least talking to us and being a witness. And maybe she has practiced in Tamil Nadu.

Karl: Okay, we'll do that Wednesday morning.

Kevin: We appreciate that. For us, this piece is going to be crucial and be a question we get asked by all of our supervisors before we can move on to taking action, so it's high on our priority list.

[Karl reiterates contacting her Wednesday morning]

Kevin: Then a tech witness, you were looking for one.

Karl: We have one. We are prepared to bring him in. He's here in the states. One of the supervisors in the IT department who can answer a lot of the questions I think you will have.

We talked about one witness who we are not going to get separate lawyers for. We will represent him and we don't see a divergence.

Kevin: We'll confirm that, but that seems right to me.  So he'll be able to explain the Tamborg records and that guys' name.

Karl: The story is that Tamborg was previously assigned, we think.

Gray: Yeah, it was somebody else's' machine that was reassigned. It was Sridar's machine, I think. We have the notes. That's effectively what happened. When we ran the report, it gave the name for the current custodian whereas previously it was a participant who we knew was on the call.

Karl: Do you want to take this person's name? Ramesh Lakshminarayanan. [FALSE HIT THAT MAY APPEAR]

Kevin: We'll let you know if there are any issues.

Karl: Sambaji Bhor.

Kevin: We did a quick search and it looks like he is on emails regarding projects we were interested in, although he gets dropped off of some of the conversations. Have you interviewed him? Can we get a download?

Karl: Sure.

Kevin: Then I think we should be able to answer whether we want to talk to him.

Karl: The lawyer who I gave you his name. He is moving from one firm to the next. There is a conference coming up and the company is worried he's not going to reach out to you beforehand but going to the conference and then we'll. His name is Steve Schortgen.

He's going to Sheppard Mullin. He was at KL Gates before.

Kevin: When is the conference?

Karl: March 27th at 2:15

Kevin: Remind me the posture, for Oz and Courtney. What's your current posture?

Karl: The posture is, they've filed the derogatory's and document requests. We've objected. Now there's a discovery conference on March 27th where we expect discussion about this. Schortgen was not willing to make a commitment about not pursing, although we let him know you had an interested. The concern is them going to the conference and having a discussion without you being able to weigh in.

Kevin: With regard to the letter we sent in December, I know you had asked—I think with regard to item 1—for more clarification and I hit pause.

Karl: Gray and I thought about this before we got on the phone and we have a proposal. If you want to click on the Webex, we are going to show a document that you have but that we wanted to show.

Gray: It's a PowerPoint presentation called management review meeting 2012.

[follow along with document as Gray shows it]

Gray: Request number one called for a list of statutory approvals. These documents are what we believe are the best source material to prepare that list. We aren't 100% that that would be a complete list. These decks were prepared by L&T with senior infrastructure personnel at cognizant throughout the duration of the project. [shows slides that show the lists, which change, that list—slide names Statutory Approval Status]

There is an associated deck that goes with each of these and there is a decent list of required permits for each facility. We checked with Mani to see if this was a good source and he confirmed. L&T was the one gathering a submitting applications so the material prepared by L&T is our best source. That's how we prepared the first list.

Then we've made an effort to gather the payment files that correspond with these.

Gray: We are dependent on the categorization of payments when they were entered, then they are sorted by facility. The challenge is that when we looked at the descriptions—they don't neatly correspond with the permits we identified. If you go to CKC [referring to list shown on desktop] you can see charges and who it was paid to but a lot of entries "KITS land development charges" likely related to a permit but it's unclear which permit. [lists other such examples that are difficult to link]

Payments, particularly in demand draft notice, to cognizant there were different fees [makes it difficult to determine which permit they relate to]. The permitting process being as lengthy as it is, it is difficult to determine a time period in which a permit should have been received. We have had some success of gathering the supporting documentation. We do have all of the supporting documents. It's generally a bank statement, accounting voucher, and a payment. We sometimes see email correspondence. We

have had some success linking those to payment files but we are not there yet so we wanted to have a conversation with you about prioritizing payments for permits you want to see first.

Karl: The concern is that there is a lot of data here and we are concerned you will get lost in it. We could give it all to you or we could organize it in a way that makes it easier for you. So we could figure out how to organize in a way that most makes sense to you. We assume maybe start with CKC.

