# EXHIBIT 19

**Cognizant Filip Factors Presentation**

DLA Piper: Karl Buch, Gray Stratton

Latham: Kathy Reummler, Natalie Rao, Doug Greenburg

CTS: Matt Friedrich

DOJ: David Last, Kevin Gingras, Courtney Howard, David Last, Leila Babaeva, Paul Murphy, Dan Kahn

FBI: Kelly Blanchfield (on phone)

**Kathy Reummler**: We are going to put forth our view that the appropriate resolution is a declination. Not just that it would be appropriate [in this case], but that it would be the appropriate resolution under current DOJ policy. The company's response to the misconduct hits those metrics [of a declination] in every respect and exceeded those.

At a high level, the most important factors to consider is that after learning of Mani's allegations, the audit committee made remarkably quick decisions about what to do. To include separating the bad actors immediately, initiating a full scale investigation, and to proactively report to DOJ and SEC.

The first two were immediate—to proactively report in less than two weeks is remarkably fast, particularly considering seniority of those involved. [Audit committee did not delay, is significant and what the DOJ expects companies to do and ought to be recognized]

After initial disclosure, cooperation has been exemplary. I've had the privilege of seeing the cooperation after the fact and what Karl, Grey, and team has done with the company's direction. Sometimes we as external counsel have to convince companies that they should cooperate and have faith in the department and policies. This was not that situation. I think the company was very much on board with—we're going to get rid of the bad actors.

**Karl Buch**: One thing I would emphasize is not only immediate, audit committee decided even before we found Steven's notes. They decided to remove these people from the investigation [all based on Mani's allegations before had other documents]

KR: In my experience working with companies, that is a tough decision and it's as you know there are internal politics involved. The speed here, to us given what we do, that is extraordinary in the corporate world.

KB: And that was a decision the board—we started to make the presentation and the board immediately [agreed that the investigation should go forward]

KR: In terms of the response—high level—the company's remediation has been extensive. We've done significant enhancements to the compliance program including—in terms of quantity and quality of senior personnel. You know matt's background is very different from Steven Schwartz. You talked on Monday about who matt has brought in. It's an impressive group of people [emphasizes commitment on behalf of the company]

We think that a declination is consistent with the DOJ's codified USAM policy on corporate resolutions but also we think it is the paradigmatic example of when a declination is appropriate. We understand the presumption can be outweighed by aggravating factors, but we think together this is the paradigmatic case for a declination if the DOJ made a decision to prosecute individuals, which we will talk about in more detail.

[*To walk through Filip factors*]

1. Nature and seriousness of offense

KR: We're not going to diminish the seriousness of the offense. That would be inconsistent with the ongoing conversations you have had and the seriousness with which the company responded.

Context to consider [factor comes in company's favor]. [The facts of this case] are fundamentally different from other FCPA cases. [In most other cases, a company is paying bribes for competitive advantage]. Certainly that is a major one—leveling the playing field. Here, you had corrupt government officials in a high risk country who said—had their hand out and that if the company wanted the permits, they had to pay.

That is not to diminish seriousness but qualitatively it is fundamentally different than paying to win a tender offer. Examples—Vimplecomm (paying 114 mil to gain market access). This is not a revenue generation scheme here. This is what they needed to do to have a space to put our people. It is also not like the Louis Berger case.

Here, the facts are such that Cognizant's business is not government facing. Bribes were ancillary to the core business—that is why I am drawing a distinction with these cases. The reason we raise this is because effectively the function here was almost like a back office function [underlines ancillary nature].

After Karl's investigation, there wasn't anything that would suggest at the core of Cognizant's business, there was a culture of greed.

KB: We have taken a look at the back office real estate and other aspects of the business. We just didn't see the same level of activity outside of that area. This was the area they were having problems. 1 the company tried to do the right thing by applying to permits (years before bribery began). They got stuck in the bureaucracy of India permitting. [not diminishing bribes]

We didn't find evidence in Pune or CKC that they were trying to undermine standards or a building that wasn't up to code. There was one instance in the Siruseri site (environmental) where that was the case. The applications were submitted. We feel comfortable saying this was isolated to real estate.

