# EXHIBIT 21

```
 1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
 2     _____

 3     UNITED STATES OF AMERICA,          CRIMINAL ACTION NUMBER:

 4                                        2:19-cr-00120-KM
       vs.
 5                                        Garrity Motion
       GORDON J. COBURN and               Volume 1 Pages 1-266
 6     STEVEN SCHWARTZ,

 7               Defendants.
       _____
 8     MARTIN LUTHER KING BUILDING & U.S. COURTHOUSE
       50 Walnut Street, Newark, New Jersey  07101
 9     April 18, 2023
       Commencing at 9:05 a.m.
10
       B E F O R E:      THE HONORABLE KEVIN MCNULTY
11                       UNITED STATES DISTRICT JUDGE

12     A P P E A R A N C E S:

13     OFFICE OF THE UNITED STATES ATTORNEY
       BY:  JONATHAN C. FAYER, ASSISTANT UNITED STATES ATTORNEY
14     970 Broad Street
       Newark, New Jersey 07102
15
       UNITED STATES DEPARTMENT OF JUSTICE
16     BY:  DAVID A. LAST, TRIAL ATTORNEY
            SONALI DINESH PATEL, TRIAL ATTORNEY
17          GERALD MOODY JR., ESQUIRE
       1400 New York Avenue, N.W.
18     Washington, DC  20530

19     JONES DAY®
       BY: HENRY KLEHM, III, ESQUIRE
20         JAMES PATRICK LOONAM, ESQUIRE
           ABIGAEL C. BOSCH, ESQUIRE
21     250 Vesey Street
       New York, New York  10281
22     For the Defendant Gordon J. Coburn

23     Proceedings recorded by mechanical stenography; transcript
                 produced by computer-aided transcription.
24               Rhéa C. Villanti, Official Court Reporter
                        RheaVillanti@Yahoo.com
25                        (732)895-3403
```

1 (Continuing)

2 A P P E A R A N C E S:

3 JONES DAY®
  BY:  MICHAEL G. FISCHER, ESQUIRE
4 51 Louisiana Avenue, N.W.
  Washington, D.C.  20001-2113
5 For the Defendant Gordon J. Coburn

6

7 KRIEGER KIM & LEWIN LLP
  BY:  NICHOLAS LEWIN, ESQUIRE
        OLEG M. SHIK, ESQUIRE
8 500 Fifth Avenue, 34th Floor
  New York, New York  10110
9 For the Defendant Gordon J. Coburn

10 BOHRER PLLC
   BY:  JEREMY ISRAEL BOHRER, ESQUIRE
11 One Pennsylvania Plaza, Suite 2520
   New York, New York  10119
12 For the Defendant Steven Schwartz

13
   PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
14 BY:  ROBERTO FINZI, ESQUIRE
        THEODORE V. WELLS, JR., ESQUIRE
15      JUSTIN D. LERER, ESQUIRE
        KYLE SIEBER, ESQUIRE
16 1285 Sixth Avenue
   New York, New York  10019
17 For the Defendant Steven Schwartz

18 GIBBONS, PC
   BY:  LAWRENCE S. LUSTBERG, ESQUIRE
19      JOHN D. HAGGERTY, ESQUIRE
        ANNE M. COLLART, ESQUIRE
20 One Gateway Center
   Newark, New Jersey  07102-5310
21 For the Defendant Steven Schwartz

22 ALSTON & BIRD LLP
   BY:  JENNY R. KRAMER, ESQUIRE
23      RACHEL FINKEL, ESQUIRE
   90 Park Avenue
24 New York, New York  10016
   For Cognizant Technology Solutions Corporation

25

```
 1   (Continuing)

 2   A P P E A R A N C E S:

 3   FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
     BY: MALA AHUJA HARKER, ESQUIRE
 4       MICHAEL S. PALMIERI, ESQUIRE
     7 Times Square, 28th Floor
 5   New York, New York  10036
     For Cognizant Technology Solutions Corporation

 6

 7   A L S O  P R E S E N T:
     Gordon J. Coburn, Defendant
 8   Steven Schwartz, Defendant
     Jesse Stevenson, IT Assistant
 9   Cinthya Trochez, Paralegal
     Jaisha Zaman, Paralegal

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                              INDEX

OPENINGS:                    Page

By Mr. Lustberg              6

By Mr. Lewin                 15

By Mr. Moody                 21

Witnesses                 Direct    Cross    Redirect    Recross

FOR THE DEFENSE

KEVIN GINGRAS

Mr. Lustberg                 31

Mr. Lewin                    129

Ms. Patel                              153

DAVID LAST

Mr. Finzi                    163                 229

Mr. Fayer                              212

KARL BUCH

Mr. Lustberg                 235

```
 1                (PROCEEDINGS held in open court, before The Honorable
 2    Kevin McNulty, United States District Judge, at 9:05 a.m.)
 3                THE COURTROOM DEPUTY:  All rise.
 4                THE COURT:  Good morning, everyone.
 5                I mean everyone.  Be seated.
 6                We are here for a hearing which everyone has, if not
 7    entirely accurately, been calling a Garrity hearing for short
 8    and -- in the case of United States v. Gordon Coburn and Steven
 9    Schwartz, Civil Docket Number 19-120.
10                All right.  I take it everyone has entered their
11    appearances.
12                MR. LUSTBERG:  Yes, Your Honor.
13                THE COURT:  Yes.  Let's not occupy the morning with
14    that.
15                Tell me, we are going -- to avoid chaos, as in the
16    past, we're going to have one lawyer per client speaking.  If
17    you want to divide up issues, fine; but one at a time.
18                So at least initially, who will be speaking for each
19    party here?
20                MR. MOODY:  Good morning, Your Honor.  Gerald Moody
21    for the United States.
22                MR. LUSTBERG:  Good morning, Judge.  Lawrence S.
23    Lustberg from Gibbons.  Mr. Finzi and I have divided up the
24    witnesses, but -- at least initially --
25                THE COURT:  Yeah.  One at a time.  That's all I'm
```

1   asking.

2          MR. LUSTBERG:  I promise we'll try not to talk over

3   each other.

4          MR. LEWIN:  Good morning, Judge.  Nick Lewin for

5   Mr. Coburn.  I will be speaking on his behalf.

6          THE COURT:  If I'm not mistaken, we also have counsel

7   present from Cognizant; is that right?

8          MS. KRAMER:  We do, Your Honor.  To the extent

9   there's anything that involves counsel for Cognizant, I will be

10  the one lodging the objections.

11         THE COURT:  We've stuck you in the jury box.  Sorry.

12  But that's all we have room for.

13         I got a letter requesting a five-minute opening

14  statement.  That wouldn't be such a bad idea, just give me a

15  road map.

16         Who would like -- I'll hear from the defense side

17  first.  Who would like to go?

18         MR. LUSTBERG:  Thank you, Your Honor.  May it please

19  the Court.

20         There has, as you well know, been a great deal of ink

21  spilled and argument offered to the Court with regard to the

22  subject matter of this hearing for months and even years now

23  and right up until last night or even this morning.

24         The reason for that is, no matter how much the

25  government may try to normalize it, this is a truly

1    extraordinary set of facts and demonstrates, in our view,

2    incredibly graphically the danger of private parties who are

3    not bound the way the government is to do the right thing and

4    by the Constitution.

5           Instead, what this is about is when private parties

6    assume those responsibilities and have a responsibility not to

7    the public, not to doing what is right, but rather to a company

8    and its shareholders.

9           Before we start, I would like to step back for just a

10   minute and talk about what we believe this hearing is about and

11   what the proofs will show.  Cutting through all the briefing

12   and all the argument, the question to be decided, although

13   incredibly important, is really pretty simple.  It is whether,

14   on the facts Your Honor is about to hear, Cognizant's actions

15   are, quote, fairly attributable, unquote, to the government for

16   Constitutional purposes.

17          That question clearly has a bearing on what has been

18   called the *Garrity* or *Connolly* issue, whether there are grounds

19   to suppress statements, statements made by the defendants that

20   were undisputably coerced.  But the government has not taken

21   issue -- and as the Court has itself said -- the idea is that

22   the defendants had no choice but to submit to the interviews at

23   issue; otherwise, they would be fired.

24          Those statements were made by the defendants to

25   private counsel engaged by Cognizant who were undertaking an

1       internal investigation that had as its purpose to earn

2       Cognizant a tremendous benefit from the government, here, a

3       declination whereby it would never be prosecuted.

4              The hearing that will follow will show that to be the

5       case and will show that Cognizant was throughout and in a sense

6       acting exactly as an agent of the government and in

7       coordination with the government.

8              The issue in this case is one of coerced statements

9       by a criminal defendant, but the same question is also relevant

10      to other Constitutional rights like *Brady* that are implicated

11      when the actions of private actors are deemed fairly

12      attributable, as I said, to the government.

13             The case law -- and I'm talking here about cases like

14      *Connolly* itself and *Stein* and *Risha* -- provide a framework for

15      deciding and defining this question.  And it is those -- the

16      factors from *Connolly, Stein*, and *Risha*, which I'm not going to

17      reiterate -- upon which this hearing focuses.

18             You have extensive briefing on those issues, and I'm

19      not going to go over them here; but I am going to focus on the

20      ones just briefly here that I think are most important.

21             First, we intend to focus, Your Honor, as I

22      mentioned, on the extent to which on the facts on this case

23      Cognizant's conduct was guided by government policies that

24      influenced their conduct.

25             We are not saying, as the government has suggested at

```
1    times, that every time a company cooperates pursuant to a
2    government policy, the company's conduct is attributable to the
3    government.  That is not our position.  Nor of course are we
4    arguing that the cooperation policies themselves are somehow
5    per se lawful -- unlawful or wrong or create some agency
6    relationship between the government and the cooperating company
7    in every case.
8            But what you will see here today as we proceed goes,
9    in our view, way, way beyond that.  It goes way beyond anything
10   we have ever seen.  And we believe it will go beyond anything
11   this Court has ever seen.  You will see that at each step and
12   every step of the process for months, weekly, daily, the
13   government and Cognizant were in constant communication
14   coordinating the investigation at the pertinent times.
15           Those communications -- and we will see them and hear
16   them in this hearing -- frankly sound a lot like the way AUSAs
17   talk to their agents, not the way a government talks to a
18   company it is investigating and potentially prosecuting.
19           The government, even as it allows Cognizant to
20   perform an essentially governmental function, directs it
21   throughout, asks questions, requests information, and provides
22   instruction.  We will show you that.  As Judge McMahon put it
23   in Connolly, we believe the proofs will here too show that, for
24   all intents and purposes, the government's investigation was
25   Cognizant's investigation.
```

1          Let me just give you a couple of examples.

2          You'll hear that after Cognizant self-reported to the

3     government on September 1st, 2016, the government completely

4     and openly handed the investigation over to Cognizant for a

5     lengthy and critical period.  Really, Cognizant's lawyers at

6     DLA conducted dozens, if not hundreds, of interviews before the

7     government, nearly six months later, spoke to the first

8     Cognizant witness for the first time.

9          It is not just that they waited to speak to the

10    witnesses; it's that they spoke -- "they," the government --

11    spoke only to those witnesses in each and every case after

12    Cognizant had downloaded -- and that's the word that's used --

13    its counsels' interviews to the government.

14         The result is that the government, for every single

15    witness save one IT person, conducted their interviews after

16    their stories had already been told, often several or even

17    numerous times, to Cognizant.

18         Judge McMahon cited exactly the same pattern in

19    *Connolly*, and she makes the point well.  When this happens,

20    Cognizant's investigation becomes the government's, for it

21    irretrievably lays the foundation and creates, as she said, a

22    road map for what the government ultimately does.

23         This is particularly true with regard to the

24    statements of defendants, perhaps among others.  Thus, you are

25    going to hear, very explicitly and really with very little

1  mincing of words, that the company specifically held off on

2  firing Mr. Coburn and Mr. Schwartz in order to get another

3  crack at interviewing them.

4        I don't know whether this is a common tactic in

5  internal investigations, but it certainly is unusual.  And

6  what's unusual is that -- in this case is that Cognizant did it

7  with the government's full knowledge and, really, for the very

8  purpose of collecting information for the government.

9        You will hear, Judge, in other words, that

10 Mr. Schwartz's interviews, and certainly his second interview,

11 were taken by Cognizant for the purpose of gathering evidence

12 for trial, that the government knew that and that Cognizant

13 took advantage of it, even bragged about it when it came time

14 to apply for leniency.

15       You will hear other evidence, even after the

16 government has -- had commenced doing some of its own

17 investigation, much of which had nothing to do with

18 Cognizant -- it was of a company called L&T, which I think

19 you're familiar with.  You will hear of many ways in which

20 Cognizant continued to act as an agent of the government.

21       This is evidence that the government would prefer you

22 not hear.  And it has labored long and hard right up until last

23 night to keep it out of your earshot.  But you will see, if you

24 allow that testimony -- and, respectfully, I think you

25 should -- that Cognizant was delegated tasks that are normally

1  those performed by the government, performing forensic

2  analyses, finding experts, asking questions that went to the

3  elements of criminal offenses, evaluating evidence for

4  relevance and, perhaps more alarmingly, for determining whether

5  evidence is exculpatory, advising on who the best witnesses

6  would be and even prepping witnesses for trial, refreshing

7  their recollections, specifically rebutting the defenses that

8  it believed the defense would proffer all in an effort to, in

9  its words, Cognizant's words, quote, hold the perpetrators

10  accountable.

11         At the same time you also see the government

12  deferring to Cognizant in revealing ways, not questioning

13  privilege assertions that are of the sort that the government

14  or any party would always challenge, instead trusting

15  Cognizant's judgment with regard to those privilege

16  determinations and trusting Cognizant's judgment with regard to

17  the credibility of witnesses, even for witnesses that are

18  implicated by the facts of the case.

19         Ultimately, Judge, allowing Cognizant to giftwrap its

20  version of the case curated in its own interests to the

21  government, really, in toto, though, again -- and we have to

22  remind ourselves of this all the time -- Cognizant does not

23  share the government's obligation to do justice, only to do

24  what is best for it and its shareholders.

25         We believe that the evidence that you will hear over

the next day or so will put meat on the bones of the arguments

we have already made in our papers and will satisfy the

requirements of the cases in which the government has been

deemed responsible for the actions of private parties because

that is what is fair.  And it is what is fair here, and

appropriate relief should be granted.

Before I sit down, I just wanted to very quickly

address the issue about the scope of the hearing.  Again,

there's been a lot written, especially over the last 24 hours

following Your Honor's order yesterday.  And we understand that

the government wants to draw a tight circle around the

appropriate time frame.

But for the reasons that this Court has articulated

before, we are requesting some leeway here for two important

reasons, and then I'll sit down.

First, Your Honor has several times now acknowledged

that what happens on day ten can be relevant to what happened

on day one or day five.  What people say and how people act

after the fact is routinely used to prove what their

relationship was at a prior point in time.

It's really a matter of common sense as well as of

law.  As *Connolly* shows, there's -- and *Connolly* itself acts

well after the statements at issue were considered in

determining whether those statements could be -- the taking of

those statements could be fairly attributable to the

1    government.

2              Here, the argument is even simpler.  What Cognizant

3    and the government did after the defendants' statement shows

4    why the coercion employed by Cognizant in getting those

5    interviews is fairly attributed to the government.

6              For example, the government delegated to Cognizant

7    the satisfaction of its *Brady* obligations or declined to pass

8    on the propriety of Cognizant's privilege invocations tells you

9    a great deal about their relationship and about whether

10   Cognizant's actions are, as a matter of fairness, properly

11   attributed to the government.  We will show respectfully that

12   they are.

13             And second and more generally, we should -- we would

14   also ask Your Honor to allow leeway, and I think that Mr. Lewin

15   will address this a little bit more fully, because this hearing

16   is not limited to *Garrity*.  We have consistently argued, and

17   the Court held in no uncertain terms -- upon which, by the way,

18   we relied in selecting the four witnesses that we were

19   allowed -- that there is a *Brady* component to this case, a

20   component that goes to the question of when a company's conduct

21   is fairly attributable to the government not just for *Garrity*

22   purposes but also for *Brady* purposes as well.

23             And that story, Your Honor, takes place over a much

24   longer period of time, not just in the period from April to

25   October of 2016.

1          We ask that Your Honor hear the evidence and stop us

2     when you think this becomes a fishing expedition.  We're

3     satisfied and fervently believe that you will not find that.

4          In any event, I'm happy to answer any questions that

5     the Court may have as to scope, but that's our opening

6     statement.

7          Thank you.

8          THE COURT:  Mr. Lewin.

9          MR. LEWIN:  Good morning, Judge, and may it please

10    the Court.

11         I will be very brief, which is a trend I think you

12    will find continues throughout the hearing, especially in light

13    of following Mr. Lustberg and later Mr. Finzi.

14         Ultimately, Judge, this hearing is about one thing,

15    which is fairness.  All the litigation, from the Rule 17

16    motions and briefings to the oral argument to the privilege

17    dispute, all of that -- all of that -- is about the fairness of

18    this proceeding to two men:  my client, Gordon Coburn, and

19    Steven Schwartz.

20         Sometimes litigation can obscure the forest.  Here --

21    for all of us, Judge, here, the forest is fairness, how the

22    government's approach in this investigation yielded an unfair

23    playing field.

24         Judge, we think that the hearing across today and

25    perhaps tomorrow morning will yield proof of that unfairness,

1   proof that highlights how the government's approach to this

2   investigation renders, as Mr. Lustberg just said, Cognizant's

3   conduct fairly attributable to the government in a

4   Constitutional sense.

5         Here, fair attribution in a Constitutional sense

6   means, as Your Honor knows, two things.

7         First, that the coercive interviews that Cognizant

8   conducted were fairly attributable to the government and thus

9   the use of those statements and the fruits derived from those

10  statements would violate Mr. Coburn and Mr. Schwartz's Fifth

11  Amendment rights.

12        Second, the extent of the investigative cooperation,

13  coordination, and direction that the government gave to

14  Cognizant both directly and via its policies render certain

15  Cognizant files in DOJ's constructive possession and thus

16  requires DOJ and not Cognizant to satisfy DOJ's obligations

17  under *United States v. Brady*.

18        Judge, I will pause there simply to briefly address

19  scope since Mr. Lustberg covered it in detail.  I think the

20  most important thing that Mr. Lustberg said is that the Court

21  has already ruled on this.

22        In the January 10th hearing in the transcript at

23  page 9, the Court explicitly held that this hearing would

24  address two things.  It would address the *Garrity* argument and

25  the *Brady* argument.

1          As Your Honor said, we have all been sometimes using

2    shorthand of describing this as a *Garrity* hearing, but that is

3    not accurate and it's not what this Court has already held this

4    hearing would be.

5          The Court said -- and I'm quoting here from page 9 --

6    "I might be tempted to just rule on the papers, but I'm not

7    going to do that.  I will give you the chance to make your

8    threshold showing here.  And what I'm going to do, I'm going to

9    give the defense four witnesses.  And I'll leave it to you to

10   choose the ones you think would get me over the hill toward

11   seeing it your way."

12         There's a few other lines.  Then you say, "That's for

13   the motions having to do with the interviews of the defendants

14   and also the one having to do with whether the corporation is

15   inside the *Brady* circle, if I can put it that way."

16         That betokens no ambiguity, Judge.  This hearing is

17   about two things.  And as Mr. Lustberg said, and critically,

18   we've relied on that ruling in selecting our witnesses who will

19   cover both the *Garrity* and *Brady* aspects of this.

20         Judge, the characteristics of this investigation that

21   I'd respectfully ask Your Honor to be on the lookout for today

22   and tomorrow are threefold.

23         First, there was a robust company investigation

24   focused from the very outset, from day one, on getting

25   cooperation credit from DOJ.  And they did that by following

specific, explicit DOJ direction regarding its policy.  So

that's the first, Judge, a robust company investigation focused

on cooperation credit per DOJ directives.

Second, for at least six months, the period between

September 2016 and February 2017, there was an absence of a

parallel DOJ investigation.  As Cognizant was investigating and

communicating and reporting and taking feedback, DOJ was doing

nothing -- no interviews, nothing.

As Your Honor knows, Justice McMahon said that's

critical in determining whether or not the conduct of Cognizant

on one hand should be attributed to the Department of Justice

on the other.

Finally and third, I'd ask Your Honor to look to the

extraordinary levels of coordination and cooperation, both the

volume and timing of the communications between DOJ and

Cognizant and the breadth of the coordination and cooperation.

THE COURT:  I'm sorry, but forgive me.  You're saying

so if the DOJ was doing something, that's bad; and if they

weren't doing something, that's bad?

MR. LEWIN:  No, Judge.  I'm saying if the Department

of Justice was truly conducting an independent investigation,

was not sitting back and waiting for the fruits of Cognizant's

investigation before conducting their investigation, that we

would have a different story here.  That's not what was

happening, Judge.

1           44 interviews were conducted and downloaded to the

2     Department of Justice before it conducted even one.  Not one of

3     the Department of Justice's interviews was conducted without

4     first getting a download from Cognizant about what that person

5     said.  Your Honor, I believe there will be substantial evidence

6     adduced there.  And I believe that that will be a substantial

7     factor, as it was for Judge McMahon in *Connolly*.

8           The government's position, as Your Honor knows well,

9     is that this type of investigation is routine, and an adverse

10    decision here by Your Honor would hamper investigative efforts.

11    But the way that this investigation was handled, especially in

12    this time period between September of 2016 and February 2017,

13    show that it's not routine.

14          So, ultimately, Judge, and here's where I'll close.

15    Why does it matter?

16          As I said at the beginning, and as Mr. Lustberg said,

17    it matters because it has already resulted in substantial

18    unfairness to Gordon Coburn and Steven Schwartz.  It is unfair

19    to Gordon Coburn and Steven Schwartz for the government to

20    deputize and rely on the judgment of a cooperating witness

21    company that is, to use your words, quote, performing an

22    investigation for the purpose of exculpating itself, end quote.

23          It is unfair to Gordon and Steven to take advantage

24    of interviews conducted under conditions that, if done by the

25    U.S. government, would be suppressed along with its fruits.

1            It is unfair to Gordon and Steven for the government,

2  in a case involving the chief legal officer and the president

3  of a public company, to defer categorically to the cooperating

4  company on questions of privilege.

5            It is unfair to Gordon Coburn and Steven Schwartz for

6  the government to explicitly delegate -- explicitly delegate --

7  its *Brady* obligations to the cooperating company without any

8  guidance, without any supervision.

9            It is unfair to Mr. Coburn and Mr. Schwartz for the

10 government to put its investigation on hold for half a year to

11 allow the company's lawyers to conduct indisputably coerced

12 interviews of the defendants and of a stable of Cognizant

13 employees.

14           It's unfair to Mr. Coburn and Mr. Schwartz for the

15 government to sit back and receive highly curated --

16 Mr. Lustberg's term, curated -- downloads of these interviews.

17           When I say curated, Judge, which parts of the

18 interviews should be shared with the government?  Which

19 interviews should be shared with the government?  The

20 government ultimately received downloads of 45 of the 450

21 interviews conducted by Cognizant.

22           Finally, Judge, it's unfair for the government to

23 have it both ways, to rely on Cognizant as its investigator

24 when it suited them and now to be permitted to disclaim that

25 reliance and prosecute the case that Cognizant's investigators

1   created, curated, and road-mapped for them.

2           This litigation, as Your Honor knows, is not about

3   government misconduct.  We do not allege that any of this

4   aspect of the investigation was intrinsically improper.

5           This litigation is also not about a typical

6   Department of Justice investigation or typical corporate

7   cooperation.  The evident coordination between the Department

8   of Justice and Cognizant was radically atypical.  Cognizant

9   acted at the direction and did, in Cognizant's own words,

10   everything that the Department of Justice could have asked for

11   here.

12           This litigation is not about legal technicalities.

13   It's not about gotcha moments.  This litigation and this

14   hearing is about ensuring Gordon Coburn and Steven Schwartz get

15   a fair shake, ensuring that the evidence and the exculpatory

16   materials that we know exist are fully and fairly aired because

17   that's what the Constitution requires, Judge, and that's what

18   fairness requires.

19           Thank you, Judge.

20           THE COURT:  All right.  Government, do you wish to

21   make a statement?

22           MR. MOODY:  Thank you, Your Honor.  The legal

23   equivalent of the Hail Mary pass in football, that's how the

24   Second Circuit in *Gilman v. Marsh & McLennan* described the

25   defendants' argument here, that, quote, acts taken by a private

1   company in response to government action and that have as one

2   goal obtaining better treatment from the government amount to

3   state action, end quote.

4           That citation is 826 F.3d at 76 to 77.

5           As I'm sure Your Honor is aware, a Hail Mary pass is

6   an extraordinary thing to see.  The quarterback knows the game

7   is lost and, with nothing to lose, seconds on the clock, he

8   throws the ball across the field --

9           THE COURT:  Let me tell you you're wasting your time

10  here.  Not a football fan.

11          MR. MOODY:  I'll leave some of the rest out,

12  Your Honor.  Apologies.

13          But that explains it's a very, very rare event that

14  very, very rarely succeeds.  And I think that explains the

15  hyperbole in the preliminary statements in Mr. Schwartz's

16  opening brief.

17          THE COURT:  Right.  I know enough to understand your

18  illustration.  Go ahead.

19          MR. MOODY:  Okay.  So the point is, in his opening

20  brief, Mr. Lustberg said this was an unprecedented situation

21  where we've directed Cognizant's internal investigation.  They

22  claim the government received information to Cognizant -- and

23  this is important; this is a direct quote -- to a degree never

24  seen in criminal prosecutions, end quote.

25          And today Mr. Lustberg said things like this is

1    something that's beyond -- beyond what anyone's ever seen.

2    Mr. Lewin just called it radically atypical.

3              And that's because, to succeed in this motion, the

4    defendants need to make the case that this is the

5    one-in-a-million Hail Mary pass that succeeds.  But it's not.

6              This was an ordinary course, white collar

7    investigation that involved a large company that had evidence

8    of a crime, no different from the many white collar

9    investigations that are happening today in U.S. attorney's

10   offices throughout the country.

11             The defense counsel over there, they all know this.

12   They or their law firm partners regularly represent large

13   companies cooperating with and sometimes reporting to the

14   Department of Justice.

15             So why are they attempting this Hail Mary pass?

16   Again, apologies.  I'm going to extend the sports analogy.

17   It's because it's part of the playbook.  This has become the

18   playbook for white collar criminal defendants.  These are

19   massive long-shot motions.  They're likely to fail.  But even

20   when they fail, the defendants get to put the government on

21   trial.

22             Now, the Court is likely to hear a lot about policies

23   today.  The Foreign Corrupt Practices Act, or FCPA Pilot

24   Program, the Yates Memo.

25             Mr. Coburn's attorneys will likely lead the charge

1    here because the company interviewed Mr. Coburn before the

2    government even knew anything about the allegations prior to

3    the company's disclosure.

4            Mr. Schwartz has conceded in his reply brief at

5    page 17 that DOJ policies alone can't create state action,

6    actually said that.

7            Mr. Coburn, he can't admit that.  His only hope is to

8    use these policies to get his interview suppressed.  So he's

9    going to try to press that argument even though his codefendant

10   concedes it's meritless.

11           Even though we argued this hearing should not occur,

12   in part because we know that white collar defense bar is going

13   to file these motions just to get a hearing in every case

14   pointing to this one, we're not at all concerned with the facts

15   here.

16           As we said in our brief and at oral argument, we did

17   not direct the company explicitly or implicitly whatsoever to

18   interview the defendants at any time.  We didn't engineer those

19   interviews, and our conduct is not attributable, nor did we

20   outsource our investigation of Cognizant.  And this goes to the

21   scope question I'll address at the end.

22           I'll just address it.  The company had independent

23   reasons for conducting an internal investigation, and they were

24   not under the government's control.

25           Now, government, law enforcement agents, and

1    prosecutors of course received information from Cognizant.

2    That's unsurprising.  After all, this was an investigation of a

3    crime that occurred within a company by employees performing

4    their jobs.  But as you'll hear, no matter what information the

5    company provided, the government at every step did its own

6    independent evaluation of that evidence, and the government

7    conducted a thorough independent investigation, which you're

8    going to hear about today.

9            Now, we're not calling any witnesses today; we're not

10   likely to object too much; and we'll try to keep our

11   cross-examination short.  That's not because we don't take this

12   hearing extremely seriously.  It's because this is defendants'

13   motion; it's their burden.

14           We did not object when the defendants called a

15   current member of our prosecution team, David Last, and we

16   voluntarily produced hundreds of pages of detailed internal

17   notes of the government's calls and meetings with Cognizant.

18   We've got nothing to hide.

19           We do believe, however, that the defendants'

20   multiyear effort here has to come to an end.  And so we

21   respectfully ask that this Court ensure the hearing concludes

22   tomorrow so we can bring this case to trial at long last.

23           Now, if I may address the scope issue briefly.

24           THE COURT:  Sure.

25           MR. MOODY:  The reason we sent that letter last

1    night, Your Honor, is we read your opinion.  We read your

2    opinion as basically saying that this hearing was limited to

3    whether, under *Garrity*, those three interviews should be

4    suppressed.

5              I just want to make clear because our letter was

6    quite short:  We would not object if the defendants asked

7    questions about things that happened later in time so long as

8    it's tied to the narrow question of whether we engineered those

9    interviews.

10             Our concern is in having received the defendants'

11   exhibit list in the middle of the night, their updated

12   version -- we received an original version yesterday morning,

13   and then we received an updated last night.  There's 137

14   exhibits on it.  And we think, based on what we know about how

15   this case has been litigated so far, that this hearing could

16   conceivably go into every single day and minute of our

17   investigation over multiple years.

18             They have deliberately called government prosecutors

19   spanning the entire time of our investigation.  We have no

20   problem with, as Mr. Lustberg indicated, some leeway.  We trust

21   the Court will, of course, police this, but we at least wanted

22   to make our position clear that we hope this will be narrowly

23   targeted to those interviews so that we don't go off into areas

24   that have nothing to do with it whatsoever.

25             THE COURT:  Okay.  Let me give everybody a little

1   insight into the scope question.

2            I'm sorry.  Were you finished?

3            MR. MOODY:  I'm finished, Your Honor.  Thank you.

4            THE COURT:  The scope issue.

5            There's two things going on.  Okay?  One is the

6   privilege issue and waiver of the privilege issue, which has

7   everything to do -- well, not everything but a lot to do with

8   what the company shared with the government.  That gives rise

9   to a waiver.

10           And there's the substantive issue which has a lot to

11  do with what the government was saying to the company.  Those

12  two are kind of on a parallel track though going in separate

13  directions.

14           The case for a waiver is far weaker with respect to

15  the later material, but the case for relevance may still be

16  there.  As everyone knows, of course, if people sit down and

17  reminisce about some action they took last week, that can be

18  relevant; but if they're just sitting around, the attorney and

19  the client reminiscing, whether it's relevant or not, that may

20  not have been waived because it comes after any disclosure to

21  the government.

22           So those two things are in a lot of tension.  I'm

23  going to try to balance them as we go along.  Yes, I'll give

24  you some leeway, to use Mr. Lustberg's term, and the government

25  does not object.  I'm not going to let it go on and on and on,

1   but I will hear nonprivileged information, assuming there is

2   any, that postdates the actual interviews, for example.  But

3   the waiver is still limited in scope; so you might find you're

4   tied up a little bit there.

5           But that's all I can really say until I hear what it

6   is you've got to offer.  I'll be frank and tell you I think

7   your main issue, defense, your main issue and strongest issue

8   has to do with the interviews and not the more nebulous idea

9   that Cognizant, in some broader sense, was the government for

10  all purposes here.  But take that as you will.

11          But let's get started.  Let's hear from -- who will

12  be your first witness?

13          MR. FINZI:  Your Honor, can I just -- two small

14  housekeeping points.  One, as indicated, one of the government

15  witnesses is in the courtroom and at counsel table.  We don't

16  have a problem with that, but I just wanted Your Honor to be

17  aware of that.

18          THE COURT:  Sure.  That horse left the barn a long

19  time ago.

20          MR. FINZI:  Okay.  Second, Your Honor, just again for

21  the record, the exhibits were delivered to the government at

22  the government's request at 10:00 a.m. on Monday morning, and

23  we added less than ten or around ten last night.  So I just

24  wanted to sort of be clear on the timing of that.

25          THE COURT:  Nevertheless, 137 exhibits, or whatever

```
 1   it is, is a lot of exhibits.  Think about that.

 2            MR. LUSTBERG:  Judge, look, we've tried to be

 3   overbroad in providing them --

 4            THE COURT:  Of course you did.  Of course.  Of

 5   course.  Of course.  You don't even need to finish that

 6   sentence.  You don't need to finish that sentence.  I know what

 7   you do when you designate exhibits.  You want to make sure

 8   you're not boxing yourself out.  I get that.  All I'm saying is

 9   to think about the number of exhibits as you're putting them

10   on.

11            But I'll hear from your first witness.

12            MR. MOODY:  Your Honor, may I make one brief point?

13            THE COURT:  Sure.

14            MR. MOODY:  We want to make the point.  So,

15   obviously, we feel very comfortable having our current

16   prosecutor testify and former prosecutor.  We think it's

17   appropriate to do this.  We're not fighting it in any way, and

18   we don't know exactly what the defense is going to ask them.

19   We'd just like to make the point that, to the extent that the

20   government attorneys testify today and are asked questions that

21   may reveal their mental impressions or internal DOJ

22   communications, our position is we're not waiving -- making a

23   broader waiver of any privilege beyond the narrow confines of

24   this hearing.

25            So we just want to make -- be on the record there.
```

United States District Court
Newark, New Jersey

```
 1   We just want to protect any argument later that there's been

 2   some sort of broad waiver.

 3            THE COURT:  Yes.  And, look, I think I understand the

 4   reasons why the defense is calling such a witness, and I take

 5   your cooperation, small C "cooperation," with that as being

 6   designed to move things along.  But I get it that that doesn't

 7   open up everything that attorney ever did.

 8            Obviously, it's somewhat extraordinary to have a

 9   prosecutor called as a witness, not unheard of but unusual.

10   And I get it that you're not waiving anything by agreeing to

11   that.

12            MR. MOODY:  Thank you.

13            MR. LUSTBERG:  So the first witness that we requested

14   was Kevin Gingras.

15            MR. FINZI:  Could he be outside?

16            THE COURT:  By the way, everyone, there's no jury

17   here.  Find a place to stand that's comfortable for you.

18   That's fine.  Near a microphone, however, is a good idea.

19            THE COURTROOM DEPUTY:  Remain standing, raise your

20   right hand.

