# EXHIBIT 23



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

INTERVIEW MEMORANDUM

TO: File
FROM: DLA Piper
DATE: September 1, 2016
RE: Cognizant August 28, 2016 Interview Memorandum – Steven Schwartz

This memorandum summarizes the interview of Steven Schwartz, Chief Legal and Corporate Affairs Officer at Cognizant Technology Solutions Corp. ("CTS" or the "Company") by Karl Buch, Gray Stratton, and Natasha Kanerva from DLA Piper, and Brackett Denniston from Goodwin Proctor LLP at the New York offices of DLA Piper on August 28, 2016. Schwartz was represented by Joshua Rievman of Hoguet Newman Regal & Kenney.

Schwartz is the only source of the information reflected herein. This memorandum is not a verbatim recitation or transcription of the interview. It reflects the mental impressions of counsel and is protected by legal privilege. The purpose of this memorandum is to assist in gathering information for counsel to render legal advice to CTS and in anticipation of potential litigation.

At the outset of the interview, Mr. Buch informed Schwartz that DLA Piper had been retained by CTS to investigate certain allegations. Mr. Buch then delivered a standard *Upjohn* warning and Schwartz acknowledged that the interview was to be kept confidential as it was protected by the attorney-client privilege, a privilege that belonged to CTS and not to him, and that the Company would determine whether to disclose information discussed to any third parties.

I. BACKGROUND INFORMATION

Schwartz is a corporate lawyer by training. Prior to joining CTS, Schwartz worked at Coopers & Lybrand in their Mergers and Acquisitions Tax group after law school and at Simpson Thatcher LLP in their Mergers and Acquisitions ("M&A") and Securities groups from 1995 to 1999. After leaving Simpson Thatcher, Schwartz had significant legal roles with a Cendant spinoff called Hagglezone and with a Seattle-based company called Soul Spark. After Soul Spark, Schwartz joined CTS, which "had the feel of a start-up but with money."

Schwartz joined CTS in October 2001. He met Gordon Coburn, President, in his first interview. He was the first corporate attorney hired by CTS. CTS wanted help with contracts. Schwartz said that the contracts were mostly commercial in nature, but that there were also some M&A deals. His first title was Chief Corporate Counsel. He indicated that he thought he was also a director at that time. Schwartz said he wanted the General Counsel role/title, but was told he could grow into that role. He advanced quickly within the organization and said he "built the legal function." He could not remember when he became General Counsel. Schwartz hired Dana Gilbert, Senior Vice President, Legal, Joelle Quilla, General Counsel, Client & Corporate Securities, and a person named John [possibly John Gordon Mayfield, Associate General Counsel].

EAST\144789194.1

Confidential    CTS_R17_0004324



CTS began in 1994 as an in-house "IT shop" at Dunn & Bradstreet ("D&B"), focused on the travel industry. In 1996, people started to worry about Y2K and CTS focused its services on Y2K. In 1996, D&B made a business decision to provide CTS services to third parties. CTS did very well in 1996-1997 and went public in 1998. In the wake of the terrorist attacks on September 11, 2001, the Company's stock plummeted due to fears about travel. According to Schwartz, the senior leaders at the time, Francis D'Souza, Chief Executive Officer, and Senthil Kumar, Manager, Legal, changed the model (very effectively) to provide a broader array of services. The Company's sales team went to JP Morgan Chase ("JPMC") and they were impressed. Schwartz worked on the contract for a deal with JPMC, which Schwartz described as a "game changer" for CTS. After CTS broadened its services and partnered with JPMC, the company grew rapidly at 50-100% per year. The commercial contracts drove the company. At the time of the interview, CTS employed 223,000 people worldwide, including around 150 lawyers. CTS's revenue at the time was USD 3.65 B.

At the time of the interview, Schwartz was Executive Vice President, Chief Legal and Corporate Affairs Officer. He was also Corporate Secretary. He oversaw Legal, Security, and Government Affairs functions. Schwartz took over Government Affairs in 2014-15. CTS recently hired Joel Livingston as the new head of Government Affairs. For the past few years, Schwartz focused a large portion of his time on Government Affairs, particularly immigration policy and related issues. Schwartz said that Senate Bill 744 on immigration was a big issue for CTS. Schwartz indicated that, in the summer of 2014 and probably before, he was in Washington D.C. every week working on immigration issues.

