# EXHIBIT 30

FEDERAL BUREAU OF INVESTIGATION

Date of entry    06/22/2018

    BALAJI SUBRAMANIAN (BS), was interviewed at the Four Seasons located at 190 Orchard Blvd, Singapore. Trial Attorney Kevin Gingras, Department of Justice, Fraud Section (DOJ), AUSA Courtney Howard, United States Attorney's Office, District of New Jersey, and FBI Special Agent (SA) Kelly Blanchfield participated in the interview. BS was represented by legal counsel William Stellmach, Zachary Cobb, and John Joy from Willkie Far & Gallagher.

    Prior to the interview commencing, BS reviewed and signed a proffer agreement with the DOJ. BS was told to be truthful as to whatever he can remember. BS was advised that at any point, he can discuss with his legal counsel or take breaks as needed. After being advised of the identity of the interviewing agent, DOJ, and AUSA, and the nature of the interview, BS provided the following information:

    BS graduated college with a civil engineering degree and a post graduate degree in construction management. Subsequently, BS began employment with L&T. BS started as a Site Construction Engineer on the New Delhi International Airport Project for L&T. BS was responsible for work force management and resources on site. BS transitioned to the planning office of L&T which focused on the planning of projects and identification of delays. BS relayed the information about the project status to clients. BS was in this role for approximately two and a half years.

    BS transferred to the Mumbi Office of L&T in the tendering department until 2011. In early 2011, BS transferred to L&T's Headquarters located in Chennai, India in the resource department. BS did not have any client interactions in the resource department.

    In 2012, BS was assigned as a Planning Engineer for the COGNIZANT project: KITS. BS's responsibilities included relaying expectations to customers about the status of projects as well as micro level planning that included the design phases, procurement phase, and execution phase of the project. BS had limited interactions with the client. BS was responsible for site coordination and managed resources for the KITS

| Investigation on | 05/21/2018 | at | Singapore, Singapore (In Person) |
|---|---|---|---|

File # ███████████████████████     Date drafted   06/12/2018

by  BLANCHFIELD KELLY SUSAN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DOJ-302-00000152

project. BS supervised approximately 10-12 Planning Engineers. BS worked on the KITS project until approximately August 2015 when the project was in a closing phase.

After August 2015, BS worked in the tender department for L&T and reported to the Tendering Head. BS's responsibility was to interact with clients and submit bids on behalf of L&T.

*{Agent Note: BS was shown document DOJ_BS000001 through DOJ_BS000006, which was an e-mail correspondence dated April 22, 2013 through November 26, 2013 with the subject of "FW: KITS- Update required-Urgent"}*

TNK was the Head of Operations at the Cluster Level for L&T. The Cluster Manager managed project managers and had approximately 5-6 projects. The clusters were based on geographical areas.

COGNIZANT wanted to employ approximately 70,000 employees on the KITS campus. L&T designed the facility. The ENSYS Consultant was a consultant to assist with getting the environmental permit for the KITS facility. The consultant was an expert in understanding the environmental standards for the region. The consultant submits the paperwork to the government agencies and was responsible for doing a presentation to the government office. The consultant was NATHAN LNU.

NATHAN was the only consultant that was used on the KITS project.

VENKATESAN N was the site project manager for KITS. VENKATESAN was BS' point of contact for COGNIZANT. BS did not interact with SRIDHAR THIRUVENGADAM, Vice President of the Strategic Initiative Department or SRIMANIKANDAN RAMAMOORTHY (MANI), Head of Infrastructure and Real Estate. MANI participated in the Management Review Meetings (MRM).

BS had a clear role in regards to obtaining statutory approvals. COGNIZANT required the information about the design of the facility from L&T in order to provide that information to the government agencies. BS assisted with submitting the paperwork to the government agencies and updating COGNIZANT once the approval for the planning permit was obtained. COGNIZANT was responsible to pay any fees associated with the planning permit. There were times that L&T paid fees on behalf of COGNIZANT and would seek reimbursement based on the client's request.

BS did not recall if the planning permit application was processed by the Chennai Metropolitan Development Authority (CMDA).

