# EXHIBIT 36

**2017.12.07 – Call with L&T Counsel**

DOJ: Kevin Gingras, Andrew Bruck, Rachelle Linsenmayer

Debevoise & Plimpton: Saqib Alam, Colby Smith, Dave O'Neil

**Colby**: There are two things to update you on. Our brute force review of documents restored and then second an update on the forensic work stream which has occupied the last couple of productions we've given to you.

You'll remember from the last call we're trying to look harder at March to June 2014, looking for a possible payment on the KITS project. We also focused on earlier 2014 and late 2013 months to find a demand for a payment from an official.

We made limited use of search terms and more of an eyes on review. Mr. Subramanian's emails were treated separately from the other custodian. There's were 6 others we looked at. S was 120k emails restored from backup tapes covering 1/2013-1/31/2014. We looked at everything he had and didn't cover any search terms, we looked at everything. We made 2 exclusions from things restored from backup.

First were emails outside of the 2013-2014 time period. We were looking at the kits project and that was the most relevant period. To the extent that there may have been captured earlier emails we didn't look at those. That was 108k emails.

The second exclusion was emails with yahoo groups—this was a common email address Mr. Subramanian and school classmate friends of his used as a group to communicate. There were 21-22k of those emails in the time period. We looked at 13k of those before deciding they were entirely irrelevant.

All told, we restored 250k emails from the backup tapes for Mr. Subramanian and reviewed 120k of those—every non yahoo groups email between 2013-2014.

For the remainder, we used search terms designed to exclude emails with nothing to do with cognizant. We were sure to capture every document that referred to cognizant and also looked for key cts employees on the kits project. For Mr. Vadivelu these emails were drawn from backup tapes covering all of 2013-2014. For 5 other custodians the backups covered 12/31/2013-June 2014 which we thought was the most relevant period and this was a large total. The other 5 custodians include Satish, naturan, kanan, lakhshmanan, nanda kumar.

For Vadivelu we also recovered emails found in several pst files. Several had been dated October 2016 so we restored them. We did not use search terms but looked at all of the emails. I don't have a count but it was a couple of bytes, all added together.

Quality control review looked at 32k records, senior lawyers reviewed, to make sure —some reviewers were in our office in London and then in India doing the review—we had the senior lawyers review work of India and have the Indian team do a quality check for those documents in London that our team was looking at.

The review did not yield new findings. No correspondence from late 2013 or early 2014 regarding payments. Nothing from 3-6/2014 relating to payments or the claim process we discussed when we

met. Based on the hints given for what to look for we thought it would be possible we would find more documents but we didn't.

L&T devoted 18 reviewers to the project. We've reviewed now close to 350k emails over the KITS, PUNE, and Hyderabad project. This was a large effort and they continue to have questions to us over the DOJ's jurisdiction on the issue.

We can't think of any other backups to turn to or other custodians. So we're preparing to move on in our internal review and look at the Sinuseri and Kochi projects.

The forensic work stream—I don't know if you've started looking at those productions—but that is to identify money flows and suspicious transactions in the construction accounting records. We've provided everything that reflects the work done to the date of the production.

As I mentioned, Subraamashan (?) has in house forensic capability. They ID'd more than 1000 transactions with cognizant to be reviewed and have examined the line items submitted by L&T for the KITS project.

We have made two productions so far and have another production in the work. Some of the documents in the forensics are more interesting than others and we thought it might make sense for us to come in and talk to you about our findings. We do still have at least one more production to make but once we've done that we would be in a position to talk to you. Perhaps early to mid January.

Those are the two things I had to report on.

**KG**: This is very helpful. We appreciate the scope and nature of what you've accomplished. Andrew may have a different take but I find the fact that there's nothing that got turned up somewhat surprising so maybe we're at a point where we need to evaluate on our side a way to perhaps steer you in certain directions in a bit more targeted fashion because I am surprised given the effort and scope.

**AB**: I think that we can come back to you guys with some more targeted information. Going off of the Debevoise presentation to us a couple months ago, you flagged the change order request for 22.6crores for statutory approvals that gets substituted out for other requests. You guys flagged that as suspicious and it kept coming up—have you guys come to any conclusions about what that initial request for 22.6 crores statutory approvals was? Why would L&T have requested reimbursement for those funds and have you found a statutory approval that that was linked to?

**Colby**: We've asked people we've spoken to about this and there's not a lot of documentation that backs up those numbers. **We were told this was an effort to claim additional money because of delays to the project. They chose the statutory approvals as the section because they knew cog would not pay a delay claim.**

**We haven't found documentation that backs up these claims and have not found consultants hired for the statutory approval process who were paid anything like that sum of money for this work. We haven't seen any connection between consultants and some of those large, round number dollars. We've reported to you everything we were able to uncover.**

**We saw something similar in the PUNE project—505 crore for statutory approvals and we were given a similar explanation.**

DOJ-EH-0000000143

**AB**: Why would L&T seek payment from cognizant for that delay? As a business matter why would they be reimbursed for that. I thought cognizant would be the ones who would be out of money and I thought L&T had to get an extension of time.

**Colby**: As you know there are different kinds of delays. **The explanation we were provided was that there were certain delays at the outset of one of the projects and that those were viewed as caused by cog's failure to obtain the right to start work on the project. But they said they had to rent equipment and brought it to the job sight and lined up workers but were unable to start. The idea for those claims is to recover those costs.**

**They were also trying to recover costs for delays after the project began. They incurred cost even though they were not making progress. Again, without looking back at my notes, that is how I recall it**.

**AB**: Okay we'll huddle and get back to you. It would be helpful to know, do you anticipate a) producing emails to the government from this review that are responsive to statutory approvals and planning permits and do you anticipate making these 6 custodians available for interview by government authorities.

**Colby**: My understanding is that there is not a lot to produce to you. You can interpret that in that we've missed something in this process—we tried to describe to you how we have been thorough—but what I hope it means is that the first round of work we did, we found what was there to be found. We knew this brute force review was reaching beyond the obvious places. It is a little surprising nothing more was found.

Making employees available, in principle L&T is prepared to do that. We have to work our way through the issues that would present from an employment perspective. They have indicated to the extent employees can be persuaded to make themselves available, it would be preferable if we could do that in a neutral location like London. I will raise that with them, now that you've asked. We'll raise those employees in particular.

One thing you should be aware of is that Mr. Subramanian has personal counsel at this point, Jeff Knox. We have not determined if we would be in a position to represent him if he were interviewed. If you wanted to work out talking with him it would be better to talk to Jeff about that.

**AB**: Okay I think we'll come back with more specifics but it will be good to raise with L&T that we anticipate speaking with employees.

**KG**: To address the neutral location, our preference it always the U.S. but we understand there are reasons to deviate so we're open to that idea if that makes the most sense for everybody.

**Colby**: And I'm sure you can appreciate maybe none of these people travel to the U.S. regularly or maybe ever. So there, it would just might be easier to persuade them that way [by meeting in London].

We'll address it with them for those specific people and if you have a list you'd like to send, please do.

**KG**: Thank you. We will try to figure out where we might be able to help you—we'll get back to you.