Courtney: I think we would want to prioritize CKC. Do you have information as to what the amount is?

Karl: Yes [shows on chart—which will not be turned over, attorney work product]

Courtney: What about—you're saying this chart is work product

Gray: We put it together, so it's our chart.

Courtney: To the extent that you know—you pulled this information from

Karl: Information provided to us by the company. This is just a listing of what was in the ledger. We have the information that was in the payment files and we can send that to you.

Courtney: Based on what you gathered, is there indication that this includes payments made by L&T and later reimbursed or only direct payments?

Karl: These are direct. IT will be hard for us to be able to know what they paid and didn't pay. We tried our best with L&T to get them to produce records but they wouldn't really.

Oz: But there would at least be some record of the variation process where L&T would have told you about payments made that needed reimbursed.

Karl: You know that generally when there was an invoice for a stat approval, the company would generally make the payment directly. But there were, like in CKC, we got the invoice and documents and we can show you the payments made to LT to cover the agreed upon amounts. But we don't have the invoices from L&T that reflect the charges that they allegedly incurred around the 2.5 million payments.

Oz: There are limited instances where Cognizant did not pay the government office directly. There was some sort of legit payment that had to be paid by cognizant to the government.

Courtney: Yes, we're aware of two examples in the KITS project.

Oz: Right so we're--

Karl: I haven't thought about this aspect in a bit. If you could give us the details around those transactions, we can look.

Courtney: Ideally what we would have is a chart of some sort with the necessary statutory approvals, authorities, amount, paid and how it was paid, and these are the documents that show that.

Karl: I think we can give you a great deal of information about that. But I don't think we can give you every example. We don't want to represent that this is the whole universe when we don't know for certain.

Courtney: Other than L&T making those payments, why would there be payments you're not aware of?

Karl: It's a big company and we did a good faith effort to ID everything in the general ledger. I think we have everything but I'm not sure I can represent to you that it's everything. [reiterates they have taken aggressive steps to find everything]

Courtney: Your source for this was the general ledger and you used that to find the documents?

Karl: Our source was the record produced by LT that set forth the stat approval process. [document first shown}. [Referencing presentation--#6]. We took these then went through the general ledger.

We don't have a lot of witnesses left from the time period. Mani pointed us back to this document.

Courtney: Kevin, if you agree, it makes sense for us to talk internally and give you more clarity. I think we're in the right realm, it's just a matter of how to present it.

Karl: Right and we will give everything you need. There will be a lot of work to get it to you in the format you are looking for which is why we want to prioritize.

Kevin: Right and I think we would want to start with KITS. If we discuss, we can get back to you about prioritizing.

Karl: Right and what would be helpful is for Gray to get the bates numbers to you.

Gray: Yeah, I'll have lit support pull those bates numbers and get those to you. We can probably do [the rest of the letter] in a quick way.

Karl: Number 2 is complete.

Courtney: Your cover letters—I'm trying to identify, for example, the January 12 cover letter is related to Steven Kasari and then one relating to various witnesses. Is that responsive to this? A related question is that you say you were producing documents—in the 2/6/2018 letter you say you got two disks, additional documents responsive to request number 2 and you say many documents were already produced—did you produce duplicates?

Gray: No. We have tried to keep that consistent. We only ever produce new documents. At times, we produce something again. In that case, we produce it in pdf.

Courtney: So if I were trying to identify where you were filing in the gaps on request number 2, is that something you could point me to?

Gray: Pointing to the previously produced stuff?

Courtney: You don't have to do it right this minute.

Gray: Request 2 we produced on set 6, 58546-73145

Courtney: Okay so those are the new documents and everything else, we already had. Okay so that is complete as of 2/6/2018 production.

Gray: Another note on the range 31038-52286 is the R&M requests.

Courtney: The PowerPoints?

Gray: Correct. They will be in chronological order, mixed in with minutes of meetings.

Courtney: Okay. So request 3.

Karl: Number 3 we've completed.

Gray: It is complete. CTS 47.

Karl: Then there's additional information. What we found is in addition to the report you mentioned here, there is a report from 2008 that EY produced for the company on infrastructure process review. Your request is for a different document but I imagine this would be of interest to you as well. This is MIPS, Coin Victor, Hyderabad and Calcutta. But there may be language that is interesting to you and we think we can trace this back to Gordon Coburn.