Matt Friedrich: If you guys are familiar with the Kay case on obtaining business. Does the conduct of any business activity you pay for fall under bribes? 5tth circuit said even taxes count. But if you think of it as a continuum to things that are core to the business [utilities, taxes, etc]. This conduct is on the lighter end of that scale on the continuum.

KR: We usually talk about the seriousness of the offense. On the nature—nature of the harm. Here, consistent with what we said, there is no impact on Cog competitors. Conduct didn't involve confidential competitor info or pricing.

Kevin Gingras: Do you mean there is no direct impact? Arguably it does put them at a competitive advantage. They just aren't beating them on a contract.

KR: Yes. We won't back away from the benefit gained is that they avoided costs that they didn't want to pay. In the meta sense, that is a competitive advantage. I agree with you on that. But just in terms of direct.

On those same lines, the payments didn't generate sales or revenue but allowed them to avoid other costs they would have had to incur.

That is everything on seriousness.

   2.  Pervasiveness

KR: That prong focuses on pervasiveness within the corporation and condonement. What we would submit here is that the conduct was not pervasive across the company. You may say during remediation, listing the people sanctioned and separated, how could it not be pervasive?

This is a sizable company. The conduct occurred in an ancillary support part of the business, not the core. When you have a decision being made at the level of seniority as it was here, the decision makers [are separate]. When you think of the context in bribery cases, what you see is a multi-national doing business in multiple countries, people are paying bribes in multiple countries in multiple contexts. Here, it is isolated to real estate where people at the top decide to do it, then a bunch of people know about it through the implementation.

I would argue that is not the kind of pervasiveness argued in the Filip factors here. It is a scheme authorized by a couple of bad actors.

KB: Within real estate there were a lot of people involved. In that perspective it's isolated to that function and to a couple of individuals. It's not pervasive in that sense.

KR: To get into granularity. The issues implicated 4 out of 57 facilities [including leased facilities] in India—even just in country.

KG: But 4 of how many owned by the company?

KB: Around 30.

KG: That LT built?

KB: No—it would have been other contractors.

KG: How many were LT?

KB: Probably nearly 30. We can get you that number.

KG: The distinction I would make is ones that were built for them vs what they bought.

KR: There are 174 locations globally. If you break that down further, in India there are 11 sales regions. Misconduct occurred only in 2.

I think that is helpful context.

Karl's team didn't find evidence of similar conduct in the rest of India or elsewhere.

KB: The Philippines is the next biggest market and there are no allegations there. India was the only market—also [the market with the] largest footprint.

KR: Improper payments were through building licenses and then operating permits.

Building licenses—few associates involved in light of the overall size of company. Coburn, Schwartz, Sridhar, Mani, BG, and Ganesh were the key people involved. Those decisions were implemented by others who the company has taken action against. With exception of Mani, Cognizant was quick to remove those individuals in the wake of Mani's allegations. That shows quick decision making on the company's part.

KB: Also consistent with the DOJ de-confliction policy, we made sure those people were available to us and you.

KG: We appreciate that and it is the company's decision.

KR: In cooperation, that is a key distinguishing factor.

Doug Greenburg: We've all seen cases were people are terminated right away and that can impede an investigation.

KB: [underlines making sure Mani was available for interview]

KR: All the others have separated or been resigned.

KG:  Sridhar?

KB: He is negotiating a separation. By next week he will be separated.

KR: Operating permits personnel—larger number—principally personnel in the corporate real estate group in India. I would argue that is the definition of lack of pervasiveness. Ancillary to business mission. Excluding the two cooperators, the company separated all people from middle management to line employees and contractors where they knowingly participated in the conduct.

Company otherwise disciplined with warning letters, training, etc. over 50 additional employees and some contractors who were implicated in some way but not so much so that they knowingly participated.

MF: With remediation, Amy mentioned this the other day. As a matter of local Indian law, there is required notice where you provide evidence and have a hearing. We made the decision not to wait or hide behind that so we are anticipating litigation risk in India for that decision.