21               KEVIN GINGRAS, DEFENSE WITNESS,

22         having been duly affirmed, testifies as follows:

23            THE WITNESS:  I do.

24            THE COURTROOM DEPUTY:  Keep the microphone close to

25   you.  State your name for the record and spell it, please.
```

```
 1              THE WITNESS:  Kevin Gingras, K-E-V-I-N,
 2    G-I-N-G-R-A-S.
 3              THE COURTROOM DEPUTY:  Thank you.
 4                   (DIRECT EXAMINATION)
 5    BY MR. LUSTBERG:
 6    Q.   Good morning, Mr. Gingras.  My name is Larry Lustberg.
 7    We've never met before I don't think, have we?
 8    A.   I don't believe so.
 9    Q.   So thank you for coming today.
10              How are you employed, sir?
11    A.   Currently?
12    Q.   Yes.
13    A.   I am an in-house attorney at Lockheed Martin Corporation.
14    Q.   Before that where were you employed?
15    A.   I was with the Department of Justice in various capacities
16    for about 13 years.
17    Q.   If you would, just briefly walk us through what those
18    various capacities were.
19    A.   So I joined the Department of Justice in 2005 after I did
20    a couple clerkships after law school.  I joined in the civil
21    rights division criminal section and also went on a detail to
22    the Eastern District of Virginia as a special assistant United
23    States attorney.
24              I transitioned to the criminal division's appellate
25    section at main justice.  So I was an appellate attorney for
```

Gingras-Direct-Lustberg                                    32

1    about five years, working on various cases throughout the

2    country in criminal appeals.

3           After that, I went to the FBI where I was special

4    counsel to director -- FBI Director Mueller and served as a

5    sort of national security advisor.  And after a period of time,

6    I became his deputy chief of staff.  So I did that for, I

7    think, a couple of years.

8           Then after that I went back to the Justice Department

9    as a line attorney in the fraud section focusing on Foreign

10   Corrupt Practices Acts and other white collar investigations.

11   Q.   Okay.  In that capacity in particular, but really in any

12   of those capacities, are you familiar with the incentives that

13   companies have to investigate and cooperate with the government

14   with regard to, in particular, FCPA violations?

15   A.   Well, I'm certainly aware of the Yates Memo and the FCPA

16   Pilot Program that later became the corporate enforcement

17   principles and the sentencing guidelines but also incentivized

18   to cooperate.

19   Q.   We'll come back to those lists a little bit later.

20          So in this case, Mr. Schwartz and Mr. Coburn's case,

21   how did you -- what was your very first involvement in the

22   case?

23   A.   My very first involvement in the case would have been in

24   2016 in September.  I can't remember exactly when, but some of

25   my supervisors assigned me to a case where Cognizant

1  technologies had apparently made a disclosure.  And so they

2  assigned me to that case.

3  Q.   Had you had any involvement prior to that with Cognizant?

4  A.   No, I'd never heard of it before.

5  Q.   And had you worked in the past with the U.S. Attorney's

6  Office for the District of New Jersey?

7  A.   I don't -- I might have as an appellate attorney, but I

8  don't remember.  Not in a trial attorney capacity.

9  Q.   And prior to that time had you had any interaction with

10  the DLA Piper law firm that had self-reported matter?

11  A.   No.

12  Q.   Did you know, when you first became involved, that DLA had

13  reported the matter?

14  A.   I think I learned pretty quickly which law firm was

15  representing Cognizant and reported it.

16  Q.   Okay.  So how long did you remain involved on the

17  Cognizant matter?

18  A.   So I remained on it until I left the Justice Department in

19  June of 2018.

20  Q.   2018 you said?

21  A.   2018.

22  Q.   Right.  And what was your role in that investigation?

23  A.   So I was a prosecutor on the case, and I worked it in

24  partnership with AUSAs from the District of New Jersey and with

25  the FBI.

1    Q.   If you could, tell us what the DOJ team was for the

2    Cognizant investigation.

3    A.   So, again, I think it had various iterations over a period

4    of time.  So in the beginning I believe Oz Benvenuto, who is

5    the AUSA from the District of New Jersey, was assigned to it.

6    So it was the two of us, and there was FBI agents.  And then we

7    all had our supervisors, lots of supervisors.

8    Q.   Okay.  When you say lots of supervisors, at the beginning

9    of the case who was your supervisor?

10   A.   So I think my direct supervisor at the time of the case

11   was Leo Tsao, and he reported to the chief of the unit, who was

12   Dan Kahn.

13   Q.   Who was who?

14   A.   Daniel Kahn.

15   Q.   Who did you -- during the time that you've discussed from

16   2014 -- I'm sorry -- 2016 to 2018, with whom did you primarily

17   interact on behalf of Cognizant?

18   A.   With whom did I primarily act on behalf of Cognizant?

19   Q.   No, on behalf of.

20        So you interacted with counsel for Cognizant,

21   correct?

22   A.   Correct.

23   Q.   Okay.  And who was that?

24   A.   That would have been Karl Buch from DLA, Grayson Stratton

25   from DLA, and I can't remember -- I can't recall specifically

1   who else, but I think there were a couple other attorneys.

2   Q.   And when I say "interact," I just want to make sure we

3   have it all.  That included phone calls, right?

4   A.   Yes.

5   Q.   And in-person meetings?

6   A.   Yes.

7   Q.   And emails?

8   A.   Correct.

9   Q.   And were there also text exchanges?

10  A.   No.

11  Q.   No texting?

12  A.   No.

13  Q.   And I take it that all throughout the period that you were

14  there, you had periodically interactions with those people,

15  correct?

16  A.   Yes.

17  Q.   I assume it's more at some time, less at others; but

18  throughout the time period, right up until you left in June of

19  2018, you were interacting with that DLA team with regard to

20  this matter, right?

21  A.   That's correct.

22  Q.   And sometimes in the course of that interaction --

23  actually, let me focus on the initial few weeks.  And in

24  particular I'm focusing on the time period between the time you

25  got involved -- which, if I understand correctly, was

1    September 2nd, 2016.  Does that sound right to you?

2    A.    I'd have to look back.  That seems a little bit early.

3    Q.    Okay.  So if we could just show -- let's show our

4    Exhibit 1.  See -- can you see that on your screen?

5    A.    Yes.

6              MR. LUSTBERG:  Scroll down.

7    BY MR. LUSTBERG:

8    Q.    Friday, September 2nd, 2016, I see an email from Daniel

9    Kahn to Zach Intrater, Paul Murphy, and Oz Benvenuto.

10             Those are all people from the U.S. Attorney's Office

11   in New Jersey, right?

12   A.    Correct.

13   Q.    It says, "Great.  Thanks.  I'm looping in Leo Tsao, who

14   will be supervising the case.  I believe we are giving it to

15   Kevin Gingras, but Leo hasn't had a chance to talk to him yet.

16   Once he has, he will put" -- I can't see -- "Oz and Kevin in

17   touch."

18             So are you saying that, as of the 2nd, you were not

19   yet aware of the case?

20   A.    I could have been.  I don't remember whether it was that

21   day or some time after that.  I know, reviewing some of the

22   other emails, that I was traveling at the time; so I don't know

23   when exactly I had a chance to speak with them.

24   Q.    But focusing on the time period in early September through

25   the 23rd -- which you know that that's the date that

1   Mr. Schwartz was reinterviewed?

2   A.   Yes.

3   Q.   Okay.  I really want to focus on that time period --

4   A.   Okay.

5   Q.   -- and on the government's actions during that time

6   period.  So we're going to look at some of those early

7   communications.

8            And in particular, if we could look at our Exhibit 2.

9            MR. LUSTBERG:  Judge, just for the record, we're

10  showing these exhibits right now.  I'm not going to take the

11  time to formally move them in, unless the Court wants me to, on

12  a document-by-document basis.

13           THE COURT:  I don't think that's necessary.  If

14  anybody has an objection, certainly speak up.

15           MR. MOODY:  No objection.

16           THE COURT:  It's a hearing; it's not a trial.  We'll

17  see what you have for us.

18  BY MR. LUSTBERG:

19  Q.   So the top email on Exhibit 2, if you could look at that,

20  this is an email to Leo Tsao from Jonathan Haray.

21           Is Jonathan Haray one of the people you interacted

22  with at DLA?

23  A.   The name sounds familiar, yes.

24  Q.   That refers to a request in Dan's -- from Dan during our

25  call last week.

1              Do you know what that refers to?  When I say "that,"

2       what request we're talking about.

3       A.   Well, based on this email, it seems to be that he had

4       requested to get personal email addresses.

5       Q.   So what's going on here is that the government is

6       requesting information from Cognizant, correct?

7       A.   Correct.

8       Q.   Was that unusual for the government to request information

9       from Cognizant during that period?

10      A.   I don't think it was unusual at the beginning of any of

11      these corporate investigations to ask for this kind of

12      information.

13              MR. LUSTBERG:  I misplaced my papers.

14      BY MR. LUSTBERG:

15      Q.   Let me direct your attention now to -- quickly to

16      Exhibit 3, again with regard to government requests.

17              So on the second page of that there's an email on

18      September 9th from Karl Buch to Leo and you.

19              Leo again is who?

20      A.   Leo was my supervisor at the time.

21      Q.   It says, "It was great catching up with you yesterday.  As

22      you requested, I write to let you know that we intend to

23      interview Lakshmi Narayanan, Cognizant's vice chairman of the

24      board, on Monday.  Please let me know if you have any

25      questions."

1          I wanted to ask you about the phrase "as you

2    requested."

3          Do you know what the government had requested of

4    Cognizant on September 8th, which was the day before?

5    A.   I don't recall the conversation, but looking at this email

6    it seems like we had made a request and that this was a

7    response to it.  I don't know the specifics of what we actually

8    requested, though.

9    Q.   So you can't tell from here, it says, "As you requested, I

10   write to let you know that we intend to interview" -- this

11   person, Lakshmi.

12         Do you know, does that refresh your recollection at

13   all that the government may have made a request to know who

14   Cognizant was interviewing?

15   A.   I mean, based on this email it seems that that's likely

16   what the request was, but I don't have a specific recollection

17   of it.

18   Q.   So as of September 9th, you knew that Cognizant was going

19   to interview -- I'll call him Lakshmi.  Correct?

20   A.   Based on this email, yes.

21   Q.   Did you do anything to participate in such an interview?

22   A.   No.

23   Q.   Did you give Cognizant counsel any guidance as to what the

24   subject of that interview should be?

25   A.   No.

1    Q.   Was there any further discussion about the interview with

2    Lakshmi between you and Mr. Buch or anybody else from DLA at

3    that time?

4    A.   I don't recall anything like that.

5    Q.   So why did the government -- if you don't specifically

6    recall -- let me ask you this way.

7         Why did the government request to know who was being

8    interviewed?

9    A.   Well, I mean, I think early on in an investigation like

10   this, I mean, I think there's a number of things that

11   prosecutors -- number of questions prosecutors are going to

12   ask.  I think primarily, you know, is there an ongoing crime?

13   Is there a chance that evidence is going to be destroyed?  Are

14   there people that are going to flee that we would want access

15   to?  So are there personal email addresses and other steps that

16   we can take proactively?

17        So, again, I don't recall specifically what the

18   request was in relation to this.  I'm not denying that we made

19   a request, but I can't recall exactly why we would have asked

20   about this particular individual.

21   Q.   Let me tell you what's puzzling me.  Maybe you can help

22   me.

23   A.   Sure.

24   Q.   The government has asked, you think, based on this, to

25   know when Cognizant was going to interview certain people or

```
 1   what interviews Cognizant was going to do.  That was the
 2   inference that you drew, right?
 3   A.   Correct.
 4   Q.   Right.  And so my question is -- but you answered that no
 5   direction was given, no questions were asked about it, no --
 6   the government didn't participate.  And I'm trying to
 7   understand how that could be.
 8   A.   Trying to understand how what could be?
 9   Q.   I'm trying to understand why you would want to know who
10   was being interviewed but not provide any information or
11   direction or questions or guidance.  And you said, if I'm
12   right, that there's certain things that the government wants to
13   know early on in an investigation -- is the crime continuing?
14   That sort of thing.  But you didn't give any guidance to
15   Cognizant with regard to what to ask this witness.  Is that
16   right?
17   A.   That's right.
18   Q.   So if that's the case, why did you even want to know who
19   was being interviewed?
20   A.   Well, I think wanting to know who the company's
21   interviewing so that we can potentially deconflict our own
22   investigation is not unusual in these corporate criminal cases.
23   So to the extent we were asking things that they were doing in
24   the moment, I think we might have been trying to understand
25   what was happening in their investigation so that we could
```

1   deconflict it from whatever steps we would eventually decide we

2   were going to take.

3   Q.   And in order for you to know what was going on in their

4   investigation, was it enough to just understand who they were

5   interviewing?  Is that what you're saying?

6   A.   I think so.  I mean, I think we'd have to have some

7   background.  But, again, this is very early on.  I think I got

8   pulled into this case literally days before this.  So I think

9   we were also just trying to understand the universe of what the

10  facts were and what was happening since things were happening

11  very quickly.

12  Q.   And in order to do that, just to make sure I understand,

13  your testimony is that you didn't request any -- that any

14  particular information be gathered from this witness?

15  A.   Definitely not.

16  Q.   Pardon me?

17  A.   Definitely not.

18  Q.   So this was one where you just -- Cognizant was going

19  ahead and they were going to do this interview without any

20  guidance from the government, right?

21  A.   Again, I think that was true with all the interviews they

22  were doing.

23  Q.   If I can just go to the first page of this document.  On

24  the bottom of it there's an email from Mr. Buch to you and Leo

25  where it says, "Please let me know if you are available for a

```
 1    call with John, Gray, and me between 2:00 and 4:00 p.m. today."
 2              This is now September 14th.
 3              "We would like to raise some recent developments with
 4    you."
 5              Was it part of the process in these early days --
 6    this is now September 14 -- that Cognizant would raise recent
 7    developments with you?
 8    A.   I'm sorry.  The first part of your question was it part of
 9    the --
10    Q.   What you did during this period in early September.
11    A.   I mean, in reviewing some of the emails, yes.  DLA reached
12    out to us to update us throughout the course of their
13    investigation.
14    Q.   And I just want to make sure I understand.  As they were
15    updating you, were you providing any guidance to them as to how
16    to go about their work?
17    A.   Definitely not.
18    Q.   Absolutely no guidance?
19    A.   No.
20    Q.   Do you have a recollection about what the recent
21    development was that Cognizant brought to your attention on
22    September 14, 2016?
23    A.   Yes.  I believe it was about notes that they discovered
24    that belonged to Mr. Schwartz.
25    Q.   All right.  And they had just discovered those notes right
```

1    around that time, right?

2    A.   That's my recollection.

3    Q.   And so they were updating you, essentially in real time,

4    as to what their investigation was uncovering, correct?

5    A.   I mean, assuming they found them that day, I suppose real

6    time is not a stretch.  But they let us know pretty quickly

7    after they found them.

8    Q.   Okay.  Well, I don't mean real time like that moment, but

9    I will represent to you that they found the notes on

10   September 9th.  It's pretty -- as you said, pretty promptly,

11   right?

12   A.   If they found them on the 9th, yeah, that's still

13   promptly.  Sure.

14   Q.   Now, are you aware that they obtained these notes from

15   Mr. Schwartz's laptop computer?

16   A.   Yes.  I knew it was from one of his devices.

17   Q.   Do you remember whether it was from his laptop computer?

18   A.   I don't recall which of the devices it was.

19   Q.   Do you remember a dispute, though, between Cognizant and

20   Mr. Schwartz with regard to his laptop computer?

21   A.   I don't.

22   Q.   You have no recollection of that?

23   A.   I don't believe I was ever told about one.

24   Q.   Okay.  In any event, do you have a recollection of a phone

25   call on September 14, 2016, with regard to this matter?

1   A.   I know that there was a phone call; I don't recall the

2   specifics of it.

3   Q.   Let's see if we can help refresh your recollection on

4   that.

5          MR. LUSTBERG:  If we could turn to Defendant

6   Exhibit 4.

7   A.   Yes.

8   BY MR. LUSTBERG:

9   Q.   You can also -- Mr. Gingras, all of the exhibits are in

10  front of you in that binder if it's easier for you to look at

11  paper.

12  A.   Okay.

13  Q.   It's a two-page exhibit.  If you prefer to see it that

14  way, that's fine.

15  A.   Which tab is this?

16  Q.   Exhibit 4.

17  A.   Okay.

18  Q.   So at the end of that exhibit it says, "We intend to

19  interview Lakshmi.  Conduct some additional interviews on

20  Monday and Tuesday, Mani and B. Gosh (head of procurement).

21  Wednesday, intend to meet with Schwartz (and his lawyer, Josh

22  Rievman, NY).  Coburn" -- it says Corburn, but -- "Coburn in

23  the afternoon."

24          And my question is, once again here, your testimony

25  is that you provided absolutely no guidance as to what any of

 1   the questions that should be asked to any of those people; is

 2   that right?

 3   A.   That's correct.

 4   Q.   They are, however -- they, Cognizant through DLA -- is

 5   telling you who they're going to be interviewing next.  And

 6   that was per the government's request that they do so.  Is that

 7   right?

 8   A.   I don't know that this was per the government's request

 9   that they do so.  I mean, the previous exhibit that you were

10   showing about Lakshmi, I mean, that could have been Leo asking

11   that question about him specifically.  I'm not sure I knew

12   enough on September 8th to ask any intelligent questions about

13   any specific person; so I don't know whether this is in

14   response to a request that we made or if they're just letting

15   us know.

16   Q.   So you don't know?

17   A.   So I don't know.

18   Q.   Was this email the first time that you learned that

19   Mr. Coburn and Mr. Schwartz had previously been interviewed?

20   A.   I think -- I mean, if there's a reference on here, I think

21   so.

22   Q.   In the middle of the first page it says, "DLA interviewed

23   Coburn and Schwartz and they both denied."

24   A.   Right.

25   Q.   Do you see that?

```
 1   A.   Yes.

 2   Q.   Before that time had you known that?

 3   A.   I don't believe so.

 4   Q.   Did DLA at the time, Mr. Gingras, explain to you what the

 5   rules were that they imposed upon interviews with people like

 6   Mr. Schwartz and Mr. Coburn?

 7   A.   No.

 8   Q.   Did there ever come a time when you became aware of the

 9   rules that were imposed by DLA with respect to interviews they

10   were doing of people?

11   A.   Yes.

12   Q.   Okay.  When did you become aware of that?

13   A.   When I read your briefing in advance of this hearing.

14   Q.   Okay.  So up until the briefing here, you had no idea that

15   DLA's policy was to have only one lawyer in the room who could

16   not speak or take notes?

17   A.   Well, I should say I may have learned that that happened

18   after the fact at some point.  I don't -- when I read it in the

19   briefing, it didn't sound familiar to me.  But I'm not

20   precluding the possibility of at some point I learned about it

21   later.  But certainly during this time we weren't having

22   conversations about exactly how they were conducting their

23   interviews.

24   Q.   And you don't know when you found that out?

25   A.   I can't recall.  Maybe it was -- it could have been during
```

1  an interview download or something.  I don't know.

2  Q.   Well, do you remember how you responded when you found out

3  that that -- those were the rules of engagement for interviews

4  by Cognizant?

5  A.   No.  I don't know how I responded.

6  Q.   But you would admit that those types of rules are not

7  rules that the government could use in interviewing witnesses,

8  could they?

9  A.   No, those are not rules -- the rules for the government

10  would certainly be different than they would be for a company.

11  Q.   Looks like --

12         THE COURT:  Could I just interrupt for one moment

13  just to clarify?

14         MR. LUSTBERG:  Sure.

15         THE COURT:  This email, Mr. Gingras, is you telling

16  Mr. Benvenuto what Buch and Sharratt had told you?

17         THE WITNESS:  That's correct, Your Honor, except

18  Mr. Sharratt was with the SEC.  So I had taken notes apparently

19  of the September 14th call with Mr. Buch from DLA.  And this

20  was the information he conveyed to us.

21         And then I sent it on to Oz Benvenuto, who wasn't

22  able to make the call.

23         THE COURT:  Got it.  Thank you.

24         MR. LUSTBERG:  That's exactly what I was going to

25  ask.

```
 1   BY MR. LUSTBERG:
 2   Q.   And why did you do that?
 3            Why did you send this on to Oz?
 4   A.   Well, because we were partnering on this together.  And
 5   for whatever reason, he wasn't able to make the call that we
 6   had.
 7   Q.   Was -- at the time you at DOJ were not doing your own
 8   investigation of Cognizant, correct?
 9   A.   Well, I wouldn't say that's correct.
10   Q.   Fair enough.  I mean, at the time DLA was interviewing
11   witnesses, right?
12   A.   Yes.
13   Q.   You were not interviewing witnesses?  You being DOJ were
14   not interviewing witnesses; is that right?
15   A.   No.
16   Q.   Was the District of New Jersey, was Oz or anybody there,
17   interviewing witnesses, gathering documents, doing the kinds of
18   things that DLA was doing at the time?
19   A.   No.
20   Q.   Now, earlier you said that you were aware that
21   Mr. Schwartz was reinterviewed on September 23rd, right?
22   A.   Correct.
23   Q.   And right after -- and he was interviewed by DLA and by
24   Cognizant -- which was Cognizant's counsel at the time, right?
25   A.   I believe that's correct.
```

1    Q.   And did they update you with regard to what had occurred

2    at that interview?

3              Withdrawn.

4              That day on September 23rd, the day of the interview,

5    did they tell you what had occurred?

6    A.   I can't recall whether it was that day or shortly

7    thereafter.

8    Q.   When you say shortly thereafter, any sense of the

9    timeframe of that?

10   A.   I don't.  I think they're reflected in some of the emails

11   if you want to direct me to some that may refresh my

12   recollection.

13   Q.   Let me show you -- I'll just move on.

14             There was a phone call, I am going to represent to

15   you, on September 23rd.

16   A.   Okay.

17   Q.   I know you've reviewed all the documents and so forth in

18   preparation for this testimony today, right?

19   A.   I've reviewed some of them.

20   Q.   Okay.  Do you know what that phone call on the 23rd, the

21   same day as Mr. Schwartz's interview, was about?

22   A.   Well, I apologize.  Which phone call are we talking about?

23   Q.   Let me quote to you.  In the government's brief they say

24   that the subject of the -- withdrawn.

25             That there was a call on September 23rd.  And at the

Gingras-Direct-Lustberg 51

1   time of that call on the 23rd, the company had asked to push

2   back a meeting that had been scheduled with DOJ for

3   September 27th.

4   A.   That sounds familiar.

5   Q.   And my question for you is do you know whether, when you

6   spoke to Cognizant for that purpose on September 23rd, they

7   briefed you as to what had occurred with regard to

8   Mr. Schwartz's interview on that day?

9   A.   I don't recall if that happened or not.  It may have.

10  Q.   They said that they had asked to push back the meeting

11  because there were complications in their fact finding.

12          Does that ring a bell?

13  A.   Yes.  I mean -- yes.

14  Q.   Well, do you know what the complications in DLA's fact

15  finding were as of September 23rd?

16  A.   I don't recall.

17  Q.   But in any event, you don't recall -- there was a call on

18  the 23rd, the date of Mr. Schwartz's interview, and you don't

19  recall whether on that day you were updated as to what had

20  occurred in that interview?

21  A.   If the call occurred after the interview, I'd find it

22  surprising if they wouldn't have at least told us generally

23  what happened; but I don't recall specifically.

24  Q.   You know that that interview is really a very important

25  interview in this case, right?

```
 1   A.   Yes.
 2   Q.   I mean, there's numerous communications where you talk
 3   about how that is critical and there's questions about who's
 4   going to testify with regard to that interview --
 5   A.   Sure.
 6   Q.   -- and that sort of thing because it was an important part
 7   of the government's -- of the case that Cognizant at least was
 8   building as of that time, right?
 9   A.   Well, I'm certainly aware that that interview was
10   important for a number of reasons, including to the
11   government's case, yes.
12   Q.   And given the importance of that interview and what had
13   occurred, don't you think they would likely have briefed you on
14   it on the very same day it happened?
15   A.   I believe I said that it's certainly possible that they
16   did so, and perhaps it's likely that they did so if it happened
17   after that.  I just -- I don't have a specific recollection of
18   it.
19   Q.   Were you aware that, as of the time of that second
20   interview of Mr. Schwartz on September 23rd, that Cognizant had
21   already decided to terminate his employment?
22   A.   I was not.
23   Q.   When did you become aware that that was the case?
24   A.   When did I become aware --
25   Q.   When did you become aware that, as of September 23rd, that
```

```
 1   Cognizant had already made a decision to terminate
 2   Mr. Schwartz?
 3   A.   When I read the briefing that -- your briefs in advance of
 4   this hearing.
 5   Q.   So up until you read the briefing in this case, you had no
 6   idea that that was the case?
 7   A.   Correct.
 8   Q.   Okay.  So were you aware that Cognizant was holding off on
 9   effecting any termination so that they could get additional
10   information from Mr. Schwartz and reinterview him?
11   A.   No.
12   Q.   So let me show you -- take a look at Exhibit 14.
13        Do you recognize Exhibit 14?
14   A.   Sort of.  These look like possibly my notes.
15   Q.   Can you tell from this when those notes were from?
16   A.   I mean, they seem fairly early on.  I wouldn't remember
17   exactly what the date was.
18   Q.   Pardon me?
19   A.   They seem to be from fairly early on in the case, but I
20   don't remember exactly what day these would have been.
21   Q.   So the meeting that we talked about before was supposed to
22   take place on September 27th and, in fact, took place on
23   October 6, 2016.
24        Do you recall that?
25   A.   Yes.
```

Gingras-Direct-Lustberg                54

1   Q.   Do these look like notes from the October 6, 2016,

2   meeting?

3   A.   Yes.  Looks like they could be, yes.

4   Q.   If you look at the bottom of the second page.

5   A.   Okay.

6   Q.   You'll see a section called "Remediation."

7         Do you see that?

8   A.   Yes.

9   Q.   And it says, "Schwartz:  On Garden leave."

10        What does that mean?

11  A.   I think that just means on paid leave.

12  Q.   Then it says, "Trying to get as much as we can."

13        Do you see that?

14  A.   Yes.

15  Q.   These are your notes.  What did you mean by that?

16  A.   I think I'm noting here what DLA is telling me and Oz and

17  the team that Cognizant is doing and is doing with certain

18  personnel, including Mr. Schwartz.

19  Q.   And I get that.  I mean, my question is were you aware

20  that what Cognizant was doing was, instead of terminating him,

21  keeping him on so that he could continue to be questioned?

22  A.   I mean, I don't know that I would say I was aware that

23  they were keeping him on just so he could be questioned.  I

24  think they were trying to conduct their investigation, and he

25  had information that they were trying to elicit from him.

1    Q.    Right.  And if he had been terminated, it would be much

2    harder to get that information, wouldn't it?

3    A.    Most likely.

4    Q.    You said most likely?

5    A.    Correct.

6    Q.    That's based on your experience that if you terminate

7    somebody, it's much harder to get an interview with them.

8    Isn't that true?

9    A.    I think that's usually true.

10           THE COURT:  Sorry.  Help me out.  Who's RW?

11           MR. LUSTBERG:  Pardon me?

12           THE COURT:  RW?  Who is that?

13           THE WITNESS:  RW.  I can't recall, Your Honor.  I'm

14   sorry.

15           THE COURT:  Fine.

16   BY MR. LUSTBERG:

17   Q.    Just to clarify and to go back to this subject, I want to

18   show you another exhibit dated -- which is Exhibit 15.  These

19   are notes dated December 16th, 2016 [sic].  I recognize this

20   was after the period, but it's going to refer back to the very

21   subject we talked about before.

22           Do you see that exhibit?

23   A.    Yes.

24   BY MR. LUSTBERG:

25   Q.    I'd like to walk you through that if you could.  So it

1    starts off by saying, "Interviews last week.  Thought we could

2    do better."

3              Any idea of what that's a reference to?

4    A.   I don't -- I'm sorry.  Are these my notes?

5    Q.   You tell me.  I thought they were based on the type and so

6    forth; but if you don't know, you don't know.

7              MS. PATEL:  I think we can just represent those are

8    his notes.

9              THE COURT:  That was not very audible.  You're

10   saying, Ms. Patel, that you can help us out?

11             MS. PATEL:  We can represent that those are

12   Mr. Gingras's notes if that makes this easier.

13             THE COURT:  You believe they are.  Okay.

14             Not evidence, obviously.  But if that helps, go

15   ahead.

16   BY MR. LUSTBERG:

17   Q.   So my question is, taking a look at those, any idea what

18   you meant when you wrote "thought we could do better"?

19   A.   Yeah, I think I'm quoting what -- this appears to be a

20   conversation with Mr. Buch.  I believe I'm summarizing what

21   Mr. Buch told me.

22   Q.   Okay.  Then it goes on to talk about "coming up with a

23   rehab program and represent to people that we are more

24   interested in finding out what the facts are and if we're

25   comfortable you're being straight up, then you won't lose your

1   position."

2              So the idea is that if you -- if people will speak,

3   then they won't get fired; is that right?

4   A.   That could be.  That seems like a fair summary of this.

5   Q.   And Karl says -- at the end it says, "Karl:  We are going

6   to terminate a lot of people, but there are lots of line people

7   that have info but are holding back."

8              Do you see that?

9   A.   Yes.

10  Q.   And you say right before that, "Devil is in the details, I

11  said," meaning you.

12             What did you mean by "devil is in the details"?

13  A.   I think I was just responding to his comment that the

14  people he's talking about are not supervisors and could have

15  been people just following orders.

16  Q.   Here's my question -- I'm sorry.

17             When you said devil is in the details, what is it

18  that you think you meant?

19  A.   Well, based on this, it seems like my response is to him

20  saying that the people he's talking about were not supervisors

21  and could have just been following orders.

22  Q.   Okay.  Got it.

23             So when you say devil is in the details, what are you

24  saying there?

25  A.   Of whether people were actually just following orders, I

```
1   suppose.

2   Q.   Got it.  Okay.

3        This email, would you agree that it essentially

4   confirms what you have said before, that people are more likely

5   to talk if they haven't been fired?

6   A.   Sure.  Yes.

7   Q.   And, likewise, just a little bit -- like, a few days

8   earlier than that -- let me show you Exhibit 16.

9   A.   Okay.

10  Q.   This is a lengthy exhibit; so let me direct you to a

11  particular page, which is page -- at the bottom it will say

12  page 13 of 18, Bates Number 135.

13  A.   Okay.

14  Q.   There's a section there called "Individual Remediation."

15       Do you see that?

16  A.   Yes.

17  Q.   Among the things it says, it says, "SEC:  Can you give us

18  a list of the people being terminated and another of the

19  people."

20       And DLA says, "Sure.  The only people I think are

21  important to you are Mani and Sridhar."

22       Do you see that?

23  A.   Yes.

24  Q.   Okay.  And then if you skip to the next page, it says

25  "AB."
```

1          Do you know who AB was?

2    A.   That would have been -- I believe that's a reference to --

3    when is this?  December 2017?  So that would have been Andrew

4    Bruck, who was the AUSA from New Jersey.

5    Q.   And Mr. Bruck says, "And you guys are proposing

6    separation?  Let me get back to you on that one.  At the end of

7    the day, it's your decision."

8          Why was the government interested in whether

9    separation was being proposed?

10   A.   Well, I think we were trying to understand -- and I think

11   what Mr. Bruck is trying to understand here -- is our ability

12   to have access to witnesses who are overseas.

13         You know, in these international investigations and

14   these big white collar investigations, it's not unusual that,

15   when a company is remediating and deciding what to do with a

16   number of its employees, they will try to make witnesses

17   available to us.  So I think that that's what Mr. Bruck is

18   trying to understand.

19   Q.   But the discussion is not about travel overseas.  I don't

20   want to argue with you, but this is about separation.  "Are you

21   guys proposing separation?"  And on the page before, it talks

22   about whether there's a list of people being terminated.

23         So just to follow up on your point, people who are

24   terminated or being separated are not people who the company is

25   giving access to the government?

1   A.   Well, it would make it a lot harder, but I think we

2   were -- I guess just to -- and I don't mean to argue with you,

3   sir; I just -- it seems like what we're talking about are

4   witnesses who are overseas, which presents a particular

5   challenge for the prosecution team.

6   Q.   I understand.  Of course that's true.  But this discussion

7   is about terminations and separation, right?

8   A.   Correct.

9   Q.   And your response was that what companies try to do is

10  make people available.  My question is, is one of the ways they

11  make people available by not terminating them?

12  A.   Well, one of the ways they -- certainly, if a company is

13  trying to get cooperation credit, I think one of the things

14  that they do, and did in this case perhaps and certainly do in

15  a lot of other cases, is put people on leave to make them

16  available to the government.  But as Mr. Bruck said here, at

17  the end of the day, it's the business's decision as to what to

18  do.

19  Q.   Let me make sure I understand.  It's the business's

20  decision what to do.  But in terms of how much credit the

21  business is going to get for cooperating with the authorities,

22  one of the things that's measured is their having given access

23  to the government to certain people, right?

24  A.   I think that's correct.  I think those are in the

25  policies.