Quilla reported to Schwartz and oversaw global contracts, litigation, and human resource matters. She was promoted last year to Senior Vice President. As part of that promotion, she became more involved in India. The ultimate goal was to move Gilbert to a compliance-only function but, at the time of the interview, that transition had not happened yet. Gilbert was responsible for compliance and India. Henry Shiembob, Chief Security Officer, was responsible for Security.

Schwartz was the "decision-maker" on certain aspects of contracts (*e.g.*, indemnification, caps on liability). He was also involved in litigation, particularly counsel selection and strategy. Quilla and Jacob A. Hill, Associate General Counsel, handled litigation. Historically, CTS had been infrequently involved in litigation. Schwartz said things that were important had his attention. He indicated this investigation only became an issue of concern for him after the August phone call with Srimanikandan Ramamoorthy ("Mani"), Vice President, Corporate Workplace Services ("Administration" or "Admin") and Corporate Real Estate ("Infrastructure" or "Infra"), which he said "made things different." Schwartz said issues involving the Department of Labor and immigration compliance would have also gotten his attention. Schwartz described CTS's favorable record of immigration compliance.

In addition to Chief Legal Officer, Schwartz was Corporate Secretary. As such, his primary responsibility was to take the Board meetings minutes and to confer with Coburn and D'Souza to

EAST\144789194.1

Confidential

CTS_R17_0004325



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

prepare for the Board meetings. Schwartz also took the minutes for the Audit Committee meetings and sometimes presented to the Audit Committee.

## II. REPORTING LINES

Compliance reported to Schwartz but the Audit Committee received reports and oversaw their activities. Internal Audit ("IA") reported to Steve Casari, Vice President, Internal Audit, who reported to Karen McLoughlin, Chief Financial Officer.

## III. RECENT CALLS WITH MANI RAMAMOORTHY

### A. August 3, 2016

Schwartz indicated that he spoke to Mani on or around August 3, 2016 based on a request from Coburn. According to Schwartz, Mani reached out to Coburn regarding issues he was experiencing in getting power to the Cognizant KITS facility ("CKC" or "KITS"). Coburn sent Schwartz and Mani an email asking Mani to follow up with Schwartz and Gilbert. Coburn said he did not have details. Schwartz said there was nothing unusual at that point.

Schwartz said that his and Gilbert's "antennas went up" during the August 3 conversation with Mani. Schwartz said that Mani was nervous. According to Schwartz, Gilbert could not understand Mani because he was speaking so quickly and Schwartz could only barely understand him. Schwartz said that Gilbert and he were both surprised by how quickly Mani was speaking. Schwartz said that Mani's eye movements and hand movements also suggested there was something wrong. Schwartz said during the call he reflected on previous investigation updates from DLA Piper and references therein to "incidental expenses" that disappeared. Schwartz said Mani said things in the call that sounded similar regarding payments relating to electricity for KITS, which further heightened Schwartz's concern. Schwartz speculated that Mani might have learned certain emails were uncovered in the investigation and was trying to come up with excuses.

Mani said they were being asked to make a "facilitation" payment. Schwartz thought Mani said USD 300 but Mani clarified he was asked to make a USD 300 K payment. Schwartz said his "heart sank" at the reference to the "huge" amount. He said, "when at first I thought it was USD 300 or USD 3 K…I thought ok that could be a facilitation payment. But USD 300 K cannot be." He said they had worked through a previous USD 50 K matter with DLA, which Schwartz also said was huge. Schwartz told Mani it was not allowed. Schwartz said he and Gilbert tried to figure out on the call whether the payment had already been made and what was going on. Mani mentioned Larsen & Toubro ("L&T") but Schwartz and Gilbert ultimately gave up on gathering additional information on that call because Mani was too difficult to understand.

Schwartz said after the call with Mani, Schwartz talked to Coburn and D'Souza (separately, from what he recalled) to "give them a heads up." After conversations involving Schwartz, Coburn, D'Souza, and maybe Gilbert, it was determined they would inform the Board. Schwartz called

EAST\144789194.1

Confidential                                                                                     CTS_R17_0004326



each of the Board members individually except for Michael Fox. Schwartz also reached out to DLA Piper to set up a follow up call with Mani on August 8, 2016.