Continuation of FD-302 of (U) Interview of BALAJI SUBRAMANIAN , On 05/21/2018 , Page 3 of 7

*{Agent Note: BS was shown document DOJ_BS000041 through DOJ_BS000043, which was an e-mail correspondence dated December 11, 2013 with the subject of "COGNIZANT KITS- MRM 10 MOM- Draft Copy"}*

ARUN RAJA MOHAN was the project architect for L&T and attended the review meetings. The attachment was the Minutes to the Meeting. BS drafted the attachment.

The Statutory Approvals line item (#5) was information that was provided from the project manager about a MEPZ November meeting. BS did not attend the MEPZ November meeting.

At the time that the attachment was drafted, the planning permit application was submitted and there was back and forth communications about discrepancies and missing documents. COGNIZANT was putting pressure on L&T to rectify the corrections and resubmitted the required paperwork. BS was informed about the communications regarding the planning permit because it was BS' responsibility to invoice the customers on a monthly basis and provide updates to the client.

BS did not recall what actions were being taken by L&T; however, he thought that it could be about missing documents.

*{Agent Note: BS was shown document DOJ_BS000018, which was an e-mail correspondence dated December 14, 2013 with the subject of "COGNIZANT-KITS Project, Sholinganallur- Minutes of MRM- 10 held on 4th Dec '13 at site- Reg"}*

BS did not recall if any feedback was provided from the draft copy to the final copy.

BS was not aware of anything specific that happened in December 2013 through April 2014 to expedite the approval of the planning permit. BS recalled that the planning permit was delayed and that COGNIZANT was frustrated. CGONIZANT wanted the facility to be operational as soon as possible.

The MRMs were supposed to happen monthly; however, some months were missed at the start and end of the project. COGNIZANT scheduled the MRMs.

BS did not go to lunch often after the MRMs. It would have been very unusual to go to lunch with a client after the MRM. BS did not recall going to lunch with COGNIZANT at a Thai restaurant.

*{Agent Note: BS was shown document DOJ_BS000025, which was an e-mail correspondence dated November 3, 2014 with the subject of "RE: COGNIZANT KITS Sholinganallur- Extension of Time- Reg"}*

The attachment was a schedule of approval dates. The project manager or the client would give BS the approval dates since the client was interacting with the government agencies. The client gave BS the information, BS inputted the information in the presentation, and then presented back to the client.

*{Agent Note: BS was shown document DOJ_BS000021 through DOJ_BS000024, which was an e-mail correspondence dated March 26, 2014 with the subject of "COGNIZANT KITS Sholinganallur- Minutes of the Management Review Meeting held on 14 Mar '14-Reg"}*

BS was unsure if he drafted the attachment. BS assumed that all of the points that were listed in the attachment were discussed during the meeting; however, BS did not recall the conversation. BS did not remember anything different about this review meeting.

*{Agent Note: BS was shown document DOJ_BS000045 through DOJ_BS000051, which was an e-mail correspondence dated December 3, 2013 through April 15, 2014 with the subject of "FW: KITS - MOM for the statutory meeting Held on 27th Nov 13"}*

COGNIZANT pressured L&T to get the approval from the government agency quickly. BS did not recall any discussions about a meeting with the Ministry of have COGNIZANT meet with the Chief Ministry (CM).

BS remembered that the issues with COGNIZANT being elevated up the chain at L&T. COGNIZANT wanted the facility to be operational and needed the approvals quickly even though L&T did not have any control over the approval process. L&T and COGNIZANT were helpless since the application was with the government agencies.

BS was unsure what the principal decision was and BS would not have had the privilege of that information. BS was unsure why the e-mail correspondence was forwarded to him. The date was not of any significance to BS.

There was a couple instances in which COGNIZANT froze payments to L&T. BS was unsure about the reasons for the delay in payments. BS did not see any relation between the freeze of payments and the planning permit.

L&T did not hire a consultant to expedite the planning permit approval in April or May.

**VARIATION PROCESS**

The contract agreement listed all of L&T's responsibilities for each project. L&T prepared a list of variations for modifications to the project that came up after the contract was signed. The variations were submitted to COGNIZANT in order to seek reimbursement for the variations which resulted in a negotiation.