This is outside of the range of what you asked for, but I imagine you would want a copy of it.

Kevin: Yes, we would.

[will send to DOJ]

Kevin: You will be able to trace how you think it goes back to Coburn?

Karl: We have an email saying it was sent to Coburn but not the one that actually went to Coburn.

Gray: Number 4. We've done the legwork and have a list of dates drafted. We have been intending to give one letter—there's about 7 dates and I have bates numbers for the documents that reflect relevant meetings. I can give those now or send them.

[agree to put in an email and send]

Karl: Number 5 we have produced all of this.

Courtney: With February 16?

Gray: I believe so. CTS 046. A: 83480-83819. For 5 B: 83661-62, 83745-50, 83480-81, 83482-87, 83488-93

Then the privilege log—I think in January we gave a big privilege log covering 97% of what we will produce. We will true that up once we complete productions. I don't think there will be an incremental difference.

With respect to individual interview privilege log—we are finalizing that. We should be able to get that out this week.

Karl: We did talk with Dana Gilbert. We have an interview with Karen Mcloughlin coming up, as well as some of the employees in the legal division. There are some documents that we are trying to determine privilege on and whether we can determine not privileged due to an exception or if the company would waive privilege.

Kevin: What do you think is the timeline for those decisions?

Karl: I would say we will try to be done with those in the next two to three weeks.

Kevin: I know there was the Deepa chat from 2014

Karl: There's better stuff than that.

Kevin: Are you able to describe the categories?

Karl: Just be patient.

Oz: Does it include the notes Dana Gilbert made during her interview?

Karl: No. We are going to maintain that those are work product. You'll get all the information that was in those notes. This is conduct that occurred during the course of the investigation. It's separate from the underlying facts but we are trying to work through it.

Oz: We just have to think through how that would play out at a trail.

Kevin: So, when do you think we should interview Gray?

Karl: We just need to figure out who your best witness is. I wasn't leading the interview, gray did, so he is probably an important witness. But if they challenge his notes, that makes me a witness. His lawyer was present but his instruction was that he not take nots during the interview.

Kevin; Do you think you'll have a better sense of who the best witness is once you walk through this stuff in the next few weeks?

Karl: As to the Steve Schwartz interview? This does raise a lot of issues for the firm. I didn't know if you would want to tee this up now or wait for trial.

Kevin: Before we indict someone we want to have an idea of what we are getting ourselves into.

Oz: I'm sure Karl, you realize the consciousness of guilt aspect here so we want to make sure we know what we have before making charging decisions.

This will be an area of the trial that is heavily litigated so we want to be sure we know what the substance is.

Karl: What would an interview or Gray or me look like that would be different from—at least for Gray, they're his notes—

Kevin: Let us think about this. It is something on our mind. Given what is at stake, our supervisors want to know specifically who the witness in the room will be.

Karl: Let us think and you think as well what the best way to tee that up is.

Kevin: Maybe we just need another conversations to lead up to this. If it were Gray, that opens up stickier problems than someone who didn't take notes. We haven't thought through all that as well. But for Schwartz it's going to be crucial for us. Without the statements he makes, I think we're—you've seen the evidence and it makes a difference.

Gray: Why is it stickier for the note taker?

Kevin: I'm just thinking about how I treat my witnesses if they have contemporaneous notes.

Karl: I would march into court and say that the only notes are DLA notes and we would be entitled to those so I think there is a big risk that those notes are turned over anyway.

Oz: There is also the issue of prior consistent statements

Karl: And the company has provided a lot of information regarding consciousness of guilt. This is a unique situation where we have learned a lot of relevant information to you and there is more than you know of conduct that occurred during the investigation. We're going to have to spend some time on this and figure out our obligations to the client. So you may want to start with gray because there is an argument that this would disqualify me from representing the company. So maybe it is Gray and Bracket.

Kevin: We are sensitive to that and we know we have the information because the company is cooperating and we know the issues that can create. If there were a way for there—if there were so much evidence we didn't have to go down that road. We appreciate it but it is something we will probably have to sort out relatively soon.

Karl: I wasn't expecting you to ask this now because you know what was in gray's notes and you know what he will testify as Schwartz saying.