KR: And we are really talking about one contractor here—LT. CTS has stopped business and payments to them. In other cases you see a cultural problem and multiple third parties over multiple jurisdictions.

KG: Pervasiveness is the chief factor—pervasiveness or involvement and complicity. Employees in a particular role or it was condoned by upper management. Your point that it is discreet and the function was ancillary—but the idea that it goes up to the president and the GC has the idea it isn't widespread, but if you look at the commentary in USAM. Where the wrongdoing was done by a large # of employees.

DOJ-EH-0000000206

That's not here. But the role and conduct of management is most important. So I take that to mean we should look at how management was behaving. Management is responsible for corporate culture where criminal conduct is encouraged or discouraged. Within real estate group it does go up straight to the top.

KR: I don't disagree. They were senior and the GC was involved and he had extra fiduciary obligations. Absent the conduct by those two, I don't believe they payments would have been made. The problem is you have these two who decided to break the law and they were senior people. The question is, what does the company do when the company learns about that? The company did the right thing and they proactively said by action that we know these guys engaged in the conduct and we will provide the DOJ with what they need to make decisions.

The cost to the company reputation is huge. There was a very significant material weakness finding that the auditors imposed based on tone at the top issues. All of these things that the company suffered— not withstanding that, is this a good or bad company? [when considering appropriate resolution, this is important to see that the company will do the right thing]

We aren't going to minimize that these two were in a senior position, but when they are taken out, the company didn't just eradicate them but they had a holistic response by cooperating. As a policy matter that is what you guys want, to me. Prosecuting companies and the way that that has evolved—what you know deters conduct is by bringing individuals to account. We own that they engaged in egregious conduct but that fact is mitigated by everything else.

Matt Friedrich: I would add that involvement of senior folks has to be viewed through the prism of how extensive it was. It is not uncommon for bad managers to perpetrate an entire scheme in multiple countries over multiple years. This was a bad choice by 2 senior people in one area for 2-3 transactions.

KB: Stephen was really involved in one bad transaction. Then Gordon was no more that 3—even for him it wasn't pervasive. [wasn't through CTS business model, relatively isolated, no evidence of pervasive pattern]

KR: And that is really important. [No evidence of others engaging in the conduct; example of other case involving seniors who directed widespread fraud; here, this appears to be outlier behavior]. How the conduct relates to the company is significant.

KB: [makes example of another fraud issue raised to Stephen and Gordon to litigate another case where an official submitted a bribe] There was a solicitation and these individuals made the right decision, which was important for the people around them. For them, they didn't do business by acceding to bribe demands.

   3. Corporation history of similar misconduct

KR: Company has a completely clean record. This one is unambiguous.

   4. Cooperation – in particular, willingness to cooperate in investigation of personnel

KR: Company has done everything in its power to investigate aggressively. Including removing the president and the GC on the same day that Mani made the allegations. Then immediately seizing all electronic and business records from custodians within 5 weeks of the allegation.

With respect to the internal investigation there were over 400 custodians whose electronic evidence was collected and reviewed. 450 witness interviews. [Large scale, particularly in the speed it was done]. They reviewed over 1.5 million documents in addition to a page-turn review of Coburn and Schwartz data over the key periods of time. In addition to those two, also reviewed the CFO, Corporate Head of Real Estate, Global Head of Procurement, former COO, and the former GC through a page-turn review.

Some companies get a lot of allegations, so how to you balance self-reporting when there is a substantive finding? Here the company took some risk in self-reporting so quickly before having done a thorough investigation. Because the self-reporting was a significant issue it was possible with further investigation that the seriousness of the concern would be mitigated. I think that points to the company's [initiative].

MF: When something like this comes up in terms of what the CEO is going through at the time, [having his GC and others implicated, deciding what to do—Brackett, a former GE lawyer and former Boston AUSA—made a quick choice to move forward]. That says a lot.

KB: [Brackett is a] high integrity individual and an incredible resource at every turn. [DLA investigation received support from him; had access to interviews with key individuals immediately based on little information]. [Underlines the audit committee's integrity—tight set of events for them to do that]

KR: This one is in the category of proactive cooperation. Karl and his team persisted in securing additional interviews with the president and the GC. That, too, doesn't always happen and it's a distinguishing factor.