```
 1   Q.   And you're not giving access to certain people if you
 2   terminate them and they're not available for interviews; is
 3   that right?
 4   A.   Well, I think a company has to weigh its remediation and
 5   mitigation efforts against its desire to get cooperation with
 6   the government.  So I think -- again, I think that's why
 7   Mr. Bruck says here it's your decision because it's the
 8   company's ultimate decision in trying to balance two things
 9   that are potentially intentioned with each other and decide how
10   they want to proceed.
11   Q.   You were around, weren't you, when Cognizant made its
12   so-called Filip Factor presentation, correct?
13   A.   I was.
14   Q.   That was in May of 2018 right before you left, right?
15   A.   Yes, sir.
16   Q.   Let me show you Defense Exhibit 17, which is called
17   "Cognizant Filip Factors Presentation."
18           Do you see that?
19   A.   Yes, sir.
20   Q.   Do you know what this document is?
21   A.   I believe these are paralegal notes of that presentation.
22   Q.   Fair enough.  And I want to direct your attention, just in
23   terms of what we were talking about a few minutes ago, to
24   page 4 of 10, which is Bates Number 000206.
25           Just a few lines down it says, "KB:  Also consistent
```

1    with the DOJ deconfliction policy, we made sure those people

2    were available to us and you."

3           Once again, what's the deconfliction policy?

4    A.   Well, I don't know that there's an actual deconfliction

5    policy.  I can't remember which of the policies it was --

6    perhaps it's the Yates Memo or one of the other policies --

7    highlights that one factor in considering a company's

8    cooperation is their deconflicting with the government's

9    separate investigation.

10   Q.   What does that mean, deconflicting?

11   A.   Well, I think it means if, as was the case here, you had

12   an internal -- a company conducting an internal investigation

13   and at the same time the government also conducting an

14   investigation into the same conduct or similar overlapping

15   aspects of conduct, that the company would try and make an

16   effort to deconflict in the sense of not impede what the

17   government was trying to do.

18   Q.   So deconfliction means trying not to impede what the

19   government is trying to do?

20   A.   I think essentially yes.

21   Q.   So you respond to that and say, "We appreciate that and it

22   is the company's decision."

23           What did you mean by that?

24   A.   Well, I acknowledged -- I think I was acknowledging what

25   he was saying and what they had tried to do.  But, again,

 1  noting that at the end of the day that decision is the

 2  company's decision in weighing that calculus of trying to

 3  remediate and mitigate and -- which includes terminating people

 4  perhaps and also trying to seek cooperation credit with the

 5  government by ensuring that they're available if the government

 6  is trying to seek access to them.

 7  Q.   Right.  In order to receive cooperation credit?

 8  A.   I can't think of another reason why a company would do

 9  that other than trying to get cooperation credit.

10  Q.   Got it.  In fact, the next two lines -- I just want to ask

11  about those.  It says, "KR:  In cooperation, that is a key

12  distinguishing factor."

13          KR, I think is -- if you can check your first page,

14  but I think it's Kathy Reummler, who is one of the attorneys

15  for Cognizant, right?

16  A.   That's correct.

17  Q.   And then Doug Greenburg, who I think was also a Latham

18  lawyer, said, "We've all seen cases were people are terminated

19  right away and that can impede an investigation."

20          Do you see that?

21  A.   Yes.

22  Q.   Do you agree with that?

23  A.   Yes.  I think I had seen other internal investigations in

24  my own experience, and I know many of my colleagues, where

25  people we would have liked to have talked to had already been

Gingras-Direct-Lustberg                64

1  terminated, and it made it very difficult, if not impossible,

2  to speak to them, especially if they were overseas in

3  jurisdictions where it would be impossible or difficult to talk

4  to them.

5  Q.   So what the lawyers for Cognizant, Mr. Bruck and

6  Ms. Reummler and Mr. Greenburg, are saying to you here is they

7  did not terminate people so that the government would have

8  access to them and they should be given cooperation credit for

9  that, correct?

10 A.   I believe that's correct.

11 Q.   Well, you know that's correct?  I mean, that's the reason

12 they were pointing that out, right?

13 A.   Well, I only say I believe because I couldn't put myself

14 in their heads.  But this is a fair reading, and common sense

15 seems to indicate that.  So correct.

16 Q.   And you were there; so you knew that that's what they were

17 trying to argue, right?

18 A.   Yes.

19 Q.   So the bottom line I'm trying to get at here is, by

20 holding off on terminating Mr. Schwartz so that they could get

21 a second interview of him, that was something that was very

22 helpful to the government, correct?

23 A.   By holding off on terminating Mr. Schwartz, that was

24 something that was helpful to the government.  I don't --

25 Q.   Let me withdraw the question and make it clearer.

United States District Court
Newark, New Jersey

1    A.    Okay.

2    Q.    Assume for purposes of this question -- because you don't

3    know, as of September 23rd, Cognizant had made the decision

4    whether to terminate Mr. Schwartz or not.

5    A.    Yeah, I did not know that.

6    Q.    We can tie that up with other witnesses.

7              The question is if they had intended to terminate him

8    by then but didn't do so in order that he would be interviewed

9    a second time, that really helped the government, didn't it?

10   A.    I don't know if I would say that that really helped the

11   government.  I mean, you're asking me to sort of hypothesize on

12   what would have happened if they would have terminated him.  I

13   don't --

14   Q.    I'm not really asking you to hypothesize.  I'm asking you

15   for your experience.  I think you said a few minutes ago that,

16   if they had terminated him, he would likely not have been

17   accessible for an interview, right?

18   A.    Well, I was speaking in terms of foreign witnesses.  I

19   don't know that -- I mean, he had an attorney.  So presumably

20   perhaps he would have been unwilling to speak to us, but --

21   Q.    Well, let me ask this question.

22   A.    Sure.

23   Q.    Were you aware that, if he did not submit to a second

24   interview, he would have been fired?  Is that something you

25   were aware was Cognizant's policy?

1   A.   I don't know that I was specifically aware that it was

2   Cognizant's policy, but that's most companies' -- many

3   companies' policies; so I don't think I would have been

4   surprised to know that, or I probably assumed it.

5   Q.   So by submitting to that interview, he generated evidence

6   that you said a little while ago was important evidence for the

7   government, right?

8   A.   Yes.

9   Q.   And, therefore, evidence that would not have been

10  available if he had not been interviewed and had been fired,

11  right?

12  A.   Presumably, yes.

13  Q.   And that would not have been available if he had been

14  fired as was intended -- assume that -- before that interview.

15  A.   If that's true, then yes.

16  Q.   Okay.  I want to go back to the October 6, 2016, meeting.

17  So as we discussed a little while ago, right from the outset a

18  meeting was going to be scheduled between the DLA team and the

19  DOJ team.  Originally it was December -- I'm sorry --

20  September 27th.  It got pushed off until October 6th based upon

21  complications in Cognizant's or DLA's investigation.

22            Remember we talked about that?

23  A.   Yes.

24  Q.   And you don't know what those complications were?

25  A.   I don't recall what those were.

1    Q.   So what was -- this is now October 6th.  It's about a

2    month after you've gotten involved with the case.  What was the

3    purpose of that meeting?

4    A.   I think that was our initial kickoff meeting to learn

5    about what the case was even about.

6    Q.   So for the month of September -- you're already involved

7    in the case -- until October 6th when you had this meeting,

8    it's your testimony you didn't know what the case was about?

9    A.   Well, I mean, I knew generally what it was about, but I

10   didn't know further details beyond what you see in those

11   September 14th notes.

12   Q.   But you were aware that during that month of September

13   that Cognizant was continuing its internal investigation of the

14   issue, right?

15   A.   Yes.

16   Q.   So for that meeting, do you recall who set the agenda for

17   that meeting?

18   A.   Who set the agenda?

19   Q.   Yes, the government or Cognizant?

20   A.   I mean, Cognizant had reached out to us in their

21   self-disclosure.  So I believe they set the agenda on what they

22   wanted to share with us.

23   Q.   I'm going to read to you from the government's brief.  You

24   said you looked at the briefs in this matter?

25   A.   Well, I skimmed them.  I wouldn't be able to answer

1   specific questions about them.

2   Q.   Let me give you a quote and see if this rings true.

3        "Cognizant summarized evidence it had discovered of

4   the $2 million bribery scheme that ultimately formed the basis

5   for the charges in the indictment and the key individuals

6   involved, including Coburn and Schwartz, and also provided a

7   binder of documents that it referenced during the

8   presentation."

9        This is with reference to October 6.

10       Does that ring a bell as to what happened on

11  October 6th?

12  A.   That sounds right.

13  Q.   Do you remember a binder of documents being provided?

14  A.   I don't specifically remember a binder, but in almost

15  every internal investigation like this, when the company came

16  in for the first time, there was usually if not a binder,

17  several binders.

18  Q.   And whether there were one or several binders, the

19  contents of those binders was selected by Cognizant, right?

20  A.   Yes.

21  Q.   That is, by their counsel, correct?

22  A.   Correct.

23  Q.   Do you remember at the time whether there was some

24  discussion about how they had selected the documents that they

25  had?

1    A.   I don't recall having that discussion, no.

2    Q.   I'm going to show you -- take a look at D-18.  Let me know

3    if you have seen this before.

4    A.   This doesn't look familiar to me.

5    Q.   I'll represent to you that these are actually talking

6    points that were developed by DLA for the meeting.  But you've

7    never seen those before?

8    A.   I've never seen this before.

9    Q.   Thank you.

10           I want to ask about whether something that's in these

11   notes is what happened at the meeting.  So let me direct your

12   attention to the top of page 3 of 9, Section C.

13           It says this:  "Cognizant self-reported on

14   September 1st.  We've had a number of conference calls since we

15   reported.  We've shared with you key points from witness

16   interviews, Steven Schwartz's notes from the April 22nd, 2014,

17   conference call" -- which you mentioned a little while ago --

18   "personal email and identifying information for a number of

19   Cognizant associates" -- which you mentioned a little while

20   ago -- "upcoming interviews" -- and I think you've testified

21   that Cognizant was providing information about upcoming

22   interviews.  Is that true for you?

23   A.   I think they were telling us who they were planning to

24   interview.

25   Q.   -- "information about witnesses and their counsel."

1        I want to focus on the first one that says, "Key

2  points from witness interviews."

3        At that meeting on October 6th, did Cognizant provide

4  you with key points on the witness interviews that they had

5  done?

6  A.   I believe they did.

7  Q.   And they selected what those key points were, right?

8  A.   Yes.

9  Q.   Did you ask at that time for memos of the whole interviews

10  or something so you could tell whether what they were providing

11  were, in fact, the most important points?

12  A.   I wouldn't have asked for memos because those would have

13  been privileged and DOJ policy is we can't ask for

14  privileged -- ask the company to waive privilege.  So, no, I

15  wouldn't have asked for memos.

16  Q.   Well, you say that they would be privileged.  Let me just

17  follow up on that.  If Cognizant is telling you about the

18  interviews, you're saying that the interview memos or notes

19  themselves are nonetheless privileged?

20  A.   If Cognizant is telling me about the interviews and giving

21  me facts, then I don't think that necessarily means that the

22  memos themselves would -- wouldn't be privileged.

23  Q.   So you wouldn't have any concern that the privilege, once

24  they were telling you some things about the interview, had been

25  waived so that they could give you an accurate, complete

 1   recount of the interviews?

 2   A.    I apologize.  Someone coughed.  Can you repeat the first

 3   part of that.

 4   Q.    It was a lousy question anyway.

 5         So Cognizant is giving you facts, key points from the

 6   interviews, right?

 7   A.    Yes.

 8   Q.    And you say that you wouldn't ask for the whole interview

 9   memos because you would be concerned that those are privileged?

10   A.    Correct.

11   Q.    And when you do that analysis of whether they are or not

12   privileged, you consider that they provided you with some facts

13   but not all of the facts regarding those interviews?

14   A.    Yes.

15   Q.    So my question is why did you, or somebody from DOJ if you

16   have all talked about it, not challenged whether they could

17   assert privilege with regard to the whole of those interviews

18   as opposed to just providing their selected key points?

19   A.    Well, as I'm sure was true in this case, every internal

20   investigation that I'd done with not just this district but any

21   other district in the U.S. Attorney's Offices, we all

22   presume -- not presumed -- we understood, and often the company

23   would be very explicit with us, that those memos were

24   attorney-client privileged and work product.  So we would find

25   other ways to try and pressure-test things that they were

1   telling us without asking them to waive privilege over those

2   materials.

3   Q.   With regard to the key points that they raised at the

4   October 6th meeting, what did you do to pressure-test, to use

5   your phrase, what they were telling you to make sure that it

6   was a complete, fair presentation of what had actually been

7   said at those meetings?

8   A.   Well, I don't know that there would have been anything in

9   this specific meeting because it was essentially a kickoff

10  meeting.  I think at this point we're in receive, you know,

11  listening mode, trying to understand the universe of the facts

12  of what Cognizant had uncovered and just trying to get our

13  bearings and just -- so basically just trying to understand

14  what this case was about.

15  Q.   So in trying -- let me ask you this:  In trying to

16  understand what the case is about, if Cognizant is reporting on

17  interviews, as a good DOJ attorney in the FCPA area and the

18  vast experience that you had in the criminal field, you would

19  really want to know whether those key points really accurately

20  represented what the witnesses had been told, wouldn't you?

21  A.   Yes.

22  Q.   So my question is, when they gave you the key points, did

23  you question them at all to make sure that those were the

24  correct key points and that they fairly and accurately

25  summarized what the interviews were?

1    A.   Well, I guess my answer -- I don't mean to repeat my

2    answer, but I think in that meeting I don't know that we would

3    have pushed back.  I don't know that it would have been the

4    appropriate time.  But certainly at some point the company

5    started producing documents and we started conducting our own

6    investigation in earnest.  And so we would have the facts that

7    they gave us, and we would assess them in light of our own

8    investigation to figure out whether those were, in fact, key

9    points.

10   Q.   Okay.  But at least as of October 6th, you accepted those

11   key points as the key points based upon the people -- what you

12   were being told by the people who were doing the investigation

13   at that point, right?

14   A.   At that meeting I was not in a position to challenge what

15   were or were not key points; so I was just listening to what

16   Cognizant was telling me.

17   Q.   Okay.  Let me show you the next exhibit, which this is

18   Exhibit 19.

19   A.   Okay.

20   Q.   Take a look at the first page of it, and I'll direct you

21   to another place.

22          These are the paralegal notes from the -- from that

23   same October 6th meeting.  Do you see that?

24   A.   Yes.

25   Q.   And have you seen these before?

```
 1   A.   Yes.

 2   Q.   Directing your attention to the fourth and fifth page of

 3   the document, so Bates Numbers 21 and 22.  Starting at the

 4   bottom of page 4, Bates Number 21, let me go through these

 5   questions with you.

 6             "Government:  Did you have these notes" -- these were

 7   with reference to the notes that you were told about on

 8   September 14th -- "when you spoke to Schwartz?"

 9             Do you know where it says "Gov" there who was asking

10   those questions?

11   A.   I don't.  It's someone from -- it's either Oz or myself

12   or --

13   Q.   Let's see who was -- I don't know that we know who was

14   present at that meeting.

15   A.   Okay.

16   Q.   And DLA says, "Yes, the second time.  We spoke to him a

17   second time with the notes last Friday, I think.  We did with

18   counsel before the president resigned."

19             Then there's a discussion of Mr. Schwartz's -- what

20   Mr. Schwartz said at that interview.

21             Do you see that?

22   A.   Yes.

23   Q.   And then where it says "Brackett," that refers to

24   Brackett Denniston that was one of the attorneys for Cognizant.

25             Do you see that?
```

1   A.   Yes.

2   Q.   Did you interact with Mr. Denniston in regards to this --

3   A.   I remember him from a couple meetings early on, but then

4   he -- that was sort of it.

5   Q.   And you'll see that Mr. Schwartz is saying that he did not

6   have a good memory of a call in April 2014 because he had had

7   surgery that week.

8           Do you see that?

9   A.   Yes.

10  Q.   And you recall that was something Mr. Schwartz had said,

11  right?

12  A.   In the second interview, correct.

13  Q.   Right.  And it says, "Gov:  Was he out any days after the

14  surgery?"

15          And DLA says, "There's emails that shows he was doing

16  normal business on the 24th," which is a little bit later.

17          Government asks who his counsel is, and then

18  government asks what's his current status.

19          "He's on home leave, on paid leave.  His access to

20  things have been terminated.

21          "Brackett:  Our preferred course is for him to resign

22  or we'll terminate."

23          DLA says, "We do want to do an additional interview

24  with him and have asked for medical records for this alibi."

25          So I want to just ask you about that statement.  "We

1    do want to do an additional interview with him."  This comes

2    after a statement about "our preferred course is for him to

3    resign or we'll terminate."

4           I take it that that's just another embodiment of what

5    we were talking about earlier, which is if he resigned or was

6    terminated, they might not get that next interview.

7    A.   I apologize.  You said it's another -- I missed the first

8    part of what you said.  It's another?

9    Q.   It's another example of what we were talking about

10   earlier.

11   A.   Correct, yes.

12   Q.   Then it says, "We do want an additional interview with him

13   and have asked for medical records for this alibi."

14          What did you understand DLA was doing there?

15   A.   I'm going to take this to mean that DLA was trying to

16   interview him again and trying to get medical records to either

17   corroborate or not his alibi.

18   Q.   And that too would have been of enormous assistance to the

19   government, right?

20   A.   Assuming we got that information, then that would

21   certainly be relevant to the government's investigation.

22   Q.   So what I really want to ask about is the very next

23   sentence --

24   A.   Okay.

25   Q.   -- which says, "Gov:  Have we exhausted everything around

Gingras-Direct-Lustberg

1    him not remembering?"

2            Any idea who Gov is there?

3    A.   Again, it was either Oz or me or, if the SEC was there,

4    someone from the SEC.

5    Q.   It says "have we exhausted."  That sounds like you're

6    talking about "we" as in the government and counsel for

7    Cognizant, right?

8    A.   That's certainly an interpretation of it.

9    Q.   Well, I'm asking -- it can be an interpretation of it.  Is

10   it the correct interpretation of it?

11   A.   I don't think it's the correct interpretation of it

12   because we were clearly on separate teams; so --

13   Q.   Right.  But we -- at this point the only ones who were

14   doing this work, as they've just said, is Cognizant, right?

15   A.   Correct.

16   Q.   This is well before there were any interviews conducted by

17   the DOJ, right?

18   A.   Correct.

19   Q.   And it's well before, even further before, DOJ issues any

20   subpoenas, right?

21   A.   Correct.

22   Q.   Right.  So when you say -- when the government says "we"

23   and they're talking about exhausting everything around him not

24   remembering, what they're talking about is that the efforts

25   that Cognizant is going to make to exhaust everything around

1    him not remembering, right?

2    A.   I mean, it could be.  First of all, these are paralegal

3    notes; so I don't know exactly how accurate they are.  But even

4    assuming they are, it could be just a misstatement if that's,

5    in fact, what someone said.  Yeah.

6    Q.   So you think that a government lawyer saying "have we

7    exhausted everything," talking about Cognizant's actions, in

8    saying "we" is somehow a misstatement?

9    A.   Well, it would have been a misstatement because they were

10   conducting their own investigation and we were going to conduct

11   our own.

12   Q.   At this point they're doing the investigation and you're

13   receiving information about it, right?

14   A.   This is October 6th?

15   Q.   Yes.

16   A.   Yeah, I think that's fair to say.

17   Q.   And, I mean, isn't it fair to say that at this point you

18   really are working together?  Isn't that what you were doing?

19   A.   No, I wouldn't say that.

20   Q.   Okay.  You would not say that what Cognizant was doing was

21   working with the government in an effort to obtain leniency at

22   this point?

23   A.   I wouldn't say they were working with the government.  I

24   think they were like a cooperator who has come in and has tried

25   to provide us -- provide the government with information and

1    the government is taking that information, conducting --

2    assessing it and making its own independent judgment and

3    conducting its own investigation.

4    Q.   Well, at this time the government is not conducting any

5    investigation?

6    A.   Well, actually, if I said that, I misspoke.  I wouldn't

7    concede the government is not conducting any investigation at

8    this point.

9    Q.   Okay.  Tell me, October 6th, a month after you're into

10   this case, what was the government doing by way of conducting

11   an investigation?

12   A.   Well, I don't recall specifically what we did, but

13   certainly we would have taken steps.  I think the reason --

14   there was a reason we were asking for personal email addresses.

15   We were making our own assessment about if there were any sort

16   of immediate steps that we needed to take.  Again, we're

17   talking about a matter of weeks.  So I don't know that there

18   was a whole lot that we could have done because, frankly, we

19   didn't even know a lot about the case.

20   Q.   When the government says "have we exhausted everything

21   around him not remembering," right after DLA said they were

22   going to do another interview and get medical records, isn't

23   that providing some direction to them that they should exhaust

24   everything around him not remembering?

25   A.   I wouldn't -- I wouldn't say that that's direction, no.

1   Q.   Okay.  What would you say that is?  Just a suggestion?

2   A.   I mean, I think it was a question, asking what they've

3   exhausted.  And if that's an accurate reflection of the use of

4   the word "we," then that's an unfortunate misstep.

5   Q.   And if they're asking a question about whether it's been

6   exhausted, you don't think implicit in that, when that's said

7   to a company that's seeking leniency, ultimately a declination

8   letter, that it gives them a suggestion as to what they should

9   do next?

10  A.   Well, I can't speak for what the company's interpretation

11  would be.  I knew that we were not to direct the company's

12  investigation.  My AUSA partner knew that as well.  And that's

13  something that wouldn't have happened.  So we weren't directing

14  them.

15         How the company interpreted it, I can't control.  But

16  we were -- this example of notwithstanding or -- and perhaps

17  there are others because we're not perfect, we're usually

18  trying to be very careful not to cross a line and be perceived

19  as directing the company to do something.

20  Q.   But you would agree that, assuming that this is correctly

21  quoted, there could be that perception that you're at least

22  suggesting, if not directing, DLA as to what to do next, right?

23  A.   Well, I think it would be a stretch to say that someone

24  would interpret it as direction, but how they interpreted it,

25  if they thought it was a suggestion and how strong they thought

```
1   that suggestion would be, I can't control and I wouldn't know.

2   Q.   So following that October 6 meeting, I want to -- later

3   that day you have a follow-up question.  Just to refresh your

4   recollection on that, let's take a look at Exhibit 21.

5             I want to make sure I get the right one.  So on

6   October 6, so on the first page --

7   A.   Okay.

8   Q.   -- there's an email from you which looks like it's to the

9   DLA team.  I can't tell exactly who, but it's in response to an

10  email from Mr. Buch.

11            By the way, it says Mr. Buch's title there is foreign

12  legal consultant.  Did you have an understanding about what

13  that meant?

14  A.   I never understood what that meant.

15  Q.   So it says that -- there's a discussion that says, "Karl,

16  I know you're in transit tomorrow, but do you all have time for

17  a follow-up call with us tomorrow?  We have some requests we'd

18  like to make."

19            Do you see that?

20  A.   What part of the page?

21            MR. LUSTBERG:  Can you show that, Jesse?

22            He's very good.

23  A.   Oh, I see it.  Yes, I see it.

24  BY MR. LUSTBERG:

25  Q.   Do you know what requests you were making following that
```

 1    meeting?

 2    A.    I don't.

 3    Q.    No idea?

 4    A.    I don't remember.

 5          THE COURT:  I'm sorry.  This email is from who to

 6    who?

 7          MR. LUSTBERG:  Okay.  So this email is from

 8    Mr. Gingras here back to counsel at DLA.  It's part of a chain

 9    between them following the October 6th meeting.

10          There's a discussion -- it's not particularly

11    relevant -- with regard to the confidentiality agreement, and

12    then this is an example of the government having some requests

13    to make to DLA at that time.

14          THE COURT:  Oh, there it is.  I'm sorry.  The top was

15    cut off on my screen.

16    BY MR. LUSTBERG:

17    Q.    Then just one more follow-up finding -- following the

18    October 6th meeting.  A call ends up getting scheduled for

19    October 17th, a little bit more than a week later, to discuss

20    documents and other items.

21          The government has told us that they have no record

22    of that call, but DLA has some talking points for that day that

23    I just want to show you to see whether this refreshes your

24    recollection or whether you can tell me whether there was a

25    call on October 17th.

Gingras-Direct-Lustberg                              83

1          So take a look at Defendants' Exhibit 23.

2   A.   Okay.

3   Q.   And my question for you is do you recall having a

4   discussion on October 17th about -- and you can just look at

5   pending DOJ requests, whatever you need to do to look at it.

6          Do you recall a call on October 17, 2016, addressing

7   these subjects?

8   A.   I don't, no.

9   Q.   It says "Pending DOJ requests."  So let me see if I can

10  try that way.

11         It says, "Additional emails/hot docs relating to the

12  $2.5 million payment."

13         Do you know what that's a reference to?

14  A.   So I don't recall specifically, but it seems like it's

15  a -- we had asked for additional emails going to the

16  $2.5 million payment.

17  Q.   Let me focus on the phrase "hot docs."  Do you know what

18  that's a reference to?

19  A.   I think that's a colloquial term that folks in your

20  business and --

21  Q.   I've heard the phrase.

22  A.   -- term documents that are particularly relevant to a

23  subject.

24  Q.   Do you know whether -- had the government asked for,

25  quote/unquote, hot docs from DLA?

1  A.   I don't know that I would have used that term.  I don't

2  recall using that term.

3  Q.   Okay.  So if somebody else used the term and this says

4  pending DOJ requests and had requested hot docs, what they're

5  saying is to -- tell me if you think I'm wrong here -- that DLA

6  should select the, to use your phrase, documents relevant to

7  the issue, right?

8  A.   I mean, you're asking me to speculate if someone asked for

9  hot docs --

10  Q.   No, no -- yeah.  So let's assume --

11  A.   Okay.

12  Q.   -- because of this that there was a pending DOJ request

13  for hot docs.

14  A.   Okay.

15  Q.   That is, in fact, a request for Cognizant to select the

16  most relevant documents, right?

17  A.   If that's the term they used, that seems like a fair

18  interpretation.

19  Q.   Do you remember a discussion at any point with Cognizant

20  as to how they should go about selecting hot docs?

21  A.   I don't remember specific discussions about how they

22  should select documents, hot docs or otherwise.  I'm sure we

23  did.  I know we had discussions -- I sort of generally have

24  recollections about sort of parameters and categories of

25  information that we were seeking.

1          So if we were asking for specific documents around,

2   for example, the payment or other transaction or something else

3   in question, I remember making those requests.

4   Q.   I'm sorry.  You remember making requests of -- I just want

5   to -- you remember making requests for what?

6   A.   For documents that were -- that had to do with certain

7   transactions or categories of topics at given times.

8   Q.   And this was obviously during the time period before the

9   government subpoenaed documents, because if you were

10  subpoenaing documents, you wouldn't have to make those

11  requests; you could just subpoena them, right?

12  A.   Right.  Although even with the subpoena, we would usually

13  sort of have a back-and-forth -- at least my experience has

14  been that there's a back-and-forth about what categories of

15  documents and what the subpoena means and what we're trying to

16  get.  So yes.

17  Q.   When you had conversations yourself that you're recalling

18  with Cognizant with regard to certain categories of documents

19  that you were interested in, was that before you issued -- the

20  subpoenas were issued?

21  A.   I don't recall.

22  Q.   And the fifth point here says, "Coordinate Mani interview

23  in mid-November."

24          Do you recall any conversation about coordinating

25  with DLA with respect to an interview of Mani in mid-November?

1    A.   So I'm sorry to keep saying I don't recall, because this

2    was quite a bit ago, but I certainly remember having

3    conversations about trying to get access to Mani to interview

4    him.  I don't remember -- I mean, I think we would have tried

5    to interview him very quickly, but I don't remember this

6    specifically.

7    Q.   So you were having conversations with counsel for DLA

8    about getting access to Mani as quickly as possible; is that

9    right?

10   A.   Well, I mean, as quickly as possible -- we were trying to

11   get access to him.  He was one of the first people we wanted to

12   talk to.

13           MR. LUSTBERG:  Judge, I don't know when you were

14   intending to take a morning break.

15           THE COURT:  Would this be a good time?

16           MR. LUSTBERG:  It's a little after 11:00.  I'm

17   halfway through, maybe even more.  It would be a good time to

18   break.

19           THE COURT:  Okay.  Good.  Let's take our 15-minute

20   morning break.

21           Do me a favor.  One counsel for each just step up for

22   a moment about scheduling.  It doesn't need to be on the

23   record.

24           (Recess taken 11:10 a.m. through 11:25 a.m.)

25           THE COURT:  Let's resume.

```
1   BY MR. LUSTBERG:

2   Q.   I walk around too much; so they made me do one of these

3   mics.

4           Mr. Gingras, we talked about the question about

5   whether the government gives direction or suggestions or

6   whatever to a party like Cognizant that's reporting activity.

7   And you said that that's not something that you do, right?

8   A.   Correct.

9   Q.   I think you said that you know that the U.S. Attorney's

10  Office for the District of New Jersey also knew that they

11  shouldn't be doing that either, correct?

12  A.   That's my recollection, correct.

13  Q.   Well, did you speak to Oz or Andrew Bruck or someone else

14  from the U.S. Attorney's Office in New Jersey about that

15  subject?

16  A.   I don't recall having a specific conversation with them

17  about it, but I know that we talked at times -- and it has

18  happened in a lot of other investigations -- where we would

19  make sure that we were all being careful about not directing a

20  company to do certain things which would be inappropriate.

21  Q.   Okay.  I'm sorry.  Did you say you had those conversations

22  in this case?

23  A.   What I said is I don't recall specific conversations, but

24  I do -- I do recall sort of generally us talking about being

25  careful in how we were phrasing our questions.
```

1    Q.   Okay.  So I want to understand that.  Careful in phrasing

2    your questions.

3           So there's no -- there's no dispute, right, that you

4    would ask questions of the -- of Cognizant lawyers, right?

5    A.   Correct, and make requests.

6    Q.   And made requests.  And we'll talk about a couple other

7    things along those lines.

8           I guess my question is how do you -- you talked about

9    phrasing.  How do you phrase a request -- let's take requests

10   first -- in a way that does not end up constituting direction?

11   A.   When I say phrasing, I just mean that it was my

12   practice -- and I think it was our practice as a team -- to be

13   thoughtful about requests that we made from the company.

14          Again, the company can interpret things in a number

15   of different ways, but we didn't ever want to be crossing a

16   line into giving direction or -- we're talking about direction

17   now, but there are sort of other contexts too where you want to

18   be careful because it's not within our purview to be telling

19   the company what to do.

20   Q.   Okay.  So let me just ask about a couple of examples in

21   response to that.

22          You requested, did you not -- and I can show you a

23   document if you need to -- that you requested that Cognizant

24   assist you in terms of finding experts on some Indian

25   contracting processes, right?

Gingras-Direct-Lustberg                            89

1   A.   Yeah.  I remember asking the company to help us find an

2   expert in the Byzantine process of permitting in Tamil Nadu in

3   India.

4   Q.   If you could, what specifically do you recall what you

5   asked Cognizant to do for you with regard to locating experts?

6   A.   Well, I remember -- I recall that we were having trouble

7   finding an expert in this field.  We had asked OIA.  I recall

8   asking the State Department.  I even did googling online.

9            It was tough to find.  So we asked the company who

10  had -- who's experienced in real estate dealings over there or

11  asked DLA to see if they could find people that would be

12  suitable for us to consider as expert witnesses.

13  Q.   And let me ask you.  In your experience, is that a normal

14  request to make of a company that comes forward in an effort to

15  self-report, that you would ask them -- let me withdraw that.

16           The purpose of finding that expert was to assist you

17  in your investigation, right?

18  A.   Correct.

19  Q.   And potentially to even testify at trial if it came to

20  that, right?

21  A.   Conceivably.

22  Q.   So my question is, is it common in your experience to ask

23  a company that comes forward to assist in those ways?

24  A.   I don't know whether it's common or unusual.  I don't

25  recall doing it in another case.

1    Q.    Looks like you may have also asked one of them to assist

2    you in finding an expert with regard to certain IT issues, for

3    example, with regard to the Tandberg communications platform

4    that Cognizant used.  Do you recall asking them for assistance

5    in that regard as well?

6    A.    Yeah.  I think we were trying to understand how their IT

7    infrastructure worked, including the Tandberg, which is, I

8    think, the phone system that they were using that some of the

9    calls in question took place on.  So we had asked the company

10   for assistance in helping us identify someone who could explain

11   that to us.

12   Q.    So that would have been somebody internal to Cognizant

13   that you were asking for, right?

14   A.    Yes.

15   Q.    But the other expert that we talked about, somebody with

16   regard to the permitting process in Tamil Nadu, that would have

17   been a third party outside that you were asking them to help

18   you to find because you couldn't -- which I would try to find

19   one on Google.

20   A.    Well, yeah, it was tough.  As I'm sure you know, when

21   you're trying to determine experts, you want to have a slate to

22   choose from.  And so assembling a number of experts that we

23   could evaluate and figure out who could help us, it was

24   challenging.

25              So like I said, we went down other avenues.  We also

Gingras-Direct-Lustberg

```
 1   asked the company to help us -- if they could help us identify
 2   someone to consider.
 3   Q.   Isn't it also the case -- and, again, just following up on
 4   the questions and answers that we had earlier with regard to
 5   providing direction.  Is it also the case that you requested
 6   that Cognizant assist you with doing certain forensic analyses?
 7   A.   I don't recall that specifically, although that sounds
 8   vaguely familiar.  I think in investigations, when we're trying
 9   to make an assessment of information that's been given to us,
10   there's obviously a forensic analysis that needs to be done.
11   We will do some, but sometimes we'll ask the company to give us
12   a sort of understanding of their forensic analysis perhaps
13   first.  So we may have asked them to do that.
14   Q.   So the specific forensic analysis, as I understand it,
15   that you requested they do here had to do with whether certain
16   emails or any emails had been deleted.
17           Does that ring a bell as to what you might have asked
18   them to do?
19   A.   If you have specific documents to point me to.  It doesn't
20   sound totally unfamiliar, but I don't recall specifically
21   asking them to do that.
22   Q.   Sure.  Let's take a look at Exhibit 43.  Now, this might
23   not -- hold on.  That might not be the best one.
24           Yes.  Let's take a look at Exhibit 44.  On 44 -- 44
25   is notes -- is this when you were still there?
```

United States District Court
Newark, New Jersey

1    A.    No.   This is after I left in June of 2018.

2    Q.    Fair enough.  So I won't ask about those.

3          You nonetheless -- do you have any recollection of

4    asking Cognizant to look into whether they could do an analysis

5    of whether emails had been deleted?

6    A.    Like I said, I have a vague recollection.  And I don't

7    know if that's because I've seen reference to it in the briefs,

8    but I don't -- I don't have a specific recollection of asking

9    them to do that.

10   Q.    How about with regard to chain of custody of certain

11   materials that were turned over?  Did you ask Cognizant to do

12   any chain-of-custody analysis with regard to, for example,

13   Mr. Schwartz's computer?

14   A.    I don't recall it.

15   Q.    Do you have -- and this may have been after your time --

16   and if so, you'll tell me.  Did it occur, during the time that

17   you were there, that the government requested that Cognizant do

18   an analysis of whether there was any *Brady* material in the

19   information that had been provided?

20   A.    Well, it certainly didn't happen when I was there.

21   Q.    When you say it certainly didn't happen when you were

22   there, why are you so sure about that?

23   A.    Because I wouldn't have asked the company to do a *Brady*

24   analysis.

25   Q.    Why is that?

1    A.   Because of that's my job as the prosecutor.

2    Q.   Okay.  In fact, because it's your job as a prosecutor, you

3    probably keep a file from early on of materials that you think

4    might end up being *Brady*, right?

5    A.   I don't know if I would have kept a log or a folder or

6    something if I would have seen any.

7    Q.   Okay.  Let me just go back.

8            Again, just with regard to your point about not

9    providing directions, it was the case, wasn't it, that at times

10   the government would provide guidance to Cognizant with regard

11   to the sequencing of interviews.  Does that ring a bell?

12   A.   I don't recall inviting guidance on the sequencing of

13   interviews.  That would be surprising.  I think the most --

14   what we would have done -- and I don't remember doing it in

15   this specific case, but we might at times ask a company to hold

16   off on doing an interview if we wanted to do the interview

17   first.  We might ask the company to hold off on taking certain

18   steps if we were trying to take our own steps.

19           But usually that was for a very limited time and it

20   was not done without some trepidation because, again, we were

21   trying to be thoughtful and cognizant of trying not to

22   interfere in whatever the company was doing in its own

23   investigation.

24   Q.   Okay.  Take a look, if you would, at Exhibit 26.  And it's

25   the last page, page 11, of that exhibit.

1        Actually, before you do it, if you have it in front
2    of you, if you could identify that -- what that exhibit is.
3    A.   26?
4    Q.   Uh-huh.
5    A.   Again, I think these are paralegal notes of a meeting.
6    Q.   And it was a meeting that you attended, right?
7    A.   Yes.
8    Q.   Okay.  So let's go to the last page.
9    A.   Okay.
10   Q.   It says -- in the second-to-last bullet point it says,
11   "McLoughlin, Dana, Casari."  And after Casari it says, "After
12   DOJ speaks to him.  Others will be interviewed December or
13   later."
14        Does that make it sound like you wanted the --
15   Cognizant to talk to Mr. Casari after DOJ had spoken to him?
16   A.   "Action Items."  I apologize.  Can I review this for one
17   second?
18   Q.   Sure.
19   A.   Okay.  Sorry.  What was the question?
20   Q.   So the question is, is this exactly what you were talking
21   about, where this is a situation where the government said, you
22   know, we're going to interview them first, then you can
23   interview them later, right?
24   A.   I don't -- I don't remember because this seems to indicate
25   that they had already interviewed him and were telling us about

1  that interview.  So I don't know if they were going to

2  interview him again.

3  Q.  So it says "Casari (after DOJ speaks to him)."

4       That makes it sound like there's a request that they

5  hold off on speaking to him until after DOJ speaks to him.  Am

6  I reading that incorrectly?

7  A.  I don't know if we had made a request or I don't know if

8  they were telling us what they were going to do.  And so I

9  don't know what the --

10  Q.  Okay.  So this could be that they were just holding off on

11  speaking to him of their own accord until after DOJ spoke to

12  him; is that right?

13  A.  It could be, or it could be we've asked them to --

14  Q.  Right.

15  A.  -- hold off because --

16  Q.  Because you said -- sorry.  I apologize.  I didn't mean to

17  talk over you.

18  A.  Sorry.  Go ahead.

19  Q.  I think one thing you said before is that sometimes you

20  would ask parties that were cooperating with you in this way to

21  hold off on interviews, right?

22  A.  Correct.

23  Q.  In fact, that happened here as well with regard to

24  somebody -- if I said T. Sridhar, do you know who that is?

25  A.  I know the name; I don't remember who that is, though.

1  Q.   So based upon disclosures from the government, we've been

2  told that it wanted to interview him first before -- he's an

3  executive at Cognizant -- before DLA did.

4  A.   Okay.

5  Q.   And that's the kind of thing you're talking about that

6  does happen, right?

7  A.   That sounds like it, yes.

8  Q.   Again, in terms of providing direction to DLA as they did

9  their job, there were times when DOJ would make requests about

10  the way documents should be handled, about -- in particular

11  about identifying documents that were being reviewed -- that

12  would be reviewed with witnesses.

13         Do you remember having those conversations with DLA?

14  A.   I recall asking -- we -- the team asking for documents

15  that were shown to witnesses that were interviewed, yes.

16  Q.   So if I understand correctly, what you're saying is that

17  you would ask DLA to keep track of the documents that were

18  being shown to witnesses so that you would know what they were,

19  right?

20  A.   Well, I don't know if we were asking them to keep track.

21  I think every law firm that does this keeps track of a binder

22  of documents that they have the interview with a witness.  And

23  so --

24  Q.   Yes.

25  A.   -- we would ask them to provide those to us before we

1    spoke to them.

2    Q.   Let me just show you just along these lines Exhibit 27.

3    A.   Okay.

4    Q.   Again, we're just talking about the subjects we were

5    discussing before.  At the top there's a dialogue between you

6    and DLA and Oz.  I just want to see if I understand it.

7            It says -- so DLA says -- and by the way, do you know

8    who -- just looking at this, this is February 14, 2017.  It's

9    after the time period but obviously relating back to what we

10   talked about before.

11           On February 14th do you remember meeting with or a

12   conversation -- a call, it looks like, with DLA on February 14,

13   2017?

14   A.   I don't recall the call specifically.

15   Q.   It wasn't a big deal for Valentine's Day or anything?

16   A.   Probably not.

17   Q.   Wouldn't have been for me either, but don't tell my wife.

18           Anyway, it says, "Sridhar's testimony has evolved and

19   his memory has gotten better."

20           Do you remember what that was about?

21   A.   I don't remember specifically what it was about.  I think

22   it's clearly about their -- they'd interviewed Sridhar more

23   than once and that his testimony had changed or his statements

24   had changed and his memory had been refreshed.

25   Q.   Let me make sure I understand.  So what you're saying is

1  that, through the course of these various interviews with DLA,

2  Mr. -- well, it's not his last name, which I can't pronounce,

3  but Sridhar's --

4          THE COURT:  We're getting a little far afield here,

5  sir.

6          MR. LUSTBERG:  Well, no, this goes to the

7  direction --

8          THE COURT:  It's not a deposition.  Let's -- we're

9  talking about the issue of domination or not of the company by

10  the government, and the ins and outs of --

11          MR. LUSTBERG:  You're right.  So I'll get off this

12  Sridhar piece.

13  BY MR. LUSTBERG:

14  Q.  But the point I really wanted to talk about here was the

15  documents.  And this is just what we were talking about before.

16  Where it says KG, that's you.  "It would be helpful to keep

17  track of what is being shown to him for the first time."

18          Do you see that?

19  A.  Correct.

20  Q.  And so that's what you were referring to earlier, that you

21  said you weren't so sure that you told them to keep track, but

22  this looks like you're telling them to keep track, right?

23  A.  I think what I may have meant is the documents that he was

24  seeing for the first time, specifically, if he hadn't seen them

25  before, or it could be just asking them to keep track.

1    Q.   Why the documents that he's seeing for the first time?

2    A.   Well, if I'm interviewing a witness, I would just want to

3    understand what they'd said in other contexts and what their

4    answers would have been.  And especially if he's talking about

5    his answers changing or his recollection getting better, I

6    think I might have just been trying to piece together what was

7    it that was jogging his memory if he was seeing something for

8    the first time.

9    Q.   And then just a little bit later -- and I'm just going to

10   direct your attention to this exhibit just to do it quickly.

11   On Exhibit 28, page 2 of 6 at the top.

12   A.   Okay.

13   Q.   Now, the date on this is February 24th, 2017; so this is

14   before the government has done their interviews, Cognizant is

15   finishing up -- is doing theirs, right?

16   A.   I don't believe we had interviewed anybody at this point.

17   Q.   Right.

18   A.   I think Cognizant was continuing to do interviews --

19           THE COURT:  I'm sorry.  Say that date again, please.

20           MR. LUSTBERG:  It's February 24th.

21           THE COURT:  February 24th.

22   BY MR. LUSTBERG:

23   Q.   And you say to DLA, "Can we talk about it first if you're

24   going to show documents that people may not have received?"

25           Do you see that?

Gingras-Direct-Lustberg

1   A.   Yes.

2   Q.   Okay.  So what did you mean by that?

3   A.   Well, I mean, my practice as a prosecutor and

4   investigator -- and I think most of my colleagues -- was to

5   prefer to not show witnesses documents that they -- that they

6   weren't -- they didn't either author or receive or they weren't

7   cc'd or they hadn't seen before.

8           So that would certainly affect my own separate

9   investigation when I was going to interview that witness.  If

10  that person had seen documents that they weren't on, I would

11  want to know that.  And I would want to understand how that

12  played into the answers that they gave.

13  Q.   But if I understand this question correctly, you're saying

14  that, before they showed particular documents to people for the

15  first time, you want to discuss it with them, right?

16  A.   No, I said -- I think what I'm saying here is if they were

17  planning to show documents that people hadn't received

18  before --

19  Q.   Uh-huh.

20  A.   -- meaning they weren't sent to them or they weren't on

21  them, that I would want to talk about that first.  There may

22  be -- again, not to direct the company what to do, but to,

23  again, maybe ask the company to hold off on showing them that

24  document or something like that.

25          But just to understand what they were planning to do

United States District Court
Newark, New Jersey

1    with that witness because that would have an effect on my

2    investigation, my separate, independent assessment of that

3    person's credibility and the answers that that person gave me

4    when I spoke with that person.

5    Q.   Got it.  And that really goes to the question I'm asking,

6    and then I'll get off this line, which is you say that's not

7    direction, but it says, "Can we talk about it first if you're

8    going to show documents that people may not have received?"

9            It sounds like you're giving direction to Cognizant,

10   to their lawyers, as to how to handle these interviews in the

11   sense of, before they show them a particular document, you want

12   to see it first.

13   A.   I wouldn't put it that way.  I think I was asking can we

14   talk about it first.

15   Q.   Okay.

16   A.   I was sincere in that.  I don't think at this point DLA --

17   you know, it had been several months.  And I think any

18   colleagues who've worked with me before would know that I say

19   what I mean.  So if I said can we talk about it, I meant can we

20   discuss it.

21   Q.   Before they show it to the witness?

22   A.   Yes.

23   Q.   So between the time you got involved in this case in

24   September 2016 up until February 2017, Cognizant -- which had

25   begun its investigation even before that, you knew -- had

1   already conducted numerous interviews, right?

2   A.   I believe that's correct.

3   Q.   Right.  And, in fact, they conducted interviews of 44 of

4   the 45 people that the government ultimately interviewed; is

5   that correct?

6   A.   I don't know if that's correct, but that doesn't sound

7   impossible.

8   Q.   Pardon me?

9   A.   It doesn't sound impossible.

10  Q.   It doesn't sound impossible?

11  A.   Yes.

12  Q.   Okay.  And the way you found out about the interviews was

13  through a process of downloads, right?

14  A.   The -- yes.  I mean, that's the term people used.  The law

15  firm would read out to us the facts that were uncovered of what

16  a witness said in an interview.

17  Q.   Okay.  So how was it decided which downloads you would

18  receive?

19  A.   I can't remember specifically.  I think at times there

20  were sort of the obvious people that were relevant to the

21  conduct that we were investigating, and we may have asked

22  specifically for other people.

23  Q.   So I just want to make sure I understand.  So did

24  Cognizant present certain witnesses for whom they would do

25  downloads and then you supplemented them and said we want

1   others?  Or did you request that they download to you specific

2   witnesses?

3   A.   I can't recall.  It could have been a combination of those

4   things.  I just don't remember.

5   Q.   All right.  So did you ever check to make sure that you

6   got downloads of all of the witnesses that they had interviewed

7   to make sure that you understood the full scope of the

8   investigation?

9   A.   Well, I know they interviewed a lot of people that were

10  part of other sort of offshoots of their investigation.  I

11  think it was pretty massive.  And some we weren't interested

12  in; so I don't think we would have asked for downloads for

13  those witnesses.

14  Q.   Do you remember ever asking for downloads -- specifically

15  asking for downloads of witnesses that Cognizant had not

16  provided?

17  A.   I don't recall specifically.  I imagine that we would have

18  asked to hear about what people said.  And I can't remember if,

19  for example, Casari was one of those people.  But I have a

20  vague recollection; I just don't remember specifically.

21  Q.   Okay.  So based on the discovery we've seen, it looks like

22  Cognizant did 450 interviews, and we have downloads for 45 of

23  them.

24        Do you know whether -- how many downloads you had?

25  A.   I don't recall how many I had.  It certainly wasn't 400.

Gingras-Direct-Lustberg                    104

1   Q.   Would you be concerned -- if you knew there were a lot of

2   interviews and that you weren't getting downloads of all of

3   them, that you weren't getting the whole story?

4   A.   No, not in this case because I think there were, like I

5   said, a lot of -- there were a number of projects, a number of

6   parts of the business that the company's internal investigation

7   covered that I think the -- my AUSA colleague and I and the FBI

8   determined we weren't specifically interested in.

9              So if there had been people that we had heard about

10  or seen in emails when we were conducting our own review and we

11  knew that those people were interviewed, then we would try to

12  seek downloads of those people.

13  Q.   And I think I asked this before.  I apologize if I did.

14  But when you would get a download, would you do anything to

15  check to make sure that that download accurately reflected what

16  the person had actually said?

17  A.   Yes.  I mean, I think, as best I can recall, that I

18  would -- that we would -- you know, we were conducting our own

19  investigation and reviewing the documents, documents we were

20  getting from the company, from other sources.  And so, I mean,

21  I think we would evaluate downloads within that -- within that

22  context.

23             I mean, of course we were eventually going to

24  interview those people; so we were trying to get a full picture

25  of what they said.  And I think we might ask sort of specific

1    questions if we thought there were areas that we needed to

2    follow up on.

3    Q.    Okay.  There was one witness about whom we've received

4    information named -- first name is Venkatesan, and this is

5    during the time that you were there.

6             So let me show you Defense Exhibit 31 -- I'm sorry.

7    Yes, that will tell you who that is.

8             Do you remember this witness?

9    A.    I'm sorry.  Defense Exhibit 31?

10   Q.    Right.

11   A.    Oh, Venkatesan.  No, I don't remember who this is.

12   Q.    So when you say you don't remember, is that because there

13   was no download of this witness?

14   A.    No.  I don't remember -- I don't know whether there was a

15   download or not.  I don't remember a lot of these names.  It's

16   been many years.

17   Q.    So we don't see a memo of a download, which may or may not

18   mean anything, but you don't have a recollection of a download

19   from this witness, Venkatesan?

20   A.    I don't remember a --

21   Q.    Okay.  Okay.

22   A.    -- download.

23   Q.    In particular, let me see if you would remember it because

24   this witness denied receiving bribe demands.  This was the

25   project manager for KITS, for the KITS Campus, which, as you

1    know, is the subject of the bribe, and denied the payment of

2    any bribe and so forth.

3              You would remember if you had gotten that download,

4    right?

5    A.   Maybe.  I recall that there were a number of people who

6    were involved in the project who denied knowing anything about

7    the bribes.

8    Q.   Okay.  So there were a number of people involved in the

9    project who said they had no knowledge of the bribes?

10   A.   I recall that there were certainly some.

11   Q.   This is the project manager.  Doesn't ring a bell at all?

12   A.   I don't recall it.

13   Q.   Okay.  Thanks.

14             How about the downloads that you got of, let's say,

15   Mr. Schwartz's interview, his September 23rd, 2016, interview?

16   Do you remember receiving that download?

17   A.   I know we did.  I can't recall the specifics of it.  I

18   don't know if it was that October 6th meeting where we had the

19   first meeting or if they went into more detail at a later time.

20   Sometimes they would give us sort of just an overview, and then

21   we would get sort of more detail on a separate occasion.

22   Q.   Okay.  I want to show you the interview memo with regard

23   to that interview of Mr. Schwartz, which is Exhibit 57 in your

24   binder.

25             MR. LUSTBERG:  Don't put it up, please.