Schwartz stated the amount at issue brought up in the phone call with Mani got his attention. Schwartz also said any general discussion of a facilitation payment or payment to a government official would have gotten his attention. Schwartz said he is of the view that there should never be payments to government officials to get something. Schwartz indicated the Company's code allowed facilitation payments if people did certain things but he said he believed that CTS should never tolerate it and they should stop it altogether.

A.   **August 8, 2016**

During the August 8 call, Schwartz asked Mani if payments of this nature were a recurring practice or a "habit." According to Schwartz, Mani did not answer, but Schwartz also said they observed in emails a trail of "incidental expenses." Schwartz said he was worried they had a bigger problem and thought it was a fair question. He said he did not know if Mani or anyone else was making improper payments. Schwartz said he did not know how Admin worked.

Schwartz stated that the relevant emails showed a line item for INR 230 M. Schwartz said there was a follow up email that broke things down more specifically, and another email to L&T or to someone, stating "we can't agree to pay this amount without an in-person meeting." Schwartz said it appeared there was an in person meeting, followed by an email with a detailed breakdown of the fees, but with no incidental expense listed. However, new expenses were included that were only slightly lower with a discount, which seemed to offset those "incidental expenses" removed. Schwartz said it appeared they inflated the cost of the work to hide the incidental charges.

Schwartz said he recalled talking to D'Souza after the August 8 call with Mani and telling him how concerned he was because they had gone from allegedly "small payments" to these new allegations. Schwartz said they took the original allegations seriously and had updated the Audit Committee but the August 3 and August 8 calls with Mani changed things.

IV.   **GORDON COBURN**

Schwartz indicated that "everything" reports into Coburn with the caveat that Real Estate has recently been transferred to McLoughlin. Schwartz described Coburn's management style as "tough" but "usually fair." "He drives people hard," and "[h]e pushes." Schwartz said Coburn was very detail-oriented but he had been trying to be more hands-off. Schwartz also said Coburn was very "in the weeds" with respect to budget management. Coburn reviewed every budget even though he was not CFO. He and McLoughlin "go through everything." At one point in the interview, Schwartz described Coburn as being "super into details."

Confidential



### V.  BUDGET PROCESS/LEGAL BUDGET

Schwartz explained that budget holders would present a deck and a spreadsheet, and Coburn would scrutinize the request. In 2016, Legal had a USD 15.5 M budget, which also covered Compliance. Schwartz described challenges in getting approval from Coburn regarding Legal and Compliance budgets. Schwartz said he thought Compliance was underfunded but Legal was adequately funded. Schwartz said he had been fighting for more Compliance budget. He wanted to "break out compliance" in 2015, as a separate line item in the budget, but it "did not go where [he] wanted it to go" with Coburn. The Legal budget for India was USD 8-10 K for the year. Schwartz said he and Gilbert built a "world-class" in-house Indian Legal team that reduced expenditures in the market. He said CTS relied little on outside counsel for litigation and environmental.

### VI.  COMPLIANCE BUDGET

Coburn rejected Schwartz's budget request for Compliance in 2015. Coburn told Schwartz with margin pressures he could only approve the base yearly increase amount of 10-12% for all of Legal. Schwartz took the Legal budget he was given, tried to help Compliance with his budget, and said they did a good job with the budget they had.

At the time of the interview, the Company's Compliance budget was USD 1.8 M. In 2016, Gilbert asked to hire seven more compliance personnel. Schwartz tried to free budget by convincing Coburn and several foreign markets to take over Compliance personnel on local Profit and Loss Statements as "embedded" personnel. Coburn had agreed to this previously for corporate security personnel and agreed to free up any released budget for Compliance personnel in 2016. Schwartz told Gilbert that if Coburn would not approve the additional hires, he would give her part of his budget to get it done. It was not necessary, however, because, in April 2016, Coburn approved the additional hires in Compliance. Prior to the additional hiring in 2016, there were approximately 35 Compliance personnel. Some of these are "embedded" personnel that are not in the Legal budget.