The cost of the variations was given to BS from the site. BS did not recall any variation inputs for statutory approvals. Statutory approvals were already included in the contracted sum so there would not be a separate variation line for statutory approvals.

*{Agent Note: BS was shown document DOJ_BS000007 which was an e-mail correspondence dated August 6, 2014 with the subject of "Cognizant KITS Sholinganallur- Variation/Extra Items"}*

VRH was RAMESH VADIVELU. DHINESH NAGRAJ was a planning engineer that worked with BS. The e-mail was drafted in preparation for the variation process.

#1 in the e-mail was L&T claiming for the overstay costs that L&T incurred at the KITS site. When the contract was signed for the KITS project, L&T was supposed to have 100% access to the land in order to start construction. The sales deed for the plot of land had discrepancies. In order to rectify the discrepancies, COGNIZANT caused a delay with the KITS project. The plot of land was measured again and approved by the government agencies in India approximately a year later. L&T incurred direct costs to assist COGNIZANT with the land issue.

#2 in the e-mail was for the extended stay expenses that L&T incurred. The 15.2 amount was a "rule of thumb" number. BS took the base from the contract and calculated 15.2 based on 10-12 months of extended stay, which was a breakdown of 1.5 Crores per month. The contract sum was 925 Crores for indirect costs that included mobilizing staff, expenses on site, and setting up offices. The indirect costs were approximately 35-45 Crores for 34 months. BS calculated 1.5 Crores per month for 10 months.

During the extended stay, L&T incurred expenses to stay on site. The project was contracted to be 34 months and due to the delays, L&T was on site for 44 months. Per the contract, L&T was supposed to get compensated for delays from the government agencies. This was a protection as a

contractor. BS was not involved in other COGNIZANT projects so he was not aware if the reimbursement happened during other COGNIZANT projects.

L&T did not incur any expenses due to extended stay from the land issue at COGNIZANT. L&T was on site and started construction while COGNIZANT fixed the land issue.

#3-6 in the e-mail came from VADIVELU. BS did not know why Siruseri expenses were included in the KITS variations. BS did not know how VADIVELU calculated the Siruseri amount.

*{Agent Note: BS was shown document DOJ_BS000038 through DOJ_BS000040, which was an e-mail correspondence dated August 22, 2014 with the subject of "COGNIZANT KITS Sholinganallur- Extension of Time- Letter- Reg"}*

The e-mail discussed a flooring item that was included in the variation for the KITS project. In August 2014, the KITS building was completely finished and COGNIZANT wanted to change the flooring. The variation was for the indirect costs associated with the design changes.

*{Agent Note: BS was shown document DOJ_BS000033 through DOJ_BS000037, which was an e-mail correspondence dated October 6, 2014 through October 18, 2014 with the subject of "FW: COGNIZANT KITS Sholinganallur- Client Invoice Certification - Reg"}*

L&T sought reimbursement for the extended stay issue at the KITS facility. L&T was aware that the government offices was taking time to approve the planning permit which caused a delay in the project. L&T assisted with the planning permit by submitting documents promptly; however, there was nothing else that L&T could have done.

*{Agent Note: BS was shown document DOJ_BS000016 through DOJ_BS000017, which was an e-mail correspondence dated October 29, 2014 with the subject of "COGNIZANT KITS VARIATION CLAIMS"}*

The variation process was ongoing and started towards the end of the project. L&T looked at the final sum of the variations and gave a breakout by line items for approval to the client. All of the variation items were requested by COGNIZANT except "#32 Approvals/Campus Regularisation".

*{Agent Note: BS was shown document DOJ_BS000008 which was an e-mail correspondence dated January 13, 2015 with the subject of "Variation"}*

Continuation of FD-302 of  (U) Interview of BALAJI SUBRAMANIAN  , On  05/21/2018  , Page  7 of 7

BS did not remember submitting a variation claim to COGNIZANT or to remove the language regarding statutory approvals. BS was not sure for the reason that the e-mail was drafted. BS was unaware that the item listed in the e-mail was previously rejected by COGNIZANT. BS did not recall any conversations with COGNIZANT or internally at L&T that discussed swapping specific line item variations for statutory approvals.