Courtney: I think we need to talk through what that will really look like in terms of discovery.

Kevin: The larger point is not so much that we want to interview Gray right now. The issues you are talking about that are going to be ugly—we want to think through them now as opposed to pretrial mode where we are struggling with the company and have crossed a line. There were different understandings on each side of what we were getting ourselves into. These are the issues we want to understand before we go into trial.

Karl: I can't see a judge not issuing a complex case order.

Kevin: Sure, but Oz's point is who knows what reed will pull? So to the extent that we have different understandings or expectations, we need to sort those our sooner rather than later.

Karl: Are you worried the company won't make us available?

Kevin: No I think just with these discovery issues, we want our arms around it. We're imagining the worst [need to think through; company pushing back on turning over certain documents]

Karl: That's why I've only been producing documents that we don't think are privileged. Who's going to be deciding the company's privilege at that point? IT's an interesting questions. I'm just asking you what you want me to get clarity from the company on.

Oz: This is just, we haven't thought about it deeply but the crime fraud exception regarding privilege and work product is going to come up.

Karl: And we have produced documents we think are subject.

Oz; Sure but it might come up with gilbert and gray so to the extent we can resolve them before trial, before we indict, that is our preference.

Karl: I suggest to get a list of documents you are concerned about, a list of the witnesses you are concerned about, and then the subject areas that you are thinking about and let's get very specific. Then let's try—that's what you're saying with respect to Gray. He will have his own lawyer. We'll have to think about it but there will be clear lines on privilege. He knows a lot more than just about Steve Schwartz.

DOJ-EH-0000000152

So tell us the topics you want gray to testify on and we will come back to you on what the boundaries are.

Kevin: This is helpful. We haven't thought deeply about it. But you guys have been. That makes sense. We will come back to you with more specific questions and concerns we may have to tee it up in a more crystalized way.

Karl: I've had lots of conversations with Matt Friedrich about these issues and he is very much wanting to help you guys. Consistent with his obligations to the company, he wants to share as much as he can.

Kevin: Okay, so we will come back to you with that. Then I just had a couple more things. Do we have a complete KITS contract somewhere?

Karl: I don't know. Gray can you follow up on that?

Gray: We certainly have one.

Kevin: We have been looking for it and we can't. if you could point us to is. Then, the 2/13 production—can you remind me who is Shakar Subramanian?

Gray: He's in internal audit and reports to Steve Kasari. I don't remember the genesis of that. You may have seen him on some other communication, but you asked us to produce his custodial file.

Courtney: The only thing is—maybe we talk about this when we follow up on request 1—another thing we think would be useful is to get a list or group of documents that show any variation request for statutory approvals for projects with LT other than the KITS project. Given how much that stand out in the presentation—we were wondering if there are other examples of those variation requests other than that PowerPoint.

Oz: Also variation request spreadsheets that don't have statutory approval which make clear why this one is unique.

Courtney: Right, I don't know if maybe the initial request and then the final one. That would be useful.

Karl: We don't have a collection of that but we can certainly look for it.

Courtney: We could put that in a letter for you so you have it.

Oz: Have you guys produced Coburn's resignation?

Gray: We can send that to you.

Oz: Then have you given a download—

Karl: He resigned two days before we interviewed him.

Oz: Have you given a download on Chandrashekaran?

Karl: I think we did. Gray can check.

Gray: I feel like we talked about it and you might have taken a pass on it.

Oz: This potential meeting with the chief minister and that certain people thought there were risks associated with meeting the minister is an issue—if we haven't done a read out we'd be interested.

Gray: Sure.

Kevin: Then for a download of Sambaji?

Karl: How about Wednesday?

[agree to have download in the afternoon; 2-4:00 for Chandra and Sambaji]

Kevin: Gray, can you include Rachelle on the calendar invitation?

Karl: Should we include the SEC?

Kevin: If you want to reach out to them separately and let them know they're welcome to join that would be fine. To keep it separate from us.

Gray: The email from me [that I am sending now] will be bates ranges of the meetings with Schwartz and Coburn about the 2004 audit.

- CTS-0056682
- CTS-0056757
- CTS-0007504-CTS-0007507
- CTS-0056395
- CTS-0056438
- CTS-0056515
- CTS-0056518
- CTS-0085791
- CTS-0056593
- CTS-0057439