In addition, the company used all of its commercial leverage to extract information from LT, including executing audit rights. Not that they were cooperative. Karls' team had multiple meetings with LT. LT refused to be interviewed but there was an effort to get information. Then finally withholding payments to LT that lacked supporting documentation, which exposed Cognizant to litigation.

Turned over GC notes. To distinguish Cognizant's conduct from other good companies, turning over a GC's notes are a big deal. There are significant implications to that. [Underlines tough decision to make, particularly so early in an investigation, decision swift to turn them over]. It is difficult in today's post KPMG [world] to get companies to produce privileged documents so that warrants consideration.

KB: Within 5 days of getting the notes they were turned over.

KG: Obviously we don't ask companies to waive privilege. I would like to think in regards to the notes, they are clearly evidence that would put them in an exception bucket but your point is well taken.

[KB notes that the speed with which the company provided the information is most notable]

KR: In addition we recently produced documents that were arguable privileged pursuant to the 503(d) order. We provided travel information to the DOJ for Lakshmi Naryan which facilitated your investigation [and others]. Facilitating your ability to interview certain people. I don't think you all have any complaints in that respect.

Extensive interview readouts. In addition, there have been 10 in person subject matter briefings. More than 40 telephone updates. 8-10 subject matter hot doc binders and more than 20 interview readouts.

Over 100K pages were produced to the Justice Department voluntarily. With an eye towards providing most relevant and pertinent documents, not just anything that was relevant.

We are also confident we have done everything we can to provide key evidence regarding the former officials who are the key wrongdoers. That was complicated by the fact that one was a GC, so that required an enormous amount of effort. 100s of pages of documents were produced as a result of the Schwartz review.

Subsidiary relating to Schwartz that the company did: investigated amnesia defense (by collecting medical records and providing to department, SEC, looked at whole line). That falls squarely into proactive cooperation. We also collected his Apple notes and engaged in an effort to help you all authenticate those and the hand written analysis. Forensic deletion on his laptop.

The conduct of the company around Coburn and Schwartz, the company acted like a company who was pissed off that these guys had behaved this way and wanted to make sure they were held accountable. They have a will continue to facilitate your ability to continue at your discretion.

[KR quotes Rod Rosenstein that if you want real cooperation and credit, you should act like a victim who wants to hold perps accountable]

If there were any concerns about how a declination with respect to the company would affect cooperation going forward—I can assure you that is not going to be an issue. The company is committed to cooperating into the future with any actions you see fit to take.

[Matt Friedrich endorses and agrees]

KG: That is a question we had.

KR: And we would get support from the audit committee and the board in that respect too.

That's it on cooperation.

**Existence and effectiveness of preexisting compliance program**

Are there any open questions since Monday? Our bottom line is that we think the compliance program was adequate given the nature of the company's business. It was an override of the program by senior people. But it was certainly an opportunity for the company to take a look and see if we do have everything that we need. [notes that there is always room for improvement, will change as company evolves]

KB: To talk about the historical program, the program actually worked and it worked well. [He was hired because of food vendor allegation by a CTS employee; that employee raised allegations about the operating licenses when confronted with the evidence against him]. It was a direct result of the compliance program [that led to the following investigation]. It was empowered enough to do what it did.

KG: What do you say about the fact that Coburn was at times starving the compliance program?

KB: It wasn't perfect. More money should have been spent on it. Even Steven was conceding it should have had more money. More money for training or third party due diligence might not have prevented

this since it was management that overrode the controls. But the program was good enough to investigate the president of company.

MF: There are probably other fact patters of a senior manager starving a compliance program to hide other conduct but I don't think that was the case here.

DG: [also not the case that people in the field weren't aware of compliance issues; people understood what they were doing]. To your resources point, you can see what the company is putting in now.

KB: And you saw in the BG and Sridhar chats where they knew they were violating the FCPA. There are other examples of that in chats and emails. It's not like they weren't trained or aware. It was that management overrode the training and controls.