```
 1   A.    Okay.

 2   BY MR. LUSTBERG:

 3   Q.    I take it you never saw this, right, because that's the

 4   kind of thing that you wouldn't ask for since you thought it

 5   would be privileged, right?

 6   A.    Correct.

 7   Q.    And my question is -- and directing your attention to

 8   page 5 of that.

 9           MR. LUSTBERG:  Again, please don't put it up.

10   BY MR. LUSTBERG:

11   Q.    Sorry.  The last paragraph on that page.

12   A.    Okay.

13   Q.    You see where it says that Mr. Schwartz had a call and

14   said that he had reported up the information that's there in

15   that paragraph, which I'm not going to say because this

16   isn't -- it's not public.

17   A.    Sorry.  One minute.

18   Q.    Yeah.  Mr. Schwartz talked to members of the board with

19   regard to this matter, indicated that he reported up what he

20   had learned after Monday, August 8th, because of the amount at

21   issue, the specificity, and the ongoing investigation.

22           Do you see that?

23   A.    Yes.

24   Q.    Was that information of which you were made aware by

25   Cognizant?
```

```
 1   A.   It doesn't sound totally unfamiliar, but I don't recall
 2   specifically.  I know that there was -- seem to recall them
 3   telling us that he had raised issues like this.
 4   Q.   When you say "raised issues like this," they told you that
 5   he had raised issues with regard to this transaction and, even
 6   though he's charged with it, that he had reported it up to
 7   people above him?
 8   A.   I don't remember this -- not this specific transaction.  I
 9   guess what I'm saying is I remember them -- I guess I'm sort of
10   confused with what the context is, what this actually is.
11   Q.   Take a look.  This is a section that says "Response to
12   potential improper payments."
13   A.   Okay.
14   Q.   And this is a memo of the September 23rd interview that
15   the government apprised you of.
16        What I'm asking you, do you remember them apprising
17   you that, some time after a call on Monday, August 8th,
18   Mr. Schwartz reported up what had occurred because of the
19   amount an issue, the specificity, and the ongoing
20   investigation?
21        Do you remember being told that by counsel for
22   Cognizant?
23   A.   Sir, what is the amount at issue?
24        Can I have one minute to just read this --
25   Q.   Absolutely.
```

1   A.   -- page?

2   Q.   Sorry.  Yes.

3         THE COURT:  Listen, I get it, and I'll permit you to

4   put in selected parts, but we've got to have an intelligible

5   record here.

6         MR. LUSTBERG:  Pardon me?

7         THE COURT:  We've got to have an intelligible record

8   here.

9         MR. LUSTBERG:  Yeah.

10        THE COURT:  This record cannot read, well, you see

11  this thing over there?  Well, did you know about that?  Help us

12  out a little bit.

13        MR. LUSTBERG:  Okay.  One second.  Let me make sure

14  this hasn't been redacted.

15        (Discussion off the record between counsel.)

16        MR. LUSTBERG:  Judge, I can do this.  I just wanted

17  to make sure I wasn't doing something that had been redacted

18  since we're in open court.

19        Jesse, if you can just pull up Exhibit 57, fifth page

20  and the bottom paragraph.

21  BY MR. LUSTBERG:

22  Q.   And it says, "Schwartz continued" -- at his interview --

23  "that after the Monday, August 8th, call with Mani, Dana got on

24  a call with Frank -- Francis D'Souza ("Frank"), chief executive

25  officer, and Karen McLoughlin, chief financial officer,

Gingras-Direct-Lustberg                    110

1    followed by a call with the audit committee chair.  Schwartz

2    also spoke to all but one member of the board.  In this case

3    Schwartz indicated that he 'reported up' because of the amount

4    at issue, the specificity, and the ongoing litigation [sic]."

5              My question to you is that, when you got the download

6    of this information, was that information made available to

7    you?

8    A.   This doesn't sound totally unfamiliar to me.  So I don't

9    recall specifically, but -- and I guess my question is, is this

10   about the $330,000 demand?  Is that what we're talking about

11   that's earlier on the page?

12   Q.   Yeah.  I mean, you have the same information as I do.

13   A.   Yeah.  So, again, that sounds familiar to me; and so I

14   think I heard it at some point, but I don't recall specifically

15   when.

16   Q.   Okay.  And you don't recall whether it was specifically

17   part of a download that you received from Cognizant?

18   A.   I don't.

19   Q.   Okay.  Just to reiterate and ask a couple questions about

20   this, and we're getting close to being done here.

21              The road map -- strike that.

22              We talked about the fact that Cognizant's counsel had

23   interviewed all of the witnesses before the government did,

24   correct?  Except for one.

25   A.   I don't know that, but I'll assume it, sure.

Gingras-Direct-Lustberg                    111

1   Q.   Okay.  Does that concern you that, by doing that,

2   Cognizant will have -- in many cases, interviewing them more

3   than once, will have influenced what they're going to say to

4   you?

5   A.   Sure.  I mean that would be something I would take into

6   consideration, absolutely.

7   Q.   Uh-huh.  And you would take it into consideration because

8   it's possible -- not just possible that people, once they say

9   things and say things multiple times, then they'll stick to

10  that story, right?

11  A.   Yes, stick to that story or change their story or any

12  number of things.

13  Q.   Right.  Well, in terms of whether that occurred here, are

14  you -- one of the things you said before is that sometimes the

15  government would prefer to interview somebody first, right?

16  A.   Correct.

17  Q.   And one of the reasons for that is because the government

18  wants to get the first crack at them before their story is told

19  to somebody else because that can influence what they say,

20  right?

21  A.   In certain circumstances, yes.

22  Q.   And my question is, when you have all those interviews

23  that are done in advance, isn't it really the case that what

24  Cognizant has done is kind of created the narrative for what

25  the government is looking at by the time they come in six

1    months later?

2    A.    No, not necessarily.

3    Q.    Okay.  When you say not necessarily, under what

4    circumstances would that not be the case?

5    A.    Well, because the team -- the AUSA and I and the FBI were

6    conducting our own assessment of the information that Cognizant

7    is providing us, the information that we are getting from other

8    sources, and law enforcement steps we're taking.  We're doing

9    document review.  I remember hiring a -- we hired a third-party

10   vendor to actually help us because it was so voluminous.  So we

11   were actually trying to get our arms around and understand what

12   it was we were looking at.

13           And we knew we'd gotten a version of events from the

14   company, but that was the company's version.  We're not on the

15   same team, and I understand they have an agenda.  They want

16   cooperation credit, and they want a certain result at the end

17   of the day.  But we're doing our own -- we're taking our own

18   steps to understand the case and focus our investigation on

19   where we're trying to go.

20   Q.    Right.  I totally understand.  And my question for you is,

21   though, if you're trying to assess the credibility of their

22   version of what occurred, which is what you just said, that you

23   assess whether their version of what occurred is the one that

24   the government accepts, right?  That's what you said?

25   A.    That I accept it?

Gingras-Direct-Lustberg                                    113

1   Q.   Yes.  So the question is Cognizant presents you with a

2   narrative of what they believe occurred, right?

3   A.   Yes.  They gave us the facts as they understand them.

4   Q.   Right.  And you want to take a good, hard, neutral look at

5   that to make sure they're the facts that the government

6   accepts, right?

7   A.   Correct.

8   Q.   And that's true in part because Cognizant and the

9   government don't have the same interests, right?

10  A.   Correct.

11  Q.   And Cognizant's interests are -- leaving aside getting

12  cooperation credit, they may have a particular version of

13  events that they wish to, you know, advance, right?

14  A.   Sure, yes.

15  Q.   So your job is to take a good hard look at that and make

16  sure that's what you think is the correct version of events,

17  right?

18  A.   Right.  My job is to determine what I think the actual

19  version of events were.

20  Q.   Right.  And my question is isn't it the case, though, that

21  that's harder for you to do if you're doing it after they've

22  interviewed all the witnesses and produced all the documents

23  because it kind of lays out the foundation or road map for what

24  it is that you're seeing?

25  A.   Well, I think there certainly are challenges and there's

Gingras-Direct-Lustberg                114

1    advantages to that as well.  I mean, part of, you know, what

2    the department struggles with -- the Department of Justice and

3    any investigator is going to struggle with is, you know, we

4    can't just tell the company to stand down and stop.  We're

5    trying to also learn the case.

6           Like I said, there's tons of documents in this case.

7    We're trying to get our arms around what actually happened.

8    I'm not going to interview someone until I have a real solid

9    understanding of documents and what -- that will form the basis

10   for what I can actually interview that person on.

11   Q.   Right.

12   A.   So, you know, there may be times where it's appropriate to

13   ask a company to hold off if I'm ready to go or we're ready to

14   go, but in other instances -- you said that they'd been

15   investigating for months.  I don't know that they were

16   investigating this specific conduct for months ahead of time.

17   I don't know where they were, but they seemed to be continuing

18   on their investigation and taking their own investigative

19   steps.

20   Q.   Okay.  Let me unpack that a little bit.  Let me just talk

21   about that last part first.

22          You knew that from September, early September 2016,

23   when you were brought into this case, until you started doing

24   your investigation, interviewing people, subpoenaing documents,

25   that sort of thing, beginning in February of 2017 --

1    A.   Well, I apologize.

2    Q.   No.  Go ahead.  I want the facts correct.

3    A.   Our first interview may have been in February, but that

4    wasn't -- we had not started an investigation.

5    Q.   Fair enough.  So let me ask my question differently.

6            So between the time that you got involved in the case

7    in early September of 2016 until the time you began doing

8    interviews and subpoenaing documents, which begins in February

9    of 2017 --

10   A.   Uh-huh.

11   Q.   Do I have those facts right?

12   A.   The interviews, yes.

13   Q.   Subpoenas are later, right?

14   A.   Yeah, I don't recall when subpoenas were.

15   Q.   So in that time period they were investigating exactly the

16   same things as you were investigating, right?

17   A.   Well, I'm sure there was overlap.  I took their

18   investigation to be also broader in other areas.

19   Q.   So you think that during that time period they were

20   investigating other things as well?

21   A.   That's what I -- what I think I recall.

22   Q.   Okay.  In any event, you said that there are times when

23   the government asks companies to stand down on their

24   investigation so that they can do -- so that it, the

25   government, can do its investigation, right?

Gingras-Direct-Lustberg                      116

1   A.   Well, I wouldn't say -- there's not a time where you ask a

2   company to stand down.  You might ask -- or the team might ask

3   the company to not take certain steps until we can take them.

4   But the direction for department prosecutors is very clear that

5   you're not to do that lightly and that it's supposed to be for

6   a limited period of time.

7   Q.   So I thought I heard you say before that the government

8   cannot ask a company to just stop its investigation so that you

9   can investigate.  Am I right about that, or is that not true?

10  A.   I think that would be pretty unusual to stop -- to ask a

11  company to just stop doing an internal investigation.

12  Q.   So I just have a few more areas that I just want to go

13  into, but we're almost done as I said.

14         So my information is that you received a number of

15  voluntary productions of documents that Cognizant turned over

16  before there were any subpoenas, right?

17  A.   I believe that's correct.

18  Q.   And, in fact, there were no subpoenas at all during the

19  time period that you were there.  Am I right about that?

20  A.   I don't know.  That seems like a fact that could be

21  verified, but I don't recall.

22  Q.   It absolutely can be verified.

23  A.   Subpoenas to the company.

24  Q.   To the company, yeah.

25         So if I represent to you that there were no subpoenas

1   to the company until November 8th, 2018, which is after you

2   were gone, do you accept that that's -- may very well be true?

3   We can get it.

4   A.    Could be.

5   Q.    And you know that when -- one of the advantages of issuing

6   a subpoena is that a recipient of a subpoena knows what they

7   have to produce, that is, what's responsive to the subpoena,

8   right?

9   A.    Correct.

10  Q.    In the absence of a subpoena, they're instead making

11  determinations as to what they think is relevant, because

12  there's no responsiveness; is that fair?

13  A.    No.  They could be responding to oral requests that I

14  made.

15  Q.    Okay.  So either responding to oral requests or -- are you

16  aware that in this case Cognizant made certain determinations

17  as to what was relevant?

18  A.    No, although "relevant" I know has a very specific term.

19  I don't know that they thought they were making relevance

20  determinations for the purposes of, you know, a criminal trial

21  or that sort of thing.

22  Q.    Let me see if I have anything that would be helpful here.

23  We'll wait.

24        I did want to ask about privilege.  During the time

25  that you were there, do you recall receiving a privilege log?

Gingras-Direct-Lustberg                                    118

```
1    A.   I don't recall specifically, but I believe we did.

2    Q.   So let me just show you -- just look in your notebook

3    because this is not the kind of thing that you can easily --

4    A.   Okay.

5    Q.   Take a look at Exhibit 42.

6    A.   Okay.

7    Q.   Do you recognize that privilege log?

8    A.   I recognize it as a privilege log and -- based on the date

9    that it was produced, but I don't -- I haven't reviewed this

10   recently; so I don't recall it specifically.

11   Q.   And I'm sorry.  I didn't hear you.

12   A.   I'm sorry.  I recognize it as a privilege log and I see

13   the date on there, but I don't recall specifically this.

14   Q.   So when you say you don't recall specifically, do you know

15   if you reviewed this privilege log to determine whether the

16   assertions of privilege were appropriate?

17   A.   I don't recall specifically reviewing this privilege log.

18   If I had had it, I assume that I would have.

19   Q.   Well, the purpose of a privilege log, right, is for the

20   recipient of the log, the government in this case, to determine

21   whether the assertions of privilege are appropriate, right?

22   A.   Right.

23   Q.   And this one says it was received -- I think this is

24   January 11th, 2018, which was a few months before you departed

25   the scene, right?
```

1   A.   Six months.

2   Q.   Six months.   Thanks.

3        But you have no recollection of whether you

4   reviewed -- whether you received or reviewed this privilege

5   log?

6   A.   I don't know whether I did.   Either I did or Oz or Andrew

7   Bruck or whoever the AUSA.   Someone must have looked at this.

8   Q.   I want to just ask you about a couple of the entries on

9   it, just literally a couple, to ask you whether that refreshes

10  your recollection about receiving it.

11       Take a look at page 111.

12  A.   Sorry.   Okay.

13  Q.   What I want to ask you about in particular is that there's

14  a document in the middle of the page dated April 29th, 2016,

15  and it says, "Text message which I received in my personal" --

16  I think it meant to say "on" -- "on my personal mobile."

17       It's between Mani.   And you know who that is, right?

18  A.   Yes.

19  Q.   And Gordon Coburn.

20  A.   Okay.

21  Q.   With a copy to Sridhar.   Do you see that?

22  A.   Yes.

23  Q.   You're aware, aren't you, that none of those people are

24  lawyers?

25  A.   Yeah.

Gingras-Direct-Lustberg

120

```
1    Q.   So my question is going to be, how could there be an

2    assertion of attorney-client privilege there?

3    A.   I don't recall this.  I can imagine ways in which it could

4    be -- there could be an assertion of privilege.

5    Q.   What are those ways?

6    A.   If they're repeating --

7              THE COURT:  Let's not get into imagining the possible

8    basis --

9              MR. LUSTBERG:  Okay.  That's fine.

10             THE COURT:  -- for assertion of privilege of a

11   document he can't remember ever seeing before.

12             MR. LUSTBERG:  Okay.  Got it.

13   BY MR. LUSTBERG:

14   Q.   Okay.  The final area I just want to go into is, as we

15   mentioned earlier, you were present for the presentation that

16   Cognizant made with regard to the so-called Filips Factors?

17   A.   The Filip Factors, correct.

18   Q.   Filip, one, no plural.  Okay.  The Filip Factors.  That

19   was May 10, 2018, shortly before you departed.  Do you remember

20   that?

21   A.   Yes.

22   Q.   And those presentations were aimed at showing why

23   Cognizant should be granted leniency.  In this case they were

24   specifically requesting a declination, correct?

25   A.   Yeah.  I think when companies come in and are trying to
```

1   cooperate, at some point they do a presentation based on

2   factors that were set forth in the former Deputy Attorney

3   General Mark Filip's factors that he laid out, and it's since

4   been incorporated into the U.S. Attorneys' Manual as factors

5   that the prosecution is supposed to consider when deciding

6   whether to charge a business organization or reach some other

7   resolution with them.

8   Q.   Right.  And you're aware -- one of the things that they

9   consider -- that you consider, you the government, at that

10  point is not only what's in the U.S. Attorney Manual and the

11  Filip memo but also, much discussed here, the Yates Memo,

12  right?

13  A.   Yeah.  Although I think -- well, I don't recall at that

14  time if the Yates Memo had all been incorporated into the U.S.

15  Attorneys' Manual, but yes.

16  Q.   And the Yates manual [sic], doesn't it focus largely on

17  issues of individual accountability and requires that

18  corporations provide information if they want to receive full

19  credit about any facts relevant to persons whom they identify

20  as involved in misconduct; is that fair?

21  A.   Yeah.  Well, I think that's correct.  I'd have to look at

22  the exact language, but I think it's -- any relevant facts, but

23  yes.

24  Q.   The point is both the Yates Memo and you mentioned earlier

25  the FCPA Pilot Program, which is now the FCPA corporate

1  enforcement policy, are really all about individual

2  accountability, correct?

3  A.   Well, they're certainly focused on incentivizing

4  corporations to cooperate with the government because the

5  government's focus is supposed to be for a variety reasons on

6  holding individuals accountable, correct.

7  Q.   And that was a big focus, wasn't it, of Cognizant's

8  presentation to you with regard to the Filip's Factors, right?

9  When I say that was a big -- let me word it more clearly.

10         A big focus of that presentation was that they had

11  brought about individual accountability with regard to

12  Mr. Coburn and Mr. Schwartz; is that fair?

13  A.   Well, that was part of it.  I mean, there's a number of

14  factors, and some of the factors are mitigation factors and

15  others are aggravating factors.  So they addressed the

16  aggravating factors as well as mitigating, and part of their

17  mitigating argument for mitigation was their cooperation.

18  Q.   And, in fact, that was a big part of it.  And not only

19  their cooperation, their cooperation against Mr. Schwartz and

20  Mr. Coburn, right?

21  A.   Well, I wouldn't call it cooperation against Mr. Schwartz

22  and Mr. Coburn, but they certainly provided information about

23  the culpability of Mr. Schwartz and Mr. Coburn.

24  Q.   Well, you're saying not against, but I want to show you a

25  couple of things.  So let me show you Exhibit 29.  This is not

```
 1  a document -- well, why don't you look at it and see if you've
 2  seen this before.  This is the outline.
 3  A.   I have not seen this before.
 4  Q.   You have not seen that before.  So I'm going to ask you
 5  whether this happened.  Take a look at page 13.
 6  A.   Okay.
 7  Q.   And under remediation, which you just mentioned, it says
 8  that "The company insisted" -- underlined -- "on cooperation,
 9  (including interviews) from both Schwartz and Coburn.  Both
10  resigned after DLA confronted Schwartz with his notes,"
11  et cetera.
12          Do you recall that that was a part of Cognizant's
13  Filip Factor presentation?
14  A.   I have a vague recollection that that was -- they
15  certainly talked about Schwartz and Coburn; so I don't dispute
16  that they may have said this.
17  Q.   Let me do one that I think you wrote yourself.  So take a
18  look at Exhibit 49.
19  A.   Okay.
20  Q.   Sorry.  Here we go.  Under Cooperation, point 4.
21  A.   Yup.
22  Q.   It says -- these are your notes, right?
23  A.   These look like my notes, yes, sir.
24  Q.   It says "Proactive cooperation:  Karl and his team
25  doggedly persisted interviews with GC and SS."
```

1          Do you see that?

2    A.    Yes.

3    Q.    And when you say that it was not cooperation against them,

4    I mean, this presentation was focused on what they had done

5    with regard to GC and SS, right?

6    A.    Yes, that was certainly part of it.

7    Q.    Sorry.  I'm flipping around a little bit here.

8          Just to go back to an exhibit we looked at before,

9    take a look at Exhibit 17, page 6.

10   A.    Okay.  These are the paralegal notes?

11   Q.    Yup.

12   A.    Right?

13   Q.    Yup.  You see where it says in the middle of the page KR?

14   A.    Yup.

15   Q.    This one -- page 6, do you see that?  "This one is in the

16   category of proactive cooperation.  Karl and his team persisted

17   in securing additional interviews with the president and the

18   GC.  That too doesn't always happen and it's a distinguishing

19   factor."

20         You know that KR is Kathy Reummler.  And so, again,

21   my question is only -- you know, when you look at this -- I

22   understand that they addressed other things.  A big focus of

23   that presentation, wasn't it, in terms of getting the

24   declination that they ultimately got was to say that they had

25   cooperated against these two individuals?

Gingras-Direct-Lustberg

125

```
 1   A.   Well, I'm not denying that it was the focus.  And it made
 2   sense.  I mean, if you're -- again, there's mitigating and
 3   aggravating factors.  And the biggest aggravating factor for
 4   the company was the fact that the former general counsel and
 5   the former president were engaged in this conduct.  So it made
 6   sense that they were, as a mitigating factor, trying to show
 7   the cooperation that they had provided with regard to those two
 8   individuals.
 9   Q.   I take it you weren't around at the time that the ultimate
10   decision was made as to whether to grant them the declination
11   or not?
12   A.   No, I left shortly after this.
13   Q.   So you can't really say what role it played, but you can
14   say that it was a big focus of their presentation, right?
15   A.   It was certainly an important aspect of their
16   presentation, yes.
17   Q.   Right.  And along those lines, take a look at that same
18   exhibit, actually, pretty much the same page but on to page 7.
19   Sorry.  I've got the wrong one.
20        Actually, the top of page 7.  "We are also confident
21   we have done everything we can to provide key evidence
22   regarding the former officials who are the key wrongdoers.
23   That was complicated by the fact that one was a GC; so that
24   required an enormous amount of effort.  Hundreds of pages of
25   documents were produced as a result of the Schwartz review.
```

1              "Subsidiary relating to Schwartz that the company

2     did:  Investigated amnesia defense (by collecting medical

3     records and providing to department)" -- department meaning

4     DOJ; is that right?

5     A.   I think that's right.

6     Q.   Yup.

7              "SEC, looked at whole line.  That falls squarely into

8     proactive cooperation.  We also collected his Apple notes and

9     engaged in an effort to help you all authenticate those and the

10    handwritten analysis.  Forensic deletion on his laptop."

11             We talked a little bit before about forensic

12    deletion.  So is this telling you that they did all of that

13    with regard to cooperating against Mr. Schwartz?

14    A.   Yes.  This seems to reflect that they are suggesting that

15    all of this should be mitigating for them as part of their

16    cooperation.

17    Q.   Cognizant argued that day that it had done everything it

18    possibly -- I'm sorry -- responsibly could do to provide key

19    evidence involving its former general counsel.

20             Do you remember them saying that?

21    A.   That sounds correct.

22    Q.   Do you agree that they had done everything that they could

23    do to provide evidence against their former general counsel?

24    A.    I don't know, sitting here today, if I could say that they

25    had done everything.  I don't -- I'd have to think about all

1   the steps they took.  I haven't sort of thought through this in

2   quite a while.

3   Q.   Okay.  Just one last question, which is this:  From the

4   time that Cognizant came to DOJ and self-reported this, their

5   focus was on Mr. Schwartz and Mr. Coburn.  Would that be fair

6   to say?

7   A.   I don't think that would be fair to say.

8   Q.   Okay.  Tell me why that's not fair to say.

9   A.   Because it seemed like they were conducting an

10  investigation and trying to figure out who else had knowledge

11  and who else was involved.

12  Q.   Uh-huh.  And do you know what they did in order to exclude

13  other people?

14  A.   Well, sitting here today, I don't recall specifically, but

15  they interviewed a lot of people and reviewed a lot of

16  documents.

17  Q.   Uh-huh.  And is it your testimony that you didn't get the

18  sense during that time period that -- well, let me back up.

19       Based on your conversation with them, you understood

20  that they understood that, in order for them to satisfy the

21  individual accountability provisions of the Yates Memo and of

22  the FCPA Pilot Program at the time, that it was incumbent upon

23  them to provide, I think you said, all relevant information

24  with regard to individuals, right?

25  A.   I think that's a fair summary of what the Yates Memo --

Gingras-Direct-Lustberg

128

1    Q.   Right?

2    A.   -- required --

3    Q.   I'm sorry --

4    A.   -- or any relevant --

5    Q.   My bad.

6         And it was -- and you understood from early on,

7    because they were telling you early on, that that's what they

8    were doing, right?

9    A.   I don't recall ever having a specific conversation about

10   the pilot program or the Yates Memo or anything like that.

11   Q.   You don't -- not even -- not from early on in the process?

12   A.   No.  I don't have a recollection of that.  I certainly

13   understood that those policies were probably driving what they

14   were doing, but I never had a specific conversation about how

15   what they were doing would fit into any one of the policies.

16   Q.   Right.  And when you say you had an understanding that

17   that was what was driving what they were doing, where did you

18   get that understanding from?

19   A.   I think the fact that they self-reported and were trying

20   to cooperate with the government was indicative of -- as many

21   companies do, that they're trying to get cooperation credit.

22   And the process for getting that is laid out in various

23   policies and in the U.S. Attorneys' Manual and in the

24   sentencing guidelines.

25        MR. LUSTBERG:  Thank you.  I have nothing further at

```
 1    this time, Your Honor.

 2               THE COURT:  All right.

 3               Counsel for Mr. Coburn, do you wish to supplement

 4    here?

 5               MR. LEWIN:  I do, Judge, just briefly.  Does it make

 6    sense to do it now?

 7               THE COURT:  Yes.  Let's do it now.  Let's get this

 8    done and break.

 9               Nick, you may want this.

10                         (DIRECT EXAMINATION)

11    BY MR. LEWIN:

12    Q.   Good afternoon, Mr. Gingras.

13    A.   Good afternoon, Mr. Lewin.

14    Q.   When did DLA start interviewing witnesses as far as you

15    remember?

16    A.   I don't know exactly when they started interviewing

17    witnesses.  I knew they had been conducting an investigation

18    over the summer; so I assumed they had interviewed witnesses

19    then.

20    Q.   Do you recall when you first became aware that DLA was

21    conducting interviews of witnesses?

22    A.   It had to have been in the first meetings, sometime in

23    September or at least in October when we had that first

24    meeting.

25    Q.   The first call you had with them, is it fair to say that
```

United States District Court
Newark, New Jersey

1   was September 14th?

2   A.   I think that's correct.

3            MR. LEWIN:  Could we pull up Exhibit 4 just briefly.

4   BY MR. LEWIN:

5   Q.   I believe you'll see these are your notes as later

6   transmitted to someone else.

7            Do you have them in front of you?

8   A.   I've got them.

9   Q.   Does this refresh your recollection that in your first

10  telephone call they informed you that they had been conducting

11  interviews of potential witnesses?

12  A.   Yes.

13  Q.   And this first call, again, September 14th, 2016?

14  A.   Yes.  I mean, these are notes that I sent to Oz, who's the

15  AUSA with whom I was partnering on this.

16  Q.   You sent them approximately two weeks later, but they

17  reflect a meeting on the 14th, correct?

18  A.   Correct.

19  Q.   Do you know why it took two weeks before you sent them to

20  Oz?

21  A.   I think, based on some of the other emails I've seen, I

22  was overseas.  And I think we were waiting in anticipation or

23  we were trying to schedule this first sort of kickoff or

24  introductory meeting.  So I don't have a good reason why I

25  hadn't sent it to him before that.

```
1   Q.   That's fine.
2              I believe you testified in response to Mr. Lustberg's
3   questions that your best recollection, as you sit here now, is
4   that the first interviews that the Department of Justice
5   conducted were in approximately February of 2017.
6   A.   I think that's right.  I think the first one we did was of
7   Mani in February of 2017.
8   Q.   So fair to say that that's about five or six months later?
9   In other words, five or six months between when you initially
10  learned that Cognizant was conducting interviews and when you
11  conducted your first interview?
12  A.   Yes.
13  Q.   Now, during that period, you guys -- when I say "you
14  guys," I mean DOJ.
15             DOJ is not conducting interviews; Cognizant is,
16  right?
17  A.   Yes.  And DOJ includes the U.S. Attorney's Office and the
18  FBI.  Yes, we were -- we had not conducted any interviews
19  between that period of time.
20  Q.   Was any government agency conducting interviews?
21  A.   Not that I'm aware of.
22  Q.   The SEC was involved.  Were they conducting interviews?
23  A.   I don't believe so.
24  Q.   But you were getting summaries of witness interviews that
25  I think were referred to -- I'm not saying it's your term --
```

1   but as downloads, right, during this time period?

2   A.   Yes.   I believe we were getting information about the

3   interviews during that time.

4   Q.   So if you could just generalize.   If Cognizant is doing

5   interviews and you guys are not, in general terms, to the

6   extent you remember, what was DOJ doing between -- in the

7   context of this investigation between approximately

8   September 2016 and approximately February 2017 when you conduct

9   the first interview of Mani?

10  A.   I don't remember specifically what we were doing.   I know

11  that we were trying to get documents from L&T and from other

12  sources.   I can't remember when those started rolling in.   We

13  were reviewing documents that the company -- Cognizant was

14  giving us.   We would have been trying to -- I remember it being

15  very difficult to schedule a meeting with Mani because he was

16  overseas.

17          The visa issue was always very difficult to get him

18  into the United States, and that had caused a delay.   So we

19  eventually actually did it overseas.   So I think we were

20  generally trying to get our arms around the documents and the

21  conduct and try and formulate a plan to conduct our -- as we

22  conducted our own investigation.

23  Q.   Did you --

24  A.   We may have served process.   I don't recall specifically

25  what other steps we would have taken, but there certainly were

1   onces we could have taken.

2   Q.   Certainly, there were ones you could have taken.  But in

3   this case, you mentioned served process.  Certainly not on --

4   A.   Not on Cognizant.

5   Q.   -- Cognizant.  I think we can agree that happened later,

6   right?

7   A.   Right.

8   Q.   You testified -- in response to Mr. Lustberg's question,

9   you said, I believe, "At some point" -- this is you speaking.

10  "At some point, we started conducting our own investigation in

11  earnest."

12          My question for you is going to be when do you think

13  that was?  And I will just frame for you that the interview of

14  Mani that you described overseas -- I believe in Rome -- was on

15  or about February 7th, 2017.

16          When would you say you started, quote, conducting

17  your own investigation in earnest?

18  A.   I don't remember specifically, but it would have been

19  after a few weeks, after we started getting actual documents

20  from the company and started planning whatever steps we were

21  going to take.  I just don't recall specifically.

22  Q.   That's fair.  I understand this is in 2017.  We're some

23  years later.

24          Do you know during this time period whether DLA was

25  sharing every interview with you or just a subset of the

```
1    interviews they were doing?