Coburn did not approve Schwartz's request for additional funds for compliance training software. Schwartz and Gilbert tried to build an internal compliance training team but it did not work well, so Schwartz proposed to introduce training software in 2016. Schwartz wanted USD 500 K for training software called Conversant and LRN. Schwartz said Coburn did not understand it. When asked why Coburn balked at a USD 500 K expenditure, Schwartz indicated Coburn was "super into details" and personally negotiated the Company's software licenses. Schwartz said there was even a time when Coburn would approve every cell phone in the company. Coburn did not reject the software budget but wanted to understand what it did. Gilbert presented details on the software and Coburn approved Conversant. Coburn wanted to negotiate a better deal for LRN, to receive more licenses or to lower the price. Later, after Mani raised allegations about improper payments, Coburn approved LRN. The purchase was approved without achieving all the negotiation goals but Schwartz thought the need overshadowed price and licenses after Mani raised his allegations.



Schwartz discussed his impressions that Compliance is underfunded. When asked where the resistance to funding Compliance came from, Schwartz indicated they have to look at all functions in the Company, but otherwise said, "I can't answer that. The resistance is in my budget. I can't speak to why." Coburn set the budget. Schwartz said he fought and received what he can and worked with that. He said getting what Gilbert wanted for Compliance this year was a win.

## VII. INTERACTION WITH MANI

Schwartz said he had "limited" involvement with Infra and was not familiar with Coburn's interactions with Mani.

## VIII. INDIA ISSUES

Schwartz was asked generally about the issues raised to him from India. He said litigation, particularly regarding the use of property, was commonly brought to his attention. He was involved in retaining counsel for all projects and real estate matters. He was involved in these issues even though he had Indian lawyers responsible for these matters, Deepa Baburaaj, General Counsel, India and Anand Bhushan, former General Counsel, India. Schwartz was not involved in the day-to-day activities but the Indian lawyers might have reached out to Schwartz or Gilbert. Schwartz added that issues the India team would raise to Coburn or other senior US leadership would often also go to him. Schwartz explained it was common for him to be copied on emails that were sent from India to Coburn.

## IX. PRE-PERMIT CONSTRUCTION

Schwartz discussed regulatory issues in India. Schwartz stated there was a time when CTS was "proceeding" without proper permits. Schwartz said he thought this practice had stopped. He described these as "legal issues" – the government would come and say you have a potential issue. Anand was also involved. Anand copied Schwartz on correspondence and provided the details. Coburn was involved on the expense side. Schwartz learned about the Company's "proceeding" without proper permits from Anand. According to Schwartz, Anand explained the situation through emails and a quick call in the 2012/2013 time period. Schwartz said Anand explained to him: (i) what was being alleged, (ii) whether they had the right permit, and (iii) the steps to take. Schwartz thought Pune was one of the sites at issue and maybe KITS.

Schwartz was asked about a practice of pre-permit construction. He pointed out that he had not used the term "practice" to describe these occurrences. He clarified he only heard it happened. Schwartz is familiar with the IA report from 2013 and saw the IA slide deck that said it happened but he was not aware of the extent of it. He understood IA raised it and it was resolved.

Schwartz reviewed ELE_00437781 [Tab 94], an Internal Audit PowerPoint presentation, dated January 6, 2014, titled "Infrastructure Project Review – Phase 2 India." Schwartz indicated this presentation was more detailed than the one he remembered seeing. This was not presented at the

EAST\144789194.1



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

Audit Committee meeting. In particular, Schwartz reviewed the reference to significant delays in obtaining pre-construction approvals on page 43 of the presentation. He remembered a slide that mentioned this but he did not remember the words "significant delays." The Audit Committee did not go through every slide in the meeting. Schwartz remembered focusing on contracts with L&T and, based on DLA Piper's recommendation, adding Foreign Corrupt Practices Act ("FCPA") language to the contract. Schwartz would "see" the presentation before the meetings and would sometimes ask questions but he generally relied on Gilbert for any compliance issues raised therein.

Schwartz reviewed ELE_00377894 [Tab 92], an Audit Committee PowerPoint presentation, dated December 3, 2013 titled "India Infrastructure and Real Estate Procurement Process Update," including slide 25. Schwartz said he recalled seeing this document. He was shown the reference in the document to "significant delays" and asked what steps he took to fix them. Schwartz said delays in obtaining approvals were an Admin issue. He said, "I don't see a legal issue here because we aren't doing anything illicit." A delay is a delay in the project. "We in Legal did not take steps to fix this." Schwartz was asked if he understood in these circumstances, that construction didn't start. He responded that he understood it "shouldn't start." He saw they were not getting permits and they should not start construction until they did. He understood IA worked with others to ensure CTS had permits before starting construction. Schwartz was not aware the Company hired Ernst & Young ("EY") to look at this issue.