KR: Timely disclosure – we have already talked about.

The specific timeline—

- Mani allegations 8/20-22/2016
- Self reporting on 9/1/2016
- Coburn out 9/27/2016
- Schwarts out 11/3/2016

That is lightning speed.

**Remediation**

KR: I think we've talked about this quite a bit. Some detail—Kevin you asked how many employees and what degree of remediation they received. We have more detail on that. We would prefer not to leave it with you due to FOIA.

We've talked about Schwartz and Coburn. With respect to garden leave: Sridhar (immediate), Ganesh Paramisvan, BG Ghosh, Pari Sriramulu, Venkatesan Nadarajan, Raj Ghosh.

Deepa Baburaj resigned (former India counsel)

17 associates separated; 10 resigned

In total, company imposed discipline on 70 cog associates and contractors. Most involved in operating license issues. Remaining (70 less 27) were given warnings and other discipline short of separation.

KB: Warning with financial penalty. A warning or coaching.

Summary of employment actions:

21 separated/resigned

10 warning with financial penalty

12 warning

18 coaching

6 contractors

DOJ-EH-0000000210

**Forward-looking remediation – most was covered on Monday**

KR: A large amount of money and human resources were employed to make sure other problems were not out there. Reviewing invoices for all construction vendors. The company engaged EY and DLA in that process. Moving permits and licensing in house to mitigate risk. Implemented a project authorization policy. Licenses and permits in place. Created independent compliance team.

Doug and Erin have been working with the company on its commitment to bring this aspect of the compliance program into the world class level. This is substantial.

DG: The commitment is evident in the personnel. [Kari Chandler had been chief of corruption before; importance of managing program with resources in place that is effective; underlines Amy's knowledge of the company and issues]

KR: The next is collateral consequences.

We didn't think this was a large factor to you. It would not be good for the company if the company were prosecuted. Most of the customers are fortune 500 companies and reputational damage would be substantial and likely cause significant customer flight and impact innocent employees and shareholders. We want to note in terms of whether the company has paid a price for the misconduct—we can say that in terms of direct cost, the company spent over 60 million in terms of legal fees, remediation, EY. That is not to say –we will discuss disgorgement later—but to give a sense of the magnitude of the cost to the company. [we think that is important context that the company has responded with commitment of resources]

MF: If you were on our earnings call a few days ago, employee retention is an issue for us in India. We have had a lot of folks leaving and the weight of this case is part of that. It's a weight on us with the market. Declination compared to a DPA matters in that context. [want to send message of declination]

KG: Legal fees, public filings—what else was a cost?

KR: EY, legal fees, other professionals brought in to assess and help with messaging, individual counsel fees, audit,

MF: 60+ I think is conservative.

Leila Babaeva: Over what period of time?

KB: 2 years.

KR: Adequacy of enforcement action.

We don't think that this would be a stand-alone declination but accompanied by an SEC resolution and disgorgement of any ill-gotten gains. We think—as what I see as the right outcome, a declination seems appropriate. We aren't suggesting the company gets a pass.

Adequacy of prosecution of individuals responsible.

As we've talked about, we believe—informed by Karls' investigation—that the conduct is not a reflection of the company, but of bad actors. What really is a reflection of the company is the conduct subsequent to the misconduct being revealed. In the Yates memo, I am in agreement that the most effective deterrent. Companies only engage in conduct through its employees so if you change to deter individuals—this is an argument that would be more to your front office even. [Argument on policy; opportunity to express policy coming from front office]. For FCPA, would bring accountability to a former GC and President of a company. [would send a message to incentivize other companies to report]  There is a lack of conduct on defense that self-reporting pays off.

Here, too, the reality is that under corporate liability, an individual's actions leads to corporate liability for the company. But few companies are prosecuted. [compares DPA, NPA, declination]. I would suggest here that this is a company that did everything right and could show a demarcation between a declination and a DPA.

[End of presentation]

MF: To come back to involvement of senior folks, in this case it's hard to imagine other cases with these mitigating factors on seriousness and pervasiveness. The other factors just weigh so strongly in the other direction. [Incentivizes companies to report]