2    A.   I -- whether they were sharing every interview?  I don't

3    know if I can remember how many interviews they'd done at that

4    point and if they shared them all with us.

5         Eventually, I heard the number 500, I mean; so

6    certainly they didn't -- we didn't ask for or get information

7    on all 500 interviews.

8    Q.   Yes.  I think what you're referring to is in the Filip

9    Factors presentation, Cognizant claimed to have done 450

10   interviews and downloaded 45 of them to the department.

11        And as you sit here now, do you know whether DLA was

12   sharing the entire interview with you -- with the Department of

13   Justice or just the parts they chose to share?

14   A.   Well, I've never -- until -- well, I don't think I've ever

15   seen the interview memos.  So I think they were giving us sort

16   of general outlines.  We would follow up and ask for more

17   information as the occasion called for it.  So I don't think

18   they were reading line by line everything that happened in the

19   interview.

20   Q.   Do you recall discussions with Cognizant about the fact

21   they were still asserting privilege over certain aspects of

22   certain interviews and therefore not sharing them at that

23   point?

24   A.   I don't remember that.

25   Q.   That's totally fair.
```

1          Was it helpful -- when you started conducting

2     interviews, was it helpful to have the downloads?

3     A.    I don't recall specifically, but I can't imagine that it

4     wouldn't be helpful to know what a witness has said previously,

5     especially on the same topics, before I question that witness.

6     Q.    Say more about that.  Why would that -- I think you said

7     you can't imagine why it wouldn't be helpful, but I'll just

8     flip it around a little.

9          Why would it be helpful to see what a witness has

10    said previously on the same topics before you yourself as a

11    representative of the Justice Department had to interview that

12    witness?

13    A.    Well, if I know how they've answered the question

14    previously, I can make my own credibility assessments.  I can

15    make my own assessment of what their recollection is, of

16    whether their story has changed previously or if it's

17    consistent.  I mean, there's a number of things that I can sort

18    of judge for myself in the same way that I would if I were

19    interviewing any other witness who had previously made

20    statements to someone else on the topic.

21    Q.    Right.  Is it fair to say it was likely you were

22    referring -- sorry.  Let me start that again.

23          Is it fair to say that it was likely you were

24    reviewing the download summaries prior to crafting your own

25    outlines or however you prepared for interviews?

Gingras-Direct-Lewin

1    A.   That we were doing that?  Like I said, we hired a

2    third-party vendor to help us actually sift through all of

3    these documents to do our own document search to prepare for

4    these interviews, to make sure that we had what we needed

5    before speaking to a witness and that we would usually circle

6    up as a team.  The AUSA and I would have a discussion.  Whoever

7    had the lead for that interview would draft an outline.

8         So, you know, I don't recall referring back to

9    interview downloads in order to frame questions.  It seems to

10   reason that I would have referred -- at least looked at them to

11   understand what they said before.  So I guess I apologize.  I'm

12   thinking out loud here, but I'm trying to remember back then.

13        I probably did refer back to them.

14   Q.   As you sit here now, do you recall referencing statements

15   made in a Cognizant interview to a witness whom you were

16   directly interviewing?

17   A.   I don't recall doing that.

18   Q.   Is it possible you did it?

19   A.   It's possible.  I don't recall.  I don't know that --

20   unless there was a good reason to do that, that I would be

21   inclined to do that.

22   Q.   You were a prosecutor for a long time.  Isn't there often

23   a good reason to remind a witness of what they've said before?

24   A.   Sure.  If they're contradicting themselves or trying to

25   change their story or -- I mean, those would seem to be the

1  main ones.

2  Q.   Or if they're repeating something and you're saying --

3  well, before you said this, does that refresh your memory?  It

4  doesn't have to be nefarious, right?

5  A.   Yes, although I think I would typically try to refresh

6  someone's recollection with documents first.

7  Q.   During Mr. Lustberg's questioning you said -- I'm going

8  to -- this is more or less a quote.

9          We might at times ask a company to hold off on doing

10  an interview if we wanted to do the interview first.  We might

11  ask the company to hold off on taking certain steps if we were

12  trying to take our own steps, but usually that was for a very

13  limited time and was not done without some trepidation because,

14  again, we were trying to be thoughtful of Cognizant of trying

15  not to interfere in whatever the company was doing in its own

16  investigation.

17          Does that generally sound familiar, even if I didn't

18  get it --

19  A.   That sounds about right.

20  Q.   So I want to make sure I understand the Department of

21  Justice's policy in your mind at the time regarding the order

22  of interviews, the order of -- let's call it deconfliction.  Is

23  that a fair term to use here?

24  A.   Makes sense.

25  Q.   So what is your understanding of the -- let me limit it

Gingras-Direct-Lewin                    138

```
 1    further -- the FCPA unit's policy on deconfliction of

 2    interviews?

 3    A.    Well, I don't think the FCPA unit had a specific

 4    deconfliction policy separate from the Department of Justice.

 5    I mean, I think a lot of what informed my answer there was

 6    department policy through the Yates Memo, which -- I think it

 7    was the Yates Memo.  It could have been in the U.S. Attorneys'

 8    Manual.  I can't remember now -- where they discuss

 9    deconfliction.

10    Q.    But I want to be precise.  Is it your testimony today that

11    it's Department of Justice policy that the Department of

12    Justice stands back and waits so as not to interfere with

13    private actors conducting their own interview -- so what --

14    policy, practice, what is the practice with regard to what

15    order -- in what order interviews occur as between the Justice

16    Department on one hand and a private entity on the other?

17    A.    I don't think there's any standard practice.  I think

18    every case is different.  And depending on how the case comes

19    in from the company, the company could be done with an internal

20    investigation.  They could have completed it and are presenting

21    us with their findings.  Or they could be just at the

22    beginning, or they could be in the middle or any number of

23    places.

24          So in any of those circumstances, it's going to

25    present different challenges, I think, for the department's
```

1    investigation.  If it's an ongoing internal investigation by

2    the company at the same time, then I think certainly I -- and I

3    think the department's policy -- are not wanting to tell --

4    dictate to companies how they can and can't do their own

5    investigations.

6            And so I can't -- and I can't remember the specific

7    policy, but I think there's even an example of, for example,

8    asking a company to hold off on doing an interview because the

9    department has reasons to want to do it first but that there

10   should be a time limit to that and not just basically shutting

11   down a company's internal investigation.

12   Q.   But some might say that this is exactly the reverse.  When

13   the Department of Justice has a criminal investigation, serious

14   stakes could result in the loss of liberty to a human being,

15   the Department of Justice wants to go first.  The Department of

16   Justice wants to collect its evidence first.  The Department of

17   Justice wants or should want to interview witnesses first

18   before any private party --

19           THE COURT:  Is there a question here?

20   BY MR. LEWIN:

21   Q.   -- conducts the interview.

22           Is that not your understanding of Department of

23   Justice procedure?

24           MR. LEWIN:  I got there, Judge.

25   A.   No, I don't take the Department of Justice policy to be

1  that we always have to go first.

2  BY MR. LEWIN:

3  Q.   Have you been involved in investigations that also involve

4  what I'll call a parallel investigation by the SEC?

5  A.   Yes.

6  Q.   And in those investigations does the Department of Justice

7  step aside so as not to interfere with the SEC's investigation?

8  A.   No.

9  Q.   Have you been involved in investigations involving the

10  CFTC?

11  A.   I don't think I've worked with the CFTC.

12  Q.   Let's just go broader.  In a typical investigation of

13  possible criminal activity, the government tries to interview

14  witnesses as close in time to alleged criminal activity as

15  possible; is that fair to say?

16  A.   Yeah, but there are a lot of circumstances that one has to

17  take into account, that prosecutors have to take into account.

18  Especially in cases like this that are document-intensive, it

19  would be, frankly, malpractice if you just ran in and did an

20  interview when you didn't have a full grasp of the universe of

21  conduct that you're trying to learn about.  So --

22  Q.   So -- I apologize.

23  A.   So if there are -- you know, it's a voluminous set of

24  documents.  Again, there's no ongoing crime.  There's no one

25  fleeing, there's no spoliation of evidence, there's nothing

1   sort of immediate, then our practice on this case with the U.S.

2   Attorney's Office and DOJ and in other cases that I've worked

3   on is to work diligently to try and do that quickly but to also

4   make sure that you're prepared going into it.

5            In addition, when you're talking about foreign

6   witnesses, as a lot of these witnesses were, there's so many

7   complications that are involved.  So I couldn't just get on a

8   plane -- and we couldn't just get on a plane and fly to India

9   the next day.  That's not how it works.

10  Q.   So you're saying essentially it would be, I think you

11  said, basically malpractice to rush in -- for DOJ to have

12  rushed in and tried to do these interviews at that early point

13  in time before reviewing the documents?

14  A.   Well, I was speaking hyperbolically, but --

15  Q.   I'm not trying to draw a legal conclusion.  It would have

16  been bad practice for DOJ to do that?

17  A.   I think we wanted to make sure that we were prepared

18  before we talked to a witness, and that included reviewing

19  documents and understanding the case and not just taking what

20  the company was telling us was the case.

21  Q.   So why isn't it bad practice for the company to be doing

22  exactly what you just described?

23  A.   Why is it --

24  Q.   Why is it not bad practice for the company to be going in

25  and conducting these exact interviews?

1  A.   I'm not going to opine on what the company decided to do

2  and what -- its own practice and how it conducted its

3  investigation, but they're separate from what I was doing.

4  Q.   But you're relying upon the company's downloads, at least

5  in the first instance, as part of your information gathering?

6  A.   Well, if the company is going to decide to interview

7  witnesses and those are witnesses that we are going to want to

8  interview, then I would certainly want to know, as I think any

9  prosecutor in America would want to know, what that person said

10  in that interview before I talked to them.

11  Q.   And the way you would find out what they said is by

12  relying on the company?

13  A.   Yes.

14  Q.   You describe the company as -- in certain -- in answer to

15  Mr. Lustberg's question as, in certain ways, just like a

16  cooperating witness, they're coming in to give information in

17  the hopes to get leniency in exchange, right?

18        How is a company like a cooperating witness?

19  A.   Well, I think exactly what you just said and what I had

20  previously said.  They're trying to curry favor with the

21  government by providing information to the government that the

22  government would deem useful and helpful.

23  Q.   Does that mean generally you would treat a company coming

24  in with some degree of scepticism because you recognize that

25  they are essentially like a cooperating witness?

Gingras-Direct-Lewin                          143

1    A.   Certainly.

2    Q.   And in terms of this case, what, if anything, do you

3    recall doing to challenge or, in your words, pressure-test what

4    Cognizant was doing as a cooperating witness that couldn't

5    necessarily be fully trusted not because of anything ethical

6    but because of divergent interests?

7    A.   Well, I think, as in any case, the team would assess the

8    information that we were acquiring through various sources

9    either from the company or from third parties or other -- there

10   was another company -- an Indian company from whom we were

11   trying to acquire information and make an assessment of whether

12   the story we were hearing and facts we were getting were, in

13   fact, consistent with what we would see.

14          And when we conducted interviews, you know, we would

15   certainly assess whether what we were hearing from those

16   witnesses were consistent or different or -- you know, than

17   what they had said in previous interviews.

18          And then just in the responsiveness of the company to

19   any requests that we would make, the posture that the company

20   would take with regard to information, it was just a constant

21   assessment from beginning to end on how the company was

22   conducting itself.

23   Q.   In your opinion based on your experience, is a witness

24   more likely to answer your questions or company counsel's

25   questions?

1    A.   What witness are we talking about?

2    Q.   A given witness.  Which is more likely to yield an

3    interview in which someone participates, the Department of

4    Justice interview or the company's interview?

5    A.   I mean, it depends entirely on the circumstances.  Do you

6    mean in this case specifically or generally?

7    Q.   Why don't we start generally.  What kind of circumstances

8    would make it more likely that a potential witness would answer

9    a government interview as opposed to their employer's questions

10   during an interview?

11   A.    I'm sorry.  Are you drawing a distinction between if --

12   are you saying, if a witness had a choice to cooperate with one

13   or the other or talk to one or the other, that they would

14   choose us over them?  Is that the question?

15   Q.   No.  The question is just, based on your experience,

16   whether you have a sense as to whether people are more likely

17   to answer questions asked by their employer in the context of

18   interview or the Justice Department and FBI?

19            THE COURT:  Maybe you can answer that on a general

20   level; maybe you can't.  But let's get moving.

21   A.   I mean, I think there are certainly lots of hurdles for

22   the government because people are worried about sitting in

23   front of an FBI agent.  But given -- I've seen this in my own

24   experience in the last few years, internal to a company.  I

25   think people are just as nervous talking to security or, you

```
 1    know, an ethics investigator or what have you.  So I think they
 2    both have challenges, but perhaps it's more difficult to get
 3    someone to talk to the government.
 4    BY MR. LEWIN:
 5    Q.   I believe you testified in response to Mr. Lustberg's
 6    questions that you don't recall talking to DLA about the
 7    conditions of the interviews.  And by "conditions," I'm
 8    referring specifically to the requirement that there be one
 9    lawyer present, that lawyer not take any notes, not ask any
10    questions or comment.
11         Am I correct that you don't recall having
12    conversations with DLA about those conditions?
13    A.   I don't recall specifically.  They may have told me.  I
14    don't recall specifically.
15    Q.   Is it fair to say those are coercive conditions?
16    A.   I mean, depends what you mean by "coercive."  If you're --
17    I can tell you some companies would never allow a lawyer in the
18    room, period.  So I think it's relative.
19    Q.   I think we are in agreement.  The DOJ couldn't impose
20    conditions like that on an interview?
21    A.   Certainly.  Certainly not I should say.
22    Q.   Do you believe that today during the hearing and reading
23    the briefs was the first time you heard about those conditions,
24    or do you believe that it was some time in the past when you
25    were involved?
```

1   A.   I'm not precluding the possibility that they told me.   I

2   just don't recall having an independent recollection of that,

3   and I know that I read them about the -- in the briefs that I

4   skimmed in preparing for this hearing.

5   Q.   Do you recall discussing with DLA the representation of

6   employees, whether employees would be or would not be

7   represented or recommended to get a lawyer?

8   A.   I recall having those discussions at times, yes.

9   Q.   Would it have been appropriate for the Justice

10  Department -- more in play the Justice Department -- to ask

11  company counsel whether or not they are recommending that a

12  certain employee obtain counsel?

13  A.   Whether or not the company is recommending?

14  Q.   Yes.

15  A.   I guess I would have to know the context of the

16  conversation.

17          MR. LEWIN:   Could we bring up Exhibit 32.   I believe

18  it's page Bates number ending in 30.

19  BY MR. LEWIN:

20  Q.   Do you have that in front of you?

21  A.   32?

22  Q.   Exhibit 32.

23  A.   Yes, I have 32.

24  Q.   Just take a moment to review that, and I'm going to grab

25  mine as well.

1    A.    Sir, where am I looking?

2    Q.    If you're looking at the bottom of the page, again,

3    Defense Exhibit 32, it's page 7 of 10.  The Bates number ends

4    in 30 at the bottom of the page.  It's sort of the last full

5    bullet point.  And I'll represent to you that these are

6    paralegal notes regarding a December 7th, 2016, download from

7    DLA to DOJ.

8              First, do you know who DA is?

9    A.    I don't, because it's not -- I don't know who DA is.

10   Q.    Could you just read these five -- the bullet -- the five

11   lines -- sorry -- six lines at the bottom there.

12   A.    Okay.

13   Q.    Read them out loud if you would.

14   A.    "DA:  BG have a lawyer?

15           "DLA:  No.  We are interviewing Raj Gosh tomorrow,

16   and he lives in U.S.

17           "DA:  BG is still cooperative?

18           "DLA:  Yes.

19           "DA:  Will you recommend that he obtain counsel?

20           "DLA:  We do not do that but will tell him."

21   Q.    That's all.  You're welcome to go on if you'd like.  But

22   my question is -- well, first, is it fair to say that DA is

23   likely a member of the government team given the context?

24   A.    I mean, given the context, perhaps, although there was no

25   one on the government team named DA.

1    Q.   As you sit here now, can you think of a legitimate reason
2    why Cognizant would be asking about whether -- sorry -- about
3    whether the government would be asking whether Cognizant will
4    recommend that a witness obtain counsel?
5    A.   I mean, if, in fact, that's what this was -- I'm sorry.
6    What was your question?  Can I think of a reason why --
7         THE COURT:  Are you asking him to assume that DA is
8    on the government team even though he doesn't know anybody
9    named DA on the government team?
10        MR. LEWIN:  I am, Judge.
11        THE COURT:  On that assumption, to answer the
12   hypothetical question, would that be okay?
13        MR. LEWIN:  I am, if only because context doesn't
14   seem to permit a different interpretation given that DLA is
15   clearly --
16        THE COURT:  I'm just trying to clarify the question.
17        MR. LEWIN:  Yes, Judge.  But I can withdraw it if
18   Your Honor --
19        THE COURT:  No, go ahead.
20   A.   I'm sorry.  Your question is, is that --
21   BY MR. LEWIN:
22   Q.   Yes.  Assuming for a moment that DA is, in fact, on the
23   government team --
24   A.   Right.
25   Q.   -- is it appropriate for the government to be making that

1  inquiry about the recommendation of counsel?

2  A.   I don't think it's necessarily inappropriate.  Again, I

3  haven't read the context of this entire exchange.  But I think

4  if he were someone that we wanted to interview and he has

5  counsel, then we would want to know that so that we could work

6  through that counsel.

7          MR. LEWIN:  Okay.  If we can pull up defense

8  Exhibit 2 and go to page 1.  If we can scroll in on that top

9  email.

10 BY MR. LEWIN:

11 Q.   Mr. Lustberg showed you this before.

12 A.   Okay.

13 Q.   Here DLA is providing DOJ personal, not company, email

14 addresses, correct?

15 A.   Yes.

16 Q.   Do you know what steps or do you believe you knew at the

17 time what steps Cognizant took to gather the personal email

18 addresses of its employees?

19 A.   I don't, but this -- you know, I'd seen this in other

20 investigations that we conducted where we would ask the company

21 to see, within the data set that they had of their

22 investigation, if there were personal email addresses being

23 used in communications; and if they were, then we would ask for

24 those.

25 Q.   And would it matter to DOJ, would it be significant how

1    the company got those personal email addresses?  Or is that

2    sort of beyond what you would be interested in with making the

3    request for personal email addresses?

4    A.    Well, I don't -- I think it would make a difference in the

5    sense that, if they're not being used within the documents that

6    are part of the investigation, they would be irrelevant to us.

7    Q.    But in general, is it fair to say that the department will

8    make the ask -- in this case ask Cognizant to provide personal

9    email addresses -- and Cognizant will try to fulfill that

10   request and how they do it is sort of up to them?

11   A.    Well, no, because if they just go to an address book and

12   pull email addresses, that's not going to help us.

13            I mean, obviously, we are asking for this because, if

14   they're used in furtherance of the scheme, we're going to have

15   to make a probable cause showing in an effort to get an email

16   search warrant.  So if they're just getting email addresses in

17   some way that isn't actually part of the, let's say, universe

18   of documents, then I don't know that that would be particularly

19   helpful for us.  So I think it would matter.

20   Q.    Okay.  In your current position are you involved in

21   internal investigations?

22   A.    Yes.

23   Q.    And are you involved in internal investigations where the

24   government --

25            MS. PATEL:  Your Honor, I'm going to object here.

```
 1              THE COURT:  Yes, I'm going to sustain that.
 2              I've given a lot of latitude.  This is not a person
 3    called as an expert witness or to give general opinions about
 4    how things are done here and there.  Let's try to stick to the
 5    issue and what happened in this case.
 6              MR. LEWIN:  Definitely, Judge.
 7    BY MR. LEWIN:
 8    Q.   You testified in response to Mr. Lustberg's questions that
 9    you were very careful about not providing guidance to the
10    company, correct?
11    A.   Direction and guidance, sure.
12    Q.   Direction and guidance.
13              But you would ask questions of the company, right?
14    A.   Absolutely.
15    Q.   And as you sit here now, sir, what in your mind is the
16    dividing line between a prosecutor asking whether the company
17    is going to take a certain step and giving them guidance?
18    A.   Well, I mean, if you're just asking me to sort of come up
19    with examples, I mean, I think there are a lot of -- I think
20    there's a line between the government telling the company to do
21    something, telling the company to go interview this person, or
22    if you're going to interview this person, ask them these
23    questions.  That seems to be pretty far over the line.
24              MR. LEWIN:  If we can pull up Defense Exhibit 11.
25    BY MR. LEWIN:
```

1   Q.  Again, this is an exhibit that Mr. Lustberg showed you.

2   Take a moment to review it.

3        My only question is whether, prior to this call, you

4   were aware of Cognizant's plan to terminate Mr. Coburn.

5   A.  Prior to which call?  I'm sorry.

6   Q.  Sorry.  The call that's reflected here in these notes to

7   Mr. Tsao.

8   A.  Let me read this one.

9   Q.  Yes, of course.

10   A.  Okay.  I'm sorry.  What was your question?

11   Q.  My question is just whether, as you sit here now, you

12   recall being aware of Cognizant's plans with respect to

13   Mr. Coburn's employment -- continued employment at Cognizant?

14   A.  No, I was not aware.

15        Just so I understand the question, I think I'm

16   reporting that they told me this in the phone call.  So is your

17   question that I understood that before that call?

18   Q.  My only question is whether you, as you sit here now,

19   recall conversations about Mr. Coburn's continued employment at

20   Cognizant prior to this call at which they informed you he had

21   resigned.

22   A.  No.

23        MR. LEWIN:  Judge, may I have just one moment?

24        THE COURT:  Sure.

25        MR. LEWIN:  Nothing further, Judge.  Thank you.

1          THE COURT:  Anything from the government?

2          MS. PATEL:  Yes, Your Honor.  Just a brief

3    cross-examination.

4          (Discussion off the record between counsel.)
                    (CROSS-EXAMINATION)
5    BY MS. PATEL:

6    Q.   So, Mr. Gingras, I just have a few questions for you.  I

7    hopefully won't be taking up too much of your time.

8    A.   Okay.

9    Q.   So, Mr. Gingras, you were assigned to this investigation

10   in early September 2016; is that right?

11   A.   That's correct.

12   Q.   At some point during the first few weeks of that

13   investigation, you learned that the company intended to

14   interview -- or rather that the company had interviewed

15   Mr. Coburn and Mr. Schwartz prior to its disclosure to the

16   government; is that right?

17   A.   I think that's correct.

18   Q.   Before those two interviews happened, before the

19   government -- before the disclosure had been made to the

20   government, did you have any communications with counsel for

21   the company about how they should conduct those interviews or

22   whether they should conduct those interviews?

23   A.   Before the interviews that they -- conducted before they

24   disclosed?

25   Q.   Yes.

Gingras-Cross-Patel

154

```
1    A.   No, I didn't.  I'd never even heard of Cognizant.

2    Q.   And at some point you learned that the company intended to

3    interview Mr. Schwartz in September of 2016; is that right?

4    A.   Correct.

5    Q.   And did you ask the company to conduct that interview?

6    A.   No.

7    Q.   Did you tell the company that they should not conduct that

8    interview?

9    A.   No.

10   Q.   Did you tell the company how they should conduct that

11   interview?

12   A.   No.

13   Q.   Did you give the company questions that they should ask

14   Mr. Schwartz?

15   A.   Definitely not.

16   Q.   Did you give the company any instruction about the tone

17   that it should take during the interview in asking questions?

18   A.   No.

19   Q.   Did the company tell you how they planned to interview

20   Mr. Schwartz and ask for your input on their plan for the

21   interview?

22   A.   No.

23   Q.   Did they ask for input on their style of questioning?

24   A.   No.

25   Q.   Did they ask for input on the topics that they intended to
```

1    cover?

2    A.    No.

3    Q.    So you received information about the interview that they

4    conducted, but you did not provide any instruction or direction

5    on how that interview should be conducted?

6    A.    No.  And I will say I think they may have told me that

7    they were going to ask him about the notes I think which they

8    recently discovered.  So I just want to make sure I'm clear

9    about that.  But that seems like a logical thing they would

10   have told me about, but I would not have opined or given them

11   direction, both because I knew not to do that and it was so

12   early in the case, I don't know how I possibly could have felt

13   empowered to tell them what to say or how to ask things, not

14   knowing anything about the case.

15   Q.    And, Mr. Schwartz -- Mr. Gingras.  Sorry about that.

16         MS. PATEL:  If we could pull up Defense Exhibit 14,

17   please.  If you could highlight at the bottom of the page where

18   it says "Remediation."

19   BY MS. PATEL:

20   Q.    Mr. Gingras, I'm just going to ask you to read to the

21   bottom of that page under "Remediation."

22   A.    Bottom of the page of --

23   Q.    Of the second page.  I apologize.

24         THE COURT:  There we are.

25         MS. PATEL:  Apologies.

1    A.    Okay.

2    BY MS. PATEL:

3    Q.    I believe Mr. Lustberg asked you about this portion of

4    these notes, which are your notes from the first meeting with

5    the company on October 6th, 2016.

6    A.    Yes.

7    Q.    It says here, "Week after next RW will come in."

8          Do you see that?

9    A.    Yes.

10   Q.    Could RW be a reference to Reid Weingarten?

11   A.    Oh, yes.

12   Q.    Who was Mr. Weingarten?

13   A.    He was Mr. Schwartz's attorney at the time, I believe.

14   Q.    So does that indicate to you that the company was having a

15   conversation with Mr. Schwartz's counsel?

16   A.    Yes.

17         MS. PATEL:  We're done with this document.

18   BY MS. PATEL:

19   Q.    During Mr. Lustberg's questioning of you, he characterized

20   Mr. Schwartz's interview as something that was helpful to the

21   government.

22         Do you recall that?

23   A.    Yes.

24   Q.    But you didn't tell the company to conduct that interview?

25   A.    Definitely not.

1   Q.   And if the company had terminated Mr. Schwartz before he

2   was interviewed, you could have sought to conduct your own

3   interview of him; is that right?

4   A.   Yes.

5   Q.   You knew he had counsel?

6   A.   Yes.

7   Q.   You could have contacted his counsel?

8   A.   Yes.

9   Q.   And you could have asked his counsel if he was willing to

10  come in and speak to you?

11  A.   Yes.

12  Q.   So you had the opportunity.  You could have gotten that

13  information if he chose to speak to you; is that right?

14  A.   That's right.

15  Q.   Now turning to sort of the initial period of the

16  investigation.  The company discloses at the beginning of

17  September and the first meeting with the company happens in the

18  first week of October; is that right?

19  A.   Yes.

20  Q.   And during that time you, as the government attorney, are

21  trying to get your arms around the facts to develop an

22  investigative plan; is that right?

23  A.   Along with my colleague, who was an AUSA in this distinct,

24  yes.

25  Q.   And, in fact, in early -- in October of 2016 you and the

Gingras-Cross-Patel

158

1    attorney in the -- in New Jersey and the FBI served a

2    preservation notice on L&T, the company we've been talking

3    about a little bit today; is that right?

4    A.    That sounds right, yes.

5    Q.    In fact, in October of 2016 you and Mr. Benvenuto started

6    having discussions with L&T about L&T producing documents to

7    the government; is that right?

8    A.    That's correct.

9    Q.    You did not tell Cognizant that you were doing that,

10   right?

11   A.    I don't believe so, no.

12   Q.    And, in fact, you ultimately ended up interviewing a

13   number of L&T witnesses; is that right?

14   A.    Yes.  We had documents from the company.  We reviewed

15   documents, and we also interviewed a number of witnesses from

16   the company, correct.

17   Q.    And that was through a process of negotiation with counsel

18   for L&T to make their employees available to the government to

19   interview; is that right?

20   A.    Yes.

21   Q.    And you didn't tell Cognizant that you were negotiating

22   with L&T to interview L&T witnesses; is that right?

23   A.    I don't recall doing that, no.

24   Q.    And you didn't give Cognizant information about the

25   substance of those interviews that you conducted of L&T

```
 1   witnesses?

 2   A.    Definitely not.

 3   Q.    And it was important for you to understand L&T's role in

 4   this conduct, right?

 5   A.    Yes.

 6   Q.    And that's why you were taking these steps very early in

 7   the investigation to engage with L&T and to obtain documents

 8   from them and interview their employees; is that right?

 9   A.    Yes.

10         MS. PATEL:  If we could pull up Defense Exhibit 61.

11   BY MS. PATEL:

12   Q.    Now, Mr. Gingras, before we look at this exhibit, during

13   your questioning by Mr. Lustberg, he asked you about the number

14   of interviews that Cognizant, the company, had conducted in the

15   course of its investigation.

16         Do you recall that?

17   A.    Yes.

18   Q.    And he mentioned that Cognizant had conducted about 450

19   interviews.  Does that sound right?

20   A.    Yes.

21   Q.    Cognizant did not give you summaries of all 450 of those

22   interviews, correct?

23   A.    Not when I was there.

24   Q.    And I think you mentioned that that was because the

25   company's investigation was not just into the allegations in
```

1    the indictment, but they were investigating a number of other

2    things?

3    A.   That's correct.

4            MS. PATEL:  So if we could turn to page 3 of this

5    document.

6    BY MS. PATEL:

7    Q.   Mr. Gingras, I'm going to direct your attention to the

8    middle of the page.  There's a bullet point that says "Phase I

9    Interviews."

10   A.   Yes.

11           MS. PATEL:  If you could highlight that portion.

12   BY MS. PATEL:

13   Q.   Mr. Gingras, Phase I, it looks like from this, is related

14   to the KITS planning permit; is that right?

15   A.   That appears to be correct.

16   Q.   And here does it say that there were 95 interviews

17   conducted in India and in the United States in connection with

18   Phase I?

19   A.   Yes.

20           MS. PATEL:  If we could turn to page 7 of this

21   document.

22   BY MS. PATEL:

23   Q.   Mr. Gingras, if you look at the top of this page, it talks

24   about the scope of Phase II of the company's investigation.

25           Do you see the scope at the top of the page?

1   A.    I'm sorry.  What page are you on?  7?

2   Q.    7.  It's Bates number ending in 5263.

3   A.    Okay.

4   Q.    At the top it says "Scope and Timeframe of the

5   Investigation"?

6            THE COURT:  We're still on 62 on the screen.

7            MS. PATEL:  5263 is the Bates number at the bottom.

8            THE COURT:  There we go.

9            MS. KRAMER:  Correct.  Excuse me, Your Honor.  I

10  apologize for the interruption.  We just want to make sure.  We

11  think this might have been filed in a redacted form.  So we

12  want to make sure that we address that before you display it,

13  if you don't mind pulling it down.

14           THE COURT:  Take one second.

15           MS. PATEL:  Thank you, Your Honor.

16           THE COURT:  There may be no issue at all.  Just find

17  out if you're showing something that was redacted.

18           (Discussion off the record between counsel.)

19           MS. PATEL:  I think I can ask my questions without

20  needing to put up documents that apparently --

21           THE COURT:  I think I see what you're getting at.  Go

22  ahead.

23           MS. PATEL:  -- were redacted.

24  BY MS. PATEL:

25  Q.    So, Mr. Gingras, we just looked at something that said

1    that there were 95 interviews that were conducted in connection

2    with Phase I; is that right?

3    A.   Correct.

4    Q.   And Phase I is related to the conduct at issue in the

5    indictment in this case; is that right?

6    A.   That's correct.

7    Q.   So the other interviews, the other about 355 interviews,

8    those were related to topics that the company was investigating

9    that were not the facts related to the indictment in this case

10   of Mr. Coburn and Mr. Schwartz; is that right?

11   A.   That's correct.

12         MS. PATEL:  I don't have any further questions,

13   Your Honor.

14         THE COURT:  Okay.  That was very brief cross.  I will

15   entertain a very, very brief redirect.

16         MR. LUSTBERG:  No further questions, Your Honor.

17         MR. LEWIN:  Nothing, Judge.

18         THE COURT:  Okay.  Thank you.

19         You may step down, sir.

20         We are now going to take our one-hour break.  See you

21   all back at 2:25.

22         (Lunch recess taken 1:25 p.m. through 2:25 p.m.)

23         THE COURT:  Let's resume.  Be seated.

24         Government, I think Mr. Last was next.  Is that

25   right?  Government, I think Mr. Last was next.

1           MR. FINZI:  That's right, Your Honor.  Defense calls

2   Mr. Last.

3           THE WITNESS:  Good afternoon, Your Honor.

4                  DAVID LAST, DEFENSE WITNESS,

5        having been duly affirmed, testifies as follows:

6           THE WITNESS:  I do.

7           THE COURTROOM DEPUTY:  Please be seated.

8           Keep the mic close to your mouth, speak loud and

9   clearly.  State your name for the record and spell it, please.

10          THE WITNESS:  Yes.  My name is David Last, D-A-V-I-D,

11  L-A-S-T.

12          MR. FINZI:  Your Honor, may I proceed?

13          THE COURT:  Go ahead.

14                  (DIRECT EXAMINATION)

15  BY MR. FINZI:

16  Q.   Let me try to start over.

17          Mr. Last, you're currently the chief of the FCPA unit

18  at the Department of Justice?

19  A.   That's correct.

20  Q.   And you've had that position since about April of 2021?

21  A.   Correct.

22  Q.   And before that, you were principal assistant chief at the

23  FCPA unit?

24  A.   Yes, since about July 2019.

25  Q.   So how long have you been in leadership at the FCPA unit?

Last-Direct-Finzi

164

```
 1   A.    I've been number one and two in the unit for the last --
 2   close to four years.  Before that, I was an assistant chief
 3   since, I think, September 2017.  And I was a line attorney
 4   before that, from April 2016 till September 2017.
 5   Q.    As chief of the FCPA unit, you have responsibility for all
 6   of the DOJ's FCPA cases?
 7   A.    Correct.
 8   Q.    And you approve charging decisions?
 9   A.    FCPA charging decisions and related cases within the unit,
10   yes.
11   Q.    Related to FCPA cases?
12   A.    Correct.
13   Q.    And you approve settlements and dispositions of FCPA cases
14   within the unit?
15   A.    So pleas with regard to individuals, like guilty pleas
16   with regard to individuals.  And as far as corporate
17   resolutions, I approve them within the unit; but those get
18   approved further up the chain at DOJ as well.
19   Q.    Fair to say you have a role in setting FCPA policy?
20   A.    I have a role in discussing it with people within the
21   department, yes.
22   Q.    Well, but don't you also have a role in discussing it with
23   people outside the department?
24   A.    I speak sometimes externally about our policies, yes.  You
25   said setting policies.
```

1  Q.   So you speak from time to time to the public about FCPA

2  policy, correct?

3  A.   Yes.

4  Q.   Your work with the unit is such that you're familiar with

5  the Yates Memo?

6  A.   Yes.

7        MR. FINZI:  Could we put a copy of it up on the

8  screen.  I think it's Defendants' 47.

9  A.   You said 47?

10 BY MR. FINZI:

11 Q.   Four-seven, yes.

12       Do you recognize that as the Yates Memo?

13 A.   Yes.

14 Q.   And that was written by the deputy AG at the time, Sally

15 Yates?

16 A.   Yes.

17 Q.   Who was the second-highest-ranking officer at the

18 Department of Justice as the time?

19 A.   Correct.

20 Q.   It was issued on September 9 of 2015?

21 A.   Yes.

22 Q.   So that's less than a year before Cognizant self-disclosed

23 in this case, correct?

24 A.   Yes.

25 Q.   And is it fair to say that the Yates Memo sets out the

Last-Direct-Finzi                                    166

1   Department of Justice's policies on cooperation, among other

2   things?

3   A.   It sets out the department's approach with regard to a

4   variety of issues.

5   Q.   Does it set forth the department's policies with respect

6   to cooperation?

7   A.   Among other things, yes.

8   Q.   And does it set out at least in part what prosecutors

9   should and should not do in evaluating cooperation?

10  A.   Do you want to point me to a particular provision?

11  Q.   Sure.  If you look at page -- let's go to page 4.

12  A.   Any particular section?

13  Q.   Yeah, the section there that reads "both criminal and

14  civil attorneys should focus on individual wrongdoing."

15  A.   Okay.

16  Q.   So am I correct that, at least in part, the Yates Memo

17  sets forth what prosecutors should and should not do?

18  A.   It does say that we should focus on individuals from the

19  inception of the investigation.

20  Q.   Now, the policies set forth in the Yates Memo are

21  addressed to DOJ employees if we go back to the first page,

22  right?

23  A.   Yes.

24  Q.   But they're also intended for the legal community and

25  corporations, correct?

United States District Court
Newark, New Jersey

```
1   A.   It's issued to people at the department, but it's

2   publicized.