Schwartz indicated he took notes at the Audit Committee meeting. Schwartz said he did not remember if one of the committee members raised a question about a potential compliance risk associated with starting construction without permits. He indicated that Gilbert would have been responsible for following up with IA on obtaining pre-construction approvals. Schwartz said he was told steps were taken and that this was not an issue anymore. He did not remember hearing after this meeting that the Company had started construction prior to obtaining permits. He thought all of the issues predated the meeting. Schwartz did not remember EY reporting on this issue.

Schwartz reviewed ELM_03234842 [Tab 69], an EY presentation dated June 3, 2013, titled "Internal Audit Report – Infrastructure Project Review: Siruseri and Sholinganallur projects," including pages 46-47. Schwartz said he did not think he had ever seen this document. He said he has heard the term "just-in-time approach" but he did not know much about it and stressed he was not involved in Admin. Schwartz was advised by Deepa that there was a potential criminal risk associated with pre-permit construction but took no steps personally to ensure the activity did not continue. He said he believed that IA and Compliance were taking steps.

Schwartz reviewed IN_ELE 03599576 [Tab 64], an email chain dated May 17, 2013 from Kumar to Schwartz, copying Anand, attaching a "brief fact sheet – MPCB matter." Schwartz said he remembered this document regarding the Pune facility. He indicated this was a project initiated without the proper permits. The Indian government initiated an action. Kumar advised Schwartz about the government action and what steps they could take in response. Schwartz observed that the document referred to criminal prosecution and commented that "in India,

EAST\144789194.1

Confidential

CTS_R17_0004330



everything could be criminal prosecution." Schwartz asked Anand to determine who was responsible but, ultimately, they were unable to determine who authorized the pre-permit construction. Schwartz was focused on fixing the issue. IA was reviewing the entire real estate program at this time.

Because of this memorandum, Schwartz became aware of the Pune facility and that construction started without an environmental permit. CTS did not have an environmental department. Environmental issues were dealt with internally by Infra or Admin. Schwartz did not remember how the show cause proceeding against the company was resolved. He said he was not aware of the current status of the proceeding.

Schwartz reviewed IN_ELE_03529882 [Tab 84], an email chain dated November 6, 2013, including an email and attached memorandum dated October 21, 2013. Schwartz said the attached memorandum reminded him that as a result of IA's findings regarding pre-permit construction, they formed an internal compliance committee in India. Anand recommended a process to Schwartz for having a review committee for real estate. Schwartz analogized it to spokes on a wheel that included Legal, Admin, and other groups that worked to review projects. Schwartz said he supported this recommendation.

As part of the overall process, McLoughlin and Raj Ghosh, Vice President, Global Procurement, worked on a presentation that was presented at the "audit meeting." Schwartz said Gilbert and maybe others worked on the committee and on the process. The presentation noted that Legal should get more involved in the process as part of an overall approach. He said he did not remember the exact date but the goal was to have India legal oversight in the process. Schwartz was asked if seeing this document refreshed his recollection about the frequency of pre-permit building. He responded that when he heard about the practice he looked for a way to fix it. "This is what they came up with: more Legal involvement going forward."

In February 2013, CTS held a Board meeting in India. At that meeting, there was side bar in which concerns were expressed. Schwartz said, "We had all seen things for the first time about our Admin program. We were all concerned." Schwartz and Gilbert both expressed concerns. Schwartz said he saw the issues arise; he saw some of the language in the report and wondered if he would be sent to jail in India. Schwartz said Anand walked him back from the ledge and said to him, "Yeah that's the law, but this is how it actually works in practice and this is how we can solve it." Even with the serious issues presented in the presentation, solutions were also presented. Schwartz said steps were being taken in December 2013.

Since that time, Schwartz asked for a subsequent IA review of Infra as a whole "to see if things have been done." He said he asked D'Souza and Gilbert, but he was not sure if he asked Casari. Schwartz said, "It [the subsequent IA review] hasn't happened." Schwartz noted that Infra does not report to him and said "it's not my job to test the steps that they take." He said this was IA's responsibility. He said he was concerned about the legal violations discussed in the report, but that he had put processes in place, he was on the phone with his India team, and he was going to India for meetings. He asked his CEO, "why aren't we looking into this."