3   Q.   So it's not secret, right?

4   A.   It's public; so no.

5   Q.   It's on the DOJ's website?

6   A.   It's public, yes.

7   Q.   And the department routinely speaks about it?

8   A.   There have been public comments.  There have been public

9   statements about it, yes.  Routine?  I don't know how you would

10  define routine.

11  Q.   Is it fair to say that the Yates Memo outlines the conduct

12  that the government expects from corporations in order for them

13  to receive cooperation credit?

14  A.   It talks about cooperation with respect to companies and

15  what prosecutors should look for in their cases.

16  Q.   But it also talks to corporations and what they should do,

17  or at least the policy does, right?

18  A.   Again, it's issued to people in the department.  It's

19  public.  And so I can't tell you the way companies and other

20  corporates or individuals read this.

21  Q.   Well -- but I think you said before Ms. Yates -- or people

22  give speeches about the policy, correct?

23  A.   Correct.

24  Q.   And that those speeches are designed to communicate the

25  policy to people outside the department, correct?
```

Last-Direct-Finzi                                    168

1   A.    It's to be transparent about the policies.

2   Q.    And to communicate and be transparent about the policies,

3   not just with lawyers inside the department but with general

4   counsels and defense lawyers, correct?

5   A.    Among others, yes.

6   Q.    People in compliance?

7   A.    Among others, yeah.

8   Q.    So let me ask you again.  Is part of the purpose of the

9   memo to communicate to companies what is expected of them if

10  they want cooperation credit?

11  A.    I can't tell you what the purpose was.  I didn't draft the

12  memo.  I wasn't involved in drafting the memo.

13  Q.    So as somebody who's responsible for policy and speaks on

14  it, you can't say whether or not part of the objective is to

15  communicate a message to companies?

16  A.    I thought you said the purpose in drafting the memo.  The

17  memo is public; so part of what we discuss when we discuss it

18  externally, when we discuss it publicly, is so that people in

19  the public, some of the categories that you described, are

20  aware of our expectations, if that's your question.

21  Q.    And in order to do that -- well, let me go back.

22        Part of the -- the memo was intended, at least in

23  part, to inform corporations on what was expected of them with

24  respect to individual accountability, correct?

25  A.    I mean, the memo is entitled "Individual accountable for

United States District Court
Newark, New Jersey

Last-Direct-Finzi                                    169

1    corporate wrongdoing."

2    Q.   So fair to say that that's a yes?

3    A.   I mean, if you're pointing to a specific provision, I'm

4    happy to take a look at it.  If your question is, is the memo

5    about individual accountability for corporate wrongdoing, the

6    answer is yes, that's the subject line of the memo.

7    Q.   And one of the messages that comes from the memo is that,

8    in order to qualify for cooperation credit, corporations must

9    provide to the department all relevant facts relating to

10   individuals responsible for the misconduct; is that right?

11   A.   That's correct.

12   Q.   And in order to get credit -- withdrawn.

13          And if corporations decline to learn of facts

14   relevant to individuals or don't provide complete factual

15   information about individuals, it could also -- it could not

16   get any cooperation credit, correct?

17   A.   I didn't follow that question.  Can you rephrase.

18   Q.   Yeah.  If corporations decline to learn of facts relevant

19   to individuals or if they fail to provide complete factual

20   information about those individuals, it's fair to say that they

21   could not get any cooperation credit?

22   A.   So the memo on page 3 says, "In order for a company to

23   receive any consideration for cooperation under the principles

24   of federal prosecution of business organizations, the company

25   must completely disclose to the department all relevant facts

Last-Direct-Finzi                           170

1    about individual misconduct."

2    Q.   Okay.  I want to go on and talk about a memo that's more

3    particular -- or a policy that's more particular to your unit,

4    which is the FCPA Pilot Program.

5              You are familiar with that?

6    A.   I am, although I will say that, when that came out in

7    April 2016, I had just started at the fraud section.

8    Q.   Understood.  But you're familiar with it, right?

9    A.   I'm familiar with it.

10             Which exhibit are you looking at?

11   Q.   It's Exhibit 48.

12   A.   Thank you.

13   Q.   The date of this memo is April 5, 2016?

14   A.   Correct.

15   Q.   And this pilot program builds on the Yates Memo, correct?

16   A.   I think that's probably fair.  Does it say that in here?

17   Q.   No.  It says it in a speech that was given the same day,

18   but --

19   A.   Okay.

20   Q.   Okay.  And fair to say that the policies in this memo were

21   designed to motivate companies to voluntarily self-disclose

22   FCPA-related misconduct?

23   A.   That seems right.

24   Q.   And to fully cooperate with the fraud section?

25   A.   Yes.

1   Q.   And where appropriate remediate flaws in their controls

2   and compliance programs, right?

3   A.   Yes.

4   Q.   And Cognizant in this case self-disclosed on September 1

5   of 2016.  Is that about right?

6   A.   I wasn't there and I wasn't part of the case at the time.

7   I joined the case in -- I think it was April 2018.  But based

8   on the documents I know that you showed Mr. Gingras this

9   morning and ones that I've seen, that seems right.

10  Q.   Okay.  So based on the testimony and the documents, you

11  have no quarrel with the fact that Cognizant self-disclosed on

12  September 1st --

13  A.   That seems right.

14  Q.   Fair to say that Cognizant -- well, fair to say that if a

15  company doesn't fully disclose, it risks indictment?

16  A.   What do you mean if a company doesn't fully disclose?

17  Q.   If a company doesn't fully cooperate.

18  A.   Sorry.  Are you speaking under the policy or are you

19  speaking more generally?

20  Q.   Either.  Both.

21  A.   So we don't indict cases based on cooperation.  A case

22  would be indicted based on the evidence.

23        Now, among the factors we consider under the Filip

24  Factors, as Mr. Gingras testified earlier, as is in the United

25  States Attorneys' Manual, we consider cooperation among the

```
 1   factors.

 2   Q.   And the failure to cooperate could lead to a decision to

 3   indict or charge?

 4   A.   It's one of the factors we consider when determining the

 5   appropriate path or the appropriate avenue of prosecution, if

 6   any.

 7   Q.   Okay.  Now, Cognizant itself believed or communicated to

 8   the department that it believed it would face serious

 9   consequences if it was prosecuted, correct?

10   A.   Could you be more specific?  In terms of what?  At what

11   point?

12   Q.   Well, were you present --

13            MR. FINZI:  Let's put up DX-17.

14   BY MR. FINZI:

15   Q.   My first question will be whether you were present for

16   this meeting.

17   A.   I was --

18   Q.   And --

19   A.   I apologize.

20            This was the Filip Factors presentation in May of

21   2018 --

22   Q.   Okay.  And in the course of the Filip Factors

23   presentation --

24   A.   I was just saying this was one of the first meetings I

25   attended related to the case.
```

Last-Direct-Finzi

173

1  Q.   As part of the Filip Factors presentation, did Cognizant

2  highlight for the government the consequences it would face if

3  it was prosecuted?

4  A.   So one of the factors that companies typically discuss are

5  collateral consequences.  I believe Cognizant covered that.

6  I'm just looking for it in the notes.  If there's an area you

7  wanted to refresh me on or if there's a particular --

8  Q.   Yeah.  Let's take a look at --

9  A.   I --

10  Q.   -- 211, the fourth attribution down.

11  A.   Yup.  Right.  So this is where counsel for the company

12  said, "The next is collateral consequences."  And she went on

13  to say, "we didn't think this was a large factor to you.  It

14  would not be good for the company if the company were

15  prosecuted."

16  Q.   And then lays out the consequences that the company might

17  face from prosecution, right?

18  A.   To some extent, yes.

19  Q.   So is it fair to say that at this point for Cognizant, the

20  choice was to fully cooperate and have a chance at cooperation

21  credit or to not cooperate, lose the chance at cooperation

22  credit, and risk the harms that Ms. Reummler laid out?

23  A.   I can't really speak to the choice to the company.  Any

24  company can decide to cooperate or not.

25       I mean, you asked about the pilot program document.

United States District Court
Newark, New Jersey

1    At the end of it, it makes very clear, I believe -- I'd have to
2    go back and find the specific language, but it said companies
3    are free to decide to cooperate or not.  They don't have to do
4    it --
5    Q.    I --
6            (Simultaneous crosstalk.)
7    A.    They don't get the benefits under the program if they
8    decide not to.
9    Q.    But the DOJ sets up incentives that are designed to
10   encourage them to cooperate, correct?
11   A.    That's true, but not unlike an individual who cooperates
12   and wants to get credit as part of a 5K.
13   Q.    Understood.  But it -- DOJ sets up policies that
14   incentivize certain behavior and, for lack of a better term,
15   punish other behavior?
16   A.    It sets out incentives for companies that cooperate, yes.
17   The sentencing guidelines also talk about cooperation.
18   Q.    For the purpose of influencing their conduct?
19   A.    I think it's to be transparent about what the benefits are
20   if they cooperate.
21   Q.    As part of Cognizant's cooperation -- and you were
22   obviously here this morning; so maybe we can do this quickly,
23   but I just want to make sure we're all on the same page.
24            As part of Cognizant's cooperation, Cognizant and its
25   lawyers provided the government with a significant amount of

Last-Direct-Finzi                                              175

```
 1   information in the course of this case?

 2   A.   Information -- information and documents, yes.

 3   Q.   Extensive interview downloads by the company?

 4   A.   They provided a number of those.  I think the testimony

 5   earlier was about 40 or 44 maybe.  That sounds about right.

 6   Q.   They -- and those downloads included downloads of

 7   interviews of Mr. Coburn and Mr. Schwartz; is that correct?

 8   A.   Correct.

 9   Q.   And as part -- in seeking cooperation credit at this

10   meeting, Cognizant and DLA indicated that they had persisted in

11   securing additional interviews of Mr. Coburn and Mr. Schwartz.

12        Do you recall that?

13   A.   I recall you showing -- I recall -- I forget which counsel

14   it was this morning showing Mr. Gingras the document.  I think

15   maybe Mr. Lustberg maybe showed him the Filip Factors notes,

16   but if you want to --

17   Q.   Let's take a look at DX --

18        (Simultaneous crosstalk.)

19   Q.   Sorry.  I didn't mean to cut you off.

20   A.   I'm happy to take a look --

21        (Simultaneous crosstalk.)

22   Q.   Let's take a look at DX-17 at the bottom of the page.

23   A.   You're looking at extensive interview readouts?

24   Q.   Yeah.  I'm at -- sorry.  Where they talk about --

25        THE COURT:  This is the same passage that was
```

1    highlighted this morning?  Is that what you're getting at?

2              MR. FINZI:  Yes, Your Honor.

3              THE COURT:  Then we don't need to spend too long on

4    it.

5              MR. FINZI:  Okay.  Yeah, that's it.

6    BY MR. FINZI:

7    Q.   Where Ms. Reummler says, "This is one category of

8    proactive cooperation.  Karl and his team persisted in securing

9    additional interviews with the president and the GC."

10   A.   That's what the company counsel said, yes.

11   Q.   Company counsel told you that they had facilitated the

12   DOJ's ability to interview people?

13   A.   That sounds right.

14   Q.   And that they had reviewed over one and a half million

15   documents?

16   A.   That sounds right.  But you understand the Filip Factors

17   presentation, that's an advocacy meeting where the company

18   comes in to tout the things that they've done?

19   Q.   Oh, a hundred percent --

20   A.   Okay.  I just wanted to --

21   Q.   That's exactly what I'm getting at.  The point is

22   Cognizant touted all of this cooperation in its effort to

23   obtain cooperation credit?

24   A.   Its advocacy.

25   Q.   Excuse me?

Last-Direct-Finzi                              177

1    A.   Its advocacy.

2    Q.   Its advocacy.  Okay.  But you don't have reason to doubt

3    it?

4    A.   No.  I mean, it depends which piece, but no.  Those

5    three -- those two or three things you just noted, no.  Those

6    seem correct.

7    Q.   And as part of their advocacy, they highlighted the fact

8    that they had provided information about their general counsel

9    and that that was a big deal.

10   A.   Could you be more specific?

11   Q.   Yeah.

12        MR. FINZI:  Can we take a look at page 6.

13   BY MR. FINZI:

14   Q.   "Turned over general counsel notes.  To distinguish

15   Cognizant's conduct from other companies, turning over a GC's

16   notes are a big deal."

17        Do you recall Cognizant emphasizing, as part of its

18   cooperation, that it was turning over notes of its general

19   counsel?

20   A.   I mean, that's what Ms. Reummler said.  That's what

21   counsel for the company said.

22   Q.   And my question is whether or not you recall that.

23   A.   That sounds right.  I'm certainly refreshed, looking at

24   the notes, that she said that.  Like I said, this was one of

25   the first meetings I attended for this case.

Last-Direct-Finzi                                    178

```
1    Q.   They also mentioned the hot document binders that they

2    provided?

3    A.   I recall seeing that --

4    Q.   Ten different subjects?

5    A.   I recall seeing in the notes about hot doc binders; I

6    don't recall the number of subjects.

7    Q.   You won't fight with me if I tell you it's ten, though?

8    A.   If that's what the notes say.

9    Q.   And more than 40 telephone updates?

10   A.   That sounds right.

11   Q.   And they to you -- I realize this isn't you saying it --

12   but they to you described their cooperation as exemplary.

13   A.   If that's what that it says in the notes.  I don't recall

14   that specifically, but if that's what it says in the notes.

15        And, again, just to be clear, some of the stuff they

16   were talking about, like the 40 interview -- the 40 telephone

17   calls, I had just joined the investigation.  So I don't -- I

18   hadn't participated in those; so I'm just saying -- if you're

19   asking me if that's what's in the notes, that's what's in the

20   notes.

21   Q.   I'm asking purely what they're telling you --

22   A.   Okay.

23   Q.   -- not what you observed.

24   A.   Understood.

25   Q.   Okay.  We're on the same page.
```

```
 1              And you started -- I should have put this in earlier,
 2    but you at some point had personal involvement in this case,
 3    right?
 4    A.   Correct.  Starting in --
 5    Q.   So --
 6    A.   -- I think it was April 2018, I became involved in the
 7    case.  And then I took over from Mr. Gingras after he left.  We
 8    overlapped for whatever it was, two months roughly, a month and
 9    a half.  Then he left, and then I was -- I was the
10    representative from the fraud section.
11    Q.   Okay.  So you became, in essence, for lack of a better
12    term, the fraud section line attorney on the case?
13    A.   Correct.  And then I worked with two AUSAs on it, which
14    was Courtney Howard and Nick Grippo.
15    Q.   So you participated in these meetings, the Filip Factors
16    meetings?
17    A.   Well, this was the one -- Filip Factors meeting was in
18    May 2018.  I did then -- excuse me.  Subsequently, I had
19    additional meetings with the company, but I don't think any of
20    them were Filip Factors presentations.
21    Q.   Okay.  You participated in meetings about a possible
22    resolution of the case?
23    A.   I think that was this.
24    Q.   Do you recall participating in discussions about what the
25    appropriate monetary penalty might be?
```

Last-Direct-Finzi                                      180

1    A.   I do recall that.

2    Q.   Do you recall participating in meetings or correspondence

3    involving the form of the disposition of the case, whether it

4    would be a plea, a deferred prosecution agreement, a

5    nonprosecution agreement, or a flat-out declination?

6    A.   I don't recall meetings related to form other than the

7    Filip Factors meetings.  I do recall a meeting -- I don't know

8    exactly when; it might have been July -- where we were talking

9    about the -- the company presented with respect to the

10   disgorgement, the amount that would be disgorged as part of a

11   resolution.

12   Q.   But fair to say that there would have been discussion

13   about the form of the resolution with the company?

14   A.   At some point.

15   Q.   And fair to say that you would have participated in that

16   discussion?

17   A.   Yes.

18   Q.   Fair to say that you would have been a decision maker or

19   at least one -- somebody who made a recommendation with respect

20   to that --

21   A.   I would have made a --

22            (Simultaneous crosstalk.)

23   A.   Sorry.  I didn't mean to interrupt.

24            I would have made recommendation to my management

25   within the fraud section, just as the AUSAs would have done to

United States District Court
Newark, New Jersey

1    their management at the U.S. Attorney's Office.  Certainly, as

2    a team, me and the two AUSAs would have discussed what we

3    viewed as the appropriate disposition of the case.

4    Q.   Is it fair to say that Cognizant didn't just passively

5    provide information as part of their cooperation?

6    A.   No, they were proactive.

7    Q.   And they were, or at least they told you they were,

8    aggressive in their cooperation?

9    A.   I wouldn't view them as aggressive.  I don't recall if

10   they said they were aggressive.

11   Q.   You would or would not?

12   A.   I wouldn't make that assessment in terms of whether a

13   company is being aggressive.  I wouldn't have the ability to

14   see that.

15   Q.   Do you recall whether or not they told you they had been

16   aggressive in their cooperation?

17   A.   That sounds familiar from the Filip Factors presentation,

18   but I don't recall specifically.

19   Q.   Real quick, let's go to page 5 of DX-17 and take a look at

20   that.

21            If we look at the bottom, do you see where it says,

22   "Cooperation -- in particular, willingness to cooperate in

23   investigation of personnel"?

24            Did I read that right?

25   A.   That's what it says.

1    Q.   And that Ms. Reummler then says the "Company has done

2    everything in its power to investigate aggressively"?

3    A.   That's what counsel for the company stated.

4    Q.   So you don't quarrel with the fact that they took the

5    position -- Cognizant took the position that it had cooperated

6    aggressively and in particular with respect to the

7    investigation of personnel?

8    A.   I don't take issue with the fact that what it says in the

9    notes is what counsel said to us.

10   Q.   Did Cognizant and its lawyers sometimes express --

11   withdrawn.

12        Did Cognizant and its lawyers sometimes draw

13   conclusions about what they thought the evidence showed with

14   respect to particular people?

15   A.   Conclusions regarding what the evidence showed?  Could you

16   be more specific?

17   Q.   Yes.  So we talked about the fact that they proactively

18   provided information, right?

19   A.   Correct.

20   Q.   And evidence?

21   A.   Correct.

22   Q.   Documents?  Downloads?

23   A.   Correct.

24   Q.   But is it also fair that from time to time they expressed

25   views on the culpability or nonculpability of certain

Last-Direct-Finzi                                    183

```
 1   individuals?

 2   A.   I don't recall that.

 3   Q.   Okay.  Let's take a look at DX-35, and in particular at

 4   page 5.

 5   A.   So this is a DLA Piper internal memo?

 6   Q.   Yeah.  These are talking points.  Do you see --

 7   A.   I --

 8   Q.   -- do you see up top, "The record contains no evidence

 9   that Karen" -- and the reference here is to Karen McLoughlin --

10   "knew that an improper payment would be made or even

11   considered"?

12   A.   That's what it says.

13   Q.   All right.  And the next bullet, "The record contains no

14   evidence that Karen was part of the inner circle of people

15   discussing the demand/payment."

16            Did I read that correctly?

17   A.   That's what it says in this DLA Piper memo, correct.

18   Q.   So is it fair to say that sometimes they drew conclusions

19   and provided the government conclusions as to the nature and

20   state of the evidence of certain individuals?

21   A.   I don't know if they actually conveyed this in this

22   meeting.  This meeting is from February of 2017.  I was not on

23   the case at the time.  This is also an internal DLA Piper memo.

24   I have no idea if that's what they actually said in the meeting

25   when they ultimately met with the earlier team that had this
```

Last-Direct-Finzi                          184

1   case at DOJ.

2   Q.   Okay.

3   A.   I can tell you that that's what it says in the memo,

4   though.

5   Q.   Yeah.  Can we go to the first page.

6   A.   I'm there.

7   Q.   And does it refer to -- in the re: line, that's the

8   subject?

9   A.   It says, "Government Meeting Talking Points."

10           MS. KRAMER:  Excuse me, Your Honor.  We're

11  encountering the same issue we had before the break in terms of

12  this being a redacted document.

13           MR. FINZI:  I won't go any further.  I'll take it

14  down.

15           THE COURT:  Apparently no conference is needed.

16  Problem solved.

17           MR. FINZI:  I can move on, Your Honor.

18  BY MR. FINZI:

19  Q.   So in addition to -- well, let me ask the question again.

20           Having seen what you've now seen, is it fair to say

21  that DLA and Cognizant, in addition to just providing evidence,

22  also provided thoughts or views on what the evidence showed?

23  A.   No, I don't have a reason to know that.  You showed me an

24  internal DLA memo.  I have no information if that information

25  was actually conveyed to the government.  As I also said, this

```
 1    meeting occurred a year and months -- three months before I
 2    even joined the case.
 3    Q.   Okay.  So you weren't there for that meeting.  But at
 4    other meetings, did they reflect views on who was culpable?
 5    A.   Culpable?  No.  I mean they reflected, they told us about
 6    evidence in the case and what the evidence was that they had
 7    identified and --
 8    Q.   Did they --
 9    A.   -- they discussed evidence -- sorry -- they discussed
10    aspects of the evidence.  I don't recall them ever saying who
11    was culpable.
12    Q.   Then let's take a look at DX-17.  We'll go back to page 1
13    just to confirm.
14               THE COURT:  Same one we've got the problem with?
15               MR. FINZI:  No.  This one's --
16               THE COURT:  I thought that was the other one.
17               MR. FINZI:  This one's all good.
18    BY MR. FINZI:
19    Q.   So let's again, let's look at the top.
20               THE COURT:  17.
21    BY MR. FINZI:
22    Q.   "Cognizant Filip Factors Presentation."
23    A.   Correct.
24    Q.   Are you with me?
25    A.   Correct.
```

1  Q.    It says who's there and who isn't -- sorry.  Who's there

2  at least.  You're there?

3  A.    Yes.

4  Q.    As is Mr. Gingras?

5  A.    Correct.

6  Q.    And then there's lawyers from DLA Piper and lawyers from

7  Latham, correct?

8  A.    Correct.

9  Q.    There's also an in-house attorney, Matt Friedrich from

10 CTS?

11 A.    Correct.

12        MR. FINZI:  Can we go to page 3 and highlight right

13 where you are, Jesse.

14 BY MR. FINZI:

15 Q.    That there are references to bad actors?

16 A.    It does say that.

17 Q.    Okay.  Is it fair -- I mean, you were at that meeting.  Is

18 it fair to say that part of what Cognizant did was to say that

19 prosecuting Mr. Coburn and Mr. Schwartz was a sufficient

20 alternative to prosecuting the company?

21 A.    I don't recall them saying that.

22 Q.    Okay.  Do you recall under the Filip Factors the

23 consideration of whether there are adequate alternatives to

24 prosecution of a company?

25 A.    Yes.  I believe it speaks with respect to civil remedies.

Last-Direct-Finzi

187

1    Q.   Not with respect to individuals, whether individual

2    prosecutions are sufficient?

3    A.   I'd have to look at the exact language.  It does reference

4    individual prosecutions, but I don't know if it's in the

5    context of an alternative.

6    Q.   Is it fair to say that one of the things that they

7    pitched, Cognizant pitched, was that a prosecution and

8    indictment of the company was not necessary because the

9    individuals could be prosecuted?

10   A.   I don't recall that.

11        MR. FINZI:  Let's go, then, to page 5 and look at the

12   second -- let's start with the bottom of the second paragraph.

13   Yes, right there, if we can highlight that.

14   BY MR. FINZI:

15   Q.   Do you recall them saying, in an effort to persuade you to

16   give them credit, that the company had done the right thing and

17   said, We know these guys engaged in the conduct and we will

18   provide DOJ with what they need to make decisions?

19   A.   That's what it says in the notes.

20   Q.   Is it fair to read that as we, Cognizant, will provide

21   you, government, what you need to make the decisions about

22   prosecuting these men?

23   A.   I read it as saying that the company did the right thing

24   by self-disclosing.  They identified criminal conduct, and they

25   disclosed it to the department.

1          They also said that they proactively said by action

2     that they cooperated because the company, as part of its own

3     independent investigation, believed they engaged in misconduct

4     and --

5     Q.    It says --

6     A.    Excuse me.  If I can finish.  And then they said they

7     would provide to the DOJ the evidence, effectively, of what DOJ

8     would need to make any decisions.

9     Q.    Does it say in that passage that the company says, "We

10    know these guys engaged in the conduct, and we will provide the

11    DOJ with what they need to make decisions"?

12          Did I read that correctly?

13    A.    That's what it says in the notes.

14    Q.    Let's go down to the next paragraph where Ms. Reummler

15    says, after talking about not minimizing senior positions, "As

16    a policy matter, that is what you guys want, to me.

17    Prosecuting companies and the way that that has evolved, what

18    you know deters conduct is bringing individuals to account."

19          Is it fair to say, Mr. Last, that what Cognizant and

20    DLA are doing is telling you that prosecuting individuals is

21    adequate and that the company itself should not be prosecuted?

22    A.    I think they are advocating to not be prosecuted and

23    they're saying that "Prosecuting companies and the way that has

24    evolved, what you know deters conduct is by bringing

25    individuals to account."  That's what it says in the notes.

```
 1            They also go on to say, "We own that they engaged in
 2   egregious conduct, but that fact is mitigated by everything
 3   else."  I think Mr. Gingras talked about that a little bit this
 4   morning.
 5   Q.   Let me stop you first, the first part of your question.
 6   You said, "They were advocating to not be prosecuted," correct?
 7   It was just part of your answer here a minute ago.
 8   A.   Correct.
 9   Q.   And one of their arguments to not be prosecuted was that
10   the individuals were the ones who had engaged in the wrongdoing
11   and they were the ones that could and should be prosecuted.
12            Isn't that, in essence, what that says?
13   A.   I think they're saying the individuals could be
14   prosecuted, yes.
15   Q.   Is it also true that Cognizant assisted the government in
16   locating a person who later became a cooperating witness?
17   A.   In locating?  I think they -- I would say they -- put us
18   in contact with his counsel and we scheduled an interview.
19   Q.   Is it fair to say that they encouraged that individual to
20   cooperate with the Department of Justice?
21   A.   That, I don't know.
22            MR. FINZI:  Okay.  Let's take a look at DX-23.
23            (Discussion off the record between counsel.)
24            MS. KRAMER:  I think if we can just put this on the
25   record, to the extent counsel has any indication that it's
```

1    going to be using a previously redacted document, because we

2    have not been provided with the exhibits, please refrain from

3    displaying unredacted forms of the documents.

4              MR. FINZI:  Okay.

5              (Discussion off the record between counsel.)

6              MR. FINZI:  This has already gone up today.  So I

7    think we're good, Judge.

8    BY MR. FINZI:

9    Q.   These are DOJ talking points of a call in October of 2016,

10   correct?

11   A.   You said DOJ talking points.  These are notes received

12   from DLA or from the company?

13   Q.   Sorry.  When I say DOJ talking points, the assumption here

14   is that they're notes used for a call by DLA to DOJ.

15   A.   Okay.

16   Q.   And, in particular, I want to direct your attention to the

17   second page where it says, "Coordinate Mani interviews in

18   mid-November."

19              Did Cognizant and its lawyers tell the Department of

20   Justice in October of 2016 that they would work with Mani and

21   his counsel and that once he was "lawyered up, we hope he will

22   continue to cooperate with the company and with the DOJ"?

23   A.   So I wasn't on the case at that time.  Obviously, this was

24   a year and a half before I joined.  But my understanding is

25   that the company facilitated us having an opportunity to

Last-Direct-Finzi                                    191

```
1    interview Mani.
2    Q.   But they didn't just facilitate it; they encouraged it.
3    A.   I don't -- I don't know that.  I had no reason to know
4    that.
5    Q.   You don't read, from what we see up on the screen, that
6    they are encouraging Mani to cooperate?
7    A.   Mr. Finzi, these are internal DLA talking point notes.  I
8    have no idea what was conveyed to the earlier team a year and a
9    half before I joined the case.
10   Q.   You were the supervisor in the unit?
11   A.   I am now.  I wasn't at the time.
12   Q.   Do you have any reason to believe that those -- do you
13   have any reason to believe those talking points were not
14   delivered?
15   A.   I don't know.
16   Q.   Do you know who picked his lawyer?
17   A.   I don't.  I assume Mani did.
18   Q.   Do you know if the company had any role in picking his
19   lawyer?
20   A.   I don't know.
21   Q.   It was clear to you that Cognizant was --
22        MR. FINZI:  Let me see if I can do this quickly,
23   Your Honor.  Can I have one second?
24   BY MR. FINZI:
25   Q.   Cognizant, in fact, ultimately received cooperation
```

Last-Direct-Finzi                                          192

1   credit, correct?

2   A.   Correct.

3   Q.   And it received a declination letter on February 13, 2019,

4   correct?

5   A.   Correct.

6   Q.   And that means they didn't get charged?

7   A.   Correct.

8   Q.   And that is the best of all possible outcomes for a

9   company?

10   A.   Well, the best would be a straight declination without

11   disgorgement where we just decide to close our investigation.

12   This was a declination with disgorgement, which is available

13   under the pilot program and then later under the corporate

14   enforcement policy where, if a company meets certain

15   requirements, self -- voluntarily self-discloses, fully

16   cooperates, and appropriately remediates, they can -- they can

17   get a declination provided they also pay disgorgement.

18   Q.   In the hierarchy of corporate resolutions, fair to say

19   that the worst for the company is indictment and a plea?

20   A.   Correct.

21   Q.   Next worse is a deferred plea agreement?

22   A.   Deferred prosecution agreement, but yes.

23   Q.   Next after that is a nonprosecution agreement?

24   A.   Correct.

25   Q.   And last is a declination?

1    A.    Declination with disgorgement, and then a straight

2    declination with closure.

3    Q.    And that's what Cognizant got in this case?

4    A.    Declination with disgorgement, correct.

5    Q.    Part of the reason they got that was for their

6    cooperation, correct?

7    A.    Among other things, yes.

8              And to be the clear, the other things are their

9    voluntary self-disclosure and the remediation.

10   Q.    You're aware that Cognizant has asserted privilege over

11   certain documents in this case?

12   A.    Yes.

13   Q.    And fair to say that, even after you got involved in this

14   case, the department and Cognizant had numerous discussions

15   about privilege and about waiver as the case went on?

16   A.    We definitely had discussions about their assertions of

17   privilege, yes.

18   Q.    And about possible waiver?

19   A.    There was a 502(d) order that was entered, which was a

20   selective waiver.  So yes.

21   Q.    And about the possibility of a crime fraud exception?

22   A.    We discussed -- I recall asking how they had drawn lines

23   and what they had produced as crime fraud, effectively.

24   Q.    Those privilege issues were discussed as part of

25   Cognizant's presentation in the Filip Factors meeting?

Last-Direct-Finzi                                    194

1    A.   I don't recall in the Filip Factors, but if you want to

2    point me to the page, I'm happy to take a look.

3    Q.   You recall we looked at the fact that they turned over the

4    general counsel's notes and they referred to that as a big

5    deal?

6    A.   I recall that that's in the notes, yes.

7    Q.   And that they mentioned providing privileged information

8    pursuant to the 503(d) order?

9    A.   I don't recall that, but if it's in the notes, then it's

10   in the notes.

11   Q.   Okay.  At this point, by October, the investigation is

12   about two years old; is that right?

13   A.   Sorry.  You said --

14   Q.   September 2016 to May of 2018.

15   A.   I'm confused.  You just said October.

16   Q.   I'm sorry.  My fault.

17        By the time of the Filip Factors presentation, the

18   investigation was about two years old?

19   A.   At the time of the Filip Factors presentation in May 2018,

20   it was, yeah, about two years, about 20 months.

21   Q.   And privilege had come up before.  Maybe you aren't aware

22   of it, but were you aware that privilege had come up several

23   times before?

24   A.   No.  I think there was -- no, I can't speak to the prior

25   conversations.

1  Q.   And did you know that -- well --

2  A.   I can't speak -- sorry.  I can't speak to the prior

3  conversations about privilege.  If there's something you want

4  to point me to, I'm happy to take a look.

5  Q.   Cognizant had produced privilege logs in January of 2018?

6  A.   That sounds right.

7  Q.   At this point, at the time of the Filip Factors meeting,

8  what was the DOJ's understanding of the scope of the waiver of

9  Cognizant's privilege?

10  A.   Scope of the waiver?  Could you be more specific?

11  Q.   Sure.  So part of what they disclose is a telephone call

12  involving the general counsel of the company, right?

13  A.   Right.

14  Q.   And it was a telephone call made for the purpose -- or at

15  least to discuss a contract and a possible payment to a

16  contractor, correct?

17  A.   Well, it was a bribe to an official, but yes.

18  Q.   Okay.  And you are aware that there was discussions of a

19  contract and a dispute as to who was responsible for getting a

20  particular permit?

21  A.   For getting a particular --

22  Q.   Permit.

23  A.   I do recall that being --

24  Q.   So in allowing -- in providing you with notes of that

25  conversation and in allowing you to question witnesses about

1   that conversation, Cognizant effected a waiver, correct?

2   A.   I don't know if it was a waiver or if they produced it as

3   not privileged, in other words, subject to crime fraud.

4   Q.   So at this point in the -- two years into the

5   investigation -- well, even to this day, do you know what the

6   scope of Cognizant's waiver is?

7   A.   I don't know the scope of the waiver.  I do recall

8   speaking to Cognizant's counsel to understand -- when we were

9   discussing things related to privilege and the privilege log, I

10  do recall trying to discern from Cognizant's counsel how they

11  were drawing lines, what --

12  Q.   Okay.

13  A.   If I can finish.  What --

14  Q.   And --

15  A.   Sorry.  What had been produced pursuant to crime fraud,

16  what had been produced pursuant to the 502(d) order, what had

17  been produced otherwise that they otherwise would have deemed

18  privileged but they had produced them.  I was trying to get

19  them to identify those lines.  They ultimately did not.  I

20  believe the -- I believe Mr. Buch said that they viewed that as

21  work product.

22  Q.   Okay.  Let's go through this one step at a time.  Let's

23  start with DX-82.

24          MR. FINZI:  Let's highlight the top left, if we

25  could.

1    BY MR. FINZI:

2    Q.    And are these your notes?

3    A.    These are my notes.

4    Q.    And this is an indication of a call with DLA?

5    A.    Correct.

6    Q.    And it lists the participants, Karl Buch and Mr. Stratton,

7    is it --

8    A.    Yes.

9    Q.    -- on DLA side and government lawyers on the left side?

10   A.    Me and the two AUSAs, correct.

11   Q.    And this conversation is on November 5th, correct?

12   A.    Yes.

13   Q.    And I'm going to direct your attention at some point to

14   page 3 at the top.  "Company has drawn lines."  This may be the

15   conversation you were referring to.

16   A.    This --

17   Q.    But before that, these questions about privilege and where

18   the privilege lines were drawn, why did they arise on

19   November 5th?

20          I'm sorry.  I'm not trying to trick you.  Withdrawn.

21   Ask another way.

22          Isn't it true that we on the defense side raised the

23   privilege issue early in November?

24   A.    Yes, you all had raised an issue relating to privilege.

25   Q.    And as a result of us raising an issue with respect to

Last-Direct-Finzi                                          198

1   privilege and how privilege lines had been drawn, you had a

2   conversation with Mr. Buch and Mr. Stratton?

3   A.   That was one of the reasons.   We typically go through

4   privilege logs during the course of an investigation anyway,

5   but, yes, you raising it certainly was part of what factored

6   in.

7   Q.   Had you been through privilege logs, by the way, before --

8   A.   Generally or --

9   Q.   -- in conversations?

10  A.   With counsel?

11  Q.   Yeah.

12  A.   I don't believe that I had.   I don't know if the -- I

13  don't know if the team that had the case before I joined it had

14  done that.

15  Q.   But the first time you discussed privilege or privilege

16  logs -- withdrawn.

17          The first time you discuss privilege logs with DLA

18  and Cognizant is in this call?

19  A.   I believe that's right.

20  Q.   And that's after we raised it?

21  A.   Yes.

22  Q.   And there's an attribution that says DAL -- that's you I

23  assume?

24  A.   That's me.

25  Q.   And you say, "Company has drawn lines re materials and

Last-Direct-Finzi                                    199

1   produced" --

2   A.    Would you like me to read it?

3   Q.    Yeah, please.  It would be quicker.

4   A.    Happy to do that.

5         Just so you know contextually, you know, when I have

6   the lines here showing initials, it's, to the extent I can,

7   trying to denote who's speaking.  So on the prior page, I'm

8   noting what some of the other folks are saying.  With this part

9   I wanted to make it very clear the point I was drawing to

10  Mr. Buch.

11        So what it says here is, "Company has drawn lines

12  regarding materials" -- it should say "it has produced" -- I'm

13  writing shorthand, and should say "we," meaning DOJ, we "want

14  to ensure that all documents responsive and nonprivileged or

15  that otherwise fall into a category of what was produced (crime

16  fraud or otherwise)" -- doesn't say "we," but the import is we,

17  meaning DOJ, want to make sure that we have that.

18  Q.    And then --

19              (Simultaneous crosstalk.)

20  Q.    -- there's a line under it that says, "Our obligations

21  require that we make terminations re:  exculpatory/favorable

22  material."

23        Did I read that right?

24  A.    Correct.  So what I said to Mr. Buch was our obligations,

25  meaning DOJ's -- our obligation as prosecutor, and we're

Last-Direct-Finzi

1    required that we make determinations regarding what's

2    exculpatory and favorable material.

3    Q.   And --

4    A.   Sorry.  Mr. Buch then responded that he -- they --

5    Cognizant, DLA -- are not the government agent.  I then

6    responded I agree, which is why I underlined it three times.  I

7    said you're not our agent.  It's the company's obligation to

8    produce all responsive materials.

9    Q.   Then it says, "We make assessment."  Who's the "we" there?

10   A.   The "we make assessment," the we is we, DOJ.  We make the

11   assessment regarding what's exculpatory.  Then I say the

12   company is to assess basis -- there, I think what I'm talking

13   about is basis as to whether something is privileged.  And then

14   underneath it, I reference the grand jury subpoena that we sent

15   them, I think, within a day or two after that.

16   Q.   Is that the first grand jury subpoena served in this case

17   to Cognizant?

18   A.   To Cognizant, yes.  But we served numerous ones --

19   Q.   Why was it served --

20            (Simultaneous crosstalk.)

21   Q.   Why was it served the day after privilege was raised?

22   A.   That was when we determined to serve the subpoena.

23   Q.   So the link between the privilege -- our raising the

24   privilege issue and the department cutting the subpoena is

25   coincidence?

United States District Court
Newark, New Jersey

1  A.   It's not coincidence.  We wanted to compel them to provide

2  materials.  To that point, they'd been providing materials

3  voluntarily.

4  Q.   Okay.

5  A.   I wanted to issue a subpoena -- we, collectively as a

6  team, wanted to issue a subpoena so the company would be

7  compelled to produce material and that then they would produce

8  what's responsive, not what they deemed relevant, not what they

9  deemed interesting, but what was responsive.  That would

10  include both anything exculpatory and anything inculpatory.

11  Q.   Well, but if it's exculpatory and privileged, then how do

12  you get that?

13  A.   I had no reason to believe that there was anything that

14  was privileged that they were withholding that was exculpatory.

15  Q.   Well, let's go back to the question we raised earlier.

16  "Company has drawn lines re: materials produced and wants to --

17  and we want to ensure all docs responsive nonprivileged or that

18  otherwise fall into categories of what were produced, crime

19  fraud or other" --

20  A.   Otherwise.

21  Q.   -- "otherwise."

22  A.   We want to make sure we had them.

23  Q.   Yeah.

24  A.   In other words, I want to make sure that we, as the

25  prosecutors, have those materials.

Last-Direct-Finzi