## X.   2014 CONVERSATION WITH GORDON COBURN

Schwartz is only familiar with KITS/CKC because of the "power issue." He said he might have talked to someone about the failure to obtain permits at KITS. Schwartz was asked if he remembered a conversation with Coburn, Sridhar Thiruvengadam, Executive Vice President, Strategic Initiatives and former Chief Operating Officer, and Mani about a failure to get permits pre-construction. Schwartz said "Maybe I don't know." When asked if he remembered a conversation with Coburn, Sridhar, Mani about payment of a bribe, Schwartz responded that he remembered only one conversation with Coburn – he believed in 2014 – and he did not remember the word bribe being used. Coburn said he was having a challenge getting approvals on a real estate transaction. Schwartz said he didn't know what the facility was. Coburn asked two questions. He asked "I can't make a payment to help with these approvals?" Schwartz said, "correct." Coburn then asked "and I can't do that through a third party?" Schwartz answered, "correct." Schwartz said he did not remember what facility the conversation concerned.

Schwartz said the conversation was short and, to his knowledge, involved only Schwartz and Coburn. Schwartz was walking by his office and Coburn called him in. Coburn did not indicate what the potential payment would have addressed or to whom it might be paid. Coburn did not say anything about L&T or any other third party. He did not mention the amount. When asked if he thought Coburn was telling him about something he was doing or there was an actual demand, Schwartz said he took it as a rhetorical question. He said people do this to him and other lawyers all the time. They want the lawyers to be the bad guy. Coburn had never considered doing it before and was not considering it then, he said. Schwartz said his 2014 conversation with Coburn was his "only involvement in Admin."

Schwartz was asked if, based on this conversation, he knew if L&T was proposing to pay a bribe. Schwartz said, "I'm walking by, heading to a meeting; he asked the questions; I thought they were rhetorical; I left." Schwartz did not ask if a demand was made. He said the conversation was short. He did not report it to anyone. Schwartz said he did not consider it a conversation about a potential payment. Schwartz said, "He did not ask about paying." He said, "I did not take it that way. I did not think I needed to report it." Schwartz speculated maybe someone asked Coburn. "I know Gordon knows that he cannot pay a bribe directly or indirectly." Schwartz analogized it to the numerous other times when people ask him questions they already know the answer to. When pressed on why he did not ask Coburn why he was asking the questions, Schwartz said Coburn told him he was having a challenge in getting an approval. Schwartz said he did not ask Coburn to explain the questions. He said it was his fault for not asking but he was heading to a meeting. Schwartz did not ask who from Admin might have brought the request to Coburn. In hindsight, given what he knows now, Schwartz admitted that Coburn's asking him about the possibility of such a payment was brazen. He added, however, that he did not take it at the time (or even now) to reflect the possibility that such a payment might be made.

Schwartz was asked about the Company's policy regarding facilitation payments. Schwartz confirmed the policy permitted facilitation payments under certain circumstances. Schwartz said the policy permitted them but, in his opinion, they should never be permitted. Schwartz was

Confidential                                                                                                                                                                                                                           CTS_R17_0004332



asked how he knew Coburn was not asking about a permissible facilitating payment. Schwartz responded that he might have been but he took a hard line. He said it was safer to say no.

## XI.   RECENT CONVERSATIONS

Schwartz was asked about recent conversations with colleagues about his removal from the investigation. Schwartz said he spoke to Gilbert and D'Souza, and then with Coburn.

### A.   August 20 Conversation with Dana Gilbert

Gilbert called Schwartz on Saturday, August 20, 2016, and told Schwartz he was off the investigation. Schwartz said they spoke once that day but maybe more because Schwartz was perplexed and tried to figure things out. He probably sent texts or emails indicating he needed to speak with her. Gilbert declined to explain why Schwartz was off the investigation. She told Schwartz he should speak to D'Souza. Schwartz said he racked his brain for any discussions he had regarding Admin and remembered the 2014 conversation with Coburn.

### B.   August 20 Conversation with Francis D'Souza

Gilbert called Schwartz on Saturday and said he needed to speak with D'Souza. Gilbert told Schwartz he was off the investigation but she would not say why. Schwartz said he did not speak to D'Souza on Saturday, August 20, because he was in Brazil. Instead, they spoke on Sunday, August 21 for 20 minutes. Schwartz said he remembered D'Souza telling him he was being removed from the investigation and they talked for a while. Schwartz did not remember the specifics but he assured D'Souza he had done nothing wrong. He said he remembered speculating it was probably Mani who made the accusation against him, "because Mani was under investigation." Schwartz said he could not think of anyone else and Schwartz knew Mani was nervous about the USD 300 K.