```
 1   Q.   So you are asking Cognizant where is the line between what
 2   is privileged and what is not privileged?
 3   A.   No.  I'm asking them to identify the line if they've
 4   produced things that are subject to crime fraud.  I know they
 5   produced things pursuant to the 502(d) order.  I wanted them to
 6   identify what those materials were so I could better understand
 7   where they were drawing the line as to those two issues.
 8   Q.   Okay.  If they're withholding -- we are clear that there
 9   has been a privilege waiver, correct?
10   A.   There's been a ruling in this case, yes.
11   Q.   No.  Sorry.  Before the ruling in this case, you can agree
12   that, either by virtue of a crime fraud exception or by virtue
13   of a privilege waiver, Cognizant has produced material that
14   would otherwise be privileged?
15   A.   Correct.  Cognizant did produce material that could
16   otherwise have been deemed privileged.
17   Q.   How do you know what they determined was the scope of what
18   they would call privileged and what they wouldn't?
19   A.   Could you repeat that.
20   Q.   Yeah.  How did the department know -- withdrawn.
21        Did the department ask how Cognizant, having waived
22   privilege at least in some respect, determined what material
23   remained privileged and what had been waived?
24   A.   I was trying to discern the line of what they'd produced,
25   where that line was, what they had designated as crime fraud
```

United States District Court
Newark, New Jersey

Last-Direct-Finzi

203

1  and what they had designated pursuant to the 502(d) selective

2  waiver order.

3  Q.   But you were just asking to identify the documents.  You

4  didn't talk about what is the subject matter that has been

5  waived?

6  A.   We did not talk about the subject matter, correct.

7  Q.   And you didn't talk about the scope of whatever crime

8  fraud exception they were using to produce privileged

9  documents?

10 A.   That's what I wanted to understand where they had drawn

11 the lines.

12 Q.   You told us --

13 A.   That's why I asked.

14 Q.   You just told us five minutes ago you never got the answer

15 to where the lines were drawn.

16 A.   I did not get the answer.

17 Q.   So what happens next is --

18       MR. FINZI:  If we could go to DX-81, please.

19 A.   To 81?

20 BY MR. FINZI:

21 Q.   Yeah.  This is a letter.  I believe you sign it, but I'm

22 not sure.  Yes, you sign it.

23       Tell me when you're through, Mr. Last.

24 A.   I'm through.

25 Q.   So this is a letter that you sent to the defense, right?

1    A.   Correct.

2    Q.   January 15th, 2020.  So right about the time we're talking

3    about here.

4    A.   The time we're talking about here.  What do you mean?

5    Q.   Sorry.  Later in the case but -- withdrawn.

6         This is January 15th of 2020, you send a letter to

7    us.

8         MR. FINZI:  If you can highlight, Jesse, the third

9    paragraph, with respect to the privilege issues raised.

10        THE WITNESS:  I see it.

11        MR. FINZI:  Let's do the last line.  No, sorry.  The

12   first one through determinations, please.

13   BY MR. FINZI:

14   Q.   So here you report to the defense that the company has

15   asserted privilege over its decision-making with respect to

16   privilege.

17   A.   Correct.  That was what I referenced earlier.

18   Q.   So the company would not tell you on what basis they

19   determined whether a document was privileged or not privileged?

20   A.   Correct.  As I was saying earlier, I was trying to figure

21   out the lines with respect to certain of these issues.

22   Q.   And you never got that answer?

23   A.   Correct.

24   Q.   You said you had no reason to believe that there was

25   anything exculpatory in the material that was being withheld as

1    privileged, correct?

2    A.    Correct.

3    Q.    But you asked Cognizant to go look for it anyway?

4    A.    To go look for what?

5    Q.    Excuse me?

6    A.    To go look for what?

7    Q.    To go look for whether there was exculpatory material in

8    what they withheld as privileged.

9    A.    No.  We issued them a subpoena that would require them to

10   produce anything that was exculpatory or inculpatory.  I was

11   very clear with Mr. Bruck that it was our job as the prosecutor

12   to determine what would be exculpatory or inculpatory or

13   otherwise.

14          MR. FINZI:  Give me just one second, Your Honor.

15          Let's go to DX-82, please.

16   A.    Which page?

17   BY MR. FINZI:

18   Q.    There is a reference to -- give me one more second.

19          Here it is.  Page before it.  I'm sorry.

20          MR. FINZI:  Sorry, one page before, Jesse.  Okay.

21          The "Timing -- unclear -- running issues to ground,"

22   can we highlight that.

23   BY MR. FINZI:

24   Q.    These are your same notes, right?

25   A.    These are the notes from November 5, 2018.

Last-Direct-Finzi

```
1    Q.   And that's your handwriting?

2    A.   My handwriting.

3              MR. FINZI:  Let's highlight the PW allegations --

4    A.   Do you want me to read that?

5    BY MR. FINZI:

6    Q.   No, I got it.

7              "Paul, Weiss allegations re: exculpatory/favorable

8    docs."

9              Did I read that right?

10   A.   That's what it says.

11   Q.   "Trying to understand line between crime fraud and

12   selective waiver."

13             Did I read that right?

14   A.   Yes.

15   Q.   "Can look at what withheld and confirm if basis for

16   privilege and whether crime fraud or other bases applies."

17   A.   I think it says company, C-O.  And so I think there what

18   I'm doing is asking -- again, this is the same thing.  I'm

19   asking the company to tell us what the line was.  I'm saying

20   I'm trying to understand the line regarding crime fraud and

21   selective waiver.  I want the company to look at what it

22   withheld and confirm for us and identify for us what had been

23   produced pursuant to crime fraud or otherwise --

24   Q.   So you don't --

25             (Simultaneous crosstalk.)
```

```
 1   A.   Sorry.  If I can finish.

 2             So we know where those lines are drawn.

 3   Q.   And now we've established we don't know where those lines

 4   are drawn?

 5   A.   They didn't respond --

 6   Q.   Because they asserted privilege over how they determined

 7   what was privileged and not and where the lines were drawn?

 8   A.   Correct.

 9   Q.   Now, you did not ask Mr. Buch and DLA to look and see in

10   the privileged documents whether there was exculpatory

11   information?

12   A.   We did not.

13             MR. FINZI:  Let's look, then, at DX-83.

14   BY MR. FINZI:

15   Q.   These are again your notes?

16   A.   These are my notes.

17             MR. FINZI:  Let's highlight the upper left block just

18   to make sure who's on.

19   BY MR. FINZI:

20   Q.   David Last, that's you, DAL?

21   A.   Correct.

22   Q.   Courtney Howard?

23   A.   Yes.

24   Q.   Who's NG?

25   A.   Nick Grippo.
```

Last-Direct-Finzi

208

1    Q.   And KB and GS are Karl Buch --

2    A.   And Gray Stratton.

3    Q.   It's titled "Call with DLA."

4    A.   Correct.

5    Q.   It's 11/21 --

6    A.   2018.

7    Q.   And that is -- in relation to the other notes we looked at

8    where Paul, Weiss was raising an issue that's about two weeks

9    later, 17 days; is that right?  Is my math right?  Something

10   like that.

11   A.   Three.

12   Q.   About two weeks later.

13            MR. FINZI:  Could we scroll down just a couple more

14   lines.

15   BY MR. FINZI:

16   Q.   According to your notation, it's Karl Buch who's speaking,

17   right?  Where it says "KB/"?

18   A.   Yes, but where are you looking?  I see.  Never mind.  I

19   see.

20   Q.   These are attributed to Karl Buch?

21   A.   Yes.

22   Q.   And he writes, "5K pulled for privilege."  Presumably

23   5,000 documents?

24   A.   Yes.  So this was -- this was, I believe, the -- we had

25   issued the subpoena already.  And so he's giving us an update

United States District Court
Newark, New Jersey

Last-Direct-Finzi

1    as to what they've -- what they -- what the timing is on

2    providing us that and where things stand.

3            So yes, 5K is 5,000.

4    Q.   And he says, "Two weeks to provide updated privilege log."

5    A.   Correct.

6    Q.   So we're talking about privilege here.  He says, "Nothing

7    new."  Then he says, "Nothing exculpatory found to date."

8    A.   That's what he said.

9    Q.   If he hadn't been asked to review the documents withheld

10   as privileged, why is he reporting to you that there's been

11   nothing exculpatory found in them?

12   A.   All I can think is that, in the last conversation that you

13   just noted, I made very clear to him that determining what is

14   exculpatory is our jobs as the prosecutor.  I'd also referenced

15   what Paul, Weiss's allegations were with regard to exculpatory

16   material.

17           So my guess on this -- because I don't recall this

18   call specifically -- is that Karl was just saying to us that

19   they hadn't found anything exculpatory.  But I was very clear

20   to him that's not his job; that's our job as the prosecutors.

21   And why he's telling me that, I don't know.

22   Q.   But -- so when Karl Buch says to you, "nothing exculpatory

23   was found to date," that is a cooperating company that is being

24   left to make the determinations about what's exculpatory and

25   what's not?

1    A.   No, I don't agree with that.

2    Q.   That would be wrong?

3    A.   I told you what it said and I told you what Mr. Buch said

4    and I told you what my perspective is on it.  Your

5    characterization, I don't view as correct.

6    Q.   Well, can we agree that Mr. Buch at least thought he was

7    looking for something exculpatory?

8    A.   I don't know what Mr. Buch thought.  You'll have to ask

9    him.

10   Q.   Well, I wasn't part of the conversation.  But do you

11   recall any part of the conversation where Mr. Buch is saying

12   that the cooperating company is taking on the job of looking --

13   finding whether or not there's exculpatory information?

14   A.   No --

15   Q.   You don't recall that?

16   A.   No.  I recall that in the notes from November 5th he

17   specifically said that he, DLA, the company, are not our agent,

18   to which I responded I agree and underlined it about ten times.

19        I do agree they're not our agent.

20   Q.   So if you don't know how they've drawn privilege lines and

21   you don't know how they've construed the crime fraud exception,

22   how can you know whether or not there are exculpatory documents

23   that are being improperly withheld as privileged?

24   A.   Could you repeat that.

25   Q.   Yeah.  You don't know where the privilege lines are being

1    drawn?

2    A.    Correct.

3    Q.    You don't know where a possible crime fraud exception line

4    is being drawn?

5    A.    Correct.

6    Q.    So there are documents that you can't see, correct, being

7    withheld as privileged.  But you can't even evaluate -- you

8    don't have the bases upon which to evaluate whether they are,

9    in fact, privileged or part of the crime fraud exception?

10   A.    We reviewed the privilege log.  And then we had multiple

11   conversations with them about the privilege log.

12   Q.    But I'm not talking about the privilege log; I'm talking

13   about the concept, the larger one.

14            There has been a waiver, right?

15            They've allowed you to inquire -- they've allowed you

16   to inquire about Steve Schwartz's communications as a lawyer.

17   They let Mani talk about it.  They let other people talk about

18   it.  They downloaded the contents of that conversation to you.

19   That's a waiver.  Can we agree on that?

20   A.    Or a crime fraud.

21   Q.    Or a crime fraud.  But what's the scope of that waiver?

22   Is it just that phone call?  Is it any bribe?  Is it any bribe

23   paid in India?  Is it any conversation that Mr. Schwartz had?

24   If you don't know the lines, what's the scope of it?

25   A.    We asked the scope, and they didn't provide the scope.

```
 1            MR. FINZI:  Your Honor, may I have a moment?

 2            May I have one moment, Your Honor?

 3            THE COURT:  You need to consult?

 4            MR. FINZI:  Yes.

 5            THE COURT:  Sure.

 6            (Discussion off the record between counsel.)

 7            MR. FINZI:  I have nothing further.

 8            THE COURT:  Anything further from the defense side?

 9            MR. LEWIN:  No, Judge.

10            THE COURT:  Government?

11            MR. FAYER:  Yes, Your Honor.  Brief cross-examination

12    from the government.

13            THE COURT:  Yes.

14                        (CROSS-EXAMINATION)

15    BY MR. FAYER:

16    Q.   Can you hear me?  Good afternoon, Mr. Last.

17    A.   Good afternoon.

18    Q.   So Mr. Finzi referenced that Paul, Weiss had made

19    allegations that Cognizant was hiding exculpatory material from

20    the government; is that right?

21    A.   Yes.

22    Q.   And do you recall Paul, Weiss coming in to meet with the

23    prosecuting attorneys in this case, including yourself?

24    A.   Yes.

25    Q.   Did that meeting take place on November 2nd of 2018?
```

1   A.   That sounds right.

2   Q.   And during that meeting did Mr. Finzi, Ted Wells, and

3   other lawyers for Paul, Weiss make the allegation that

4   Cognizant was asserting privilege over exculpatory material?

5   A.   Yes.

6   Q.   Did you give after that meeting Paul, Weiss an opportunity

7   to point you to anything that could help you figure out what

8   that exculpatory material was?

9   A.   Yeah.  So we exchanged a series of letters with Paul,

10  Weiss to Mr. Schwartz's counsel on this issue.  We asked them

11  to point us to any issue relating to this, any -- to identify

12  any documents, any issue, anything that would sort of lead us

13  to what they were alleging.  And they repeatedly refused to do

14  that.

15  Q.   Paul, Weiss refused to take up your opportunity to point

16  you to the exculpatory information that they claimed that

17  Cognizant was hiding from the government; is that right?

18  A.   Correct.  Not only to the actual information itself but to

19  any information that would lead us to what they were alleging

20  existed.

21  Q.   In the four and a half years since that meeting has the

22  government issued several reciprocal discovery requests to

23  Paul, Weiss?

24  A.   Yes.

25  Q.   In those four and a half years has Paul, Weiss or anyone

1   else representing Mr. Schwartz disclosed any exculpatory

2   information to the government?

3   A.   No.

4   Q.   In those years has Mr. Wells or Mr. Finzi or anybody at

5   Paul, Weiss put any meat on the bone regarding their claim that

6   Cognizant was hiding exculpatory information from the

7   government?

8   A.   No.

9   Q.   Now, you testified on direct that Cognizant had withheld

10  documents -- some documents as privileged; is that right?

11  A.   Correct.

12  Q.   And that makes sense because Cognizant is not on the

13  government's team, right?

14  A.   Correct.

15  Q.   In fact, Cognizant was in possession of those privileged

16  documents, not the government; is that right?

17  A.   Yes.

18  Q.   Now, in your career you've worked on cases where companies

19  have produced privilege logs; is that right?

20  A.   Yes.

21  Q.   And based on your experience, is it common to challenge a

22  privilege log in court?

23  A.   No.

24  Q.   When do prosecutors typically in your experience challenge

25  a privilege log in court?

```
 1    A.   Usually where there's some obstruction or there's some
 2    other issue that's at play.
 3    Q.   That's not what happened in this case, though, is it?
 4    A.   No.
 5    Q.   In this case Cognizant was producing documents voluntarily
 6    to the government; is that right?
 7    A.   Correct.
 8    Q.   In this case Cognizant produced certain documents pursuant
 9    to a 502(d) order; is that right?
10    A.   Yes.
11    Q.   You issued a grand jury subpoena to Cognizant; is that
12    right?
13    A.   Yes.
14    Q.   After issuing that grand jury subpoena to Cognizant, did
15    you request an updated privilege log from Cognizant?
16    A.   Yes.
17    Q.   And did Cognizant produce updated privilege logs to you?
18    A.   Yes.
19    Q.   Did you flag -- did the prosecution team review those
20    privilege logs?
21    A.   Yes.  We reviewed all the logs.
22    Q.   What did the prosecution team do to review the privilege
23    logs?
24    A.   Sure.  So collectively as a team, me and the two AUSAs
25    that were on the case, we reviewed the privilege logs.  And
```

Last-Cross-Fayer

1   what we would do is we would go through and highlight any

2   material that seemed -- you know, that we wanted to either push

3   back or ask a question about or get more information.  And so

4   then we did that with DLA, where we would have a conversation

5   where we would go through with them the items on the log.

6   Q.   So you highlighted certain entries that you had questions

7   about; is that right?

8   A.   Yes.

9   Q.   And you forwarded those highlighted entries to Cognizant;

10  is that right?

11  A.   To DLA, but yes.

12  Q.   Sorry.  To DLA Piper; is that right?

13  A.   Yes.

14  Q.   And then you had calls with DLA Piper where they provided

15  more information on some of the entries that you had questions;

16  is that right?

17  A.   Yes.

18  Q.   And did DLA Piper also send the prosecution team certain

19  letters providing additional information on the entries that

20  you had discussed during those calls?

21  A.   Yes.

22  Q.   Did you have any reason to believe that DLA Piper was

23  using privilege to hide exculpatory material from the

24  prosecution team?

25  A.   No.

United States District Court
Newark, New Jersey

1   Q.   Were you satisfied with the explanations that you had

2   received from DLA Piper about its assertions of privilege over

3   its own documents?

4   A.   Yes.

5   Q.   Had you believed that DLA Piper was hiding anything from

6   the government, would you have taken depositional steps to

7   obtain the material?

8   A.   Yes.

9   Q.   If you had believed that DLA Piper or Cognizant possessed

10  exculpatory material that it had not produced to you, how would

11  that have impacted the investigation?

12  A.   I would have not sought charges in this case.

13              MR. LUSTBERG:  I'm sorry.  We didn't hear that.

14              THE WITNESS:  I would not have sought charges in this

15  case.

16  BY MR. FAYER:

17  Q.   Okay.  I'd like to ask you just a few questions about the

18  investigation in this case.

19              MR. FAYER:  Your Honor, just so you're aware, we'd

20  like -- for efficiency's sake, we'd like to have Mr. Last

21  testify to these so we don't have to recall him to the extent

22  that some of the questions I may ask him were not within the

23  scope of what Mr. Finzi asked.

24              THE COURT:  Yes, I think that's fine.  If you need to

25  examine him further on that material, of course you can do

Last-Cross-Fayer                          218

1   that.

2            MR. FINZI:  No objection.

3   BY MR. FAYER:

4   Q.   So I believe you testified on direct examination that you

5   began working on the Cognizant investigation in April of 2018;

6   is that right, Mr. Last?

7   A.   Yes.  Correct.

8   Q.   And in the course of working on the Cognizant

9   investigation, did you review the case file?

10  A.   Yes.

11  Q.   Are you generally aware of investigative steps taken prior

12  to joining the case?

13  A.   Generally, yes.

14  Q.   And obviously you're aware of investigative steps that

15  were taken after you joined the case team; is that right?

16  A.   Certainly.

17  Q.   Prior to the indictment in this case, did the prosecution

18  team interview approximately 23 witnesses?

19  A.   Yes.

20  Q.   Did the prosecution team rely on Cognizant to make the

21  determination as to who -- which witness to interview?

22  A.   No.

23  Q.   Who made that determination?

24  A.   We did as the prosecutors and with -- in conjunction with

25  our FBI agents.

Last-Cross-Fayer                                        219

```
 1   Q.   And were some of those witnesses Cognizant employees?
 2   A.   Yes.
 3   Q.   And were some of those witnesses not Cognizant employees?
 4   A.   Yes.
 5   Q.   Was DLA Piper at any of the interviews you conducted of
 6   these witnesses?
 7   A.   No.  Of course not.
 8            Well, actually, there was one.  There was one
 9   technical witness.  I think he's -- he was an employee who
10   could speak about the Tandberg videoconferencing system.
11   That's why I think they represented him as his counsel.  That
12   was the only one.
13   Q.   So other than the interview of the technical witness
14   regarding the Tandberg records, DLA Piper did not participate
15   in the government's interviews of witnesses in this case?
16   A.   Correct.
17   Q.   Now, the first interview in this case took place on
18   February 7th, 2017.  Does that sound right to you?
19   A.   That sounds right.
20   Q.   And that was of Srimanikandan Ramamoorthy, or Mani; is
21   that right?
22   A.   Correct.
23   Q.   And before that interview took place, Cognizant produced
24   over 5,000 pages of documents to the prosecution team.  Does
25   that sound right?
```

Last-Cross-Fayer

1  A.   That sounds right.

2  Q.   Prior to Mani's interview did the prosecution team prepare

3  draft chronologies of documents?

4  A.   Yes.

5  Q.   Did Cognizant prepare those chronologies for the

6  government?

7  A.   No.  The team prepared them.  Our team, the prosecutors

8  that preceded me prepared that.

9  Q.   But you've reviewed the chronology so you know that they

10  were prepared?

11  A.   Correct.

12  Q.   Prior to Mani's first interview, did the prosecution team

13  issue preservation notices to various internet service

14  providers?

15  A.   Yes.

16  Q.   Did the prosecution team also issue a preservation notice

17  to Lawrence & Toubro [sic]?

18  A.   Yes, L&T.

19  Q.   Or L&T?

20  A.   Yes.

21  Q.   By the way, L&T, according to the indictment, is the

22  company that paid the bribe payment to the government official

23  on behalf of Cognizant; is that right?

24  A.   That's correct.  In the indictment, it's noted as "the

25  construction company."

United States District Court
Newark, New Jersey

1   Q.   And prior to Mani's first interview, the prosecution team

2   issued grand jury subpoenas to JPMorgan and Verizon; is that

3   right?

4   A.   Yes.

5   Q.   Did the prosecution take these various investigative steps

6   independent of Cognizant or DLA Piper?

7   A.   Yes.   Completely independent.

8   Q.   So, in other words, independent of whatever Cognizant was

9   doing, the prosecution team was actively conducting its own

10  investigation before it interviewed Mani on February 7th, 2017;

11  is that right?

12  A.   Correct.

13  Q.   And those steps included analyzing the voluminous records

14  that were coming in, seeking to preserve additional data, and

15  issuing subpoenas to gather more information; is that right?

16  A.   Yes.

17  Q.   Now, the prosecution team in this case also arranged

18  interviews without any facilitation from Cognizant; is that

19  right?

20  A.   Yes.

21  Q.   So, for example, in May of 2018 did the prosecution team

22  travel to Singapore to interview employees of L&T?

23  A.   Yes.

24  Q.   And over the course of five days in Singapore the

25  prosecution team interviewed four L&T employees; is that right?

1    A.    Correct.

2    Q.    Did DLA Piper or Cognizant encourage the prosecution team

3    to do these interviews?

4    A.    No.

5    Q.    Did DLA Piper or Cognizant participate in these

6    interviews?

7    A.    No.

8    Q.    Did the prosecution team also request and receive

9    documents from L&T?

10   A.    Yes.

11   Q.    Did the prosecution team meet with L&T's lawyers?

12   A.    Yes.

13   Q.    Did the prosecution team meet for individual counsel for

14   the L&T witnesses?

15   A.    Yes.

16   Q.    And the prosecution team didn't tell Cognizant or

17   DLA Piper about these meetings, did they?

18   A.    No.

19   Q.    So independently of Cognizant or DLA Piper, the

20   prosecution team had these meetings, gathered evidence, and

21   interviewed folks from L&T; is that correct?

22   A.    Yes.

23   Q.    In Mr. Schwartz's second interview by DLA Piper did he

24   make reference to the fact that he was dealing with eye surgery

25   on the week of the two calls that are at issue in the

Last-Cross-Fayer                                    223

```
 1   indictment?
 2   A.   Yes.
 3   Q.   And those calls took place on April 21st and April 22nd,
 4   2014, right?
 5   A.   Correct.
 6   Q.   Did the government take any investigative steps to
 7   investigate Mr. Schwartz's claim that he was concerned about
 8   his eye surgery during that week?
 9   A.   Yeah.  So we interviewed -- there were three doctors.  We
10   interviewed one of the doctors.  Two of the others testified
11   before the grand jury.  And then we obtained medical records
12   from all three.
13   Q.   Did the prosecution team also learn that on April 22nd,
14   2014, Mr. Schwartz attended a Mets game?
15   A.   Yes.
16   Q.   And that was on the day when Mr. Schwartz had one of the
17   calls described in the indictment?
18   A.   Yes.
19   Q.   And on one of the days Mr. Schwartz claimed to be
20   concerned about his eye surgery?
21   A.   Yes.  And we also obtained video footage of him at the
22   game from, I think, a television station.  And then we verified
23   through StubHub that he'd purchased the tickets.
24   Q.   Did DLA Piper tell you they obtained footage of
25   Mr. Schwartz at the Mets game?
```

Last-Cross-Fayer

224

1   A.   No.

2   Q.   Did Cognizant encourage you to do that?

3   A.   Not that I'm aware of, no.

4   Q.   So the prosecution independently took these investigative

5   steps; is that right?

6   A.   Yes.

7   Q.   Okay.  As part of the investigation, did the prosecution

8   team issue more than 25 grand jury subpoenas?

9   A.   That sounds right.

10  Q.   The first subpoena was issued in around November 2016?

11  A.   Yes.

12  Q.   And did you issue subpoenas all the way up to

13  January 2019?

14  A.   Yes.

15  Q.   Did the prosecution team subpoena third parties other than

16  Cognizant?

17  A.   Yes.

18  Q.   Credit card companies?

19  A.   Yes.

20  Q.   Phone companies?

21  A.   Yes.

22  Q.   Financial institutions?

23  A.   Yes.

24  Q.   DLA Piper have any role in the prosecution team seeking

25  these records?

1    A.    No.

2    Q.    Prosecution team -- did the prosecution team obtain an

3    order pursuant to 18 United States Code Section 2703(d) to

4    obtain records from Yahoo for an email account in this case?

5    A.    Yes.

6    Q.    Did DLA Piper or Cognizant have any role in the

7    prosecution team seeking this court order?

8    A.    Not that I'm aware of, no.

9    Q.    Over the course of the investigation, the prosecution team

10   received a lot of documents; is that right?

11   A.    Yes.

12   Q.    Was there a system in place to review documents?

13   A.    Yeah.  So when we receive document productions in this

14   case or any case in the unit -- this is common, I think, in

15   white collar cases generally -- we put them into a system

16   called Relativity where we can review documents in that type of

17   platform.

18          In this particular case, we also used third-party

19   document reviewers that reviewed documents for us.  And then as

20   part of the team, certainly once I joined the case, but I have

21   every reason to think the prior team did this and I think

22   Mr. Gingras testified to this earlier, that we as a team also

23   review the documents.  And so we sort of parse out, you know,

24   through various methods of sort of analyzing the documents and

25   trying to determine what's there and really get our arms around

Last-Cross-Fayer

226

```
 1   what's there and what's the most relevant based on our own
 2   review.
 3   Q.   So you undertook your own investigation of the documents
 4   that Cognizant provided; is that right?
 5   A.   Correct.
 6   Q.   Did you ever direct Cognizant to perform interviews of its
 7   witnesses?
 8   A.   No.
 9   Q.   Did you ever tell Cognizant who to interview and when?
10   A.   No.
11   Q.   Did you ever tell Cognizant how it should interview a
12   witness?
13   A.   No.
14   Q.   Did you ever tell a lawyer at DLA Piper to grill a witness
15   like a prosecutor?
16   A.   No, definitely not.
17   Q.   Have you ever, in the course of your career, directed a
18   company to perform an interview of a witness?
19   A.   No.  I've been a prosecutor for 17 years.  I've never done
20   that.
21   Q.   Did you ever hear of anybody else on the prosecution team
22   directing Cognizant to perform an interview of a witness?
23   A.   No.
24   Q.   So I think you testified a moment ago that Cognizant
25   provided a lot of information to the prosecution team in this
```

Last-Cross-Fayer                          227

```
 1   case, right?
 2   A.    Yes.
 3   Q.    And did the prosecution team use the information that
 4   Cognizant provided derivatively to perform its own
 5   investigation?
 6   A.    Yes, just like we would with any cooperator.  Just like we
 7   would -- when I was an AUSA in Washington, DC, where I was ten
 8   years, I had cooperators in cases.  A cooperator provides
 9   information, you take the information and you use it for
10   follow-on investigation.  That's exactly what was done here.
11   Q.    Does a corporate cooperator that provides exculpatory
12   information receive any less credit for their cooperation?
13   A.    No.
14   Q.    Did the prosecution team ever control Cognizant?
15   A.    No.
16   Q.    Did the prosecution team ever use DLA Piper's offices?
17   A.    No.
18   Q.    Did the prosecution team ever use DLA Piper's computers?
19   A.    No.
20   Q.    Was Cognizant or DLA Piper part of the prosecution team?
21   A.    No, absolutely not.
22   Q.    Did you trust Cognizant or DLA Piper like you would an FBI
23   agent?
24   A.    No.  The FBI agents and the prosecutors, we're part of our
25   investigative team.  We're law enforcement.  We work together
```

```
 1    as our team.
 2           A company that's cooperating has very different
 3    interests and divergent interests from us.  When a company is
 4    cooperating, again just like an individual cooperator, there's
 5    a certain healthy amount of skepticism when they're providing
 6    information.
 7           And so I think Mr. Gingras also testified to this
 8    earlier as well, like, if you have cooperator that's providing
 9    information, you pressure-test it through other aspects of the
10    investigation.  We always conduct our own investigation, make
11    our own assessments of the evidence.
12    Q.   The prosecution team conducted its own investigation in
13    this case; is that right?
14    A.   Yes.
15    Q.   It did its own interviews; is that right?
16    A.   Yes.
17    Q.   Made its own determination as to which witness was
18    credible; is that right?
19    A.   Yes.
20    Q.   And who made the ultimate decision to charge the case?
21    A.   We did as the prosecution team.
22           MR. FAYER:  One moment, Your Honor.
23           Thank you.
24           THE COURT:  Okay.  There was some new material there.
25    So I'll hear you.
```

 1          MR. FINZI:  Yes.

 2                    (REDIRECT EXAMINATION)

 3    BY MR. FINZI:

 4    Q.   Can you hear me okay?

 5    A.   Yes.

 6    Q.   Mr. Last, you testified -- there was a long string

 7    questions about work that the DOJ did early in the

 8    investigation, but you weren't there for that, correct?

 9    A.   Correct.  I joined in April 2018.

10    Q.   So anything you're telling us about pre-April 2018 is just

11    based on what you've heard from others?

12    A.   And what I've seen in the case file.

13    Q.   Okay.  Fair.

14          There was some discussion about inviting the defense

15    to provide exculpatory material or evidence -- I think --

16    sorry.  Withdrawn.

17          You were asked some questions by Mr. Fayer, I think,

18    about whether the defense had been invited to produce material

19    and provide information to substantiate that there was

20    exculpatory material behind the privilege, correct?

21    A.   Mr. Fayer was asking and I think my answer was whether

22    Mr. Schwartz's counsel -- after making those allegations, we

23    had asked you all, respectfully, to point to either that

24    evidence or to any information related to that evidence, and

25    you and Mr. Schwartz's other counsel declined.