Schwartz denied telling D'Souza he was on a call with Coburn, Mani and Sridhar concerning a bribe payment. "I did not say that to Frank." He said he told D'Souza the same version of events that he told us. He said he could not imagine what was being alleged because he had so little involvement in Admin. He said the only thing he could think of is when Coburn called him into his office and gave Schwartz the two queries. Schwartz was asked if he remembered mentioning to D'Souza the issue related to KITS. He indicated the only reason he knew it was KITS was because he spoke to Coburn recently about the substance of their 2014 conversation. Schwartz asked Coburn if his recollection of the 2014 conversation was correct.

Schwartz was asked if he told D'Souza that the payment at issue in 2014 involved L&T. He did not think so, adding, "If I did, that would be something Gordon reminded me about." Schwartz was asked if he told D'Souza that he advised Coburn in 2014 that he couldn't do it, but L&T could use their government affairs group. Schwartz indicated he did not make this statement to D'Souza.



### C. Recent Conversations with Gordon Coburn

Schwartz acknowledged having two conversations with Coburn in the past week or so to discuss their 2014 conversation. They spoke by phone on Saturday, August 20, 2016 and then subsequently in Coburn's office. Schwartz said after he spoke to Gilbert and she informed Schwartz he was off the investigation, Schwartz called Coburn for two reasons. First, Gilbert had reached out to Coburn and he was not calling her back. He never called people back. So Schwartz said he called Coburn to tell him to call Gilbert. Second, he wanted to discuss the 2014 conversation. He thought it was a 2013 conversation, not 2014. Schwartz asked him about it on the phone. It was a quick call.

Schwartz asked Coburn if his recollection of the conversation was correct [wherein Coburn asked two questions and Schwartz confirmed that payment could not be made to help the situation at KITS]. Schwartz said to Coburn, "This is what I remember. If I said anything different or wrong I will resign right now." Coburn confirmed his account. Schwartz subsequently asked him about it again in Coburn's office a few days later because he "wanted to look into his eyes." Coburn again confirmed Schwartz's recollection of the events. Eye-to-eye, Schwartz said, Coburn's demeanor was matter-of-fact, calm, cool, and collected.

Schwartz was not sure of the exact date of when the original 2014 conversation occurred. Coburn said his memory was accurate and Schwartz said Coburn "reminded" him that their previous conversation involved KITS. Schwartz later repeated that Gordon "reminded" him that it was a KITS project that he was having a challenge with in 2014. In their August 2016 conversation, Coburn told Schwartz that a payment had been withheld but it was an appropriate withholding under the turnkey contract. Coburn told Schwartz that the project was delayed for months and months. Schwartz asked him "how it got done" and understood that the appropriate procedures were followed. Coburn gave his assurance that no amounts were paid directly or indirectly to get the permit issue resolved.

Schwartz said he did not know how CTS ultimately obtained the building permit for KITS. He only learned that KITS received the permit when Coburn told him on August 20. Coburn said they withheld payment as they contractually were entitled to do, and many months later they received the permit. Schwartz asked Coburn if he did anything inappropriate. He said no. Schwartz said in India you can do things the right way without paying someone. Schwartz had no indication that any amounts were paid that should not have been paid. Schwartz said, "I would never authorize that. I follow the book."

### D. More Recent Conversations with Dana Gilbert

Schwartz had subsequent phone calls with Gilbert in which Schwartz discussed his 2014 conversation with Coburn. Schwartz said he was consistent in his retelling: he told Gilbert he was called into Coburn's office, where Coburn asked Schwartz two questions. Schwartz said he might have expressed his significant frustration about Admin, not for being accused of anything, but because they were in this situation. He was frustrated there was a memorandum that said they

Confidential

CTS_R17_0004334



had done things wrong. He was frustrated with his phone call with Mani about the USD 300 K. Schwartz indicated he spent fifteen years protecting the company and the memorandum alone contained things that caused him frustration.