```
 1              MR. FINZI:  Can we take a look at -- I think it's a
 2   new GX number.  I forget what our last number is.  We can
 3   just -- let's set the stage here.
 4   BY MR. FINZI:
 5   Q.   Do you recall that we were supposed to come in for a
 6   meeting on Friday, November 2nd?
 7   A.   Yes.
 8   Q.   And that was the meeting you were referring to where
 9   Mr. Wells, myself, and some others were going to come in to
10   talk about the case?
11   A.   Yes.
12   Q.   And before we could even get there, you sent us an email,
13   correct?
14   A.   Yes.
15   Q.   And it attaches a letter relating to that very meeting?
16   A.   Correct.
17              MR. FINZI:  Can we look at the letter?
18              THE WITNESS:  Is this an exhibit in the binder?
19              MR. FINZI:  No, it's a new exhibit.
20              Your Honor, I'll mark it later, if it's okay.  I just
21   don't have a number.
22              THE COURT:  Does anybody have handy what the last
23   number was?
24              MS. COLLART:  138.
25              MR. FINZI:  138, Your Honor.
```

```
 1              THE COURT:  We're going to call this 138?  Go ahead.
 2   BY MR. FINZI:
 3   Q.   Isn't it true that, rather than invite us to provide
 4   information, you warned us not to provide information and
 5   threatened that, if we disclosed information that might be
 6   privileged -- not threatened; threatened is too strong a
 7   word -- you reminded us of obligations under the New Jersey
 8   professional rules and trust you will not disclose any
 9   potential privileged information during our meeting?
10   A.   What we wrote is we assumed that you have complied with
11   your ethical obligations.  I assume you would.
12   Q.   Okay.  So when you said a few minutes ago that you invited
13   us to give you information, in fact, you were telling us, be
14   careful what information you give me because it might be
15   privileged and you might be violating your ethical rules?
16   A.   So these weren't the letters I was speaking with.  This is
17   the letter that came before that meeting.
18              At the meeting you all made the allegation that
19   there's this information that Cognizant was withholding as
20   privileged but that you said was exculpatory.
21              We then sent follow-on letters and exchanged a number
22   of letters -- I don't know if it was two or three iterations
23   between the two sides -- about this issue where we said, if
24   you're aware of information, please identify it for us, even at
25   a minimum by just identifying the date, subject matter, just
```

Last-Redirect-Finzi

1   anything that would be a clue as to what it was.  And you

2   continuously refused to do that.  And I think our final letter

3   was quite clear on this point.

4   Q.   Whose obligation is it?

5   A.   To do what?

6   Q.   To find exculpatory material.  Mine or yours?

7   A.   The government identifies exculpatory information.

8   However -- excuse me -- if I had defense counsel's claim

9   that --

10              (Reporter admonishment.)

11              THE WITNESS:  I speak very fast.  I apologize.

12  A.   In my career, when other defense counsel have raised this

13  when there has been exculpatory information, they have been at

14  least willing to provide some indication as to what it is to

15  point in the correct direction.  You were not willing to do

16  that.

17              It's not your obligation to do that, if that's your

18  question.  It is not your obligation.  However, if you are

19  suggesting that this existed and that we were blind to it and

20  we weren't able to find it and it was being hidden from us,

21  providing some indication, some clue as to what it was, if it

22  really did exist, would have seemed reasonable.  But you

23  declined to do that.

24  Q.   I'm not suggesting, Mr. Last, that you saw it and didn't

25  give it.  I'm suggesting that you don't know what's behind the

United States District Court
Newark, New Jersey

1    curtain and you don't know how long or wide the curtain is.

2    They have not told you what the scope of their waiver is or

3    what the scope of the crime fraud exception is.  How can you

4    possibly know whether or not there's material that should be

5    turned over that hasn't been if you don't know that?

6    A.   My point, Mr. Finzi, is that, if you are alleging that

7    this existed, providing some indication as to what it was

8    seemed reasonable.  You declined.  And that's your prerogative

9    to do.

10   Q.   In the 17 years that you've been a federal prosecutor have

11   you ever come across a case where you have asked a company to

12   define the scope of their waiver and they have said no, even

13   just the definition of the scope of my waiver is privileged?

14   In your 17 years, has that happened?

15   A.   I don't know that I've asked a company to identify the

16   scope of --

17              (Simultaneous crosstalk.)

18   Q.   In the 17 years that you've been a prosecutor have you

19   ever had a situation involving a crime fraud exception where

20   you don't know what the scope of the crime fraud exception is?

21   A.   I don't follow your question.

22   Q.   So if something is nonprivileged because of crime fraud --

23   take, for example, the phone call that Mr. Schwartz and

24   Mr. Coburn are alleged to have participated in.  You said

25   earlier that that may have fallen under the crime fraud

1   exception, correct?

2   A.   Correct.

3   Q.   That crime fraud exception suggests a subject, there is

4   some subject over which crime fraud applies?

5   A.   Agree.

6   Q.   You don't know the scope of that subject in this case

7   because Cognizant wouldn't tell you?

8   A.   Correct.

9            MR. FINZI:   I have nothing further, Your Honor.

10           MR. FAYER:   Nothing further from the government.

11           THE COURT:   Nothing further from the government?

12           You may step down, sir.   Thank you.

13           THE WITNESS:   Thank you, Your Honor.

14           THE COURT:   This would be a good time for a 15-minute

15   break.

16           (Recess taken 4:05 through 4:20 p.m.)

17           THE COURT:   Everybody ready?   Let's resume.

18           MR. LUSTBERG:   Defense calls Karl Buch.

19           THE COURT:   Bring Mr. Buch up.

20                KARL BUCH, DEFENSE WITNESS,

21        having been duly affirmed, testifies as follows:

22           THE WITNESS:   I do.

23           THE COURTROOM DEPUTY:   Thank you.   Please have a

24   seat.   Keep the mic close to your mouth, speak loud and

25   clearly.   State your name for the record and spell it, please.

1            THE WITNESS:  Sure.  My name is Karl Buch, K-A-R-L,

2    last name B-U-C-H.

3                    (DIRECT EXAMINATION)

4    BY MR. LUSTBERG:

5    Q.   So it's Buch?

6    A.   Buch.

7    Q.   I get that wrong all the time.  Thank you for coming

8    today, Mr. Buch.

9            How are you currently employed?

10   A.   I'm a partner at DLA Piper.

11   Q.   Any other employment?

12   A.   No.

13   Q.   And before you were -- how long have you been at

14   DLA Piper?

15   A.   About nine years.

16   Q.   What did you do before that?

17   A.   I worked in-house for a company.

18   Q.   So that's all public.  So it was Pfizer?

19   A.   Correct, Pfizer.

20   Q.   And before that?

21   A.   I was in-house -- sorry.  I was at a law firm, Chadbourne

22   & Parke.

23   Q.   I take it, then, before that you were at the

24   U.S. Attorney's Office in New Jersey, right?

25   A.   Correct.

Buch-Direct-Lustberg

236

```
1    Q.   And from when to when were you an assistant U.S. attorney?
2    A.   2003 to 2008.
3    Q.   And I take it that -- what did you do at the
4    U.S. Attorney's Office?  What was your area?
5    A.   I was in several different units, including
6    counterterrorism, securities, healthcare fraud, general -- you
7    know, general crimes.
8    Q.   I'm sorry.  For how long were you at the U.S. Attorney's
9    Office?
10   A.   Well, I think 2003 to 2008.
11   Q.   Okay.  Five years.
12        I take it that you developed close relationships with
13   people at the U.S. Attorney's Office when you were there?
14   A.   Sure.
15   Q.   And, in fact, some of the alumni of that office are people
16   who represent other employees of Cognizant in this matter,
17   right?
18   A.   Correct.
19   Q.   Were those people brought into this case by you?
20   A.   Their clients decided to bring them in.
21   Q.   Were they recommended -- did you make recommendations?
22   I'll be specific, the ones I know about.  Carlos Ortiz?
23   A.   True.
24   Q.   You recommended Mr. Ortiz, and I can't remember who his
25   client is.  Who's that?
```

1    A.   I don't remember.

2    Q.   John Kearny?

3    A.   Yeah.  Typically, my practice would be to recommend

4    multiple lawyers to a client or to, you know, an employee of

5    the company and sort of let them make a decision to choose

6    either one of those or anybody else that they might have in

7    mind.

8    Q.   Of course, the decision is theirs.  But I'm just asking

9    who you referred.

10        And with regard to Mr. Ortiz and Mr. Kearny, those

11   are people to whom you referred various Cognizant employees; is

12   that right?

13   A.   Yeah.  I think, Mr. Lustberg, we also, you know,

14   recommended at one point two attorneys from Gibbons to people

15   within the company as well.

16   Q.   Good thing that didn't happen.

17        And the last one was Matt Beck.  Was he a person that

18   you recommended to anybody, to Mani in particular, with regard

19   to this --

20   A.   I actually didn't recommend him.  I recommended his

21   partner, Jeff Chiesa.

22   Q.   Got it.  Have you had cases other than this one involving

23   the U.S. Attorney's Office for the District of New Jersey while

24   you've been -- well, first let's start with DLA.

25   A.   Yes.

1   Q.   How about when you were at Chadbourne & Parke?

2   A.   I don't remember.  I just don't remember.

3   Q.   Did you interact with that office at all in your

4   capacity -- in-house capacity at Pfizer?

5   A.   I don't remember.

6   Q.   Okay.  I want to just discuss briefly with you the facts

7   underlying your becoming involved in this matter.  How did that

8   happen?

9   A.   Sometime in late April of 2016, I received a call about a

10  matter for Cognizant involving certain claims.

11  Q.   I'm sorry.  You said you received a call?

12  A.   Correct.

13  Q.   Who did that call come from?

14         MS. KRAMER:  Your Honor, I'm just going to

15  preemptively object to the extent that the answer to these

16  questions relate to anything that's privileged, whoever the

17  call was from and what was discussed during that call.

18         THE COURT:  Well, let's take it one at a time.

19         Are we going to be talking about calls seeking legal

20  advice?

21         MR. LUSTBERG:  I was just asking how he -- how he got

22  involved in the case.  So, no, I won't be asking about legal

23  advice.  I promise.

24  BY MR. LUSTBERG:

25  Q.   Who called you?

1    A.    My partner.

2    Q.    And which partner was that?

3    A.    Mike Hynes.

4    Q.    My question -- I want to understand why -- so why did he

5    call you?

6    A.    I don't know.

7    Q.    There was no discussion of why he decided that you were a

8    good person to work with on this case?

9    A.    I don't remember.

10   Q.    Okay.  Well, let me ask you this:  Was there any

11   discussion about the fact that this might be a good case for

12   you to become involved in because it might be in the

13   U.S. Attorney's Office for the District of New Jersey?

14   A.    I don't remember that conversation ever occurring.

15   Q.    So when you say you don't remember, are you saying that

16   that didn't happen or you just don't remember whether there was

17   a discussion like that?

18   A.    I don't think that ever happened.

19   Q.    Okay.  How about the fact that you had particular

20   experience with the Foreign Corrupt Practices Act?  I'm not

21   going to ask about legal advice you gave; I'm just asking

22   whether that was a reason why you were asked to become involved

23   in this case.

24   A.    I don't think so.  I don't remember that anyway.

25   Q.    Pardon me?

1   A.   I don't remember that discussion.

2   Q.   Well, you did, in fact, have FCPA experience at that

3   point, didn't you?

4   A.   Correct.

5   Q.   And come to the FCPA experience you had at Pfizer, but did

6   you have other FCPA experience beyond Pfizer?

7   A.   Yes.

8   Q.   What was the other FCPA experience that you had?

9        You don't have to talk about specific cases, but had

10   you had cases at the U.S. Attorney's Office?  Had you had cases

11   at Chadbourne & Parke?  What was your FCPA experience?

12   A.   I remember having one matter involving the FCPA while I

13   was an assistant U.S. attorney.  I certainly had cases

14   involving the FCPA at Chadbourne & Parke and at Pfizer.

15   Q.   So had you had any prior FCPA cases at DLA before this

16   one?

17   A.   Yes.

18   Q.   Okay.  Many?  A few?  How many?  Can you quantify that at

19   all?

20   A.   So is your question did I have many FCPA cases before --

21   Q.   Can you estimate --

22   A.   -- while -- sorry -- while I was at DLA?

23   Q.   Yes.

24   A.   No.

25   Q.   Let's --

1   A.   Or maybe you can define "many."  I certainly had some,

2   Larry -- Mr. Lustberg.

3   Q.   That's okay.

4        So the FCPA -- okay.  So you had a few less than

5   five? less than ten?  Can you say?  I'm just trying to gauge

6   why it was that you were brought into this matter.  I'm trying

7   to really get at that issue.

8   A.   So I -- so to try to answer that question, I think -- I

9   was living in Hong Kong at the time, conducting an

10  international investigation while I was in that office, and

11  maybe the proximity to the allegations being in India was the

12  reason why.

13  Q.   That's helpful.  So at the time of this case you were

14  living in Hong Kong?

15  A.   Correct.

16  Q.   And working in a DLA office there?

17  A.   Correct.

18  Q.   How long were you in Hong Kong?

19  A.   I think approximately a year.

20  Q.   So I wanted to just talk about -- just briefly about your

21  FCPA experience at Pfizer.  Just reading from your DLA bio, it

22  says, "Most immediately, Karl joined DLA Piper from Pfizer,

23  where he was an assistant general counsel in the government

24  investigations group.  At Pfizer, Karl's responsibilities

25  included managing government and regulatory investigations

242

1    across the company's global operations.  He interacted with

2    prosecutors' offices in the United States and abroad regarding

3    a variety of areas of law, among them the Foreign Corrupt

4    Practices Act and tax and environmental matters."

5           Would you view that as an accurate description of

6    what you did at Pfizer?

7    A.   Yes.

8    Q.   Thank you.

9           With regard to the specific FCA experience that you

10   had at Pfizer, am I right that that specific experience was one

11   in which Pfizer had self-reported to the Department of Justice?

12   Am I right about that?

13   A.   So, Mr. Lustberg, you said FCA.  So are you talking about

14   the False Claims Act?

15   Q.   I said FCPA.

16   A.   No, no.  I heard FCA.

17   Q.   Sorry.  I do FCA stuff; so maybe I got them confused.  I'm

18   focused completely on the FCPA.

19   A.   Okay.

20   Q.   So the Foreign Corrupt Practices Act, not the False Claims

21   Act.

22          So with regard to that False Claims Act, am I right

23   that your experience --

24   A.   You just said False Claims Act again.

25   Q.   So this is really -- I mean, it is entertaining.

1           With regard to the Foreign Corrupt Practices Act, am

2   I right that your specific experience at Pfizer involved

3   self-reporting to DOJ?

4   A.   No.

5   Q.   Okay.  That's not what happened?

6   A.   Well, your question was whether that was my experience,

7   and I think your question was ambiguous.  That's why I answered

8   no.

9   Q.   So I'm going to just -- rather than try to direct you in

10  the right place, tell me why my question was ambiguous on what

11  occurred with regard to Pfizer -- well --

12  A.   It wasn't clear to me, Mr. Lustberg, with whether you were

13  asking about the initial decision to self-report or subsequent,

14  you know, to that decision.

15  Q.   I was taking a look at the DOJ's press release with regard

16  to that self-report, and it was clear that Pfizer had

17  self-reported, had done a thorough and wide-reaching

18  self-investigation of the underlying and related conduct.  And

19  not to be opaque here, I'm reading from the press release.

20          Talks about the significant cooperation provided by

21  the company to the department and the SEC and the early and

22  extensive remedial efforts and the substantial and continuing

23  improvements Pfizer, Inc., has made to its global

24  anticorruption compliance procedures.

25          My question is were those things that you were

1   involved in, any of those things, when you were at Pfizer?

2   A.   Yes.

3   Q.   Explain what it is that -- what your role was with regard

4   to Pfizer's self-report.

5          MS. KRAMER:  Your Honor, apologies.  Appreciate we're

6   here to represent Cognizant's interests, but to the extent

7   Mr. Lustberg is asking Mr. Buch about the substance and scope

8   of his prior representation of Pfizer, who counsel is not here,

9   we wanted to object to that basis.

10         MR. LUSTBERG:  Respectfully, Judge, I mean,

11  Ms. Kramer represents Cognizant.  How is she offering an

12  objection on behalf of Pfizer?

13         THE WITNESS:  I still represent Pfizer, and I'm not

14  comfortable answering that question either.  I would like to

15  lodge a similar objection.  So...

16         THE COURT:  Yes, listen, we have some attorney

17  witnesses here who can take care of themselves, but we -- let

18  me make a more global comment, which is we don't need too much

19  on his background at Pfizer, do we?

20         MR. LUSTBERG:  This is the last question I was going

21  to ask.

22         And all I wanted to ask about was what role he played

23  with regard to the self-reporting.  And I'm not sure I

24  understand why that's privileged, confidential, or otherwise --

25  I mean, the fact that he was there was public, the fact that

```
 1   Pfizer self-reported was public, and I just wanted to know what
 2   his role was.  And I'm not sure I understand what the objection
 3   to that is.
 4            THE COURT:  I think he can generally describe his
 5   role without talking about any advice he gave or anything like
 6   that, just "I was in charge" or "I obeyed orders" or whatever
 7   it was.
 8            MR. LUSTBERG:  That's fine.
 9   BY MR. LUSTBERG:
10   Q.   So you heard the Court's question.
11   A.   Can you repeat the question, Larry -- Mr. Lustberg.
12   Q.   So the question is -- the question I asked was, without
13   providing any attorney-client privileged information that you
14   provided while in that capacity, just generally, what was the
15   role you played with regard to Pfizer's determination to
16   self-report and the actions they took in self-reporting?
17   A.   I would have been responsible for directing investigations
18   which included outside counsel involving potential -- you know,
19   potential issues under the Foreign Corrupt Practices Act.  I
20   had --
21   Q.   Not under the False Claims Act?
22   A.   Not the False Claims Act.
23   Q.   Sorry.  Couldn't resist.
24            THE COURT:  I think that's about as far as you can go
25   with that one.
```

1          MR. LUSTBERG:  I think it's still pretty funny.

2          THE COURT:  No, I didn't mean that joke; I meant that

3    issue.

4    BY MR. LUSTBERG:

5    Q.   Beginning in the approximately 2017 time period, after the

6    Yates Memo and after the Foreign Corrupt Practices Act Pilot

7    Program, it seems that you've written a number of articles with

8    regard to those two pieces of DOJ guidance; is that right?

9    A.   Correct.

10   Q.   I'm just going to point you to a few.  And if you need to

11   look at them, they're in the binder; but maybe we can save some

12   time by not doing that.

13          There was an article dated November 30th, 2017 --

14   it's Exhibit 50 in your binder if you want to look at it --

15   entitled "New FCPA enforcement policy presumes declination for

16   companies that voluntarily disclose, cooperate, and remediate."

17          Do you see that?

18          And, by the way, there's also screens and that kind

19   of thing.

20   A.   I'm sorry.  I just didn't hear the last bit.

21   Q.   I just said that if you want to look at -- oh, actually --

22   okay.

23   A.   Thank you.

24          Yeah, I'm familiar with this.

25   Q.   That was an article that you wrote, right?

1   A.   I was one of the authors on it, correct.

2   Q.   And the article says that the new policy provides greater

3   incentives for companies to self-disclose potential FCPA

4   misconduct and cooperate with federal prosecutors.

5        And then it goes on to advise companies how to get

6   those benefits, including with regard to providing information

7   about high-level corporate individuals.

8        And my question is what was your purpose in writing

9   that article?

10  A.   Providing information about the new policy to people who

11  were interested in the topic.

12  Q.   Okay.  Again, just to be clear, so the new policy was

13  what?

14       What was the new policy that you were writing about?

15  A.   This is the -- let's see.

16       It says new FCPA enforcement policy.

17  Q.   Am I right that that new FCPA enforcement policy did at

18  least two things; one is that it made it more possible to get

19  lenient treatment, up to and including declinations, by virtue

20  of self-reporting?

21  A.   I think that's correct.

22  Q.   And it also focused, as the Yates Memo had -- and you're

23  familiar with the Yates Memo, right?

24  A.   A lot of these memos come and go; so I'm generally

25  familiar with it, yeah.

```
 1   Q.   And your general familiarity with it teaches that it
 2   encourages individual accountability.  It encourages
 3   corporations to not only cooperate in the way they might have
 4   before but to point the finger at individuals in the corporate
 5   setting; is that fair?
 6   A.   I'd like to see a copy of that.
 7   Q.   Of the Yates Memo?
 8   A.   Yes.
 9   Q.   Oh, sure.
10   A.   When you say "point the finger at that," can you just sort
11   of explain to me what you mean by that?
12   Q.   Sure.  So the Yates Memo is, I believe, exhibit -- it is
13   Exhibit 47.
14   A.   Is there a particular piece of this you want me to look
15   at?
16   Q.   Sure.  I'm just going to ask the question again.
17          The subject of the Yates Memo, Exhibit 47, is
18   individual accountability for corporate wrongdoing, right?
19   A.   Correct.
20   Q.   And what does that mean?
21   A.   Focusing on the individual actors who are responsible for
22   the corporate wrongdoing.
23   Q.   And one of the things that the Yates Memo sets forth is
24   that if corporations do that -- in fact, corporations have to
25   do that if they're to qualify for more lenient treatment by
```

1   DOJ; is that right?

2   A.   Correct.

3   Q.   So I was talking about your articles and the question --

4   let me just continue to talk about a few others of them.

5           There's an article -- and this is Exhibit 45 in your

6   binder -- dated July 10th, 2018, entitled "Declinations for

7   self-reporting on the rise under FCPA Pilot Program and

8   corporate enforcement policy."

9           And that makes clear, right, that this great result,

10  which is a declination -- and just for the record, what's a

11  declination?

12  A.   That's a decision by the department not to bring charges

13  against an individual or corporation.

14  Q.   And that a declination is more possible -- I'm sorry -- is

15  more possible than ever with full cooperation.  And your

16  article advises companies -- and you can take a look at it if

17  you want and tell me if this is a mischaracterization.  It

18  advises companies how to effect such cooperation, right?

19  A.   The document speaks for itself.

20  Q.   It may, but I'm asking you if you think that's a fair

21  description of it.

22  A.   Let me take a look.

23          I think that's right.

24  Q.   Thank you.

25          And you've written some more articles more recently,

1   because there have been some policies this year with the Monaco

2   Memorandum and with the Southern District of New York guidance

3   that -- which we don't have to go over, but if you want to look

4   at them, you can.  They're Exhibits 51 and 52.

5          But they stick with the themes that voluntary

6   self-disclosure can really reap enormous benefits for

7   corporations.  And they instruct companies how to do that,

8   right?  Or advise -- advise -- you're advising colleagues about

9   how to realize those benefits; is that fair?

10  A.   Could you just ask that again.  I'm a little confused by

11  your question.

12  Q.   Sure.  Sure.

13         So I was just looking at your more recent articles.

14  And those articles also emphasize the benefits to corporations

15  of self-disclosure and of cooperation with the authorities.

16  And you provide sort of a primer or advice in those articles

17  with regard to how companies should go about doing that and

18  their counsel?

19  A.   I think we, in the articles, sort of summarize what the

20  policy is and what the takeaways are.  I don't think it

21  provides any particular advice.

22  Q.   Okay.  Let me make sure that's true.

23         So just, if you would, take a look at Exhibit 51,

24  page 5.

25         For the record, page 51 -- I'm sorry -- Exhibit 51,

1    DX-51, is an article written by you and others -- and tell me

2    if I misdescribe this -- that says "DOJ announces policy

3    changes and enhanced guidance for corporate compliance

4    programs:  Key takeaways."

5            That's what you were saying?

6    A.   Correct.  Correct.

7    Q.   And if we look at the key takeaways which is on page 5, it

8    talks about what companies should consider doing, right?

9    A.   Correct.

10   Q.   And it talks about revising policies and training

11   employees and reviewing metrics and holding remedial trainings

12   and the like, right?

13   A.   Correct.  That's what the document says.

14   Q.   Okay.  So with all that background and your expertise in

15   this area, what do you view as the real advantages to a company

16   of self-reporting to the authorities when they see an issue?

17   A.   Well, I think there's the potential benefits that are set

18   forth in the various documents and memos that you just

19   described.

20   Q.   Is that it?

21   A.   Maybe you could be more specific.

22   Q.   Sure.  So one of the advantages, right, is that it helps

23   companies that are facing potential problems get those problems

24   resolved on what might be the best possible terms; is that

25   fair?

Buch-Direct-Lustberg

252

1    A.   When you say "best possible terms," what do you mean by

2    that?

3    Q.   If that's incorrect, just tell me.  Aren't there

4    advantages in terms of a way a case will go that -- if the

5    company cooperates?

6    A.   I think there's pros and cons to the decision to

7    self-disclose.  And the policy sets forth the potential

8    benefits, including a declination or a reduction in a fine.  So

9    those are potential benefits of self-reporting.

10   Q.   Okay.  Thank you.

11        And isn't it also true that one of the advantages of

12   self-reporting and of doing an internal investigation is to

13   essentially engage in the investigative process yourself as

14   opposed to having FBI agents crawling all over the company

15   doing an investigation?

16        Do you view that as an advantage of -- you don't?

17   A.   I think it's just going to depend on the facts of the

18   case, the circumstances the company finds itself in.

19   Q.   But based on your experience, isn't it the case that one

20   reason why companies tend to self-report, to do their -- let me

21   stop.  Let me back up.

22        One of the reasons why companies tend to do their own

23   internal investigation is so that they can gather the facts,

24   present them to the government, and hopefully not go through

25   the difficult process that occurs when the government is doing

United States District Court
Newark, New Jersey

Buch-Direct-Lustberg

253

1    an investigation.

2            Do you think that's fair?

3    A.   Again, I think it's going to depend on the facts and

4    circumstances the company finds itself in.  And there's a lot

5    of -- depending on those facts and circumstances, there's lots

6    of decisions that a company can make about self-disclosure.

7    Q.   I understand.  But what I'm asking is, is one of the

8    potential advantages of self-reporting -- and I understand that

9    sometimes that advantage will be there and sometimes it won't

10   be.

11           But one of the advantages of doing an internal

12   investigation of its own is that the company may avoid a

13   longer, more intrusive investigation by federal law enforcement

14   or state law enforcement, for that matter?

15   A.   My experience, it's a pretty rare event for a company to

16   self-disclose.  So I'm sort of having trouble with your

17   question because I just don't understand -- I'm just having

18   trouble following.  I'm sorry.

19   Q.   Okay.  I am not going to belabor this, but I want to try

20   it just one more time.

21           You've discussed how one of the advantages of

22   self-disclosure is that there can be a more lenient penalty,

23   maybe even no penalty at the end of the day; is that fair?

24   A.   Under the government's policies that we talked about, yes.

25   Q.   And my question is aren't there other advantages in terms

United States District Court
Newark, New Jersey

1  of the company getting to the facts, presenting them in a

2  certain way, and potentially heading off more intrusive

3  investigation?

4  A.   I think where I'm struggling is you're talking about a

5  situation where a company does an internal investigation and

6  then decides to self-disclose as opposed to the more typical

7  case where a company does an internal investigation and decides

8  not to disclose.

9  Q.   Fair enough.

10  A.   So you're limited to the former situation, right?

11  Q.   Right.

12  A.   Right.  The answer is yes.

13  Q.   So when did Cognizant determine to self-report in this

14  case?

15  A.   Sometime in August, late August of 2016.

16  Q.   And was -- let me ask it this way.  I want to check on

17  this document.

18          MR. LUSTBERG:  Can you guys tell me is Exhibit 53 on

19  your list of things that have redactions?

20          MS. COLLART:  53 of the hearing exhibits is a

21  different motion.

22          MR. LUSTBERG:  Sorry.  Exhibit 53 on the list that

23  you just got, which I can probably tell you what that is to our

24  motion.  Actually, it was Exhibit 4.

25  A.   You want me to look at Exhibit 53?

```
1   BY MR. LUSTBERG:

2   Q.   Just wait until we iron out this issue.

3   A.   All right.

4            MS. KRAMER:  Larry, it's redacted.

5            MR. LUSTBERG:  Okay.  We'll come back to it because I

6   just don't want to go there.

7   BY MR. LUSTBERG:

8   Q.   So what I've tried to stay away from, potentially

9   privileged stuff right now, we may revisit it tomorrow when we

10  finish it up.  And we'll have you out of here for sure because

11  I know you have a vacation starting at noon.  I promise.

12           So from the time of the beginning of this -- of your

13  work with Cognizant, you did a good amount of investigating,

14  correct?

15  A.   Correct.  You mean -- just to be clear, investigations in

16  general, not specific as to this matter?

17  Q.   So now let's talk about this matter.

18  A.   Okay.  Because I wasn't sure of your question.

19  Q.   Fair enough.

20           With regard to this matter when you first -- I think

21  you said it was late April that you first became involved?

22  A.   Correct.

23  Q.   And did you -- and you had a team that worked with you to

24  do an internal investigation of the issues that had been

25  raised?
```

```
1              And I'm not asking you what those issues are, but you

2    had a team?

3    A.    Uh-huh.

4    Q.    Tell me how big that team was.  How many people worked

5    with you on this?  Ballpark.

6    A.    It was a very small team.  At the beginning it was me and

7    probably two associates.

8    Q.    Okay.  And you were still in Hong Kong at that time?

9    A.    I said correct.  I'm sorry.

10             MR. LUSTBERG:  Thanks, Rhéa.

11   BY MR. LUSTBERG:

12   Q.    According -- let me just see.  When eventually this matter

13   was self-reported, as of that time, I want to ask you about

14   some of what had been done.  Is it a fact that, by then, you

15   had collected documentary and electronic evidence totaling in

16   excess of 6.59 terabytes of information?

17   A.    I don't know.

18   Q.    So you don't know.  Take a look if you would --

19             MR. LUSTBERG:  Don't publish this, please.

20   BY MR. LUSTBERG:

21   Q.    -- DX -- Defendant Exhibit 56.

22             MR. LUSTBERG:  Can you guys let me know if that

23   one -- what the status is on that one?

24   BY MR. LUSTBERG:

25   Q.    For your -- to assist you here, I'm looking at page 3 of
```

1    4.

2    A.    Page 3?

3    Q.    Yeah.

4              MS. KRAMER:  It's redacted.

5              MR. LUSTBERG:  That section is redacted?

6              MS. KRAMER:  Which section?

7              MR. LUSTBERG:  II.D.  It's not?

8              MS. KRAMER:  No.

9              MR. LUSTBERG:  Thank you.

10             So if we could just put up II.D on the screen, just

11   make sure that's all you have.  Just blow up II.D, please.

12   Thank you.

13   BY MR. LUSTBERG:

14   Q.    So this document is talking points that were prepared for

15   when you were going to report this to the government; is that

16   correct?

17             If you look at the first page.

18   A.    So these were talking points that were used for a

19   particular meeting, but your question wasn't clear as to

20   whether this was the initial report to the government or at

21   some other point in time.

22   Q.    Well, what was it?

23   A.    So this was at some other point in time, I believe in

24   October of 2016.

25   Q.    It says, "Draft, August 31st, 2016," on the first page.

Buch-Direct-Lustberg

258

1    A.    Okay.  So then this is a script for the first call.

2    Q.    So I just want to -- again, I'm trying to just pin down

3    what you had done by the time of that first call.

4    A.    Okay.

5    Q.    By the time of that first call, you had issued multiple

6    litigation holds.  Do you know what those were?  What the

7    litigation holds --

8    A.    What a litigation hold is?

9    Q.    Sure.  Start there.

10   A.    It's a document that's presented to employees or other

11   custodians to maintain their records and not destroy anything.

12   Q.    And without saying who got them here, this was -- when you

13   say you issued multiple litigation holds, you sent it around to

14   a number of people in the company, that sort of document to

15   assure that documents were not destroyed on purpose or

16   inadvertently --

17   A.    I think the company issued the holds, actually; but

18   correct.

19   Q.    And it said, "We have collected documentary electronic

20   evidence currently totaling in excess of 6.59 terabytes of

21   information."

22         Is that a lot?

23   A.    That's what it says.  I'm not an IT guy; so I don't know

24   if that's a lot or not, but it sounds like it is.

25   Q.    And "have interviewed over 25 witnesses in India and the

1    United States (including the president, general counsel, and

2    chief financial officer)," right?

3    A.   I don't see that.

4    Q.   So that's the third bullet where -- there's a solid bullet

5    and then there's three hollow bullets.  And those --

6    A.   Is that page 2 or 3?

7    Q.   This is page 3 of 4 under the "What is the current status

8    of the investigation?"

9    A.   Okay.  I see that.  It does say that.

10   Q.   So do you recall when you first contacted the government?

11   Was it August 31st?  I can show you a document if it would

12   help.

13   A.   I think it was either August 31st or September 1st.  That

14   was the first time we contacted --

15   Q.   So let's take a look at Exhibit 55.

16        MR. LUSTBERG:  This one's definitely not privileged.

17        I'm sorry.  That was 55.  Yes, Exhibit 55.

18   BY MR. LUSTBERG:

19   Q.   So this is an email from Jonathan Haray.  Who's Jonathan

20   Haray?

21   A.   He was a partner of mine at DLA Piper at the time.

22   Q.   And he worked on this matter with you?

23   A.   He did.

24   Q.   And he emailed somebody name Kara Brockmeyer at the SEC;

25   is that right?

```
1    A.   Correct.

2    Q.   First of all, why her?

3    A.   My recollection is at the time she was either the FCPA

4    unit chief or some -- in some supervisory role, and she was the

5    person to whom disclosures were typically made.

6    Q.   The email starts, "Hi, Kara."  Was she a person that

7    Mr. Haray knew?

8    A.   I don't know.

9    Q.   And why did he go to the SEC first as opposed to DOJ

10   first?

11        MS. KRAMER:  Objection, Your Honor.  The answer to

12   this question possibly calls for privileged information

13   regarding strategy calls between Mr. Buch and his then-partner.

14        MR. LUSTBERG:  Your Honor, I don't see how -- I'm not

15   asking for a particular --

16        THE COURT:  I'll permit that.  There's a question

17   after that that could --

18        MR. LUSTBERG:  I'm not going to ask the question.

19        THE COURT:  -- that could involve privilege, but that

20   question doesn't, I don't think.

21   A.   I don't remember.

22   BY MR. LUSTBERG:

23   Q.   So let me ask this question, then.  And take a look at

24   Exhibit 54.

25        So this is the next day, September 1st.  Do you see
```

1  that?

2  A.   I do.

3  Q.   And this is -- by the way, both the last exhibit and this

4  exhibit are ones where you're copied, right?

5  A.   Correct.

6  Q.   And this one says -- this is from Jonathan to Daniel Kahn.

7  Do you know who Daniel Kahn is?

8  A.   I do.

9  Q.   Who is he?

10  A.   He is an attorney who I think at the time was the head of

11  the FCPA unit for the Department of Justice.

12  Q.   Okay.  And do you know if Jonathan Haray knew him?

13  A.   I don't know.

14  Q.   And do you know why Mr. Kahn was the person that Jonathan

15  reached out for?

16  A.   I think, like Ms. Brockmeyer, Mr. Kahn, as the head of the

17  unit, was typically the person to whom disclosures -- you know,

18  these initial disclosures were made.

19  Q.   Okay.  Do you know what was discussed between Mr. Kahn

20  from the Department of Justice and you and Mr. Haray when you

21  eventually spoke?

22  A.   I think we had a discussion about the fact that Cognizant

23  had identified or hadn't received -- or put it differently.  A

24  whistleblower had raised concerns about potential improper

25  payment, and the company wanted to disclose that to the Justice

1    Department.

2    Q.   Do you recall whether you or Mr. Haray -- or anybody else,

3    for that matter -- mentioned the Yates Memo or the FCPA Pilot

4    Program on that September 1st call?

5    A.   I don't remember that, but I know we prepared some talking

6    points in advance of that which may help refresh my

7    recollection.

8    Q.   Well, let's take a look at those.  That's exhibit -- that

9    is Exhibit 56.  It's the one we looked at earlier.

10            If I can direct your attention to page 2.  Let me

11   just check with my colleagues.

12            MR. LUSTBERG:  The third bullet point on the second

13   page, is that redacted?

14            MS. KRAMER:  That's okay, the third bullet point.

15   There are redactions underneath that.

16            MR. LUSTBERG:  Yeah.  The fourth bullet point is

17   redacted?

18            MS. KRAMER:  Fourth is okay as well.

19   BY MR. LUSTBERG:

20   Q.   So I want to just -- if you look at the third and fourth

21   bullet points on the top of page 2 -- and by tomorrow, we'll

22   have all this ironed out so I don't have to keep asking

23   Ms. Kramer for -- and her team.

24            It says, "The company is not aware of any disclosure

25   obligations in this or any other jurisdiction relating to the

1  facts under review.  This disclosure is voluntary, and we would

2  ultimately like to be considered for inclusion in the FCPA

3  Pilot Program."

4          So just to unpack that a bit, why is it important

5  that there's no disclosure obligations in this or any other

6  jurisdiction?  Why is that part of that talking point?

7  A.   My recollection is that that's a requirement under the

8  pilot program.

9  Q.   So I understand, that idea that you are attempting to

10  be -- get the benefit of the FCPA Pilot Program was something

11  that the board at Cognizant had already -- had urged you to

12  request, no?

13          MS. KRAMER:  Objection, Your Honor.  Calls for

14  privileged information, discussions between counsel and the

15  board.

16          THE COURT:  If the board is telling him to tell DOJ

17  and the SEC, why is that not --

18          MS. KRAMER:  To the extent a conversation, Your

19  Honor, with the board involved legal advice or guidance as to

20  whether that was a good idea or not, that would be privileged

21  information.

22          THE COURT:  Okay.  But I think he was asking just a

23  yes-or-no question.  Did the board ask you to do that?  And we

24  can take it that far.

25          MS. KRAMER:  Okay.

 1   BY MR. LUSTBERG:

 2   Q.   Just in this very same document, Exhibit 56, page 4, the

 3   second or third bullet point down it says, "On Wednesday

 4   august 31st, the board charged DLA with voluntarily reporting

 5   this matter to the DOJ and SEC along with its stated

 6   intention" --

 7              MS. KRAMER:   Mr. Lustberg, this is redacted.

 8              MR. LUSTBERG:   Okay.  We'll just let the Court look

 9   at it, then.

10   BY MR. LUSTBERG:

11   Q.   In response to your call on September 1st that we've been

12   talking about with DOJ, what was the government's response?

13   A.   I think they listened to the points that we made, and it

14   was very -- it was a very minimal response.  I don't remember

15   exactly what they said, but there wasn't -- nothing sort of

16   stands out about their response.

17   Q.   Do you remember whether they asked any questions or made

18   any requests at that time?

19   A.   They must have asked some questions.

20   Q.   Why do you say that?

21   A.   About the company.  You know, where they were located,

22   things like that.  But I don't ask -- don't remember them

23   asking for -- or asking us to do anything, if that was your

24   question.

25   Q.   So take a look, if you would, at Defendants' Exhibit 2 and

1    in particular at the bottom of that page.  This is an email

2    dated Thursday, September 8th, from Mr. Haray to DOJ, and

3    you're copied on it, right?

4    A.    Uh-huh.

5    Q.    It says, "Dan, I left you a voice message a moment ago to

6    follow up on a question you asked us last week.  Is there a

7    good time to reach you this afternoon?"

8          Do you recall what that question was?

9    A.    I don't recall the question being asked, but based on

10   this, the full email, it appears that there may have been a

11   request relating to personal email addresses.

12         MR. LUSTBERG:  Your Honor, it's 5:12 or so.  I'm

13   about to get into a particular area that I'm not going to be

14   able to finish up by 5:30.

15         THE COURT:  If you're starting a new chunk of

16   material, we might as well break now rather than have to recap

17   in the morning.

18         MR. LUSTBERG:  Okay.

19         THE COURT:  Okay.  We're going to break for the day.

20   We will start at 9:00 sharp tomorrow, and I'll see you all

21   there.

22         Anything we need to take up, take care of?

23         MR. LUSTBERG:  I don't think so.  We'll work with the

24   Cognizant lawyers to try to avoid some of that back-and-forth.

25         THE COURT:  With my prior rulings in mind, I saw some

United States District Court
Newark, New Jersey

1    areas for concern there.

2            MR. LUSTBERG:  Yeah.

3            THE COURT:  I'm sure you'll talk it over.

4            MR. LUSTBERG:  What we're going to is just substitute

5    redacted exhibits so that we don't have that problem.

6            THE COURT:  Sure.  And whatever disputes remain,

7    we'll deal with.

8            MR. LUSTBERG:  Thank you, Judge.

9            THE COURT:  Thank you, everyone.  We're adjourned.

10           MR. LUSTBERG:  9:00, right?

11           THE COURT:  9:00.

12           (Proceedings conclude 5:15 p.m.)

13   -------------------------------------------------

14       I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16

17

18   /S/Rhéa C. Villanti, CCR, CRCR, RMR          4/18/2023

19   Court Reporter/Transcriber

20

21

22

23

24

25

United States District Court
Newark, New Jersey