Schwartz never discussed with Mani the subject of the conversation he had with Coburn but he said when he walked into Coburn's office in 2014, he did not know if anyone else was on the phone. Schwartz was asked about comments attributed to him by Gilbert that Mani might have accused Schwartz. Schwartz was concerned that Mani made an accusation because he was in a lot of trouble regarding the USD 300 K. Schwartz said he was trying to think who could have made the accusation, and Mani was his guess. When asked how Mani would have known about his private conversation with Coburn, Schwartz said, "Mani and the conversation are two separate things." He elaborated, "I'm saying Mani may have been trying to throw me under the bus because he knows our FCPA policy. The only other thing I could think of – and I'm not tying these together – but the other thing was the conversation. Maybe Gordon told Mani. I don't know."

Schwartz was asked, if Coburn was being rhetorical, why would that conversation have stood out as something he should be concerned about. Schwartz responded, "I did not say I was concerned. I said it was all I remembered." It was the only thing he could remember that was tangentially related to Admin. Schwartz said Coburn did not tell him in their 2014 conversation that L&T was involved in the potential payment. Schwartz said he only assumed L&T was involved because L&T did most of its work with them. Schwartz later added that to the best of his recollection, L&T did not come up in the 2014 conversation with Coburn but it might have. L&T was not something that would have necessarily stuck in his mind.

When asked if he remembered telling Gilbert that he was pulled into a meeting with Coburn in 2014 for a call regarding trouble at KITS, where he said that L&T could do what was not illegal, Schwartz responded, "I said that we put FCPA language into our contract. And that they could do what wasn't illegal."

### E. Conversation with Karen McLoughlin

The only other conversation Schwartz had about this issue was with McLoughlin.

McLoughlin knew Schwartz's and her computers were being taken and she made a comment about the investigation. Schwartz said he did not think it would be appropriate to say he could not talk to her about it. She commented how long it took when her computer was taken. She further commented that she was not surprised the U.S. folks were being looked at, but that in her experience, no one in the U.S. would have been involved in this.

### F. Conversation with Coburn, Mani, and Sridhar

Schwartz did not remember a meeting with Mani, Coburn, and Sridhar concerning the potential KITS payment.

Page 12 of 13

EAST\144789194.1



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY-WORK PRODUCT

Schwartz reviewed ELE_00961746 [Tab 110], an email chain dated April 21, 2014 from Coburn to Schwartz. Schwartz indicated he did not remember the call referenced in the email.

Schwartz reviewed IN_ELE_01166165 [Tab 113], an email call invitation dated April 21, 2014, from Coburn to Schwartz, Sridhar and Mani, referencing a follow-up call. Schwartz did not remember the topic of conversation in this call.

Schwartz reviewed IN_ELE_01075463 [Tab 140], an email chain dated August 25, 2014, including an email dated June 30, 2014, from Mani to Sridhar, Coburn, Schwartz and others, regarding permit approval. Schwartz said he did not remember the email and commented that he receives a lot of emails. Schwartz was asked if it was unusual to get an email about a permit approval. He said it happens on occasion.

## XII.  INTERNAL INVESTIGATION

Schwartz was asked about Coburn's interest [expressed in the early stages] in concluding the internal investigation in three weeks. Schwartz indicated that Coburn expressed this interest first to Gilbert but he thinks he had a similar conversation with Coburn himself. Coburn said the investigation was interrupting the real estate business. He was worried about Mani and Joseph Korah, Associate Vice President, Admin.

## XIII. FACILITATION PAYMENTS

Schwartz was asked about facilitation payments with approval by Legal. He mentioned two payments: one for USD 50 K and one for USD 500. The USD 50 K payment was ultimately determined to be a payment for legitimate services and not a payment to a government official. Mike Hynes, DLA Piper, was involved. They looked at the breakout, which described it as for architectural or something, so Hynes said it was fine. According to Schwartz, Hynes said based on what CTS heard from L&T, the payment was fine. Afterward, CTS put in FCPA language in all of their L&T contracts. The other payment was a USD 500 facilitating payment approved as a one-time payment.

## XIV.  MEPZ ENVIRONMENTAL ISSUES

Schwartz was asked if he was familiar with the environmental issues at the Madras Export Processing Zone ("MEPZ"). He said Anand or Deepa brought one of the facilities to his attention. He did not remember the issue.

*   *   *

At the end of the interview, Schwartz was instructed to keep the content of the discussion confidential.

Confidential                                                                                                                CTS_R17_0004336